# Exhibit I

Guy Engel
Bailiff and Process Server,
2 Rue Guido Oppenheim
L-2263 Luxembourg

**SUMMONS TO APPEAR BEFORE THE LUXEMBOURG DISTRICT COURT
SITTING IN COMMERCIAL MATTERS
ACCORDING TO THE CIVIL PROCEDURE**

In the year two thousand and twenty-two, on ten June

**At the request of:**

1. **Blue Skye Financial Partners S.à r.l.**, a private limited liability company established and having its registered office at 5 Côte d'Eich, L-1450 Luxembourg, registered in the Luxembourg Trade and Companies Register under number B 193.016, represented by its management board in office,

    (hereinafter referred to as "**Blue Skye**")

2. **Luxembourg Investment Company 159 S.à r.l.**, a private limited liability company established and having its registered office at 5 Côte d'Eich, L-1450 Luxembourg, registered in the Luxembourg Trade and Companies Register under number B 210.208, represented by its management board in office,

    (hereinafter referred to as the "**Creditor of TPECs**")

    (hereinafter referred jointly to as the "**Plaintiffs**" or the "**Claimants**"),

who shall be represented in the present case by **Bonn Steichen & Partners,** a limited partnership, established and having its registered office at Building C2, 2 Rue Peternelchen, L-2370 Howald, registered in the Luxembourg Trade and Companies Register under number 8211933, registered in list V of the Luxembourg Bar Association, represented by its manager currently in office, namely the private limited liability company BSP S.à r.l., established and having its registered office at Building C2, 2 Rue Peternelchen,L-2370 Howald, registered in the Luxembourg Trade and Companies Register under number B211880, itself represented for the purposes of the present proceedings by Mr Fabio Trevisan, Barrister, (box no. 9), at whose office address for service is elected,

I, the undersigned Guy Engel, bailiff and process server, of 2 Rue Guido Oppenheim, L-2263 Luxembourg, registered with the District Court of and in Luxembourg,

HAVE SERVED A SUMMONS TO

1. **Mrs Daniela Italia**, company manager, electing professional address for service at Intertrust Group, 6 Rue Eugène Ruppert, L-2453 Luxembourg;

2. **Mr Jean-Marc McClean,** company manager, electing professional address for service at IQ-EQ, 12C Rue Guillaume Kroll, L-1882 Luxembourg;

3. **Mr Elliott Greenberg**, company manager, of 600 Steamboat Road, 06830 Greenwich Connecticut, United States of America;

4. **Mr Victor Schuh**, company manager, electing professional address for service at Intertrust Group, 6 Rue Eugène Ruppert, L-2453 Luxembourg;

5. **Mr Alfred lzak Gosling**, company manager, electing professional address for service at Intertrust Group, at 6 Rue Eugène Ruppert, L-2453 Luxembourg;

6. **Mr Christos Stavrou**, company manager, electing professional address for service at IQ-EQ, 12C Rue Guillaume Kroll, L-1882 Luxembourg;

7. **Mr. Aiden Aspelding**, company manager, electing professional address for service at Intertrust Group, 6 Rue Eugène Ruppert, L-2453 Luxembourg

8. The private limited liability company **Project Redblack S.à r.l.**, a company established and having its registered office at 42-44 Avenue de la Gare, L-1610 Luxembourg, registered in the Luxembourg Trade and Companies Register under number B.213.015, represented by its management board in office, (hereinafter referred to as "**Project Redblack**");

9. **Genio Investments LLC**, a company incorporated under the laws of the United States of America, having its registered office at 1209 Orange Street, Corporation Trust Centre, 19801 Wilmington, United States of America, registered with the *Division of Corporations of the Secretary of the State of Delaware* under number 6368216, represented by its management body in office (hereinafter referred to as "**Genio**");

10. King George Investments LLC, a company incorporated under the laws of the United States of America, having its registered office at 1209 Orange Street, Corporation Trust Centre, 19801 Wilmington, United States of America, registered with the *Division of Corporations of the Secretary of the State of Delaware* under number 6368212, represented by its management body in office (hereinafter referred to as "King George");

11. The private limited liability company **Rossoneri Sport Investment Luxembourg S.à r.l.**, established and having its registered office at 12CRue Guillaume Kroll, L-1882 Luxembourg, registered with the Luxembourg Trade and Companies Register under number B. 211.625, represented by its management body in office (hereinafter referred to as "**Rossoneri Spor**t")

12. The private limited liability company **Elliott Advisors (UK) Limited**, a company established and having its registered office at Park House, 116 Park Street, London, W1K 6AF, United Kingdom, registered with the *Companies House* under company number 02989338, represented by its management body in office (hereinafter referred to as "**Elliott UK**");

13. **Associazione Calcio Milan  S.p.A.**, a company incorporated under Italian Law, established and having its registered office at 8 Via Aldo Rossi, 20149, Milan, Italy, registered with the Chamber of Commerce of Milan under number 569909 and with tax number 01073200154, represented by its management body in office;

14. **Milan Entertainment S.r.l.**, a company incorporated under Italian law, established and having its registered office at 8 Via Aldo Rossi, 20149, Milan, Italy, registered with the Chamber of Commerce of Milan under number 1355664 and with tax number 10219030151, represented by its management body in office;

15. **Milan Real Estate S.p.A.**, a company incorporated under Italian law, established and having its registered office at 25 Via Milanello, 21040 Carnago, Italy, registered with the Chamber of Commerce of Varese under number 285406 and tax number 13287110152, represented by its management body in office;

16. **Mr Alfredo Craca**, in his capacity of receiver of the pledge, electing professional address for service at 2 Via degli Omenoni, 20121 Milan, Italy;

17. **Footballco Intermediate Coöperatief U.A**. , a company established and having its registered office at 10 Basiveg, 1043AP Amsterdam, the Netherlands, registered in the Trade and Companies Register under number 78443962 (RSIN 861399663), represented by its management body in office;

18. **Mr Giovanni Caslini**, company manager, electing professional address for service at Blue Skye Financial Partners, 5 Côte d'Eich, L-1450 Luxembourg;


TO ENTER AN APPEARANCE THROUGH A BARRISTER WITHIN THE LEGAL TIME LIMIT OF FIFTEEN DAYS, IN ADDITION TO THE TIME LIMITS FOR DISTANCE, IF ANY, AT 9:00 A.M., BEFORE THE COURT OF THE REGION OF AND IN LUXEMBOURG, SECOND SECTION, SITTING IN COMMERCIAL MATTERS IN ACCORDANCE WITH THE PROCEDURE APPLICABLE IN CIVIL MATTERS, CITÉ JUDICIAIRE, BÂTIMENT CO, L-2080 LUXEMBOURG, FOR THE REASONS SET OUT ABOVE,


WITH A DECLARATION, IN ACCORDANCE WITH ARTICLES 79, 80 AND 154 OF THE NEW CODE OF CIVIL PROCEDURE, THAT IF THE PRESENT SERVICE IS MADE IN PERSON AND THE DEFENDANT DOES NOT APPEAR, THE JUDGMENT TO BE GIVEN SHALL BE DEEMED TO HAVE BEEN HANDED DOWN AFTER TRIAL WHICH MAY NOT BE SET ASIDE.

**I.** 1. **THE FACTS**

A. STRUCTURE OF THE GROUP

The share capital of Project RedBlack of €12,000, represented by 12,000 shares with a nominal value of €1, is distributed as follows (**Exhibits 1 and 2**):

- 3,447 Class A shares with a nominal value of €1 are held by the US company Genio Investments LLC;
- 8,041 Class A shares with a nominal value of €1 are held by the US company King George Investments LLC.

  These two majority Class A partners are investment vehicles belonging to the American investment group Elliott Management, which manages assets of more than $51.5 billion worldwide (hereinafter referred jointly to as "Elliott").

- 512 Class B shares with a nominal value of €1 are held by the Luxembourg company Blue Skye.

The management board of Project RedBlack is composed of :

- Mrs Daniela Italia, Class A manager, appointed by Elliott;
- Mr Jean-Marc McClean, Class A manager, appointed by Elliott; and
- Mr Giovanni Caslini, Class B manager, appointed by Blue Skye.

Project RedBlack is the sole partner of Rossoneri Sport, of which it holds all 20,000 shares (11,999 Class A shares and one Class B share) (**Exhibit 3**).

Rossoneri Sport holds almost all the shares of Associazione Calcio Milano S.p.A. or A.C. Milan, the internationally known Italian football club ("**AC Milan**"), which constitutes its only asset.

Until 17 May 2022, the management board of Rossoneri Sport was composed as follows:

- Mr Victor Schuh, Class A manager;
- Mr Alfred lzak Gosling, Class A manager;
- Mr Giovanni Caslini, Class A manager;
- Mr Jean-Marc McLean, Class B manager; and
- Mr Elliott Greenberg, Class B manager.

Since 17 May 2022, the management board of Rossoneri Sport is composed as follows:

- Mr Victor Schuh, Class A manager;
- Mr Aiden Aspelding, Class A manager;
- Mr Christos Stavrou, Class A manager;

- Mr Jean-Marc McLean, Class B Manager; and
- Mr Elliott Greenberg, Class B manager.

The structure of the group can therefore be summarised as follows (Exhibit 4):

| King George Investments LLC | Genio Investments LLC | Blue Skye Financial Partners Sàrl |
|---|---|---|
| 8,041<br>Class A shares | 3,447<br>Class A shares | 512<br>Class B shares |

Class A managers: D. Italia, J-M. McClean — Project RedBlack Sàrl — Class B manager: G. Caslini

100% — 11,999 Class A shares, 1 Class B shares

Class B managers: E. Greenberg, J-M. McClean — Rossoneri Investment Luxembourg — Class A managers: G. Caslini until 17 May 2022, A. Gosling until 17 May 2022, V. Schuh

Ca. 99.93%

Associazione Calcio Milano SpA

B. ACQUISITION OF AC MILAN: THE BIRTH OF A PARTNERSHIP BETWEEN THE ELLIOTT GROUP AND BLUE SKYE

Without prejudice to a more exact date, in the course of 2017 Blue Skye and the Elliott Group set the terms of their investment partnership in AC Milan through a contractual package described in greater detail in the section below, formed by the Acquisition Facility Agreement, the general terms and conditions governing the *Tracking Preferred Equity Certificates* and the articles of association of the companies carrying the investment (Project Redblack and Rossoneri Sport).

These documents allocate roles in clear terms: Blue Skye identified the investment opportunity, negotiated and structured it, while the Elliott Group was to finance it.

The governance of the structures was a key point for Blue Skye: Blue Skye was guaranteed a place on the various management bodies (board of directors and management board), at all levels of the structure, including within the company that was the object of the investment, AC Milan.

Furthermore, as in any private equity investment, in addition to any dividends, the parties to the joint venture agree on other remuneration for the investment made, commonly known as management fees (TPECs Fixed Yield) and the Carried Interest (Variable Fixed Interest). The Carried Interest is in fact the

main remuneration of the parties to the partnership who thus share the profit. Blue Skye is entitled thereto as it is the originator of the investment in AC Milan and its management.

In the case at hand, an email of 23 March 2017 from Elliott UK to the managers of Blue Skye (**Exhibit 29**) specifies the following:

> *"( ... ) this is to confirm that the terms agreed apply only to the loans granted to the bidder. Should we get additional value in the form of equity participation (warrants or else), the carry payable to you on these instruments will be 8% of the profits realised on the instruments. No further mgmt. [*management*] fee will be payable on these instruments".*

This agreement to share the remuneration of the joint project between the parties was subsequently implemented by the negotiation and participatory debt instruments known as 'TPECs' (as will be further elaborated in the following section) issued by Project Redblack.

As will be described in this writ, the Elliott Group, by de facto excluding Blue Skye and its representatives from the divestment process (as soon as it was contemplated), grossly and knowingly violated the partnership agreement which forms the basis of the co-investment in question, with the objective of depriving Blue Skye of the remuneration initially agreed upon (the carried interest).

This behaviour, as will be demonstrated by the facts, is to be qualified as contractual fraud, an element which forms the basis of the principle of *fraus omnia corrumpit*.

C. FINANCING OF ROSSONERI SPORT'S ACQUISITION OF AC MILAN

Project RedBlack financed Rossoneri Sport's acquisition of AC Milan in April 2017 by way of an acquisition facility agreement dated 13 April 2017 (hereinafter referred to as the "**AFA**") (**Exhibit 5**). Through the AFA, Project RedBlack committed to finance Rossoneri Sport up to €202,000,000 (see in this sense Article 2 of the AFA).

However, Project RedBlack demanded that guarantees be provided that it would be fully repaid. Therefore, a first rank pledge on the shares of AC Milan {hereinafter referred to as the "**Pledge**") was granted to it by Rossoneri Sport pursuant to a contract concluded on 13 April 2017 (**Exhibit 6**), amended on 31 July 2017 (**Exhibit 7**).

1. Conclusion of an acquisition facility agreement dated 13 April 2017

2. Acquisition following the acquisition facility agreement concluded on 13 April 2017

Project RedBlack    Acquisition facility agreement    Rossoneri Sport    Acquisition    AC Milan

3. Senior pledge on the shares of AC Milan granted by Rossoneri Sport.

In order to be able to meet its obligations under the AFA, Project RedBlack issued hybrid credit instruments called "Tracking Preferred Equity Certificates" (hereinafter referred to as the "**TPECs**") pursuant to an agreement entered into on 10 April 2017 (**Exhibit 8**). Thus, an agreement by and between the investors was concluded on the same date (hereinafter the **"Investors Agreement" Exhibit 30**).

Pursuant to the terms of the TPECs, the Claimants are TPEC holders. Thus, the Applicant sub2), Luxembourg Investment Company 159, is the holder of 10,735,567 Class B TPECS for a total amount of € 10,735,567. Blue Skye holds 10 TPECs of Class A-2.

1. In order to be able to meet its obligations under the AFA, Project RedBlack has issued TPECs, pursuant to an agreement entered into on 10 April 2017

Project RedBlack Issue of TPECs

Luxembourg Investment Company 159

TPECs creditors

Blue Skye

TPECs creditors

Other creditors

2. Luxembourg investment Company 159 subscribed to 10,735,567 Class B TPECS for a total amount of €10,735,567. Blue Skye subscribed to 10 Class A-2 TPECs.
   Other creditors subscribed to Class A-1 TPECs, for a total amount of €240,724,434.

In order to meet AC Milan's cash flow requirements, new TPECs have been issued. Thus, as of the date hereof, the total number of TPECs issued by Project Redblack amounts to 733,728,971 for a total amount of € 733,728,971.

Interest-free associated loans have also been granted (see in this respect **Exhibit 9)**.

1. To meet the cash flow needs of the A.C. Milan, new TPECs were issued for a total amount of 482,268,971 to date.

Associated loans

Luxembourg Investment Company 159

Project Additional issue of TPECs TPECs TPECs creditors

RedBlack

Blue Skye

Creditors of TPECs

Other creditors

TPEC holders are thus creditors of Project Redblack for a total amount of €733,728,971.

This total amount was injected in Rossoneri Sport on the basis of the AFA as well as by the loans granted.

Rossoneri Sport

RedBlack project

Associated loans

Luxembourg Investment Company 159

Creditors of TPECs

1. Injection of the total amounts receivable in Rossoneri Sport on the basis of the AFA.

Rossoneri Sport is therefore now liable to the Project RedBlack for a total amount of €1,231,048,383 (**Exhibit 10**).

Finally, the Investors Agreement provides certain assumptions concerning the Variable Yield of the investors, among which it is indicated that the Class A-2 holders, including Blue Skye, are creditors to 11% of the remaining revenues of the Class A Eligible TPEC[1].

D. THE DELIBERATELY OBSCURE PROCESS OF DISPOSAL OF AC MILAN BY ELLIOTT

On 1 June 2022, a press release appeared on AC Milan's website stating that "RedBird Capital Partners ("RedBird") and Elliott Advisors UK Limited ("Elliott") today announced that they have reached a definitive agreement for RedBird to acquire Associazione Calcio Milan"[2] (**Exhibit n° 11**).

This officialization follows weeks of rumours (since mid-April 2022) of an imminent sale, relayed the press, without the Claimants ever having been able to obtain any information on this sale.

In this respect, the exchanges between Mr Salvatore Cerchione, one of the economic beneficiaries of Blue Skye, and Mr Gordon Singer, one of the economic beneficiaries of the Elliott Group and an executive occupying key positions in this group, including in Elliott UK (**Exhibit 31**) between mid-April and the beginning of May 2022, are enlightening.

[1] Clause 7.3 Scenario (3) (b) (ii) of the Investors Agreement

[2] Translator's note: the original English text, which had been translated into French in the body of the text, was cited verbatim here.

Thus, in an e-mail dated 19 April 2022 (**Exhibit 25**), Salvatore Cerchione picked up on the press articles announcing a possible sale of AC Milan's shares, stating that:

- He considered that the sale price mentioned in the press was an underestimate of the Club's value;
- The process of identifying a buyer had to be structured to maximize the value of the Club and the work done in recent years;
- It was therefore necessary to wait until the end of the Championship (2021-2022) and then to launch a tender with a specialist advisor in this area.

Gordon Singer's response was unmistakable (**Exhibit 25**): "I agree we are aligned and focused on maximizing value."[3]

However, on 23 April 2022 (four days after this exchange), a new email was sent to Gordon Singer by Salvatore Cerchione following a telephone conversation between them (**Exhibit 26**).

In this e-mail, it is stated that  Gordon Singer had systematically confirmed to Salvatore Cerchione  since 25 March 2022 that no sale process was underway for AC Milan shares. However, on Friday 22 April 2022, Gordon Singer suddenly admitted that in fact the Elliott Group had put the Club up for sale and had even signed an exclusivity agreement with a Bahraini company for a price of €1.1 billion. The e-mail also highlights the fact that no bidding process was carried out.

Thus, on 19 April 2022, deliberately lied to Salvatore Cerchione indicating that he agreed with Salvatore Cerchione on the strategy to be followed for the sale of the Club, should Elliott wish to sell (i.e. a sale after the end of the Championship through a bidding process).

Following this email Blue Skye was kept in the dark about the ongoing sale process.

For this reason, on 5 May 2022, Salvatore Cerchione pointed out to Gordon Singer that the sale process followed by the Elliott Group was one-sided and secretive, did not maximize the return on investment since it did not even reimburse the investment made, and did not allow any potential buyer to make an offer allowing a sound sale process aimed at obtaining the real market value (Exhibit 27).

The Elliott Group was therefore requested to respect the principle of transparency and the rules of governance by communicating all the data relating to the current sale process. It will be established below that this request has remained unanswered and that to date Blue Skye only has fragmentary information.

For example, Elliott UK, the entity that concluded the agreement to buy AC Milan's shares, deliberately lied to Blue Skye (through its manager) about the existence of a possible sale that it was negotiating in parallel, and refused to communicate any document relating to this process once it became clear that such a process existed.

Even the manager appointed by Blue Skye within Project RedBlack (also manager of Rossoneri Sport), Mr Giovanni Caslini, was denied access to the documentation. After insisting on obtaining the information in his capacity as manager of Rossoneri Sport, he was suddenly dismissed from his position on 17 May 2022.

---

[3] Translator's note:  the original English text, which had been translated into French in the body of the text, was cited verbatim here.

His summons to appear in interlocutory proceedings served on 18 June 2022 on Project RedBlack and Rossoneri Sport is edifying as it highlights (**Exhibit 12**) that:

- On 17 May 2022, date on which he was dismissed as manager of Rossoneri Sport, no meeting of the latter company's board was held to:

  - appoint advisors to negotiate on behalf of Rossoneri Sport a transfer of AC Milan shares;
  - appoint representatives to negotiate on behalf of Rossoneri Sport a transfer of AC Milan shares;
  - decide to enter into negotiations (exclusive or not) with a potential buyer;
  - organize the process of a sale of AC Milan's shares (in particular the acquisition audit process, the terms and conditions of the transmission of confidential information, etc.);
  - 
- despite his repeated requests for information, both in his capacity as manager of Rossoneri Sport as well as Project RedBlack and Blue Skye, Mr Giovanni Caslini was never given any document relating to a potential transfer of AC Milan shares; and that

- on the contrary, his insistence on being able to make an informed decision led directly to his led directly to his dismissal on 17 May 2022.

The same reproaches are made in his writ of summons served on 22 June 2022 (**Exhibit 13**).

In the press, the President of AC Milan indicated that two offers had been received for the purchase of AC Milan on 10 May 2022 and that they were being studied (**Exhibit 14**).

At that time, Mr Giovanni Caslini was still the manager of Rossoneri Sport, a company that which owns the shares of AC Milan. However, it is clear from the legal proceedings he initiated in Luxembourg that he had **never been consulted** about any sale process or delegation of power, and a fortiori never had a copy of these two offers!

Thus, the process of transferring AC Milan's shares was **deliberately concealed** from at least one manager (representing the Claimants) of Rossoneri Sport (the shareholder of AC Milan), which shows that there are clearly elements of the transfer that must be hidden from the Claimants.

This is confirmed by the simple fact that it was the Elliott Group, through Elliott UK headed by Gordon Singer, which negotiated the sale in order to retain control over the whole process (**Exhibit 15**).

The sale was then made official in a hurry, since less than eight working days after the dismissal of Mr Giovanni Caslini as manager of Rossoneri Sport, the sale of AC Milan's shares was completed.

It is implausible that a due-diligence audit could have been carried out and a contract negotiated and approved in this time frame. It goes without saying that such a process takes months and Blue Skye was deliberately excluded from the process, as was the manager she appointed. This is nothing less than a fraudulent manoeuvre designed to keep the whole process of putting the property up for sale, selecting the buyer, negotiating and finalizing the sale as opaque as possible.

The fact that the very existence of talks and the content of the agreement finally reached with a  buyer are concealed from the Claimants is not surprising, since this assignment implies the waiver and/or release by Project RedBlack of all or part of any existing indebtedness of Rossoneri Sport and the pledge for such indebtedness.

This was implicitly confirmed by the Class A managers of Project Redblack, namely Jean Marc McLean and Daniela Italia (**Exhibit 16**).

This point was, in any case, acknowledged by a letter dated 2 June 2022 addressed by Rossoneri Sport to Blue Skye and Project RedBlack in particular (**Exhibit 17**).

In point of fact, one of the conditions precedent that must be met is the release of the pledge. **By waiving its pledge, Project RedBlack waives any guarantee of repayment of the financing granted.** Thus, from the moment it waives its pledge, Project RedBlack no longer has any certainty that it will receive any repayment from Rossoneri Sport, even though it has its own creditors to repay.

In this respect, if the envisaged sale price is estimated at € 1,228,418,010.20, not all of this amount will be paid. Indeed, (i) only € 1,150,000,000 can be paid to Rossoneri Sport, the difference corresponding to AC Milan's net financial debt and (ii) Rossoneri Sport has, in any event, committed to grant a seller's loan (loan from the seller to the buyer) of a minimum amount of **€ 200,000,000 and a maximum amount of € 550,000,000** (plus an additional amount of € 60,000,000 to cover AC Milan's equity until June 2025) (**Exhibit n°17** - Appendix C}.

If in the best case scenario the amount received by Rossoneri Sport from the transfer of AC Milan shares is transferred to Project Redblack, only an amount between € 540,000,000 and € 950,000,000 will theoretically be repaid.

Thus, up to **half of Rossoneri Sport's debt** to Project RedBlack may never be repaid. This is all the more so as Project RedBlack will no longer have any guarantee to ensure the repayment of this debt, and will have no clue on what the management board will do in this respect.

It should be stressed here, and this point will be developed further below, that the identity of the entity acquiring the AC Milan shares is not determined, which makes it impossible to know whether this entity has other debts or the ability to repay. Furthermore, the contract for the sale of the AC Milan shares, concluded by and between a Luxembourgish company and a Dutch company, has been subjected to US law and the US courts, for unexplained reasons. If the buyer defaults, it is therefore completely unrealistic for Rossoneri Sport to be able to repay Project RedBlack the amount of its debt when it will have no assets left.

In addition, the transfer price is in any event insufficient to meet the amount owed by Rossoneri Sport to Project RedBlack, namely €1,231,048,383.

**Thus, in addition to the risk incurred by the waiver of the Pledge, the transfer of the AC Milan shares requires a waiver by Project RedBlack of part of its claim, without consideration, plus a deterioration of its position in terms of guarantees.**

Moreover, no tender was made, as the sale price was set unilaterally by the Elliott Group (and as the identity of the entity is not known to the Claimants today, the latter reserve the right to provide further

details in the course of the investigation). It appears from the elements known to date that the Elliott Group, through Elliott UK if not through any other entity of the Elliott Group, has identified the candidate buyer not on the basis of a selection process aimed at obtaining the best economic conditions and maximizing the value of the sole asset, namely AC Milan, but by virtue of criteria based solely on the personal interests of the Elliott Group.

Thus, in addition to the fact that the amount collected does not cover the entire debt, it moreover violates the rights of TPEC creditors.

Indeed, TPECs are hybrid debt instruments. The purpose of TPECs is to track the proceeds of the underlying assets, i.e. the TPEC holder will receive a portion of the proceeds of the underlying assets or the reinvestment made in those assets.

The term "track" does not mean a right to participate in the transaction but a right to receive the proceeds from the transaction. If the reinvestment is made to the detriment of the TPEC holders, however (i.e. without involving them in any way or allowing them to continue to benefit from the proceeds of the assets replacing those underlying assets), there will be no more proceeds to track and the TPEC holders will be deprived of those proceeds.

Similarly, if the sale of AC Milan is made at a price lower than its real value, and assuming no reinvestment, the TPEC creditors will receive less than they should have received based on the agreements by and between the parties.

E. THE EMERGENCE OF THE DISPUTE AS TO THE CONDITIONS UNDER WHICH WAIVERS CAN BE GRANTED

1. THE NEED FOR UNANIMITY IN GRANTING WAIVERS

As soon as Blue Skye became aware of the rumours of a possible sale of the AC Milan shares, it wrote to the receiver of the pledge through their Italian counsel, DLA Piper (**Exhibits 18 and 19**).

In this letter, Blue Skye pointed out that the Articles of Association of Project RedBlack provide in their article 13 for certain so-called "Special" (or reserved) matters for which the unanimity of the management board is required for the approval of resolutions relating to these matters.

In point of fact, Article 13 of Project RedBlack's Articles of Association provides in particular that (**Exhibit 2)**:

> *The unanimous agreement of all the Managers shall be required for decisions on the following matters ("**Special Matters**"):*
>
> - *The creation or granting of any pledge, security interest, charge, or mortgage on any assets or property of the Company, as well as the decision to extend them;*
> - *The issue by the Company of any securities, bonds, debt securities, and other instruments or any modification of the rights and obligations relating to such securities, bonds, debt securities, and other instruments;*
> - *The taking out of any loans or other indebtedness other than reasonable charges for professional, institutional, administrative or accounting fees properly incurred by the*

*Company; Any amendment to the terms of tracking preferred equity certificates (TPECs) of any class issued by the Company;*

- *Any transaction between the Company and any of its Associates or holders of TPECs or any subsidiary of, or affiliate of, such Associate or TPEC holder. To remove any ambiguity, payments under or redemptions of TPECs by the Company do not constitute Special Materials;*
- *The conclusion by the Company of any advisory, management or other service contract for undue amounts per contract exceeding €20,000 per annum.*

*If the Managers are unable to reach unanimous consent in relation to the Special Matters set out above, the relevant decision shall be submitted to the Shareholders for deliberation.*

In view of the content of this article, unanimity is required in particular for the following reasons:

- Firstly, under the paragraph which provides that *"Any transaction between the Company and any of its Partners or TPEC holders or with any subsidiary or affiliate of such Partner or TPEC holder:"*

  In the case at hand, the release of the pledge between Project RedBlack and Rossoneri Sport and the waiver of part of the debt is actually transaction between Project RedBlack and Rossoneri Sport, RedBlack and Rossoneri Sport, unquestionably falling into this category, and therefore having to be submitted to the management board of Project RedBlack.

- Secondly, under the paragraph which provides that "*The creation or granting of any pledge, security interest, charge or mortgage over any of the assets or property of the Company, as well as the decision to extend them:"*

  The partners of Project RedBlack have therefore taken steps to ensure that no encumbrance can be placed on the company without the unanimous consent of the managers appointed by them, if not their unanimous agreement.

  Under the unwritten rule of parallelism, termination of the pledge, where the termination does not result from a stipulation in the pledge agreement, should also require the unanimous consent of the Project RedBlack management board.

  Thus, by waiving the Pledge on a key asset of the company (its claim on Rossoneri Sport which exceeds €1 billion), the company's burden increases as it will not be able to recover its claim. This is clearly the counterpart of the granting of the pledge: the same procedure must be followed for the release of the same pledge.

The applicants as well as the manager Mr. Giovanni Caslini are therefore of the opinion that the waivers can only be granted by a unanimous decision of the management board of Project RedBlack. Any other conclusion would result in a violation of the company's Articles of Association.

2. <u>FOR PROJECT REDBLACK CLASS A MANAGERS, WAIVERS MAY BE MADE BY THEIR SIGNATURES ALONE, AND DO NOT REQUIRE UNANIMITY</u>

In response to this letter, the Class A Managers wrote, without having previously consulted the management board, a letter, on behalf of Project RedBlack, contesting the application of this unanimity

requirement to vote on such a resolution authorizing waivers (**Exhibit n°16** - see also in this sense **Exhibit n°20**).

According to them:

- Article 13 of Project RedBlack's Articles of Association simply does not apply. Whereas no explanation is given in their initial letter, a letter from the Board of Class A Managers of 6 May 2022 (**Exhibit 20**) alleges that this article only referred to transactions between Project RedBlack and its partners, but not to Project RedBlack and its subsidiaries, and that in any event it would be inapplicable to Rossoneri Sport since the latter was only acquired after the introduction of this provision.

- This position is simply not tenable and remains a mere allegation: thus, as soon as a statutory provision is passed before the acquisition of an asset or the entry of a new partner, it would not be applicable to it... This is simply irrelevant as the Articles of Association reflect the will of the partners. If they do not amend them, they remain applicable!

- The terms and conditions of the TPECs would apply according to them, and would allow to derogate from the statutes. However, TPECs are debt instruments, which could be compared for the purposes of this paper to bonds, which cannot interfere with the statutory rights and obligations of a partner, unless the very nature of TPECs, which do not grant voting rights, like company shares, but only a claim, is distorted.

Thus, according to the theory of Project RedBlack’s Class A Managers, the signature of two managers would be sufficient to bind Project RedBlack to a waiver that would empty it of all assets. Since these managers were appointed by Elliott, it is undisputed that Elliott shares the same position and benefits directly from this waiver without any consideration for Project RedBlack in the sense that its claims cannot be repaid in full.

We should add that if the Class A managers were to decide to submit the waivers to a vote of the partners, in accordance with Articles 13 and 16 of the Articles of Association, the same problem of unanimity would then exist at the level of the general meeting of partners of Project RedBlack, of which the applicant sub 1) is a member, and which does not share this theory in any way.

There is therefore a very clear and irreconcilable divergence between the parties, members of the management board and partners of Project RedBlack, on the interpretation of the provisions of the latter's Articles of Association, and hence on the conditions under which waivers can be granted, namely, is unanimity required within the management board or not?

The Claimants have therefore brought this issue before the Luxembourg Commercial Court by way of a writ of summons seeking a declaration that two managers alone cannot waive the said pledge (**Exhibit 21**).

F. <u>THE BENEFITS DERIVED BY THE ELLIOTT GROUP FROM THE TRANSACTION: THE UNMENTIONABLE REASONS FOR SAID TRANSACTION</u>

It is clear from various sources that the Elliott Group derives an immediate and substantial benefit from the situation, since cross-checking the press releases published on AC Milan's website with an article in L'Equipe dated 17 June 2022 (**Exhibit 22**), indisputable  shows that:

- Elliott will retain a minority stake in AC Milan, reportedly between 30% and 49% of the capital. Blue Skye will no longer have a stake;
- Elliott will be a creditor of AC Milan or the buyer for up to €550 million (plus €60 million) at what are likely to be very high interest rates. A guarantee on losses would also be given;
- Elliott will retain seats on the AC Milan board, including the chairman, the managing director and 2 or 3 other seats out of a total of 9. This is strange  to say the least in such a transaction, because in practice the buyer of any company appoints trusted individuals to the board of the company it is buying, to the exclusion of any other person

Through this process, the Elliott Group ultimately retains full control and the certainty of obtaining reimbursement of the financing it granted through Project Redblack (associated loans and TPECs), while Blue Skye will be definitively excluded from AC Milan and Luxembourg Investment Company 159 will be harmed as a TPEC creditor of Project Redblack. Neither Blue Skye nor Luxembourg Investment Company 159 will therefore be able to benefit, in the event of a real sale of AC Milan shares at a later date, from the capital gain, based this time on a real valuation resulting from the sale of this asset. They will thus be deprived of their share of the remuneration initially foreseen between the partners: what is commonly called the carried interest.

In addition to this significant benefit, <u>another objective is sought by the Elliott Group</u>. It appears in fact from the specialized press that UEFA is taking a close interest in the situation of the following two football clubs: Lille Olympique Sporting Club (or LOSC) and the aforementioned AC Milan, of which the Elliott Group has been the owner since 2018, together with Blue Skye (**Exhibit 23**).

In point of fact, in December 2020, LOSC changed ownership from Gérard Lapez to the club's main creditor, the Elliott Group.

However, Article 5 of the Europa League regulations states that "*To ensure the integrity of the UEFA club competitions (C1, C3, C4)", "no club [. . .] may, either  directly or indirectly [. . .] be involved in any capacity whatsoever in the management, administration and/or sporting performance of any other club participating in a UEFA club competition;  or have any power whatsoever in the management, administration and/or sporting performance of any other club.*"

At the time, UEFA allowed both clubs, LOSC and AC Milan, to participate in the Europa League, during which they even played each other in the group stage.

Officially, the shares of LOSC were subsequently sold to an entity called Merlyn Partners SCSp, a Luxembourgish investment fund (more precisely, these shares are owned by a French company called L. Holding, which is itself a subsidiary of a Luxembourgish company called Callisto Sporting S.à r.l., which is the subsidiary of Merlyn Partners SCSp).

However, UEFA seems to have been intrigued by the creation of two A2 shares by Callisto Sporting S.à r.l. in May 2021 which give a rather intrusive veto right in the management of LOSC itself. The beneficiaries of this veto right are companies that are domiciled at the same address as Elliott's head office.

UEFA is thus interested in the fact that the Elliott Group, owner of AC Milan - through Genio and King George - (together with Blue Skye), would exercise significant control over LOSC.

However, the same Article 5 of the Europa League regulations states that "*No individual or legal entity may have control or influence over more than one club participating in a UEFA club competition*".

However, this season both LOSC and AC Milan have competed in the Champions League. Thus, there is a real risk that sanctions will be imposed on both clubs, if not on one of them (in this respect, it should be noted that LOSC will not participate in the Champions League next year, which increases the risk that sanctions will be imposed on AC Milan). In addition, there have been transfers between the two clubs, the conditions of which could be called into question given the existing links between the Elliott Group and LOSC.

It is precisely in this context that the sale of AC Milan suddenly took place, without Blue Skye ever having discussed it with the Elliott Group. The above-mentioned exchange of e-mails demonstrates as much beyond any doubt, as does the fact that the existence of the sale process was concealed from Blue Skye.

As can be seen from the foregoing, however, in addition to ousting Blue Skye as co-owner of AC Milan, this transfer is nothing more than a masquerade in an attempt to dupe UEFA, since in the end a scheme similar to the one used for LOSC would be reproduced, with the Elliott Group retaining effective control of AC Milan (by remaining the main creditor and minority shareholder), while formally not being the owner of two clubs playing in the Champions League.

## II. <u>THE LAW</u>

### A. THE PRINCIPLE OF FRAUS OMNIA CORRUMPIT

The principle of 'Fraus omnia corrumpit' is summarized by the case law as follows (see in particular in this sense the commercial judgment 2020TALCH02/01669 of 20 November 2020)

> *A contract which, without formally contravening a law of public order, tends to circumvent it and to evade its application constitutes a fraud of the law* (Jean Carbonnier; Droit civil, Volume 2, Les biens et les obligations p.390).
>
> *The notion of fraud in the broad sense, as reflected in the adage "fraus omnia corrumpit", is synonymous with cunning, deception or disloyal action (Court, 14 June 2000, No 23.551 of the cause list)*.
>
> *There is therefore necessarily a fraudulent intent, which may result in particular from the exceptionally abnormal nature of the legal structure used by the parties to the transaction. On the*

*other hand, the fact that the parties choose, from among different existing mechanisms, the one they consider the most favourable when the chosen path is not forbidden by the law, even if the contract that is concluded or the structure that is put in place will turn out to be unfavourable to one of them or to third parties, does not constitute fraud and will not result in the nullity of the act (Court, 9 May 2001, Pas. 32, page 75; Olivier Poe/mans, Droit des obligations au Luxembourg, Principes généraux et examen de jurisprudence, Larcier, n° 124).*

*The principle of "fraus omnia corrumpit" has a wide scope of application, since fraud cannot create a right and the act affected by it is unenforceable upon by third parties or the parties. Fraud is an exception to all legal rules and has an essentially corrective function.*

*Where, through the effect of a rule of law (or a legal institution, a legal act, or the acquisition of legal personality), the perpetrator of fraudulent conduct is likely to derive an advantage from it, the application of the adage may reduce this effect to nought, or in any event to the extent necessary to defeat the prohibited purpose.*

*The neutralization of the effects of such conduct takes the form of the unenforceability of the act or rule against the victim, whether the latter is a third party or a party to a contract, possibly raised in the form of a "fraud exception". The sanction may ultimately require that the act be set aside completely, resulting in its nullity. The application of the adage does not, however, preclude the application of the rules of ordinary law where the conditions of the latter are met, which results either in the act being unenforceable, this time by way of reparation in kind based on Article 1382 of the Civil Code, or by damages, or again, where appropriate, by the application of the regime reserved for fraudulent misrepresentation.*

*Thus the adage fulfils the function which has long been assigned to it, in Belgium as in France, which prescribes that the court must make sure that equity prevails, with the essential correction that if the court 'cannot give the just man more than the law gives him, it recognizes that he has the power to take away from the guilty party the advantages of the legal situation which the latter thought he was acquiring' (F. Glansdorff, L'adage 'fraus omnia corrumpit', J.T. no. 6719- 07/2018).*

*It is clear from these developments that not only is the scope of application of the adage fraus omnia corrumpit very broad, but also that its application can take extremely diverse forms (unenforceability or nullity of an act, damages), so that the perpetrator of the fraud cannot benefit from his fraud.*

*To constitute fraud, the disloyal act must be performed with the intention of causing damage or obtaining gain. It "implies malicious intent, intentional deception, disloyalty with the aim of harming or claiming a gain" (Belgian Court of Cassation 3 October 1997, Pas. 1997, I, No. 386). It is not enough for the unfair act to be voluntary and thus cause damage (F. Glansdorff, L'adage " fraus omnia corrumpit ", op.cit.; Belgian Court of Cassation, 16 November 2015, Pas., 2015, n° 679 cited therein).*

*According to the current case law, there must therefore be deception or disloyalty – insofar as it concerns "conduct" - committed with the intention to harm. Mere awareness of possible harm is not enough.*

*The adage implies a material element, i.e. wrongful conduct on the part of the person against whom it will be enforced, whereby the fault does not result from the mere fact that the interests or rights of a third party are harmed. According to the definition of fault resulting from the case law of the Court of Cassation, the perpetrator of the act (or omission) must have "either violated a legal provision binding on him or disregarded a general standard of good conduct determined by reference to due diligence, with all the nuances that this notion implies (P. Van Ommeslaghe, op. cit., pp. 608 and 612; A. Lenaerts, op. cit., in C.U.P. 168, p. 46, n38).*

*The rush to carry out the act suggests fraud (L Sautonie Laguionie, La fraude paulienne, pref. by G. Wicker LGDJ 2008, Coll. Bibliothèque de droit privé, t., 500, n° 545).*

B. THE CONDITIONS OF THE PRINCIPLE FRAUS OMNIA CORRUMPIT ARE MET IN THIS CASE

It follows from point A above that the following conditions must be met for the principle of fraus omnia corrumpit to apply:

- There must be malice, deceit or disloyalty committed with intent to harm; and
- wrongful conduct.

These conditions are met in the case at hand..

It has actually been established under the section entitled "The Facts" above that:

1) By virtue of the Articles of Association of Project Redblack, the plaintiff Blue Skye the right to appoint a manager to the management board of the former. In this capacity, it has appointed Giovanni Caslini. It should be noted here that Giovanni Caslini is also an employee of the plaintiff Blue Skye.
   Giovanni Caslini was also a manager with Rossoneri Sport since 27 May 2019. In this capacity, Giovanni Caslini is entitled to ask the other managers to communicate to him all the information in their possession relating to the management of the company. As Rossoneri Sport is a private limited liability company operating via a board, each manager must each manager must in fact have the same level of information as the other managers.
   Finally, pursuant to Article 9.3 of the Articles of Association of Rossoneri Sport, Project Redblack must receive a copy of any notice convening a meeting of the management board of Rossoneri Sport. Thus, Project Redblack had at all times all information relating to the affairs of Rossoneri Sport.

   In the context of legal proceedings brought by Giovanni Caslini, it is stated that:

   > *"From mid-April 2022 (without prejudice as to the exact date), the international press reported offers to acquire AC Milan for amounts in excess of €1 billion, as well as negotiations and acquisition audits concerning AC Milan (the "Proposed Transaction").*
   >
   > *However, to the knowledge of the Petitioner, then manager of Project Redblack and Rossoneri Sport, no offer had been received by either Rossoneri Sport or Project Redblack on that date, and no decision had been taken by Rossoneri Sport and Project Redblack as*

*to the offering for sale of AC Milan, the appointment of advisors and/or representatives for such sale, the commencement of, and organization of, negotiations, the organization of acquisition audits, the provision of related information, and/or the Proposed Transaction.*

*In other words, the terms and conditions of the sale of an asset were negotiated and confidential information was exchanged, without the agreement or consent of the owner of that asset!*

*According to the press, the negotiations and discussions were conducted by the Elliott Management Corporation. (**Exhibits 12 and 13**).*

However, when Giovanni Caslini requested more information from the other managers of Rossoneri Sport and Project Redblack, he was suddenly dismissed as manager of Rossoneri Sport on 17 May 2022. There was no statutory provision requiring that he remain in office, in fact, contrary to the Articles of Association of Project Redblack.

It is worth noting that the sale of a football club such as AC Milan, is a process that takes at least several months. It is indeed necessary to carry out an audit of the club (due diligence) and of the companies that own it, as well as to negotiate a memorandum of understanding.
Such a transfer agreement was in fact concluded between Rossoneri Sport and a buyer on 26 May 2022 (**Exhibit 17**).

**It is therefore indisputable that Giovanni Caslini was deliberately excluded from the process under which AC Milan's shares were transferred by the other managers appointed by the majority partner of Project Redblack.**

The deliberate aim was to prevent him from having access to the exchanges between the potential buyer and Elliott UK (who reached the agreement with this buyer) as this would have enabled him to learn that:

- The sale price was set unilaterally by the Elliott Group and therefore did not take into account the real value of AC Milan (this point will be discussed further below);
- Elliott UK, on behalf of the Elliott Group, is repeating the same pattern in the case of AC Milan as in the case of LOSC, namely that it is in fact the one who runs the club, which is strictly forbidden by UEFA.

It is therefore indisputable that any manager acting with due diligence would have done everything in his power to ensure that such a transfer did not take place.

There was therefore malicious intent  if not disloyalty or deception on the part of Elliott UK, assisted in this by the complicity of Genio and King George and the managers appointed by them, namely, at the level of Project Redblack, Daniela Italia and Jean-Marc McLean, and at the level of Rossoneri Sport, Elliot Greenberg, Jean-Marc McLean, Victor Schuh and Alfred Gosling. In doing so, they violated the rules relating to the management board  by effectively excluding a manager from any information relating to the sale of AC Milan. They also violated the Articles of Association of Rossoneri Sport by not putting any item relating to this sale on the agenda of a meeting of the management board of Rossoneri Sport, all in order to prevent Giovanni Caslini from intervening

and possibly interrupting a sale process that was fraudulent and aimed both at harming the Claimants financially and at circumventing the provisions relating to the UEFA Champions League.

2) It is interesting to note in the quotation from the court proceedings above in point 1), that the process of selling AC Milan's shares was conducted by Elliott Management Corporation ("According to press reports, the negotiations and discussions were conducted by Elliott Management Corporation" (**Exhibits 12 and 13**).

   However, according to a press release dated 1 June 2022, it was Elliott UK that concluded the deal (**Exhibit 11**).
   Now, as shown above, no resolution of the management board of Rossoneri Sport was taken to deliberate on a possible transfer of AC Milan shares. A fortiori, no resolution was passed to delegate any power to negotiate such a sale to a third party and to communicate the information necessary for the audit of the club.

   A managing director is bound by a duty of confidentiality and may not communicate information relating to the company without the company's consent, either to third parties or to shareholders. In practice, therefore, it is only the management board (or any person in whom the board of directors has vested such authority) that can communicate such information to third parties or to all shareholders.

   In the case at hand, once again the rules relating to the management board have been violated once again since on 17 May 2022, the management board of Rossoneri Sport never gave Elliott Management Corporation and/or Elliott UK the power to communicate information to third parties or even to negotiate a transfer.
   In addition, there was a breach by the managers of Rossoneri Sport and Project Redblack of their duty of confidentiality.

   Once again, there was malicious intent, if not disloyalty or deception on the part of Elliott UK, assisted in this by the complicity of Genio and King George and the managers appointed by them, namely, at the level of Project Redblack, Daniela Italia and Jean-Marc McLean, and at the level of Rossoneri Sport, Elliot Greenberg, Jean-Marc McLean, Victor Schuh and Alfred Gosling to prevent Giovanni Caslini, if not Blue Skye, from intervening and possibly interrupting a sales process that was fraudulent and aimed both at harming the Claimants financially and at circumventing the provisions of the UEFA Champions League.

3) The sale of such an asset requires, in principle, a call for tenders in order to choose, from among the commercial proposals of several candidate buyers, the one that best meets the seller's conditions (price, conditions precedent, financial prospects for developing AC Milan, etc.). For example, this is precisely what was done for the sale of Chelsea Football Club.
   As the bids are made on the basis of an initial audit of AC Milan, an analysis of all the bids makes it possible to determine the real value of the latter.
   It has been established under the section entitled “The Facts” above that Blue Skye requested that such a bidding process be carried out in order to ensure that the sale price reflects the real value of the club (**Exhibits 26 and 27**).

In the case at hand, the Claimants were informed that the sale price was set unilaterally by the Elliott Group (the identity of the entity is not known to the Claimants at present and they reserve the right to provide further details in the course of the investigation). It should be noted that Rossoneri Sport, the owner of the assets sold, had, as at 17 May 2022, never even been consulted on the sale price, as it results from Giovanni Caslini's summons!

Thus, the real value of the assets was never really determined. Now, knowing that the Chelsea club has just been sold for the modest sum of €3.3 billion, it is indisputable that AC Milan has been undervalued.

The following were therefore violated: (i) the rules relating to the Management Board, by not allowing it to take a position on the sale price, (ii) the sale of the AC Milan shares on normal commercial terms and conditions and (iii) the rules relating to the management of the company with due diligence.

Furthermore, the price finally fixed for the sale of the AC Milan shares does not cover the full amount owed by Rossoneri Sport to Project Redblack. However, the latter was asked to waive a pledge guaranteeing the €1.2 billion financing granted to it (the only guarantee granted). This point had already been raised by Blue Skye on 5 May 2022 as being problematic (Exhibit 27).

By the same token, Project Redblack's corporate interest is clearly not preserved, putting it in the position of being unable to repay its own creditors.

The determination of the price is an essential element for the Elliott Group. In fact, if it wishes to retain control of AC Milan, it has to retain a significant claim giving it veto and supervisory rights over the management of the club.
The conditions concluded between Elliott UK and the purchaser in this respect were not disclosed to the Claimants, who received only fragmentary information (**Exhibit 17**), despite requests to this effect that went unheeded (see in this sense **Exhibit 27**).

Once again, there was malicious intent, if not disloyalty or deception, on the part of Elliott UK, assisted in this by the complicity of Genio and King George and the managers appointed by them, namely, at the level of Project Redblack, Daniela Italia and Jean-Marc McLean, and at the level of Rossoneri Sport, Elliot Greenberg, Jean-Marc McLean, Victor Schuh and Alfred Gosling to prevent Giovanni Caslini, if not Blue Skye, from intervening and possibly interrupting a sales process that was fraudulent and aimed both at harming the Claimants financially and at circumventing the provisions of the UEFA Champions League. Indeed, formally the Elliott Group will no longer be the majority shareholder of AC Milan, which would result in a breach of the provisions of the UEFA Champions League, while retaining the same control over the club following the sale.

Aiden Aspelding and Christos Stavrou, managers of Rossoneri Sport since 17 May 2022, are also complicit in this fraud by having approved this management operation to sell the only asset of the company, a few days after they were appointed without a normal commercial process and in violation of the corporate interest (Rossoneri Sport not being able to repay Project Redblack).

4) The only information available to Blue Skye is contained in the letter of 2 June 2022 which is (i) deliberately incomplete and fragmentary and (ii) thereby misleading.

Thus, in addition to what was mentioned above regarding the sale price, a loan was granted to the buyer. The definitions in the body of the letter do not correspond to the definitions in the annex.

For example, in the body of the letter, the buyer is Footballco intermediate Coöperatief U.A. or one of its subsidiaries, whereas in Appendix A the buyer can only be Footballco intermediate Coöperatief U.A..

This point is of crucial importance however. it was in fact been mentioned above that Project Redblack is called upon to waive the pledge granted as security for a financing granted to Rossoneri Sport in excess of € 1.2 billion.
However, according to Appendix 3 of the letter of 2 June 2022, a loan of between € 200 million and € 550 million (plus € 60 million) was granted to the buyer. Knowing who the buyer is who will benefit from the loan is therefore essential in order to know whether it will be able to replay.

Thus, if it is a subsidiary that already has other financing to repay, its capacity to repay is more than unsettled.

It is not specified either whether it is indeed Rossoneri Sport that will do the lending in the end. As mentioned above, the buyer's indebtedness to the Elliott Group is the only way for the latter to maintain control over AC Milan. Moreover, in its press release announcing the agreement, the Elliott Group states that it will remain a "*significant investor with seats on the Board*" (**Exhibit 24**).

The information provided is therefore deliberately fragmentary and contradictory, not allowing Blue Skye to interfere in the transfer to assert its rights.
However, the Elliott Group, the majority shareholder of Project Redblack, which has arrogated to itself the right to negotiate the transfer of AC Milan's shares, has all the information at its disposal, as do the managers appointed by it. There is therefore a violation of the rules relating to the management board, as well as of the general meeting of shareholders.

In addition, there is a violation of the execution of agreements in good faith.

Once again, there was malicious intent, if not disloyalty or not deception on the part of Elliott UK, assisted in sending this letter by the complicity of the managers of Rossoneri Sport, Elliot Greenberg, Jean-Marc McLean, Victor Schuh, Aiden Aspeling and Christos Stavrou to prevent Blue Skye from intervening and possibly interrupting a sales process that was fraudulent and aimed both at harming the Claimants financially and at circumventing the provisions of the UEFA Champions League.

5) It has been demonstrated above that the sale of AC Milan shares by Rossoneri Sport is a transaction that is contrary to the corporate interest of Project Redblack. The latter, which has a claim on Rossoneri Sport of €1.2 billion euros, had in point of fact obtained a pledge on the AC Milan shares to guarantee this claim. However, Project Redblack is being asked to waive this pledge without obtaining either fair remuneration for the value of the shares or immediate full reimbursement of its claim in return.
It has nonetheless been shown that the sale price is not sufficient to pay off the entire claim. To this must be added the loan granted to the buyer (if this loan is granted by Rossoneri Sport),

whose precise identity, possible indebtedness and financial capacity are not known, for an amount of up to €550 million (to which €60 million must be added).

**The waiver, in the above-mentioned circumstances, of the pledge granted to Project Redblack clearly violates its corporate interest.**

In addition, by doing so, Project Redblack will not be able to pay its own creditors, a fact which Blue Skye pointed out as early as 5 May 2022 (Exhibit 27), i.e. well before the agreement was concluded. However, the Elliott Group, through Elliot UK, went ahead with the sale at the same price as it had unilaterally set. Project Redblack will also be liable to TPEC creditors, including the plaintiff Luxembourg Investment Company 159.

As mentioned above, TPECs are hybrid debt instruments, in fact. The purpose of TPECs is to track the proceeds of the underlying assets, i.e. the TPEC holder will receive a portion of the proceeds of the underlying assets or the reinvestment made in those assets. The term "tracking" does not mean a right to a right to participate in the transaction but a right to receive the proceeds of the transaction. However, if the reinvestment is made to the detriment of the TPEC holders (i.e. without involving them in any way or allowing them to continue to benefit from the proceeds of the assets replacing those underlying assets), there will no longer be any proceeds to track and the TPEC holders will be deprived of those proceeds, thereby breaching the contractual agreements embodied in the contractual package governing the AC Milan project irreparably. The purpose of the partnership was to identify a project, invest, develop, manage and share the benefits of the operation, not simply to benefit from a loan.

Similarly, if the sale of AC Milan was made at a price lower than its real value, and assuming that there was no reinvestment, the TPEC creditors will in any case receive less than they should have.

This necessarily implies that Project Redblack is liable in either case. However, as Project Redblack is deprived of its only guarantee, it will not be able to compensate the creditors, which will lead to its bankruptcy.

It is therefore indisputable that the managers of Project Redblack appointed by the Elliott Group (Genio and King George), Daniela Italia and Jean-Marc McLean, are not managing in the best interests of the Elliott Group. They have already indicated that they would commit Project Redblack by their signatures alone for the waiver of this pledge, even though this is a decision that requires the unanimous agreement of the managers of Project Redblack. The Claimants therefore had to file a separate action on the merits (**Exhibit 21**).

Without a waiver of the pledge, however, the AC Milan shares cannot be sold as they are not transferable in their current state. A conventionally chosen sequestrator receiver holds them, namely Mr Craca of Milan, who was summoned for a declaration of joint judgment.

6) At the level of Project Redblack, Daniela Italia and Jean-Marc McLean, and at the level of Rossoneri Sport, Elliot Greenberg, Jean-Marc McLean, Victor Schuh, Alfred Gosling, Aiden Aspeling and Christos Stavrou do not act in the social interest but in the sole interest of Elliott.
They thus commit abuses of powers and/or votes on the orders of Elliott, which acts as a de facto manager with impunity.

Thus, at the level of Rossoneri Sport, they have given power to Elliott UK, if not Elliott Management Corporation, or even allowed them to act in fact, to negotiate the sale of AC Milan shares, while neither the possibility of such a sale nor even the delegation of power was ever put on the agenda of the Rossoneri Sport management board. It is highly likely that letters were sent and contracts with intermediaries (such as lawyers) were made without the approval of the management board. They also concealed from Giovanni Caslini the information relating to this operation, violating the absolute equality of information that must exist between managers due to the collegiality of its management body.

At the level of Project Redblack, Daniela Italia and Jean-Marc McLean sent letters to Blue Skye which were not approved by the management board (the content being in flagrant contradiction with the position taken by Giovanni Caslini in a letter to which he replied (**Exhibits n°16 and 18**). They also concealed the information they knew about the transaction. Thus, the principle of collegiality was clearly violated here too.

The objective was clearly stated above: to enable the Elliott Group to conclude the sale of the AC Milan shares without any interference from the Claimants and/or Giovanni Caslini. This is explained by Elliot's intention, which emerges from the facts, to remove the Plaintiffs from the ownership structure of AC Milan, without paying anything thus depriving them of any benefit from the sale of the latter under normal market conditions, after a genuine sale process normally carried out. These were the original objectives, based on the division of roles between Elliot, which financed, and Blue Skye, which structured and participated in the management.

Finally, it is important to point out that the transfer of AC Milan's shares was never considered at the general meeting of Project Redblack's partners.

However, although Blue Skye will no longer be an indirect partner of AC Milan following the transfer of the AC Milan shares, this will not be the case for Elliott, which will retain, in addition to a substantial investment (as mentioned above), a minority stake (**Exhibit 11**). The actions taken by the Elliott Group, through Elliott UK, have therefore borne fruit, as Blue Skye was unable to interfere in the sale process to assert its rights (and in particular to remain a minority shareholder in AC Milan, and involved in the management of the latter as the agreements gave it the right to do). On the other hand, the Elliott Group retains a minority shareholding in AC Milan and a substantial loan which enables them to retain control through veto rights (and to this end has seats on the AC Milan board of directors).

The exchanges since 19 April 2022 between Blue Skye and Elliot UK demonstrate that Blue Skye acted in good faith in not opposing the implementation of a disposal process, if this was the wish of the Elliott Group, but only to the extent that such a process would be fair and equitable, namely that a tender be initiated, at a time that would maximize the price of sale, and with the assistance of an expert advisor in the field (**Exhibit 25**).

On that date, Elliott UK, through Gordon Singer, indicated that it agreed with this approach (Exhibit 25), even though an exclusivity agreement had been reached with a potential buyer. Elliott UK therefore deliberately lied to Blue Skye in order to pursue the disposal process behind Blue Skye's back.

After being cornered and having to admit the existence of a sale process, the Elliott Group, through Elliott UK, deliberately excluded Blue Skye from that process and from any access to information and documents relating to this sale despite Blue Skye's requests to respect the principle of transparency and the rules of governance (**Exhibits 26 and 27**).

It is therefore indisputable that the conditions for the application of the principle of *fraus omnia corrumpit* have been met. However, these are only the facts of which the Claimants are currently aware. In view of the manoeuvres undertaken by the Elliott Group, through Elliott UK, assisted in this by the complicity of the managers appointed by it, namely, at the level of Project Redblack, Daniela Italia and Jean-Marc McLean, and at the level of Rossoneri Sport, Aiden Aspeling, Christos Stavrou, Elliot Greenberg, Jean-Marc McLean, Victor Schuh and Alfred Gosling, there is every reason to believe that other actions have also been taken.

In addition, the entire operation was officially completed in less than ten days (Giovanni Caslini having been dismissed on 17 May 2022 and the sale agreement having been concluded on 26 May 2022). It goes without saying that discussions had been going on for several months, in particular to carry out an audit of the club, which tends to be confirmed by press articles that appeared in mid-April 2022.

However, the parties intended to finalize the transaction in a hurry, which leads to the presumption of fraud (as indicated in Section A above).

The fraud perpetrated by the Elliott Group is ongoing. Thus, Blue Skye received a letter from Giovanni Caslini dated 10 June 2022 informing the partners of Project Redblack that Rossoneri Sport had undertaken, on or about 26 May 2022, to provide AC Milan with financing of €5 million (**Exhibit 28**). As Rossoneri Sport had no assets, this necessarily implied that this funding would come from Project Redblack, itself (having no assets other than Rossoneri Sport) calling on its own partners.

On **1 June 2022**, AC Milan called for this funding, which led Rossoneri Sport to 5 million from its sole shareholder on **2 June 2022**.

In his capacity of manager of Project Redblack, Giovanni Caslini indicated in his aforementioned letter that he did not have the information and documents required to be able to vote in favour of such a call for funds from the partners of Project Redblack.

Having taken note of both Rossoneri Sport's call for funds (Exhibit 17) and the aforementioned letter from Giovanni Caslini, Blue Skye pointed out that such a transaction was clearly contrary to the corporate interest of Project Redblack (the price of the sale of AC Milan shares not even covering the total amount of the debt owed even before this call for funds and while this financing would become unsecured with the waiver of the pledge).

Furthermore, responding to such a request violates the contractual provisions between Project Redblack and Rossoneri Sport, and in particular, but not only, the AFA (under Article 4.2 in conjunction with Articles 17.19 and 17.22 of the AFA).

Under the sale agreement concluded on 26 May 2022, such financing should logically have been included and provided by the buyer. The Elliott Group is therefore once again concealing its game here, as it has its own interests in having such financing provided not by the buyer of the AC Milan shares, but by it. This fact also enables it to maintain control via governance arrangements contained in the loan agreement.

C.   THE APPLICABLE PENALTY

It follows from point A above that the perpetrator of the fraud cannot benefit from his fraud. Thus, the sanction resulting from the application of the principle of *fraus omnia corrumpit* may take extremely diverse forms, in particular the unenforceability or nullity of an act, or even damages.

In the case at hand, the Claimants seek, **principally**, as the only compensation for their entire loss, and in order to restore the victim to his original state, the **annulment of the transaction** aimed at the transfer of AC Milan's shares, namely the annulment of any contract or agreement concluded with a view to carrying out this transfer, and in particular, but without this list being exhaustive:

- the Stock Purchase Agreement concluded on 26 May 2022 between Rossoneri Sport Luxembourg and Footballco intermediate Coöperatief ;
- any other subsequent agreement by and between the same parties for the transfer of AC Milan shares;
- the nullity of any waiver by Project Redblack and/or Daniela 1TALIA and/or Jean Marc McLean of the pledge granted to him by Rossoneri Sport to guarantee the AFA;
- the nullity of any waiver by Project Redblack and/or Daniela Italia and/or Jean Marc McLean of a part of its claim;
- the nullity of any delegation of authority granted by Rossoneri Sport and/or Victor Schuh and/or Jean-Marc McLean and/or Elliott Greenberg and/or Alfred lzak Gosling to any entity of the Elliott group, including Elliott Management Corporation, in connection with the sale of AC Milan shares;
- the nullity of any engagement letter concluded with any service provider involved in the disposal of the AC Milan shares.
- Any act ancillary, incidental or connected to the agreements entered into with a view to the sale of AC Milan.

**Very subsidiarily,** and only if, *per impossibile,* the Court were to find that the conditions for annulment are not met in this case, and in accordance with the principle of the need to concentrate resources, the Claimants request the payment to the Defendants sub 1) to sub 12), jointly and severally, if not in solidum, then each for the whole, of damages for the loss suffered as a result of the fraud.

The monetary damage suffered by Blue Skye is at least equal to the value of the TPECs A-2 its shares in Project Redblack plus the interest-free loans granted to the latter.

With regard to the TPECs A-2, the damage is estimated, without prejudice for the purposes of the case, as at 26 May 2022, at € 48,906,538 (i.e. 11% of the profit generated as a result of the underlying asset A).

This amount is calculated as follows (in accordance with the provisions of the Terms and Conditions of the TPECs (**Exhibit 8**) as amended by the Amended and Restated Investment Agreement dated 31 October 2018 (**Exhibit 30**):

11% x (95.73% * funding provided by Project Redblack to Rossoneri Sport plus, if applicable, the residual value of Rossoneri Sport's equity) minus TPECs A-1 minus the interest-free Associated Loan A minus the equity invested by Associates A minus the Fixed Yield due for TPECs A-2

i.e.

11% * (1,170,943,918 € - 702,403,906 € - 14,289,721 € - 8,751,128 € - 894,270 €)

To this amount, € 894,270 is added for the Fixed Yield for the second quarter of 2022, excluding interest.

With regard to the interest-free loans, the amount due to Blue Skye on 26 May 2022 was € 636,734.

Subsidiarily, the defendants sub 1) to sub 12) should be ordered, jointly and severally, if not in solidum, if not each for the whole, to pay to Blue Skye the amount of €50,437,542, or any other amount to be determined by the Court.

The damage suffered by Luxembourg Investment Company 159 amounts to the value of its TPECs B. On 26 May 2022, Luxembourg Investment Company 159 held 31,325,066 TPECs. It was mentioned above that the TPECs are a hybrid debt instrument giving a right to follow. The loss suffered is estimated for the purposes of this case at € 52,229,505.

This amount is calculated as follows (in accordance with the provisions of the Terms and Conditions of the TPECs (**Exhibit 8**) as amended by the Amended and Restated Investment Agreement dated 31 October 2018 (**Exhibit 30**):

4.27% * financing granted by Project Redblack to Rossoneri Sport

i.e.

4.27% * 1.223.173.423 €

The defendants sub 1) to sub 12) should be ordered, jointly and severally, if not in solidum, if not each for the whole, to pay to Luxembourg Investment Company 159 the value of these TPECs B, namely €52,229,505, if not any other amount to be determined by the Court.

D. THE DECISION TO BE TAKEN MUST BE DECLARED COMMON TO THE SUB 13) TO SUB 18)

In light of the foregoing the decision to be taken should also be declared common to the parties summoned under sub 13) to sub 19) for the following reasons:

- Mr Giovanni Caslini is a Class B manager of Project RedBlack and is therefore directly concerned by the decision to be taken;

- Mr Craca is the receiver of the Pledge. In the event that the decision pending states that the unanimity of the management board of Project RedBlack is required to waive the pledge and part of the claim, or, if applicable, the general meeting of partners, Mr Craca, in his capacity of receiver, must be made aware thereof so that the decision pending can be enforceable against him.

- AC Milan is the entity whose shares are the subject of the fraud. The outcome of the litigation is therefore crucial for AC Milan to know who is the owner of the shares in question so that it can draw the appropriate conclusions.

- AC Milan's main financial assets are Milan Entertainment and Milan Real Estate. Therefore, as with AC Milan, the outcome of the litigation is crucial for them to know who owns the shares of their sole shareholder and to be able to draw the appropriate consequences.

-   Footballco intermediate Coöperatief is the purchaser of the AC Milan shares according to the letter of 2 June 2022 and is therefore directly affected by the decision to be made.

E.   IN ANY EVENT: ON ARTICLE 240 OF THE NEW CODE OF CIVIL PROCEDURE

The Claimants were forced to bring the case before you in order to assert their rights. It would therefore be unfair to make them bear the costs they had to incur as a result of the fraud perpetrated by the subpoenaed parties (sub 1} to sub 12). The latter will therefore be ordered, jointly and severally if not *in solidum*, then each for the whole, pursuant to Article 240 of the New Code of Civil Procedure, to pay to the Plaintiffs, each individually, part of the sums incurred by them and not included in the costs, which it would be unfair to leave to the sole charge of Mr Trevisan's party, estimated at €50,000.

F.   <u>ON THE NEED TO ORDER PROVISIONAL EXECUTION OF THE FORTHCOMING DECISION NOTWITHSTANDING ANY APPEAL AND WITHOUT SECURITY</u>

The bad faith shown by the parties summoned in the context of this dispute, and the existence of clear statutory provisions, justify your Court in granting provisional enforcement of the judgment pending, notwithstanding appeal and without security.

Indeed, the actions taken by the parties summoned under sub 1) to sub 12} to achieve their ends are likely to cause definitive damage to the rights of the Claimants, which would be harmed if they were to continue, with irreversible consequences for them (we refer to the above).

* *

<u>THIS SUMMONS IS BASED ON THE FOLLOWING EXHIBITS:</u>

**Exhibit no. 1**   Project RedBlack Extract from the Companies and Trade Register
**Exhibit no. 2**   Articles of Association of Project Redblack
**Exhibit no. 3**   Rossoneri Sport Extract from the Companies and Trade Register
**Exhibit no. 4**   Organization chart of the RedBlack group
**Exhibit no. 5**   Acquisition Facility Agreement by and between Rossoneri Sport and Project RedBlack of 13 April 2017
**Exhibit no. 6**   Pledge agreement of 13 April 2017
**Exhibit no. 7**   Supplemental pledge agreement of 31 July 2017
**Exhibit no. 8**   Master Agreement relating to the Tracking Preferred Equity Certificates entered into on 10 April 2017
**Exhibit no. 9**   Table summarizing TPECs and associated loans at Project RedBlack level
**Exhibit no. 10** Table summarizing the financing granted by Project RedBlack to Rossoneri Sport

**Exhibit no. 11** AC Milan press release dated 1 June 2022
**Exhibit no. 12** Summons for interim relief served by Mr Giovanni Caslini on 1 June 2022
**Exhibit no. 13** Summons issued on the merits of the case by Mr Giovanni Caslini on 22 June 2022
**Exhibit no. 14** Article that appeared in L'Equipe on 10 May 2022
**Exhibit no. 15** Press article mentioning that Elliot had negotiated the transfers of AC Milan shares
**Exhibit no. 16** Letter from Project RedBlack dated 27 April 2022 (letter not submitted to the management Board
**Exhibit no. 17** Letter from Rossoneri Sport of 2 June 2022
**Exhibit no. 18** Letter from DLA Piper dated 25 April 2022
**Exhibit no. 19** Letter from CAS dated 2 May 2022 and letter from DLA Piper dated 2 May 2022
**Exhibit no. 20** Letter from Befana Bagnés dated 6 May 2022
**Exhibit no. 21**  Action on the merits brought by the Claimants on 10 June 2022
**Exhibit no. 22**  Article published in L'Equipe dated 17 June 2022
**Exhibit no. 23**  Article published in L'Equipe on Friday 15 April 2022
**Exhibit no. 24** Elliott press release dated 1 June 2022 ("Elliott's letter of gratitude to AC Milan"} ;
**Exhibit no. 25** Exchange of e-mails between Gordon Singer and Salvatore Cerchione dated 19 April 2022
**Exhibit no. 26** E-mail from Salvatore Cerchione to Gordon Singer dated 23 April 2022;
**Exhibit no. 27** Article no. 27 E-mail from Salvatore Cerchione to Gordon Singer dated 5 May 2022
**Exhibit no. 28** E-mail from Giovanni Caslini dated 10 June 2022
**Exhibit no. 29** E-mail from Elliott Advisors to the managers of Blue Skye dated 23 March 2017
**Exhibit no. 30** Amended and Restated lnvestors Agreement dated 31 October 2018
**Exhibit no. 31** Extract from Elliot Management's website dated 22 June 2022.

as well as any other document, annex or additional document to be produced as appropriate, which could prove useful for the successful completion of its application.

ON THESE GROUNDS

May it please the court to declare this summons admissible in form, and declare it justified don the merits

Therefore,

**DECLARE** the existence of fraud in the transaction for the transfer of AC Milan shares,

Therefore, PRINCIPALLY

DECLARE the transaction aimed at the transfer of AC Milan shares null and void, i.e. declare null and void any contract or agreement entered into with a view to the transfer of AC Milan shares and in particular, (the list is not exhaustive): but without this list being exhaustive

- the Stock Purchase Agreement concluded on 26 May 2022 between Rossoneri Sport Luxembourg and Footballco intermediate Coöperatief ;
- any other subsequent agreement by and between the same parties for the transfer of AC Milan shares;
- the nullity of any waiver by Project Redblack and/or Daniela 1TALIA and/or Jean Marc McLean of the pledge granted to him by Rossoneri Sport to guarantee the AFA;
- the nullity of any waiver by Project Redblack and/or Daniela Italia and/or Jean Marc McLean of a part of its claim;
- the nullity of any delegation of authority granted by Rossoneri Sport and/or Victor Schuh and/or Jean-Marc McLean and/or Elliott Greenberg and/or Alfred lzak Gosling to any entity of the Elliott group, including Elliott Management Corporation, in connection with the sale of AC Milan shares;
- the nullity of any engagement letter concluded with any service provider involved in the disposal of the AC Milan shares.
- Any act ancillary, incidental or connected to the agreements entered into with a view to the sale of AC Milan.

RESERVE the right of claimants to increase their claim during the course of the proceedings, in particular by adding new documents of which they have knowledge

SUBSIDIARILY

AS TO BLUE SKYE

ORDER the defendants sub 1) to sub 12), jointly and severally, if not in solidum, if not each for the whole, to pay to Blue Skye the amount of € 48,906,538 as well as the Fixed Yield of € 894,270.
In any event, order that the amount due under the interest-free loans, namely € 636,734, be repaid to Blue Skye by the defendants sub 1) to sub 12), jointly and severally, if not in solidum, if not each for all.
Therefore, order the defendants sub 1) to sub 12), jointly and severally, if not in solidum, if not each for the whole, to pay to Blue Skye the amount of € 50,437,542, if not any other amount to be determined by the Court.

AS TO LUXEMBOURG INVESTMENT COMPANY 159

ORDER the defendants sub 1) to sub 12), jointly and severally, if not in solidum, if not each for the whole, to pay Luxembourg Investment Company 159 the amount of € 52,229,505, if not any other amount to be determined by Your Court.

IN ANY EVENT

RESERVE to the Claimants the right to amend their claim in the course of the proceedings ;

ORDER the parties summoned under sub 1) to sub 12) in accordance with Article 240 of the New Code of Civil Procedure to pay to the Claimants, jointly and severally, if not in solidum, if not each taken as a whole, part of the sums incurred by them and not included in the costs which it would be unfair to leave to the sole charge of the party of Mr Trevisan, evaluated at € 50,000;

DECLARE the judgment pending is common to Mr Giovanni Caslini, Mr Alfredo Craca, Footballco intermediate Coöperatief, AC Milan, Milan Entertainment and Milan Real Estate.

ORDER the provisional execution of the pending judgment on the minutes and before registration, notwithstanding appeal or opposition and without security,

RESERVE to the Plaintiffs all other rights, claims and actions to be asserted at the appropriate time and place,

In witness whereof, with all reservations and whereas :

- the parties summoned under **3), sub 9) and sub 10)** are domiciled in the United States of America, I have sent a copy of my writ translated into English to their respective addresses in the United States of America by ordinary mail and I have sent them a copy of my writ translated into English to their respective addresses in the United States of America by registered letters, delivered by myself to the P&T Administration in Luxembourg, against the receipts and acknowledgements of receipt annexed to my original and I have further sent respectively two copies of this writ translated into English by registered letter delivered by myself to the P&T Administration in Luxembourg, against the receipt and acknowledgement of receipt annexed to my original to **ABC LEGAL, 633 Yesler Way, Seattle, WA-98104, USA**, in order to ensure the delivery of the writ to the parties summoned under (3), (9) and (10);

- As the party summoned **under 12)** is domiciled in London in the United Kingdom, I have sent a copy of this writ translated into English to his address in the United Kingdom by ordinary letter and I have sent him a copy of this writ translated into English to his address in the United Kingdom by registered letter, delivered by myself to the P&T Administration in Luxembourg, against the receipt and advice of delivery annexed to my original, and I have further sent two copies of this writ translated into English by registered letter delivered by myself to the P&T Administration in Luxembourg, against the receipt and advice of delivery annexed to my original, to the **Senior Master, for the Attention of the Foreign Process Section, Room E16, Royal Courts of Justice, Strand, London, WC2A 2LL**, for the purpose of effecting service on the party summoned **under 12**);

- the parties summoned under **13), sub 14), sub 15) and sub 16)** are established in Italy, I have sent a copy of my writ, all translated into Italian, to their respective postal addresses in Italy, by simple letter and I have sent a copy of my writ, all translated into Italian, to their respective addresses in Italy, by registered letter, delivered by myself to the P&T Administration in Luxembourg, against the receipt and the advice of delivery annexed to my original, and I have sent two copies of the present document, all translated into Italian by registered letter delivered by myself to the P&T Administration in Luxembourg, against the receipt and advice of delivery annexed to my original, to the **Ufficio Unico degli Ufficiali Giudiziari presso la Corte di Appello di Roma, Viale Giulio Cesare, N. 52, 1-00192 Rome, Italy**, in order to ensure the delivery of the document to the parties summoned **under 13), 14), 15) and 16).**

- As the party summoned **under 17**) is domiciled in the Netherlands, I have sent a copy of this writ translated into Dutch to its address in the Netherlands by ordinary mail and I have sent a copy of this writ translated into Dutch to its address in the Netherlands by registered mail, delivered by myself to the P&T Administration in Luxembourg, against the receipt and advice of receipt annexed to my original and I have also sent two copies of this writ translated into Dutch by registered letter delivered by myself to the P&T

Administration in Luxembourg, against the receipt and advice of receipt annexed to my original to **Havenstad Gerechtsdeurwaarders, Corsicaweg 10; NL-1044 AB Amsterdam (NH), The Netherlands,** for the purpose of ensuring delivery of the document to the party summoned **under 17)**.

Guy Engel
*Huissier de Justice*
[Bailiff and Process Server]
P.O. Box 2761
L-1027 Luxembourg

PROCEDURES FOR SERVING THE WRIT OF SUMMONS

Date of service: Twenty-three December, two thousand nineteen

This writ was served by the undersigned bailiff and process server under the conditions indicated in the crossed item below and according to the statements gathered for the addressee at his/her/its

[ ] domicile [ ] residence [x] registered office
[X] official address for service

Addressee of the writ of summons
Aiden Aspelding
c/o Intertrust Group
6 Rue Eugene Ruppert
L-2453 Luxembourg

As indicated below.
The accuracy of the address was verified with the

[ ] Bureau of Population [x] Trade and Companies Register [ ] Central Legislation Service [ ] …..

A) SERVICE TO A PERSON

[ ] Natural Person to addressee him/herself

[ ] Legal Person to Forename(s)/Surname who declared that s/he was authorized to receive a copy

[ ] Official address for service, to proxy himself/herself

Thus declared, who accepted the writ of summons

B) SERVICE TO OFFICIAL ADDRESS

B.I. Having found Forename(s)/Surname
Capacity
Address

thus declared, who accepted to receive a copy and issue receipt, whereupon the undersigned bailiff handed a copy of the writ under sealed envelope bearing only the forename(s), surname, capacity and address of the addressee and the bailiff's seal affixed on the closing fold of the envelope; furthermore, a copy of the writ of summons as well as an attempted service notice, with the particulars of the person to whom the writ of summons was delivered – all under sealed envelope bearing only the forename(s), surname, capacity and address of the addressee and the bailiff's seal affixed on the closing fold of the envelope – were left on the premises, since the writ under A) could not be served, notwithstanding the tasks carried out and after due diligence and verifications having been performed as to the accuracy of the address

Signature of the person met on the premises

B.I. Not having found any person authorized to receive a copy and issue receipt or who accepted to receive the copy and issue receipt because

[x] there was no one there *at 5:25 PM*

[ ] the person present refused to give his/her forename(s), surname, capacity and address

[ ] the person present was not 15 years old yet

[ ] the person present refused to receive the copy

[ ] the person present was the applicant

[ ] the person present refused to issue receipt

and after due diligence and verifications having been performed as to the accuracy of the address

the undersigned bailiff left a copy of the writ of summons on the premises together with an attempted service notice with information on the procedures for serving the writ of summons, indicating only the forename(s), surname, capacity and address of the addressee and the bailiff's seal affixed on the closing fold of the envelope, and moreover sent a copy of the writ and the attempted service notice by simple letter to the addressee within the statutory time limit.

ALL PARAGRAPHS NOT CROSSED SHALL BE DEEMED UNWRITTEN

REMARK: Signed: Guy Engel

---

ATTEMPTED SERVICE NOTICE

The addressee of this notice is hereby informed that the bailiff went the afore-indicated address on the afore-indicated date to serve a writ of summons to him or her.
As the addressee could not be found,

[X] a copy of the aforesaid writ of summons was handed under sealed envelope to …………
afore-identified under B.I; a second envelope containing a copy of the writ and this attempted service notice was left on the premises.

[ ] the person present having refused [ ] to accept [ ] to give his/her forename(s), surname, capacity and address
[ ] to issue receipt

[x] the person authorized to receive a copy not being present on the premises, a copy of the writ and this attempted service notice were left on the premises; a second copy of the writ of summons and a copy of this attempted service notice were sent by simple letter to the addressee.

Date: <illegible> Signed: Guy Engel