# EXHIBIT A



N° des rôles :    TAL-2022-07355 ;   TAL-2022-07361
                 TAL-2023-03720 ; TAL-2023-04206
Chambre :        TAL, IIe
Notifiées le :   23 septembre 2025
Fixée au :       24 septembre 2025

## CONCLUSIONS DE SYNTHÈSE N° 1
### LIMITÉES AUX MOYENS DE NULLITÉ ET D'IRRECEVABILITÉ
### SOULEVÉS PAR LES PARTIES DÉFENDERESSES

**POUR :**

1) **BLUE SKYE FINANCIAL PARTNERS S.À R.L.**, société à responsabilité limitée, établie et ayant son siège social à L-1450 Luxembourg, 5, Côte d'Eich, immatriculée au Registre de commerce et des sociétés de Luxembourg sous le numéro B193016, représentée par son conseil de gérance en fonctions,

ci-après, « **BLUE SKYE LUX** »,

2) **LUXEMBOURG INVESTMENT COMPANY 159 S.À R.L.**, société à responsabilité limitée, établie et ayant son siège social à L-1450 Luxembourg, 5, Côte d'Eich, immatriculée au Registre de commerce et des sociétés de Luxembourg sous le numéro B210208, représentée par son gérant en fonctions,

ci-après, « **LIC 159** »,

parties demanderesses aux termes d'un exploit de l'huissier de justice Guy ENGEL, immatriculé près le Tribunal d'arrondissement de et à Luxembourg, en date du 10 juin 2022,

parties demanderesses aux termes d'un exploit de l'huissier de justice Guy ENGEL, immatriculé près le Tribunal d'arrondissement de et à Luxembourg, en date du 27 juin 2022,

parties demanderesses aux termes d'un exploit de l'huissier de justice Martine LISÉ, immatriculé près le Tribunal d'arrondissement de et à Luxembourg, du 26 juin 2025,

parties demanderesses aux termes d'un exploit de l'huissier de justice suppléant, Kelly FERREIRA SIMOES, en remplacement de l'huissier de justice Carlos CALVO, immatriculé près le Tribunal d'arrondissement de et à Luxembourg, en date du 30 juin 2025,

les parties sub 1) et sub 2) étant ci-après désignées par les « **Demanderesses** »,

3) Monsieur **Salvatore CERCHIONE**, gérant de sociétés, demeurant à P.O. BOX 506736 CAP 0, Dubaï, Emirats Arabes Unis, et demeurant professionnellement à L-1450 Luxembourg, 5, Côte d'Eich,

ci-après, « **Monsieur CERCHIONE** »,

4) Monsieur **Gianluca D'AVANZO**, gérant de sociétés, demeurant à DIFC GATE VILLAGE 7 107 CAP 0, Dubaï, Emirats Arabes Unis, et demeurant professionnellement à L-1450 Luxembourg, 5 Côte d'Eich,

ci-après, « **Monsieur D'AVANZO** »,

parties défenderesses aux termes d'un exploit de l'huissier de justice Josiane GLODEN, immatriculé près le Tribunal d'arrondissement de et à Luxembourg, en date du 2 mars 2023, comparant par la société à responsabilité limitée **MOLITOR Avocats à la Cour SARL**, établie et ayant son siège social à L-2763 LUXEMBOURG, 8, rue Sainte-Zithe, inscrite sur la liste V du Tableau de l'Ordre des avocats du Barreau de Luxembourg, immatriculée au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 211810, représentée dans le cadre de la présente procédure par **Maître Armel WAISSE**, avocat à la Cour, demeurant à la même adresse ;

**CONTRE :**

1) **Madame Daniela ITALIA**, gérant de sociétés, élisant domicile professionnellement chez Intertrust Group, à L-2453 Luxembourg, 6, rue Eugène Ruppert,

ci-après, « **Madame ITALIA** »,

2) **Monsieur Jean-Marc MCLEAN**, gérant de sociétés, élisant domicile professionnellement chez IQ-EQ, à L-1882 Luxembourg, 12C, rue Guillaume Kroll,

ci-après, « **Monsieur MCLEAN** »,

parties défenderesses aux fins du prédit exploit ENGEL du 10 juin 2022,
parties défenderesses aux fins du prédit exploit ENGEL du 27 juin 2022,

3) Monsieur **Elliott GREENBERG**, gérant de sociétés, domicilié au 600 Steamboat Road, 06830 Greenwich Connecticut, États-Unis d'Amérique,

ci-après, « **Monsieur GREENBERG** »,

4) Monsieur **Viktor SCHUH**, gérant de sociétés, élisant domicile professionnellement chez Intertrust Group, à L-2453 Luxembourg, 6, rue Eugène Ruppert,

ci-après, « **Monsieur SCHUH** »,

5) Monsieur **Alfred Izak GOSLING**, gérant de sociétés, élisant domicile professionnellement chez Intertrust Group, L-2453 Luxembourg, 6, rue Eugène Ruppert,

ci-après, « **Monsieur GOSLING** »,

6) Monsieur **Christos STAVROU**, gérant de sociétés, élisant domicile professionnellement chez IQ-EQ, à L-1882 Luxembourg, 12C, rue Guillaume Kroll,

ci-après, « **Monsieur STAVROU** »,

7) Monsieur **Aiden ASPELDING**, gérant de société, élisant domicile professionnellement chez Intertrust Group, L-2453 Luxembourg, 6, rue Eugène Ruppert,

ci-après, « **Monsieur ASPELDING** »,

parties défenderesses aux fins du prédit exploit ENGEL du 27 juin 2022,

comparant, toutes les sept (sub 1) à 7)) par la société à responsabilité limitée **BONN & SCHMITT**, établie et ayant son siège social à L-1511 Luxembourg, 148, avenue de la Faïencerie, inscrite sur la liste V du Tableau de l'Ordre des avocats du Barreau de Luxembourg, immatriculée au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B246634, représentée dans le cadre de la présente procédure par **Maître Cédric BELLWALD**, avocat à la Cour, demeurant à la même adresse ;

8) Monsieur **Giovanni CASLINI**, gérant de sociétés, élisant domicile professionnellement chez Blue Skye Financial Partners, à L-1450 Luxembourg, 5, Côte d'Eich,

ci-après, « **Monsieur CASLINI** »,

partie défenderesse aux fins du prédit exploit ENGEL du 10 juin 2022,
partie défenderesse aux fins du prédit exploit ENGEL du 27 juin 2022,

partie défenderesse aux termes d'un exploit de l'huissier de justice Josiane GLODEN, immatriculé près le Tribunal d'arrondissement de et à Luxembourg, en date du 2 mars 2023,

partie demanderesse aux termes d'un exploit de l'huissier de justice suppléant Luana COGONI, en remplacement de l'huissier Véronique REYTER, immatriculé près le Tribunal d'arrondissement de et à Luxembourg, en date du 8 mars 2023,

comparant par la société à responsabilité **C.A.S.**, établie et ayant son siège social à L-2339 Luxembourg, 1A, rue Christophe Plantin, inscrite sur la liste V du Tableau de l'Ordre des avocats du Barreau de Luxembourg, immatriculée au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B231602, représentée par **Maître Emmanuelle PRISER**, avocat à la Cour, demeurant à la même adresse ;

9) **PROJECT REDBLACK S.À R.L.**, société à responsabilité limité, établie et ayant son siège social à L-1616 Luxembourg, 5 place de la Gare, immatriculée au Registre du commerce et des sociétés de Luxembourg sous le numéro B 213015, représentée par son conseil de gérance en fonctions,

ci-après, **« PROJECT REDBLACK »**,

partie défenderesse aux fins du prédit exploit ENGEL du 10 juin 2022,
partie défenderesse aux fins du prédit exploit ENGEL du 27 juin 2022,
partie demanderesse aux fins du prédit exploit GLODEN du 2 mars 2023,
partie défenderesse aux fins du prédit exploit REYTER du 8 mars 2023,

10) **ROSSONERI SPORT INVESTMENT LUXEMBOURG S.À R.L.**, société à responsabilité limité, établie et ayant son siège social à L-1882 Luxembourg, 12C, rue Guillaume Kroll, immatriculée au Registre du commerce et des sociétés de Luxembourg sous le numéro B 211625, représentée par son conseil de gérance en fonctions,

ci-après, « **ROSSONERI SPORT** »,

partie défenderesse aux fins du prédit exploit ENGEL du 10 juin 2022,
partie défenderesse aux fins du prédit exploit ENGEL du 27 juin 2022,
partie demanderesse aux fins du prédit exploit GLODEN du 2 mars 2023,

comparant toutes les deux (sub 9) et 10)) par la société anonyme **ELVINGER HOSS PRUSSEN**, établie et ayant son siège social é L-1340 Luxembourg, 2, place Winston Churchill, inscrite sur la liste V du Tableau de l'Ordre des avocats du Barreau de Luxembourg, immatriculée au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B209469, représentée aux fins des présentes par **Maître Marc ELVINGER**, avocat à la Cour, demeurant professionnellement à Luxembourg ;

11) **GENIO INVESTMENT LLC**, une société de droit américain, établie et ayant son siège social au 1209 Orange Street, Corporation Trust Center, 19801 Wilmington, Delaware, États-Unis d'Amérique, immatriculée au *Division of Corporations of the Secretary of the State of Delaware* sous le numéro 6368216, représentée par son organe de gestion en fonction,

ci-après, « **GENIO** »,

12) **KING GEORGE INVESTMENTS LLC**, une société de droit américain, établie et ayant son siège social au 1209 Orange Street, Corporation Trust Center, 19801 Wilmington, Delaware, États-Unis d'Amérique, immatriculée au *Division of Corporations of the Secretary of the State of Delaware* sous le numéro 6368212, représentée par son organe de gestion en fonction,

ci-après, « **KING GEORGE** »,

parties défenderesses aux fins du prédit exploit ENGEL du 10 juin 2022,
parties défenderesses aux fins du prédit exploit ENGEL du 27 juin 2022,

13) **ELLIOTT ADVISORS (UK) LIMITED,** une société à responsabilité limitée de droit anglais, établie et ayant son siège social à Park House, 116 Park Street, London WIK 6AF, Royaume-Uni, immatriculée auprès de la *Companies House* sous le numéro 02989338, représentée par son organe de gestion en fonction,

ci-après, « **ELLIOTT UK** »,

partie défenderesse aux fins du prédit exploit ENGEL du 27 juin 2022,

comparant toutes les trois (sub 11), 12) et 13)) par la société en commandite simple **CLIFFORD CHANCE**, établie et ayant son siège social à L-1330 Luxembourg, 10, Boulevard G.D. Charlotte, inscrite sur la liste V du Tableau de l'Ordre des avocats du Barreau de Luxembourg, immatriculée au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B185112, représentée par son gérant actuellement en fonction, à savoir la société à responsabilité limitée **CLIFFORD CHANCE GP**, elle-même représentée aux fins de la présente procédure par son gérant **Maître Albert MORO**, avocat à la Cour, demeurant professionnellement à Luxembourg ;

14) Monsieur **Alfredo CRACA,** pris en sa qualité de séquestre du castre, domicilié professionnellement à Via degli Omenoni, 2, 20121 Milan, Italie,

ci-après, « **Monsieur CRACA** »,

partie défenderesse aux fins du prédit exploit ENGEL du 10 juin 2022,
partie défenderesse aux fins du prédit exploit ENGEL du 27 juin 2022,

15) **ASSOCIAZIONE CALCIO MILAN S.p.A.**, une société par actions de droit italien, établie et ayant son siège social à Via Aldo Rossi 8, 20149, Milan, Italie, immatriculée auprès de la Chambre de Commerce de Milan sous le numéro 569909 et sous le numéro fiscal 01073200154, représentée par son organe de gestion actuellement en fonctions,

ci-après, l'« **AC MILAN** »,

16) **MILAN ENTERTAINMENT S.r.l.**, une société à responsabilité limitée de droit italien, établie et ayant son siège social à Via Aldo Rossi, 8, 20149 Milan, Italie, immatriculée auprès de la Chambre de Commerce de Milan sous le numéro 1355664 et sous le numéro fiscal 10219030151, représentée par son organe de gestion en fonctions,

ci-après, « **MILAN ENTERTAINMENT** »,

17) **MILAN REAL ESTATE S.p.A.**, une société par actions de droit italien, établie et ayant son siège social à Via Milanello 25, 21040 Carnago, Italie, immatriculée auprès de la Chambre de Commerce de Varese sous le numéro 285406 et sous le numéro fiscal 13287110152, représentée par son organe de gestion en fonctions,

ci-après, « **MILAN REAL ESTATE** »,

parties défenderesses aux fins du prédit exploit ENGEL du 27 juin 2022,

comparant toutes les quatre (sub 14), 15), 16) et 17)) par la société par actions simplifiée **Christmann.legal S.A.S.**, établie et ayant son siège social à L-1420 Luxembourg, 27 avenue Gaston Diderich, inscrite sur la liste V du Tableau de l'Ordre des avocats du Barreau de Luxembourg, immatriculée au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B212183, représentée aux fins de la présente procédure par **Maître Bertrand CHRISTMANN**, avocat à la Cour, demeurant professionnellement à Luxembourg ;

18) **FOOTBALLCO INTERMEDIATE COÖPERATIEF U.A.**, une société de droit hollandais, établie et ayant son siège social à Basiveg, 10, 1043AP, Amsterdam, Pays-Bas, immatriculée au Registre de Commerce néerlandais (KVK) sous le numéro 78443962 (RSIN 861399663) représentée par son collège de gérance en fonctions,

ci-après, « **FOOTBALLCO** »,

partie défenderesse aux fins du prédit exploit ENGEL du 10 juin 2022,
partie défenderesse aux fins du prédit exploit ENGEL du 27 juin 2022,

comparant par **Maître Nicolas THIELTGEN**, avocat à la Cour, demeurant professionnellement à Luxembourg,

les parties assignées sub 1) à 18) étant ci-après désignées par les « **Défenderesses** » ;

En présence de :

19) **Lexington Finance Designated Activity Company**, une société de droit irlandais, établie et ayant son siège social au 32, Molesworth Street, DO2 Y512 Dublin, Irlande, immatriculée au Registre des Sociétés sous le numéro 594130, représentée par ses représentants légaux actuellement en fonction ;

ci-après, « **LEXINGTON** »,

partie intervenant volontairement aux termes d'une requête en intervention volontaire en date du 9 février 2024 (incorrectement datée du 9 février 2023),

comparant par la société **CMS DeBacker Luxembourg**, établie et ayant son siège social à L-1433 Luxembourg, 5, rue Charles Darwin, inscrite sur la liste V du Tableau de l'Ordre des avocats du Barreau de Luxembourg, immatriculée au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 241190, représentée dans le cadre de la présente procédure par **Maître Antoine LANIEZ**, avocat à la Cour, demeurant à la même adresse.

TAL-2022-07355

Revu l'assignation du 10 juin 2022

Revu les conclusions n° 1 de Maître Marc ELVINGER du 18 janvier 2023

Revu les conclusions n° 1 de Maître Albert MORO du 20 février 2023

Revu les conclusions n° 1 de Maître Bertrand CHRISTMANN du 11 avril 2023


TAL-2022-07361

Revu l'assignation du 27 juin 2022

Revu les conclusions n° 1 de Maître Marc ELVINGER du 31 octobre 2022

Revu les conclusions n° 1 de Maître Bertrand CHRISTMANN du 11 avril 2023

Revu les conclusions n° 1 de Maître Albert MORO du 7 juin 2023

Revu conclusions n° 1 de Maître Cédric BELLWALD du 3 juillet 2023

Revu les conclusions n° 2 de Maître Marc ELVINGER du 5 juillet 2023

Revu les conclusions n° 1 de Maître Bertrand CHRISTMANN du 25 septembre 2024

Revu les conclusions n° 1 de Maître Nicolas THIELTGEN du 4 juillet 2024

Revu les conclusions n° 1 de Maître Emmanuelle PRISER du 5 juillet 2024

Revu le désistement d'instance notifié à Maître Bertrand CHRISTMANN le 22 septembre 2025


TAL-2023-03720

Revu l'assignation du 8 mars 2023


TAL-2023-04206

Revu l'assignation du 2 mars 2023


TAL-2022-07355 ; TAL-2022-07361 ; TAL-2023-03720 ; TAL-2023-04206

Revu la requête en intervention volontaire du 9 février 2024 (incorrectement datée du 9 février 2023) de Maître Clara MARA-MARHUENDA

1.    À titre liminaire, avant tout moyen de défense au fond, et à titre principal, Monsieur Salvatore CERCHIONE et Monsieur Gianluca D'AVANZO donnent à considérer qu'ils soulèvent *in limine litis*, la nullité, sinon l'irrecevabilité de l'acte introductif d'instance qui leur a été signifié le 2 mars 2023, dans la procédure portant le numéro de rôle TAL-2023-04206, à la requête de PROJECT REDBLACK et ROSSONERI SPORT, du fait du libellé obscur dudit acte introductif (*exceptio obscuri libelli*), en contravention de l'article 154 du Nouveau Code de procédure civile.

2.    Ce moyen sera plus amplement développé aux paragraphes 304 et suivants des présentes.


**INTRODUCTION**

3.    Le présent litige s'inscrit dans le cadre d'une opération de financement en avril 2017, devenue une opération d'acquisition en 2018 (à la suite du défaut de l'emprunteur), ayant pour cible la société italienne *Associazione Calcio Milan S.p.A.*, propriétaire du club de football AC MILAN (l'« **AC MILAN** ») par Rossoneri Sport Luxembourg (« **ROSSONERI SPORT** »), devenue depuis lors la filiale de Project Redblack S.à r.l. (« **PROJECT REDBLACK** »).

      PROJECT REDBLACK est un véhicule de droit luxembourgeois codétenu à hauteur de 95,73 % par Genio Investment LLC (« **GENIO** ») et KING GEORGE Investments LLC (« **KING GEORGE** »), deux entités du groupe d'investissement américain Elliott Management (« **ELLIOTT** »).

      Blue Skye Financial Partners S.à r.l. (« **BLUE SKYE LUX** ») et Luxembourg Investment Company 159 S.à r.l. (« **LIC 159** ») sont deux entités du groupe européen Blue Skye (« **BLUE SKYE** »), qui détiennent une participation minoritaire, à hauteur de 4,27 %, dans PROJECT REDBLACK.

4.    Plus particulièrement, et comme il sera détaillé ci-après, les griefs formulés par BLUE SKYE LUX et LIC 159, les deux entités du groupe BLUE SKYE impliquées dans les opérations de financement et d'acquisition de l'AC MILAN, parties demanderesses dans les deux premières actions portées devant Votre Tribunal, se concentrent sur une série d'actes posés à l'instigation d'ELLIOTT depuis 2022, sans préjudice quant à la date exacte, dont l'élément central est la vente des actions de l'AC MILAN par ROSSONERI SPORT , organisée dans des conditions plus que douteuses, en fraude manifeste des droits de BLUE SKYE et au mépris du rôle essentiel joué par celui-ci depuis 2017.

5.    BLUE SKYE LUX et LIC 159 n'ont eu d'autre choix que d'initier, dès 2022, plusieurs procédures judiciaires, sur base des informations parcellaires dont elles disposaient alors, afin de préserver leurs droits d'actionnaire ou d'associée et de créancier et donc, indirectement, ceux de leurs propres associés et créanciers. Elles ont en particulier introduit les demandes suivantes au Luxembourg :

      (i)    une action déclaratoire lancée par une assignation du 10 juin 2022 (n° TAL-2022-07355 du rôle), concernant la mainlevée par PROJECT REDBLACK du gage de droit italien qui lui avait été consenti par ROSSONERI SPORT sur les actions émises par l'AC MILAN (lequel représentait un obstacle juridique à la vente de ces actions par ROSSONERI SPORT), et la renonciation corrélative au remboursement d'une partie de la créance de ROSSONERI SPORT envers PROJECT REDBLACK, lesquelles auraient dû être approuvées à l'unanimité par les gérants de PROJECT REDBLACK ou à défaut par tous ses associés (et donc, par BLUE SKYE LUX)  ; et

(ii)     une action introduite par une assignation du 27 juin 2022 (n° TAL-2022-07361) et fondée sur l'existence d'une fraude perpétrée par plusieurs personnes (dont les gérants de PROJECT REDBLACK nommés sur proposition du groupe ELLIOTT) dans le cadre de la vente des actions de l'AC MILAN, laquelle doit, entre autres, donner lieu à la nullité de l'acte de vente intervenu au mépris des droits de BLUE SKYE LUX et à celle de la mainlevée du gage de droit italien octroyé en faveur de PROJECT REDBLACK sur les actions de l'AC MILAN.

6.    Monsieur Giovanni CASLINI (« **Monsieur CASLINI** »), le seul des trois gérants de PROJECT REDBLACK nommé sur proposition de BLUE SKYE LUX, a, par le biais d'une assignation du 8 mars 2023 (n° TAL-2023-03720 du rôle), intenté une action en nullité contre les résolutions prises le 9 septembre 2022 par le conseil de gérance de PROJECT REDBLACK concernant, notamment, la ratification de la décision de mainlevée du gage de droit italien et de la décision de vendre les actions de l'AC MILAN.

7.    Dans une tentative d'intimidation et de représailles, PROJECT REDBLACK et la filiale de celle-ci, ROSSONERI SPORT, qui détenait les actions de l'AC MILAN avant leur vente, ont lancé une assignation le 2 mars 2023 (n° TAL-2023-04206 du rôle) contre Monsieur Salvatore CERCHIONE (« **Monsieur CERCHIONE** ») et Monsieur Gianluca D'AVANZO (« **Monsieur D'AVANZO** »), les associés de BLUE SKYE LUX, et Monsieur CASLINI afin de mettre en cause leur responsabilité civile sur base de prétendus comportements abusifs liés aux démarches judiciaires évoquées ci-dessus que ces derniers avaient entreprises.

8.    Par une ordonnance prise par le Tribunal d'Arrondissement de et à Luxembourg le 20 décembre 2023, les quatre procédures visées par les assignations susmentionnées ont fait l'objet d'une jonction. Une ordonnance rendue le même jour par la même juridiction a requis des parties dans le rôle n° TAL-2022-07361 de ne conclure dans un premier temps que sur :
-     « *le libellé obscur,*
-      *les moyens d'irrecevabilité soulevés par Maître Albert MORO*
-     *la loi applicable* ».

9.    Il faut enfin relever que Lexington Finance Designated Activity Company LLC (« **LEXINGTON** »), la filiale du fonds d'investissement américain Arena (« **ARENA** »), dont BLUE SKYE avait permis la participation aux opérations concernant l'AC MILAN depuis avril 2017 en raison des excellentes relations qui l'unissaient alors à ARENA, a soudainement décidé d'intervenir volontairement dans les quatre affaires aux numéros de rôle susmentionnés au moyen d'une requête du 9 février 2024 (et non du 9 février 2023, comme mentionné dans la requête) pour se ranger, de manière assez suspecte, du côté du groupe ELLIOTT pour entraver le groupe BLUE SKYE dans ses démarches judiciaires relatives à la vente de l'AC MILAN.

10.    LEXINGTON a également introduit une assignation en référé le 31 octobre 2023 (rôle n° TAL-2023-08710) afin d'obtenir la nomination d'un administrateur *ad hoc* pour BLUE SKYE LUX et LIC 159. Signe d'une connivence ou d'un accord secret entre les parties, PROJECT REDBLACK et ROSSONERI SPORT sont intervenues à la cause par une requête en intervention volontaire datée du 4 avril 2024 visant à soutenir les demandes de LEXINGTON. De manière prévisible, l'ordonnance n° 2025TALREFO/00286 du 26 mai 2025 (rectifiée par une ordonnance

n° 2025TALREFO/00398 du 14 juillet 2025)[1], rendue par la vice-présidente de Votre Tribunal, a déclaré la demande de LEXINGTON irrecevable pour défaut de qualité et d'intérêt à agir dans le chef de cette dernière, laquelle n'était qu'une simple créancière et n'avait pas pu établir le fait que BLUE SKYE LUX et LIC 159 se seraient retrouvées en état de liquidation ou n'auraient plus disposés d'organes de gestion aptes à assurer leur fonctionnement normal et régulier.

11.     Comme il sera détaillé ci-après, BLUE SKYE LUX et LIC 159 ont eu connaissance, à la suite de la signification des assignations des 10 et 27 juin 2022, d'une série d'actes posés antérieurement et postérieurement à la vente des actions de l'AC MILAN qui, mis bout à bout, démontrent incontestablement que PROJECT REDBLACK et ROSSONERI SPORT, pilotées par ELLIOTT, ont agi en fraude de leurs droits. En effet, même si la vente des actions de l'AC MILAN a joué un rôle central dans le présent litige, elle n'a été qu'une des étapes du stratagème déloyal et frauduleux mis en place par le groupe ELLIOTT pour (i) permettre à ce dernier de siphonner les fonds issus de la vente, pour un montant évalué provisoirement à 962.704.136 euros, (ii) suspendre artificiellement et indéfiniment toute distribution à laquelle BLUE SKYE LUX et LIC 159 ont droit en gardant les sommes correspondantes bloquées au niveau de ROSSONERI SPORT et (iii) dépenser ces sommes de toutes les manières possibles afin de les réduire à peau de chagrin au cas où une distribution devrait finalement avoir lieu en faveur de BLUE SKYE LUX et de LIX 159.

12.     Enfin, BLUE SKYE LUX et LIC 159 ont aussi pu découvrir l'identité des entités qui étaient parties au contrat de vente des actions de l'AC MILAN et de la société ayant acquis les actions de l'AC MILAN le 31 août 2022. De manière similaire, BLUE SKYE LUX et LIC 159 ont également pu conclure à l'absence d'éléments suffisants pour impliquer certaines parties assignées dans les assignations des 10 et 27 juin 2022. Par conséquent, BLUE SKYE LUX et LIC 159 se désistent de certaines instances à l'égard de certaines parties, de même qu'elles ont procédé à des mises en intervention forcées en date des 26 et 30 juin 2025[2] pour faire joindre les parties impliquées dans le contrat de vente des actions de l'AC MILAN dans les présents contentieux.

*   *

*

---

[1]     **Rôle n° TAL-2022-07355, pièce n° 92 de la farde II de MOLITOR –** Ordonnance de la Vice-Présidente du Tribunal d'arrondissement de et à Luxembourg du 26 mai 2025 ;  **pièce n° 93 de la farde III de MOLITOR –** Ordonnance rectifiée de la Vice-Présidente du Tribunal d'arrondissement de et à Luxembourg du 14 juillet 2025 ; **rôle n° TAL-2022-07361, pièce n° 92 de la farde II de MOLITOR –** Ordonnance de la Vice-Présidente du Tribunal d'arrondissement de et à Luxembourg du 26 mai 2025 ; **pièce n° 93 de la farde III de MOLITOR –** Ordonnance rectifiée de la Vice-Présidente du Tribunal d'arrondissement de et à Luxembourg du 14 juillet 2025 ; **rôle n° TAL-2023-04206, pièce n° 92 de la farde I de MOLITOR –** Ordonnance de la Vice-Présidente du Tribunal d'arrondissement de et à Luxembourg du 26 mai 2025 ; **pièce n° 93 de la farde II de MOLITOR –** Ordonnance rectifiée de la Vice-Présidente du Tribunal d'arrondissement de et à Luxembourg du 14 juillet 2025.

[2]     **Rôle n° TAL-2022-07355, pièce n° 94 de la farde III de MOLITOR –** Assignation en intervention forcée du 26 juin 2025, **pièce n° 95 de la farde III de MOLITOR –** Assignation en intervention forcée du 30 juin 2025 ; **rôle n° TAL-2022-07361, pièce n° 94 de la farde III de MOLITOR –** Assignation en intervention forcée du 26 juin 2025 ; , **pièce n° 95 de la farde III de MOLITOR –** Assignation en intervention forcée du 30 juin 2025 ; **rôle n° TAL-2023-04206, pièce n° 94 de la farde III de MOLITOR –** Assignation en intervention forcée du 26 juin 2025, **pièce n° 95 de la farde II de MOLITOR –** Assignation en intervention forcée du 30 juin 2025.

\*  \*
\*

# Table des matières

I.      EN FAIT ........................................................................................................................... 11

1      LES PARTIES EN CAUSE ................................................................................................. 11

2      RÉSUMÉ DES FAITS ........................................................................................................ 13

  2.1    L'acquisition de l'AC MILAN ....................................................................................... 13

    2.1.1   La situation avant le 10 juillet 2018 : le financement de l'acquisition de l'AC MILAN par un investisseur chinois 13

    2.1.2   La réalisation du Gage luxembourgeois par PROJECT REDBLACK ........................ 15

  2.2    Le financement de PROJECT REDBLACK par BLUE SKYE et ELLIOTT ....................... 16

    2.2.1   Les TPECs de classes A-1, A-2 et B émis par PROJECT REDBLACK ..................... 16

    2.2.2   Les TPECs de classe E-1, E-2 et F initialement émis par BLUE SKYE LUX ............ 18

    2.2.3   Le transfert des TPECs de classe B par BLUE SKYE LUX à LIC 159 et le remplacement de BLUE SKYE LUX par LIC 159 comme émetteur des TPECs de classes E-1, E-2 et F ................. 19

  2.3    Les litiges nés de la dissimulation à BLUE SKYE du projet de vente de l'AC MILAN ...................... 20

  2.4    Les procédures initiées par BLUE SKYE LUX et LIC 159 en relation avec la vente des actions de l'AC MILAN 28

  2.5    La réalisation de la vente des actions de l'AC MILAN ................................................... 30

  2.6    Les éléments plus récents confirmant la fraude dont BLUE SKYE LUX, LIC 159 et leurs créanciers sont victimes ..................... 33

    2.6.1   Les distributions illégales du 1er février 2023 par ROSSONERI SPORT et PROJECT REDBLACK ............... 34

    2.6.2   La sous-évaluation frauduleuse des *notes* de crédit- vendeur distribuées par PROJECT REDBLACK aux entités ELLIOTT .................. 37

    2.6.3   Le remboursement anticipé des *notes* de crédit-vendeur et leur refinancement par ELLIOTT .................... 39

  2.7    La position surprenante prise par LEXINGTON ............................................................ 42

  2.8    Les premiers échecs subis par le groupe ELLIOTT ...................................................... 49

II.    EN DROIT ......................................................................................................................... 50

1      TAL-2022-07355 : ACTION DÉCLARATOIRE ................................................................ 50

2      TAL-2022-07361 : ACTION POUR FRAUDE .................................................................. 63

3      TAL-2023-04206 : Action en responsabilité civile contre Messieurs CERCHIONE, D'AVANZO et CASLINI ... 92

4      TAL-2023-03720 : Action en annulation initiée par Monsieur CASLINI .................................... 106

\*  \*
\*

## I.    EN FAIT

## 1    LES PARTIES EN CAUSE

13.    BLUE SKYE LUX est une société à responsabilité limitée de droit luxembourgeois co-fondée par Monsieur CERCHIONE et Monsieur D'AVANZO, lesquels détiennent chacune la moitié de son capital social. Cette société est à la tête d'un groupe d'investissement européen fournissant du *venture capital* et investissant dans le domaine du crédit.

14.    LIC 159 est une société à responsabilité limitée de droit luxembourgeois et était au moment des faits la filiale entièrement détenue par BLUE SKYE LUX. L'intégralité de ses parts sociales a été transférée le 7 novembre 2024 à Monsieur CERCHIONE et Monsieur D'AVANZO, chacun d'entre eux en détenant actuellement la moitié[3].

15.    PROJECT REDBLACK est une société à responsabilité limitée de droit luxembourgeois actuellement détenue par BLUE SKYE LUX à hauteur de 4,27 %, et détenue majoritairement, à hauteur de 95,73 %, par deux sociétés du groupe ELLIOTT, GENIO (détenant 28,72%) et KING GEORGE (détenant 67,01%). Au moment des faits en cause, le conseil de gérance de PROJECT REDBLACK comptait deux gérants de classe A nommés sur proposition de GENIO et KING GEORGE (à savoir, Monsieur Jean-Marc MCLEAN (« **Monsieur MCLEAN** ») et Madame Daniela ITALIA (« **Madame ITALIA** »)) et un gérant de classe B nommé sur proposition de BLUE SKYE LUX (Monsieur CASLINI).



---

3    **Rôle n° TAL-2022-07355, pièce n° 32 de la farde II de MOLITOR** - Avis déposé auprès du Registre de Commerce et des Sociétés de Luxembourg le 8 novembre 2024 relativement aux nouveaux associés de LIC 159 ; **rôle n° TAL-2022-07361, pièce n° 32 de la farde II de MOLITOR** - Avis déposé auprès du Registre de Commerce et des Sociétés de Luxembourg le 8 novembre 2024 relativement aux nouveaux associés de LIC 159 ; **rôle n° TAL-2023-04206, pièce n° 32 de la farde II de MOLITOR** - Avis déposé auprès du Registre de Commerce et des Sociétés de Luxembourg le 8 novembre 2024 relativement aux nouveaux associés de LIC 159.

16. ROSSONERI SPORT est une société à responsabilité limitée de droit luxembourgeois entièrement détenue par PROJECT REDBLACK depuis le 10 juillet 2018 à la suite de la réalisation par voie d'appropriation d'un gage de droit luxembourgeois constitué sur les parts sociales de ROSSONERI SPORT en faveur de PROJECT REDBLACK. Au moment des faits ayant donné lieu aux présentes actions, le conseil de gérance de cette société comptait trois gérants de classe A (à savoir, Monsieur CASLINI, Monsieur Alfred Izak GOSLING (« **Monsieur GOSLING** ») et Monsieur Viktor SCHUH (« **Monsieur SCHUH** »)), et deux gérants de classe B (à savoir, Monsieur Elliott GREENBERG (« **Monsieur GREENBERG** ») et Monsieur MCLEAN). Monsieur CASLINI a été révoqué de ses fonctions de gérant de ROSSONERI SPORT le 17 mai 2022, tandis que Monsieur GOSLING a démissionné de ses fonctions avec effet au 13 mai 2022, la société ayant pris acte de cette démission le 17 mai 2022. Monsieur Aiden ASPELDING et Monsieur Christos STAVROU ont été nommés gérants de classe A de ROSSONERI SPORT le 17 mai 2022.

17. L'AC MILAN est une société de droit italien et est propriétaire du club de football AC MILAN. Jusqu'au 31 août 2022, cette société était détenue à hauteur de 99,93 % par ROSSONERI SPORT avant que les actions détenues par cette dernière soient cédées, par l'acte de vente frauduleux, à ACM BIDCO B.V. (« **ACM BIDCO** »).

18. Monsieur Alfredo CRACA (« **Monsieur CRACA** ») était le dépositaire de certificats représentatifs des actions de l'AC MILAN détenues par ROSSONERI SPORT et sujettes à un gage de droit italien en faveur de PROJECT REDBLACK afin de garantir les dettes de ROSSONERI SPORT envers celle-ci. Au moment de la vente des actions de l'AC MILAN, Monsieur CRACA était également un administrateur de cette société et a toujours nié l'existence ou l'imminence d'une telle transaction. Monsieur CRACA, qui était de mèche avec ELLIOTT, a aussi servi de conseil juridique italien pour l'AC MILAN par rapport à la vente des actions pour laquelle il a coordonné la *due diligence* et a été généreusement rémunéré pour ce rôle, notamment via FIVERS (anciennement dénommé FIVELEX STUDIO E LEGALE TRIBUTARIO), le cabinet d'avocats italien au sein duquel il est associé, qui a reçu, entre autres, de ROSSONERI SPORT une somme de 602.830 euros le 1er septembre 2022[4].

19. Elliot Advisors (UK) Limited (« **ELLIOTT UK** ») est une société anglaise appartenant au groupe ELLIOTT et a joué un rôle prépondérant dans la vente des actions de ROSSONERI SPORT dans l'AC MILAN.

---

[4]    **Rôle n° TAL-2022-07355, pièce n° 99 de la farde III de MOLITOR** – Communiqué de presse de FIVERS ; **pièce n° 100 de la farde II de MOLITOR** – Capture d'écran de la page web de FIVERS concernant Monsieur CRACA ; **pièce n° 101 de la farde III de MOLITOR** – preuve du paiement de FIVELEX STUDIO E LEGALE TRIBUTARIO le 1er septembre 2022 ; **rôle n° TAL-2022-07361, pièce n° 99 de la farde III de MOLITOR** – Communiqué de presse de FIVERS ; **pièce n° 100 de la farde II de MOLITOR** – Capture d'écran de la page web de FIVERS concernant Monsieur CRACA ; **pièce n° 101 de la farde III de MOLITOR** – preuve du paiement de FIVELEX STUDIO E LEGALE TRIBUTARIO le 1er septembre 2022 ; **rôle n° TAL-2023-04206, pièce n°99 de la farde III de MOLITOR** – Communiqué de presse de FIVERS ; **pièce n° 100 de la farde II de MOLITOR** – Capture d'écran de la page web de FIVERS concernant Monsieur CRACA ; **pièce n° 101 de la farde II de MOLITOR** – preuve du paiement de FIVELEX STUDIO E LEGALE TRIBUTARIO le 1er septembre 2022.

20.     Footballco Intermediate Coöperatief U.A. (« **FOOTBALLCO** »), une société appartenant au groupe RedBird Capital Partner (« **REDBIRD** »), est la société qui a conclu le contrat de vente des actions de l'AC MILAN le 26 mai 2022 avec ROSSONERI SPORT. Les autres parties à ce contrat sont ELLIOTT ASSOCIATES L.P. (« **ELLIOTT ASSOCIATES** ») et ELLIOTT INTERNATIONAL L.P (« **ELLIOTT INTERNATIONAL** »), parties contre lesquelles a été lancées des assignations en intervention forcées en date des 26 et 30 juin 2025[5].

21.     ACM BIDCO est le véhicule de droit hollandais appartenant au groupe REDBIRD et désigné par FOOTBALLCO pour devenir le nouveau propriétaire des actions de l'AC MILAN le 31 août 2022.

22.     LEXINGTON est une société de droit irlandais appartenant au groupe ARENA et ayant fourni une partie des fonds injectés par le groupe BLUE SKYE dans PROJECT REDBLACK.


## 2     RÉSUMÉ DES FAITS


### 2.1     L'acquisition de l'AC MILAN

#### 2.1.1     La situation avant le 10 juillet 2018 : le financement de l'acquisition de l'AC MILAN par un investisseur chinois

23.     En avril 2017, le groupe BLUE SKYE, connu pour son activité dans la restructuration de dettes, a été approchée pour fournir le financement nécessaire à ROSSONERI SPORT INVESTMENT CO. LIMITED (« **ROSSONERI HK** »), la holding de droit hong-kongais d'un investisseur chinois, Monsieur Yong Hong LI (« **Monsieur LI** »), afin de permettre à celui-ci d'acquérir 99,93 % des actions de l'AC MILAN.

24.     Le groupe BLUE SKYE a alors contacté le groupe ELLIOTT, avec lequel il avait déjà collaboré dans le passé (notamment pour l'acquisition, la restructuration de la dette et la revente de l'hôtel *Bauer* à Venise) pour lui proposer de participer au projet, ce qu'ELLIOTT a accepté.

25.     Des entités de ces deux groupes ont alors acquis les parts sociales de PROJECT REDBLACK afin de l'utiliser comme véhicule dédié pour les besoins du projet et en ont redessiné la gouvernance. En particulier, les statuts de PROJECT REDBLACK ont prévu la nomination de deux gérants de classe A proposés par GENIO et KING GEORGE[6] et d'un gérant de classe B proposé par BLUE SKYE (Monsieur CASLINI), aucun de ces gérants ne pouvant être révoqué sans l'aval du ou des associés dont ils dépendent.

---

[5]     **Rôle n° TAL-2022-07355, pièce n° 94 de la farde III de MOLITOR** – précitée, **pièce n° 95 de la farde III de MOLITOR** – précitée ; **rôle n° TAL-2022-07361, pièce n° 94 de la farde III de MOLITOR** précitée ; **pièce n° 95 de la farde III de MOLITOR** – précitée ; **rôle n° TAL-2023-04206, pièce n° 94 de la farde III de MOLITOR** – précitée, **pièce n° 95 de la farde II de MOLITOR** – précitée.

[6]     Lesquels furent Monsieur MACLEAN et Madame ITALIA, remplacés le 10 février 2023 par VENTO DELL'S EAST MANAGEMENT S.A.R.L. et ZORO MANAGEMENT S.A.R.L., deux sociétés de droit luxembourgeois représentées par Madame ITALIA et Monsieur MCLEAN.

26. PROJECT REDBLACK a consenti une facilité de crédit à terme (*term loan facility*) à ROSSONERI SPORT, la filiale indirecte de ROSSONERI HK, en vertu d'un *acquisition facility agreement* de droit anglais daté du 17 avril 2017[7] (l'« **AFA** »), laquelle était notamment garantie par :

(i) un gage de droit luxembourgeois portant notamment sur l'intégralité des parts sociales de classe A émises par ROSSONERI SPORT (le « **Gage luxembourgeois** ») ; et

(ii) un gage de droit italien consenti par ROSSONERI SPORT et portant sur les actions de l'AC MILAN, originellement mis en place par deux contrats de gage des 13 avril 2017 et 31 juillet 2017[8] (le « **Gage italien** »). En application de la clause 3.3 des contrats de gage italien, les certificats représentatifs des actions de l'AC MILAN ont été remis à Monsieur CRACA, le dépositaire désigné par PROJECT REDBLACK qui devait les conserver pendant toute la durée du Gage italien[9].



---

7    **Rôle n° TAL-2022-07355, pièce n° 5 de la farde I de MOLITOR –** *Acquisition Facility Agreement* entre ROSSONERI SPORT et PROJECT REDBLACK ; **rôle n° TAL-2022-07361, pièce n° 5 de la farde I de MOLITOR –** Acquisition Facility Agreement entre ROSSONERI SPORT et PROJECT REDBLACK. ; **rôle n° TAL-2023-04206, pièce n° 5 de la farde I de MOLITOR –** Acquisition Facility Agreement entre ROSSONERI SPORT et PROJECT REDBLACK.

8    **Rôle n° TAL-2022-07355, pièce n° 6 de la farde I de MOLITOR –** Contrat de gage du 13 avril 2017 **et pièce n° 7 de la farde I de MOLITOR** – *Supplemental pledge agreement* du 31 juillet 2017 ; **rôle n° TAL-2022-07361, pièce n° 6 de la farde I de MOLITOR –** Contrat de gage du 13 avril 2017 **et pièce n° 7 de la farde I de MOLITOR** – *Supplemental pledge agreement* du 31 juillet 2017 ; **rôle n° TAL-2023-04206, pièce n° 6 de la farde I de MOLITOR –** Contrat de gage du 13 avril 2017 **et pièce n° 7 de la farde I de MOLITOR** – *Supplemental pledge agreement* du 31 juillet 2017.

9    **Rôle n° TAL-2022-07355, pièce n° 33 de la farde III de MOLITOR –** Courrier du 24 avril 2017 envoyé au notaire par PROJECT REDBLACK concernant la désignation de Monsieur CRACA en qualité de dépositaire ; **rôle n° TAL-2022-07355, pièce n° 33 de la farde II de MOLITOR –** Courrier du 24 avril 2017 envoyé au notaire par PROJECT REDBLACK concernant la désignation de Monsieur CRACA en qualité de dépositaire ; **rôle n° TAL-2023-04206, pièce n° 33 de la farde II de MOLITOR –** Courrier du 24 avril 2017 envoyé au notaire par PROJECT REDBLACK concernant la désignation de Monsieur CRACA en qualité de dépositaire.

### 2.1.2    La réalisation du Gage luxembourgeois par PROJECT REDBLACK

27.    Le 10 juillet 2018[10], à la suite d'un cas de défaut sous l'AFA, PROJECT REDBLACK a réalisé le Gage luxembourgeois en s'appropriant toutes les parts sociales de classe A émises par ROSSONERI SPORT (l'unique part sociale de classe B de cette société étant déjà détenue par PROJECT REDBLACK). C'est ainsi que BLUE SKYE LUX et le groupe ELLIOTT (par l'intermédiaire de GENIO et de KING GEORGE) sont devenus les détenteurs indirects, via PROJECT REDBLACK et ROSSONERI SPORT, de 99,93 % du capital social de l'AC MILAN. Un contentieux est d'ailleurs toujours en cours avec Monsieur LI par rapport à la réalisation de cette sûreté.

La structure de détention de l'AC MILAN était alors comme suit :



28.    À la suite de la réalisation du Gage luxembourgeois, l'AFA et le Gage italien ont été maintenus entre PROJECT REDBLACK et ROSSONERI SPORT. Cette sûreté a même été étendue pour couvrir plusieurs facilités de crédit supplémentaires de droit anglais qui ont été accordées à ROSSONERI SPORT par PROJECT REDBLACK pour financer l'AC MILAN[11].

---

[10]    **Rôle n° TAL-2022-07355, pièce n° 34 de la farde III de MOLITOR –** Avis déposé auprès du Registre de Commerce et des Sociétés de Luxembourg le 12 juillet 2018 relativement à la réalisation du gage consenti par ROSSONERI CHAMPION sur les parts sociales qu'il détient dans ROSSONERI SPORT ; **rôle n° TAL-2022-07355, pièce n° 34 de la farde II de MOLITOR –** Avis déposé auprès du Registre de Commerce et des Sociétés de Luxembourg le 12 juillet 2018 relativement à la réalisation du gage consenti par ROSSONERI CHAMPION sur les parts sociales qu'il détient dans ROSSONERI SPORT ; **rôle n° TAL-2023-04206, pièce n° 34 de la farde II de MOLITOR –**. Avis déposé auprès du Registre de Commerce et des Sociétés de Luxembourg le 12 juillet 2018 relativement à la réalisation du gage consenti par ROSSONERI CHAMPION sur les parts sociales qu'il détient dans ROSSONERI.

[11]    **Rôle n° TAL-2022-07355, pièce n° 35 de la farde III de MOLITOR –** Extension du Gage italien et traduction automatique en français ; **rôle n° TAL-2022-07355, pièce n° 35 de la farde II de MOLITOR –** Extension du Gage italien et traduction automatique en français ; **rôle n° TAL-2023-04206, pièce n° 35 de la farde II de MOLITOR –** Extension du gage italien et traduction automatique en français.

29.   Le Gage italien a ainsi été soigneusement conservé jusqu'à sa mainlevée le 31 août 2022, jour de la cession des actions de l'AC MILAN. Il est donc faux d'affirmer, comme le font certaines parties adverses, que le Gage italien avait perdu tout intérêt le jour où PROJECT REDBLACK (le créancier gagiste) est devenue l'associée unique de ROSSONERI SPORT (le débiteur)[12]. Au contraire, cette sûreté restait essentielle pour préserver les intérêts financiers de PROJECT REDBLACK et de ses investisseurs[13].

## 2.2   Le financement de PROJECT REDBLACK par BLUE SKYE et ELLIOTT

30.   Comme expliqué dans les assignations des 10 juin 2022 (n° TAL-2022-07355 du rôle)[14] et 27 juin 2020 (n° TAL-2022-07361)[15], les fonds prêtés à ROSSONERI SPORT par PROJECT REDBLACK ont été levés par cette dernière via (i) des prêts sans intérêts (*interest free loans*) consentis par BLUE SKYE LUX et des entités du groupe ELLIOTT et (ii) des « *Tracking Preferred Equity Certificates* » (des « **TPECs** »), c'est-à-dire des instruments conférant à leurs titulaires plusieurs droits économiques, à savoir un « *fixed yield* » (ou rendement fixe) qui ressemble à un taux d'intérêt, et un « *variable yield* » (ou rendement variable) lié à la valeur d'un sous-jacent.

### 2.2.1   Les TPECs de classes A-1, A-2 et B émis par PROJECT REDBLACK

31.   PROJECT REDBLACK a émis plusieurs catégories de TPECs, tous régis par des conditions générales (*Terms and Conditions*) originellement datées du 10 avril 2017 et modifiées les 8 mai 2017 et 31 octobre 2018 (les « **Conditions Générales des TPECs de classes A et B** »)[16].

32.   Ces catégories de TPECs sont les suivantes :

(i)   des **TPECs de classe A** qui donnent un droit sur 95,73 % des produits générés par le financement puis par toute cession des actions de l'AC MILAN.

---

[12]   **Rôle n° TAL-2022-07355**, conclusions de CLIFFORD CHANCE du 20 février 2023, n° 7, p. 6 et n° 21, p. 15 ; **rôle n° TAL-2022-07355**, conclusions d'ELVINGER HOSS PRUSSEN du 31 octobre 2022, n° 14, p. 9 ; n° TAL-2023-04206, assignation du 2 mars 2023 d'ELVINGER HOSS PRUSSEN, n° 14, p. 7.

[13]   **Rôle n° TAL-2022-07355, pièces n° 6 et 7 de la farde I de MOLITOR** – précitées ; **rôle n° TAL-2022-07361, pièces n° 6 et 7 de la farde I de MOLITOR –** précitées ; **rôle n° TAL-2023-04206, pièces n° 6 et 7 de la farde I de MOLITOR**, précitées.

[14]   **Rôle n° TAL-2022-07355**, assignation du 10 juin 2022, pp. 3 et s.

[15]   **Rôle n° TAL-2022-07361**, assignation du 27 juin 2022, pp. 6 et s.

[16]   **Rôle n° TAL-2022-07355, pièce n° 8 de la farde I de MOLITOR –** Master Agreement relatif aux *Tracking Preferred Equity Certificates* conclu le 10 avril 2017 **et pièce n° 36 de la farde II de MOLITOR** – Conditions générales cadres modifiées et refondues (*amended and restated master terms and conditions*) des *tracking preferred equity certificates* de classes A-1, A-2 et B, datées du 10 avril 2017, modifiées et complétées le 8 mai 2017 et modifies et refondues le 31 octobre 2018 ; **rôle n° TAL-2022-07361, pièce n° 8 de la farde I de MOLITOR –** *Master Agreement* relatif au *Tracking Preferred Equity Certificates* conclu le 10 avril 2017 **et pièce n° 36 de la farde II de MOLITOR** – Conditions générales cadres modifiées et refondues (*amended and restated master terms and conditions*) des *tracking preferred equity certificates* de classes A-1, A-2 et B, datées du 10 avril 2017, modifiées et complétées le 8 mai 2017 et modifies et refondues le 31 octobre 2018 ; **rôle n° TAL-2023-04206, pièce n° 8 de la farde I de MOLITOR –** Master Agreement relatif aux *Tracking Preferred Equity Certificates* conclu le 10 avril 2017 **et pièce n° 36 de la farde II de MOLITOR** – Conditions générales cadres modifiées et refondues (*amended and restated master terms and conditions*) des *tracking preferred equity certificates* de classes A-1, A-2 et B, datées du 10 avril 2017, modifiées et complétées le 8 mai 2017 et modifies et refondues le 31 octobre 2018.

Les TPECs de classe A ont eux-mêmes été divisés en deux sous-catégories, les TPECs de classes A-1 et A-2 :

(a) des **TPECs de classe A-1,** dont le nombre actuel est de 702.403.906, qui sont détenus par BUCKTHORN ASSOCIATES LIMITED et BUCKTHORN INTERNATIONAL LIMITED, appartenant au groupe ELLIOTT ; et

(b) 10 **TPECs de classe A-2** souscrits le 10 avril 2017 par BLUE SKYE LUX[17].

Ces TPECs de classe A-2, dont le montant nominal (10 euros) est faible mais les rendements très élevés, ont en effet été attribués à BLUE SKYE LUX en raison de son rôle prépondérant dans la mise en place, le développement et la gestion du projet.

Conformément aux termes du contrat d'investissement (*investors agreement*) signé le 10 avril 2017 entre Buckthorn International Limited et Buckthorn Associates Limited, Genio, King George, Blue Skye Lux et Project Redblack (le « **Contrat d'Investissement** »)[18], les TPECs de classe A-2 donnent droit aux revenus suivants :

---

[17] Le 10 mai 2017, les TPECs de classe A-2 ont été transférés dans un premier temps à la société caïmanaise BLUE SKYE CAPITAL LIMITED, intégralement détenue par Messieurs CERCHIONE et D'AVANZO (« BLUE SKYE **CAÏMANS »),** afin de séparer les entités détenant les TPECs émis par PROJECT REDBLACK de celle détenant des parts sociales dans PROJECT REDBLACK **(Rôle n° TAL-2022-07355, pièce n° 38 de la farde II de MOLITOR -** Contrat de cession du 10 mai 2017 entre BLUE SKYE LUX et BLUE SKYE CAÏMANS ; **rôle n° TAL-2022-07361, pièce n° 38 de la farde II de MOLITOR –** Contrat de cession du 10 mai 2017 entre BLUE SKYE LUX et BLUE SKYE CAÏMANS ; **rôle n° TAL-2023-04206, pièce n° 38 de la farde II de MOLITOR –** Contrat de cession du 10 mai 2017 entre BLUE SKYE LUX et BLUE SKYE CAÏMANS). Ils été à nouveau rétrocédés à BLUE SKYE LUX le 20 avril 2022 pour faire en sorte que les différentes procédures au fond opposant BLUE SKYE LUX et LIC 159 au groupe ELLIOTT n'affectent pas BLUE SKYE CAÏMANS du simple fait de sa détention des TPECs de classe A-2 **(Rôle n° TAL-2022-07355, pièce n° 39 de la farde II de MOLITOR -** Contrat de cession du 20 avril 2022 entre BLUE SKYE CAÏMANS et BLUE SKYE LUX ; **rôle n° TAL-2022-07361, pièce n° 39 de la farde II de MOLITOR –** Contrat de cession du 20 avril 2022 entre BLUE SKYE CAÏMANS et BLUE SKYE LUX ; **Rôle n° TAL-2023-04206, pièce n° 39 de la farde II de MOLITOR –** Contrat de cession du 20 avril 2022 entre BLUE SKYE CAÏMANS et BLUE SKYE LUX). PROJECT REDBLACK n'a finalement accepté de mettre à jour le registre des TPECs de classe A par rapport à la titularité des TPECs de classe A-2 par BLUE SKYE LUX qu'avec effet au 21 mai 2024, non sans avoir tenté d'opposer toutes les excuses possibles et imaginables pour échapper à cette obligation **(Rôle n° TAL-2022-07355, pièce n° 40 de la farde II de MOLITOR –** Courrier du 10 juillet 2024 envoyé à BLUE SKYE LUX et BLUE SKYE CAÏMANS par PROJECT REDBLACK ; **pièce n° 41 de la farde II de MOLITOR –** Courrier recommandé avec accusé de réception de Blue Skye Lux et LIC 159 à Project Redblack du 21 mai 2024 quant à la modification du registre des TPECs de classe A-2 ; **rôle n° TAL-2022-07361, pièce n° 40 de la farde II de MOLITOR –** Courrier du 10 juillet 2024 envoyé à BLUE SKYE LUX et BLUE SKYE CAÏMANS par PROJECT REDBLACK ; **pièce n° 41 de la farde II de MOLITOR –** Courrier recommandé avec accusé de réception de Blue Skye Lux et LIC 159 à Project Redblack du 21 mai 2024 quant à la modification du registre des TPECs de classe A-2 ; **Rôle n° TAL-2023-04206, pièce n° 40 de la farde II de MOLITOR –** Courrier du 10 juillet 2024 envoyé à BLUE SKYE LUX et BLUE SKYE CAÏMANS par PROJECT REDBLACK ; **pièce n° 41 de la farde II de MOLITOR –** Courrier recommandé avec accusé de réception de Blue Skye Lux et LIC 159 à Project Redblack du 21 mai 2024 quant à la modification du registre des TPECs de classe A-2). BLUE SKYE LUX s'est naturellement réservée le droit de prendre les mesures qui s'imposent pour faire inscrire dans le registre la date à partir de laquelle sa nouvelle titularité des TPECs de classe A-2 a été réellement connue par PROJECT REDBLACK, laquelle est en tout état de cause antérieure au 21 mai 2024.

[18] **Rôle n° TAL-2022-07355, pièce n° 37 de la farde II de MOLITOR –** Contrat d'investissement (*investors agreement*) du 10 avril 2017, tel que modifié et refondu au 31 octobre 2018 ; **rôle n° TAL-2022-07361, pièce n° 37 de la farde II de MOLITOR –** Contrat d'investissement (*investors agreement*) du 10 avril 2017, tel que modifié et refondu au 31 octobre 2018 ; **rôle n° TAL-2023-04206, pièce n° 37 de la farde II de MOLITOR – **Contrat d'investissement (*investors agreement*) du 10 avril 2017, tel que modifié et refondu au 31 octobre 2018.

- un *carried interest* (c'est-à-dire le droit à un pourcentage du bénéfice que les entités du groupe ELLIOTT tirent de leur investissement dans l'AC MILAN) afin de rémunérer le travail de structuration réalisé par le groupe BLUE SKYE et son rôle en tant qu'initiateur (*originator*) du projet, ayant permis à ELLIOTT de participer à la transaction, et

- des frais de gestion (*management fees*) au titre du travail réalisé par le groupe BLUE SKYE pour augmenter la valeur et les revenus de l'AC MILAN (Monsieur CERCHIONE et Monsieur D'AVANZO ayant été administrateurs de l'AC MILAN et Monsieur D'AVANZO ayant également occupé les fonctions de *chief financial officer* pour cette société jusqu'en 2021)[19]. Ces frais ont été régulièrement payés par PROJECT REDBLACK jusqu'en 2022.

(ii)    des TPECs de **classe B** (au nombre actuel de 31.325.065 pour un montant de 31.325.065 euros) émis à partir du 10 avril 2017. Comme il sera expliqué ci-après, si **BLUE SKYE LUX** a été titulaire entre le 10 avril 2017 et le 8 mai 2017 des 10.735.567 premiers TPECs de classe B, **LIC 159** est devenue titulaire de ces instruments et de tous les autres TPECs de classe B émis après le 8 mai 2017.

### 2.2.2    Les TPECs de classe E-1, E-2 et F initialement émis par BLUE SKYE LUX

33.    Les fonds utilisés par BLUE SKYE LUX pour le paiement du prix de souscription des 10.735.567 premiers TPECs de classe B émis par PROJECT REDBLACK proviennent du financement obtenu par celle-ci par l'émission des TPECs suivants entre le 6 avril 2017 et le 8 mai 2017 :

(i)    des TPECs de **classe E** dénommés en euros, se décomposant en :

(a)    10.009.852 TPECs de **classe E-1** souscrits par **LEXINGTON**[20], et

(b)    des TPECs de **classe E-2** souscrits par BLUE SKYE CAÏMANS, ainsi que

(ii)    des TPECs de **classe F** souscrits par SKYE CAPITAL PARTNERS LIMITED et GIGIBA CAPITAL LIMITED, des tiers à la présente procédure.

---

[19]    Rôle n° TAL-2022-07361, assignation du 27 juin 2022, p. 5.

[20]    **Rôle n° TAL-2022-07355, pièce n° 42 de la farde II de MOLITOR –** Contrat de contribution et de souscription de TPEC de classe E-1 (*class E-1 TPEC contribution and subscription agreement*) daté du 6 avril 2017 entre LEXINGTON en qualité de souscripteur et BLUE SKYE LUX en qualité d'émetteur et **pièce n° 43 de la farde II de MOLITOR –** Conditions générales des TPECs de classe E d'un montant maximal de 12.000.000 EUR (*terms and conditions of class E tracking preferred equity certificates up to a maximum amount of EUR 12,000,000*) daté du 6 avril 2017 ; **rôle n° TAL-2022-07361, pièce n° 42 de la farde II de MOLITOR –** Contrat de contribution et de souscription de TPEC de classe E-1 (*class E-1 TPEC contribution and subscription agreement*) daté du 6 avril 2017 entre Lexington en qualité de souscripteur et BLUE SKYE LUX en qualité d'émetteur et **pièce n° 43 de la farde II de MOLITOR –** Conditions générales des TPECs de classe E d'un montant maximal de 12.000.000 EUR (*terms and conditions of class E tracking preferred equity certificates up to a maximum amount of EUR 12,000,000*) daté du 6 avril 2017 ; **rôle n° TAL-2023-04206, pièce n° 42 de la farde II de MOLITOR –** Contrat de contribution et de souscription de TPEC de classe E-1 (*class E-1 TPEC contribution and subscription agreement*) daté du 6 avril 2017 entre Lexington en qualité de souscripteur et BLUE SKYE LUX en qualité d'émetteur et **pièce n° 43 de la farde I de MOLITOR –** Conditions générales des TPECs de classe E d'un montant maximal de 12.000.000 EUR (*terms and conditions of class E tracking preferred equity certificates up to a maximum amount of EUR 12,000,000*) daté du 6 avril 2017.

34.    Comme expliqué plus amplement ci-après[21], les sous-jacents des TPECs de classe E-1 et E-2 sont constitués des TPECs de classe B émis par PROJECT REDBLACK et n'ont jamais inclus les TPECs de classe A-2.

### 2.2.3    Le transfert des TPECs de classe B par BLUE SKYE LUX à LIC 159 et le remplacement de BLUE SKYE LUX par LIC 159 comme émetteur des TPECs de classes E-1, E-2 et F

35.    Le 8 mai 2017, à la demande même de LEXINGTON qui exigeait que les TPECs E-1 qu'elle avait souscrits et les sous-jacents correspondants à ces instruments (soit, les TPECs de classe B) soient tous isolés dans une entité dédiée[22] , LIC 159 s'est substituée à BLUE SKYE LUX :

-    en sa qualité de titulaire des 10.009.852 TPECs de classe B alors existants[23] ; et
-    en sa qualité d'émetteur des TPECs de classes E[24] et F,

en vertu d'un *Contribution Agreement*[25] de droit luxembourgeois entre BLUE SKYE LUX, LIC 159, LEXINGTON, BLUE SKYE CAÏMANS, SKYE CAPITAL PARTNERS LIMITED et GIGIBA CAPITAL LIMITED (le « **Contrat de Contribution** »)[26].

---

[21]    Voir *infra*, paragraphe 92.
[22]    **Rôle n° TAL-2022-07355, pièce n° 44 de la farde II de MOLITOR** – E-mails de Monsieur D'Avanzo et de Monsieur Lawrence Cutler, employé d'Arena L.P. du 1er avril 2017 ; **rôle n° TAL-2022-07361, pièce n° 44 de la farde II de MOLITOR** – E-mails de Monsieur D'Avanzo et de Monsieur Lawrence Cutler, employé d'Arena L.P. du 1er avril 2017 ; **rôle n° TAL-2023-04206, pièce° 44 de la farde II de MOLITOR** – E-mails de Monsieur D'Avanzo et de Monsieur Lawrence Cutler, employé d'Arena L.P. du 1er avril 2017: « *Toutes nos conversation précédences* […] *parlaient de la transaction comme allant dans une nouvelle entité séparée* […]. *Je suis certain que nous pouvez comprendre que si nous mélangeons notre transaction dans une entité avec des transactions auxquelles nous n'avons pas pris part, nous devons comprendre le risque que de telles transactions affectent l'intégrité du véhicule et de nos investissements* » (traduction libre de :« *All of our previous conversation*[s] […] *had this deal going into a separate clean entity*, […]. *I am sure that you can understand that if we are commingling our deal into an entity with deals we are not part of, we must understand the risk if such deals can* [a]*ffect the integrity of the vehicule and any of our investments* ».
[23]    Ce transfert était d'ailleurs permis par les Conditions générales cadres s'appliquant aux TPECs de classe B (**rôle n° TAL-2022-07355, pièce n° 43 de la farde II de MOLITOR** – précitée, clause I, p. 2 ; **rôle n° TAL-2022-07361, pièce n° 43 de la farde II de MOLITOR** – précitée, clause I, p. 2 ; **rôle n° TAL-2023-04206, pièce n° 43 de la farde II de MOLITOR** – précitée, clause I, p. 2).
[24]    De nouveaux contrats de souscription ont également été signés entre LEXINGTON et LIC 159 par rapport à de nouveaux TPECs de classe E-1 dès le 10 juillet 2021. Ces contrats démontrent que LEXINGTON reconnaissait bien LIC 159 (et non BLUE SKYE LUX) comme émettrice actuelle des TPECs de classe E-1.
[25]    Il convient de noter que LEXINGTON semble considérer que le Contrat de Contribution a opéré une double novation au niveau des TPECs de Classe E-1 et TPECs de classe B anciennement détenus par BLUE SKYE LUX (Requête en intervention volontaire du 9 février 2024, n° 27, p. 15), alors qu'aucun des termes de ce contrat ne contient une quelconque référence à une « *novation* » (et alors que celle-ci doit être expresse selon le droit luxembourgeois), mais parle d'un apport (« *contribution* ») et d'un transfert (« *transfer* »).
[26]    **Rôle n° TAL-2022-07355, pièce n° 45 de la farde II de MOLITOR** – Contrat de contribution (*contribution agreement*) daté du 8 mai 2017 entre BLUE SKYE LUX en qualité de contributeur et LIC 159 en qualité de contribué ; **rôle n° TAL-2022-07361, pièce n° 45 de la farde II de MOLITOR** – Contrat de contribution (*contribution agreement*) daté du 8 mai 2017 entre BLUE SKYE LUX en qualité de contributeur et LIC 159 en qualité de contribué ; **rôle n° TAL-2023-04206, pièce n° 45 de la farde II de MOLITOR** – Contrat de contribution (*contribution agreement*) daté du 8 mai 2017 entre BLUE SKYE LUX en qualité de contributeur et LIC 159 en qualité de contribué.

36.    En plus des 10.735.567 premiers TPECs de classe B reçus en vertu du Contrat de Contribution, LIC 159 est devenue titulaire de tous les autres TPECs de classe B émis après le 8 mai 2017 par PROJECT REDBLACK (actuellement au nombre de 20.589.498) et a payé l'entièreté des prix de souscription de ces nouveaux instruments financiers à PROJECT REDBLACK[27]. Cette titularité de tous les TPECs de classe B a été reflétée dans les comptes annuels de LIC 159 depuis 2017[28].

37.    En résumé de ce qui précède, l'évolution de la structure de détention (i) des TPECs de classe A-2 et de classe B émis par PROJECT REDBLACK et (ii) des TPECs de classe E-1 émis par BLUE SKYE peut être schématisée comme suit :



**2.3    Les litiges nés de la dissimulation à BLUE SKYE du projet de vente de l'AC MILAN**

38.    À partir de mars 2022, Monsieur CERCHIONE s'est enquis à plusieurs reprises[29] auprès de Monsieur Gordon SINGER (« **Monsieur SINGER** »), *equity* et *managing partner* d'ELLIOTT MANAGEMENT CORPORATION (le fonds d'investissement américain à la tête du groupe ELLIOTT fondé par le père de ce dernier, Monsieur Paul SINGER), du bien-fondé de rumeurs relayées par la presse, selon lesquelles l'AC MILAN allait être vendu à un fonds bahreïni.

---

[27]    **Rôle n° TAL-2022-07355, pièce n° 46 de la farde II de MOLITOR –** Preuve du paiement du prix de souscription des TPECs de classe B à partir du compte bancaire de LIC 159 ; **rôle n° TAL-2022-07361, pièce n° 46 de la farde II de MOLITOR –** Preuve du paiement du prix de souscription des TPECs de classe B à partir du compte bancaire de LIC 159 ; **rôle n° TAL-2023-04206, pièce n° 46 de la farde II de MOLITOR –** Preuve du paiement du prix de souscription des TPECs de classe B à partir du compte bancaire de LIC 159.

[28]    **Rôle n° TAL-2022-07355, pièce n° 47 de la farde II de MOLITOR –** Comptes annuels de LIC 159 publiés pour les exercices 2017 à 2023 ; **rôle n° TAL-2022-07361, pièce n° 47 de la farde II de MOLITOR –** Comptes annuels de LIC 159 publiés pour les exercices 2017 à 2023 ; **rôle n° TAL-2023-04206, pièce n° 47 de la farde I de MOLITOR –** Comptes annuels de LIC 159 publiés pour les exercices 2017 à 2023.

[29]    **Rôle n° TAL-2022-07355, pièce n° 48 de la farde II de MOLITOR –** Messages WhatsApp entre Monsieur Gordon SINGER et Monsieur CERCHIONE du 30 mars 2022 ; **rôle n° TAL-2022-07361, pièce n° 48 de la farde II de MOLITOR –** Messages WhatsApp entre Monsieur Gordon SINGER et Monsieur CERCHIONE du 30 mars 2022 ; **rôle n° TAL-2023-04206, pièce n° 48 de la farde II de MOLITOR –** Messages WhatsApp entre Monsieur Gordon SINGER et Monsieur CERCHIONE du 30 mars 2022.

39.  Monsieur SINGER nia délibérément à plusieurs reprises l'existence de toute opération en cours pour la cession de l'AC MILAN mais s'engagea à tenir le groupe BLUE SKYE informé de toute évolution « concrète » à ce sujet[30], ce qu'il n'a pas fait. Il fit également croire à BLUE SKYE que ses intérêts et ceux du groupe ELLIOTT étaient alignés et que tout serait fait pour maximiser la valeur de l'AC MILAN (en se gardant bien de mentionner quoi que ce soit de la possible vente des actions)[31].

40.  Il convient de relever à ce propos que GENIO et KING GEORGE tentent de faire croire que dans un e-mail précité du 19 avril 2022 adressé à Monsieur SINGER[32], Monsieur CERCHIONE aurait donné un blanc-seing pour la vente des actions de l'AC MILAN. En réalité, ce faisant, elles déforment en tous points les propos de Monsieur CERCHIONE en sélectionnant les bouts de phrases qui les arrangent[33]. L'extrait en cause doit être reproduit dans son intégralité pour en révéler la teneur exacte : « *Si vous avez pris la décision de céder* [l'AC MILAN], *nous pouvons seulement suivre vos décisions **mais** comme vous le savez, nos incitatifs sont plus qu'alignés (la valeur économique de BLUE SKYE étant liée aux bénéfices* [de l'AC MILAN]*). Nous pensons que **le prix mentionné dans la presse sous-évalue la société et toute la valeur que nous avons amenée** depuis que nous avons hérité* [de cette société] *de Monsieur L[i]* [l'investisseur chinois et ancien bénéficiaire effectif de l'AC MILAN avant l'appropriation des parts sociales de ROSSONERI SPORT par PROJECT REDBLACK]*. Le processus de sélection d'un acquéreur doit, à notre sens, être structuré avec l'objectif de maximiser la valeur et d'entièrement refléter ce qui a été fait au cours de ces années. Similairement à ce qui avait été fait pour l'hôtel Bauer, ce qui a donné lieu à des résultats positifs par rapport à nos attentes initialement conservatrices*. »[34] (soulignés par nous). Ces propos sont donc bien éloignés d'un blanc-seing donné à une vente qui devait emporter le plein et entier assentiment de la société qu'il dirigeait, mais s'inscrivent seulement dans l'hypothèse où une vente, dont tous les détails ne leur seraient pas dissimulés, serait à négocier.

---

30  **Rôle n° TAL-2022-07355, pièce n° 48 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2022-07361, pièce n° 48 de la farde II de MOLITOR**, précitée ; **pièce n° 48 de la farde I de MOLITOR**, précitée **Rôle n° TAL-2022-07355, pièce n° 49 de la farde II de MOLITOR** – Messages WhatsApp de Monsieur CERCHIONE à Monsieur Gordon SINGER du 15 avril 2022 ; **rôle n° TAL-2022-07361, pièce n° 49 de la farde II de MOLITOR** – Messages WhatsApp de Monsieur CERCHIONE à Monsieur Gordon SINGER du 15 avril 2022 ; **rôle n° TAL-2023-04206, pièce n° 49 de la farde II de MOLITOR** – Messages WhatsApp de Monsieur CERCHIONE à Monsieur Gordon SINGER du 15 avril 2022.

31  **Rôle n° TAL-2022-07355, pièce n° 25 de la farde II de MOLITOR** – Échange d'e-mails entre Gordon SINGER et Salvatore CERCHIONE en date du 19 avril 2022 ; **rôle n° TAL-2022-07361**, assignation du 27 juin 2022, p. 9 ; **pièce n° 25 de la farde I de MOLITOR** – Échange d'e-mails entre Gordon SINGER et Salvatore CERCHIONE en date du 19 avril 2022 ; **rôle n° TAL-2023-04206, pièce n° 25 de la farde II de MOLITOR –**. Échange d'e-mails entre Gordon SINGER et Salvatore CERCHIONE en date du 19 avril 2022.

32  **Rôle n° TAL-2022-07355, pièce n° 25 de la farde II de MOLITOR** – Échange d'e-mails entre Gordon SINGER et Salvatore CERCHIONE en date du 19 avril 2022 ; **rôle n° TAL-2022-07361**, assignation du 27 juin 2022, p. 9 ; **pièce n° 25 de la farde II de MOLITOR** – Échange d'e-mails entre Gordon SINGER et Salvatore CERCHIONE en date du 19 avril 2022 ; **rôle n° TAL-2023-04206, pièce n° 25 de la farde II de MOLITOR –**. Échange d'e-mails entre Gordon SINGER et Salvatore CERCHIONE en date du 19 avril 2022.

33  Rôle n° TAL-2022-07361, conclusions de CLIFFORD CHANCE du 7 juin 2023, n° 20, p. 13.

34  Traduction libre de « *If you have made the decision to dispose of ACM we can only follow your decisions but as you know our incentives are more than aligned (blue skey real economics are linked to the profit). We believe that the price mentioned in the press undervalue the company and all the value that we have brought since we have inherited from Mr L*[i]. » (**rôle n° TAL-2022-07355, pièce n° 25 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2022-07361, pièce n° 25 de la farde I de MOLITOR**, précitée ; **rôle n° TAL-2023-04206, pièce n° 25 de la farde II de MOLITOR**, précitée).

41.   Au cours d'une conférence téléphonique tenue le 20 avril 2022, Monsieur SINGER, qui ne pouvait plus nier de manière crédible l'existence de discussions sérieuses avec un potentiel acquéreur, a fini par avouer à Monsieur CERCHIONE qu'un engagement d'exclusivité avait été signé avec INVESTCORP HOLDINGS B.S.C., un fonds d'investissement situé à Bahreïn (« **INVESTCORP** »), par rapport à la vente de l'AC MILAN pour un prix de 1,1 milliard d'euros[35].

42.   Ces tractations, menées entre, d'une part, INVESTCORP, et, d'autre part, ELLIOTT UK, la filiale anglaise du groupe ELLIOTT, qui n'avait aucun lien capitalistique direct ou indirect avec l'AC MILAN, avaient été sciemment dissimulées au groupe BLUE SKYE et à Monsieur CASLINI. BLUE SKYE LUX était pourtant l'une des trois associées de PROJECT REDBLACK et tirait en cette qualité, et en vertu des statuts de cette société, le droit de recevoir les informations nécessaires aux fins de donner son consentement à l'opération. Monsieur CASLINI était quant à lui gérant de PROJECT REDBLACK et ROSSONERI SPORT, cette dernière détenant 99,93 % du capital social de l'AC MILAN, de sorte qu'en raison de ces qualités, il aurait dû recevoir toutes les informations pertinentes par rapport à la transaction.

43.   Les manœuvres du groupe ELLIOTT ne s'arrêtaient cependant pas à la dissimulation de l'opération, mais englobaient également le fait de ne pas vouloir maximiser le prix de vente de l'AC MILAN. Dans deux e-mails datés des 23 avril et 5 mai 2022[36], qui sont restés sans réponse, Monsieur CERCHIONE interrogeait Monsieur SINGER sur les raisons d'une telle décision, aussi surprenante que contraire à toute logique. Il relevait en effet :

   (i)   qu'aucune procédure d'appel d'offres n'avait été mise en place, contrairement au procédé usuel pour ce genre d'opérations et à ce qui aurait été conforme à la manière de procéder adoptée dans le passé par ELLIOTT et BLUE SKYE pour un autre projet (la vente de l'hôtel Bauer à Venise) ; et

   (ii)   que la vente allait se dérouler sans attendre que (a) les effets de la pandémie de la Covid-19 soient complètement derrière eux, (b) l'AC MILAN atteigne enfin l'équilibre financier et (c) l'acquisition du stade de l'AC MILAN, qui était pourtant alors en cours, soit finalisée**.**

44.   Face aux dissimulations frauduleuses et autres comportements malhonnêtes d'ELLIOTT, BLUE SKYE LUX n'a eu d'autre choix que de mandater ses conseils juridiques pour défendre ses intérêts et voir ses droits respectés, à savoir le droit (i) de bénéficier du même niveau d'information et de transparence qu'ELLIOTT ou ROSSONERI SPORT, (ii) de voir l'opération réalisée dans des conditions normales de concurrence et (iii) de voir respectées les prérogatives que lui conféraient les statuts de PROJECT REDBLACK (notamment quant à l'exigence d'accord unanime pour toute Matière Spéciale (« *Restricted Matter* ») en vertu des articles 13 et 16 des statuts[37]) et la documentation relative aux TPECs.

---

[35]   Rôle n° TAL-2022-07361, assignation du 27 juin 2022, p. 9.

[36]   **Rôle n° TAL-2022-07361**, assignation du 27 juin 2022, p. 9 ; **rôle n° TAL-2022-07355, pièce n° 26 de la farde II de MOLITOR** – E-mail envoyé le 23 avril 2022 à 19h36 par Monsieur CERCHIONE à Monsieur Gordon SINGER et **pièce n° 27 de la farde II de MOLITOR** – E-mail envoyé le 5 mai 2022 à 12h17 par Monsieur CERCHIONE à Monsieur Gordon SINGER **; rôle n° TAL-2022-07361, pièce n° 26 de la farde I de MOLITOR** – E-mail de Salvatore CERCHIONE à Gordon SINGER en date du 23 avril 2022 ; **pièce n° 27 de la farde I de MOLITOR** – E-mail de Salvatore CERCHIONE à Gordon SINGER en date du 5 mai 2022 ; **rôle n° TAL-2023-04206, pièce n° 26 de la farde II de MOLITOR** – E-mail de Salvatore CERCHIONE à Gordon SINGER en date du 23 avril 2022 ; **pièce n° 27 de la farde I de MOLITOR** – E-mail de Salvatore CERCHIONE à Gordon SINGER en date du 5 mai 2022.

[37]   **Rôle n° TAL-2022-07355, pièce n° 2 de la farde I de MOLITOR** – Statuts de Project Redblack ; **rôle n° TAL-2022-07361, pièce n° 2 de la farde I de MOLITOR** – Statuts de Project Redblack ; **rôle n° TAL-2023-04206, pièce n° 2 de la farde I de MOLITOR**, – Statuts de Project Redblack.

S'en suivirent de nombreux échanges de courriers et d'e-mails entre les parties et leurs avocats respectifs, mettant en lumière les torts que BLUE SKYE LUX et Monsieur CASLINI reprochaient au groupe ELLIOTT. Ces démarches n'ont cependant pas permis d'infléchir le comportement du groupe ELLIOTT et de ses séides.

45.    Il y a notamment lieu de relever les éléments suivants repris dans cette correspondance :

(i)     le 25 avril 2022[38], BLUE SKYE LUX rappela à Monsieur CRACA (qui, comme nous l'avons vu, travaillait dans l'ombre pour ELLIOTT, notamment via ses fonctions d'administrateur de l'AC MILAN) qu'en sa qualité de dépositaire des certificats représentatifs des actions de l'AC MILAN soumises au Gage italien, la mainlevée de cette sûreté était un préalable nécessaire à toute vente des actions de l'AC MILAN et était soumise à l'approbation unanime des gérants de PROJECT REDBLACK et à défaut, de celui de ses associés.

(ii)    le 27 avril 2022[39], Monsieur MCLEAN et Madame ITALIA, les gérants de classe A de PROJECT REDBLACK, vinrent se mêler de l'histoire en se gardant bien de fournir la moindre information sur la transaction en cours par rapport aux actions de l'AC MILAN (le fait même qu'ils ne dénient pas l'existence de cette transaction et la promesse de l'organisation d'une réunion du conseil de gérance de PROJECT REDBLACK pour discuter de cette transaction est lourd de sens[40]).

(iii)   le 2 mai 2022[41], les conseils luxembourgeois et italien de BLUE SKYE et Monsieur CASLINI prirent note de la confirmation implicite du rôle du groupe ELLIOTT dans l'opération secrète de vente des actions de l'AC MILAN et rappelèrent à nouveau la nécessité de respecter les exigences d'unanimité posées par les statuts de PROJECT REDBLACK dans le cadre d'une telle opération.

(iv)    le 6 mai 2022[42], BEFANA BAGNES, le conseil luxembourgeois de gérants de classe A de PROJECT REDBLACK (Monsieur MCLEAN et Madame ITALIA), affirmait qu'une transaction soi-disant à réaliser « *dans des conditions normales de marché* » (« *at arm's length* ») était en cours, et que tous les détails seraient révélés lors de réunions des conseils de gérance de PROJECT REDBLACK et de ROSSONERI SPORT qui devaient se tenir le 13 mai 2022.

---

[38]    **Rôle n° TAL-2022-07355, pièce n° 15 de la farde I de MOLITOR** – Courrier du 25 avril 2022 de DLA PIPER **; rôle n° TAL-2022-07361, pièce n° 18 de la farde I de MOLITOR** – Courrier du 25 avril 2022 de DLA PIPER ; **rôle n° TAL-2023-04206, pièce n° 18 de la farde II de MOLITOR** – Courrier du 25 avril 2022 de DLA PIPER.

[39]    **Rôle n° TAL-2022-07355, pièce n° 13 de la farde I de MOLITOR** – Courrier du 27 avril 2022 de Project Redblack (courrier non soumis au conseil de gérance) **; rôle n° TAL-2022-07361, pièce n° 16 de la farde I de MOLITOR** – Courrier du 27 avril 2022 de Project Redblack (courrier non soumis au conseil de gérance) ; **rôle n° TAL-2023-04206, pièce n° 16 de la farde I de MOLITOR** – Courrier du 27 avril 2022 de Project Redblack (courrier non soumis au conseil de gérance).

[40]    **Rôle n° TAL-2022-07355**, assignation du 10 juin 2022, p. 7 ; **rôle n° TAL-2022-07361**, assignation du 27 juin 2022, p. 10 ; conclusions de C.A.S. du 5 juillet 2023, n° 17, pp. 6 et 7.

[41]    **Rôle n° TAL-2022-07355, pièce n° 16 de la farde I de MOLITOR** – Courrier de CAS du 2 mai 2022 et courrier de DLA PIPER du 2 mai 2022 ; **rôle n° TAL-2022-07361, pièce n° 19 de la farde I de MOLITOR** – Courrier de CAS du 2 mai 2022 et courrier de DLA PIPER du 2 mai 2022 ; **rôle n° TAL-2023-04206, pièce n° 19 de la farde II de MOLITOR** – Courrier de CAS du 2 mai 2022 et courrier de DLA PIPER du 2 mai 2022.

[42]    **Rôle n° TAL-2022-07355, pièce n° 17 de la farde I de MOLITOR** – Courrier de BEFANA BAGNÈS du 6 mai 2022 ; **rôle n° TAL-2022-07361, pièce n° 20 de la farde I de MOLITOR** – Courrier de BEFANA BAGNÈS du 6 mai 2022 ; **rôle n° TAL-2023-04206, pièce n° 20 de la farde II de MOLITOR** – Courrier de BEFANA BAGNÈS du 6 mai 2022.

46.    La réunion du conseil de gérance de PROJECT REDBLACK, reportée le 17 mai 2022[43], qui aurait dû permettre de faire toute la lumière sur la transaction proposée[44], avait en réalité pour ordre du jour « *le changement de la composition du conseil de gérance de ROSSONERI SPORT* ». Cette formulation était en réalité un doux euphémisme utilisé pour désigner la révocation de Monsieur CASLINI de ses fonctions de gérant de ROSSONERI SPORT, après que les gérants de classe A de PROJECT REDBLACK (et donc ELLIOTT) avaient tout fait pour le garder dans l'ignorance des tractations concernant la vente des actions de l'AC MILAN[45]. Cette éviction était contraire à la commune intention des groupes ELLIOTT et BLUE SKYE d'avoir un représentant de BLUE SKYE comme gérant de ROSSONERI SPORT.

47.    L'éviction de Monsieur CASLINI et les accusations formulées ultérieurement par PROJECT REDBLACK et ROSSONERI SPORT à son encontre[46] sont pour le moins déconcertantes. Ces deux sociétés font en effet preuve d'une rare ingratitude et d'une animosité incompréhensible envers leur (ancien) gérant[47], lequel s'est évertué à faire respecter les dispositions statutaires à agir dans leur intérêt social afin d'éviter (i) que la vente des actions de l'AC MILAN ne soit effectuée à prix réduit, (ii) que ROSSONERI SPORT se retrouve en conséquence dans une situation où elle ne peut payer intégralement ses dettes envers PROJECT REDBLACK, et (iii) que cette dernière ne doive en conséquence abandonner une partie de sa créance envers sa filiale, essuyant ainsi une perte de plusieurs centaines de millions d'euros.

48.    Il faut aussi relever qu'au 17 mai 2022, aucune décision n'avait été prise par le conseil de gérance de ROSSONERI SPORT par rapport à de possibles négociations pour la vente de ses actions dans l'AC MILAN ou à la désignation de mandataires spéciaux à cette fin[48], ce qui démontre que les tractations avaient été effectuées directement et en secret par le groupe ELLIOTT et les gérants A de PROJECT REDBLACK afin de laisser BLUE SKYE et Monsieur CASLINI dans l'ignorance totale.

---

[43]    **Rôle n° TAL-2022-07361, pièce n° 15 de la farde I de C.A.S.** – Procès-verbal du conseil de gérance de PROJECT REDBLACK du 17 mai 2022. Le 22 juin 2022, Monsieur CASLINI a initié une action devant le Tribunal d'arrondissement de Luxembourg à l'encontre de PROJECT REDBLACK et ROSSONERI SPORT afin d'obtenir la nullité de la décision l'ayant révoqué de ses fonctions de gérant de ROSSONERI SPORT. Cette procédure est à ce jour pendante et enrôlée sous le numéro TAL-2022-05135 (**rôle n° TAL-2022-07355, pièce n° 18 de la farde II de MOLITOR** – Assignation du 22 juin 2022 **; rôle n° TAL-2022-07361, pièce n° 13 de la farde I de MOLITOR** – Assignation au fond signifiée par Monsieur Giovanni CASLINI en date du 22 juin 2022 **; rôle n° TAL-2023-04206, pièce n° 13 de la farde I de MOLITOR** – Assignation au fond signifiée par Monsieur Giovanni CASLINI en date du 22 juin 2022). Précédemment, il avait saisi le juge des référés d'une demande suspension des effets de cette révocation, signifiée le 1er juin 2022 (**rôle n° TAL-2022-07355, pièce n° 12 de la farde I de MOLITOR** – Assignation en référé signifiée en date du 1er juin 2022 **; rôle n° TAL-2022-07361, pièce n° 12 de la farde I de MOLITOR** – Assignation en référé signifiée en date du 1er juin 2022 **; rôle n° TAL-2023-04206, pièce n° 12 de la farde I de MOLITOR** – Assignation en référé signifiée en date du 1er juin 2022). Cette demande a été déclarée irrecevable en référé par ordonnance du 30 novembre 2022. Monsieur CASLINI n'a pas sollicité en référé la suspension des effets des résolutions approuvant la vente de l'AC MILAN contrairement à ce que prétend Lexington (requête en intervention volontaire du 9 février 2024, n° 25, p. 15).

[44]    **Rôle n° TAL-2022-07355, pièce n° 17 de la farde I de MOLITOR** – précitée ; **rôle n° TAL-2022-07361, pièce n° 20 de la farde I de MOLITOR** – précitée ; **rôle n° TAL-2023-04206, pièce n° 20 de la farde II de MOLITOR** – précitée.

[45]    Rôle n° TAL-2022-07355, assignation du 10 juin 2022, pp. 6 et 7 ; rôle n° TAL-2022-07361, assignation du 27 juin 2022, pp. 9 et 10.

[46]    Contenues notamment dans la prédite assignation du 2 mars 2023.

[47]    **Rôle n° TAL-2022-07355**, conclusions d'ELVINGER HOSS PRUSSEN du 31 octobre 2022, n° 24 et 25, pp. 15 et 16 ; rôle n° TAL-2023-04206, assignation du 2 mars 2023, n° 24 et 25, p. 13.

[48]    Rôle n° TAL-2022-07361, assignation du 27 juin 2022, p. 10.

49.    Le 26 mai 2022, soit à peine neuf jours après la révocation de Monsieur CASLINI, ROSSONERI SPORT a signé avec FOOTBALLCO, un véhicule *ad hoc* de droit hollandais détenu à 100% par le fonds d'investissement américain REDBIRD, une convention d'achat d'actions (*stock purchase agreement*, ci-après, le « **SPA** »)[49] concernant l'intégralité des actions détenues par ROSSONERI SPORT dans l'AC MILAN, après qu'une *due diligence* coordonnée par Monsieur CRACA[50] a été réalisée pour les besoins de l'opération[51] (un tel processus, qui s'étale en général sur plusieurs mois, ayant donc été délibérément caché à Monsieur CASLINI et BLUE SKYE).

50.    Le 1er juin 2022, un communiqué de presse fut publié par REDBIRD et ELLIOTT pour annoncer la conclusion d'un accord définitif par rapport à la vente des actions de l'AC MILAN avec un *closing* prévu pour septembre 2022 et une indication selon laquelle le groupe ELLIOTT conservera un intérêt financier minoritaire dans l'AC MILAN et des sièges auprès du conseil d'administration de cette société[52]. Par contre, et ce fait est important, aucune phrase de cet article ne fait mention de BLUE SKYE LUX, comme si cette société s'était volatilisée, occultant ainsi le rôle que le groupe BLUE SKYE a joué pendant les années dans le développement de l'AC MILAN. Même si PROJECT REDBLACK et ROSSONERI SPORT (et derrières elles, le groupe ELLIOTT) aiment à rappeler que l'investissement financier effectué par le groupe BLUE SKYE dans la structure est moindre que celui d'ELLIOTT[53], elles ne peuvent ainsi occulter le rôle prépondérant joué par le groupe BLUE SKYE dans la structuration de la transaction et les efforts déployés par celle-ci.

51.    Ce n'est cependant que le lendemain, soit le 2 juin 2022, qu'un courrier a finalement été adressé par ROSSONERI SPORT à PROJECT REDBLACK (avec une copie envoyée à BLUE SKYE LUX)[54], par lequel BLUE SKYE LUX et Monsieur CASLINI ont finalement[55] été officiellement informés de la signature du SPA et de la vente de l'AC MILAN, non pas à INVESTCORP, comme l'avaient laissé penser les déclarations faites le 20 avril 2022 par Monsieur SINGER, mais à REDBIRD. Les affirmations de GENIO et de KING GEORGE, selon lesquelles l'offre de

---

[49]    **Rôle n° TAL-2022-07355, pièce n° 50 de la farde II**– Extraits du SPA ; **rôle n° TAL-2022-07361, pièce n° 50 de la farde II de MOLITOR** – Extraits du SPA ; **rôle n° TAL-2023-04206, pièce n° 50 de la farde II de MOLITOR** – Extraits du SPA.

[50]    **Rôle n° TAL-2022-07355, pièce n°99 de la farde III de MOLITOR** – précité ; **pièce n° 100 de la farde II de MOLITOR** – précitée ; **pièce n° 101 de la farde III de MOLITOR** – précitée ; **rôle n° TAL-2022-07361, pièce n° 99 de la farde III de MOLITOR** – précité ; **pièce n° 100 de la farde II de MOLITOR** – précitée ; **pièce n° 101 de la farde III de MOLITOR** – précitée ; **rôle n° TAL-2023-04206, pièce n° 99 de la farde III de MOLITOR** – précité ; **pièce n° 100 de la farde II de MOLITOR** – précitée ; **pièce n° 101 de la farde II de MOLITOR** – précitée.

[51]    Rôle n° TAL-2022-07355, assignation du 10 juin 2022, p. 7 ; rôle n° TAL-2022-07361, assignation du 27 juin 2022, p. 10.

[52]    Rôle n° TAL-2022-07355, assignation du 10 juin 2022, p. 6 ; rôle n° TAL-2022-07361, assignation du 27 juin 2022, p. 8 ; **Rôle n° TAL-2022-07355, pièce n° 11 de la farde I de MOLITOR** – Communiqué de presse de l'AC MILAN en date du 1er juin 2022 ; **rôle n° TAL-2022-07361, pièce n° 11 de la farde I de MOLITOR** – Communiqué de presse de l'AC Milan en date du 1er juin 2022 ; **rôle n° TAL-2023-04206, pièce n° 11 de la farde I de MOLITOR** – Communiqué de presse de l'AC Milan en date du 1er juin 2022.

[53]    **Rôle n° TAL-2022-07355, rôle n° TAL-2022-07361**, conclusions d'ELVINGER HOSS PRUSSEN du 31 octobre 2022, n° 20, p. 14 ; **rôle n°TAL-2023-04206**, assignation du 2 mars 2023, n° 20, p. 12.

[54]    **Rôle n° TAL-2022-07355, pièce n° 14 de la farde I de MOLITOR** – Courrier du 2 juin 2022 de ROSSONERI SPORT ; **rôle n° TAL-2022-07361, pièce n° 17 de la farde I de MOLITOR** – Courrier du 2 juin 2022 de ROSSONERI SPORT ; **rôle n° TAL-2023-04206, pièce n° 17 de la farde I de MOLITOR** – Courrier du 2 juin 2022 de ROSSONERI SPORT.

[55]    **Rôle n° TAL-2022-07355, pièce n° 51 de la farde II de MOLITOR –** Partie non-confidentielle des échanges WhatsApp entre Monsieur Gordon SINGER et Monsieur CERCHIONE entre le 11 et le 15 mai 2022 ; **rôle n° TAL-2022-07361, pièce n° 51 de la farde II de MOLITOR –** Partie non-confidentielle des échanges WhatsApp entre Monsieur Gordon SINGER et Monsieur CERCHIONE entre le 11 et le 15 mai 2022 ; **rôle n° TAL-2023-04206, pièce n° 51 de la farde II de MOLITOR –** Partie non-confidentielle des échanges WhatsApp entre Monsieur Gordon SINGER et Monsieur CERCHIONE entre le 11 et le 15 mai 2022.

REDBIRD était meilleure que celle d'INVESTCORP[56], ne peuvent être vérifiées, en raison de la rétention abusive d'informations de la part du groupe ELLIOTT et de ses exécutants à ce sujet.

ROSSONERI SPORT annexa à ce courrier les « principaux » éléments de l'opération.

Ainsi, BLUE SKYE LUX apprit que :

(i)     le prix de vente de l'AC MILAN se baserait sur une valeur d'entreprise fixée à 1.228.418.010,20 euros ;

(ii)    une partie du prix de cession (entre 200 millions d'euros et 550 millions d'euros) serait financée par une ou plusieurs *notes* (ou « billets ») de crédit-vendeur (*vendor loan notes*) émise(s) par l'acheteur et souscrite(s) par ROSSONERI SPORT à un taux de 7 % par an, laquelle ou lesquelles viendrai(en)t à échéance au troisième anniversaire de la date de réalisation de l'opération ;

(iii)   la mainlevée du Gage italien (qui, rappelons-le, portait sur les actions de l'AC MILAN et était une garantie pour PROJECT REDBLACK du bon remboursement de sa créance sur ROSSONERI SPORT) était une condition suspensive à la réalisation de l'opération de cession, ce qui permettrait la cession des actions de l'AC MILAN ;

(iv)    ROSSONERI SPORT disposerait d'un gage sur les actions de l'AC MILAN[57] (ce que semblent admettre PROJECT REDBLACK et ROSSONERI SPORT[58]) en garantie du remboursement des *notes* de crédit-vendeur (*vendor loan notes*) émises pour le paiement d'une partie du prix de vente. Or le prix de vente ainsi garanti par le nouveau gage est en tout état de cause inférieur au montant de la créance de PROJECT REDBLACK à l'encontre de ROSSONERI SPORT, laquelle était anciennement garantie par le Gage italien. Ce nouveau gage ne pouvait cependant permettre que le remboursement des *notes* de crédit-vendeur, dont le montant est inférieur à celui de la créance de PROJECT REDBLACK à l'encontre de ROSSONERI SPORT ; et

(v)     jusqu'au remboursement complet des *notes* de crédit-vendeur, ROSSONERI SPORT (et donc, en réalité, le groupe ELLIOTT, qui a le contrôle de cette société) pouvait désigner deux membres au conseil d'administration de l'AC Millan.

52.    Dans le courrier du 2 juin 2022, ROSSONERI SPORT demandait également à PROJECT REDBLACK l'octroi d'un prêt supplémentaire de 5.000.000 EUR pour répondre à une demande de fonds de la part de l'AC MILAN. Or, un tel prêt creusait encore plus la dette de ROSSONERI SPORT envers PROJECT REDBLACK, alors que ROSSONERI SPORT ne disposait de toute façon plus d'actifs suffisants pour le rembourser une fois vendues les actions de l'AC MILAN. De plus, cette demande de prêt supplémentaire intervenant après la signature du SPA, il aurait été logique que ce soit l'acquéreur des actions de l'AC MILAN qui prenne en charge ce financement.

---

[56]    Rôle n° TAL-2022-07361, conclusions de CLIFFORD CHANCE du 7 juin 2023, n° 20, p. 14.
[57]    **Rôle n° TAL-2022-07355, pièce n° 14 de la farde I de MOLITOR**, précitée, Appendix C ; **rôle n° TAL-2022-07361, pièce n° 17 de la farde I de MOLITOR**, précitée, Appendix C ; **rôle n° TAL-2023-04206, pièce n° 17 de la farde I de MOLITOR**, précitée, Appendix C.
[58]    Rôle n° TAL-2022-07361, conclusions de demande reconventionnelle et incidente d'ELVINGER HOSS PRUSSEN du 31 octobre 2022, n° 15, p. 10 ; TAL-2023-04206, assignation du 2 mars 2023, n° 15, p. 8.

L'incongruité de cette demande est révélatrice du fait que la conclusion du SPA a eu lieu dans la précipitation la plus totale pour mettre le groupe BLUE SKYE devant le fait accompli[59].

53. La vente de l'AC MILAN telle que permise par PROJECT REDBLACK violait l'article 13 des statuts de cette société à plusieurs égards. On peut notamment relever à ce stade que :

(i) La mainlevée du Gage italien, qui nécessitait un accord entre PROJECT REDBLACK et ROSSONERI SPORT est une transaction entre PROJECT REDBLACK et une filiale ou un affilié de ses associés ou des porteurs de TPECs (ROSSONERI SPORT étant la filiale indirecte de KING GEORGE, une des associées de PROJECT REDBLACK à hauteur du 67,01% de son capital social).

(ii) L'article 19.12.(a) de l'AFA interdisait la cession des actions de l'AC MILAN par ROSSONERI SPORT (une telle opération ne tombant pas dans la définition de « *Permitted Disposal* » ou de « *Permitted Transaction* »). De même, l'article 20.16 indiquait que tout « *Changement de Contrôle* » (« *Change of Control*[60] ») constituait un Cas de Défaut (« *Event of Default* ») sous ce contrat. Enfin, la mise en place de *notes* de crédit-vendeur pour partie du prix de vente des actions de l'AC MILAN violait la clause 19.14 de l'AFA, laquelle interdisait à ROSSONERI SPORT d'être créancière au titre d'un « *Endettement Financier* » (« *Financial Indebtedness* ») autre qu'un « *Permitted Loan* » ou qu'une « *Permitted Transaction* », ce qui n'était pas applicable dans le cas présent. La seule solution aurait en effet été la cession des actions de l'AC MILAN à PROJECT REDBLACK à la suite de la mise en œuvre du Gage italien et l'apurement de la créance de PROJECT REDBLACK envers ROSSONERI SPORT pour un montant équivalent à la valeur de réalisation des actions.

Pour permettre à la transaction d'être réalisée, il était nécessaire que ROSSONERI SPORT et PROJECT REDBLACK modifient les termes de l'AFA, ce qui, encore une fois, constituait une transaction entre PROJECT REDBLACK et une société filiale ou affiliée à l'une de ces associées (en l'occurrence, KING GEORGE).

54. Les articles 13 et 16 des statuts de PROJECT REDBLACK considèrent de telles transactions comme faisant partie des « Matières Spéciales » (« *Restricted Matters* ») et des « Matières Réservées » (« *Reserved Matters* »)[61] devant être approuvées par tous les gérants de PROJECT REDBLACK ou à défaut par les associées de celle-ci. Il était donc impossible pour PROJECT REDBLACK de satisfaire cette exigence et de ne pas se trouver en violation de ses propres statuts dans les conditions évoquées ci-dessus où la transaction s'est déroulée à l'insu de Monsieur CASLINI et de BLUE SKYE LUX.

---

[59] Rôle n° TAL-2022-07361, assignation du 27 juin 2022, pp.23 et 24 ; **Rôle n° TAL-2022-07355, pièce n° 14 de la farde I de MOLITOR**, précitée, point 11 **; rôle n° TAL-2022-07361, pièce n° 17 de la farde I de MOLITOR**, précitée, point 11 ; **rôle n° TAL-2023-04206, pièce n° 17 de la farde I de MOLITOR**, précitée, point 11.

[60] Le point (c) de la définition de « *Change of Control* » à la clause 1.1 de l'AFA inclut le cas où ROSSONERI SPORT ne détient plus directement 99,92973% du capital social de la Cible, autrement dit AC MILAN (« *the Borrower no longer, directly : holds 99.92973% of the issued Share capital of Target* ») - **Rôle n° TAL-2022-07355, pièce n° 5 de la farde I de MOLITOR**, précitée ; **rôle n° TAL-2022-07361, pièce n° 5 de la farde I de MOLITOR**, précitée ; **rôle n° TAL-2023-04206, pièce n° 5 de la farde I de MOLITOR**, précitée**.**

[61] Article 13, alinéa 7 des statuts de PROJECT REDBLACK: « *any transaction to be entered into by and between the Company and any of its Shareholders, TPECs holders or any other subsidiary or affiliate of that Shareholder or TPECs holder* » (**rôle n° TAL-2022-07355, pièce n° 2 de la farde I de MOLITOR**, précitée ; **rôle n° TAL-2022-07361, pièce n° 2 de la farde I de MOLITOR**, précitée ; **rôle n° TAL-2023-04206, pièce n° 2 de la farde I de MOLITOR**, précitée); assignation du 10 juin 2022, p. 11.

Il importe peu que les parties adverses parlent de « droit de véto »[62] de BLUE SKYE LUX pour qualifier l'exigence d'unanimité posée pour la prise de ces décisions des gérants et des associés pour les « Matières Spéciales » et les « Matières Réservées ». Dans la mesure où BLUE SKYE LUX et Monsieur CASLINI ont, en vertu des statuts, le droit de ne pas consentir à certaines opérations qu'ils estiment contraires à l'intérêt social de PROJECT REDBLACK, ils pouvaient légitimement exercer ce droit, même si, en ce faisant, ils contrecarraient les manigances du groupe ELLIOTT.

55.    Loin d'être un oubli fâcheux, la violation de ces dispositions statutaires était totalement délibérée et s'inscrivait dans un plan savamment orchestré de longue date par ELLIOTT et ses exécutants. En témoigne notamment une facture adressée à PROJECT REDBLACK par son ancien conseil luxembourgeois pour des services allant de mai à juin 2022[63]. On y retrouve notamment (i) la préparation avec une personne d'ELLIOTT de la réunion au cours de laquelle Monsieur CASLINI a été évincé du conseil de gérance de ROSSONERI SPORT, (ii) la correspondance avec « ELLIOTT » à ce sujet, et (iii) divers services rendus par rapport au Gage italien et au contrat de vente des actions de l'AC MILAN. Il ressort donc clairement que la vente en catimini des actions de l'AC MILAN faisait partie d'un plan longuement réfléchi par ELLIOTT et n'est en réalité, comme il sera expliqué ci-après, que la première étape d'une opération visant à gruger BLUE SKYE et à s'accaparer tous les revenus dérivés de cette opération sans devoir les partager avec BLUE SYKE, au mépris des engagements contractuels et statutaires pris par ELLIOTT et ses entités et subalternes.

## 2.4    Les procédures initiées par BLUE SKYE LUX et LIC 159 en relation avec la vente des actions de l'AC MILAN

56.    Le 10 juin 2022, BLUE SKYE LUX et LIC 159 saisirent le Tribunal d'arrondissement de et à Luxembourg afin que celui-ci déclare que (i) la mainlevée du Gage italien par PROJECT REDBLACK, condition essentielle à la réalisation de la vente de l'AC MILAN et (ii) la renonciation par PROJECT REDBLACK à une partie de sa créance envers ROSSONERI SPORT (qui ne serait plus garantie par le Gage italien, et ne pourrait être remboursée en raison de l'insuffisance du prix de vente des actions de l'AC MILAN) devaient être autorisées à l'unanimité des gérants, et à défaut, des associés de PROJECT REDBLACK (c'est-à-dire BLUE SKYE LUX, GENIO et KING GEORGE), conformément aux articles 13 et 16 des statuts de PROJECT REDBLACK (procédure enrôlée sous le numéro TAL 2022-07355 susmentionné)[64].

57.    L'objectif de l'assignation du 10 juin 2022 est de faire établir la manière dont le processus de cession de l'AC MILAN alors en cours - dont l'opacité démontrait qu'il ne suivait pas le meilleur intérêt de PROJECT REDBLACK et de ROSSONERI SPORT, de leurs actionnaires et créanciers – aurait dû se poursuivre dans le respect des articles 13 et 16 des statuts de PROJECT REDBLACK, notamment au titre des « Matières Spéciales » et des « Matières Réservées ».

---

[62]    Rôle n° TAL-2022-07361, conclusions de CLIFFORD CHANCE du 7 juin 2023, n° 80, p. 39.

[63]    **Rôle n° TAL-2022-07355, pièce n° 96 de la farde III de MOLITOR** – Copie de la facture du 15 juillet 2022 de Maître Raphaël COLLIN ; **rôle n° TAL-2022-07361, pièce n° 96 de la farde III de MOLITOR** – Copie de la facture du 15 juillet 2022 de Maître Raphaël COLLIN ; **rôle n° TAL-2023-04206, pièce n° 96 de la farde III de MOLITOR** – Copie de la facture du 15 juillet 2022 de Maître Raphaël COLLIN.

[64]    **Rôle n° TAL-2022-07361, pièce n° 21 de la farde II de MOLITOR –** Action au fond introduite par Blue Skye Lux et LIC 159 en date du 10 juin 2022 ; **rôle n° TAL-2023-04206, pièce n° 21 de la farde II de MOLITOR – Action au fond introduite par Blue Skye Lux et LIC 159 en date du 10 juin 2022.

58.    Les soupçons de BLUE SKYE par rapport aux intentions frauduleuses d'ELLLIOTT ont été confirmés par le journal *L'Équipe* qui, dans un article du 17 juin 2022, a révélé qu'« *ELLIOTT entendrait conserver entre 30 et 49 % du capital de l'AC MILAN* ». Le texte de l'article poursuivant en se demandant si la vente des actions de l'AC MILAN signerait la fin de toute présence d'ELLIOTT dans l'AC MILAN[65].

59.    C'est notamment à la lecture de cet article de presse que BLUE SKYE LUX put entrevoir l'étendue de la fraude dont elle était victime et a réalisé que les manœuvres d'ELLIOTT avaient pour véritables objectifs (i) de se débarrasser d'une manière ou d'une autre de BLUE SKYE LUX en tant qu'actionnaire indirecte de l'AC MILAN en violation des droits que lui confèrent les statuts de PROJECT REDBLACK, (ii) de réaliser ultérieurement une plus-value, dont serait exclue BLUE SKYE LUX, en finançant l'acquéreur pour le paiement du prix de vente des actions de l'AC MILAN) et (iii) de conserver, sous une forme ou une autre, un contrôle, ou *a minima* une influence certaine, sur l'AC MILAN et les bénéfices qui pourraient en découler, comme le suspectent d'ailleurs aujourd'hui les autorités italiennes[66].

60.    Afin de faire toute la lumière sur cette fraude, BLUE SKYE LUX a lancé le 27 juin 2022 aux États-Unis une procédure de *discovery* à l'encontre de REDBIRD et d'ELLIOTT MANAGEMENT CORPORATION, dont les sièges sociaux sont aux États-Unis, dans le but d'obtenir la production forcée de nombreux documents liés à la cession de l'AC MILAN.

---

[65]    **Rôle n° TAL-2022-07355, pièce n° 22 de la farde II de MOLITOR** – Article de presse paru dans *l'Equipe* en date du 17 juin 2022 **; rôle n° TAL-2022-07361, pièce n° 22 de la farde I de MOLITOR** – Article de presse paru dans *l'Equipe* en date du 17 juin 2022 ; **rôle n° TAL-2023-04206, pièce n° 22 de la farde II de MOLITOR** – Article de presse paru dans *l'Equipe* en date du 17 juin 2022.

[66]    **Rôle n° TAL-2022-07355, pièce n° 52 de la farde II de MOLITOR** – Article du *Corriere della Sera* du 12 mars 2024 et traduction automatique en français de cet article ; **pièce n° 53 de la farde II de MOLITOR** – Article du *Financial Times* du 12 mars 2024 ; **pièce n° 54 de la farde II de MOLITOR** – Article du *Corriere della Sera* du 14 mars 2024 et traduction automatique en français de cet article ; **pièce n° 87 de la farde II de MOLITOR** – Avis d'enregistrement en tant que partie offensée délivrés les 14 février 2023, le 19 avril 2024 et 20 mars 2025 par le ministère public italien et traductions assermentées en français de ces documents ; **pièce n° 87 de la farde II de MOLITOR** – Déclaration du 12 juillet 2024 de Maître Roberto ZINGARI, avocat au barreau de Milan, concernant les avis d'enregistrement en tant que partie offensée délivrées par le ministère public italien ; **rôle n° TAL-2022-07361, pièce n° 52 de la farde II de MOLITOR** – Article du *Corriere della Sera* du 12 mars 2024 et traduction automatique en français de cet article ; **pièce n° 53 de la farde II de MOLITOR** – Article du *Financial Times* du 12 mars 2024 ; **pièce n° 54 de la farde II de MOLITOR** – Article du *Corriere della Sera* du 14 mars 2024 et traduction automatique en français de cet article ; **pièce n° 87 de la farde II de MOLITOR** – Avis d'enregistrement en tant que partie offensée délivrés les 14 février 2023, le 19 avril 2024 et 20 mars 2025 par le ministère public italien et traductions assermentées en français de ces documents ; **pièce n° 87 de la farde II de MOLITOR** – Déclaration du 12 juillet 2024 de Maître Roberto ZINGARI, avocat au barreau de Milan, concernant les avis d'enregistrement en tant que partie offensée délivrées par le ministère public italien ; **rôle n° TAL-2023-04206, pièce n° 52 de la farde II de MOLITOR** – Article du *Corriere della Sera* du 12 mars 2024 et traduction automatique en français de cet article ; **pièce n° 53 de la farde I de MOLITOR** – Article du *Financial Times* du 12 mars 2024 ; **pièce n° 54 de la farde I de MOLITOR** – Article du *Corriere della Sera* du 14 mars 2024 et traduction automatique en français de cet article ; **pièce n° 87 de la farde I de MOLITOR** – Avis d'enregistrement en tant que partie offensée délivrés les 14 février 2023, le 19 avril 2024 et 20 mars 2025 par le ministère public italien et traductions assermentées en français de ces documents ; **pièce n° 87 de la farde I de MOLITOR** – Déclaration du 12 juillet 2024 de Maître Roberto ZINGARI, avocat au barreau de Milan, concernant les avis d'enregistrement en tant que partie offensée délivrées par le ministère public italien

Le 17 mai 2023, Madame Katherine POLK FAILLA, juge auprès de l'*United States District Court Southern District of New York*, a ordonné la production de tous documents en possession de deux employés d'ELLIOTT MANAGEMENT CORPORATION ayant travaillé sur la vente de l'AC MILAN[67]. Il ne peut cependant être fait état des informations ainsi trouvées dans le cadre des présentes, en raison des conditions restrictives auxquelles la juge américaine a assorti la communication des documents[68].

61.   En parallèle, BLUE SKYE LUX et LIC 159 ont initié, le 27 juin 2022, une autre action devant le Tribunal d'arrondissement de et à Luxembourg (n° TAL-2022-07361 du rôle)[69] afin de demander :

(i)    à titre principal, la nullité d'un certain nombre de contrats et accords (dont le SPA) et, *a fortiori,* de la cession des actions de l'AC MILAN ; et

(ii)   à titre subsidiaire, la réparation du dommage subi par elles du fait des agissements frauduleux d'ELLIOTT, lequel est estimé à 102.667.407 euros au moment de l'introduction de l'action, sans préjudice de toute évaluation plus avantageuse pour BLUE SKYE.

**2.5    La réalisation de la vente des actions de l'AC MILAN**

62.   Malgré les avertissements de BLUE SKYE LUX et de Monsieur CASLINI, ROSSONERI SPORT (dont les gérants étaient tous contrôlés par ELLIOTT) a délibérément transféré les actions de l'AC MILAN à ACM BIDCO le 31 août 2022, en sachant qu'aucune décision au niveau du conseil de gérance de PROJECT REDBLACK n'a été prise à ce sujet conformément aux articles 13 et 16 des statuts de cette société.



---

[67]   **Rôle n° TAL-2022-07355, pièce n° 55 de la farde II de MOLITOR –** Transcription (*transcript*) du 17 mai 2023 ; **rôle n° TAL-2022-07361, pièce n° 55 de la farde II de MOLITOR –** Transcription (*transcript*) du 17 mai 2023 ; **rôle n° TAL-2023-04206, pièce n° 55 de la farde II de MOLITOR –** Transcription (*transcript*) du 17 mai 2023.

[68]   **Rôle n° TAL-2022-07355, pièce n° 56 de la farde II de MOLITOR –** Ordonnance de protection (*protective order*) du 4 août 2023 ; **rôle n° TAL-2022-07361, pièce n° 56 de la farde II de MOLITOR –** Ordonnance de protection (*protective order*) du 4 août 2023 ; **rôle n° TAL-2023-04206, pièce n° 56 de la farde II de MOLITOR –** Ordonnance de protection (*protective order*) du 4 août 2023.

[69]   **Rôle n° TAL-2022-07355, pièce n° 57 de la farde II de MOLITOR –** Assignation du 27 juin 2022 ; **rôle n° TAL-2022-07361, pièce n° 57 de la farde II de MOLITOR –** Assignation du 27 juin 2022 ; **rôle n° TAL-2023-04206, pièce n° 57 de la farde II de MOLITOR –** Assignation du 27 juin 2022.

63.    Lors de la réunion du conseil de gérance de PROJECT REDBLACK tenue le 9 septembre 2022[70], Monsieur CASLINI se vit imposer par les gérants de classe A de PROJECT REDBLACK des résolutions de ratification *a posteriori* des actes suivants, dont il ignorait tout jusqu'alors :

   (i)    la mainlevée en date du 31 août 2022[71] du Gage italien, qui était la seule sûreté garantissant efficacement le paiement complet de la créance de PROJECT REDBLACK à l'encontre de ROSSONERI SPORT ;

   (ii)   le transfert des actions de l'AC MILAN pour un prix de 1.123.036.449,06 euros, dont près de la moitié, à savoir 560.000.100 euros, étaient financés par l'émission de *notes* de crédit-vendeur émises par l'acheteur et souscrites par ROSSONERI SPORT - celle-ci finançant donc l'acheteur - le reste (soit 563.036.349,06 euros) étant payé en espèces ; et

   (iii)  la constitution (a) d'un gage de droit hollandais sur des créances de ROSSONERI SPORT, dont celles au titre des *notes* de crédit-vendeur (*vendor loan notes*), dont le remboursement dépendait entièrement de la santé financière de leur débiteur, et (b) d'un gage de droit luxembourgeois concernant un compte bancaire ouvert au nom de ROSSONERI SPORT, sur lequel ont été versés les fonds en espèces résultant du paiement du prix de vente des actions de l'AC MILAN[72]. Contrairement à ce que laissent entendre PROJECT REDBLACK, ROSSONERI SPORT, GENIO et KING GEORGE[73], la valeur cumulée des assiettes des nouveaux gages est inférieure à celle des actions de l'AC MILAN (l'assiette du Gage italien).

64.    Il est à cet égard indifférent que le prix de vente de l'AC MILAN ait pu être qualifié, comme le font PROJECT REDBLACK, ROSSONERI SPORT et LEXINGTON, de « *prix de vente le plus élevé jamais payé pour un club de football d'Europe continentale* »[74], son montant ainsi que ses modalités de paiement restant extrêmement problématiques à plusieurs égards.

65.    En effet, les sommes reçues par ROSSONERI SPORT au titre du prix de vente de l'AC MILAN (soit **1.123.036.449,06 euros**) ne lui permettent pas de rembourser le reliquat de sa dette envers PROJECT REDBLACK, laquelle s'élevait en juin 2022 à **1.231.048.383 euros** (en capital et intérêts). Ce constat est d'autant plus flagrant que ROSSONERI SPORT s'est dépossédée de son seul actif réellement générateur de revenus (soit les actions de l'AC MILAN) qui aurait pu lui permettre de recevoir davantage de fonds pour rembourser sa dette. Autrement dit, les gérants de classe A de PROJECT REDBLACK (et derrière eux, le groupe ELLIOTT) ont décidé, sans aucune raison apparente, que PROJECT REDBLACK abandonnerait une créance de **108.011.933,94 euros**, faute pour ROSSONERI SPORT d'avoir ou de pouvoir générer les fonds nécessaires pour payer cette somme. Une telle remise de dette a par conséquent une incidence directe et négative sur les revenus générés par les TPECs émis par PROJECT REDBLACK.

---

[70]    **Rôle n° TAL-2022-07355, pièce n° 58 de la farde II de MOLITOR –** Procès-verbal de la réunion du conseil de gérance de Project Redblack du 9 septembre 2022 ; **rôle n° TAL-2022-07361, pièce n° 58 de la farde II de MOLITOR –**Procès-verbal de la réunion du conseil de gérance de Project Redblack du 9 septembre 2022 ; **rôle n° TAL-2023-04206, pièce n° 58 de la farde II de MOLITOR –**Procès-verbal de la réunion du conseil de gérance de Project Redblack du 9 septembre 2022.

[71]    TAL-2022-07355, conclusions d'ELVINGER HOSS PRUSSEN du 18 janvier 2023, n° 1, p. 4.

[72]    TAL-2022-07355, conclusions de CLIFFORD CHANCE du 20 février 2023, n° 11, p. 7 ; rôle n° TAL-2022-07355, conclusions d'ELVINGER HOSS PRUSSEN du 31 octobre 2022, n° 14, p. 9 ; TAL-2023-04206, assignation du 2 mars 2023, n° 14, p. 7.

[73]    TAL-2022-07355, conclusions de CLIFFORD CHANCE du 7 juin 2023, n° 21, p. 15 ; rôle n° TAL-2022-07355, conclusions d'ELVINGER HOSS PRUSSEN du 31 octobre 2022, n° 14, p. 10 ; TAL-2023-04206, assignation du 2 mars 2023, n° 15, p. 8.

[74]    Rôle n° TAL-2022-07361, conclusions de CLIFFORD CHANCE du 7 juin 2023, n° 21, p. 14 ; rôle n° TAL-2023-04206, assignation d'ELVINGER HOSS PRUSSEN du 2 mars 2023, n° 7, p. 4 ; requête en intervention volontaire du 9 février 2024, n° 25, p. 14.

Les affirmations de PROJECT REDBLACK et ROSSONERI SPORT qui se focalisent sur le prix de vente des actions de l'AC MILAN qui excède le montant total (évalué à 733.728.971 euros) investi dans PROJECT REDBLACK par les groupes ELLIOTT et BLUE SKYE[75], donnent une vision biaisée de la réalité puisqu'elles ne prennent pas en compte les revenus importants que les sommes injectées dans PROJECT REDBLACK devaient produire, notamment au titre des TPECs de classe A-2 et B[76].

66.    Pour ces raisons, Monsieur CERCHIONE a déposé, pour le compte de BLUE SKYE LUX, une plainte pénale en Italie à l'encontre d'ELLIOTT et de ses représentants et affiliés. Le ministère public italien a alors décidé d'ouvrir une enquête pénale en 2023 à l'encontre de plusieurs parties affiliées à ELLIOTT, et, en particulier, à l'encontre de Madame ITALIA, Monsieur MCLEAN et Monsieur SCHUH, pour diverses infractions. L'enquête est toujours en cours à l'heure où sont écrites ces lignes et d'après les informations fournies par le Procureur de la République italien, de nouvelles infractions ont encore été récemment ajoutées d'autorité par le ministère public à la liste de celles faisant déjà l'objet d'une enquête, mettant en lumière le fait que le groupe ELLIOTT fait l'objet d'une enquête allant au-delà des faits reprochés par BLUE SKYE LUX et LIC 159. Sont ainsi notamment visées des infractions concernant (i) des obstructions aux autorités de surveillance prudentielle, (ii) une banqueroute frauduleuse et (iii) des détournements et abus de biens sociaux[77].

Dans le cadre de cette enquête, diverses perquisitions ont été diligentées à l'encontre de PROJECT REDBLACK, de l'AC MILAN et de personnes physiques, dont certaines sont liées à ELLIOTT UK. La perquisition des bureaux de PROJECT REDBLACK a été ordonnée le 12 avril 2023 et s'est déroulée le 21 avril 2023[78]. Plus récemment et dans la continuité de ces démarches, il a été relayé par la presse[79] que la brigade financière de la police italienne avait effectué une nouvelle perquisition au siège de l'AC MILAN le 12 mars 2024, et qu'une enquête pour obstruction à l'autorité de contrôle était en cours contre Monsieur Ivan GAZIDIS, l'ancien président (*chief executive officer*) de l'AC MILAN, et Monsieur Giorgio FURLANI, l'actuel président (*chief executive officer*) de l'AC MILAN (ce, depuis 2022), qui était auparavant un gestionnaire de

---

[75]    **Rôle n° TAL-2022-07361**, conclusions de CLIFFORD CHANCE du 7 juin 2023, n° 79, p. 38 ; rôle n° TAL-2022-07355, conclusions d'ELVINGER HOSS PRUSSEN du 31 octobre 2022, n° 13, p. 9 ; TAL-2023-04206, assignation du 2 mars 2023, n° 13, p. 6.

[76]    **Rôle n° TAL-2022-07355, pièce n° 37 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2022-07361, pièce n° 37 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2023-04206, pièce n° 37 de la farde II de MOLITOR**, précitée.

[77]    **Rôle n° TAL-2022-07355, pièce n° 87 de la farde II de MOLITOR** – précitée ; **rôle n° TAL-2022-07361, pièce n° 87 de la farde II de MOLITOR** – précitée ; **rôle n° TAL-2023-04206, pièce n° 87 de la farde II de MOLITOR** – précitée ; **Rôle n° TAL-2022-07355, pièce n° 88 de la farde II de MOLITOR** – précitée ; **rôle n° TAL-2022-07361, pièce n° 88 de la farde II de MOLITOR** – précitée ; **rôle n° TAL-2023-04206, pièce n° 88 de la farde II de MOLITOR** – précitée.

[78]    **Rôle n° TAL-2022-07355, pièce n° 59 de la farde II de MOLITOR** – Ordonnance de perquisition et de saisie du Tribunal de et à Luxembourg du 12 avril 2023 ; **pièce n° 60 de la farde II de MOLITOR** – Procès-verbal de perquisition du 21 avril 2023 ; **rôle n° TAL-2022-07361, pièce n° 59 de la farde II de MOLITOR** – Ordonnance de perquisition et de saisie du Tribunal de et à Luxembourg du 12 avril 2023 ; **pièce n° 60 de la farde II de MOLITOR** – Procès-verbal de perquisition du 21 avril 2023 ; **rôle n° TAL-2023-04206, pièce n° 59 de la farde II de MOLITOR** – Ordonnance de perquisition et de saisie du Tribunal de et à Luxembourg du 12 avril 2023 ; **pièce n° 60 de la farde I de MOLITOR** – Procès-verbal de perquisition du 21 avril 2023.

[79]    **Rôle n° TAL-2022-07355, pièces n° 52 et 53 de la farde II de MOLITOR**, précitées ; **rôle n° TAL-2022-07361, pièces n° 52 et 53 de la farde II de MOLITOR**, précitées ; **rôle n° TAL-2023-04206, pièces n° 52 et 53 de la farde II de MOLITOR,** précitées.

portefeuille (*portfolio manager*) pendant douze ans auprès d'ELLIOTT UK[80]. Les domiciles de ces deux personnes ont été perquisitionnés.

Ces mesures et l'ampleur des moyens utilisés et l'accroissement du nombre d'infractions faisant l'objet d'investigations démontrent le sérieux des soupçons portant sur les liens réels entre l'AC MILAN et le groupe ELLIOTT, les autorités italiennes soupçonnant que le groupe ELLIOTT maintienne toujours un contrôle effectif sur l'AC MILAN[81].

67.    Le 6 mars 2023, BLUE SKYE LUX initia également une action en Italie visant à obtenir la liquidation de la « super société de fait » composée en Italie par les sociétés PROJECT REDBLACK et ROSSONERI SPORT, cette structure ne disposant plus des actifs suffisants pour faire face à ses dettes, notamment pour rembourser la totalité des sommes dues au titre des différents TPECs émis par PROJECT REDBLACK[82]. Par décision du 9 novembre 2023, le juge italien se déclara incompétent pour juger de ces demandes, considérant que le centre des intérêts principaux de la « super société de fait » était présumé être au Luxembourg[83]. Le fond de l'affaire ne fut néanmoins pas examiné.

**2.6    Les éléments plus récents confirmant la fraude dont BLUE SKYE LUX, LIC 159 et leurs créanciers sont victimes**

68.    Tout aussi centraux que soient la mainlevée du Gage italien et la vente des actions de l'AC MILAN, ils ne constituent que la pointe de l'iceberg, ou de manière tout aussi imagée, le premier acte d'un opéra qui aurait pu s'intituler « La fraude (presque) parfaite ». En effet, l'ensemble des décisions qui seront prises par la suite, notamment par PROJECT REDBLACK et ROSSONERI SPORT, s'inscrivent toutes dans la même ligne, qui comme l'avaient rapidement compris BLUE SKYE LUX et LIC 159, peut se résumer comme suit :

(i)    la cession des actions de l'AC MILAN afin de mettre cet actif hors de portée de BLUE SKYE, moyennant un prix d'achat volontairement non maximalisé ;

(ii)    le siphonnage en règle, par des entités du groupe ELLIOTT situées aux Etats-Unis et Îles Caïmans, des sommes et avoirs résultant de ce prix réduit (composés, comme nous l'avons vu, de 563.036.349,06 euros en espèces et de 500.000.100[84] euros sous forme de *notes* de crédit-vendeur) ;

---

[80]    **Rôle n° TAL-2022-07355, pièce n° 61 de la farde II de MOLITOR** – Biographie de Monsieur Giorgio FURLANI : **rôle n° TAL-2022-07361, pièce n° 61 de la farde II de MOLITOR** – Biographie de Monsieur Giorgio FURLANI ; **rôle n° TAL-2023-04206, pièce n° 61 de la farde II de MOLITOR** – Biographie de Monsieur Giorgio FURLANI.

[81]    **Rôle n° TAL-2022-07355, pièces n° 52 et 53 de la farde II de MOLITOR**, précitées ; **rôle n° TAL-2022-07361, pièces n° 52 et 53 de la farde II de MOLITOR,** précitées ; **rôle n° TAL-2023-04206, pièces n° 52 et 53 de la farde II de MOLITOR,** précitées.

[82]    **Rôle n° TAL-2022-07355, pièce n° 62 de la farde II de MOLITOR** – Requête aux fins d'ouverture d'une procédure de liquidation judiciaire du 6 mars 2023 ; **rôle n° TAL-2022-07361, pièce n° 62 de la farde II de MOLITOR** – Requête aux fins d'ouverture d'une procédure de liquidation judiciaire du 6 mars 2023 ; **rôle n° TAL-2023-04206, pièce n° 62 de la farde II de MOLITOR** – Requête aux fins d'ouverture d'une procédure de liquidation judiciaire du 6 mars 2023.

[83]    **Rôle n° TAL-2022-07355, pièce n° 63 de la farde II de MOLITOR** – Décision du tribunal de Milan (Section civile) du 9 novembre 2023, n° 270-2023 ; **rôle n° TAL-2022-07361, pièce n° 63 de la farde II de MOLITOR –**Décision du tribunal de Milan (Section civile) du 9 novembre 2023, n° 270-2023 ; **rôle n° TAL-2023-04206, pièce n° 63 de la farde II de MOLITOR –**Décision du tribunal de Milan (Section civile) du 9 novembre 2023, n° 270-2023.

[84]    Un paiement de 10.000.000 euros avait été effectué en octobre 2022 par rapport la valeur nominale totale des *notes* de 560.000.000 euros.

(iii)    la dissipation de toute somme non détournée par ELLIOTT afin de réduire au maximum ce qui devrait éventuellement être versé à BLUE SKYE LUX et LIC 159 ; et

(iv)    l'octroi d'un nouveau financement par le groupe ELLIOTT à l'acheteur des actions de l'AC MILAN dans l'anticipation d'un prochain défaut de paiement lui permettant de reprendre la main sur l''AC MILAN, cette fois après avoir évincé BLUE SKYE LUX et LIC 159.

69.    Les faits qui sont résumés dans les paragraphes suivants sont certes complexes et techniques mais confirment point par point le plan d'ELLIOTT.

70.    Il faut d'emblée relever le *modus operandi* habituel des gérants de classe A de PROJECT REDBLACK qui, agissant en marionnettes obéissantes d'ELLIOTT, ont pour habitude d'effectuer en secret une série d'opérations pour ensuite les soumettre formellement à la ratification du conseil de gérance de PROJECT REDBLACK, mettant ainsi Monsieur CASLINI devant le fait accompli[85] et l'empêchant d'introduire toute demande en justice qui viendrait entraver le plan d'ELLIOTT.

### 2.6.1    Les distributions illégales du 1er février 2023 par ROSSONERI SPORT et PROJECT REDBLACK

71.    À partir d'éléments indiqués dans un courrier des gérants de classe A de PROJECT REDBLACK du 1er février 2023[86], BLUE SKYE LUX a pu reconstituer la chronologie des premières opérations, qui semblent s'être produites le 27 janvier 2023 :

(i)    le remboursement d'une partie de la créance de PROJECT REDBLACK à l'encontre de ROSSONERI SPORT par la distribution à PROJECT REDBLACK de 515.117.074,73 euros en espèces et de 95,73% des *notes* de crédit-vendeur (*vendor loan notes*) émises par ACM BIDCO[87], lequel est contraire à l'AFA, qui ne permet pas de remboursement en nature (puisque selon la clause 20.1 de ce contrat, le non-paiement des sommes convenues dans les délais contractuels prévus et dans la devise permise par le contrat est un « Cas de Défaut » (« Event of Default »)) et nécessitait donc une modification de ce dernier en accord avec les articles 13 et 16 des statuts de PROJECT REDBLACK ;

(ii)    la distribution en espèces par PROJECT REDBLACK (a) de 14.289.989,73 euros à GENIO et KING GEORGE pour rembourser des prêts sans intérêts (*interest free loans*) et (b) 454.201.707 euros à BUCKTHORN INTERNATIONAL LIMITED et BUCKTHORN

---

[85]    **Rôle n° TAL-2022-07361**, conclusions de C.A.S. du 5 juillet 2023, n° 31, pp. 9 et 10 ; **pièce n° 35 de la farde I de C.A.S.** – Procès-verbal de la réunion du conseil de gérance de PROJECT REDBLACK du 2 mars 2023 ; **rôle n° TAL-2022-07355, pièce n° 65 de la farde II de MOLITOR** – Procès-verbal de la réunion du conseil de gérance de PROJECT REDBLACK du 2 mars 2023 ; **rôle n° TAL-2022-07361, pièce n° 65 de la farde II de MOLITOR** – Procès-verbal de la réunion du conseil de gérance de PROJECT REDBLACK du 2 mars 2023 ; **rôle n° TAL-2023-04206, pièce n° 65 de la farde II de MOLITOR** – Procès-verbal de la réunion du conseil de gérance de PROJECT REDBLACK du 2 mars 2023.

[86]    **Rôle n° TAL-2022-07355, pièce n° 64 de la farde II de MOLITOR** – Courrier du 1er février 2023 adressé à BLUE SKYE CAÏMANS et BLUE SKYE LUX par PROJECT REDBLACK ; **rôle n° TAL-2022-07361, pièce n° 64 de la farde II de MOLITOR** – Courrier du 1er février 2023 adressé à BLUE SKYE CAÏMANS et BLUE SKYE LUX par PROJECT REDBLACK ; **rôle n° TAL-2023-04206, pièce n° 64 de la farde II de MOLITOR** – Courrier du 1er février 2023 adressé à BLUE SKYE CAÏMANS et BLUE SKYE LUX par PROJECT REDBLACK.

[87]    Voir *supra*, paragraphe 51 (iv).

ASSOCIATES LIMITED au titre des paiements du rendement fixe et d'une partie du rendement variable des TPECs de classe A-1[88] ; et

(iii)     le transfert de 95,73 % des *notes* de crédit-vendeur (*vendor loan notes*) le 27 janvier 2023 à BUCKTHORN INTERNATIONAL LIMITED et BUCKTHORN ASSOCIATES LIMITED pour une valeur totale de 541.412.981 euros en tenant compte des intérêts ayant couru entre le 31 août 2022 et le 27 janvier 2023 (avec une valeur nominale de 526.515.000 euros) au titre des TPECs de classe A-1, avec pour conséquence le fait que ces deux entités devaient alors devenir bénéficiaires du nouveau gage sur les actions de l'AC MILAN accessoire à ces *notes* de crédit-vendeur, leur permettant ainsi de s'en emparer en cas de défaut affectant les *notes*.

Une telle distribution viole non seulement les articles 3.1.5 et 5.1.1 des Conditions Générales des TPECs de classes A et B (lesquels prévoient que les sommes dues au titre de ces TPECs ne peuvent être payées que si la société a suffisamment d'argent liquide disponible[89]), mais aussi l'article 3.3 (qui ne permet que les paiements en espèces et libellés en euros pour les TPECs[90]).

De plus, elle est contraire aux Conditions Générales des TPECs de classes A et B, selon lesquelles BLUE SKYE LUX aurait dû recevoir 16,16 millions d'euros[91].



---

[88]     Cette somme a fait l'objet d'un *clawback* pour une somme de 47.200.000,00 résultant d'un *clawback* intervenu les 16 et 17 mai 2023 (**Rôle n° TAL-2022-07355, pièce n° 68 de la farde II de MOLITOR**, précitée, p. 12 ; **rôle n° TAL-2022-07361, pièce n° 68 de la farde II de MOLITOR**, précitée, p. 12 ; **rôle n° TAL-2023-04206, pièce n° 68 de la farde II de MOLITOR**, précitée, p. 12).

[89]     « *only to the extent the Company has enough cash* available » (**Rôle n° TAL-2022-07355, pièce n° 8 de la farde I de MOLITOR et pièce n° 43 de la farde II de MOLITOR**, précitées ; **rôle n° TAL-2022-07361, pièce n° 8 de la farde I de MOLITOR et pièce n° 43 de la farde II de MOLITOR**, précitées ; **rôle n° TAL-2023-04206, pièce n° 8 de la farde I de MOLITOR et pièce n° 43 de la farde I de MOLITOR**, précitées).

[90]     **Rôle n° TAL-2022-07355, pièce n° 43 de la farde II de MOLITOR** – précitée, article 3.3, p. 14 ; **rôle n° TAL-2022-07361, pièce n° 43 de la farde II de MOLITOR** – précitée, article 3.3, p. 14 ; **rôle n° TAL-2023-04206, pièce n° 43 de la farde II de MOLITOR** – précitée, article 3.3, p. 1.

[91]     En prenant en compte le transfert des *notes* de crédit-vendeur pour un montant de 541.412.981 euros le 27 janvier 2023 et le fait que ces *notes* devaient venir à maturité le 31 août 2025, le rendement fixe des TPECs de classe A-2 serait d'environ **6.900.000 euros** (soit 0.5% x 947 jours/360 x 526,515,000) et le rendement variable serait d'environ **9.700.000 euros** (soit 8% d'environ 121.000.000, représentant les intérêts payables pour les *notes* entre le 27 janvier 2023 et le 31 août 2025).

72.    En conséquence de ces transferts, il ne restait plus que 47.620.390 euros au niveau de PROJECT REDBLACK et 4,27 % des *notes* de crédit-vendeur pour une valeur de 23.485.000 euros au niveau de ROSSONERI SPORT, lesquels, s'ils n'avaient pas été volontairement et artificiellement maintenu dans cette société, auraient dû revenir à BLUE SYKE LUX et LIC 159 en vertu des TPECs de classes A-2 et B.

73.    Pire encore : ROSSONERI SPORT, qui est entièrement contrôlée par ELLIOTT, s'est employée à dépenser autant que possible les avoirs bloqués auprès d'elle, notamment en frais de consultance et en frais juridiques par rapport au présent litige, pour réduire au maximum la part qui devrait revenir en définitive à BLUE SKYE LUX et LIC 159[92]. En faisant en sorte que ce soit ROSSONERI SPORT et non PROJECT REDBLACK qui paie ces frais, ELLIOTT s'est donc arrangée pour ne pas avoir, ici encore, à respecter les articles 13 et 16 des statuts de PROJECT REDBLACK, lesquels subordonnaient la conclusion par cette société de contrats de consultance, de gestion ou d'autres services pour des montants dépassant 20.000 euros par an à l'approbation par tous les gérants de PROJECT REDBLACK et sinon, les associés de cette dernière.

74.    Dans le courrier susmentionné du 1er février 2023[93], les gérants de classe A de PROJECT REDBLACK ont tenté de justifier la différence de traitement entre, d'une part, les entités ELLIOTT détentrices des TPECs A-1 et d'autre part, BLUE SKYE LUX ET LIC 159. L'explication toute trouvée tiendrait au fait que les *notes* de crédit-vendeur émises par ACM BIDCO (dont les termes avaient été négociés avec le groupe ELLIOTT dans le cadre de la vente des actions de l'AC MILAN) qu'à des entités dites « affiliées » (« *Affiliates* ») à ROSSONERI SPORT, ce qui excluait (sans doute, de manière calculée depuis le départ) les entités du groupe BLUE SKYE en raison de l'absence de toute détention de participation directe ou indirecte de plus de 50% dans cette dernière[94]. Ce fait montre que contrairement à ce qu'affirment PROJECT REDBLACK et ROSSONERI SPORT, les *notes* de crédit-vendeur ne bénéficient pas à tous les investisseurs de PROJECT REDBLACK, et ont été rédigées dans le seul intérêt du groupe ELLIOTT[95].

75.    De surcroît, si dans le même courrier du 1er février 2023, les gérants de classe A de PROJECT REDBLACK laissaient entrevoir la possibilité d'une distribution des produits de la vente de l'AC MILAN au titre des TPECs de classe B (mais pas les TPECs de classe A-2), les conditions qu'ils imposaient étaient en fait un nouveau piège tendu au groupe BLUE SKYE. En effet, la distribution proposée ne pouvait être que provisoire et aurait dû être restituée sans délai à PROJECT REDBLACK en vertu d'un mécanisme de *clawback*, si cette dernière était condamnée au paiement des dommages et intérêts dans une des affaires judiciaires la concernant (dont la réalisation du gage sur les parts sociales de ROSSONERI, remise en cause par l'ancien investisseur chinois).

---

[92]    Par exemple : **rôle n° TAL-2022-07355, pièce n° 88 de la farde II de MOLITOR** – Comptes annuels de ROSSONERI SPORT pour l'exercice se terminant au 30 juin 2023, p. 13 (« *other professional fees* ») ; **rôle n° TAL-2022-07361, pièce n° 88 de la farde II de MOLITOR** – Comptes annuels de ROSSONERI SPORT pour l'exercice se terminant au 30 juin 2023, p. 13 (« *other professional fees* ») ; **rôle n° TAL-2023-04206, pièce n° 88 de la farde I de MOLITOR** – Comptes annuels de ROSSONERI SPORT pour l'exercice se terminant au 30 juin 2023, p. 13 (« *other professional fees* »).

[93]    **Rôle n° TAL-2022-07355, pièce n° 64 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2022-07361, pièce n° 64 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2023-04206, pièce n° 64 de la farde II de MOLITOR**, précitée.

[94]    BLUE SKYE LUX ne pouvait être qualifiée d'« affiliée » de ROSSONERI SPORT en raison de l'absence de participation majoritaire directe ou indirecte dans cette société, Blue Skye Lux ne détenant qu'indirectement 4,26 % du capital social de ROSSONERI SPORT via PROJECT REDBLACK.

[95]    Rôle n° TAL-2022-07355, conclusions d'ELVINGER HOSS PRUSSEN du 31 octobre 2022, n° 15, p. 10 ; TAL-2023-04206, assignation du 2 mars 2023, n° 15, p. 9.

Or, à partir du moment où LIC 159 aurait perçu une distribution au titre des TPECs de classe B, elle aurait été dans l'obligation d'en transférer la quasi-totalité aux titulaires des TPECs de classes E et F. (dont LEXINGTON), lesquels n'étaient, quant à eux, liés par aucun engagement de *clawback*. Dès lors, dans l'hypothèse d'une restitution à PROJECT REDBLACK en vertu du *clawback*, le groupe BLUE SKYE aurait dû en supporter toutes les conséquences financières négatives, faute de pouvoir exiger une quelconque restitution de la part des titulaires des TPECs de classes E et F. De façon paradoxale, le groupe BLUE SKYE avait donc plus à perdre en acceptant la distribution aux conditions exigées par PROJECT REDBLACK qu'en la refusant.

Contrairement à ce qu'affirment les entités ELLIOTT[96], la perspective d'une telle situation évidemment préjudiciable au groupe BLUE SKYE rendait ainsi inacceptable la distribution proposée. Il est fort à parier que PROJECT REDBLACK n'a fait entrevoir la perspective d'une telle distribution que parce qu'elle savait qu'une telle proposition resterait lettre morte, s'assurant ainsi que les *notes* de crédit-vendeur continueraient à être détenues par ROSSONERI SPORT, et donc sous le contrôle du groupe ELLIOTT.

76. Enfin, les gérants de classe A précisaient dans le prédit courrier du 1er février 2023 que, compte tenu des demandes reconventionnelles[97] formulées par PROJECT REDBLACK et ROSSONERI SPORT à l'encontre de BLUE SKYE et de LIC 159 dans le cadre, notamment, de l'action pour fraude intentée par ces dernières, aucun remboursement des TPECs de classe A-2 ne pourrait être réalisé au profit de BLUE SKYE LUX puisque les sommes éventuellement dues pour ces TPECs seraient compensées avec les sommes réclamées à titre reconventionnel. Cette excuse encore une fois toute trouvée doit être mise en lien avec la demande reconventionnelle faite par PROJECT REDBLACK et ROSSONERI SPORT dans leurs conclusions en réponse[98] à l'assignation du 27 juin 2023, lesquelles visent à priver BLUE SKYE LUX et de LIC 159 des revenus afférents aux TPECs qu'elles détiennent, voire à annuler ces titres, ce qui est révélateur de la volonté du groupe ELLIOTT de s'accaparer tous les revenus dérivant de la vente des actions de l'AC MILAN.

**2.6.2    La sous-évaluation frauduleuse des *notes* de crédit- vendeur distribuées par PROJECT REDBLACK aux entités ELLIOTT**

77. Le 26 juillet 2023, PROJECT REDBLACK et BUCKTHORN INTERNATIONAL LIMITED et BUCKTHORN ASSOCIATES LIMITED ont décidé de réévaluer à la baisse la valeur des *notes* de crédit-vendeur que ces dernières avaient reçu. La valeur de ces *notes* est donc passée de **541.412.981** euros à **463.333.200** euros, ce qui correspond à une **décote de 78.079.781 euros**[99].

---

[96]    **Rôle n° TAL-2022-07361**, conclusions de CLIFFORD CHANCE du 7 juin 2023, n° 79, pp. 38 et 39.
[97]    **Rôle n° TAL-2022-07355**, conclusions d'ELVINGER HOSS PRUSSEN du 31 octobre 2022, n° 12, p. 8 ; TAL-2023-04206, assignation du 2 mars 2023, n° 12, p. 6.
[98]    **Rôle n° TAL-2023-04206**, assignation du 2 mars 2023, n° 29, p. 14.
[99]    **Rôle n° TAL-2022-07355, pièce n° 68 de la farde II de MOLITOR –** Comptes annuels de PROJECT REDBLACK au 30 juin 2023, pp. 12 et 17 ; **rôle n° TAL-2022-07361, pièce n° 68 de la farde II de MOLITOR –** Comptes annuels de PROJECT REDBLACK au 30 juin 2023, pp. 12 et 17 ; **rôle n° TAL-2023-04206, pièce n° 68 de la farde II de MOLITOR –** Comptes annuels de PROJECT REDBLACK au 30 juin 2023, pp. 12 et 17 ; **rôle n° TAL-2022-07355, pièce n° 89 de la farde II de MOLITOR –** Comptes annuels de ROSSONERI SPORT au 30 juin 2023, p. 15 ; **rôle n° TAL-2022-07361, pièce n° 89 de la farde II de MOLITOR –** Comptes annuels de ROSSONERI SPORT au 30 juin 2023, p. 15 ; **rôle n° TAL-2023-04206, pièce n° 89 de la farde II de MOLITOR –** Comptes annuels de ROSSONERI SPORT au 30 juin 2023, p. 15.

78.   En raison de la réévaluation à la baisse des *notes* de crédit-vendeur qu'elle a distribuées au titre du remboursement des TPECs de classe A-1, PROJECT REDBLACK a réévalué à la hause sa dette au titre de ces TPECs de classe A-1, puisqu'elle avait en réalité remboursé une somme moindre que celle initialement estimée.

79.   Par ce tour de magie, PROJECT REDBLACK a réussi une double opération : (i) transférer des *notes* de crédit-vendeur volontairement sous-évaluées à BUCKTHORN INTERNATIONAL LIMITED et BUCKTHORN ASSOCIATES LIMITED, et (ii) faire croire que sa dette envers ses sociétés était plus élevée qu'en réalité (en raison de la réduction de la valeur de remboursement via la sous-évaluation des *notes*). Elle a donc réussi par ce subterfuge à dérouter vers des entités ELLIOTT des actifs qui auraient autrement dû être partagés avec BLUE SKYE LUX et LIC 159 en leur qualité de titulaires des TPECs de classes A-2 et B.

80.   Or, comme nous allons l'expliquer ci-après, les *notes* de crédit-vendeur ont été intégralement et anticipativement remboursées en décembre 2024, ce qui remet en cause la sous-évaluation des *notes* distribuées par PROJECT REDBLACK. En effet, alors que ces instruments ont été évalués à une valeur nominale **463.333.200 euros**, BUCKTHORN INTERNATIONAL LIMITED et BUCKTHORN ASSOCIATES LIMITED ont en réalité reçu **630.860.700 euros** (couvrant la valeur nominale des notes (**526.515.000 euros**) et leur rendement fixe et variable (*fixed and variable yield*). Il en résulte donc un enrichissement sans cause de ces entités et un détournement de sommes à leur profit (pour un montant de **167.527.500 euros**), au détriment de BLUE SKYE LUX et de LIC 159.

| | Montants avant la réévaluation | Montants après la réévaluation | Différence |
|---|---|---|---|
| Valeur des *notes* remboursées | 541.412.981 euros | 463.333.200 euros | 78.079.781 euros |
| Montant remboursé au titre des TPECs A-1 par les *notes* | 541.412.981 euros | 463.333.200 euros | 78.079.781 euros |
| Montant effectivement reçu lors du remboursement des *notes* en décembre 2024 (en prenant en compte des rendements fixe et variable) | 630.860.700 euros | 630.860.700 euros | Gain pour les entités ELLIOTT de 89.447.719 euros (par rapport aux montants avant réévaluation)<br><br>Gain pour les entités ELLIOTT de 167.527.500 euros (par rapport aux montants après réévaluation) |

### 2.6.3  Le remboursement anticipé des *notes* de crédit-vendeur et leur refinancement par ELLIOTT

81.    Le 20 décembre 2024, l'AC MILAN a publié un communiqué[100], dont le contenu a été commenté par divers articles de presse[101], lequel annonçait que l'intégralité des *notes* de crédit-vendeur (*vendor loan notes*) avait été remboursée par ACM BIDCO en décembre 2024 (sans préjudice quant à la date exacte), soit huit mois en avance par rapport à la date contractuelle.

82.    Les Demanderesses ont alors appris que ce remboursement anticipé avait été financé en partie par un apport en fonds propres de 170.000.000 euros mais aussi, et plus curieusement, par un refinancement de 489.000.000 euros accordé jusqu'en 2028 par SHEVA INVESTMENTS LIMITED[102], **une société des Îles Caïmans appartenant au groupe ELLIOTT** et conseillée par ELLIOTT UK.

D'une part, les *notes* de crédit-vendeur originaires produisant des intérêts à hauteur de 7%, elles ont permis au groupe ELLIOTT, via BUCKTHORN INTERNATIONAL LIMITED et BUCKTHORN ASSOCIATES LIMITED d'amasser entre le 27 janvier 2023 (date de la distribution contestée des *notes* de crédit-vendeur à ces deux entités) et le 20 décembre 2024 (date du remboursement anticipé et inattendu des *notes* de crédit-vendeur) un montant de 89.447.719 euros. Cette somme n'est bien évidemment pas prise en compte dans le calcul des sommes distribuées au titre du remboursement des TPECs de classe A-1 et représente un nouveau **détournement** des sommes qui auraient normalement dû faire partie du pot commun à distribuer entre le groupe ELLIOTT et le groupe BLUE SKYE en vertu des Conditions Générales des TPECs de classe A et B. Les Demanderesses réévalueront dès lors le dommage qu'elles ont subi du fait des comportements frauduleux dont elles ont été victimes, lorsqu'elles concluront sur le fond.

Le bénéfice dont profite indûment le groupe ELLIOTT au titre de ce détournement est encore plus important au regard du nouveau taux d'intérêt d'environ 13% qu'elles ont imposé lors du refinancement des *notes* de crédit-vendeur accordé le 20 décembre 2024, ce qui représenterait un montant d'environ 273.000.000 euros[103]. Ce faisant, le groupe ELLIOTT s'est encore une fois arrangé pour détourner le flux de revenus générés par la vente de l'AC MILAN (et notamment les intérêts produits par les *notes* de crédit-vendeur encore détenues par ROSSONERI SPORT) alors qu'elles devaient servir au remboursement de la créance de PROJECT REDBLACK et ensuite, être distribués à BLUE SKYE LUX et LIC 159 en leurs qualités de détentrices des TPECS de classes A-2 et B.

---

[100].    **Rôle n° TAL-2022-07355, pièce n° 66 de la farde II de MOLITOR –** Copie du communiqué publiée le 10 décembre 2024 sur le site internet de l'AC MILAN ; **rôle n° TAL-2022-07361, pièce n° 66 de la farde II de MOLITOR –** Copie du communiqué publiée le 10 décembre 2024 sur le site internet de l'AC MILAN ; **rôle n° TAL-2023-04206, pièce n° 66 de la farde II de MOLITOR –** Copie du communiqué publiée le 10 décembre 2024 sur le site internet de l'AC MILAN.

[101]    **Rôle n° TAL-2022-07355, pièce n° 67 de la farde II de MOLITOR –** Article de *Sempre Milan* du 23 décembre 2024 ; **rôle n° TAL-2022-07361, pièce n° 67 de la farde II de MOLITOR –** Article de *Sempre Milan* du 23 décembre 2024 ; **rôle n° TAL-2023-04206, pièce n° 67 de la farde II de MOLITOR –** Article de *Sempre Milan* du 23 décembre 2024.

[102]    **Rôle n° TAL-2022-07355, pièce n° 97 de la farde III de MOLITOR –** Rapport de recherche délivré par le Cayman Islands General Registry concernant SHEVA INVESTMENTS LIMITED ; **rôle n° TAL-2022-07361, pièce n° 97 de la farde III de MOLITOR –** Rapport de recherche délivré par le Cayman Islands General Registry concernant SHEVA INVESTMENTS LIMITED ; **rôle n° TAL-2023-04206, pièce n° 97 de la farde II de MOLITOR –** Rapport de recherche délivré par le Cayman Islands General Registry concernant SHEVA INVESTMENTS LIMITED.

[103]    Ce montant est calculé de la minière suivante sur une période allant du 20 décembre 2024 à juillet 2028 : (i) montant total avec intérêts 489.000.000 x (1+13%) x (1308/360) = 762.000.000 euros ; (ii) montant des intérêts : 762.000.000 - 489.000.000 = 273.000.000 euros.

D'autre part, ce refinancement bien opportun pour ELLIOTT était, de plus, selon toute vraisemblance, garanti par un nouveau gage sur les actions d'AC MILAN. ELLIOTT pourra, en cas de défaut de la part d'ACM BIDCO, réaliser cette sûreté et mettre ainsi directement la main sur l'AC MILAN, sans devoir la partager avec BLUE SKYE si la fraude n'avait pas été commise. BLUE SKYE LUX et LIC 159 se réservent naturellement tout droit de demander la production forcée des documents attestant de l'existence de cette nouvelle sûreté et même, encore une fois, qu'elles réévalueront le montant de leur dommage lorsqu'elles concluront sur le fond.

Enfin, il faut constater que le refinancement par SHEVA INVESTMENTS LIMITED est une transaction globale passée entre ROSSONERI SPORT, BUCKTHORN INTERNATIONAL LIMITED et BUCKTHORN ASSOCIATES LIMITED (en tant que détentrices de *notes* de crédit-vendeur), ACM BIDCO (en tant qu'émettrice de ces *notes*), SHEVA INVESTMENTS LIMITED (en tant que société fournissant le refinancement) et REDBLACK (en tant que créancière de ROSSONERI SPORT, notamment au titre de l'AFA). Il s'agissait de transformer les *notes* de crédit vendeur originaires en un refinancement accordé par SHEVA INVESTMENTS LIMITED. Cette convention, qui affecte directement les sous-jacents des TPECs de classes A et B, constitue une nouvelle fois une transaction entre les sociétés affiliées aux associées de PROJECT REDBLACK ou aux porteurs des TPECs de classe A-1, sans qu'aucune décision n'ait été validée à l'unanimité par les gérants ou les associés de PROJECT REDBLACK en vertu des articles 13 et des statuts de PROJECT REDBLACK. Voilà encore un élément à rattacher à la fraude subie par les Demanderesses. Nous reviendrons bien entendu plus largement sur ces éléments lorsque nous concluons sur le fonds de l'affaire.

83.    Enfin, le remboursement des *notes* de crédit-vendeur intervenu le 20 décembre 2024 permet de cristalliser la situation financière de ROSSONERI SPORT et de PROJECT REDBLACK.

Il faut d'abord relever que les comptes annuels de PROJECT REDBLACK au 30 juin 2023 mentionnent l'existence d'une créance de cette dernière envers ROSSONERI SPORT pour un montant de 340.821.221,84 euros [104]. Ce montant aurait dû être plus élevé si les dispositions de l'AFA avaient été respectées et si PROJECT REDBLACK n'avait pas décidé de renoncer le 28 août 2023 aux intérêts dont ROSSONERI SPORT était redevable avec effet au 6 mars 2023[105], une fois encore, en violant les articles 13 et 16 de ses statuts, la modification des termes d'un contrat conclu avec une filiale ou une affiliée d'une des associées de PROJECT REDBLACK étant une « Matière Spéciale ».

À la suite du remboursement des *notes* de crédit-vendeur et d'autres créances envers ROSSONERI SPORT pour une somme évaluée à 27.348.615,41 euros au 30 juin 2024[106], et même en prenant en considération les avoirs en espèces détenus par ROSSONERI SPORT

---

[104]    **Rôle n° TAL-2022-07355, pièce n° 68 de la farde II de MOLITOR**, précitée, p. 10 ; **rôle n° TAL-2022-07361, pièce n° 68 de la farde II de MOLITOR**, précitée, p. 10 ; **rôle n° TAL-2023-04206, pièce n° 68 de la farde II de MOLITOR**, précitée, p. 10.

[105]    **Rôle n° TAL-2022-07355, pièce n° 68 de la farde II de MOLITOR**, précitée, p. 14 ; **rôle n° TAL-2022-07361, pièce n° 68 de la farde II de MOLITOR**, précitée, p. 14 ; **rôle n° TAL-2023-04206, pièce n° 68 de la farde II de MOLITOR**, précitée, p. 14.

[106]    **Rôle n° TAL-2022-07355, pièce n° 90 de la farde II de MOLITOR –** Comptes annuels de ROSSONERI SPORT pour l'exercice se terminant au 30 juin 2024, première page ; **rôle n° TAL-2022-07361, pièce n° 90 de la farde II de MOLITOR –** Comptes annuels de ROSSONERI SPORT pour l'exercice se terminant au 30 juin 2024, première page ; **rôle n° TAL-2023-04206, pièce n° 90 de la farde II de MOLITOR –** Comptes annuels de ROSSONERI SPORT pour l'exercice se terminant au 30 juin 2024, première page.

(6.151.370,59 euros d'après les comptes annuels au 30 juin 2023 de cette société[107] et 3.498.615,09 euros d'après les comptes annuels au 30 juin 2024 de cette société[108]), il est certain que seule une infime partie de la dette de ROSSONERI SPORT à PROJECT REDBLACK, qui apparaît s'élever à 340.949.811,96 euros au 30 juin 2024[109], pourra être remboursée intégralement, ce qui représente un manque de 310.102.581 euros pour PROJECT REDBLACK.

Situation financière de ROSSONERI SPORT

| Avoirs totaux : | 33.500.986,00 euros<br><br>dont<br>- 27.348.615,41 euros (remboursement des *notes* de crédit-vendeur)<br>- 6.151.370,59 euros (espèces en compte) |
|---|---|
| Dette envers PROJECT REDBLACK | 340.949.811,96 euros |
| **Résultat** | **-307.448.825,96 euros** |

Par conséquent, la créance de PROJECT REDBLACK envers ROSSONERI SPORT (incluse dans les actifs totaux de PROJECT REDBLACK, qui sont évalués à 435.599.872,78 euros au 30 juin 2023 et à 434.903.692,69 euros au 30 juin 2024[110]) a dû être réévaluée à la baisse au 30 décembre 2024.

Il est possible, sur cette base, d'évaluer les actifs de PROJECT REDBLACK comme s'élevant aujourd'hui à plus ou moins 124.801.112 euros, ce qui est évidemment insuffisant pour permettre à PROJECT REDBLACK de payer ses dettes (et notamment celles envers BLUE SKYE LUX et PROJECT REDBLACK), lesquelles s'élevaient à 409.529.574,25 euros au 30 juin 2024[111]. En effet, les Conditions Générales des TPECs de classes A et B indiquent que les réductions de valeur (« *write-downs* ») subies par la Société sur les actifs sous-jacents des TPECs de classes A et B ne sont pas prises en compte à titre de « perte » dans le calcul des rendements liés aux TPECs de classes A et B et ne viennent donc pas réduire les montants dus[112].

---

[107] **Rôle n° TAL-2022-07355, pièce n° 88 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2022-07361, pièce n° 88 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2023-04206, pièce n° 88 de la farde II de MOLITOR**, précitée.

[108] **Rôle n° TAL-2022-07355, pièce n° 90 de la farde II de MOLITOR** – précitée, première page ; **rôle n° TAL-2022-07361, pièce n° 90 de la farde II de MOLITOR** – précitée, première page ; **rôle n° TAL-2023-04206, pièce n° 90 de la farde II de MOLITOR** – précitée, première page.

[109] **Rôle n° TAL-2022-07355, pièce n° 90 de la farde II de MOLITOR** – précitée, seconde page ; **rôle n° TAL-2022-07361, pièce n° 90 de la farde II de MOLITOR** – précitée, seconde page ; **rôle n° TAL-2023-04206, pièce n° 90 de la farde I de MOLITOR** – précitée, seconde page.

[110] **Rôle n° TAL-2022-07355, pièce n° 91 de la farde II de MOLITOR** – Comptes annuels de PROJECT REDBLACK pour l'exercice se terminant au 30 juin 2024, première page ; **rôle n° TAL-2022-07361, pièce n° 91 de la farde II de MOLITOR** – Comptes annuels de PROJECT REDBLACK pour l'exercice se terminant au 30 juin 2024, première page ; **rôle n° TAL-2023-04206, pièce n° 91 de la farde II de MOLITOR** – Comptes annuels de PROJECT REDBLACK pour l'exercice se terminant au 30 juin 2024, première page

[111] **Rôle n° TAL-2022-07355, pièce n° 91 de la farde II de MOLITOR** – précitée, deuxième page ; **rôle n° TAL-2022-07361, pièce n° 91 de la farde II de MOLITOR** – précitée, deuxième page ; **rôle n° TAL-2023-04206, pièce n° 91 de la farde II de MOLITOR** – précitée, deuxième page.

[112] **Rôle n° TAL-2022-07355, pièce n° 36 de la farde II de MOLITOR**, précitée, définitions de « *Class A Eligible TPEC Income* » et de « *Class B Eligible TPEC Income* » ; **rôle n° TAL-2022-07361, pièce n° 36 de la farde II de MOLITOR**, précitée, définitions de « *Class A Eligible TPEC Income* » et de « *Class B Eligible TPEC Income* » ; **rôle n° TAL-2023-04206, pièce n° 36 de la farde II de MOLITOR**, précitée, définitions de « *Class A Eligible TPEC Income* » et de « *Class B Eligible TPEC Income* ».

**2.7    La position surprenante prise par LEXINGTON**

84.    Il ressort des événements amplement décrits ci-dessus qu'ELLIOTT ne cesse d'agir en fraude des droits de BLUE SKYE LUX, de LIC 159 et de leurs créanciers et actionnaires respectifs. Afin de remédier à cette situation, BLUE SKYE LUX et LIC 159 redoublent d'efforts depuis plus de trois ans afin de voir leurs droits enfin respectés et par là même d'assurer la protection des droits et intérêts de leurs propres actionnaires et créanciers respectifs. Il serait donc normal de s'attendre à ce que LEXINGTON, en tant que créancier détenteur des TPECs de classe E-1, se réjouisse d'une telle entreprise et collabore avec BLUE SKYE LUX et LIC 159 afin d'assurer le succès des actions judiciaires qu'elles ont intentées.

85.    Pourtant, LEXINGTON prend, depuis le mois de mai 2022, une position pour le moins déconcertante par rapport à BLUE SKYE LUX et LIC 159.

86.    Il faut donc redresser les erreurs qui parsèment la présentation des faits proposée par LEXINGTON.

87.    En mai 2022, alors que BLUE SKYE LUX elle-même n'avait pas (et n'a d'ailleurs toujours que très peu) d'informations sur la vente des actions de l'AC MILAN, LEXINGTON a soudainement écrit à BLUE SKYE LUX (en mettant GENIO, KING GEORGE, ROSSONERI SPORT et PROJECT REDBLACK en copie de cette correspondance) afin de l'exhorter à mettre tout en œuvre pour autoriser cette opération, qui était, selon elle, dans l'intérêt de tous les créanciers de BLUE SKYE LUX[113]. Par cette prise de position (ou plutôt cette volte-face, puisque LEXINGTON était précédemment du côté de BLUE SKYE LUX), LEXINGTON s'opposait donc aux initiatives judiciaires prises par BLUE SKYE.

88.    BLUE SKYE LUX n'a pas manqué de marquer son étonnement en mai, puis en juin 2022[114], par rapport à l'étrangeté de l'attitude de LEXINGTON et au fait que celle-ci se trouvait bien mieux informée que les entités du groupe BLUE SKYE sur la cession des actions de l'AC MILAN, au point de craindre que derrière le comportement incohérent de LEXINGTON ne se cache l'existence d'un accord secrètement conclu entre celle-ci et ELLIOTT. LEXINGTON fait donc preuve d'une hypocrisie non contenue lorsqu'elle affirme que BLUE SKYE LUX ne lui a pas fourni d'informations par rapport à la vente de l'AC MILAN[115]. À cette époque, le groupe BLUE SKYE faisait face à la rétention d'informations de la part du groupe ELLIOTT et ne pouvait donc pas fournir des informations dont il ne disposait pas.

89.    LEXINGTON ne s'est alors plus manifestée pendant plus d'un an, jusqu'au 31 octobre 2023, date à laquelle elle a assigné en référé BLUE SKYE LUX et LIC 159[116] afin d'obtenir la désignation d'un « administrateur *ad hoc* » pour chacune de ces deux sociétés, dont la mission serait, notamment, de « *surveiller tous les flux financiers de BLUE SKYE et de Company 159 ; donner son accord à tout transfert de fonds par BLUE SKYE et Company 159, lequel ne pourra uniquement autoriser les opérations dans l'intérêt social de BLUE SKYE et de Company 159 et devra refuser toute opération permettant une dissipation d'actifs au préjudice de LEXINGTON ;* […] *surveiller toute procédure judiciaire déjà initiée (et encore à initier) par BLUE SKYE et/ou*

---

[113]    Pièces n° 6, 8 et 11 de la farde I d'Arendt & Medernach.

[114]    Pièces n° 7 et 9 de la farde I d'Arendt & Medernach.

[115]    Requête en intervention volontaire du 9 février 2024, n° 25, p. 14.

[116]    **Rôle n° TAL-2022-07355, pièce n° 69 de la farde II de MOLITOR** – Copie de l'assignation en référé du 31 octobre 2023 ; **rôle n° TAL-2022-07361, pièce n° 69 de la farde II de MOLITOR** – Copie de l'assignation en référé du 31 octobre 2023 ; **rôle n° TAL-2023-04206, pièce n° 69 de la farde II de MOLITOR** – Copie de l'assignation en référé du 31 octobre 2023.

*Company 159 qui pourrait causer un préjudice financier à LEXINGTON en conséquence, jusqu'à ce que la créance de LEXINGTON sous les « TPECs LEXINGTON » soit entièrement satisfaite ».*

De plus, le 4 avril 2024[117], PROJECT REDBLACK et ROSSONERI SPORT ont choisi d'intervenir volontairement au soutien des demandes de LEXINGTON, ce qui confirme l'existence de tractations entre les dirigeants/propriétaires de LEXINGTON et du groupe ELLIOTT pour maximiser le pouvoir de nuisance à l'encontre du groupe BLUE SKYE.

90.    LEXINGTON a continué à adopter un comportement illogique et suspect en introduisant le 9 février 2024 une requête en intervention volontaire dans diverses affaires intentées par BLUE SKYE LUX et LIC 159 contre ELLIOTT, visant principalement à tenter de faire passer les démarches judiciaires entreprises par le groupe BLUE SKYE comme étant erronées et recherchant « *un avantage illicite dans* [son] *intérêt purement personnel* »[118], mettant ainsi « *gravement en péril les droit légitimes et intérêts financiers de LEXINGTON résultant* […] *de la vente de l'AC MILAN* »[119]. Une telle requête en intervention (que PROJECT REDBLACK et ROSSONERI SPORT, toutes deux contrôlées par le groupe ELLIOTT, semblaient déjà curieusement avoir envisagée dès le 2 mars 2023 dans le cadre de l'action civile contre Monsieur CERCHIONE, Monsieur D'AVANZO et Monsieur CASLINI (en indiquant se réserver le droit d'être appuyées par LEXINGTON)[120], et que LEXINGTON semblait annoncer dans son assignation en référé du 31 octobre 2023) n'a d'autre objectif que de permettre à LEXINGTON de se joindre au groupe ELLIOTT en raison probablement d'un accord secret conclu entre ces entités.

91.    Plus récemment, BLUE SKYE LUX et LIC 159 ont tenté d'alerter par courrier[121] LEXINGTON sur les événements du mois de décembre 2024 (dont le refinancement des *notes* de crédit-vendeur par le groupe ELLIOTT), lesquels ont eu une incidence négative sur la valeur des TPECs de classe B et par ricochet, sur celle des TPECS de classe E-1 détenus par LEXINGTON. LEXINGTON est cependant restée silencieuse, confirmant ainsi s'être rangée du côté du groupe ELLIOTT, alors que les termes de l'arrangement financier qui peut avoir été conclu entre eux restent inconnus.

92.    Par ses actions, LEXINGTON essaie de soutirer au groupe BLUE SKYE plus d'argent que les TPECs de classe E-1 ne le lui permettent, en affirmant de manière fallacieuse que les sous-jacents de ces instruments sont non seulement les TPECs de classe B mais également les TPECs de classe A-2. Elle invoque pour ce faire une interprétation volontairement erronée des *Terms and Conditions of Class E Tracking Preferred Equity Certificates,* datés du 6 avril 2017, soumis au droit luxembourgeois et non modifiés à ce jour, qui régissent les TPECs de classe E[122].

---

[117]    **Rôle n° TAL-2022-07355, pièce n° 70 de la farde II de MOLITOR –**Copie de la requête en intervention du 4 avril 2024 ; **rôle n° TAL-2022-07361, pièce n° 70 de la farde II de MOLITOR –** Copie de la requête en intervention du 4 avril 2024 ; **rôle n° TAL-2023-04206, pièce n° 70 de la farde II de MOLITOR –** Copie de la requête en intervention du 4 avril 2024.

[118]    Requête en intervention volontaire du 9 février 2024, n° 2, p. 6.

[119]    Requête en intervention volontaire du 9 février 2024, n° 7, p. 7.

[120]    Rôle n° TAL-2023-04206, Assignation du 2 mars 2023 d'ELVINGER HOSS PRUSSEN, p. 3.

[121]    **Rôle n° TAL-2022-07355, pièce n° 71 de la farde II de MOLITOR –** Courrier du 10 janvier 2025 par BLUE SKYE LUX et LIC 159 à LEXINGTON ; **rôle n° TAL-2022-07361, pièce n° 71 de la farde II de MOLITOR –** Courrier du 10 janvier 2025 par BLUE SKYE LUX et LIC 159 à LEXINGTON ; **rôle n° TAL-2023-04206, pièce n° 71 de la farde II de MOLITOR –** Courrier du 10 janvier 2025 par BLUE SKYE LUX et LIC 159 à LEXINGTON.

[122]    **Rôle n° TAL-2022-07355, pièce n° 43 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2022-07361, pièce n° 43 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2023-04206, pièce n° 43 de la farde II de MOLITOR**, précitée.

93.    Or, cette position se trouve contredite par le texte même de ces conditions générales ainsi que par les éléments factuels exposés ci-après, lesquels sont amplement suffisants pour expliquer pourquoi pendant près de sept ans, LEXINGTON n'a jamais émis la moindre prétention par rapport aux TPECs de classe A-2 :

(i)    La lecture des Conditions Générales des TPECs de classe E[123] nous apprend notamment que :

« *Les TPECs de classe E suivront 92.308 % de tous les investissements par la Société* [à l'origine BLUE SKYE, puis LIC 159] *dans les TPECs de classe B et d'autres instruments émis par PROJECT REDBLACK S.à r.l. à* [BLUE SKYE LUX] *(l'Investissement initial sous-jacent de Classe E) et tous autres investissements sous-jacents, qui peuvent être convenus par* [BLUE SKYE LUX] *et les Détenteurs* [de TPECs de classe E] »[124] (Section II des Conditions Générales des TPECs de classe E).

Les TPECs de classe E suivent ainsi les sommes perçues par BLUE SKYE LUX au titre des seuls TPECs de classe B et aucune mention n'y est faite des TPECs de classe A-2.

Il faut relever que le texte même de la section II des Conditions Générales des TPECs de classe E soumet certes l'inclusion (i) d'autres instruments émis par PROJECT REDBLACK à BLUE SKYE LUX, et (ii) d'autres instruments sous-jacents, en plus des TPECs de classe B, à la condition expresse, dans ces deux cas, que ces instruments aient été convenus entre les détenteurs et l'émetteur des TPECs de classe E. La syntaxe de cette clause (à savoir l'inclusion d'une virgule dans le texte, juste avant le pronom relatif « *which* » introduisant la condition) confirme d'ailleurs le fait que la condition n'est pas liée exclusivement aux mots la précédant immédiatement (à savoir « *autres instruments sous-jacents* »). A titre exemplatif, il a en effet été décidé par la Cour Suprême de l'Oregon, citant un ouvrage de référence en la matière, que la preuve qu'une réserve est censée s'appliquer à tous les termes qui précèdent au lieu du terme immédiatement précédent peut être trouvée dans le fait que cette réserve est séparée de tous ces termes par une virgule. La Cour Suprême nota que d'autres cours et tribunaux avaient utilisé cette règle de manière régulière. Elle ajouta également que cette règle tenant à l'observation de l'usage de virgules était cohérente avec les règles grammaticales générales s'appliquant en dehors d'un contexte juridique[125].

Par application de ces règles grammaticales, les TPECs de classe A-2 doivent nécessairement être exclus des sous-jacents des TPECs de classe E, faute d'accord conclu entre BLUE SKYE LUX (et *a fortiori* LIC 159), LEXINGTON et tout autre détenteur de TPECs de classe E à ce sujet.

---

[123]    **Rôle n° TAL-2022-07355, pièce n° 43 de la farde II de MOLITOR**, précitée **; rôle n° TAL-2022-07361, pièce n° 43 de la farde II de MOLITOR**, précitée **; rôle n° TAL-2023-04206, pièce n° 43 de la farde II de MOLITOR**, précitée.

[124]    Traduction libre de « *The Class E TPECs shall track 92.308% of all investments by the Company in the Class B TPECs and other instruments issued by Project RedBlack S.à r.l. to* [Blue Skye Lux] *(the Class E Initial Underlying Investment) and any other underlying investments, which may be agreed by* [Blue Skye Lux] *and the* [class E TPECs] *Holders* » – (**rôle n° TAL-2022-07355, pièce n° 43 de la farde II de MOLITOR**, précitée **; rôle n° TAL-2022-07361, pièce n° 43 de la farde II de MOLITOR**, précitée **; rôle n° TAL-2023-04206, pièce n° 43 de la farde II de MOLITOR**, précitée).

[125]    **Rôle n° TAL-2022-07355, pièce n° 72 de la farde II de MOLITOR –** Décision de la Cour Suprême de l'Oregon du 29 Novembre 1996 **; rôle n° TAL-2022-07361, pièce n° 72 de la farde II de MOLITOR –** Décision de la Cour Suprême de l'Oregon du 29 Novembre 1996 **; rôle n° TAL-2023-04206, pièce n° 72 de la farde II de MOLITOR –** Décision de la Cour Suprême de l'Oregon du 29 Novembre 1996.

(ii)     Le prix de souscription des TPECs de classe A-2 est d'un montant de 10 euros, du fait que les revenus générés par ces instruments financiers ne dépendent pas des fonds investis mais, comme nous l'avons vu, du rôle joué par BLUE SKYE LUX dans la mise en place du financement octroyé à ROSSONERI SPORT et dans l'augmentation de la valeur des actions de l'AC MILAN, comme stipulé dans le Contrat d'Investissement[126]. Il ne fait donc aucun doute que BLUE SKYE LUX n'avait besoin d'aucuns fonds extérieurs pour payer un prix de souscription d'un montant si limité.

(iii)    L'e-mail du 24 mars 2017 envoyé par Monsieur D'AVANZO à Arena L.P., la société-mère de LEXINGTON, avant l'émission des TPECs de classe E précisait que : « *[…] les TPECS F et les TPECS E partageront un investissement sous-jacent qui est les TPECS B* » [127]. Preuve en est qu'au moment où la création tant des TPECs de classe A-2 que celle des TPECs de classe B était envisagée pour les besoins du financement de PROJECT REDBLACK, il n'était nullement question de compter les TPECs de classe A-2 parmi les sous-jacents des TPECs de classe E.

(iv)    Le lien entre les TPECs de classe B et des TPECs de classe E et par contraste, l'absence de lien entre les TPECs de classe A-2 et les TPECs de classe E, sont *encore* illustrés par les dispositions du Contrat de Contribution[128], en vertu duquel LIC 159 assume la double position d'émetteur des TPECs de classe E et de titulaire des TPECs de classe B, en lieu et place de BLUE SKYE LUX, afin d'isoler ces instruments, conformément à la demande expresse d'ARENA L.P., la société-mère de LEXINGTON[129]. En revanche, la propriété des TPECs de classe A-2 détenus par BLUE SKYE LUX n'a pas été transférée à LIC 159.

(v)     Il ressort des états financiers de LEXINGTON pour 2021[130] que le seul investissement effectué en euros par cette société dans des actifs financiers est estimé à une valeur correspondant à 29.955.965 dollars américains en 2020, à 30.976.374 dollars américains pour 2021, ce montant étant brusquement réévalué à 44.255.513 dollars américains dans les états financiers de LEXINGTON pour 2022 par la suite du changement de la méthode d'évaluation, passée d'une approche de marché à la méthode « *discounted cash flow* » ou « *DCF* » (nous reviendrons sur ce détail troublant mais très important ci-après)[131].

---

126     Voir *supra*, paragraphe 32 (i)(b).

127     Traduction libre de « […] *TPECS F and TPECS E will share some underlying investment which is TPECS B* » (**rôle n° TAL-2022-07355, pièce n° 73 de la farde II de MOLITOR –** E-mail de Monsieur D'AVANZO envoyé le 24 mars 2017 à 14h34 à Misha RENDA, *Director, Structured Finance* auprès d'Arena LP ; **rôle n° TAL-2022-07361, pièce n° 73 de la farde II de MOLITOR –** E-mail de Monsieur D'AVANZO envoyé le 24 mars 2017 à 14h34 à Misha RENDA, *Director, Structured Finance* auprès d'Arena LP ; **rôle n° TAL-2023-04206, pièce n° 73 de la farde II de MOLITOR –** E-mail de Monsieur D'AVANZO envoyé le 24 mars 2017 à 14h34 à Misha RENDA, *Director, Structured Finance* auprès d'Arena LP).

128     **Rôle n° TAL-2022-07355, pièce n° 42 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2022-07361, pièce n° 42 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2023-04206, pièce n° 42 de la farde II de MOLITOR,** précitée.

129     **Rôle n° TAL-2022-07355, pièce n° 44 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2022-07361, pièce n° 44 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2023-04206, pièce n° 44 de la farde II de MOLITOR,** précitée.

130     **Rôle n° TAL-2022-07355, pièce n° 74 de la farde II de MOLITOR –** États financiers de Lexington se rapportant à l'année financière se terminant le 31 décembre 2021, pp. 30 et 36 ; **rôle n° TAL-2022-07361, pièce n° 74 de la farde II de MOLITOR –** États financiers de Lexington se rapportant à l'année financière se terminant le 31 décembre 2021, pp. 30 et 36 ; **rôle n° TAL-2023-04206, pièce n° 74 de la farde II de MOLITOR –** États financiers de Lexington se rapportant à l'année financière se terminant le 31 décembre 2021, pp. 30 et 36.

131     **Rôle n° TAL-2022-07355, pièce n° 75 de la farde II de MOLITOR –** États financiers de Lexington se rapportant à l'année financière se terminant le 31 décembre 2022, pp. 31 et 37 ; **rôle n° TAL-2022-07361, pièce n° 75 de la farde II de MOLITOR –** États financiers de Lexington se rapportant à l'année financière se terminant le 31 décembre 2022, pp. 31 et 37 ; **rôle n° TAL-2023-04206, pièce n° 75 de la farde II de**

Les TPECs de classe E étant libellés en euros, il est raisonnable de déduire que ces montants devraient correspondre à l'évaluation de la valeur des TPECs de classe E-1 faite par LEXINGTON. Or, d'après les évaluations fournies par PROJECT REDBLACK et ROSSONERI SPORT[132], la valeur cumulée des TPECs de classes A-2 et B est approximativement de 75 millions d'euros (soit plus ou moins 80 millions de dollars américains, en fonction du taux de conversion appliqué). Il faut donc là encore en conclure que la valeur des TPECs de classe E comptabilisés par LEXINGTON ne peut s'expliquer que la seule prise en compte de la valeur des TPECs de classe B, à l'exclusion de celle des TPECs de classe A-2.

94.     LEXINGTON n'a donc pas à s'intéresser aux transferts des TPECs de classe A-2 entre BLUE SKYE LUX et une société du groupe située aux Îles Caïmans, ni même au sort de ces instruments. Notons pour le surplus que les allégations de LEXINGTON concernant le prix de 10 euros appliqué à ces transferts sont purement fantaisistes[133]. En effet, comme il a été indiqué ci-dessus et comme le reconnaissent d'ailleurs PROJECT REDBLACK et ROSSONERI SPORT[134], ce montant correspond au prix de souscription des TPECs de classe A-2, lesquels rémunéraient les efforts fournis par le groupe BLUE SKYE pour le développement de la valeur de l'AC MILAN[135]. Les dirigeants du groupe BLUE SKYE étaient donc parfaitement libres de loger les TPECs de classe A-2 dans l'entité de leur choix, les revenus que ces titres produisaient devant revenir en fin de compte à Monsieur CERCHIONE et Monsieur D'AVANZO.

95.     LEXINGTON s'attache également à faire croire que LIC 159 ne serait pas le titulaire de tous les TPECs de classe B émis par PROJECT REDBLACK en ce qu'elle n'apparaît pas à ce titre dans le registre des TPECs de classe B, malgré les éléments objectifs exposés ci-dessus montrant qu'une telle affirmation n'est pas tenable[136] et en dépit de l'existence du Contrat de Contribution[137] auquel LEXINGTON est pourtant partie.

Il convient de rappeler qu'au regard de la bonne entente de toutes les parties à ces dates et du fait que LEXINGTON avait explicitement demandé à ce que LIC 159 soit son interlocuteur unique, et du fait que toute nouvelle émission de TPECs de classe B était directement payée par LIC 159 à PROJECT REDLBLACK en toute transparence, BLUE SKYE LUX et LIC 159 n'ont pas considéré comme nécessaire d'effectuer immédiatement la formalité de notification de ce transfert à PROJECT REDBLACK, qui connaissait alors parfaitement la situation des parties.

96.     BLUE SKYE LUX et LIC 159 ont finalement obtenu l'inscription en date du 12 novembre 2024 de LIC 159 comme titulaire dans le registre correspondant tenu par PROJECT REDBLACK[138] des

---

MOLITOR – États financiers de Lexington se rapportant à l'année financière se terminant le 31 décembre 2022, pp. 31 et 37.

[132]    **Rôle n° TAL-2022-07355**, conclusions d'ELVINGER HOSS PRUSSEN du 31 octobre 2022, n° 13, p. 9 et n° 19, p. 13 ; rôle n° TAL-2023-04206, Assignation du 2 mars 2023 d'ELVINGER HOSS PRUSSEN, n° 13, p. 7 et n° 19, p. 12.

[133]    Requête en intervention du 9 février 2024, n° 31, p. 18.

[134]    **Rôle n° TAL-2022-07355**, conclusions d'ELVINGER HOSS PRUSSEN du 31 octobre 2022, n° 19, p. 13 ; TAL-2023-04206, assignation du 2 mars 2023, n° 19, p. 11.

[135]    Voir *supra*, paragraphe 32 (i).

[136]    Voir *supra*, paragraphe 36.

[137]    **Rôle n° TAL-2022-07355, pièce n° 42 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2022-07361, pièce n° 42 de la farde II de MOLITOR**, précitée ; rôle n° TAL-2023-04206, pièce n° 42 de la farde II de MOLITOR, précitée.

[138]    **Rôle n° TAL-2022-07355, pièce n° 76 de la farde II de MOLITOR** – Courrier du 15 novembre 2024 envoyé par PROJECT REDBLACK à BLUE SKYE LUX et LIC 159 ; **rôle n° TAL-2022-07361, pièce n° 76 de la farde II de MOLITOR** – Courrier du 15 novembre 2024 envoyé par PROJECT REDBLACK à BLUE SKYE

10.735.567 premiers TPECs de classe B acquis le 10 mai 2017 en vertu du Contrat de Contribution, sans préjudice du droit de BLUE SKYE LUX et de LIC 159 d'obtenir une inscription à toute date antérieure à laquelle PROJECT REDBLACK avait connaissance du changement de titularité des TPECs de classe B. Cette inscription ne fut pas obtenue sans mal et conduisit LIC 159 à devoir remplir (sans aucune reconnaissance qui puisse lui être préjudiciable) des conditions qui n'existaient pas mais que PROJECT REDBLACK prétendait unilatéralement tirer des conditions générales applicables aux TPECs de classe B par une lecture erronée de ces règles.

97.    Même si LIC 159 n'a, pour l'instant, pas pu obtenir d'inscription rétroactive des TPECs de classe B dans le registre correspondant, LEXINGTON ne peut en tirer aucun grief puisqu'à ce jour, aucune distribution n'a jamais été effectuée au titre des TPECs B, de sorte que les distributions dues en vertu des TPECs de classe E-1 détenus par LEXINGTON n'ont pas été déclenchées[139].

98.    La demande d'inscription de LIC 159 comme titulaire des 20.589.498 TPECs de classe B restants est actuellement refusée de mauvaise foi par PROJECT REDBLACK sur base de raisons peu convaincantes. En particulier :

(i)    La documentation contractuelle mise en place par BLUE SKYE LUX et LIC 159 concomitamment à l'émission des TPECs de classe B nouvellement émis, dont PROJECT REDBLACK se borne à remettre en cause l'authenticité sans en apporter la moindre preuve[140], montre encore que chacun de ces TPECs était immédiatement intégré dans le patrimoine de LIC 159 dès son émission par PROJECT REDBLACK[141] et que LIC 159 s'est

---

LUX et LIC 159 ; **rôle n° TAL-2023-04206, pièce n° 76 de la farde II de MOLITOR** – Courrier du 15 novembre 2024 envoyé par PROJECT REDBLACK à BLUE SKYE LUX et LIC 159.

[139]    **Rôle n° TAL-2022-07355, pièce n° 43 de la farde II de MOLITOR**, précitée, article 4.1 ; **rôle n° TAL-2022-07361, pièce n° 43 de la farde II de MOLITOR**, précitée, article 4.1 ; **rôle n° TAL-2023-04206, pièce n° 43 de la farde II de MOLITOR**, précitée, article 4.1.

[140]    **Rôle n° TAL-2022-07355, pièce n° 77 de la farde II de MOLITOR** – Courrier du 13 décembre 2024 envoyé par PROJECT REDBLACK à BLUE SKYE LUX et LIC 159 ; **pièce n° 78 de la farde II de MOLITOR** – Courrier du 15 décembre 2024 envoyé par BLUE SKYE LUX et LIC 159 à PROJECT REDBLACK ; **pièce n° 79 de la farde II de MOLITOR** – Courrier du 14 janvier 2025 envoyé par PROJECT REDBLACK à BLUE SKYE LUX et LIC 159 ; **pièce n° 80 de la farde II de MOLITOR** – Courrier du 5 février 2025 envoyé par BLUE SKYE LUX et LIC 159 à PROJECT REDBLACK ; **rôle n° TAL-2022-07361, pièce n° 77 de la farde II de MOLITOR** – Courrier du 13 décembre 2024 envoyé par PROJECT REDBLACK à BLUE SKYE LUX et LIC 159 ; **pièce n° 78 de la farde II de MOLITOR** – Courrier du 15 décembre 2024 envoyé par BLUE SKYE LUX et LIC 159 à PROJECT REDBLACK ; **pièce n° 79 de la farde II de MOLITOR** – Courrier du 14 janvier 2025 envoyé par PROJECT REDBLACK à BLUE SKYE LUX et LIC 159 ; **pièce n° 80 de la farde II de MOLITOR** – Courrier du 5 février 2025 envoyé par BLUE SKYE LUX et LIC 159 à PROJECT REDBLACK ; **rôle n° TAL-2023-04206, pièce n° 77 de la farde II de MOLITOR** – Courrier du 13 décembre 2024 envoyé par PROJECT REDBLACK à BLUE SKYE LUX et LIC 159 ; **pièce n° 78 de la farde I de MOLITOR** – Courrier du 15 décembre 2024 envoyé par BLUE SKYE LUX et LIC 159 à PROJECT REDBLACK ; **pièce n° 79 de la farde I de MOLITOR** – Courrier du 14 janvier 2025 envoyé par PROJECT REDBLACK à BLUE SKYE LUX et LIC 159 ; **pièce n° 80 de la farde I de MOLITOR** – Courrier du 5 février 2025 envoyé par BLUE SKYE LUX et LIC 159 à PROJECT REDBLACK.

[141]    **Rôle n° TAL-2022-07355, pièces n° 78 et 80 de la farde II de MOLITOR**, précitées ; **pièce n° 81 de la farde II de MOLITOR** – Courrier du 10 décembre 2024 envoyé par BLUE SKYE LUX et LIC 159 à PROJECT REDBLACK ; **pièce n° 82 de la farde II de MOLITOR** – Exemple de contrat de contrat de transfert de TPECs de Classe B (*TPECs B Assignment Agreement*) accompagné de la lettre de souscription des TPECs de Classe B datée du même jour et de la preuve de paiement du prix de souscription par LIC 159 à Project Redback ; **rôle n° TAL-2022-07361, pièces n° 78 et 80 de la farde II de MOLITOR**, précitées ; **pièce n° 81 de la farde II de MOLITOR** – Courrier du 10 décembre 2024 envoyé par BLUE SKYE LUX et LIC 159 à PROJECT REDBLACK ; **pièce n° 82 de la farde II de MOLITOR** – Exemple de contrat de contrat de transfert de TPECs de Classe B (*TPECs B Assignment Agreement*) accompagné de la lettre de souscription

acquittée elle-même du paiement des prix de souscription directement auprès de PROJECT REDBLACK. Notons également que les Conditions Générales des TPECs de classe A et de classe B[142] n'imposant aucune forme pour la notification des transferts, la transmission des informations pertinentes à PROJECT REDBLACK était amplement suffisante pour lui permettre de mettre à jour le registre.

(ii)     PROJECT REDBLACK tente de tirer prétexte du fait que LIC 159 n'est détenue directement par Monsieur CERCHIONE et Monsieur D'AVANZO que depuis le 7 novembre 2024 pour tenter de remettre en cause la possibilité de cession des TPECs de classe B à LIC 159[143]. Non seulement, comme nous l'avons vu, les conditions générales des TPECs de classe B[144] n'imposaient pas que le détenteur des TPECs B soit « directement » détenu par ces deux personnes, mais à suivre le raisonnement de PROJECT REDBLACK, cette restriction aurait dû s'appliquer à tous les TPECs de classe B, donc également aux 10.735.567 TPECs de Classe B émis initialement. À situation égale, traitement égal. PROJECT REDBLACK est donc incohérente, voire de mauvaise foi, en ayant accepté d'inscrire le transfert de ces premiers TPECs de classe B et en refusant d'inscrire celui des 20.589.498 TPECs de classe B alors qu'à l'époque de l'acquisition des premiers, LIC 159 était dans tous les cas détenue indirectement par Monsieur CERCHIONE et Monsieur D'AVANZO via BLUE SKYE LUX.

(iii)    Malgré les informations et les documents complémentaires qui lui ont été fournis, PROJECT REDBLACK continue de semer la polémique sur des points secondaires. En particulier, elle se réfère de mauvaise foi au fait que BLUE SKYE LUX aurait été renseignée comme titulaire des TPECs de classe B[145] dans une procédure étrangère[146], alors qu'elle avait reçu la copie de la procuration notariée que LIC 159, en qualité de titulaire des TPECs de classe B, avait donnée à BLUE SKYE LUX pour que celle-ci la représente dans cette affaire[147].

---

des TPECs de Classe B datée du même jour et de la preuve de paiement du prix de souscription par LIC 159 à Project Redblack ; **rôle n° TAL-2023-04206, pièces n° 78 et 80 de la farde II de MOLITOR**, précitées ; **pièce n° 81 de la farde I de MOLITOR** – Courrier du 10 décembre 2024 envoyé par BLUE SKYE LUX et LIC 159 à PROJECT REDBLACK ; **pièce n° 82 de la farde I de MOLITOR** – Exemple de contrat de contrat de transfert de TPECs de Classe B (*TPECs B Assignment Agreement*) accompagné de la lettre de souscription des TPECs de Classe B datée du même jour et de la preuve de paiement du prix de souscription par LIC 159 à Project Redblack.

[142]   **Rôle n° TAL-2022-07355, pièce n° 8 de la farde I de MOLITOR et pièce n° 36 de la farde II de MOLITOR**, précitées ; **rôle n° TAL-2022-07361, pièce n° 8 de la farde I de MOLITOR et pièce n° 36 de la farde II de MOLITOR**, précitées ; **rôle n° TAL-2023-04206, pièce n° 8 de la farde I de MOLITOR et pièce n° 36 de la farde II de MOLITOR**, précitées.

[143]   **Rôle n° TAL-2022-07355, pièce n° 79 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2022-07361, pièce n° 79 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2023-04206, pièce n° 79 de la farde II de MOLITOR**, précitée.

[144]   **Rôle n° TAL-2022-07355, pièce n° 8 de la farde I de MOLITOR et pièce n° 36 de la farde II de MOLITOR**, précitées ; **rôle n° TAL-2022-07361, pièce n° 8 de la farde I de MOLITOR et pièce n° 36 de la farde II de MOLITOR**, précitées ; **rôle n° TAL-2023-04206, pièces n° de la farde I de MOLITOR et pièce n° 36 de la farde II de MOLITOR**, précitées.

[145]   **Rôle n° TAL-2022-07355, pièce n° 79 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2022-07361, pièce n° 79 de la farde II de MOLITOR**, précitée ; **rôle n° TAL-2023-04206, pièce n° 79 de la farde II de MOLITOR**, précitée.

[146]   **Rôle n° TAL-2022-07355, pièce n° 84 de la farde II de MOLITOR** – Extrait du mémoire en défense (*memoria difensiva*) de Project Redblack du 17 mai 2023 ; **rôle n° TAL-2022-07361, pièce n° 84 de la farde II de MOLITOR** – Extrait du mémoire en défense (*memoria difensiva*) de Project Redblack du 17 mai 2023 ; **rôle n° TAL-2023-04206, pièce n° 84 de la farde II de MOLITOR** – Extrait du mémoire en défense (*memoria difensiva*) de Project Redblack du 17 mai 2023.

[147]   **Rôle n° TAL-2022-07355, pièce n° 83 de la farde II de MOLITOR** – Procuration attestant du mandat donné à Blue Skye Lux par LIC 159 ; **rôle n° TAL-2022-07361, pièce n° 83 de la farde II de MOLITOR** –

99. Les soupçons de BLUE SKYE et LIC 159 quant à la possibilité que les actions de LEXINGTON soient en réalité pilotées par ELLIOTT ont encore été renforcés par l'examen des états financiers de LEXINGTON déjà mentionnés ci-avant[148]. Le changement de méthode d'évaluation par LEXINGTON, ayant conduit à une évaluation fortement à la hausse des TPECs de classe E-1, est en effet fort révélateur.

La méthode « *discounted cash flow* » ou DCF dorénavant utilisée par LEXINGTON pour valoriser cet actif applique en effet un taux d'actualisation fixe de 3,5 % à la valeur actuellement déterminée de cet actif[149]. Or, plus ce taux est bas, plus le propriétaire de cet actif est certain d'obtenir un remboursement de la part de l'émetteur.

Cependant, comme nous l'avons vu, PROJECT REDBLACK et ROSSONERI SPORT se sont arrangées pour que LIC 159 ne puisse obtenir, dans un futur proche, le remboursement des TPECs de classe B, sous-jacents des TPECs de classe E. Il aurait dès lors été normal pour LEXINGTON d'appliquer un taux de décote bien plus élevé pour prendre en compte ce risque non négligeable de non-remboursement des TPECs de classe E. L'utilisation du taux anormalement bas de 3,5% ne pourrait s'expliquer que parce que LEXINGTON a reçu l'assurance d'obtenir le remboursement de ses TPECs de classe E-1, ce qui pourrait être le cas si elle a conclu un accord financier avec ELLIOTT à ce sujet.

100. BLUE SKYE LUX et LIC 159 peuvent donc raisonnablement conclure de cette analyse que LEXINGTON n'est désormais probablement plus titulaire des TPECs de classe E-1, lesquels sont peut-être même devenus la propriété d'un tiers (peut-être le groupe ELLIOTT ?). Si tel est bien le cas, la présence de LEXINGTON dans les présentes ne se justifie dès lors pas.

## 2.8   Les premiers échecs subis par le groupe ELLIOTT

101. Le 7 septembre 2023, soit près de six mois après l'assignation lancée contre Monsieur CERCHIONE, Monsieur D'AVANZO et Monsieur CASLINI, PROJECT REDBLACK et ROSSONERI SPORT ont produit une citation directe contre BLUE SKYE LUX, LIC 159, Monsieur CERCHIONE, Monsieur D'AVANZO et Monsieur CASLINI dans une énième tentative ayant pour but d'entraver les actions prises par le groupe BLUE SKYE contre ELLIOT[150]. Cette demande a été déclarée irrecevable le 30 mai 2024 par le Tribunal d'arrondissement et à Luxembourg siégeant en matière correctionnelle, ce qui a mis un terme à l'une des manigances du groupe ELLIOTT à l'encontre du groupe BLUE SKYE, aucune nouvelle action pénale n'ayant été diligentée à l'encontre de BLUE SKYE LUX, LIC 159, Monsieur CERCHIONE, Monsieur D'AVANZO et Monsieur CASLINI[151].

---

Procuration attestant du mandat donné à Blue Skye Lux par LIC 159 ; **rôle n° TAL-2023-04206, pièce n° 83 de la farde II de MOLITOR** – Procuration attestant du mandat donné à Blue Skye Lux par LIC 159.

[148] Voir supra, paragraphe 93 (v) ; **rôle n° TAL-2022-07355, pièce n° 74 de la farde II de MOLITOR**, précitée, pp. 31 et 37 ; **rôle n° TAL-2022-07361, pièce n° 74 de la farde II de MOLITOR**, précitée, pp. 31 et 37 ; **rôle n° TAL-2023-04206, pièce n° 74 de la farde II de MOLITOR**, précitée, pp. 31 et 37.

[149] **Rôle n° TAL-2022-07355, pièce n° 75 de la farde II de MOLITOR**, précitée, p. 37 ; **rôle n° TAL-2022-07361, pièce n° 75 de la farde II de MOLITOR**, précitée, p. 37 ; **rôle n° TAL-2023-04206, pièce n° 75 de la farde II de MOLITOR**, précitée, p. 37.

[150] **Rôle n° TAL-2022-07355, pièce n° 85 de la farde II de MOLITOR** – Citation directe du 7 septembre 2023 ; **rôle n° TAL-2022-07361, pièce n° 85 de la farde II de MOLITOR**, – Citation directe du 7 septembre 2023 ; **rôle n° TAL-2023-04206, pièce n° 85 de la farde II de MOLITOR** – Citation directe du 7 septembre 2023.

[151] **Rôle n° TAL-2022-07355, pièce n° 86 de la farde II de MOLITOR** – Jugement du 30 mai 2024 rendu par le tribunal d'arrondissement et et à Luxembourg, siégeant en matière correctionnelle ; **rôle n° TAL-2022-07361, pièce n° 86 de la farde II de MOLITOR** – Jugement du 30 mai 2024 rendu par le tribunal

102. Plus récemment, les tentatives de LEXINGTON et du groupe ELLIOTT de faire mettre sous tutelle BLUE SKYE LUX et LIC 159 via la nomination d'un administrateur *ad hoc* ont lamentablement échoué : le 26 mai 2025, la Vice-Présidente du Tribunal d'arrondissement de et à Luxembourg a déclaré irrecevable la demande en référé de LEXINGTON ainsi que les demandes en intervention volontaire de PROJECT REDBLACK et ROSSONERI SPORT[152], mettant enfin un point final à cette affaire.

103. En revanche, comme expliqué ci-dessus[153], la plainte pénale lancée par BLUE SKYE LUX contre ELLIOTT et ses représentants et affiliés, continue de suivre son cours, ce qui démontre bien que les reproches formulés par le groupe BLUE SKYE relativement à la vente de l'AC MILAN sont loin d'être infondés.

## II.     EN DROIT

104. Par avis du 20 décembre 2023, pour le rôle TAL-2022-07361, votre Tribunal a invité les parties à conclure limitativement sur :
- le libellé obscur ;
- les moyens d'irrecevabilité soulevés par Maître Albert MORO ; et
- la loi applicable.

105. Les présentes conclusions sont donc limitées aux arguments procéduraux présentés par les parties adverses. Les concluantes se réservent donc le droit d'aborder les aspects liés au fond des affaires dans des conclusions ultérieures.

## 1     TAL-2022-07355 : ACTION DÉCLARATOIRE

106. Les parties défenderesses à la procédure portant le numéro de rôle TAL-2022-07355 sont les parties défenderesses sub 1), 2), 8) à 12), 14) et 18).

107. Les parties défenderesses sub 1), 2), 8) et 18) n'ont pas encore conclu dans ce rôle.

108. Les parties défenderesses sub 9) à 12) ont soulevé dans leurs conclusions n° 1 l'irrecevabilité de l'assignation du 10 juin 2022 et demandent partant à ce qu'une décision préalable, avant toute défense au fond, soit prise sur cette fin de non-recevoir[154].

109. Monsieur CRACA, partie défenderesse sub 14), se contente de se rapporter « à prudence de justice en ce qui concerne la recevabilité de l'assignation en la pure forme »[155]. Pour ce qui concerne le fond, Monsieur CRACA se limite à soulever l'irrecevabilité sinon le caractère non-fondé de l'assignation du 10 juin 2022 à son encontre en raison du fait qu'il n'est plus, depuis le

---

d'arrondissement de et à Luxembourg, siégeant en matière correctionnelle ; **rôle n° TAL-2023-04206, pièce n° 86 de la farde II de MOLITOR** – Jugement du 30 mai 2024 rendu par le tribunal d'arrondissement de et à Luxembourg, siégeant en matière correctionnelle.

[152] **Rôle n° TAL-2022-07355, pièce n° 92 de la farde II de MOLITOR** – précité ; **pièce n° 93 de la farde III de MOLITOR** – précitée ; **rôle n° TAL-2022-07361, pièce n° 92 de la farde II de MOLITOR** – précitée ; **pièce n° 93 de la farde III de MOLITOR** – précitée ; **rôle n° TAL-2023-04206, pièce n° 92 de la farde II de MOLITOR** – précitée ; **pièce n° 93 de la farde II de MOLITOR** – précitée.

[153] Voir *supra*, paragraphe 60.

[154] **Rôle n° TAL-2022-07355**, conclusions d'ELVINGER HOSS PRUSSEN du 18 janvier 2023, p. 4 ; **rôle n° TAL-2022-07355**, conclusions de CLIFFORD CHANCE du 20 février 2023, n° 2, p. 2.

[155] **Rôle n° TAL-2022-07355**, conclusions de CHRISTMANN.LEGAL S.A.S. du 11 avril 2023, p. 3.

31 août 2022, le détenteur des certificats représentatifs des actions de l'AC MILAN qui faisaient l'objet du Gage italien.

110. Les présentes conclusions se limiteront partant aux moyens d'irrecevabilité allégués de l'assignation du 10 juin 2022 soulevés par les parties défenderesses sub 9) à 12) et de la partie défenderesse sub 14).

111. Pour le surplus, les Demanderesses se réservent la possibilité de conclure plus amplement dans des conclusions subséquentes, notamment sur le fond de l'affaire.

### A. QUANT À LA PRÉTENDUE IRRECEVABILITÉ D'UNE ACTION DÉCLARATOIRE

112. Les parties défenderesses sub 9) à 12) s'évertuent à tenter de faire croire que les conditions applicables aux actions déclaratoires ne seraient pas remplies en l'espèce[156], rendant ainsi irrecevables les demandes de BLUE SKEY LUX et LIC 159.

113. Il convient de rappeler que « [l]'action déclaratoire est celle qui a pour but de faire déclarer judiciairement l'existence ou l'inexistence d'une situation juridique, la régularité ou l'irrégularité d'un acte qui ne font l'objet d'aucune contestation. La pure action déclaratoire, c'est-à-dire celle qui aurait pour finalité de demander une simple consultation aux juges et qui serait totalement détachée de la notion d'intérêt n'est pas admise. […] Pareille action est recevable sans référence à un litige existant s'il y a dans le chef du demandeur un intérêt certain, né et actuel[157] ».

114. Le demandeur a intérêt à agir dans le cadre d'une action déclaratoire « si la déclaration judiciaire qu'il sollicite est de nature à lui offrir, non point une satisfaction purement théorique, mais une utilité concrète et déterminée[158] ».

115. La recevabilité limitée des actions déclaratoires est fermement établie en jurisprudence luxembourgeoise, sous les deux conditions cumulatives selon lesquelles (i) le demandeur doit être exposé à une incertitude grave ou une menace sérieuse paralysant l'exercice normal d'un droit et (ii) la déclaration judiciaire sollicitée doit être de nature à offrir au demandeur non pas une satisfaction purement théorique, mais une utilité concrète et déterminée[159].

   (i)    La condition tenant à l'existence d'une incertitude grave ou d'une menace sérieuse paralysant l'exercice normal d'un droit se dédouble en deux éléments :

          a) d'une part, l'existence d'une incertitude grave ou d'une menace sérieuse ; et
          b) d'autre part, le risque de paralysie de l'exercice normal d'un droit.

   (ii)   La condition tenant à l'utilité concrète et déterminée que l'action déclaratoire peut procurer au demandeur doit être examinée au regard du contenu de l'action en justice. Les conditions de recevabilité de la demande déclaratoire doivent en effet être examinées au regard de l'objet de la demande, c'est-à-dire le résultat économique ou social qui constitue l'objectif de la prétention.

---

[156]    **Rôle n° TAL-2022-07355**, conclusions d'ELVINGER HOSS PRUSSEN du 18 janvier 2023, n° 7 et s., pp. 7 et s. ; Conclusions de CLIFFORD CHANCE du 20 février 2023, n° 12 et s., pp. 7 et s.
[157]    Cour d'appel (9e ch.), 3 avril 2014, *J.T.L.*, 2014/6, n° 36, p. 169-172.
[158]    TAL, 11 juillet 2018, n° 184072 du rôle.
[159]    TAL, 11 juillet 2018, *op. cit.*

116. Quoiqu'en disent les parties adverses[160], l'action déclaratoire initiée le 10 juin 2022 remplit bien les deux conditions cumulatives imposées par la jurisprudence luxembourgeoise.

117. En premier lieu, cette demande s'appuie bien sur une incertitude grave et sérieuse et la paralysie d'un droit de nature à causer un trouble précis. Il faut à ce propos relever les éléments suivants :

    (i)   *Existence d'une incertitude grave ou menace sérieuse et paralysie d'un droit de nature à causer un trouble précis*

Les parties adverses tentent vainement de faire croire que l'obligation d'obtenir une décision unanime n'existait qu'au niveau du conseil de gérance pour la mainlevée du Gage italien[161], ce qui est incorrect, puisque l'article 13 des statuts de PROJECT REDBLACK[162] prévoit que si le consentement unanime des gérants n'est pas possible, la proposition de résolution doit alors être transférée aux associés pour que ceux-ci se prononcent. Dans ce cas, l'article 16 des statuts[163] prévoit également que les associés doivent approuver de manière unanime une telle résolution. Étant donné que Monsieur CASLINI a refusé de se prononcer en faveur de la ratification de la mainlevée du Gage italien, la décision aurait dû être soumise aux associés de PROJECT REDBLACK (et donc à BLUE SKYE LUX elle-même). Par ailleurs, le fait que la décision n'ait été soumise à approbation qu'une fois la mainlevée du Gage italien effectuée est d'ailleurs problématique en soi puisqu'elle inverse l'ordre des choses en faisant passer l'exécution des résolutions avant la prise de celles-ci.

Étant donné la perte à laquelle PROJECT REDBLACK allait devoir faire face à la suite de la mainlevée du Gage italien (consistant dans le fait qu'en autorisant la mainlevée du Gaga italien, PROJECT REDBLACK a fait en sorte que ROSSONERI SPORT ne puisse rembourser entièrement ses dettes envers PROJECT REDBLACK), il aurait été dans l'intérêt social de PROJECT REDBLACK de s'opposer à une telle opération. Le fait que PROJECT REDBLACK et ses gérants de classe A aient eu une autre lecture des statuts de PROECT REDBLACK et aient forcé la prise d'une décision aux conséquences dommageables pour la société, ses associés et ses créanciers, témoigne bien de la nécessité pour le juge luxembourgeois de trancher l'incertitude grave et la menace sérieuse créée par la décision prise par PROJECT REDBLACK quant à la mainlevée du Gage italien et à la paralysie des droits de Monsieur CASLINI (gérant de classe B de PROJECT REDBLACK et de BLUE SKYE LUX, associée de cette entité) de s'opposer à un tel acte.

---

[160]   **Rôle n° TAL-2022-07355**, conclusions d'ELVINGER HOSS PRUSSEN du 18 janvier 2023, n° 9, p. 7 ; **rôle n° TAL-2022-07355**, conclusions de CLIFFORD CHANCE du 20 février 2023, n° 18 et s., pp. 9 et s.

[161]   **Rôle n° TAL-2022-07355**, conclusions de Clifford Chance du 20 février 2023, n° 20, p. 9.

[162]   **Rôle n° TAL-2022-07355, pièce n° 2 de la farde I de MOLITOR**, précitée, « Si les Gérants ne parviennent pas à réunir un consentement unanime en rapport avec les Matières Spéciales énoncées ci-dessus, la décision pertinente sera soumise aux Associés pour délibération ».

[163]   **Rôle n° TAL-2022-07355, pièce n° 2 de la farde I de MOLITOR**, précitée, « Toutes décisions relatives à :
   (i)   toute modification du capital de la Société et/ou rachat de toute Part Sociale ;
   (ii)  tout avenant aux Statuts ;
   (iii) la nomination de toute personne au poste de commissaire aux comptes ou de réviseur d'entreprises agréé ;
   (iv) la décision de dissoudre la Société et de la mettre en liquidation et la nomination du liquidateur de la Société ; et
   (v)  toute Matière Spéciale soumise par les Gérants aux Associés ;
constituent les « **Matières Réservées** » et requièrent le consentement unanime des Associés ».

(ii)    *Qualité et intérêt de LIC 159*

Comme nous l'avons vu ci-avant, et contrairement à ce qu'affirment les parties adverses[164], LIC 159, qui est créancière de PROJECT REDBLACK au titre des TPECs de classe B, et donc partie intéressée, peut très bien invoquer la violation frauduleuse des articles et 16 des statuts de PROJECT REDBLACK et le dommage financier qui en a résulté pour elle. Elle est en effet directement affectée par la violation des statuts de PROJECT REDBLACK, laquelle a conduit à la mainlevée du Gage italien, à la vente des actions de l'AC MILAN et au détournement des fonds qui auraient dû autrement lui revenir. De telles violations en chaîne, dont le point de départ reste la mainlevée du Gage italien, ont pour conséquence directe le fait que PROJECT REDBLACK s'est volontairement mise dans l'impossibilité de verser à LIC 159 ce que cette dernière aurait dû normalement recevoir au titre des TPECs de classe B. Un tiers pouvant poursuivre, sur le fondement de la responsabilité délictuelle, une partie à un contrat pour un manquement contractuel commise par cette dernière et ayant causé un dommage au tiers[165], LIC 159 justifie partant bien d'un intérêt personnel d'obtenir un jugement déclaratoire lui permettant de faire reconnaître que la mainlevée du Gage italien était bien soumise à l'accord unanime des gérants de PROJECT REDBLACK ou sinon, à celui de ses associés.

Pour le surplus, l'action déclaratoire n'est pas une action attitrée et peut donc être intentée par n'importe quel justiciable. Il est donc pas nécessaire, contrairement à ce que pensent PROJECT REDBLACK et ROSSONERI SPORT[166], que LIC 159 doive justifier d'une qualité particulière pour pouvoir être co-demanderesse dans la présente affaire[167].

(iii)   *Intérêt personnel de BLUE SKYE LUX*

Le préjudice subi par BLUE SKYE LUX, en sa double qualité d'associée de PROJECT REDBLACK et de créancière de PROJECT REDBLACK (comme l'est également LIC 159, comme expliqué au point (ii) ci-avant), lui est bien, n'en déplaise à KING GEORGE et GENIO[168], personnel. Il faut relever que le droit de vote de BLUE SKYE en vertu de l'article 16 des statuts de PROJECT REDBLACK, qui est une de ses prérogatives propres[169], a été lésé, puisque son vote contre la mainlevée du Gage italien aurait empêché la réalisation de cet acte. De plus, la mainlevée du gage italien et les opérations qui s'en suivirent à l'instigation du groupe ELLIOTT, ont causé l'impossibilité pour ROSSONERI SPORT de rembourser ses dettes envers PROJECT REDBLACK tout en permettant au groupe ELLIOTT (auxquelles appartiennent notamment GENIO, KING GEORGE, BUCKTHORN ASSOCIATES LIMITED et BUCKTHORN INTERNATIONAL LIMITED) de recevoir bien plus d'argent que ce qui n'aurait dû lui revenir, au détriment de BLUE SKYE LUX, qui doit subir toutes les conséquences négatives résultant de la mainlevée du Gage italien, telles que décrites dans la partie « *En fait* » ci-dessus.

---

[164]   **Rôle n° TAL-2022-07355**, conclusions d'ELVINGER HOSSS PRUSSEN du 18 janvier 2023, n°8, p. 7 ; **rôle n° TAL-2022-07355**, conclusions de CLIFFORD CHANCE du 20 février 2023, n° 20, p. 9.

[165]   Cour d'appel, 17 mai 2017, n° 87/17 IV-COM, n° du rôle 42252 ; Cass. fr., ass. plén., 13 janvier 2020, n° 17-19.963 ; Cour d'appel, 31 mai 2022, n° 105/22 IV-COM, n° du rôle CAL-2021-00407 ; Cour d'appel, 29 octobre 2024, n° 157/24 IV-COM, n° du rôle CAL-2020-00484.

[166]   **Rôle n° TAL-2022-07355**, conclusions d'ELVINGER HOSSS PRUSSEN du 18 janvier 2023, n° 8, p. 7.

[167]   S. MÉNETREY, *Procédure civile luxembourgeoise*, Larcier, 2e édition, 2023, n° 203 et 204, p. 139.

[168]   **Rôle n° TAL-2022-07355**, conclusions de CLIFFORD CHANCE du 20 février 2023, n° 21, p. 9.

[169]   A. STEICHEN, *Précis de droit des sociétés*, 6e édition, Ed. Saint-Paul, 2018, p. 310, n° 391.

(iv)    Les autres arguments évoqués par les parties défenderesses pour tenter de réfuter l'existence d'une incertitude grave ou d'une menace sérieuse et la paralysie d'un droit de nature à causer un trouble précis peuvent être également écartés pour les raisons suivantes :

(a)  Le fait que la mainlevée du Gage italien intervenue le 31 août 2022 aurait donné lieu à une substitution de cette sûreté par un gage de droit luxembourgeois sur avoirs en compte concernant la partie du prix payée en espèces et par un gage de droit hollandais sur les *notes* de crédit-vendeur (*vendor loan notes*)[170] est sans aucune conséquence sur l'existence d'un trouble grave et précis lié au non-respect de l'exigence de décision unanime en vertu des articles 13 et 16 des statuts de PROJECT REDBLACK pour les besoins de la mainlevée du Gage italien.

Comme nous l'avons vu, les assiettes des nouvelles sûretés, qui portent sur des espèces et des créances, sont d'une toute autre nature que celle du Gage italien, qui portait sur les actions de l'AC MILAN. Plus important encore, la valeur de ces nouvelles assiettes est considérablement inférieure à celle du Gage italien[171]. Par conséquent, PROJECT REDBLACK ne dispose plus d'une sûreté couvrant la totalité de la valeur de sa créance envers ROSSONERI SPORT et, faute pour cette dernière de disposer d'actifs suffisants à la suite de la vente des actions de l'AC MILAN, elle ne sera jamais en mesure de rembourser sa dette. PROJECT REDBLACK doit donc subir une perte égale au montant qui ne sera jamais recouvré, dont elle ne pourra jamais exiger le remboursement intégral, au risque de se rendre coupable de soutien abusif de crédit à l'encontre de ROSSONERI SPORT. Comme nous l'avons vu, la majorité de cette perte devra être absorbée davantage par le groupe BLUE SKYE que par le groupe ELLIOTT. Il est donc impossible de partager l'analyse des parties adverses, qui osent qualifier cette situation pourtant évidente et constitutive d'une menace grave et sérieuse, de « *chimère* »[172].

Enfin, il est à noter que les parties adverses tentent de réfuter l'idée de la mainlevée du Gage italien en la qualifiant de simple changement d'assiette. Il n'en reste pas moins qu'une telle opération nécessite plusieurs étapes successives et séparées consistant en la mainlevée d'un gage existant (en l'occurrence le Gage italien), la libération des actifs gagés (les actions de l'AC MILAN) et la constitution de nouvelles sûretés sur d'autres avoirs.

(b) Il est également incorrect d'affirmer que la question de la renonciation à une partie de la créance de PROJECT REDBLACK envers ROSSONERI SPORT n'a aucun lien avec la vente de l'AC MILAN[173]. Cette renonciation, qui est intimement liée à la décision de procéder à la mainlevée du Gage italien (condition *sine qua non* pour le transfert des actions de l'AC Milan à ACM BIDCO) pour le remplacer par des sûretés d'une autre qualité et d'une assiette considérablement inférieure, sont bien des questions tombant dans le champ d'application de l'article 13 des statuts de PROJECT REDBLACK, puisque, entre autres choses, ces opérations constituent notamment des transactions avec une société associée (*affiliated company*) à un associé de PROJECT REDBLACK (ROSSONERI SPORT étant la filiale de PROJECT REDBLACK, laquelle est à son tour la filiale de KING GEORGE).

---

[170]    **Rôle n° TAL-2022-07355**, conclusions d'ELVINGER HOSS PRUSSEN du 18 janvier 2023, n° 10, p. 7 ; **rôle n° TAL-2022-07355**, conclusions de CLIFFORD CHANCE du 20 février 2023, n° 21, p. 9.

[171]    Voir *supra*, paragraphe 63 (i).

[172]    **Rôle n° TAL-2022-07355**, conclusions de CLIFFORD CHANCE du 20 février 2023, n° 21, p. 9.

[173]    **Rôle n° TAL-2022-07355**, conclusions de CLIFFORD CHANCE du 20 février 2023, n° 21, pp. 9 et 10.

(c) L'affirmation selon laquelle l'éventuelle renonciation à une créance par PROJECT REDBLACK serait neutre du point de vue économique[174] est fausse, puisque les gérants de cette société devraient s'expliquer d'une telle libéralité (consistant en une remise de dette ou au fait de ne jamais réclamer le paiement d'une créance), laquelle est contraire à l'intérêt social d'une société commerciale.

118.   En second lieu, les parties adverses versent encore dans l'erreur lorsqu'elles affirment que l'action déclaratoire du 10 juin 2022 est dénuée de toute utilité pratique pour BLUE SKYE LUX et LIC 159[175]. En effet :

(i)    Contrairement aux insinuations des parties adverses[176], la vente des actions de l'AC MILAN n'était pas finalisée au moment de l'introduction de la demande du 10 juin 2022. Même si le SPA avait bien été conclu le 26 mai 2022, la cession de ces actions nécessitait la levée d'une série de conditions suspensives, dont la mainlevée du Gage italien. Ces conditions n'ont été levées que le 31 août 2022, soit plus de deux mois après le 10 juin 2022. Ces parties affirment donc faussement que la vente était déjà accomplie.

(ii)   Contrairement aux affirmations de GENIO et KING GEORGE[177], l'existence de l'action intentée par le biais de l'assignation du 27 juin 2022 ne remet pas en cause celle de l'action déclaratoire. Dans la mesure où Votre tribunal ne s'est toujours pas prononcé sur la recevabilité de ces actions, elles doivent donc toutes deux continuer à exister.

En tout état de cause, « [l]a disparition en cours de procédure des circonstances qui fondent l'intérêt à agir n'affecte pas la recevabilité de l'action, puisque les conditions de recevabilité sont appréciées au jour de l'acte introductif d'instance. Leur disparition en cours d'instance entraîne que la demande devient non fondée ou sans objet[178] ». Les présentes conclusions étant limitées aux seuls moyens d'irrecevabilité à ce stade, l'introduction de l'action pour fraude postérieurement à l'action déclaratoire, est partant sans conséquence quant à l'intérêt à agir de BLUE SKYE LUX et LIC 159 à l'action déclaratoire, les conditions de recevabilité de ladite action étant remplies au jour de l'assignation du 10 juin 2022, et leur prétendue disparition en cours d'instance n'étant pas avérée.

De plus, même si les actions déclaratoires et pour fraude procèdent (en partie) des mêmes faits, elles sont chacune fondées sur des éléments différents, ce qui empêche que l'une exclue l'autre. Alors que l'action déclaratoire se focalise sur le respect des articles 13 et 16 des statuts de PROJECT REDBLACK par rapport à la mainlevée du Gage italien, l'action pour fraude concerne quant à elle l'ensemble des manœuvres frauduleuses ayant conduit à la cession des actions de l'AC MILAN à ACM BIDCO.

---

[174]   **Rôle n° TAL-2022-07355**, conclusions de CLIFFORD CHANCE du 20 février 2023, n° 21, p. 9.
[175]   **Rôle n° TAL-2022-07355**, conclusions d'ELVINGER HOSS PRUSSEN du 18 janvier 2023, n° 9, p. 7 ; **Rôle n° TAL-2022-07355**, conclusions de Clifford Chance du 20 février 2023, n° 22, p. 10.
[176]   **Rôle n° TAL-2022-07355**, conclusions de CLIFFORD CHANCE du 20 février 2023, n° 21, p. 10 et n° 25, pp. 10 et 11 et n° 26, p. 11.
[177]   **Rôle n° TAL-2022-07355**, conclusions de CLIFFORD CHANCE du 20 février 2023, n° 21, p. 10 et n° 25, pp. 10 et 11.
[178]   T. HOSCHEIT, *Le droit judiciaire privé au Grand-Duché de Luxembourg*, éd. Paul Bauler, 2e éd., 2019, n° 999, p. 569.

(iii)   L'utilité pratique de l'action déclaratoire n'est pas, comme l'affirment GENIO et KING GEORGE de l'utiliser en détournement de procédure pour bloquer la vente des actions de l'AC MILAN[179], mais de voir reconnaître que les dispositions des statuts de PROJECT REDBLACK empêchaient la mainlevée du Gage italien sans une décision unanime des gérants, ou sinon, des associés, de cette société. Une fois cette reconnaissance obtenue et même si la vente des actions de l'AC MILAN a tout de même eu lieu au mépris de nombreuses règles, il ne sera en aucune façon trop tard pour BLUE SKYE et LIC 159 de poursuivre contre qui de droit la réparation des torts et préjudices que la violation des dispositions statutaires de PROJECT REDBLACK leur a causés.

### B. QUANT A L'INTERVENTION FORCÉE DE MONSIEUR CRACA

119.   Monsieur CRACA conteste avoir agi comme séquestre du Gage italien et indique avoir été simple détenteur précaire des certificats d'actions de l'AC MILAN, unique raison pour laquelle il a été assigné en déclaration de jugement commun[180].

120.   Selon lui, comme suite à la cession par ROSSONERI SPORT à ACM BIDCO des actions de l'AC MILAN, il ne serait plus détenteur des certificats représentatifs des actions de l'AC MILAN, il n'y aurait plus de raison à ce qu'il figure comme partie à la présente procédure, de sorte qu'il y aurait lieu de déclarer sa mise en intervention forcée à la présente irrecevable, sinon non fondée.

121.   Or, Monsieur CRACA exerçait bien sa fonction de dépositaire des certificats représentatifs d'actions dans le cadre du Gage italien, comme le confirment la clause 3.1.2 de ce contrat[181], aux termes de laquelle ces certificats doivent être remis à PROJECT REDBLACK et le courrier envoyé par le notaire italien ayant officié pour les besoins de la création de cette sûreté, lequel confirme que Monsieur CRACA est le dépositaire nommé par PROJECT REDBLACK pour conserver les certificats[182].

122.   De plus, Monsieur CRACA avait été alerté par courrier[183] sur le fait que la mainlevée du Gage italien était soumise à l'obtention d'une décision unanime au sein de PROJECT REDBLACK en vertu de l'article 13 des statuts de cette société. Il ne pouvait donc ignorer qu'en acceptant de se démettre des certificats représentatifs des actions de l'AC MILAN à la demande de PROJECT REDBLACK (et donc de ses deux gérants de classe A), il se mettait délibérément en porte-à-faux avec cette disposition statutaire. Les courriers qu'il avait reçus lui apprenaient en effet que ni Monsieur CASLINI ni BLUE SKYE LUX ne voteraient en faveur de résolutions pour la mainlevée de la sûreté, qui seraient prises en contravention des statuts de PROJECT REDBLACK et que Monsieur CASLINI et BLUE SKYE LUX s'opposaient au stratagème orchestré par le groupe ELLIOTT et ses créatures pour vendre l'AC MILAN à leur insu et dans des conditions plus que douteuses.

---

[179]   **Rôle n° TAL-2022-07355**, conclusions de CLIFFORD CHANCE du 20 février 2023, n° 21, p. 10 et n° 24, p. 11.
[180]   **Rôle n° TAL-2022-07355**, conclusions de Maître Bertrand CHRISTMANN du 11 avril 2023, p. 3.
[181]   **Rôle n° TAL-2022-07355, pièce n° 6 de la farde I de MOLITOR**, précitée ; **rôle n° TAL-2022-07361, pièce n° 6 de la farde I de MOLITOR**, précitée.
[182]   **Rôle n° TAL-2022-07355, pièce n° 33 de la farde III de MOLITOR**, précitée.
[183]   Voir *supra*, paragraphe 45 (i) et (iii) ; **rôle n° TAL-2022-07355, pièces n° 15 et 16 de la farde I de MOLITOR**, précitées.

123. Par conséquent, Monsieur CRACA était bien partie prenante au Gage italien au moment de l'assignation du 10 juin 2022, date à laquelle cette sûreté n'avait pas encore fait l'objet d'une mainlevée, et les actions de l'AC Milan étaient toujours détenues par ROSSONERI SPORT. En se défaisant des certificats représentatifs des actions de l'AC MILAN, mais également, comme cela a été évoqué ci-avant, en prêtant un concours essentiel à la mise en œuvre des manigances d'ELLIOTT[184], il acceptait de collaborer à une violation des statuts de PROJECT REDBLACK, alors qu'il avait été préalablement informé de ce fait. Monsieur CRACA doit donc rester partie prenante au présent litige et se voir déclarer commun le jugement à intervenir.

### C. QUANT A LA REQUÊTE EN INTERVENTION VOLONTAIRE DE LEXINGTON

124. Suivant requête du 9 février 2024, LEXINGTON entend intervenir volontairement à la procédure portant le numéro TAL-2022-07355 du rôle pour prendre fait et cause pour PROJECT REDBLACK et ROSSONERI SPORT[185]. Pourtant, cette demande est irrecevable à plusieurs égards.

125. Tout d'abord, LEXINGTON n'aurait ni la qualité ni l'intérêt nécessaires pour pouvoir soutenir ses demandes :

    (i)    LEXINGTON n'est plus créancier de BLUE SKYE et n'a donc plus aucun droit contre cette société depuis le 8 mai 2017 (soit plus de six ans), lorsqu'elle a approuvé le remplacement de BLUE SKYE LUX par LIC 159 en qualité d'émetteur des TPECs de classe E-1, par sa contresignature du Contrat de Contribution[186]. Comme expliqué ci-avant, LEXINGTON ne peut avoir aucune prétention quant aux TPECs de classe A-2, actuellement détenus par BLUE SKYE LUX. De plus, la propriété de tous les TPECs de classe B et des revenus dérivant de ces instruments a été contractuellement transférée à LIC 159.

    (ii)    La qualité de créancière de LEXINGTON à l'égard de LIC 159 est incertaine. Certes, LEXINGTON invoque sa qualité de titulaire des TPECs de classe E-1 pour asseoir sa demande. Toutefois, à la lumière des éléments tangibles découverts par BLUE SKYE LUX et LIC 159 dans les états financiers de LEXINGTON pour 2021 et 2022 par rapport à la cession des TPECs de classe E-1 à un tiers[187], il est fortement suspecté, et il est fort raisonnable de penser, que LEXINGTON n'était déjà plus, au moment de l'introduction de sa demande, créancière de LIC 159, faute de détenir encore les TPECs de classe E-1. Au regard de l'incroyable bond de valeur des TPECs qui ressort de ses états financiers et du taux d'actualisation anormalement bas qui a été appliqué à ces titres (3,5 %), la seule explication logique serait que LEXINGTON ait été totalement désintéressée par un tiers (vraisemblablement une entité du groupe ELLIOTT) qui aurait acquis les TPECs de classe E-1. En effet, on voit mal comment une société financière comme LEXINGTON pourrait appliquer un taux d'actualisation de 3,5 % pour valoriser les TPECs de classe E-1 alors que leur remboursement, à tout le moins dans un futur proche, est plus qu'improbable (ce qui aurait alors commandé l'application d'un taux d'actualisation nettement plus élevé).

---

[184]   Voir notamment *supra*, paragraphe 18.
[185]   Requête en intervention volontaire du 9 février 2024, n° 41 et s., pp. 21 et s.
[186]   **Rôle n° TAL-2022-07355, pièce n° 344 de la farde III de MOLITOR**, précitée.
[187]   **Rôle n° TAL-2022-07355, pièces n° 74 et 75 de la farde II de MOLITOR**, précitées. Voir *supra,* paragraphe 71.

Si LEXINGTON n'est pas créancière de LIC 159, elle n'a dès lors *a fortiori* aucun intérêt à soutenir ses demandes dans le cadre de la présente affaire. Au regard des doutes légitimes sur la qualité de créancier de LEXINGTON, celle-ci devra apporter des preuves tangibles démontrant sa possession des TPECs de classe E-1 à la date de la notification de la requête en intervention volontaire, et produire par exemple une attestation de son commissaire aux comptes ou le rapport que celui-ci a produit par rapport à la valorisation des TPECs de classe E-1, faute de quoi, sa qualité à agir ainsi que son intérêt à agir seront jugés inexistants.

126. Suivant l'article 60 du Nouveau Code de procédure civile (« **NCPC** »), « les parties sont tenues d'apporter leur concours aux mesures d'instruction, sauf au juge à tirer toute conséquence d'une abstention ou d'un refus. Si une partie détient un élément de preuve, le juge peut, à la requête de l'autre partie, lui enjoindre de le produire, au besoin à peine d'astreinte. Il peut, à la requête de l'une des parties, demander ou ordonner, au besoin sous la même peine, la production de tous documents détenus par des tiers s'il n'existe pas d'empêchement légitime ».

« Aux termes de l'article 288 du même code, "les demandes de production des éléments de preuve détenus par les parties sont faites, et leur production a lieu, conformément aux dispositions des articles 284 et 285 du même code".

L'article 284 du code précité prévoit que "si, dans le cours d'une instance, une partie entend faire état d'un acte authentique ou sous seing privé auquel elle n'a pas été partie ou d'une pièce détenue par un tiers, elle peut demander au juge saisi de l'affaire d'ordonner la délivrance d'une expédition ou la production de l'acte ou de la pièce".

Conformément à l'article 285 du Nouveau Code de procédure civile, le juge ordonne la production s'il estime la demande fondée, ce qui signifie que la production doit présenter un intérêt pour la solution du litige : la production doit être utile, sinon indispensable (cf. *JurisClasseur Procédure civile, Production forcée de pièces*, Fasc. 623, n°32).

Pour qu'il puisse être fait droit à une demande tendant à la communication ou la production de pièces, quatre conditions doivent être remplies : la pièce sollicitée doit être déterminée avec précision, l'existence de cette pièce doit être vraisemblable, la détention de la pièce par le défendeur/tiers doit être vraisemblable et la pièce sollicitée doit être pertinente pour la solution du litige »[188].

La production d'un document justifiant de la détention par LEXINGTON des TPECS de classe E-1 est pertinente et indispensable à la présente procédure pour justifier de sa qualité et de son intérêt à agir.

La détention de la preuve de détention par LEXINGTON des TPECS E-1 est vraisemblable puisque LEXINGTON se prévoit de la détention de TPECS de classe E-1 pour agir en intervention à la présente procédure. Si son affirmation est exacte, elle dispose nécessairement de document attestant de sa détention.

127. Par conséquent, et afin de permettre à Votre Tribunal de trancher quant à la qualité et l'intérêt à agir de LEXINGTON à la présente procédure, BLUE SKYE LUX et LIC 159 demandent à ce qu'il soit enjoint à LEXINGTON la communication d'une attestation de son commissaire aux comptes

---

[188] Cour d'appel (9e chbr,), 13 mars 2025, n° 27/25, n° du rôle CAL-2018-00718.

quant à sa détention des TPECS de classe E-1, sinon le rapport produit par son commissaire aux comptes relatif à la valorisation des TPECS de classe E-1, sur le fondement de l'article 60 du NCPC. Dans la mesure où ces documents ne seraient pas concluants pour attester de la propriété ou de l'absence de propriété des TPECs de classe E-1 par LEXINGTON, BLUE SKYE LUX et LIC 159 se réservent expressément de droit de demander la production de tout autre document dans le respect des conditions de l'article 60 du NCPC.

128. Il convient ensuite de relever que LEXINGTON soutient qu'« *il ne ressort ni explicitement, ni implicitement de l'article 13 des statuts de PROJECT REDBLACK, que le changement de l'assiette d'une sûreté, et même la mainlevée d'une sûreté quelconque nécessiterait un accord unanime des gérants de la société*[189] » et que « *le conseil de gérance étant compétent en toute matière à moins que les statuts ou la loi ne les confèrent à l'assemblée générale des associés, le conseil de gérance pouvait prendre une telle décision* [la résiliation du Gage] *sans approbation préalable de l'assemblée générale des associés, voire de l'associé unique*[190] ».

129. Pourtant, dans ses développements en faits, LEXINGTON renvoie à son courrier du 6 mai 2022 adressé à BLUE SKYE LUX[191] dans lequel elle affirme que l'accord de BLUE SKYE LUX et de Monsieur CASLINI sera nécessaire pour procéder à la vente des actions de l'AC MILAN :

   « Compte tenu des actions que la Société [BLUE SKYE LUX] sera bientôt appelée à entreprendre en lien avec l'Opération Envisagée [la vente des participations de ROSSONERI SPORT dans l'AC MILAN] et les résolutions à adopter également par M. Giovanni Caslini, le directeur de la Société [BLUE SKYE LUX] (agissant en sa qualité de directeur de Rossoneri Sport et Project Redblack) […]

   *Nous exhortons donc la Société [BLUE SKYE LUX] et, dans la mesure requise, M. Giovanni Caslini, à approuver l'Opération Envisagée* [la vente des participations de ROSSONERI SPORT dans l'AC MILAN] […][192] ».

130. Les prétentions soutenues par LEXINGTION dans sa requête en intervention volontaire sont donc en totale contradiction.

131. Or, le principe de cohérence (ou *estoppel)* s'oppose à ce qu'une partie puisse invoquer une argumentation contraire à ce qu'elle a avancé auparavant[193].

   Chacun doit être cohérent avec soi-même, nul ne peut se contredire soi-même. Celui qui adopte un comportement contraire à son attitude ou à ses dires antérieurs, viole la confiance légitime placée en lui[194].

---

[189]    Requête en intervention volontaire du 9 février 2024, n° 42, p. 22.
[190]    Requête en intervention volontaire du 9 février 2024, n° 43, p. 23.
[191]    **Rôle n° TAL-2022-07355**, pièce n° 6 de la farde I de CMS.
[192]    Traduction libre de « *In view of the actions that the Company [BLUE SKYE LUX] will soon be called to take in connection with the Envisaged Transaction and the resolutions to be adopted also by Mr Giovanni Caslini, Company's manager (acting in his capacity as manager of Rossoneri Sport and Project Redblack) […] We therefore urge the Company [BLUE SKYE] and, to the extent required, Mr Giovanni Caslini, to approve the Envisaged Transaction […]* ».
[193]    Jurisclasseur Procédure civile, Moyens de défense – Règles générales, fasc. 128, n° 75.
[194]    Jurisclasseur civil, App. Art. 1131 à 1133, nos 80 – 82 ; Cass.fr, ch. com., 20 septembre 2011, n° 10-22888, RTDC 2011, p. 760, note B. FAGES.

Le principe d'*estoppel* est constitutif d'un changement de position en droit, de nature à induire en erreur sur ses intentions. L'interdiction de se contredire au détriment d'autrui est une déclinaison de la bonne foi et l'expression objective d'une certaine loyauté procédurale. Et d'autres règles, dont celles de procédure civile, ont intrinsèquement pour fonction d'assurer la loyauté des débats. Ce principe selon lequel nul ne peut se contredire au détriment d'autrui a été consacré par la Cour de cassation française, laquelle, en accueillant la fin de non-recevoir tirée de l'application de la règle de l'*estoppel*[195], a déclaré irrecevable une action en justice.

La jurisprudence luxembourgeoise a également reconnu le principe de l'*estoppel* en indiquant qu'il s'agit d'une fin de non-recevoir devant réunir les deux conditions cumulatives suivantes : (i) un même litige opposant les mêmes parties et (ii) « un comportement sans cohérence de la partie qui crée une apparence trompeuse et revient sur sa position qu'elle avait fait valoir auprès de l'autre partie, trompant ainsi les attentes légitimes de cette dernière et d'autre part, un changement de position pour l'autre partie, qui est conduite elle-même à modifier sa position initiale du fait du comportement contradictoire de son adversaire qui lui porte préjudice »[196].

132. LEXINGTON, en affirmant dans un premier temps que l'accord de BLUE SKYE et Monsieur CASLINI était requis pour procéder à la mainlevée du Gage italien, puis en soutenant dans un second temps de manière diamétralement opposée que l'accord de ceux-ci n'était pas nécessaire pour effectuer cette démarche, se contredit au détriment des Demanderesses.

133. Cette contradiction est d'autant plus incohérente que les intérêts de LEXINGTON devraient logiquement être alignés sur ceux de BLUE SKYE et LIC 159, puisque, comme nous l'avons vu, ces deux dernières tentent, par leurs actions, de faire réparer les torts causés à l'occasion de la vente des actions de l'AC MILAN. Si leurs actions triomphent, il en résultera une augmentation de valeur des TPECs de classe B et, par ricochet, une augmentation de la valeur des TPECs de classe E-1 dont ils sont les sous-jacents, qui ont été souscrits par LEXINGTON. Il est donc plus que déroutant que LEXINGTON s'acharne à mettre des bâtons dans les roues de BLUE SKYE LUX et LIC 159, à moins, comme déjà suspecté, qu'elle n'ait conclu un accord secret avec le groupe ELLIOTT à ce sujet.

134. BLUE SKYE et LIC 159 pâtissent des contradictions de position de LEXINGTON alors qu'elles ont dans un premier temps légitimement pu penser que LEXINGTION partageait sa position puisque cette dernière estimait également que l'article 13 des statuts de PROJECT REDBLACK aurait dû être appliqué et respecté, pour ensuite apprendre à leurs dépens, de par l'intervention volontaire de LEXINGTON, que cette dernière avait finalement pris la position des parties défenderesses à la procédure.

### D. QUANT AUX DEMANDES EN INDEMNITÉ DE PROCÉDURE

135. Dans leurs divers corps de conclusions, les parties défenderesses demandent à ce que BLUE SKYE LUX et LIC 159 soient condamnées au paiement d'une indemnité de procédure ainsi qu'aux frais et dépens de l'instance.

136. Comme développé ci-avant, il y a lieu de rejeter l'ensemble des moyens d'irrecevabilité soulevés par les parties défenderesses de sorte que les parties doivent désormais conclure sur le fond.

---

[195]  TAL, 27 octobre 2022, n° TAL-2020-09397 du rôle, fiche JUDOC n° 100111304.
[196]  Cour d'appel, 13 juillet 2022, n° 166/22-I-CIV, n° du rôle CAL-2019-00507.

137. Dans ces circonstances, les demandes en indemnité de procédure des parties défenderesses, auxquelles BLUE SKYE LUX et LIC 159 s'opposent, sont à réserver au jugement à intervenir sur le fond de la présente.

138. Il en va de même pour les demandes de BLUE SKYE LUX et LIC 159 en condamnation des parties sub. 1) et sub. 2), soit les gérants de classe A, à savoir Madame ITALIA et Monsieur MCLEAN, en paiement solidairement, sinon *in solidum*, sinon chacun pour le tout à payer à BLUE SKYE LUX et LIC 159, chacune prise individuellement, d'une indemnité de procédure fondée sur l'article 240 du Nouveau Code de procédure civile évaluée à 20.000 euros, alors qu'il serait injuste de laisser à l'unique charge des Demanderesses une partie des sommes exposées par elles dans la présente procédure initiée en raison du seul comportement frauduleux des parties défenderesses sub. 1) et sub. 2).

139. Si par impossible Votre Tribunal venait faire suite aux moyens d'irrecevabilité soulevés par les parties défenderesses, BLUE SKYE LUX et LIC 159 s'opposent à ces demandes, alors qu'il ressort à suffisance des développements ci-avant que l'équité ne les justifie aucunement, et que la présente procédure a dû être initiée par les Demanderesses en raison du seul comportement frauduleux des parties défenderesses.

140. Pour cette raison, il y aurait donc lieu de faire droit à la demande de BLUE SKYE LUX et LIC 159 en condamnation des parties sub 1) et sub 2), soit les gérants de classe A, à savoir Madame ITALIA et Monsieur MCLEAN, en paiement solidairement, sinon *in solidum*, sinon chacun pour le tout à payer à BLUE SKYE LUX et LIC 159, chacune prise individuellement, d'une indemnité de procédure fondée sur l'article 240 du Nouveau Code de procédure civile évaluée à 40.000 euros.

141. BLUE SKYE LUX et LIC 159 se réservent expressément le droit de majorer cette demande en cours d'instance.

### E. QUANT AUX HONORAIRES D'AVOCAT

142. Monsieur CRACA demande la condamnation de BLUE SKYE LUX et LIC 159 au paiement de la somme de 8.230 euros, sous réserve d'augmentation en cours d'instance, au titre de ses frais et honoraires d'avocat sur base des dispositions de l'article 1382 du Code civil[197].

143. Comme développé ci-avant, il y a lieu de rejeter l'ensemble des moyens d'irrecevabilité soulevés par les parties défenderesses de sorte que les parties doivent désormais conclure sur le fond.

144. Si par impossible Votre Tribunal venait faire suite au moyen d'irrecevabilité soulevé par Monsieur CRACA, BLUE SKYE LUX et LIC 159 s'opposent à la demande en condamnation de ce dernier au paiement de ses honoraires d'avocat alors qu'aucune faute ne saurait être retenue dans le chef des Demanderesses.

145. En effet, le droit d'agir en justice pour être entendu par le juge sur le fond d'une contestation constitue un droit fondamental dont l'exercice n'est susceptible d'engager la responsabilité de son auteur qu'en présence d'un abus résultant d'une intention malveillante, d'une erreur grossière équipollente au dol ou d'une légèreté blâmable[198].

---

[197]   **Rôle n° TAL-2022-07355 -** conclusions de Maître Bertrand CHRISTMANN du 11 avril 2023, p. 4.
[198]   Cour d'appel, 19 janvier 2023, n° CAL-2021-00599 du rôle.

146.    Monsieur CRACA restant en défaut d'établir une telle faute dans le chef des Demanderesses, ces dernières ayant dû introduire la présente en raison du seul comportement frauduleux des parties défenderesses, il y a lieu de rejeter la demande de Monsieur CRACA en condamnation des Demanderesses au paiement de ses honoraires d'avocat sur le fondement de l'article 1382 du Code civil.

147.    En revanche, il résulte des considérations de fait et de droit ci-avant développées que les Demanderesses sont fondées à demander condamnation des parties défenderesses sub 1) et sub 2) au remboursement des frais et honoraires d'avocat par elle exposées dans le cadre de la présente procédure, alors que depuis un arrêt de la Cour de cassation du 9 février 2012, il est désormais acquis que les honoraires d'avocats peuvent être constitutifs d'un préjudice réparable[199].

148.    Cette demande peut être cumulée avec une demande en condamnation fondée sur l'article 240 du NCPC, sous condition d'établir les éléments conditionnant une telle indemnisation, à savoir une faute, un préjudice et une relation causale entre la faute et le préjudice :

« La circonstance que l'article 240 du Nouveau Code de procédure civile permet au juge, sur le fondement de l'équité, d'allouer à une partie un certain montant au titre des sommes non comprises dans les dépens, dont les honoraires d'avocat, n'empêche pas une partie de réclamer ces honoraires au titre de réparation de son préjudice sur base de la responsabilité contractuelle ou délictuelle, à condition d'établir les éléments conditionnant une telle indemnisation, à savoir une faute, un préjudice et une relation causale entre la faute et le préjudice (cf. Jurisclasseur Proc. civ. fasc. 524, nos 6 et suivants)[200] ».

149.    La doctrine retient que :

« Un principe de droit incoercible est que le préjudice résultant d'une faute, quelle qu'elle soit, doit être réparé par l'auteur de la faute et cette réparation doit être totale. Or, les frais de défense constituent à l'évidence un dommage réparable et l'indemnisation de la victime ne sera pas totale si elle est amputée de ces frais de défense ou s'il en a coûté au justiciable de faire reconnaître son droit. Le droit à la réparation intégrale du dommage justifie la répétibilité des frais de défense, dont les honoraires d'avocat (Devoirs et Prérogatives de l'Avocat, Cléo Leclerq, éd. 1999, n° 76) (cf. Trib. arr. XI, 25 mars 2004, SES/Whitehead, n° du rôle 64 095) »[201].

150.    Le rôle essentiel joué par les parties sub 1) et 2) en tant que bras armé d'ELLIOTT, qui ont avalisé sans mot dire le mécanisme frauduleux mis en place en contravention avec les statuts de PROJECT REDBLACK, alors qu'ils savaient pertinemment que leurs actions étaient limitées par les statuts, doit conduire à leur condamnation à rembourser les frais d'avocats exposés par les Demanderesses pour faire reconnaître leurs droits, comme l'implique le principe de réparation intégrale.

151.    Les Demanderesses sont dès lors fondés à réclamer la condamnation des parties défenderesses sub 1) et sub 2), solidairement, sinon *in solidum*, sinon chacune pour sa part, à leur payer à chacune prise individuellement, la somme évaluée provisoirement à 50.000 euros au titre des frais et honoraires d'avocat par elles exposées sur le fondement des articles 1382 ou 1383 du Code civil.

---

[199]    Cour d'appel, 9 février 2012, *J.T.L.*, n° 20, 2012, p. 190.
[200]    Cour d'appel, 5 décembre 2018, *Pas.*, 39, p. 287.
[201]    Cour d'appel, 4 janvier 2012, *Pas.*, 35, p. 848.

152. Les Demanderesses se réservent expressément le droit de majorer cette demande en cours d'instance.

## 2    TAL-2022-07361 : ACTION POUR FRAUDE

### A. QUANT À LA PRÉTENDUE NULLITÉ DE L'EXPLOIT INTRODUCTIF D'INSTANCE POUR LIBELLÉ OBSCUR

153. Il convient de noter d'emblée que les parties assignées sub 8) et sub 11) à 14) n'ont pas soulevé la nullité de l'assignation du 27 juin 2022 pour libellé obscur, de sorte qu'il y a lieu d'acter la validité de l'assignation du 27 juin 2022 à leur encontre.

#### 1.    Quant à la compétence du juge de la mise en état

154. L'exception de libellé obscur soulevée par les parties défenderesses constitue un moyen de nullité[202].

155. En tant que moyen de nullité, l'exception de libellé obscur relève de la seule compétence du juge de la mise en état conformément à l'article 212 du NCPC :

> « Lorsque la demande est présentée postérieurement à sa désignation, le juge de la mise en état est, jusqu'à son dessaisissement, <u>seul compétent</u>, à l'exclusion de toute autre formation du tribunal pour :
> a) statuer sur les moyens d'incompétence, <u>de nullité</u> et les exceptions dilatoires ; à l'exception des moyens d'ordre public, les parties soulèvent ces moyens dès leurs premières conclusions ou dès leur révélation s'ils devaient se révéler postérieurement à leurs premières conclusions. Après présentation d'un tel moyen, chacune des parties à l'instance prend position au moins deux fois au plus sur ce moyen, la présentation du moyen valant conclusions, avant que le juge de la mise en état ne statue, [...]» (souligné par nous).

156. L'exception de libellé obscur soulevée par les parties défenderesses relève partant de la seule compétence du juge de la mise en état et devra, de fait, être tranchée par une ordonnance séparée de ce dernier limitée à ce moyen de nullité.

#### 2.    Quant au moyen du libellé obscur soulevé par les parties défenderesses sub 1) à sub 7)

157. À titre liminaire, les Demanderesses rappellent qu'au moment des faits en cause, les parties défenderesses sub 1) et sub 2) étaient les gérants de classe A de PROJECT REDBLACK, les parties défenderesses sub 2) à sub 3) étaient gérants de classe B de ROSSONERI SPORT et les parties défenderesses sub 4), sub 5) et sub 8) étaient les gérants de classe A de ROSSONERI SPORT[203]. Il s'ensuit que toutes les décisions prises par PROJECT REDBLACK et ROSSONERI SPORT par rapport à la vente de l'AC MILAN en violation des dispositions statutaires de ces deux entités, et pour dissimuler les diverses étapes de la transaction à BLUE SKYE LUX, LIC 159 et Monsieur CASLINI, ont nécessairement été prises par ces défenderesses, seuls qualifiées à agir

---

[202]    T. HOSCHEIT, *op. cit.*, n° 348, p. 233.
[203]    **Rôle n° TAL-2022-07361, Pièce n° 4 de la farde I de MOLITOR** – Organigramme du groupe REDBLACK.

pour ces sociétés. De plus, ce sont les parties défenderesses sub 1) et 2) qui ont pris la décision au nom et pour le compte de PROJECT REDBLACK d'écarter Monsieur CASLINI du conseil de gérance de ROSSONERI SPORT afin de l'empêcher d'exercer les droits à l'information et droits de vote inhérents à sa qualité de gérant de cette société. Il s'ensuit que toutes ces personnes physiques ont nécessairement, par les décisions qu'elles ont approuvées et par les actes positifs qu'elles ont posés au nom et pour le compte de ces sociétés, participé activement à la commission de la fraude en exécutant les directives qu'elles avaient reçues du groupe ELLIOTT.

158. Pourtant, dans leurs conclusions n°1, les parties assignées sub 1) à sub 7) jouent les innocentes en soulevant *in limine litis* la nullité de l'assignation du 27 juin 2022 pour libellé obscur au motif que BLUE SKYE LUX et LIC 159 n'exposeraient pas dans l'acte introductif d'instance *« quels griefs elles nourrissent précisément à l'encontre des gérants, et à quelle « fraude » ils auraient participé »*[204]. Le fait qu'elles qualifient les pages de l'assignation du 27 juin 2022 de *« longues et pénibles »* doit certainement tenir au malaise dont les parties défenderesses 1) à 7) souffrent au rappel des actes répréhensibles auxquels elles se sont prêtées. On peut notamment citer :

(i) la mise à l'écart volontaire et délibérée de Monsieur CASLINI, pourtant gérant de classe B de PROJECT REDBLACK et gérant de classe A de ROSSONERI SPORT (jusqu'à sa révocation le 17 mai 2022), pour faire en sorte, soit qu'il ne soit jamais au courant de la transaction envisagée et des opérations préparatoires à celle-ci, soit qu'il le soit à contretemps afin de l'empêcher d'entreprendre toute démarche juridique visant à suspendre les décisions prises par PROJECT REDBLACK et ROSSONERI SPORT[205] ;

(ii) la dissimulation de l'imminence de la transaction à BLUE SKYE LUX et Monsieur CASLINI[206] ;

(iii) le fait que les résolutions devant être prises par les gérants de PROJECT REDBLACK (et donc également soumises à l'approbation de Monsieur CASLINI) étaient toujours des résolutions de ratification, en ce qu'elles concernaient systématiquement des actes qui avaient été posés auparavant dans le plus grand secret par les gérants contrôlés par le groupe ELLIOTT, sans en informer Monsieur CASLINI, puisqu'aucun point n'était jamais mis à l'ordre du jour des réunions des conseils de gérance de PROJECT REDBLACK et de ROSSONERI SPORT avant que les accords et actes liés à la transaction ne soient pris[207] ;

(iv) le fait pour Monsieur MCLEAN et Madame ITALIA, parties sub 1) et sub 2), agissant en tant que gérants de classe A de PROJECT REDBLACK, de révoquer Monsieur CASLINI de ses fonctions de gérants de ROSSONERI SPORT le 17 mai 2022 pour l'empêcher d'invoquer les droits à l'information que cette qualité lui conférait[208] ;

---

[204]   **Rôle n° TAL-2022-07361**, conclusions n° 1 du 3 juillet 2023 de BONN & SCHMITT, p. 6.
[205]   **Rôle n° TAL-2022-07361**, assignation du 27 juin 2022, pp. 9 et 10.
[206]   **Rôle n° TAL-2022-07361, pièce n° 16 de la farde I de MOLITOR**, précitée.
[206]   **Rôle n° TAL-2022-07361,** assignation du 10 juin 2022, p. 7 ; **rôle n° TAL-2022-07361,** assignation du 27 juin 2022, p. 10
[207]   **Rôle n° TAL-2022-07361**, assignation du 27 juin 2022, pp. 9, 10 et 19.
[208]   **Rôle n° TAL-2022-07361**, assignation du 27 juin 2022, pp. 9 et 10 ; **Rôle n° TAL-2022-07361, pièce n° 15 de la farde I de C.A.S.**, précitée.

(v)    le fait pour les gérants de ROSSONERI SPORT d'avoir selon toute vraisemblance, laissé ELLIOTT UK, une entité du groupe ELLIOTT, mener secrètement les tractations de la vente de l'AC MILAN en suivant un processus volontairement opaque, et d'en avoir approuvé les termes a posteriori que pour la forme, entérinant ainsi ce qui avait été décidé par ELLIOTT[209] ;

(vi)    la violation consciente de l'article 13 des statuts de PROJECT REDBLACK par Monsieur MCLEAN et Madame ITALIA pour la mainlevée du Gage italien et l'acceptation du fait que PROJECT REDBLACK ne pourrait jamais obtenir le remboursement de sa créance envers ROSSONERI SPORT, faute pour cette dernière de disposer du moindre actif à l'issue du transfert des actions de l'AC MILAN, que ces deux gérants ont tenté de justifier par tous les moyens[210] ;

159.    Les faits subséquents à l'assignation du 27 juin 2022, tels que résumés dans les présentes conclusions, comme la distribution aux entités du groupe ELLIOTT de la majeure partie des espèces et des *notes* de crédit-vendeur obtenues à la suite de la vente de l'AC MILAN, viennent renforcer le fait que les gérants de PROJECT REDBLACK et de ROSSONERI SPORT nommés par le groupe ELLIOTT ont bien participé à la fraude.

160.    Il ressort des quelques points mentionnés ci-dessus que le rôle des parties défenderesses sub) 1 à 7) a bien été décrit dans l'assignation du 27 juin 2022, de sorte que ces personnes savent très bien à la lecture de cette assignation pourquoi elles sont aujourd'hui inquiétées par la justice. Les développements des parties défenderesses sub 1) à sub 7) quant au libellé obscur soulevé relèvent partant clairement de la mauvaise foi.

161.    Il faut cependant relever que pour illustrer leurs propos, les parties défenderesses sub 1) à sub 7) tentent de déformer la réalité en revenant sur la révocation de Monsieur CASLINI de ses fonctions de gérants de ROSSONERI SPORT. Pour tenter de se dédouaner, les parties défenderesses sub 1) à 7) indiquent que la décision de révocation d'un gérant d'une société appartient à son ou ses associés. Elles omettent bien évidemment de mentionner le fait que la décision de révocation de Monsieur CASLINI a été prise par Monsieur MCLEAN et Madame ITALIA, les gérants de PROJECT REDBLACK (agissant certainement en bons exécutants des ordres du groupe ELLIOTT), au nom et pour le compte de cette société, étant l'associée unique de ROSSONERI SPORT. Les parties défenderesses sub 1) à 7) tentent également de normaliser cette révocation brutale et inattendue par une phrase reprise hors de tout contexte de l'assignation du 27 juin 2022, selon laquelle ils veulent déduire que BLUE SKYE LUX et LIC 159 auraient reconnu qu'« *aucune disposition statutaire obligeait à* [maintenir Monsieur CASLINI]*, contrairement aux statuts de Project Redblack* »[211]. En réalité, la phrase à laquelle les parties défenderesses sub 1) à 7) se réfèrent dans l'assignation relate simplement le fait que seules les fonctions de Monsieur CASLINI en tant que gérant de PROJECT REDBLACK étaient protégées statutairement, de sorte qu'il ne pouvait en être révoqué. Comme nous l'avons vu, ceci ne justifie cependant pas sa révocation brutale au niveau de ROSSONERI SPORT le 17 mai 2022, puisque la structure mise en place par les groupes BLUE SKYE et ELLIOTT supposait que BLUE SKYE dispose de dirigeants à tous les étages de la structure de détention afin de lui permettre d'influer sur la gestion de l'AC MILAN, dont les bons résultats conditionnaient les rémunérations

---

[209]    **Rôle n° TAL-2022-07361**, assignation du 27 juin 2022, p. 10.
[210]    **Rôle n° TAL-2022-07361**, assignation du 27 juin 2022, pp. 12 et 13.
[211]    **Rôle n° TAL-2022-07361,** assignation du 27 juin 2022, p. 18 ; conclusions n° 1 du 3 juillet 2023 de BONN & SCHMITT, p. 6.

auxquelles BLUE SKYE LUX a droit aux termes des TPECs de classe A et celles revenant à LIC 159 en vertu des TPECs de classe B[212].

162. Les agissements frauduleux qui leur sont reprochés par les Demanderesses sont explicités dans des termes clairs à d'itératives reprises dans l'assignation de ces dernières, notamment aux pages 9, 10, 17 à 23 et 28 pour avoir « *violé les règles relatives à l'organe collégial qu'est le conseil de gérance, en excluant de fait un gérant de toute information relative à la cession de l'AC MILAN, [...] violé les statuts de ROSSONERI SPORT en ne mettant aucun point relatif à la cession à l'ordre du jour du conseil de gérance de ROSSONERI SPORT le tout pour empêcher Giovanni CASLINI [Monsieur CASLINI] d'intervenir et éventuellement d'interrompre un processus de vente qui était frauduleux et visant tant à nuire aux Parties Demanderesses [les Demanderesses] financièrement qu'à contourner les dispositions relatives à la Champions League de l'UEFA[213]* », et la vente des actions de l'AC MILAN telle que structurée permettait à ELLIOTT de diriger l'AC MILAN[214].

### 3. Quant au moyen du libellé obscur soulevé par FOOTBALLCO

163. Dans ses conclusions n° 1, FOOTBALLCO soulève *in limine litis* l'exception de libellé obscur au motif qu'elle ne serait « *pas en mesure d'organiser sa défense alors qu'elle ne comprend pas en quelle qualité et pour quelle raison elle se trouve dans la présente affaire* »[215].

164. À l'appui de sa prétention, elle indique qu'elle n'aurait été citée qu'une unique fois dans l'assignation du 27 juin 2022 en page 20, les Demanderesses indiquant « *à titre d'exemple, dans le corps du texte du courrier [du 2 juin 2022[216]] l'acheteur est Footballco Intermedate Cooperatief U.A. ou une de ses filiales alors que à l'annexe A, l'acheteur ne peut qu'être FootballCo Intermediate Cooperatif U.A.* ».

165. L'affirmation de FOOTBALLCO selon laquelle elle ne serait citée qu'une fois dans l'assignation du 27 juin 2022 est erronée alors que dans ladite assignation, la partie assignée sub 18) est également mentionnée :

    (i)   en pages 25 et 26 afin d'expliquer que la décision à intervenir est à déclarer commune à FOOTBALLCO, notamment puisque cette dernière « *est l'acheteur des actions de l'AC MILAN selon le courrier du 2 juin 2022 et est partant directement concerné par la décision à intervenir* »[217].

    (ii)  en page 28, au titre du dispositif, où les Demanderesses demandent la nullité « *du Stock Purchase Agreement conclu le 26 mai 2022 entre ROSSONERI SPORT Luxembourg et Footballco Intermediate Coöperatif* »[218] ;

    (iii) en page 29, au titre du dispositif toujours, afin de voir « *déclarer le jugement à intervenir commun à [...] Footballco Intermediate Coöperatif [...]*[219] ».

---

212  Voir *supra*, paragraphe 30.
213  **Rôle n° TAL-2022-07361,** assignation du 27 juin 2022, p. 19.
214  **Rôle n° TAL-2022-07361,** assignation du 27 juin 2022, p. 18.
215  **Rôle n° TAL-2022-07361**, conclusions n° 1 du 4 juillet 2024 de Maître Nicolas THIELTGEN, p. 6.
216  **Rôle n° TAL-2022-07361, pièce n° 17 de la farde I de BSP**, précitée.
217  **Rôle n° TAL-2022-07361,** assignation du 27 juin 2022, p. 26.
218  **Rôle n° TAL-2022-07361,** assignation du 27 juin 2022, p. 28.
219  **Rôle n° TAL-2022-07361,** assignation du 27 juin 2022, p. 29.

166. Dans leur assignation du 27 juin 2022, les Demanderesses ont partant, dans un premier temps indiqué de manière claire et précise en page 20 qu'elles ont pu identifier que FOOTBALLCO était l'acquéreur des actions de l'AC MILAN grâce au courrier du 2 juin 2022, raison pour laquelle, dans le cadre de la présente procédure, qui nous le rappelons a pour objet l'annulation de la vente en question pour fraude, elles indiquent dans un second temps en pages 25 et 26 de leurs développements, assigner FOOTBALLCO en déclaration de jugement commun en sa qualité d'acquéreur des actions de l'AC MILAN alors qu'elle est directement concernée par la décision à intervenir.

167. C'est donc en parfaite cohérence qu'au titre de leur dispositif, les Demanderesses demandent, notamment (i) l'annulation du SPA, dans lequel FOOTBALLCO est désignée comme acheteur des actions de l'AC MILAN, qui a été conclu en fraude des droits des Demanderesses et (ii) à ce que le jugement à intervenir soit partant déclaré commun à FOOTBALLCO afin qu'elle soit avisée de l'annulation du contrat auquel elle est partie.

168. Si, dans le cadre de l'organisation de sa défense, FOOTBALLCO s'est, comme elle semble le laisser entendre, limitée à l'instruction de l'assignation du 27 juin 2022 jusqu'à la page 20 sur 30 de l'acte introductif d'instance, elle ne saurait aujourd'hui se prévaloir de ce fait pour invoquer la nullité non justifiée de l'assignation du 27 juin 2022 prétendument obscure alors qu'il ressort des développements ci-avant qu'il n'en est rien.

169. Il y a partant lieu de rejeter l'exception du libellé obscur soulevée par FOOTBALLCO en ce qu'elle n'est ni caractérisée, ni justifiée.

**4.     Quant au moyen du libellé obscur soulevé par PROJECT REDBLACK et ROSSONERI SPORT**

170. Les parties assignées sub 9) et sub 10) ont conclu une première fois par des conclusions n° 1 du 31 octobre 2022 dans lesquelles elles ont formulé des demandes reconventionnelles et incidentes notamment à l'encontre de BLUE SKYE LUX et LIC 159 en demande de condamnation au paiement de dommages et intérêts sur base des règles régissant la responsabilité contractuelle, sinon délictuelle.

171. Dans leurs conclusions n° 2 du 5 juillet 2023, les parties assignées sub 9) et sub 10) indiquent faire leur les conclusions n° 1 de Maître Cédric BELLWALD du 3 juillet 2023 tendant à l'annulation de l'assignation du 27 juin 2022, sans autre précision.

172. Dans l'hypothèse où Votre Tribunal en conclurait que PROJECT REDBLACK et ROSSONERI SPORT reprennent à leur compte, par une curieuse motivation par référence, l'exception de libellé obscur soulevée par les parties assignées sub 1) à sub 7), les Demanderesses entendent prendre position comme suit.

173. L'exception de libellé obscur relève du régime juridique des nullités de pure forme soumises aux exigences de l'article 264 du NCPC[220].

174. Les exigences prévues à l'article 264 du NCPC sont au nombre de deux, à savoir :
   (i)      l'exception doit être soulevée au seuil de l'instance ;
   (ii)     l'irrégularité formelle doit avoir causé un préjudice au demandeur en nullité.

---

[220]     Th. HOSCHEIT, *op. cit*, n° 348, p. 233.

175. Aucune des deux conditions n'est donnée en l'espèce alors que :

(i) l'exception a été soulevée par les parties défenderesses sub 9) et sub 10) dans leurs conclusions n° 2 après avoir conclu sur le fond dans ses conclusions n° 1 du 31 octobre 2022. Elle n'a donc pas été soulevée au seuil de l'instance. La jurisprudence conclut à *« l'irrecevabilité du moyen tiré du libellé obscur de l'assignation et soulevé dans les deuxièmes conclusions du défendeur »*[221] ;

(ii) PROJECT REDBLACK et ROSSONERI SPORT se limitent à renvoyer aux conclusions n° 1 des parties assignées sub 1) à sub 7) du 3 juillet 2023. Or, dans leurs conclusions, les parties sub 1) à sub 7) se limitent à exposer l'exception du libellé obscur quant aux développements de l'assignation du 27 juin 2022 qui leurs sont relatifs. Lesdites conclusions du 3 juillet 2023 ne comportent donc en rien des développements quant à une quelconque exception pour libellé obscur de l'assignation relative à PROJECT REDBLACK et ROSSONERI SPORT. Par voie de conséquence, les conclusions n° 1 du 3 juillet 2023 de Maître Cédric BELLWALD ne comprennent pas non plus de développements venant expliquer en quoi l'irrégularité formelle alléguée causerait préjudice à PROJECT REDBLACK et ROSSONERI SPORT.

176. Il y a partant lieu de rejeter l'exception de libellé obscur soulevée par PROJECT REDBLACK et ROSSONERI SPORT alors qu'elle n'a pas été soulevée au seuil de l'instance et que les parties assignées sub 9) et sub 10) restent en défaut de la justifier ainsi que d'expliquer en quoi elle leur causerait un préjudice.

177. Pour le surplus, PROJECT REDBLACK et ROSSONERI SPORT ne peuvent contester le fait que l'assignation énumère en long et en large les faits qui leur sont reprochés et ont été adoptés en leur nom et pour leur compte par les pions placés par le groupe ELLIOTT au sein de leurs conseils de gérance. On peut citer à titre d'exemples non-exhaustifs :

(i) la mise à l'écart volontaire et délibérée de Monsieur CASLINI, pourtant gérant de classe B de PROJECT REDBLACK et gérant de classe A de ROSSONERI SPORT (jusqu'à sa révocation le 17 mai 2022), pour faire en sorte qu'il ne soit jamais au courant de la transaction envisagée et des opérations préparatoires à celle-ci ou qu'il le soit à contretemps afin de l'empêcher d'entreprendre toute démarche juridique visant à suspendre les décisions prises par PROJECT REDBLACK et ROSSONERI SPORT[222] ;

(ii) la dissimulation de l'imminence de la transaction à BLUE SKYE LUX et Monsieur CASLINI[223] ;

(iii) le fait que les résolutions devant être prises par les gérants de PROJECT REDBLACK (et donc également soumises à l'approbation de Monsieur CASLINI) étaient toujours des résolutions de ratification, en ce qu'elles concernaient systématiquement des actes qui avaient été posés auparavant dans le plus grand secret, sans en informer Monsieur CASLINI, puisqu'aucun point n'était jamais mis à l'ordre du jour des réunions des conseils de gérance de PROJECT REDBLACK et de ROSSONERI SPORT avant que les accords et actes liés à la transaction ne soient pris[224] ;

---

[221] TAL, 17e ch., 29 mars 2017, n°s 165899 et 167151.
[222] **Rôle n° TAL-2022-07361,** assignation du 27 juin 2022, pp. 9 et 10.
[223] **Rôle n° TAL-2022-07361, pièce n° 17 de la farde I de MOLITOR**, précitée.
[223] **Rôle n° TAL-2022-07361,** assignation du 10 juin 2022, p. 7 ; assignation du 27 juin 2022, p. 10
[224] **Rôle n° TAL-2022-07361,** assignation du 27 juin 2022, pp. 9, 10 et 19.

(iv)    le fait pour PROJECT REDBLACK, à travers ses gérants de classe A (Monsieur MCLEAN et Madame ITALIA), de révoquer Monsieur CASLINI de ses fonctions de gérants de ROSSONERI SPORT le 17 mai 2022 pour l'empêcher d'invoquer les droits à l'information que cette qualité lui conférait[225] ;

(v)    le fait pour ROSSONERI SPORT d'avoir, selon toute vraisemblance, laissé ELLIOTT UK, une entité du groupe ELLIOTT, mener secrètement les tractations de la vente de l'AC MILAN en suivant un processus volontairement opaque, et de n'en avoir approuvé les termes que pour la forme, entérinant ainsi ce qui avait été décidé par ELLIOTT[226] ; et

(vi)    la violation consciente de l'article 13 des statuts de PROJECT REDBLACK en permettant la mainlevée du Gage italien et l'acceptation du fait que PROJECT REDBLACK ne pourrait jamais obtenir le remboursement de sa créance envers ROSSONERI SPORT, faute pour cette dernière de disposer du moindre actif à l'issue du transfert des actions de l'AC MILAN, que ces deux gérants ont tenté de justifier par tous les moyens[227].

**5.**    **Quant au moyen du libellé obscur soulevé par les parties défenderesses sub 15) à sub 17)**

178.    Les parties défenderesses sub 15) à sub 17) soulèvent la nullité de l'assignation du 27 juin 2022 pour libellé obscur au motif que ladite assignation ne contiendrait « *aucun développement sur les conséquences d'une éventuelle annulation du contrat de cession des actions de l'AC Milan sur la répartition des actions entre les actionnaires de l'AC Milan*[228] » de sorte que dans ce contexte, « *les parties concluantes* [les parties défenderesses sub 15) et sub 17)] *ne comprennent pas comme elles pourraient « savoir qui est propriétaire des actions* [de l'AC Milan] *» si les parties demanderesses* [les Demanderesses] *n'en font pas la demande*[229] ».

179.    Comme il sera plus amplement développé au point I. des présentes, BLUE SKYE LUX et LIC 159 se sont désistées purement et simplement de leurs demandées introduites contre les parties défenderesses sub 16) et sub 17) dans le cadre de la présente instance devant Votre Tribunal sous le numéro de rôle TAL-2022-07361 par acte d'avocat à avocat du 19 septembre 2025[230].

180.    Les moyens soulevés par les parties défenderesses sub 16) et sub 17) sont donc devenus sans objet de par le désistement d'instance intervenu, de sorte qu'il n'y a pas lieu à prendre position sur ces derniers.

181.    Quant aux moyens soulevés par la partie défenderesse sub 15), aa présente procédure a pour objet de voir « *déclarer nulle la transaction visant à voir céder les action de l'AC MILAN, à savoir déclarer nul tout contrat ou accord conclu en vue de procéder à la cession de l'AC MILAN*[231] » ce qui ressort clairement des développements des Demanderesses, ce que ne conteste pas la partie

---

[225]  **Rôle n° TAL-2022-07361**, assignation du 27 juin 2022, pp. 9 et 10 ; **pièce n° 15 de la farde I de C.A.S.**, précitée.
[226]  **Rôle n° TAL-2022-07361**, assignation du 27 juin 2022, p. 10.
[227]  **Rôle n° TAL-2022-07361**, assignation du 27 juin 2022, pp. 12 et 13.
[228]  **Rôle n° TAL-2022-07361**, conclusions de Maître Bertrand CHRISTMANN du 25 septembre 2024, p. 7.
[229]  **Rôle n° TAL-2022-07361**, conclusions de Maître Bertrand CHRISTMANN du 25 septembre 2024, p. 7.
[230]  **Rôle n° TAL-2022-07361, pièce n° 98 de la farde III de MOLITOR** – Désistement d'instance du 22 septembre 2025 ; **rôle n° TAL-2022-07355, pièce n° 98 de la farde III de MOLITOR** – Désistement d'instance du 22 septembre 2025 ; **rôle n° TAL-2023-04206, pièce n° 98 de la farde III de MOLITOR** – Désistement d'instance du 22 septembre 2025.
[231]  **Rôle n° TAL-2022-07361**, assignation du 27 juin 2022, p. 28.

défenderesse sub 15) qui ne soulève pas l'exception de libellé obscur à ce titre et qui a pu aisément rappeler les demandes des Demanderesses dans ses conclusions[232].

182. L'annulation du contrat a pour effet de faire disparaître le contrat, et ce de manière rétroactive, remettant les parties dans leur pristin état :

> « "L'annulation de la convention provoque sa dissolution pour l'avenir mais, également pour le passé. Chacune des parties au contrat doit donc restituer à l'autre ce qu'elle a reçu en exécution du contrat annulé. En principe cette restitution se fera en nature. Si la restitution en nature s'avère impossible, elle se fera par équivalent. La nullité prononcée vise à effacer la situation illicite créée dans la formation du contrat et les parties sont ainsi remises, du fait de l'annulation, dans le « pristin état[233]"[234] ».

183. Ce principe est le corollaire du principe de réparation intégrale du préjudice subi.

184. Partant, l'annulation d'une convention, et donc la remise dans leur pristin état des parties à ladite convention est la conséquence juridique directe de leur nullité.

185. La nullité des conventions visant à voir céder les actions de l'AC MILAN étant énoncée clairement au titre du dispositif, ce que la partie défenderesse sub 15) ne conteste pas, la précision de leur effet, à savoir la nullité rétroactive et partant remise en pristin état des parties aux conventions, n'est pas nécessaire puisqu'il est induit de la demande en nullité même.

186. De surcroît, les Demanderesses ne voient pas en quoi la prétendue ignorance par la partie défenderesse sub 15) de l'effet de la nullité des contrats serait de nature à ne pas lui permettre de choisir les moyens de défense appropriés[235], alors que la preuve d'une telle impossibilité à se défendre constitue une condition de recevabilité de l'exception de libellé obscur.  L'ignorance des effets de la nullité dans le chef de la partie défenderesse sub 15) à la procédure en vue d'une déclaration de jugement commun ne pose en tout état de cause pas de problème alors que la partie défenderesse sub 15) a compris qu'aucune demande en condamnation n'était dirigée contre elle.


**B.   QUANT À LA PRÉTENDUE IRRECEVABILITÉ DES DEMANDES DE BLUE SKYE LUX ET LIC 159**

187. Les parties assignées sub 11) à sub 13) soulèvent l'irrecevabilité de l'assignation du 27 juin 2022 en raison de (1) l'existence alléguée d'une fin de non-recevoir conventionnelle, (2) du défaut allégué de mise en cause d'un contradicteur légitime, (3) du défaut allégué d'intérêt à agir des Demanderesses et (4) de la renonciation alléguée ultérieure à la demande en nullité.

---

[232]   **Rôle n° TAL-2022-07361**, conclusions de Maître Bertrand CHRISTMANN du 25 septembre 2024, p. 5.
[233]   Cour d'appel, 9 novembre 2011, n° 35055 à paraître dans Pas., 35 (2012/3) et note P. ANCEL ; Cour d'appel, 12 mars 2008, *Pas.,* 34, p.189
[234]   O. POELMANS, *Droit des obligations au Luxembourg, Larcier,* 2013, n° 234, p. 298.
[235]   TAL, 6 mai 2008, BIJ 6/2008, p. 117.

1.    **Quant à la prétendue fin de non-recevoir conventionnelle des conditions générales des TPECS**

188.    Afin d'empêcher BLUE SKYE LUX et LIC 159 de mener à bien les actions qu'elles ont entreprises aux termes de l'assignation du 27 juin 2022, GENIO, KING GEORGE et ELLIOTT UK tentent de se retrancher derrière la clause 4 des conditions générales des TPECs de classe A et de classe B[236]. Selon ces trois parties défenderesses, la clause 4.3 stipule que :

> « *4.3 [...]. Les détenteurs se tourneront uniquement vers* [les] *sommes et ces montants* [(a) payables au titre des TPECs de classe A ou des TPECs de classe B ou (b) les montants reçus, réalisés ou recouvrés par ou pour le compte de PROJECT REDBLACK par rapport aux TPECs de classe A ou de classe B] *pour les paiements à effectuer par la Société en vertu des présentes conditions générales et n'engageront aucune procédure judiciaire ou autre ni n'exerceront aucun autre droit ou recours qu'ils pourraient avoir à l'encontre de la Société ou de l'un de ses actifs* »[237].

189.    GENIO, KING GEORGE et ELLLIOTT UK se réfèrent également à la clause 7.3 des conditions générales des TPECs de classe A et de classe B, en vertu de laquelle PROJECT REDBLACK se verrait reconnaître toute discrétion par rapport au fait de « *(ii) vendre (en particulier par rapport au prix et au moment) tout ou partie des Actifs Sous-Jacents de Classe A et/ou des Actifs Sous-Jacents de Classe B* » et « *(iv) (i) de consentir à toute modification ou renonciation aux documents qui se rapportent aux Actifs Sous-Jacents de Classe A et/ou aux Actifs Sous-Jacents de Classe B* »[238], laquelle permettrait, selon ces parties, « *expressément à Project Redblack de prendre la décision de vendre tout sous-jacent des TPECs, au moment et au prix souhaité, ainsi que de procéder à des renonciations, rappelant que cette décision pouvait parfaitement être prise par deux gérants de catégorie A.* »[239].

190.    Il convient de relever les points suivants, qui viennent contredire les affirmations péremptoires de GENIO, KING GEORGE et ELLIOTT UK et doivent conduire au rejet de l'argument formulé par ces dernières et tenant à l'existence d'une clause de renonciation :

(i)    Les actions de l'AC MILAN ne constitueraient des Actifs Sous-Jacents de Classe A et des Actifs Sous-Jacents de Classe B aux termes des conditions générales des TPECs de classe A et de classe B que dans la mesure où elles seraient <u>détenues par PROJECT REDBLACK</u>, comme l'indiquent clairement le point (d) de la définition d'Actifs Sous-Jacents de Classe A[240] et le point (d) de la définition d'Actifs Sous-Jacents

---

[236]    **Rôle n° TAL-2022-07361**, conclusions de Clifford Chance du 7 juin 2022, n° 28 et s, pp. 18 et s. **; pièce n° 8 de la farde I de MOLITOR –** Précitée **et pièce n° 36 de la farde II de MOLITOR**, précitée.

[237]    Traduction libre de : « *The Holders will look solely to such sums and such amounts for payments to be made by the Company under these Terms and Conditions and will not otherwise take any judicial or others proceedings or exercise any other right or remedy it might otherwise have against the Company or any of its assets* » (**rôle n° TAL-2022-07361, pièce n° 36 de la farde II de MOLITOR**, précitée).

[238]    Traduction libre de : « *(ii) sell (particularly with regard to price and timing) all or part of the Class A Underlying Assets and/or the Class B Underlying Asset,* [...], *(iv) exercise any voting and other rights in relation to the Class A Underlying Assets and/or the ClassB Underlying Assets* » (**Rôle n° TAL-2022-07361, pièce n° 36 de la farde II de MOLITOR**, précitée).

[239]    **Rôle n° TAL-2022-07361**, conclusions de CLIFFORD CHANCE du 7 juin 2022, n° 30, p. 18.

[240]    « *95.73 percent of all the rights, assets, claims. receivables. income, gains, payments and proceeds in relation to any present and future shares, notes, bonds, and other debt financial instruments, which may be issued by Associazione Calcio Milan S.p.A.. (the Italian Issuer) and the Borrower and acquired by the Company (including any warrants, call option and derivative arrangements between the Company and the Borrower in relation to shares in the Italian Issuer)* » (**rôle n° TAL-2022-07361, pièce n° 36 de la farde II de MOLITOR**, précitée, p. 4).

de Classe B[241]. Puisque ces actions étaient détenues par ROSSONERI SPORT et non par PROJECT REDBLACK, la discrétion accordée à PROJECT REDBLACK par la clause 7.3 (ii) des conditions générales des TPECs de classe A et de classe B concernant la vente des actifs sous-jacents de ces TPECs ne s'applique donc pas à la vente des actions de l'AC MILAN, faute pour elles d'être éligibles comme Actifs Sous-Jacents de Classe A ou d'Actifs Sous-Jacents de Classe B. Par conséquent, la clause 7.3 (ii) ne permet pas à PROJECT REDBLACK et à ses gérants de classe A d'esquiver les exigences posées par les articles 13 et 16 des statuts de cette société.

(ii)     Le pouvoir discrétionnaire qui serait conféré à PROJECT REDBLACK en vertu de la clause 7.3 ne lui permet pas pour autant de violer l'article 13 de ses propres statuts, lequel prévoit l'obligation d'obtenir l'approbation unanime de ses gérants et à défaut, de ses associés, pour une série d'actes, comme notamment dans le cas de toute transaction entre PROJECT REDBLACK et une société affiliée à l'un de ses associés, ce qui est le cas pour ROSSONERI SPORT, laquelle est une filiale indirecte de KING GEORGE, une des trois associées de PROJECT REDBLACK. De plus, comme en a décidé la Cour de cassation française dans une affaire similaire, la vente des actions de l'AC MILAN, seul actif de ROSSONERI SPORT, devait **nécessairement conduire à la liquidation de cette société et à celle de PROJECT REDBLACK** après la distribution du produit de vente aux investisseurs, puisque la réalisation de son objet social serait devenue impossible[242]. Par conséquent, la décision de liquider PROJECT REDBLACK est soumise à la décision unanime de ses associés (et donc à l'approbation de BLUE SKYE LUX) en vertu de l'article 16 des statuts. Il est donc faux d'affirmer que PROJECT REDBLACK pouvait agir comme bon lui semblait en vertu des conditions générales des TPECs de classe A et de classe B ;

(iii)    une renonciation à un droit futur doit avoir un objet déterminé ou déterminable[243] et n'est valable que si la partie y renonçant le fait en connaissance de cause. La doctrine autorisée indique en effet que « *la renonciation doit être clairement établie par la preuve d'actes concrets démontrant la volonté du renonçant d'abandonner son droit et sa conscience de la portée de son acte, impliquant à la fois conscience de l'éventuelle existence de son droit et conscience des implications de sa renonciation* »[244]. Il revient alors à celui qui se prévaut d'une renonciation de prouver que l'auteur de la renonciation connaissait ou ne pouvait ignorer l'existence de la prérogative abdiquée »[245].

Il est inconcevable que BLUE SKYE LUX et LIC 159, en leurs qualités de détenteurs de TPECs de classe A-2 et de classe B, aient pu consentir à l'avance à ce que PROJECT REDBLACK, devenue la créature du groupe ELLIOTT, agisse en fraude des statuts et des droits conférés à BLUE SKYE LUX pour servir les seuls intérêts de ceux qui tiraient les ficelles. Les parties assignées sub 11) à sub 13) restent en tout état de cause en défaut de rapporter la moindre preuve établissant le fait que BLUE SKYE LUX et LIC 159 auraient renoncé à toute action à l'encontre de PROJECT REDBLACK en cas de fraude perpétrée par cette dernière pour permettre la cession des actions de l'AC MILAN par ROSSONERI SPORT.

---

[241]     « *95.73 percent of all the rights, assets, claims. receivables. income, gains, payments and proceeds in relation to any present and future shares, notes, bonds, and other debt financial instruments, which may be issued by the Italian Issuer and the Borrower and acquired by the Company (including any warrants, call option and derivative arrangements between the Company and the Borrower in relation to shares in the Italian Issuer)* » (**Rôle n° TAL-2022-07361, pièce n° 36 de la farde II de MOLITOR**, précitée, p. 5).

[242]     Cass. fr. comm., 13 mars 2024, arrêt n° 122 FS-B, pourvoi n° R 22-13.764.

[243]     D. HOUTCIEFF, « Renonciation », dans : *Répertoire de droit civil*, Paris, Dalloz, 2017, n°28.

[244]     T. HOSCHEIT, *op. cit.*, n° 1056.

[245]     D. HOUTCIEFF, *op. cit.*, n°20.

(iv)    Plus parlant encore est l'inefficacité d'une clause de renonciation à une action en justice en cas de faute lourde ou dolosive commise par le bénéficiaire de la renonciation. Il faut en effet dans cette hypothèse traiter la clause de renonciation comme équivalant à une « clause de non-responsabilité » en ce qu'elle prive le renonçant de son action, l'obligeant ainsi à supporter son propre préjudice[246]. « [O]n imagine ainsi facilement que l'on ne puisse renoncer à certaines prérogatives en raison du comportement du cocontractant »[247].

En droit luxembourgeois, une faute lourde ou faute inexcusable est définie comme étant une « négligence grossière que l'homme le moins averti ne commettrait pas dans la gestion de ses propres affaires », cette faute étant plus facilement décelable dans le chef d'un professionnel et ne nécessite pas la démonstration d'une intention de nuire, la conscience ou la connaissance du dommage qui peut en résulter ou la volonté de commettre un tel dommage[248]. Le concept de faute dolosive ou faute intentionnelle recouvre quant à lui une faute résultant de la volonté de son auteur de réaliser l'acte dommageable, ce qui suppose une prévision de ce dommage et une acceptation sans réserve de l'auteur de réaliser un résultat déterminé, indépendamment du fait de savoir si cet auteur a souhaité ou non nuire à autrui[249].

Enfin, par application des principes généraux de droit des contrats, la mauvaise foi de la personne invoquant à son profit une clause de renonciation rendrait cette dernière inefficace[250].

Quand bien même les parties assignées sub 11) à sub 13) parviendraient à démontrer que les dispositions des conditions générales des TPECs de classe A et classe B sont à interpréter comme contenant une renonciation donnée en connaissance de cause par BLUE SKYE LUX et LIC 159 à formuler des demandes telles que celles contenues dans l'assignation du 27 juin 2022, *quod non*, une telle clause ne pourrait opérer. En effet, dans la mesure où la fraude, laquelle comprend la commission d'une faute intentionnelle ou dolosive pour les parties assignées sub 11) à sub 13), est au cœur de la présente affaire, il est évident que toute clause de renonciation derrière laquelle PROJECT REDBLACK tenterait de se cacher doit être écartée de ce fait.

## 2.    Quant à la prétendue fin de non-recevoir pour défaut de mise en cause de contradicteur légitime

191.    Il convient d'insister encore une fois sur le fait qu'au moment de l'assignation du 27 juin 2022, BLUE SKYE LUX et LIC 159 n'avaient pas été en mesure d'obtenir une copie du SPA, en raison des manigances du groupe ELLIOTT, de PROJECT REDBLACK de ROSSONERI SPORT et des gérants fidèles à leur cause. ACM BIDCO, ELLIOTT ASSOCIATES et ELLIOTT INTERNATIONAL ont depuis lors été mises en intervention forcée à la procédure par

---

[246]    P. DELEBECQUE, « Les renonciations à recours », in X., *Etudes offertes au Doyen Philippe Simler*, Dalloz, 2006, n° 4, p. 564.

[247]    P. DELEBECQUE, *op. cit.*, n° 4, pp. 564-565.

[248]    G. RAVARANI, *La responsabilité civile des personnes privées et publiques*, 3e éd., *Pasicrisie luxembourgeoise*, 2014, n° 77, p. 79.

[249]    G. RAVARANI, *op. cit.*, n° 76, pp. 77 et 78.

[250]    C.-E. BUCHER, « La clause de renonciation anticipée à la résolution judiciaire » *Contrats Concurrence Consommation*, n° 6, juin 2020, form. 6.

assignations des 26 et 30 juin 2025[251], de sorte que la fin de non-recevoir soulevée par les parties assignées sub 11) à 13) quant à l'absence d'ACM BIDCO, ELLIOT ASSOCIATES et ELLIOTT INTERNATIONAL à la procédure est désormais sans objet.

192.   Quant aux contrats nommément visés à l'assignation du 27 juin 2022, à savoir :

> *« - tout autre accord ultérieur intervenu entre ces mêmes parties [ROSSONERI SPORT et FOOTBALLCO] visant à la cession des actions de l'AC MILAN ;*
> - *la nullité de toute renonciation par PROJECT REDBLACK et/ou Daniela ITALIA et/ou Jean-Marc MCLEAN du gage lui accordé par ROSSONERI SPORT pour garantir l'AFA ;*
> - *la nullité de toute renonciation par PROJECT REDBLACK et/ou Daniela ITALIA et/ou Jean-Marc MCLEAN d'une partie de sa créance ;*
> - *la nullité de toute délégation de pouvoir accordée par ROSSONERI SPORT et/ou Victor SHUH et/ou Jean-Marc MCLEA et/ou Elliot GREENBERG et/ou Alfred Izak GOSLING à toute entité du groupe ELLIOTT, y inclus ELLIOTT MANAGEMENT CORPORATION, dans le cadre de la cession des actions de l'AC MILAN[252] ; »*

pour lesquels les Demanderesses demandent la nullité, toutes les parties auxdits contrats sont parties à la présente procédure. La fin de non-recevoir soulevée par les parties assignées sub 11) à 13) à ce titre est partant sans objet, ou sinon non-fondée.

193.   Au titre de leur assignation du 27 juin 2022, les Demanderesses demandent encore la nullité de *« tout contrat annexe, accessoire ou lié aux accords en vue de la cession de l'AC MILAN[253] »*.

194.   Comme il ressort amplement des faits tels que décrits au titre de leur assignation et de la présente, les Demanderesses n'ont pu obtenir aucune information, que ce soit de ROSSONERI SPORT, de PROJECT REDBLACK ou encore des gérants de ces entités quant à la transaction portant sur la vente des actions de l'AC MILAN, et ce en parfaite violation de leurs droits. Les Demanderesses ignorent donc encore à l'heure actuelle l'intégralité des conventions satellites au *Stock Purchase Agreement* qui ont été passées avec des tiers qui seraient partant affectées par le prononcé de la nullité du *Stock Purchase Agreement*. Raison pour laquelle les Demanderesses ont intégré au titre de leur dispositif, une demande en nullité de toutes les conventions liées à la vente des actions de l'AC MILAN, alors que si d'autres conventions avaient été passées en lien avec la vente des actions de l'AC, elles seraient nécessairement touchées par le prononcé de la nullité du *Stock Purchase Agreement*.

195.   Ainsi, contrairement aux affirmations des parties défenderesses sub 11) à 13)[254], un tel constat ne saurait être de nature à entraîner l'irrecevabilité de l'assignation du 27 juin 2022, alors qu'en

---

[251]   **Rôle n° TAL-2022-07355, pièce n° 94 de la farde III de MOLITOR** – Assignation en intervention forcée du 26 juin 2025, **pièce n° 95 de la farde III de MOLITOR** – précitée ; **rôle n° TAL-2022-07361, pièce n° 94 de la farde III de MOLITOR** – Assignation en intervention forcée du 30 juin 2025, **pièce n° 95 de la farde III de MOLITOR** – précitée ; **rôle n° TAL-2023-04206, pièce n° 94 de la farde III de MOLITOR** – Assignation en intervention forcée du 26 juin 2025, **pièce n° 95 de la farde II de MOLITOR** – Assignation en intervention forcée du 30 juin 2025.

[252]   **Rôle n° TAL-2022-07361,** assignation du 27 juin 2022, p. 28.

[253]   **Rôle n° TAL-2022-07361,** assignation du 27 juin 2022, p. 28.

[254]   **Rôle n° TAL-2022-07361,** conclusions de CLIFFORD CHANCE du 7 juin 2022, n° 41 et s, pp. 24 et s.

l'état toutes les parties aux conventions passées en vue de la cession des actions de l'AC MILAN et connues des Demanderesses sont parties à la présente procédure.

196. Ni les parties défenderesses sub 11) à 13), ni aucune autre partie défenderesse ne soulèvent d'ailleurs dans leurs conclusions que d'autres conventions auraient été passées en vue de la cession des actions de l'AC MILAN.

197. Si une telle situation devait se présenter, les Demanderesses ne manqueraient pas de mettre en intervention à la présente tous tiers intéressés comme elles l'ont d'ailleurs fait pour ACM BIDCO, ELLIOT ASSOCIATES et ELLIOTT INTERNATIONAL.


**3.    Quant à la prétendue absence d'intérêt à agir**

198. Les parties défenderesses sub 11) à 13) soutiennent que (3.1.) BLUE SKYE LUX et LIC 159 n'auraient pas d'intérêt à agir alors que BLUE SKYE LUX ne serait plus titulaire de TPECS de classe A-2[255] et LIC 159 ne serait plus titulaire de TPECS de classe B[256], et que (3.2.) BLUE SKYE LUX et LIC 159 n'auraient pas d'intérêt à agir né et actuel.

199. Les parties défenderesses sub 9) et 10) soutiennent quant à elles que (3.2.) BLUE SKYE LUX n'aurait pas qualité ou intérêt à agir à la présente alors qu'elle ne serait pas partie au SPA « ainsi que de tout autre accord ultérieur intervenu visant à la cession des actions de l'AC Milan[257] ». Elles questionnent encore l'intérêt à agir de BLUE SKYE LUX en raison de sa qualité d'associée minoritaire de PROJECT REDBLACK (3.3.).

**3.1.    L'intérêt à agir de BLUE SKYE LUX et LIC 159 résultant de la détention des TPECs**

200. Comme ceci a été amplement décrit dans les faits tels que relatés ci-dessus[258], BLUE SKYE LUX avait dans un premier temps transféré les TPECs de classe A-2 dont elle était titulaire à la société BLUE SKYE Caïmans, une société immatriculée aux Îles Caïmans et détenue intégralement par Messieurs CERCHIONE et D'AVANZO, afin de séparer les entités détenant les TPECs émis par PROJECT REDBLACK de celle détenant des parts sociales dans PROJECT REDBLACK[259]. Cependant, l'affirmation des parties défenderesses sub 11) à 13)[260], suivant laquelle BLUE SKYE ne serait partant plus titulaire des TPECs de classe A-2, est erronée alors que les TPECs de classe A-2 ont été à nouveau rétrocédés à BLUE SKYE LUX le 20 avril 2022[261], ce que PROJECT REDBLACK a d'ailleurs reflété dans le registre des TPECs de classe A[262].

201. Le but de cette rétrocession était de s'assurer que les différentes procédures au fond opposant le groupe BLUE SKYE au groupe ELLIOTT ne concernent que BLUE SKYE LUX et LIC 159, afin d'éviter que BLUE SKYE Caïmans n'ait aussi à y participer, que ce soit en qualité de demanderesse ou de défenderesse. Après avoir épuisé toutes les excuses possibles et imaginables, PROJECT REDBLACK a finalement dû procéder à l'inscription de BLUE SKYE LUX

---

[255]    **Rôle n° TAL-2022-07361,** conclusions de CLIFFORD CHANCE du 7 juin 2022, n° 46, p. 25.
[256]    **Rôle n° TAL-2022-07361,** conclusions de CLIFFORD CHANCE du 7 juin 2022, n° 49, p. 26.
[257]    **Rôle n° TAL-2022-07361,** conclusions d'ELVINGER HOSS PRUSSEN du 5 juillet 2023, n° 5, p. 6.
[258]    Voir supra, paragraphe 35 et s.
[259]    **Rôle n° TAL-2022-07361, pièce n° 38 de la farde II de MOLITOR**, précitée.
[260]    **Rôle n° TAL-2022-07361,** conclusions de CLIFFORD CHANCE du 7 juin 2022, n° 47 et s, p. 26.
[261]    **Rôle n° TAL-2022-07361, pièce n° 39 de la farde II de MOLITOR**, précitée.
[262]    Voir supra, paragraphe 36.

comme titulaire des TPECs de classe A-2 au 21 mai 2024, quoiqu'à une date bien postérieure au moment où PROJECT REDBLACK a eu connaissance du transfert.

202. Le moyen d'irrecevabilité soulevé par les parties défenderesses sub 11) à 13) suivant lequel BLUE SKYE LUX n'aurait pas intérêt à agir à la présente procédure alors qu'elle ne serait pas titulaire des TPECs de classe A-2 est partant à rejeter pour être sans objet.

203. Après avoir soutenu dans un premier temps que BLUE SKYE LUX n'aurait pas d'intérêt à agir aux présentes alors qu'elle ne serait pas titulaire de TPECs, les parties défenderesses sub 11) à 13) soutiennent dans un second temps que LIC 159 n'aurait pas d'intérêt à agir car elle ne serait pas titulaire des TPECs de classe B dont elle se prévaut. Pour soutenir cette prétention, les parties défenderesses sub 11) et 3 se fondent sur le fait que, dans le cadre de la procédure de faillite italienne, c'est BLUE SKYE qui revendiquerait la propriété des TPECs de Classe B.

204. Cette affirmation des parties défenderesses sub 11) à 13) est une interprétation erronée de la réalité alors que, comme cet élément a déjà été expliqué[263], le fait que BLUE SKYE LUX ait été renseignée comme étant toujours titulaire des TPECs de classe B dans des procédures d'insolvabilité italiennes résulte d'un mandat que LIC 159, en qualité de titulaire des TPECs de classe B, a donné devant notaire à BLUE SKYE LUX pour que celle-ci la représente dans ces procédures[264].

205. Pour le surplus, les éléments de preuve soutenant la titularité de LIC 159 de tous les TPECs de classe B ont été décrits ci-avant[265] et PROJECT REDBLACK a finalement déjà dû inscrire LIC 159 comme titulaire des 10.735.567 premiers TPECs de classe B[266].

206. Il faut également relever à ce sujet que les conditions générales applicables aux TPECs de classe A et de classe B ne prévoient qu'une présomption simple de preuve de la titularité des TPECs par les inscriptions contenues dans les registres correspondants lorsqu'elles indiquent que « [s]*auf disposition légale expresse, la personne au nom de laquelle les TPECs* […] *sont enregistrés dans le Registre des TPECs est <u>réputée</u> en être le propriétaire et le détenteur officiel à toutes fins utiles* » (souligné par nous)[267]. Il en découle que les registre des TPECs ne créent qu'une présomption simple de propriété dans le chef des personnes qui y sont inscrites.

207. Cette disposition contractuelle s'aligne sur la jurisprudence constante relative au registre des actions nominatives d'une société anonyme, laquelle indique que l'inscription dans un tel registre n'emporte aucune présomption irréfragable de propriété et que la preuve contre cette inscription peut toujours être rapportée par toutes voies de droit. La doctrine fait également sienne la solution jurisprudentielle et reconnaît cet effet limité que doit emporter le registre[268]. Il n'est donc pas permis à une société émettrice de titres nominatifs de se retrancher derrière les inscriptions figurant sur son registre, sous peine de lui permettre de pouvoir se confectionner de la sorte, elle-

---

[263] Voir supra, paragraphe 203.

**[264] Rôle n° TAL-2022-07361, pièce n° 83 de la farde II de MOLITOR –** Copie de la procuration attestant du mandat donné à Blue Skye Lux par LIC 159, accompagnée d'une traduction automatique en français.

[265] Voir notamment *supra*, paragraphes 95 et suivants.

[266] Voir *supra*, paragraphe 36.

[267] Traduction libre de « [e]*xcept as expressly required by law, the Person in whose name the Class TPECs are registered in the TPEC Register shall be deemed to be the owner and record holder thereof for all purposes* » (**Rôle n° TAL-2022-07361, pièce n° 36 de la farde II de MOLITOR**, précitée).

[268] Cour d'appel 30 octobre 2002, numéro du rôle 25762 ; Cour d'appel (4ᵉ ch.), 23 janvier 2019, n° CAL-2018-00072 du rôle ; A. STEICHEN, *Précis de droit des sociétés*, 6ᵉ édition, édition Saint-Paul, 2018, note de bas de page n° 4, p. 711.

même, le titre sur lequel elle appuiera ses dires[269]. Comme nous l'avons vu, LIC 159 a fourni toutes les preuves démontrant sa titularité de l'ensemble des TPECs de classe B[270], lesquelles permettront de remettre en cause toute inscription discordante dans le registre des TPECs de classe B par rapport aux 20.589.498 TPECs de classe B restants.

208. Il ressort incontestablement de ces éléments que le moyen d'irrecevabilité soulevé par les parties défenderesses sub 11) à 13) suivant lequel LIC 159 n'aurait pas intérêt à agir à la présente procédure alors qu'elle ne serait pas titulaire des TPECs de classe B est partant à rejeter pour être non-fondé.

### 3.2. L'intérêt à agir né et actuel

209. Les parties défenderesses sub 11) à 13) soutiennent que les demandes en nullité formulées par les Demanderesses dans leur assignation du 27 juin 2022 seraient irrecevables alors que les Demanderesses « *n'avaient, au moment de l'introduction de la présente action, pas d'intérêt à agir né et actuel pour demander la nullité d'actes qui n'avaient pas encore été conclus, et n'existaient partant pas, au moment de l'assignation[271]* ».

210. Il échet toutefois de constater à titre liminaire que les parties défenderesses sub 11) à 13) ne soulèvent pas l'irrecevabilité de la demande des Demanderesses en nullité *« du Stock Purchase Agreement conclu le 26 mai 2022 entre Rossoneri Sport Luxembourg et Footballco Intermediate Coöperatief ;[272] »*, la convention ayant été conclue antérieurement à l'introduction de la présente demande en justice.

211. La jurisprudence luxembourgeoise considère que l'intérêt à agir existe « *lorsque le résultat de la demande introduite est de nature à modifier ou à améliorer la condition juridique du demandeur, respectivement lorsque la demande est de nature à présenter pour lui une utilité ou un avantage[273]* ». Il est donc fonction de l'utilité que peut présenter pour la partie demanderesse l'exercice de l'action[274].

212. À ce titre, « [l]*'intérêt à agir existe dès lors indépendamment du résultat que procure effectivement l'action et n'est pas subordonné à la démonstration préalable du bien-fondé de l'action ou de l'existence réelle du droit invoqué ou de l'existence du préjudice invoqué. La vérification de l'existence réelle du droit ou de la lésion invoqués ne produit une incidence que sur le bien-fondé de la demande. L'intérêt à agir est une notion qui s'attache à l'action en justice, et non pas au droit substantiel que l'action en justice tend à sanctionner, ce qui explique qu'il doit être examiné au titre de la recevabilité de l'action, et non pas au regard du bien-fondé du droit allégué[275]* », de sorte que « [l]*a vérification de l'intérêt à agir (et par répercussion de la qualité à agir ; les deux notions se confondent en effet le plus souvent) fait donc abstraction de la question de savoir si le demandeur est réellement titulaire du droit qu'il invoque à l'appui de son action[276]* ».

---

269  TAL (17e ch.), 19 janvier 2011, n° 122354 du rôle.
270  **Rôle n° TAL-2023-04206, pièces n° 32, 46, 47 et 82 de la farde II de MOLITOR**, précitées.
271  **Rôle n° TAL-2023-04206**, conclusions de CLIFFORD CHANCE du 7 juin 2022, n° 50 et s, pp. 26 et s.
272  **Rôle n° TAL-2022-07361**, Assignation du 27 juin 2022, p. 28.
273  T. HOSCHEIT, *op. cit.*, n° 997 et 998, pp. 567 et 568.
274  Trib. arr. Lux., 25 octobre 2002, n° 77445 du rôle.
275  T. HOSCHEIT, *op. cit.*, n° 997 et 998, pp. 567 et 568.
276  *Ibidem.*

213.  Le fait de savoir si un droit existe effectivement dans le chef de BLUE SKYE LUX de demander la nullité d'une série de contrats et d'accords et les considérations soulevées par les parties défenderesses sub 11) à 13) quant à l'exercice prohibée d'une action *ad futurum*[277], que les Demanderesses contestent pour être non-fondées, sont donc des questions de fond et non des questions de recevabilité de la demande[278], de sorte qu'elles n'ont pas à être analysées à ce stade de la procédure.

214.  Comme nous l'avons vu, les Demanderesses agissent en tant qu'associée de PROJECT REDBLACK et actionnaire indirecte de ROSSONERI SPORT et de l'AC MILAN (dans le chef de BLUE SKYE LUX) et créancières de PROJECT REDBLACK (dans le chef de BLUE SKYE LUX et LIC 159) pour obtenir que les juges luxembourgeois annulent la vente des actions de l'AC MILAN qui a été passée en violation de leurs droits. Elles ont donc bien intérêt à agir.

215.  Comme il a été indiqué ci-avant, lorsque des Demanderesses ont fait signifier l'assignation du 27 juin 2022, elles étaient encore dans l'ignorance des contrats et actes ayant été effectivement déjà passés par rapport à la vente des actions de l'AC MILAN. Pour cette raison, le dispositif de l'assignation du 27 juin 2022 vise, entre autres à « *DECLARER nulle la transaction visant à voir céder les actions de l'AC Milan, à savoir déclarer nul tout contrat ou accord conclu en vue de procéder à la cession des actions de l'AC Milan et* notamment mais sans que cette liste soit limitative *:[…]* » (souligné par nous). Il en ressort que la liste des contrats et d'accords mentionnée dans le dispositif n'est qu'exemplative et non exhaustive, ce qui évite de devoir se focaliser sur la date de chacun des éléments y mentionnés.

216.  Quoi qu'il en soit, la nullité de la vente des actions de l'AC MILAN entraînera nécessairement, par voie de conséquence, celle du SPA mais également celle des autres conventions et actes juridiques y liés, dont ceux mentionnés dans l'assignation du 27 juin 2022, et notamment la mainlevée du Gage italien. Si les parties défenderesses sub 11) à 13) devaient persister à y voir une cause d'irrecevabilité, il sera très aisé pour les Demanderesses de les qualifier de demandes incidentes au sens de l'article 53 de NCPC, puisqu'il est évident qu'elles se rattachent aux prétentions originaires par un lien suffisant et y étaient au moins virtuellement comprises[279].

### 3.3.   L'intérêt et la qualité à agir de BLUE SKYE LUX

217.  À titre liminaire, les Demanderesses précisent que par avis du 20 décembre 2024, Votre Tribunal a indiqué aux parties, en ce qui concerne le rôle TAL-2022-07361, de conclure sur les seuls moyens d'irrecevabilité soulevés par Maître Albert MORO, de sorte que le moyen d'irrecevabilité soulevés par Maître Marc ELVINGER n'entre en principe pas dans le champ des présentes conclusions.

218.  Toutefois, s'agissant d'un moyen d'irrecevabilité, et dans un souci de bonne administration de la justice, les Demanderesses entendent prendre position sur ce moyen comme indiqué dans les paragraphes suivants.

219.  Les Demanderesses prennent acte que le moyen d'irrecevabilité pour défaut « *d'intérêt ou de qualité à agir* » n'est soulevé par les parties défenderesses sub 9) et 10) qu'à l'encontre de BLUE SKYE LUX de sorte que ces dernières ne contestent pas l'intérêt et la qualité à agir de LIC 159 à ce titre.

---

[277]  **Rôle n° TAL-2022-07361**, conclusions de CLIFFORD CHANCE du 7 juin 2023, n° 51 et s, p. 27.
[278]  Cour d'appel, 21 novembre 1995, n° 15696 du rôle.
[279]  Cour d'appel, 12 mars 2014, n° 37801 du rôle ; T. HOSCHEIT, *op. cit.*, n° 117, pp. 628-629;

220. Les parties défenderesses sub 9) et 10) estiment que BLUE SKYE LUX n'aurait pas intérêt ou qualité à agir en annulation du SPA car cette dernière ne serait pas partie audit contrat, et, de par sa qualité d'associée de PROJECT REDBLACK, ne pourrait se substituer à cette société pour entreprendre une action qui concernerait cette dernière au premier plan, notamment du fait de l'atteinte portée à son patrimoine[280].

221. Comme amplement indiqué ci-avant, les actes entourant la vente des actions de l'AC MILAN ont eu lieu en violation des statuts de PROJECT REDBLACK et notamment l'article 13 de ces derniers et les droits d'associée de BLUE SKYE LUX. En sa double qualité d'associée et de créancière de PROJECT REDBLACK, BLUE SKYE LUX a partant, tout comme LIC 159 en sa qualité de créancière de PROJECT REDBLACK, la possibilité d'invoquer la violation des statuts de cette dernière. Puisque Monsieur CASLINI a logiquement refusé de se prononcer en faveur de la mainlevée du Gage italien et de l'opération de vente des actions de l'AC MILAN, la décision aurait dû être soumise aux associés de PROJECT REDBLACK (et donc à BLUE SKYE LUX elle-même). Comme la condition d'unanimité nécessaire pour approuver ces transactions n'aurait pas été remplie, la vente des actions de l'AC MILAN n'aurait pas pu se produire et n'aurait pas eu les conséquences qu'elle a eues, qui préjudicient uniquement BLUE SYKE et LIC 159 et épargnent les entités du groupe ELLIOTT, donc GENIO et KING GEORGE.

222. Le préjudice ainsi subi par BLUE SKYE LUX en raison de la violation des statuts de PROJECT REDBLACK est bien personnel, en ce que, contrairement aux deux autres associées de cette société, elle est également détentrice de TPECs de classe A-2, et souffre, comme LIC 159 en tant que détentrice des TPECs de classe B, d'une perte personnelle liée à la fraude ourdie par le groupe ELLIOTT depuis la vente des actions de l'AC MILAN et la mainlevée du Gage italien jusqu'au récent remboursement des *notes* de crédit-vendeur en décembre 2024.

**4.  Quant à la prétendue renonciation de BLUE SKYE LUX à la demande en nullité de la vente de l'AC MILAN**

223. Les parties défenderesses sub 11) à 13) soutiennent que BLUE SKYE LUX aurait tacitement renoncé à sa demande en nullité de la vente des actions de l'AC MILAN en raison de l'action en faillite initiée à l'encontre de PROJECT REDBLACK et ROSSONERI SPORT devant le tribunal de Milan[281].

224. Les Demanderesses prennent acte que LIC 159 n'est pas visée par le moyen d'irrecevabilité soulevé par les parties défenderesses sub 11) à 13).

225. La renonciation se définit comme l'acte juridique unilatéral par lequel le titulaire abdique une prérogative ou un ensemble de prérogatives[282]. À ce titre, la renonciation à un droit ne se présume pas et ne peut être établie que par des faits qui l'impliquent nécessairement, c'est-à-dire qu'elle ne peut résulter que d'actes manifestant sans équivoque la volonté d'une renonciation certaine et non équivoque et la conscience de la portée de cet acte, impliquant à la fois la conscience de l'éventuelle existence de son droit et la conscience des implications de sa renonciation[283]. Il est de principe que les renonciations ne se présument pas[284] et il appartient à celui qui se prévaut de la renonciation de démontrer que le renonçant avait connaissance de la prérogative abdiquée

---

[280]  Conclusions d'ELVINGER HOSS PRUSSEN du 5 juillet 2023, n° 5, p. 6.
[281]  Conclusions de CLIFFORD CHANCE du 7 juin 2022, n° 54 et s, p. 27.
[282]  D. HOUTCIEFF, Renonciation, Répertoire de droit civil, Dalloz, 2017, n° 1, p. 3.
[283]  Cour d'appel, 14 décembre 2023, n° CAL-2023-00103 du rôle ; T. HOSCHEIT, *op. cit.*, n° 1056, p. 603.
[284]  Cour d'appel Lux., 3 juin 2009, n° 34203 du rôle.

ou qu'il ne pouvait en ignorer l'existence[285], de sorte que les conditions quant à l'existence d'une renonciation doivent être interprétées de manière stricte.

226.    Les parties défenderesses sub 11) à 13) déduisent la renonciation des Demanderesses à leur demande principale en nullité de la vente de l'AC MILAN de la seule procédure de faillite initiée par ces dernières devant les juridictions italiennes contre PROJECT REDBLACK et ROSSONERI SPORT. Les allégations des parties défenderesses sub 11) à 13) ne sauraient à aucun moment démontrer la volonté des Demanderesses à renoncer à leur demande principale en nullité de la vente de l'AC MILAN alors que :

(i)      ladite assignation en faillite est intervenue le 27 mars 2023, soit postérieurement à l'assignation du 27 juin 2022 ayant introduite la présente procédure et avait pour objet l'impossibilité pour PROJECT REDBLACK de payer l'intégralité de ses créances au vu des actifs dont elle disposait [286] ;

(ii)     si les Demanderesses avaient voulu renoncer à leur demande principale en nullité à la suite de l'assignation en faillite initiée devant les juridictions italiennes, elles se seraient désistées purement et simplement de la procédure devant Votre Tribunal en nullité de la vente des actions de l'AC MILAN, ce qu'elles n'ont pas fait ; et, en tout état de cause,

(iii)    le 9 novembre 2023, le juge italien a débouté BLUE SKYE de ses demandes, du fait qu'il ne s'est pas reconnu compétent territorialement.

227.    Il ressort des éléments de faits ci-avant exposés, que la procédure de faillite initiée devant les juridictions italiennes ne saurait valoir renonciation tacite des Demanderesses à leurs droits d'agir en annulation de la vente des actions de l'AC MILAN.

228.    Dans ces circonstances, il y a lieu de rejeter le moyen d'irrecevabilité soulevé par les parties défenderesses sub 11) à 13) pour être non-fondé.

### C.    INTERVENTION FORCÉE DE MONSIEUR CRACA

229.    Monsieur CRACA conteste avoir agi comme séquestre du Gage italien et indique avoir été simple détenteur précaire des certificats d'actions de l'AC MILAN, unique raison pour laquelle il a été assigné en déclaration de jugement commun[287].

230.    Selon lui, comme suite à la cession par ROSSONERI SPORT à ACM BIDCO des actions de l'AC MILAN, il ne serait plus détenteur des certificats d'actions de l'AC MILAN, il n'y aurait plus de raison à ce qu'il figure comme partie à la présente procédure, de sorte qu'il y aurait lieu de déclarer sa mise en intervention forcée à la présente irrecevable, sinon non fondée.

231.    Il convient cependant de souligner que Monsieur CRACA exerçait bien sa fonction de dépositaire des certificats représentatifs d'actions dans le cadre du Gage italien, comme le confirment (i) la clause 3.1.2 de ce contrat[288], aux termes de laquelle ces certificats doivent être remis à PROJECT REDBLACK, ainsi que (ii) le courrier envoyé par le notaire italien ayant officié pour les besoins de la création de cette sûreté, lequel confirme que Monsieur CRACA est le dépositaire nommé

---

[285]    Cass. fr. 1ère ch. civ., 5 décembre 1972, Bull civ. I, n° 269; Trib. arr. Lux., 13 juillet 2022, n° TAL-2022-03762 du rôle.
[286]    Voir supra, paragraphe 75
[287]    **Rôle n° TAL-2022-07361**, conclusions de Maître Bertrand CHRISTMANN du 11 avril 2023, p. 4.
[288]    **Rôle n° TAL-2022-07361, pièce n° 6 de la farde I de MOLITOR**, précitée.

par PROJECT REDBLACK pour conserver les certificats[289]. Comme déjà énoncé *supra*[290], au moment de la vente des actions de l'AC MILAN, Monsieur CRACA était également un administrateur de cette société et a toujours nié l'existence ou l'imminence d'une telle transaction. Monsieur CRACA, qui était de mèche avec ELLIOTT, a aussi servi de conseil juridique italien pour l'AC MILAN par rapport à la vente des actions pour laquelle il a coordonné la *due diligence* et a été généreusement rémunéré pour ce rôle, notamment via FIVERS (anciennement dénommé FIVELEX STUDIO E LEGALE TRIBUTARIO), le cabinet d'avocats italien au sein duquel il est associé, qui a reçu, entre autres, de ROSSONERI SPORT une somme de 602.830 euros le 1er septembre 2022[291].

232. De plus, comme nous l'avons vu dans le cadre de l'action déclaratoire[292], Monsieur CRACA avait été alerté par courrier[293] sur le fait que la mainlevée du Gage italien était soumise à l'obtention d'une décision unanime au sein de PROJECT REDBLACK en vertu de l'article 13 des statuts de cette société. Il ne pouvait donc ignorer qu'en acceptant de se démettre des certificats représentatifs des actions de l'AC MILAN à la demande de PROJECT REDBLACK (et donc de ses deux gérants de classe A), il se mettait délibérément en porte-à-faux avec cette disposition statutaire et concourrait ainsi à la fraude ourdie par le groupe ELLIOTT pour la vente des actions de l'AC MILAN. Les courriers qu'il avait reçus lui apprenaient en effet que (i) ni Monsieur CASLINI ni BLUE SKYE LUX ne voteraient en faveur de résolutions pour la mainlevée de la sûreté, qui seraient dès lors forcément prises en contravention des statuts de PROJECT REDBLACK et que (ii) Monsieur CASLINI et BLUE SKYE LUX s'opposaient au stratagème orchestré par le groupe ELLIOTT et ses créatures pour vendre l'AC MILAN à leur insu et dans des conditions plus que douteuses.

233. Par conséquent, en se défaisant des certificats représentatifs des actions de l'AC MILAN, Monsieur CRACA a marqué son accord à collaborer aux activités frauduleuses telles que décrites dans l'assignation du 27 juin 2022. Monsieur CRACA doit donc rester partie prenante au présent litige et se voir déclarer commun le jugement à intervenir.

### D. QUANT A L'INTERVENTION FORCÉE DE FOOTBALLCO

234. FOOTBALLCO considère que l'assignation du 27 juin 2022 ne mentionne aucune raison pour laquelle elle devrait figurer dans la procédure pour fraude. Elle feint donc l'innocence en affirmant ignorer en quelle qualité elle a reçu cette assignation et tente par là même de faire déclarer l'assignation irrecevable, sinon non fondée, à son encontre[294].

---

[289]  **Rôle n° TAL-2022-07361, pièce n° 33 de la farde II de MOLITOR,** précitée.

[290]  Voir *supra,* paragraphe 18.

[291]  **Rôle n° TAL-2022-07355, pièce n° 99 de la farde III de MOLITOR** – Communiqué de presse de FIVERS ; **pièce n° 100 de la farde II de MOLITOR** – Capture d'écran de la page web de FIVERS concernant Monsieur CRACA ; **pièce n° 101 de la farde III de MOLITOR** – preuve du paiement de FIVELEX STUDIO E LEGALE TRIBUTARIO le 1er septembre 2022 ; **rôle n° TAL-2022-07361, pièce n° 99 de la farde III de MOLITOR** – Communiqué de presse de FIVERS ; **pièce n° 100 de la farde II de MOLITOR** – Capture d'écran de la page web de FIVERS concernant Monsieur CRACA ; **pièce n° 101 de la farde III de MOLITOR** – preuve du paiement de FIVELEX STUDIO E LEGALE TRIBUTARIO le 1er septembre 2022 ; **rôle n° TAL-2023-04206, pièce n° 99 de la farde III de MOLITOR** – Communiqué de presse de FIVERS ; **pièce n° 100 de la farde II de MOLITOR** – Capture d'écran de la page web de FIVERS concernant Monsieur CRACA ; **pièce n° 101 de la farde II de MOLITOR** – preuve du paiement de FIVELEX STUDIO E LEGALE TRIBUTARIO le 1er septembre 2022.

[292]  Voir supra, paragraphe 122.

[293]  Voir *supra,* paragraphe 45 (i) et (iii) ; **rôle n° TAL-2022-07355, pièces n° 18 et 19 de la farde I de MOLITOR,** précitées.

[294]  **Rôle n° TAL-2022-07361**, conclusions n° 1 du 4 juillet 2024 de Maître Nicolas THIELTGEN, p. 7.

235.    Pourtant, comme ceci a été déjà été amplement expliqué, que ce soit dans l'assignation du 27 juin 2022[295] ou dans les présentes conclusions[296], FOOTBALLCO est partie au SPA concernant la vente des actions de l'AC MILAN et a désigné ACM BIDCO pour devenir la nouvelle actionnaire de l'AC MILAN.

236.    L'assignation du 27 juin 2022 poursuivant, entre autres, l'annulation de toute transaction ayant participé à la cession des actions de l'AC MILAN, il est donc naturel que FOOTBALLCO se trouve parmi les parties défenderesses. Par conséquent, le moyen invoqué par FOOTBALLCO visant à voir déclarer l'assignation irrecevable, sinon non fondée, à son égard est à rejeter.


### E.    LOI APPLICABLE

237.    Les Demanderesses prennent acte que les parties défenderesses sub 11) à sub 13) ne contestent pas la compétence de Votre Tribunal.

238.    Les parties défenderesses sub 11) à sub 13) demandent à titre subsidiaire que Votre Tribunal se prononce quant à la loi applicable à la demande en annulation des contrats et accords conclus pour les besoins de la vente des actions de l'AC MILAN et soutiennent que la loi de l'État de New-York devrait s'appliquer en raison de la clause d'*electio juris* du SPA[297].

239.    Les parties défenderesses sub 11) à sub 13) soutiennent, pour arriver à cette conclusion, (i) que les Demanderesses invoqueraient une fraude à leurs droits (*fraus alterius*) dans un contexte international et (ii) que la sanction applicable à une fraude aux droits d'autrui dans un contexte international se ferait selon la loi nationale déterminée par la règle de conflit applicable. Dans ce contexte, les parties défenderesses sub 11) à sub 13) tentent d'attirer dans le débat le droit applicable au SPA en se retranchant de manière curieuse derrière l'article 3 du règlement (CE) n° 593/2008 (et non pas n° 893/2008 comme indiqué erronément par les parties défenderesses sub 11) à sub 13)[298]) du Parlement européen et du Conseil du 17 juin 2008 (« **Règlement Rome I** »).

240.    Le raisonnement tenu par les parties défenderesses sub 11) à sub 13) ainsi que les conclusions qu'elles en tirent sont incorrects à plusieurs niveaux pour les raisons ci-après exposées.

241.    Premièrement, les parties défenderesses sub 11) à sub 13) semblent confondre les notions de fraude à la loi en droit interne et de fraude à la loi en droit international privé[299]. Alors que la seconde a pour objectif « *de sanctionner la création artificielle, par l'entremise d'une simulation, des conditions d'application d'une loi déterminée, de manière à profiter de cette loi, jugée plus favorable que la loi normalement applicable selon les règles de conflits de lois* », permettant ainsi fraude fondée sur « *l'utilisation artificielle des règles de conflits de lois* »[300], la première, qui est un concept flou, « *suppose l'utilisation d'un procédé juridique en soi licite, mais de manière artificieuse, déloyale, ou immorale, en vue d'arriver à un résultat prohibé par une loi d'ordre public*

---

[295]    **Rôle n° TAL-2022-07361,** assignation du 27 juin 2022, pp. 25, 26, 28 et 29.
[296]    Voir *supra*, paragraphes 20, 49 et 164 et s.
[297]    **Rôle n° TAL-2022-07361,** conclusions de CLIFFORD CHANCE du 7 juin 2022, n° 57 et s, pp. 29 et s.
[298]    **Rôle n° TAL-2022-07361,** conclusions de CLIFFORD CHANCE du 7 juin 2022, n° 65, p. 32.
[299]    **Rôle n° TAL-2022-07361,** conclusions de CLIFFORD CHANCE du 7 juin 2022, n° 60, p. 30.
[300]    P. VAN OMMESLAGHE, *De Page. Traité de droit civil belge, Tome II, Les obligations*, Bruylant, 2013, n° 302, p. 463.

*ou par une norme impérative*[301] »[302]. Dans le cas présent, il est évident que par leur assignation du 27 juin 2022, les Demanderesses n'invoquent pas l'existence d'une fraude à la loi en droit international privé, puisqu'elles ne fondent pas leur demande sur une utilisation artificielle des règles de conflits de lois. Les considérations des parties défenderesses sub 11) à sub 13) sont donc hors propos, puisque la fraude à la loi en droit interne sera forcément toisée à l'aune du droit luxembourgeois.

242.    En deuxième lieu, il faut relever le fait que la distinction entre fraude à la loi et fraude aux droits des tiers est généralement considérée comme étant peu aisée, tant la démarcation entre ces deux concepts peut paraître artificielle et imprécise[303]. Sa réalité et son utilité sont d'ailleurs très fréquemment remises en question[304]. Quoi qu'il en soit, il y a néanmoins lieu d'examiner ces notions pour répondre aux arguments des parties défenderesses sub 11) à sub 13).

243.    Contrairement à l'affirmation faite par les parties défenderesses sub 11) à sub 13)[305], la présente action au fond initiée par les Demanderesses se fonde, à tout le moins en partie, sur une fraude à la loi luxembourgeoise ayant conduit à la vente des actions de l'AC MILAN et ayant eu pour conséquence ultime une fraude aux intérêts patrimoniaux des Défenderesses.

Il ressort en effet des développements ci-avant que, sous le couvert de procédés juridiques paraissant licites mais étant en réalité artificiels, PROJECT REDBLACK et ses gérants de classe A sont, par des agissements frauduleux, parvenus à une situation violant une série de prescriptions légales impératives, voire d'ordre public, du droit luxembourgeois des sociétés qui se seraient autrement appliquées à PROJECT REDBLACK, une société établie et ayant son siège social au Luxembourg.

244.    On peut en effet relever :

(i)    En essayant faire croire que les décisions prises en son sein et ayant conduit à divers actes, comme la mainlevée du Gage italien et la vente des actions de l'AC MILAN sont conformes aux dispositions statutaires et respectent le prescrit de l'article 710-15 de la loi du 10 août 1915 concernant les sociétés commerciales, telle que modifiée (la « **Loi de 1915** »), PROJECT REDBLACK et ses gérants de classe A ont par cela violé les articles 13 et 16 des statuts de cette société et par conséquent l'article 1134, alinéa 3 du Code civil, selon lequel les conventions, telles que les statuts, doivent être exécutées de bonne foi.

(ii)    Plus parlant encore, comme la vente de l'AC MILAN doit conduire irrémédiablement à la liquidation volontaire de ROSSONERI SPORT et par conséquent, celle de PROJECT REDBLACK, puisque le but pour lequel ces sociétés ont été créées n'existe plus à la suite de la vente des actions de l'AC MILAN, il était impératif que <u>préalablement</u> à toutes les transactions liées de près ou de loin à cette cession (comme la mainlevée du Gage italien) et indépendamment des exigences posées par les articles 13 et 16 des statuts de PROJECT REDBLACK, l'assentiment de tous les associés de ROSSONERI SPORT et PROJECT REDBLACK ait été recueilli, [306] en application du principe bien établi en droit des société

---

[301]    P. VAN OMMESLAGHE, *op. cit.*, n° 300, p. 460.
[302]    Cass. (be.), 16 novembre 2015, *Pas. be.*, 2015, n°679.
[303]    P. DE VAREILLES-SOMMIÈRES, *Répertoire de droit international*, v° "Fraude à la loi", Dalloz, décembre 1998, n° 2; C. PEDAMON, « Theory of fraud in French law: fraus omnia corrumpit – old law, new opportunities? », in X. *Research Handbook on International Financial Crimes*, Edward Elgar Publishing Ltd, 2015, p. 349; P. VAN OMMESLAGHE, *op. cit.*, n° 300, p. 460.
[304]    J. GHESTIN et H. BARBIER, *Traité de droit civil*, 5ᵉ ed., t. II, n° 701, L.G.D.J., 2020, pp. 550 et 551.
[305]    **Rôle n° TAL-2022-07361**, conclusions de CLIFFORD CHANCE du 7 juin 2022, n° 63, p. 32.
[306]    Cass. fr. comm., 13 mars 2024, arrêt n° 122 FS-B, pourvoi n° R 22-13.764.

selon lequel la décision de dissoudre une société doit recueillir l'unanimité de ses associés en vertu de l'article 1134, alinéa 2 du Code civil, lequel les conventions « ne peuvent être révoquées que de leur consentement mutuel, ou pour les causes que la loi autorise »[307]. Il est en effet incontestable que tant PROJECT REDBLACK et ROSSONERI SPORT (dont les noms sont évocateurs et sont intimement liés au club de football « AC MILAN ») étaient des véhicules dédiés (*special purpose vehicles*) constitués uniquement pour les besoins du financement, de l'acquisition, du développement et de la vente de l'AC MILAN. Une fois les actions de cette société cédées et le prix payé, il ne restait plus à ROSSONERI SPORT de rembourser ses dettes envers PROJECT REDBLACK et à cette dernière d'effectuer les distributions dues au titre des TPECs. Une fois ces opérations effectuées, plus rien ne justifiait le maintien de ces véhicules, qui avaient perdu leur but et leur raison d'être, et selon le cours normal des choses dans le domaine de l'investissement, devaient alors tirer leur révérence.

245.    À titre subsidiaire, si Votre Tribunal devait retenir la fraude telle que décrite dans l'assignation du 27 juin 2022 n'inclut pas de fraude à la loi en droit interne, *quod non*, elle serait constitutive d'une fraude aux droits des tiers fondée sur la maxime « *fraus omnia corrumpit* » et incluant les cas de fraudes à des dispositions contractuelles[308]. Une telle fraude implique généralement la violation frauduleuse d'une règle (par exemple, une disposition contractuelle ou une norme générale de bon comportement par référence au bon père de famille), laquelle pourrait porter atteinte aux droits d'autrui[309].

246.    En cas de fraude aux droits des tiers, le juge saisi doit toiser l'application de la maxime « *fraus omnia corrumpit* » à divers comportements. Dans un tel cas de figure, peu importe si les comportements frauduleux ont pu avoir lieu au Luxembourg ou à l'étranger. En effet, puisque les droits protégés par la maxime sont soumis au droit luxembourgeois, le juge luxembourgeois ne peut appréhender la fraude qu'en vertu de la loi luxembourgeoise pour déterminer si la partie qui demande réparation a le droit d'agir sur cette base[310].

247.    Il faut en effet rappeler que la fraude dont il est question dans cette affaire viole des droits contractuels, en ce qu'elle a conduit à :

(i)      la violation des dispositions statutaires de PROJECT REDBLACK, dont les articles 13 et 16, lesquelles sont du ressort du droit luxembourgeois en tant que *lex societatis*, comme spécifié à l'article 1er (2), f) du Règlement Rome I ; et

(ii)     la violation des règles contenues dans les conditions générales des TPECs de classe A-2 et de classe B, lesquelles désignent expressément la loi luxembourgeoise comme étant la loi applicable à ces obligations contractuelles[311], cette clause étant valable au regard de la 3 (1) du Règlement Rome I.

Les intérêts protégés étant tous soumis au droit luxembourgeois, l'utilisation de la seule loi luxembourgeoise par le juge pour constater l'existence d'une fraude s'impose. Une telle position est d'ailleurs confirmée par la jurisprudence de la Cour de Justice de l'Union européenne qui, en

---

[307]   A. STEICHEN, *op. cit.*, ° 626, p. 473.
[308]   C. PEDAMON, *op. cit.*, p. 345.
[309]   P. DE VAREILLES-SOMMIÈRES, *Répertoire de droit international, op. cit.*, pp. 349 et s.; P. VAN OMMESLAGHE, *op. cit.*, n° 309, p. 484.
[310]   M.-A. ANCEL, P. DEUMIER et M. LAAZOUZI, *Droit des contrats internationaux*, 2e éd., *Lefebvre Dalloz*, 2020, n° 308, pp. 260 et 261.
[311]   **Rôle n° TAL-2022-07361, pièce n° 36 de la farde II de MOLITOR**, précitée, article 11.1.

examinant une question en matière de compétence, a expressément confirmé qu'une action paulienne (un des cas d'application de la théorie de la fraude) intentée par un créancier sur base de droits qu'il tire d'un contrat relève de la matière contractuelle[312]. L'application du droit luxembourgeois en vertu du Règlement Rome I, applicable aux obligations contractuelles, est donc correcte.

248.    Il ressort de ces règles que l'application de la loi de l'État de New-York, que les parties défenderesses sub 11) à sub 13) proposent comme loi applicable au SPA est à écarter : il est en effet difficile de comprendre comment la question de l'existence et des conséquences de la violation de droits luxembourgeois en raison d'une fraude devrait être toisée à l'aune du droit étranger. L'application du droit de l'État de New-York est d'autant plus incongrue que le droit luxembourgeois dispose sans aucun conteste d'un certain nombre de mécanismes modulant les effets de la fraude, comme la protection des tiers de bonne foi et les correctifs à la remise dans le pristin état en cas d'annulation. Les parties au SPA disposent donc de solides garanties en droit luxembourgeois visant à préserver ce qui doit l'être dans le cas d'une action basée sur la fraude sans avoir besoin de recourir au droit de l'État de New-York pour ce faire. De plus, à essayer de suivre l'argument présenté les parties défenderesses sub 11) à sub 13), celles-ci ne justifient pas en quoi seule la loi de l'État de New-York devrait être retenue, alors que les comportements reprochés par les Demanderesses dans l'assignation du 27 juin 2022 et procédant de la fraude à la loi luxembourgeoise sont multiples et peuvent être rattachés à diverses juridictions, dont le Luxembourg.

## F. DEMANDE RECONVENTIONNELLE ET INCIDENTE DE PROJECT REDBLACK ET ROSSONERI SPORT

249.    Dans leurs conclusions du 31 octobre 2022, les parties assignées sub 9) et 10) présentent, avant toute défense sur la recevabilité ou le fond, (i) une demande reconventionnelle en dommages et intérêts contre PROJECT REDBLACK et ROSSONERI SPORT pour procédure abusive et vexatoire et pour « *comportement systématiquement et délibérément fautif, abusif et préjudiciable* » et (ii) une demande incidente contre Monsieur CASLINI pour « faute (grave) de gestion, violation manifeste de son devoir de loyauté et de ses « obligations fiduciaires » vis-à-vis de PROJECT REDBLACK et violation de ses obligations en matière de conflits d'intérêts »[313].

250.    En particulier, PROJECT REDBLACK et ROSSONERI SPORT demandent (i) le paiement de dommages et intérêts pour les coût de transaction encourus à cause de ce qu'ils qualifient d'« *actions d'obstruction et de harcèlement* » menées par BLUE SKYE LUX et LIC 159, (ii) le remboursement de tous les *management fees* versés à BLUE SKYE LUX au titre des TPECs de classe A-2 et la déchéance de BLUE SKYE LUX de son droit à recevoir le *carried interest* lié à ces instruments financiers, du fait de sa prétendue tentative de saborder la vente des actions de l'AC MILAN, qu'elles qualifient de détournement de pouvoir et (iii) à titre subsidiaire, l'annulation des TPECs de classe A-2 et la remise des parties dans leur pristin état, en raison d'une prétendue inexécution flagrante par BLUE SKYE LUX de ses obligations au titre de ces instruments[314].

---

[312]    CJUE, 4 octobre 2018, *Feniks Sp. z o.o. contre Azteca Products & Services SL.*, n° C-337/17, paragraphes 43, 44 et 50.

[313]    **Rôle n° TAL-2022-07361**, conclusions d'ELVINGER HOSS PRUSSEN du 31 octobre 2022, n° 1, p. 5.

[314]    **Rôle n° TAL-2022-07361**, conclusions d'ELVINGER HOSS PRUSSEN du 31 octobre 2022, n° 25 et s., pp. 16 et s.

251.    Comme développé ci-avant, il y a lieu de rejeter l'ensemble des moyens d'irrecevabilité soulevés par les parties défenderesses de sorte que les parties doivent désormais conclure sur le fond.

252.    Dans ces circonstances, les demandes reconventionnelles formulées par PROJECT REDBLACK et ROSSONERI SPORT, auxquelles BLUE SKYE LUX et LIC 159 s'opposent, sont à réserver au jugement à intervenir sur le fond de la présente.

253.    Si par impossible Votre Tribunal venait faire suite aux moyens d'irrecevabilité soulevés par les parties défenderesses, BLUE SKYE LUX et LIC 159 s'opposent aux demandes faites par PROJECT REDBLACK et ROSSONERI SPORT, alors qu'aucune faute ne saurait être retenue dans le chef des Demanderesses.

254.    Il convient en effet de rappeler que le droit d'agir en justice pour être entendu par le juge sur le fond d'une contestation constitue un droit fondamental dont l'exercice n'est susceptible d'engager la responsabilité de son auteur qu'en présence d'un abus résultant d'une intention malveillante, d'une erreur grossière équipollente au dol ou d'une légèreté blâmable[315].

255.    Il convient encore de souligner que comme amplement décrit dans les faits repris ci-avant, lesquels sont corroborés par un nombre considérable d'éléments factuels objectifs, BLUE SKYE LUX et LIC 159 ont agi de bonne foi afin de préserver les droits légitimes qui ont été bafoués par le groupe ELLIOTT et ses exécutants, dont PROJECT REDBLACK et ROSSONERI SPORT, de sorte que les démarches judiciaires que BLUE SKYE LUX et LIC 159 ont initiées ne peuvent conduire à leur condamnation à verser des dommages et intérêts à PROJECT REDBLACK et ROSSONERI SPORT. De plus, les allégations de PROJECT REDBLACK et ROSSONERI SPORT pour justifier l'annulation des versements effectués à BLUE SKYE LUX et la déchéance de leur droit à recevoir d'autres sommes au titre des TPECs de classe A-2 et, à titre subsidiaire, l'annulation de ces instruments financiers, sont aussi farfelues que formulées de mauvaise foi. Comme déjà étayé, le groupe BLUE SKYE a, par son travail, grandement contribué à faire fructifier les affaires de l'AC MILAN et a tout fait pour développer sa valeur, ce qui a bénéficié à tous les détenteurs de TPECs de classe A et de classe B, dont GENIO et KING GEORGE au titre de leurs TPECs de classe A-1. Les actions intentées par BLUE SKYE et LIC 159 dans le cadre de la présente affaire visent notamment à éviter que la vente des actions de l'AC MILAN en violation des statuts de PROJECT REDBLACK n'ait donné lieu au paiement d'un prix bien inférieur à ce qu'il aurait dû être. Il est dès lors bien difficile pour PROJECT REDBLACK et ROSSONERI SPORT de pouvoir soutenir que ces démarches avaient pour but de porter atteinte à la valeur des actions de l'AC MILAN alors que les faits montrent que c'est en réalité tout le contraire.

256.    Il y a partant lieu de rejeter l'entièreté des demandes reconventionnelles formulées par PROJECT REDBLACK et ROSSONERI SPORT à l'encontre de BLUE SKYE LUX et LIC 159 telles que formulées dans les conclusions notifiées par ELVINGER HOSS PRUSSEN le 31 octobre 2022.

---

[315]    Cour d'appel, 19 janvier 2023, *op. cit.*

### G.  DEMANDE RECONVENTIONNELLE DE GENIO, KING GEORGE ET ELLIOTT UK POUR PROCÉDURE ABUSIVE ET VEXATOIRE

257.    GENIO, KING GEORGE et ELLIOTT UK demandent la condamnation de BLUE SKYE LUX et LIC 159 au paiement de dommages et intérêts d''un montant évalué provisoirement à 1.000.000 euros pour procédure abusive et vexatoire sur base des dispositions des articles 6-1, 1382 et 1383 du Code civil[316].

258.    GENIO, KING GEORGE et ELLIOTT UK précisent que leur présente demande reconventionnelle est à réserver pour être toisée avec le jugement au fond dans le cas où la présente action ne devait pas être déclarée irrecevable[317].

259.    Comme développé ci-avant, il y a lieu de rejeter l'ensemble des moyens d'irrecevabilité soulevés par les parties défenderesses de sorte que les parties doivent désormais conclure sur le fond.

260.    Dans ces circonstances, les demandes en dommages et intérêts pour procédure abusive et vexatoire de GENIO, KING GEORGE et ELLIOTT UK, auxquelles BLUE SKYE LUX et LIC 159 s'opposent, sont à réserver au jugement à intervenir sur le fond de la présente.

261.    Si par impossible Votre Tribunal venait faire suite aux moyens d'irrecevabilité soulevés par les parties défenderesses, BLUE SKYE LUX et LIC 159 s'opposent à la demande en condamnation faite par GENIO, KING GEORGE et ELLIOTT UK en paiement de dommages et intérêts pour procédure abusive et vexatoire, alors qu'aucune faute ne saurait être retenue dans le chef des Demanderesses.

262.    En effet, le droit d'agir en justice pour être entendu par le juge sur le fond d'une contestation constitue un droit fondamental dont l'exercice n'est susceptible d'engager la responsabilité de son auteur qu'en présence d'un abus résultant d'une intention malveillante, d'une erreur grossière équipollente au dol ou d'une légèreté blâmable[318].

263.    GENIO, KING GERGOE et ELLIOTT UK justifient leur demande au motif que BLUE SKYE LUX et LIC 159 auraient agi avec une intention malveillante tant au niveau factuel, alors que les faits avancés dans leur assignation du 27 juin 2022 ne seraient que pures allégations[319], qu'au niveau juridique, alors que la présente action serait irrecevable et aurait pour but d'imposer par la force la volonté d'investisseurs minoritaires[320].

264.    Les développements de l'assignation du 27 juin 2022 ont été confirmés point par point par les faits décrits par les présentes, ce qui renforce encore la version des faits telle que présentée par BLUE SKYE LUX et LIC 159. Partant, les demandes de BLUE SKYE LUX et LIC 159 sont parfaitement fondées et justifiées, ces dernières ayant dû introduire la présente action en raison du seul comportement frauduleux des parties défenderesses.

265.    Il y a partant lieu de rejeter la demande de GENIO, KING GERGE et ELLIOTT UK en condamnation de BLUE SKYE LUX et LIC 159 au paiement de dommages et intérêts pour procédure abusive et vexatoire sur le fondement des articles 6-1, 1382 et 1383 du Code civil.

---

[316]    **Rôle n° TAL-2022-07361,** conclusions de CLIFFORD CHANCE du 7 juin 2022, n° 77 et s, pp. 37 et s.
[317]    **Rôle n° TAL-2022-07361,** conclusions de CLIFFORD CHANCE du 7 juin 2022, n° 81, p.40
[318]    Cour d'appel, 19 janvier 2023, *op. cit.*
[319]    **Rôle n° TAL-2022-07361,** conclusions de CLIFFORD CHANCE du 7 juin 2022, n° 78 et s., pp.37 et s.
[320]    **Rôle n° TAL-2022-07361,** conclusions de CLIFFORD CHANCE du 7 juin 2022, n° 80 et s., pp. 39 et s.

### H. QUANT A LA REQUÊTE EN INTERVENTION VOLONTAIRE DE LEXINGTON

266.    Par requête du 9 février 2023, LEXINGTON a entendu intervenir volontairement à l'instance « *à titre* purement *conservatoire*[321] » dans le cadre de l'action pour fraude.

267.    Les arguments développés dans l'action déclaratoire par rapport au défaut de qualité et d'intérêt à agir dans le chef de LEXINGTON sont repris ici, en ce que LEXINGTON n'est pas créancière de BLUE SKYE LUX et qu'elle ne semble à toute évidence plus détenir les TPECs de classe B et être en cette qualité créancière de LIC 159[322]. Par conséquent, les demandes de LEXINGTON devraient être déclarées irrecevables, faute pour cette dernière de pouvoir établir sa qualité et son intérêt à agir.

268.    De plus, il convient de relever que par le biais de l'intervention conservatoire, le tiers *« intervient à titre conservatoire, pour préserver* ses *intérêts, en se joignant à la partie à laquelle ses intérêts sont liés. Il prend fait et cause pour cette partie et la soutient en ses arguments, mais sans solliciter un avantage personnel*[323] » (nous soulignons).


        Or, si en première partie de ses développements LEXINGTON prend fait et cause pour PROJECT REDBLACK et ROSSONERI SPORT[324], en deuxième partie de ses développements, elle conclut au rejet des demandes reconventionnelles formulées par PROJECT REDBLACK et ROSSONERI en condamnation de BLUE SKYE au remboursement entre les mains de PROJECT REDBLACK des *managements fees*, évaluées au montant de 16,5 millions d'euros au motif que « *toute condamnation pécuniaire de BLUE SKYE et/ou LIC 159 engendrerait un préjudice dans le chef de LEXINGTON, dans la mesure où il lui deviendrait impossible de percevoir la somme totale devant lui revenir sous les TPECs LEXINGTON* [les TPECs de classe E-1] *si la situation financière de BLUE SKYE et/ou LIC 159 devait se dégrader, notamment du fait de la diminution des actifs*[325] ».

269.    Il faut donc constater que LEXINGTON prétend agir au soutien des intérêts de PROJECT REDBLACK et de ROSSONERI SPORT quand ceci arrange également ses intérêts, et, inversement, s'oppose aux demandes de ces deux entités lorsqu'elles viennent contrarier ses intérêts et lui procurer un désavantage. Par conséquent, la présente intervention volontaire de LEXINGTON au rôle n° TAL-2022-07361 est partant à déclarer irrecevable alors que LEXINGTON reste en défaut de prendre fait et cause pour les parties auxquelles elle lie ses intérêts, à savoir PROJECT REBLACK et ROSSONERI, et que par la même, elle sollicite et poursuit, sans même le dissimuler, un avantage personnel.

270.    Si par impossible Votre Tribunal, venait à requalifier la présente intervention conservatoire en intervention active – *quod non* –, l'intervention volontaire de LEXINGTON à la procédure serait en tout état de cause à déclarer irrecevable alors que par le biais d'une intervention active, même si la partie tierce intervenante peut faire valoir ses propres droits, elle reste tenue de prendre fait et cause pour le défendeur principal[326], ce que LEXINGTON reste en défaut de faire dans sa requête en intervention volontaire du 9 février 2023, puisqu'elle sert uniquement ses seuls intérêts.

---

[321]    Requête en intervention volontaire du 9 février 2023, n° 50, p. 24
[322]    Voir *supra*, paragraphe 125.
[323]    Cour d'appel, 7 mai 2008, n° 31679 du rôle ; T. HOSCHEIT, *op. cit.*, n° 1139, p. 641.
[324]    Requête en intervention volontaire du 9 février 2023, n° 45 et s., pp. 23 et s.
[325]    Requête en intervention volontaire du 9 février 2023, n° 51 et s., p. 25
[326]    T. HOSCHEIT, *op. cit.*, n° 1139, p. 641

### I.     DÉSISTEMENTS D'INSTANCE

271.   Par acte d'avocat à avocat du 22 septembre 2025[327], les Demanderesses ont notifié à MILAN ENTERTAINEMENT et MILAN REAL ESTATE se désister purement et simplement de l'instance pendante devant Votre Tribunal sous le numéro de rôle TAL-2022-07361.

272.   Les Demanderesses demandent partant à Votre Tribunal de prendre acte de son désistement pure et simple d'instance pendante devant Votre Tribunal sous le numéro de rôle TAL-2022-07361, précision faite que lesdits désistements d'instance portent limitativement sur les demandes introduites par BLUE SKYE LUX et LIC 159 à l'encontre de MILAN ENTERTAINMENT et MILAN REAL ESTATE au titre du prédit exploit de l'huissier Guy ENGEL du 27 juin 2022.

### J. QUANT AUX DEMANDES EN INDEMNITÉ DE PROCÉDURE

273.   Dans leurs divers corps de conclusions, les parties défenderesses demandent que BLUE SKYE et LIC 159 soient condamnées au paiement d'une indemnité de procédure ainsi qu'aux frais et dépens de l'instance.

274.   Comme développé ci-avant, il y a lieu de rejeter l'ensemble des moyens d'irrecevabilité soulevés par les parties défenderesses, de sorte que les parties doivent désormais conclure sur le fond.

275.   Dans ces circonstances, les demandes en indemnité de procédure des parties défenderesses, auxquelles BLUE SKYE et LIC 159 s'opposent, sont à réserver au jugement à intervenir sur le fond de la présente.

276.   Il en va de même pour les demandes de BLUE SKYE LUX et LIC 159 en condamnation des parties défenderesses sub 1 à sub 7) et sub 9) à 13) solidairement, sinon *in solidum*, sinon chacune pour le tout au paiement d'une indemnité de procédure en vertu de l'article 240 du NCPC à chacune des Demanderesses prise individuellement, évaluée à 50.000 euros en raison des sommes par elles exposées et non comprises dans les dépens alors qu'il serait inéquitable de leur laisser à leur unique charge, la présente procédure ayant été initiée du seul fait de la fraude mise en place par les parties défenderesses sub 1 à sub 7) et sub 9) à sub 13).

277.   Si, par impossible, Votre Tribunal venait à faire suite aux moyens d'irrecevabilité soulevés par les parties défenderesses, BLUE SKYE LUX et LIC 159 s'opposent à ces demandes, alors qu'il ressort à suffisance des développements ci-avant que l'équité ne les justifie aucunement, et que la présente procédure a dû être initiée par les Demanderesses en raison du seul comportement frauduleux des parties défenderesses.

278.   Pour cette raison, il y aurait donc lieu de faire droit à la demande de BLUE SKYE LUX et LIC 159 en condamnation des parties défenderesses sub 1 à 7) et sub 9) à 13) solidairement, sinon *in solidum*, sinon chacune pour le tout, au paiement d'une indemnité de procédure en vertu de l'article 240 du NCPC à chacune des Demanderesses prise individuellement, évaluée à 100.000 euros en raison des sommes par elles exposées et non comprises dans les dépens alors qu'il serait inéquitable de leur laisser à leur unique charge, la présente procédure ayant été initiée du seul frais de la fraude mise en place par les parties défenderesses sub 1) à sub 7) et sub 9) à sub 13).

---

[327]   **Rôle n° TAL-2022-07361, pièce n° 98 de la farde III de MOLITOR** – précitée ; **rôle n° TAL-2022-07355, pièce n° 98 de la farde III de MOLITOR** – précitée ; **rôle n° TAL-2023-04206, pièce n° 98 de la farde III de MOLITOR** – précitée.

279.   BLUE SKYE LUX et LIC 159 se réservent expressément le droit de majorer cette demande en cours d'instance.

280.   Pour ce qui est des demandes en condamnation de MILAN ENTERTAINMENT et MILAN REAL ESTATE, elles sont à rejeter pour être sans objet en raison des désistements d'instance intervenus.

281.   Quant à la demande en condamnation de MILAN ENTERTAINMENT et MILAN REAL ESTATE au paiement à une indemnité de procédure sur base de l'article 240 du NCPC, elle est, en tout état de cause, à rejeter en ce qu'elle précise expressément couvrir « les frais d'avocats que les parties concluantes ont dû exposer s'agissant d'une procédure dans laquelle le ministère d'avocat à la Cou est obligatoire »[328], frais d'avocats déjà couverts par sa demande en condamnation au paiement de dommage et intérêts résultant de leurs frais et honoraires d'avocat sur base de l'article 1382 du Code civil[329].

282.   Une condamnation des Demanderesses en paiement des frais et honoraires d'avocat de MILAN ENTERAINMENT et MILAN REAL ESTATE à la fois au titre de l'article 240 du NCPC et de l'article 1382 du Code civil reviendrait en effet, à « couvrir à deux fois la même dépense et ainsi donner lieu à un gain indu[330] ».

### K.   QUANT AUX HONORAIRES D'AVOCAT

283.   Monsieur CRACA[331,] AC MILAN, MILAN ENTERTAINMENT et MILAN REAL ESTATE[332] demandent la condamnation de BLUE SKYE et LIC 159 au paiement de dommages et intérêts résultant de leurs frais et honoraires d'avocat sur base des dispositions de l'article 1382 du Code civil.

284.   Les demandes de MILAN ENTERTAINMENT et MILAN REAL ESTATE sont à rejeter pour être sans objet en raison des désistements d'instance intervenus.

285.   En tout état de cause, et comme développé ci-avant, il y a lieu de rejeter l'ensemble des moyens d'irrecevabilité soulevés par les parties défenderesses de sorte que les parties doivent désormais conclure sur le fond.

286.   Si, par impossible, Votre Tribunal venait faire suite aux moyens d'irrecevabilité soulevés par Monsieur CRACA, AC MILAN, MILAN ENTERAINMENT et MILAN REAL ESTATE, BLUE SKYE LUX et LIC 159 s'opposent à la demande en condamnation de ces derniers au paiement de leurs honoraires d'avocat alors qu'aucune faute ne serait être retenue dans le chef des Demanderesses.

287.   En effet, le droit d'agir en justice pour être entendu par le juge sur le fond d'une contestation constitue un droit fondamental dont l'exercice n'est susceptible d'engager la responsabilité de son auteur qu'en présence d'un abus résultant d'une intention malveillante, d'une erreur grossière équipollente au dol ou d'une légèreté blâmable[333].

---

[328]   **Rôle n° TAL-2022-07361,** conclusions de Maître Bertrand CHRISTMANN du 11 avril 2023, p. 8
[329]   **Rôle n° TAL-2022-07361,** conclusions de Maître Bertrand CHRISTMANN du 11 avril 2023, pp. 8 et s.
[330]   T. HOSCHEIT, *op. cit.*, n° 1215, p. 674
[331]   **Rôle n° TAL-2022-07361,** conclusions s de Maître Bertrand CHRISTMANN du 11 avril 2023, p. 4.
[332]   **Rôle n° TAL-2022-07361,** conclusions de Maître Bertrand CHRISTMANN du 25 septembre 2023, pp. 8 et s.
[333]   Cour d'appel, 19 janvier 2023, *op. cit.*

288. Monsieur CRACA, AC MILAN, MILAN ENTERAINMENT et MILAN REAL ESTATE restent en défaut d'établir une telle faute dans le chef des Demanderesses, ces dernières ayant dû introduire la présente en raison du seul comportement frauduleux des parties défenderesses. Il y a dès lors lieu de rejeter les demandes de Monsieur CRACA, AC MILAN, MILAN ENTERAINMENT et MILAN REAL ESTATE en condamnation des Demanderesses au paiement de leurs honoraires d'avocat sur le fondement de l'article 1382 du Code civil.

289. BLUE SKYE et LIC 159 s'opposent à cette demande, et relèvent notamment qu'il n'entre pas dans les compétences du juge de la mise en état de trancher des demandes portant condamnation à des dommages et intérêts sur base de l'article 1382 du Code civil, cette compétence relevant du fond de l'affaire et n'étant partant pas visée par l'article 212 du NCPC.

290. En revanche, il résulte des considérations de fait et de droit ci-avant développées que BLUE SKYE LUX et LIC 159 sont fondées à demander condamnation des parties défenderesses sub 1) à sub 7) et sub 9) à sub 13) au remboursement des frais et honoraires d'avocat par elles exposées dans le cadre de la présente procédure, alors que depuis un arrêt de la Cour de cassation du 9 février 2012, il est désormais acquis que les honoraires d'avocats peuvent être constitutifs d'un préjudice réparable[334].

291. Cette demande peut être cumulée avec une demande en condamnation fondée sur l'article 240 du NCPC, sous condition d'établir les éléments conditionnant une telle indemnisation, à savoir une faute, un préjudice et une relation causale entre la faute et le préjudice :

    « La circonstance que l'article 240 du Nouveau Code de procédure civile permet au juge, sur le fondement de l'équité, d'allouer à une partie un certain montant au titre des sommes non comprises dans les dépens, dont les honoraires d'avocat, n'empêche pas une partie de réclamer ces honoraires au titre de réparation de son préjudice sur base de la responsabilité contractuelle ou délictuelle, à condition d'établir les éléments conditionnant une telle indemnisation, à savoir une faute, un préjudice et une relation causale entre la faute et le préjudice (cf. Jurisclasseur Proc. civ. fasc. 524, nos 6 et suivants)[335] ».

292. La doctrine retient que :

    « Un principe de droit incoercible est que le préjudice résultant d'une faute, quelle qu'elle soit, doit être réparé par l'auteur de la faute et cette réparation doit être totale. Or, les frais de défense constituent à l'évidence un dommage réparable et l'indemnisation de la victime ne sera pas totale si elle est amputée de ces frais de défense ou s'il en a coûté au justiciable de faire reconnaître son droit. Le droit à la réparation intégrale du dommage justifie la répétibilité des frais de défense, dont les honoraires d'avocat (Devoirs et Prérogatives de l'Avocat, Cléo Leclercq, éd. 1999, n° 76) (cf. Trib. arr. XI, 25 mars 2004, SES/Whitehead, n° du rôle 64 095) »[336].

293. Il ressort des faits ci-avant exposés que les parties défenderesses sub 1) à 7) et sub 9 à 13) ont toutes participé à la fraude ourdie à l'encontre des parties demanderesses, obligeant celles-ci à saisir Votre Tribunal pour faire reconnaître leurs droits.

294. En vertu du principe de réparation intégrale, les Demanderesses ont droit au remboursement des frais d'avocat exposés pour faire reconnaître leurs droits.

---

[334]    Cour d'appel, 9 février 2012, JTL, n° 20, 2012, p. 190.
[335]    Cour d'appel, 5 décembre 2018, *Pas.*, 39, p. 287.
[336]    Cour d'appel, 4 janvier 2012, *Pas.*, 35, p. 848.

295.   Les Demanderesses sont dès lors fondés à réclamer la condamnation des parties défenderesses sub 1) à 7) et sub 9) à 13) solidairement, sinon *in solidum*, sinon chacune pour sa part, à leur payer à chacune prise individuellement, la somme de 100.000 euros au titre des frais et honoraires d'avocat par elles exposées sur le fondement des articles 1382 ou 1383 du Code civil.

296.   Les Demanderesses se réservent expressément le droit de majorer cette demande en cours d'instance.

### III.    TAL-2023-04206 : Action en responsabilité civile contre Messieurs CERCHIONE, D'AVANZO et CASLINI

297.   Monsieur CERCHIONE et Monsieur D'AVANZO soulèvent in limine litis, avant tout moyen de défense au fond, et à titre principal, la nullité, sinon l'irrecevabilité de l'acte introductif d'instance qui leur a été signifié le 2 mars 2023 à la requête de PROJECT REDBLACK et ROSSONERI SPORT, du fait du libellé obscur dudit acte introductif (*exceptio obscuri libelli*), en contravention de l'article 154 du Nouveau Code de procédure civile (**A**).

Monsieur CERCHIONE et Monsieur D'AVANZO prendront subsidiairement position, au cas où l'exploit introductif d'instance ne serait pas affecté de nullité pour libellé obscur, sur la recevabilité des demandes de PROJECT REDBLACK et ROSSONERI SPORT (**B**).

298.   Monsieur CERCHIONE et Monsieur D'AVANZO ne prendront position sur le fond du présent litige qu'ultérieurement, et seulement si, par impossible, l'assignation de PROJECT REDBLACK et ROSSONERI SPORT était déclarée recevable et que Votre Tribunal acceptait de toiser le fond de l'affaire.

299.   Monsieur CERCHIONE et Monsieur D'AVANZO formuleront à titre reconventionnel une demande en dommage et intérêts pour procédure abusive et vexatoire (**C**).

300.   Suivront ensuite des explications quant aux indemnités de procédure sollicitées par Monsieur CERCHIONE et Monsieur D'AVANZO.

### A.    *IN LIMINE LITIS, À TITRE PRINCIPAL, NULLITÉ, SINON IRRECEVABILITÉ DE L'ASSIGNATION POUR LIBELLÉ OBSCUR*

301.   Au titre des exigences de forme qu'impose l'article 154 du NCPC pour la validité d'une assignation, cette disposition prévoit notamment que « *l'assignation doit contenir :*
*1) l'objet et un exposé sommaire des moyens, […] à peine de nullité* ».

302.   L'état de la jurisprudence concernant l'exception de libellé obscur se résume comme suit (nous soulignons) :

« *Si l'exposé des moyens peut être sommaire, il doit néanmoins être suffisamment **précis** pour mettre le juge en mesure de déterminer le fondement juridique de la demande, pour ne pas laisser le défendeur se méprendre sur l'objet de celle-ci et pour lui permettre le choix des moyens de défense appropriés.*

*Dans la même mesure, **l'objet de la demande doit être précisé** de telle façon qu'elle permette au défendeur d'en apprécier la portée et de savoir précisément ce qu'on lui demande et sur quelle qualité, quel titre, quels motifs le demandeur se fonde.*

*En effet, le **libellé de la prétention** formulée à l'encontre de l'adversaire doit être énoncé de façon **explicite** en vue de **déterminer** et **délimiter** l'objet initial du litige permettant ainsi non seulement à la partie défenderesse d'élaborer ses moyens de défense en connaissance de cause, mais encore au tribunal de connaître exactement le litige dont il est saisi pour qu'il puisse se prononcer sur le fond.*

*L'exigence de clarté comporte l'obligation pour le demandeur d'**exposer les faits** qui se trouvent à la base du litige de manière **intelligible**, c'est-à-dire qu'ils doivent être **structurés** de telle façon à ce qu'ils ne prêtent **pas à équivoque**.*

*Il n'est pas nécessaire, pour satisfaire aux exigences de l'article 154 précité du Nouveau Code de procédure civile, d'indiquer le texte de loi sur lequel est basée l'action, c'est-à-dire de qualifier juridiquement la demande.*

*Il est néanmoins indispensable que l'exploit soit rédigé de telle façon que les textes visés s'en dégagent, du moins implicitement »* [337].

303.  Clarté, précision, intelligibilité, sens univoque, caractère explicite, absence d'ambiguïté sont les qualités que doit revêtir un acte introductif d'instance.

De telles exigences ont pour logique de permettre au défendeur de choisir les moyens de défense appropriés pour répondre à la demande formulée par la partie adverse.

304.  La règle de l'immutabilité du litige interdira au demandeur de couvrir l'irrégularité par des conclusions ultérieures ou par référence à des actes antérieurs[338].

305.  Force est de reconnaître que l'assignation signifiée à Monsieur CERCHIONE et Monsieur D'AVANZO ne satisfait pas aux exigences posées par l'article 154 du NCPC pour les raisons ci-après exposées.

## 1.    Méconnaissance par l'assignation des exigences posées par l'article 154 du Nouveau Code de procédure civile

306.  Tant la forme de l'assignation, que l'« objet » de la demande ainsi que « l'exposé sommaire des moyens » sont confus et font preuve d'un manque évident de cohérence et de clarté.

### 1.1    Quant aux obscurités et incohérences de la forme même de l'acte introductif d'instance

307.  L'assignation du 2 mars 2023 précise d'abord être une assignation. Or, PROJECT REDBLACK et ROSSONERI SPORT, dans leurs développements, ne cessent de renvoyer à l'assignation du 27 juin 2022 portant le numéro de rôle TAL-2022-07361 et initiée par BLUE SKYE LUX et LIC159, assignation qu'elles ne versent pourtant pas à la présente procédure.

---

[337]   TAL, 17 novembre 2022, n° TAL-2020-04008 et TAL-2021-02330 du rôle
[338]   Cour d'appel, 29 mars 2022, n° CAL-2020-00305 du rôle

308.    Les développements de PROJECT REDBLACK et ROSSONERI SPORT se limitent à contester les affirmations faites par BLUE SKYE LUX et LIC 159 dans leur assignation du 27 juin 2022 et à demander la condamnation solidaire, sinon *in solidum* de Monsieur CERCHIONE et Monsieur D'AVANZO.

309.    Dans leur dispositif, PROJECT REDBLACK et ROSSONERI SPORT incluent même des demandes de condamnation contre BLUE SKYE LUX et LIC 159 alors que ces dernières ne sont pas parties à la procédure[339].

310.    Monsieur CERCHIONE et Monsieur D'AVANZO ne sont ainsi pas en mesure d'identifier si l'assignation du 2 mars 2023 constitue effectivement une assignation, sinon une assignation en intervention forcée au rôle TAL-2022-07361, ou encore des conclusions en réponse à l'assignation du 27 juin 2022, ni, par voie de conséquence, de déterminer l'objet de la présente procédure.

### 1.2    Quant aux obscurités et incohérences dans l'exposés des faits

311.    Au vœu de l'article 154 du NCPC, l'exposé des faits doit être intelligible, structuré, et non équivoque[340]. Il est ainsi régulièrement rappelé par les cours et tribunaux que « [l]'*exigence de clarté dans l'exposé des moyens comporte l'obligation pour le demandeur d'exposer les faits qui se trouvent à la base du litige d'une façon claire et intelligible, qu'ils doivent être structurés de telle façon à ce qu'ils ne prêtent pas à équivoque* »[341].

312.    Dans leur assignation du 2 mars 2023, PROJECT REDBLACK et ROSSONERI SPORT se limitent à se rapporter à des faits reprochés à BLUE SKYE LUX et LIC 159 et à se référer à l'assignation du 27 juin 2022 dans la procédure portant le numéro de rôle TAL-2022-07361.

313.    Or, Monsieur CERCHIONE et Monsieur D'AVANZO ne figurent pas au titre des parties de l'assignation du 27 juin 2022 et PROJECT REDBLACK et ROSSONERI SPORT reste en défaut de verser ladite assignation à la présente procédure. Monsieur CERCHIONE et Monsieur D'AVANZO ne sont donc pas en mesure de connaître les faits reprochés à BLUE SKYE LUX et LIC 159 auxquels PROJECT REDBLACK et ROSSONERI SPORT font allusion.

314.    Aucun reproche n'est formulé à l'encontre de Monsieur CERCHIONE et Monsieur D'AVANZO, sauf à être « commandtaires » de BLUE SKYE LUX et LIC 159[342], ou associés de BLUE SKYE LUX[343]. La rédaction des faits ne permet pas de comprendre si PROJECT REDBLACK et ROSSONERI SPORT émettent des reproches envers Monsieur CERCHIONE et Monsieur D'AVANZO en leur qualité d'associés ou de dirigeants. En tout état de cause, ni l'une, ni l'autre de ses qualités, ne constitue une faute en soi.

315.    Monsieur CERCHIONE et Monsieur D'AVANZO ne sont, de ce fait, pas en mesure de pouvoir comprendre les faits qui leur sont reprochés et partant d'organiser leur défense.

---

[339]    **Rôle n° TAL-2023-04206**, assignation du 2 mars 2023, pp. 15 et s.
[340]    TAL, 17 novembre 2022, *op. cit.*
[341]    TAL, 9 mai 2018, n^os 171820, 171961, 171962, 175433, 176025 et 176026 ; Cour d'appel, 8 avril 1998, n° 20062 du rôle ; Cour d'appel, 19 décembre 2000, n° 24212 du rôle ; voir aussi T. HOSCHEIT, *op. cit.*, n° 358, p. 238
[342]    **Rôle n° TAL-2023-04206**, assignation du 2 mars 2023, p. 3.
[343]    **Rôle n° TAL-2023-04206**, assignation du 2 mars 2023, p. 4.

### 1.3     Quant à l'absence de fondement juridique

316.    L'assignation du 2 mars 2023 ne comprend par ailleurs que des développements en fait et non des développements en droit, de sorte que Monsieur CERCHIONE et Monsieur D'AVANZO, au-delà de ne pas savoir quels sont les faits qui leur sont reprochés, ne savent pas non plus de quelle infraction ces derniers seraient constitutifs.

317.    PROJECT REDBLACK et ROSSONERI SPORT ne précisent pas non plus si elles entendent engager la responsabilité contractuelle ou délictuelle de Monsieur CERCHIONE et Monsieur D'AVANZO.

318.    L'absence de fondement juridique ne permet pas non plus de comprendre si la responsabilité de Monsieur CERCHIONE et Monsieur D'AVANZO est recherchée en raison de leur qualité d'associés ou de dirigeants.

319.    S'il n'est pas exigé que le texte de loi sur la base duquel est fondée l'action soit indiqué au titre de l'assignation[344], « [i]l est néanmoins indispensable que l'exploit soit rédigé de telle façon que les textes visés s'en dégagent, du moins implicitement »[345].

320.    Comme exposé ci-avant, l'exploit n'est pas rédigé de façon à ce que les textes visés s'en dégagent implicitement, et lesdits textes ne sont pas non plus visés explicitement, de sorte que Monsieur CERCHIONE et Monsieur D'AVANZO, et Votre Tribunal, se voient dans l'impossibilité de les identifier.

### 1.4     Quant au caractère totalement flou de l'objet de la demande

321.    L'objet de la demande se doit d'être « énoncé de façon claire et complète[346] ». Il doit être « précis » pour permettre au défendeur « d'en apprécier la portée et de savoir précisément ce qu'on lui demande et sur quelle qualité, quel titre, quels motifs le demandeur se fonde[347] ». Tel doit en être ainsi puisque « [c]'est l'acte introductif d'instance qui circonscrit le lien d'instance en ses éléments constitutifs (les parties, l'objet et la cause de la demande »[348].

322.    Il échet de constater que le dispositif est énoncé ni de façon claire, ni de façon complète. Il ajoute à la confusion quant à la responsabilité recherchée par PROJECT REDBLACK et ROSSONERI SPORT contre Monsieur CERCHIONE et Monsieur D'AVANZO, alors qu'il se limite à préciser à Votre Tribunal de « *donner acte à Project Redblack de sa demande à l'encontre de Blue Skye sur base des règles régissant la responsabilité contractuelle, sinon, à titre subsidiaire, délictuelle dans ses conclusions du 31 octobre 2022 de la procédure enregistrée sous le numéro de rôle TAL-2022-07361* »[349], sans qu'aucune mention ne soit faite à Monsieur CERCHIONE ou Monsieur D'AVANZO et alors même que BLUE SKYE n'est pas partie à la présente procédure.

---

[344]    Cour d'appel, 16 juin 2004, n° 28385 du rôle.
[345]    T. HOSCHEIT, *op. cit.,* n° 358, p. 239.
[346]    TAL, 17 novembre 2022, *op. cit.*
[347]    *Ibidem*
[348]    TAL, 28 février 2018, n° 179095 du rôle
[349]    **Rôle n° TAL-2023-04206,** assignation du 2 mars 2023, p. 15

323.    Toujours dans leur dispositif, et sans préciser si la demande est fondée sur la responsabilité contractuelle ou délictuelle, PROJECT REDBLACK et ROSSONERI SPORT demandent à Votre Tribunal de « *constater, à charge des assignés sub 1)* [Monsieur CERCHIONE] *et 2)* [Monsieur D'AVANZO]*, un comportement constitutif d'un **abus caractérisé** »[350] (nous soulignons). Or, la notion vague d'« abus caractérisé » ne constitue ni une notion juridique, ni une infraction prévue du Code civil. Elle n'est pas non plus étayée par des considérations de fait au titre des développements de l'assignation du 2 mars 2023. La responsabilité de Monsieur CERCHIONE et Monsieur D'AVANZO ne saurait être engagée sans faute, « *principe fondamental de la responsabilité civile, son fait générateur et le fondement du droit à réparation. S'il n'y a pas de faute, la responsabilité des articles 1382 et 1383 du Code civil ne saurait être mise en jeu* »[351].

324.    Un régime de responsabilité délictuelle spéciale existe quant à la responsabilité des dirigeants envers les tiers, PROJECT REDBLACK et ROSSONERI SPORT étant nécessairement tiers alors qu'aucun engagement contractuel n'existe entre elles et Monsieur CERCHIONE et Monsieur D'AVANZO. Ce régime spécial, auquel PROJECT REDBLACK et ROSSONERI SPORT restent en défaut de se référer puisque leur assignation du 2 mars 2023 ne contient aucun développement en droit, exigent non seulement une faute quelconque, celle du « *bon père de famille, mais aussi une faute personnelle séparable ou détachable des fonctions* »[352]. Dans leurs développements en fait et tel que précisé ci-avant, PROJECT REDBLACK et ROSSONERI SPORT ne renvoient à aucune faute quU aurait été commise par Monsieur CERCHIONE et Monsieur D'AVANZO et encore moins à une faute détachable de leur fonction.

325.    Enfin, si l'assignation du 2 mars 2023 constituait effectivement une assignation et non une assignation en intervention, Monsieur CERCHIONE et Monsieur D'AVANZO ne voient pas en quoi ils pourraient être condamnés solidairement, sinon *in solidum*, ensemble avec des personnes qui ne sont pas parties à la procédure, en l'espèce BLUE SKYE LUX et LIC159, le tout sans que par ailleurs une faute ne leur soit reprochée, sauf à être dirigeants de ces sociétés, fonction qui n'est pas constitutive de faute.

326.    La demande en condamnation solidaire avec LIC 159 est en outre dénuée de toute logique alors que LIC 159 n'est pas partie à la présente procédure, qu'aucune demande en condamnation n'est introduite contre LIC 159 dans l'assignation du 2 mars 2023 et que Monsieur CERCHIONE et Monsieur D'AVANZO ne sont pas dirigeants de ladite société.

327.    Quant à la demande en condamnation solidaire, sinon *in solidum* de Monsieur CERCHIONE et Monsieur D'AVANZO, ensemble avec BLUE SKYE et LIC 159, à payer à ROSSONERI SPORT des dommages et intérêts pour un montant provisoirement évalué à 100.000 euros, elle ne fait également aucun sens, alors que contrairement à PROJECT REDBLACK, ROSSONERI SPORT ne mentionne au dispositif aucune demande en condamnation de BLUE SKYE LUX et LIC 159.


**2.    Réunion des conditions posées par l'article 264 du NCPC et nullité de l'assignation**

328.    L'exception de libellé obscur est une nullité de pure forme soumise aux conditions cumulatives de l'article 264 du NCPC[353].

---

[350]    *Ibidem*, p. 15
[351]    G. RAVARANI, *op. cit.*, p. 57, n° 51
[352]    G. RAVARANI, *op. cit.*, p. 650, n° 632 ; Lux., 12 juillet 2013, II n° 1417/2013
[353]    T. HOSCHEIT, *op. cit.*, n° 348, p. 233.

329.    Conformément à l'article 264 du NCPC, l'exception de nullité, pour être recevable, doit être soulevée *in limine litis*, et, pour être fondée, suppose la preuve rapportée par le défendeur que le défaut de clarté de l'acte lui cause grief[354].

330.    L'*exceptio obscuri libelli* a bien été soulevée par Monsieur CERCHIONE et Monsieur D'AVANZO au seuil de l'instance, de sorte qu'elle est recevable, conformément à l'alinéa 1er de l'article 264 du NCPC.

331.    La seconde condition est posée à l'alinéa 2 de l'article 264 du NCPC qui se lit comme suit : *[a]ucune nullité pour vice de forme des exploits ou des actes de procédure ne pourra être prononcée que s'il est justifié que l'inobservation de la formalité, même substantielle, aura pour effet de* **porter atteinte aux intérêts de la partie adverse** » (nous soulignons).

332.    La jurisprudence a explicitement consacré le fait que « *[l]es termes de "porter atteinte aux intérêts" sont considérés comme étant synonymes de "causer grief"* »[355], et que la notion de grief « visée par l'article 264 alinéa 2 du Nouveau code de procédure civile ne comporte aucune restriction »[356]. La Cour de cassation en a déduit que « les juges d'appel peuvent souverainement constater que la nullité d'un acte d'appel résultant de l'absence d'exposé des moyens fait grief à la partie adverse en ce qu'elle provoque une entrave ou même une simple gêne à condition que celle-ci soit réelle, à l'organisation de la défense de l'adversaire **le mettant ainsi dans l'impossibilité de préparer utilement sa défense et ce même si cette impossibilité n'est pas absolue** » (nous soulignons).

333.    Il a notamment été jugé que « *[l]e grief dont le défendeur doit rapporter concrètement la preuve sans qu'il ne puisse se borner à en invoquer l'existence dans l'abstrait, peut être de nature diverse. Il réside généralement dans l'entrave ou la gêne portée à l'organisation de la défense en mettant le défendeur dans l'impossibilité d'organiser sa défense ou de choisir les moyens de défense appropriés* »[357].

334.    Il découle des éléments ci-avant exposés que Monsieur CERCHIONE et Monsieur D'AVANZO ne sont pas en mesure de préparer utilement leur défense – qui se trouve dès lors désorganisée – alors que les termes de l'assignation du 2 mars 2023 ne leur permettent pas de connaître l'objet exact des demandes dirigées à leur encontre, ainsi que l'exposé des moyens qui pourrait conduire à engager leur responsabilité, de sorte que Monsieur CERCHIONE et Monsieur D'AVANZO subissent un préjudice au sens de l'article 264 du NCPC.

335.    L'assignation du 2 mars 2023 ne contient en effet aucune description précise des manquements de Monsieur CERCHIONE et Monsieur D'AVANZO. Elle se limite à contester les moyens de l'assignation du 27 juin 2022 et à invoquer la responsabilité de BLUE SKYE LUX et LIC159 qui ne sont même pas parties à la procédure. Cette carence est de nature à entraîner la nullité de l'acte d'assignation du 2 mars 2023 puisqu'il est impossible de pratiquer un syllogisme juridique entre l'objet de la demande et un quelconque acte ou omission commis par Monsieur CERCHIONE et Monsieur D'AVANZO[358].

336.    L'assignation ne contient pas d'avantage de référence à un prétendument comportement d'« abus caractérisé » de la part de Monsieur CERCHIONE et Monsieur D'AVANZO.

---

[354]    TAL, 9 mai 2018, *op. cit.*
[355]    TAL, 2 mai 2012, n° 136532
[356]    Cour de cassation, 20 mars 2003, *Pas.* 32, p. 365
[357]    TAL, 9 mai 2018, *op. cit.*
[358]    TAL, 9 mai 2018, *op. cit.*

337.  L'assignation du 2 mars 2023 n'établit pas non plus les responsabilités respectives de chacune des parties défenderesses et reste en défaut d'apporter la moindre explication sur le caractère solidaire de la responsabilité entre BLUE SKYE LUX, LIC 159, qui ne sont pas parties à la procédure, et Monsieur CERCHIONE et Monsieur D'AVANZO.

338.  Enfin, l'assignation du 2 mars 2023 reste en défaut de ventiler ses demandes en condamnation à l'encontre de BLUE SKYE LUX, LIC 159, et Monsieur CERCHIONE et Monsieur D'AVANZO au paiement de sommes globales alors que la solidarité entre les parties susmentionnées reste en défaut d'être justifiée par PROJECT REDBLACK et ROSSONERI SPORT et ne saurait, en tout état de cause, être caractérisée.

339.  Compte tenu de l'ensemble des considérations qui précèdent, la nullité de forme de l'acte introduction d'instance pour libellé obscur sera à prononcer sur le fondement des articles 154 et 264 du NCPC.

**5.    Quant à la compétence du juge de la mise en état**

340.  L'exception de libellé obscur constitue un moyen de nullité[359].

341.  En tant que moyen de nullité, l'exception de libellé obscur relève de la seule compétence du juge de la mise en état conformément à l'article 212 du NCPC :

> *« Lorsque la demande est présentée postérieurement à sa désignation, le juge de la mise en état est, jusqu'à son dessaisissement, <u>seul compétent</u>, à l'exclusion de toute autre formation du tribunal pour :*
> *a) statuer sur les moyens d'incompétence, <u>de nullité</u> et les exceptions dilatoires ; à l'exception des moyens d'ordre public, les parties soulèvent ces moyens dès leurs premières conclusions ou dès leur révélation s'ils devaient se révéler postérieurement à leurs premières conclusions. Après présentation d'un tel moyen, chacune des parties à l'instance prend position au moins deux fois au plus sur ce moyen, la présentation du moyen valant conclusions, avant que le juge de la mise en état ne statue, […]»* (souligné par nous).

342.  L'exception de libellé obscur soulevée par Monsieur CERCHIONE et Monsieur D'AVANZO relève partant de la seule compétence du juge de la mise en état et devra, de fait, être tranchée par une ordonnance séparée de ce dernier limitée à ce moyen de nullité.

**B.  *À TITRE SUBSIDIAIRE, NULLITÉ, SINON IRRECEVABILITÉ DES DEMANDES DE PROJECT REDBLACK ET ROSSONERI SPORT POUR VIOLATION DU PRINCIPE DU CONTRADICTOIRE***

343.  À titre subsidiaire, et si, par impossible, Votre Tribunal venait à retenir que l'exception de libellé obscur ne pourrait être retenue, quod non, les demandes de PROJECT REDBLACK et ROSSONERI SPORT sont à déclarer nulles, sinon irrecevables, pour violation du principe du contradictoire.

---

[359]  T. HOSCHEIT, *op. cit.*, n° 348, p. 233.

**1. Nullité, sinon irrecevabilité, des demandes dirigées contre BLUE SKYE LUX et LIC 159**

344.    Tout au long des développements de leur assignation du 2 mars 2023, PROJECT REDBLACK et ROSSONERI SPORT évoquent des faits reprochés à BLUE SKYE LUX.

345.    Au titre de son dispositif, PROJECT REDBLACK et ROSSONERI SPORT formulent les demandes suivantes à l'encontre de BLUE SYKE LUX et LIC 159 :

> « donner acte à Project Redblack de sa demande à l'encontre de Blue Skye sur base des règles régissant la responsabilité contractuelle, sinon, à titre subsidiaire, délictuelle dans ses conclusions du 31 octobre 2022 de la procédure enregistrée sous le numéro de rôle TAL-2022-07361,
>
> […]
>
> Sous ce rapport, condamner Giovanni Caslini et Blue Skye à produire l'intégralité des accords les liant et ayant, d'une manière ou d'une autre, trait à l'exercice par Giovanni Caslini, de son mandat de gérant de Project Redblack et, précédemment, de Rossoneri Sport, ceci sans distinction suivant que ces accords aient été conclus spécifiquement en rapport avec les mandats de Giovanni Caslini au sein des deux sociétés visées ou non »[360].

346.    PROJECT REDBLACK et ROSSONERI SPORT introduisent également des demandes en condamnation solidaire, sinon in solidum entre BLUE SKYE LUX, LIC 159 et les parties défenderesses à la procédure.

347.    Dans leur assignation du 2 mars 2023, PROJECT REDBLACK et ROSSONERI SPORT présentent par ces demandes des demandent en condamnation contre des sociétés qui ne sont pas parties à son assignation.

348.    Ni BLUE SKYE LUX, ni LIC 159 ne sont partant en mesure de se défendre à la présente procédure. Les demandes de PROJECT REDBLACK et ROSSONERI SPORT à leur encontre son partant formulées en violation du principe du contradictoire tel que garanti par l'article 63 du NCPC et l'article 6 paragraphe 1er de la Convention de sauvegarde des droits de l'homme et libertés fondamentales.

349.    Or, le « débat contradictoire est de l'essence même de la procédure judiciaire en ce qu'il constitue un des piliers du procès équitable et du respect des droits de la défense. Sans contradiction, impliquant que chaque partie soit informée à tout moment des démarches procédurales des autres acteurs impliqués, que ce soient ses adversaires, les juges ou les autres intervenants dans la procédure, l'instance ne peut pas jouir de la crédibilité et de l'acceptation nécessaires pour assurer sa légitimité et celle de la décision adoptée en fin de parcours »[361], « la violation de ces principes entraîne la nullité de la décision »[362].

350.    La jurisprudence admet « qu'une demande est irrecevable si elle contrevient au principe du contradictoire consacré par l'article 63 du Nouveau Code de procédure civile »[363].

---

[360]    Assignation du 2 mars 2023, p. 15.
[361]    T. HOSCHEIT, *op. cit.*, n° 47, pp. 82 et 83.
[362]    Cour de cassation, 30 mai 2024, n° CAS-2023-00139 du registre.
[363]    TAL, 2 mai 2015, nos TAL-2024-01042 et TAL-2024-06480 du rôle ; Cour d'appel, 10 juillet 2002, nos 23054, 24097 et 26382 du rôle, *BIJ* 02/2004, p. 27.

351.    Les demandes de PROJECT REDBLACK et ROSSONERI SPORT contre BLUE SKYE LUX et LIC 159 étant formulées en violation du principe du contradictoire, il y a lieu de conclure à leur nullité, sinon irrecevabilité.

**2. Nullité, sinon irrecevabilité des demandes solidaires dirigées contre Monsieur CERCHIONE et Monsieur D'AVANZO**

352.    Les demandes formulées par PROJECT REDBLACK et ROSSONERI SPORT contre Monsieur CERCHIONE et Monsieur D'AVANZO au titre de leur assignation du 2 mars 2023 portent sur des demandes en condamnation solidaire pour les fautes qui auraient été commises par BLUE SKYE LUX et LIC 159.

353.    Comme indiqué ci-avant, il convient de conclure à la nullité, sinon l'irrecevabilité des demandes en condamnation dirigées à l'encontre de BLUE SKYE LUX et LIC 159 au titre de l'assignation du 2 mars 2023 pour violation du principe du contradictoire, BLUE SKYE LUX et LIC 159 n'étant pas parties à la présente procédure.

354.    De facto, Monsieur CERCHIONE et Monsieur D'AVANZO ne sauraient être tenus solidairement responsables de demande en condamnation dirigées contre BLUE SKYE LUX et LIC 159 nulles, sinon irrecevables.

355.    Il y a donc lieu de conclure à la nullité, sinon l'irrecevabilité, des demandes de PROJECT REDBLACK et ROSSONERI SPORT dirigées au titre de leur assignation du 2 mars 2023 contre Monsieur CERCHIONE et Monsieur D'AVANZO.

**C.  *DANS UN AUTRE ORDRE DE SUBSIDIARITÉ, IRRECEVABILITÉ DES DEMANDES DE PROJECT REDBLACK ET ROSSONERI SPORT POUR DÉFAUT DE QUALITÉ À AGIR***

356.    Si par impossible, Votre Tribunal retenait que l'exception de libellé obscur ne serait pas caractérisée et que l'assignation du 2 mars 2023 ne serait pas nulle, sinon irrecevable pour violation du principe du contradictoire, *quod non*, les demandes de PROJECT REDBLACK et ROSSONERI SPORT en responsabilité dirigées contre Monsieur CERCHIONE et Monsieur D'AVANZO sont en tout état de cause nulles pour défaut de qualité à agir dans le chef de PROJECT REDBLACK et ROSSONERI SPORT.

357.    PROJECT REDBLACK et ROSSONERI SPORT se limitent à demander à Votre Tribunal de prendre acte de leur demande à l'encontre de BLUE SKYE LUX et LIC 159 « sur base des règles régissant la responsabilité contractuelle, sinon, à titre subsidiaire, délictuelle dans ses conclusions du 31 octobre 2022 » et partant « constater que Blue Skye a agi à l'intervention de ses commanditaires [Monsieur CERCHIONE et Monsieur D'AVANZO][364] ».

358.    Cette formulation ne permet pas à Monsieur CERCHIONE et Monsieur D'AVANZO d'exclure que PROJECT REDBLACK et ROSSONERI SPORT entendraient engager leur responsabilité contractuelle.

---

[364]    Assignation du 2 mars 2023, p. 15.

359.  La référence faite par PROJECT REDBLACK et ROSSONERI SPORT à la notion de « commanditaires » semblent laisser supposer qu'elles entendant engager la responsabilité de Monsieur CERCHIONE et Monsieur D'AVANZO en leur qualité de dirigeants de BLUE SKYE et LIC 159.

360.  La responsabilité contractuelle présuppose l'existence d'un contrat entre la partie demanderesse et la partie défenderesse à l'action.

361.  En matière de responsabilité des dirigeants, « [l]a responsabilité contractuelle repose sur l'inexécution ou la mauvaise exécution d'un contrat de mandat. La responsabilité délictuelle nécessite l'existence d'un dommage trouvant sa source dans un fait juridique intervenant entre deux personnes qui n'ont pas la qualité de cocontractant. Vis-à-vis de la société comme des associés, la responsabilité des dirigeants est donc contractuelle ; aucun mandat ne liant les dirigeants aux tiers, la responsabilité des dirigeants à l'égard des tiers est de nature exclusivement délictuelle »[365].

362.  PROJECT REDBLACK et ROSSONERI SPORT n'étant ni créancières de BLUE SKYE LUX ou de LIC 159 (au contraire, elles sont leurs débitrices), ni associés desdites sociétés, elles sont donc tiers et ne sauraient partant se prévaloir d'une inexécution ou d'une mauvaise exécution d'un contrat de mandat à l'encontre de Monsieur CERCHIONE et Monsieur D'AVANZO.

363.  PROJECT REDBLACK et ROSSONERI SPORT n'ont donc pas qualité à agir en responsabilité contractuelle contre Monsieur CERCHIONE et Monsieur D'AVANZO, la responsabilité contractuelle étant une responsabilité attitrée[366] réservée aux cocontractants.

364.  Le défaut de qualité à agir dans le chef des parties demanderesses à l'action constitue un vice affectant les conditions d'existence de l'action et entraîne son irrecevabilité, en ce qu'il constitue une fin de non-recevoir.

365.  Les fins de non-recevoir pouvant être soulevées à tout stade de la procédure, il n'existe pas d'obligation de la soulever avant tout débat, ni d'obligation de démontrer qu'une atteinte a été portée aux droits de la partie adverse pour qu'elle puisse être retenue[367].

366.  Dans ces circonstances, il y a donc lieu de conclure à l'irrecevabilité de la demande de PROJECT REDBLACK et ROSSONERI SPORT en responsabilité contractuelle dirigée contre Monsieur CERCHIONE et Monsieur D'AVANZO.

### D.  DEMANDE EN CONDAMNATION DE PROJECT REDBLACK ET ROSSONERI SPORT EN PAIEMENT D'UNE INDEMNITÉ DE PROCÉDURE AINSI QU'AUX FRAIS ET DÉPENS DE L'INSTANCE

367.  Il serait inéquitable, au vu des circonstances et de l'attitude de PROJECT REDBLACK et ROSSONERI SPORT, de laisser à la seule charge de Monsieur CERCHIONE et Monsieur D'AVANZO les frais irrépétibles qu'ils ont exposés et qu'ils doivent encore débourser en vue de la préservation de leurs droits et intérêts légitimes, non compris dans les dépens et frais de justice proprement dits, tel que les honoraires et frais d'avocats.

---

[365]  A. STEICHEN, Précis de droit des sociétés, Éditions Saint-Paul, 6e édition, 2018, n° 381, pp. 299 et 300.
[366]  T. HOSCHEIT, op. cit., n° 1006, p. 574.
[367]  T. HOSCHEIT, op. cit., n° 995, p. 566.

368.    Cette situation est particulièrement inéquitable alors qu'il a été démontré que la présente procédure a été introduite par PROJECT REDBLACK et ROSSONERI SPORT dans le seul but d'exercer une pression sur Monsieur CERCHIONE et Monsieur D'AVANZO et indirectement sur BLUE SKYE LUX et LIC 159 sans qu'aucune faute ne leur soit réellement reprochée.

369.    Monsieur CERCHIONE et Monsieur D'AVANZO sont dès lors fondés à réclamer la condamnation de PROJECT REDBLACK et ROSSONERI SPORT, solidairement, sinon *in solidum*, sinon chacune pour sa part, à leur payer à chacun pris individuellement, la somme de 100.000 euros sur le fondement de l'article 240 du NCPC.

370.    Monsieur CERCHIONE et Monsieur D'AVANZO sont encore fondés à demander la condamnation de PROJECT REDBLACK et ROSSONERI SPORT, solidairement, sinon *in solidum*, sinon chacune pour sa part, à l'entièreté des frais et dépens.

371.    Monsieur CERCHIONE et Monsieur D'AVANZO se réservent expressément le droit de majorer cette demande en cours d'instance.


E.    **DEMANDE EN CONDAMNATION DE PROJECT REDBLACK ET ROSSONERI SPORT EN PAIEMENT D'UNE INDÉMNITÉ POUR PROCÉDURE ABUSIVE ET VEXATOIRE**

372.    Eu égard aux faits de l'espèce, il y a lieu de condamner PROJECT REDBLACK et ROSSONERI SPORT solidairement, sinon *in solidum*, sinon chacune pour sa part, au paiement d'une indemnité pour procédure abusive et vexatoire d'un montant évalué *ex aequo et bono* à 80.000 euros au titre de l'article 6-1 du Code civil.

373.    L'article 6-1 du Code civil dispose que « Tout acte ou tout fait qui excède manifestement, par l'intention de son auteur, par son objet ou par les circonstances dans lesquelles il est intervenu, l'exercice normal d'un droit, n'est pas protégé par la loi, engage la responsabilité de son auteur et peut donner lieu à une action en cessation pour empêcher la persistance dans l'abus »[368].

374.    Tant la doctrine que la jurisprudence admettent que :

    « Il est admis qu'en matière d'abus de droits processuels, un abus peut être commis dans l'exercice d'une voie de droit. La question essentielle est évidemment celle de savoir en quoi consiste l'abus dans de semblables hypothèses. Elle est délicate, car il faut tenir compte de deux impératifs contradictoires : d'une part, la liberté de recourir à la justice de sorte que l'échec ne peut constituer en soi une faute (il serait excessif de sanctionner la moindre erreur de droit).

    D'autre part, la nécessité de limiter les débordements de procédure (la justice est un service public - gratuit en principe - et dont il ne faut pas abuser).

    S'agissant des abus en matière d'action de justice, il est de règle que le demandeur qui échoue dans son action et le défendeur qui est condamné ne sont pas considérés *ipso facto* comme ayant commis un abus (Cass. fr., Civ. 1ère, 18.5.1949, Bull. Civ, I, n° 175 ; Soc. 7.1.1955, Gaz. Pal. 1955.1.182 ; Civ. 2e, 19.4.1958, Bull. Civ. II, n° 260 ; Civ. 1ère, 8.11.1976, JCP 1976.IV.395; Civ. 2e, 24.6.1987, Bull. Civ. II, n° 137).

---

368    TAL, réf., 6 septembre 2024, n° TAL-2024-06622 du rôle.

Après avoir exigé une attitude malicieuse, sinon une erreur grossière équipollente au dol, la jurisprudence en est arrivée à ne plus exiger qu'une simple faute, souvent désignée de légèreté blâmable.

Il ne suffit cependant pas que la demande soit téméraire, mais il faut un comportement procédural excédant l'exercice légitime du droit d'ester en justice. Il convient de sanctionner non pas le fait d'avoir exercé à tort une action en justice ou d'y avoir résisté injustement, puisque l'exercice d'une action en justice est libre, mais uniquement le fait d'avoir abusé de son droit en commettant une faute indépendante du seul exercice des voies en justice et de recours (Cour d'appel, 20 mars 1991, Pas. 28, p. 150 ; Cour d'appel, 17 mars 1993, n° 14446 du rôle ; Cour d'appel, 22 mars 1993, n° 14971 du rôle, TAL, 9 février 2001, n° 25/2001 du registre). Cette faute intentionnelle engage la responsabilité civile de la partie demanderesse à l'égard de la partie défenderesse, si cette dernière prouve avoir subi un préjudice (cf. Cour d'appel, 16 février 1998, nos. 21687 et 22631 du rôle).

Il convient aussi de rappeler que ne constitue pas un acharnement judiciaire, l'opiniâtreté à défendre sa thèse devant les juridictions et de montrer de l'obstination à vouloir que ses droits - ou du moins ce que l'on considère comme tels - soient reconnus légitimes (Cour d'appel, 21 mars 2002, n° 25297 du rôle) »[369].

375.   Il ressort des développements qui précèdent que la présente procédure a été initiée par PROJECT REDBLACK et ROSSONERI SPORT dans le seul but dans le seul but d'exercer une pression sur Monsieur CERCHIONE et Monsieur D'AVANZO et indirectement sur BLUE SKYE LUX et LIC 159 sans qu'aucune faute ne leur soit réellement reprochée. Comme exposé précédemment, il ressort en effet de l'assignation du 2 mars 2023 que cette dernière fait fi de toutes les exigences élémentaires dans le cadre de la rédaction d'un acte juridique, tant sur la forme que sur le fond, alors que PROJECT REDBLACK et ROSSONERI SPORT n'ont, par exemple même pas pris la peine de verser les actes de procédure auxquelles ils se réfèrent, ni de préciser les fondements juridiques violés ni les fautes reprochées à Monsieur CERCHIONE et Monsieur D'AVANZO, pour la simple et bonne raison que PROJECT REBLACK et ROSSONERI SPORT n'ont en réalité aucun reproche à formuler à l'encontre de ces derniers, et que le seul but de la présente procédure est d'exercer une pression sur Monsieur CERCHIONE et Monsieur D'AVANZO.

376.   Dans ces circonstances, l'attitude de PROJECT REBLACK et ROSSONERI SPORT à la présente procédure est constitutive d'un acte de malice, sinon d'erreur grossière équipollente au dol, sinon de légèreté blâmable.

377.   Il y a donc lieu de prononcer la condamnation de PROJECT REDBLACK et ROSSONERI SPORT, solidairement, sinon *in solidum*, sinon chacune pour sa part, au paiement d'une indemnité pour procédure abusive et vexatoire évaluée *ex aequo et bono* à 80.000 euros, ou tout autre montant même supérieur arbitré par Votre Tribunal ou à dire d'expert, au titre de l'article 6-1 du Code civil.

---

[369]   *Ibidem.*

**F.  DEMANDE EN CONDAMNATION DE PROJECT REDBLACK ET ROSSONERI SPORT EN PAIEMENT DES FRAIS D'AVOCAT**

378.  Il résulte des considérations de fait et de droit ci-avant développées que Monsieur CERCHIONE et Monsieur D'AVANZO sont fondés à demander condamnation PROJECT REDBLACK et ROSSONERI SPORT au remboursement des frais et honoraires d'avocat par eux exposés dans le cadre de la présente procédure, alors que depuis un arrêt de la Cour de cassation du 9 février 2012, il est désormais acquis que les honoraires d'avocats peuvent être constitutifs d'un préjudice réparable[370].

379.  Cette demande peut être cumulée avec une demande en condamnation fondée sur l'article 240 du NCPC, sous condition d'établir les éléments conditionnant une telle indemnisation, à savoir une faute, un préjudice et une relation causale entre la faute et le préjudice :

« La circonstance que l'article 240 du Nouveau Code de procédure civile permet au juge, sur le fondement de l'équité, d'allouer à une partie un certain montant au titre des sommes non comprises dans les dépens, dont les honoraires d'avocat, n'empêche pas une partie de réclamer ces honoraires au titre de réparation de son préjudice sur base de la responsabilité contractuelle ou délictuelle, à condition d'établir les éléments conditionnant une telle indemnisation, à savoir une faute, un préjudice et une relation causale entre la faute et le préjudice (cf. Jurisclasseur Proc. civ. fasc. 524, nos 6 et suivants)[371] ».

380.  La doctrine retient que :

« Un principe de droit incoercible est que le préjudice résultant d'une faute, quelle qu'elle soit, doit être réparé par l'auteur de la faute et cette réparation doit être totale. Or, les frais de défense constituent à l'évidence un dommage réparable et l'indemnisation de la victime ne sera pas totale si elle est amputée de ce frais de défense ou s'il en a coûté au justiciable de faire reconnaître son droit. Le droit à la réparation intégrale du dommage justifie la répétibilité des frais de défense, dont les honoraires d'avocat (Devoirs et Prérogatives de l'Avocat, Cléo Leclerq, éd. 1999, n° 76) (cf. Trib. arr. XI, 25 mars 2004, SES/Whitehead, n° du rôle 64 095) »[372].

381.  Il ressort à suffisance des développements repris au point F. ci-avant, que l'attitude de PROJECT REDBLACK et ROSSONERI SPORT à la présente est constitutive d'une faute.

382.  En vertu du principe de réparation intégrale, les Monsieur CERCHIONE et Monsieur D'AVANZO ont droit au remboursement des frais d'avocat exposés en raison de la seule faute de PROJECT REDBLACK et ROSSONERI SPORT.

383.  Les Demanderesses sont dès lors fondés à réclamer la condamnation des parties défenderesses sub 1) à 7) et sub 9) à 13) solidairement, sinon *in solidum*, sinon chacune pour sa part, à leur payer à chacune prise individuellement, la somme calculée provisoirement de 100.000 euros au titre des frais et honoraires d'avocat par elles exposées sur le fondement des articles 1382 ou 1383 du Code civil.

384.  Monsieur CERCHIONE et Monsieur D'AVANZO se réservent expressément le droit de majorer cette demande en cours d'instance.

---

370    Cour d'appel, 9 février 2012, JTL, n° 20, 2012, p. 190.
371    Cour d'appel, 5 décembre 2018, *Pas.,* 39, p. 287.
372    Cour d'appel, 4 janvier 2012, *Pas.,* 35, p. 848.

### G.  QUANT À LA REQUÊTE EN INTERVENTION VOLONTAIRE DE LEXINGTON

385.    Par requête du 9 février 2023, LEXINGTON entend intervenir volontairement à la procédure portant le numéro de rôle TAL-2023-04206 et semble le faire de manière exclusivement conservatoire dans le cadre de cette affaire[373].

386.    Les arguments développés dans l'action déclaratoire par rapport au défaut de qualité et d'intérêt à agir dans le chef de LEXINGTON sont repris ici, en ce que LEXINGTON n'est pas créancière de BLUE SKYE LUX et qu'elle ne semble à toute évidence plus détenir les TPECs de classe B et être en cette qualité créancière de LIC 159[374]. Par conséquent, les demandes de LEXINGTON devraient être déclarées irrecevables, faute pour cette dernière de pouvoir établir sa qualité et son intérêt à agir.

387.    À titre subsidiaire, dans la mesure où les demandes formulées par PROJECT REDBLACK et ROSSONERI SPORT ne seraient pas déclarées irrecevables[375], il convient de rappeler que par le biais de l'intervention conservatoire, le tiers *« intervient à titre conservatoire, pour préserver ses intérêts, en se joignant à la partie à laquelle ses intérêts sont liés. Il prend fait et cause pour cette partie et la soutient en ses arguments, mais sans solliciter un avantage personnel*[376] *»* (nous soulignons).

388.    Or, si LEXINGTON prend d'abord fait et cause pour PROJECT REDBLACK et ROSSONERI SPORT en sollicitant la condamnation de Monsieur CERCHIONE, Monsieur D'AVANZO et Monsieur CASLINI[377], elle indique dans la même phrase ne le faire que si ceci n'affecte pas le patrimoine personnel de BLUE SKYE LUX et de LIC 159[378].

389.    Il y a cependant lieu de rappeler que le dispositif de l'assignation du 2 mars 2023 a pour objet des demandes de condamnations à l'encontre de Monsieur CERCHIONE, Monsieur D'AVANZO et Monsieur CASLINI solidairement ou *in solidum* avec BLUE SKYE LUX et LIC 159. Il faut donc constater que le comportement de LEXINGTON est ici identique à celui qu'elle a adopté dans l'action pour fraude[379], en ce qu'elle prétend agir au soutien des intérêts de PROJECT REDBLACK et de ROSSONERI SPORT quand ceci arrange également ses intérêts, et s'oppose aux demandes de ces deux entités lorsqu'elles viennent contrarier ses intérêts et lui procurer un désavantage. Par conséquent, la présente intervention volontaire de LEXINGTON au rôle n° TAL-2023-04206 est à déclarer irrecevable alors que LEXINGTON reste en défaut de prendre fait et cause pour les parties auxquelles elle lie ses intérêts, à savoir PROJECT REBLACK et ROSSONERI, et que par le même, elle sollicite et poursuit, sans même le dissimuler, un avantage personnel.

390.    Si, par impossible, Votre Tribunal venait à requalifier la présente intervention conservatoire en intervention active – *quod non* – l'intervention volontaire de LEXINGTON à la procédure serait en tout état de cause à déclarer irrecevable alors que par le biais d'une intervention active, même si la partie tierce intervenante peut faire valoir ses propres droits, elle reste tenue de prendre fait et cause pour le défendeur principal, ce que LEXINGTON reste en défaut de faire dans sa requête en intervention volontaire du 9 février 2023, puisqu'elle sert uniquement ses seuls intérêts.

---

[373]    Requête en intervention volontaire du 9 février 2023, n° 54, p. 25.
[374]    Voir *supra*, paragraphe 125.
[375]    Voir supra, paragraphe n° 268.
[376]    Cour d'appel, 7 mai 2008, n° 31679 du rôle ; T. HOSCHEIT, *op. cit.*, n° 1139, p. 641.
[377]    Requête en intervention volontaire du 9 février 2023, n° 56, pp. 26.
[378]    Requête en intervention volontaire du 9 février 2023, n° 56, p. 26.
[379]    Voir *supra*, paragraphe n° 131 et s..

391. Il y a partant lieu de prononcer l'irrecevabilité de la demande en intervention volontaire de LEXINGTION.

### IV.   TAL-2023-03720 : action en annulation initiée par Monsieur CASLINI

392. Par ordonnance prise par le Tribunal d'Arrondissement de et à Luxembourg le 20 décembre 2023, la procédure portant le numéro TAL-2023-03720 a été jointe aux procédures portant les numéros de rôle TAL-2022-07355, TAL-2022-07361 et TAL-2023-04206.

393. Les parties sub 1) à sub 4) pour lesquelles MOLITOR Avocats à la Cour SARL est constituée n'étant pas attraites dans ce rôle, elles n'ont pas à prendre conclusions.

## PAR CES MOTIFS

et tous autres à suppléer en plaidant et sous la réserve expresse et formelle de pouvoir majorer, modifier ou supprimer les présentes conclusions en cours d'instance, la société MOLITOR, pour ses parties, conclut à ce qu'il

## PLAISE AU TRIBUNAL

### plus précisément au juge de la mise en état en charge de l'affaire, en application des articles 206 et 212 du NCPC

**constater** que Monsieur CERCHIONE et Monsieur D'AVANZO soulèvent *in limine litis*, la nullité pour libellé obscur de l'assignation du 2 mars 2023 dans la procédure portant le numéro de rôle TAL-2023-04206,

**ordonner** la jonction de l'assignation en intervention forcée dirigée contre AC MILAN et ACM BIDCO en déclaration de jugement commun du 26 juin 2025 portant le numéro de rôle TAL-2025-07764 avec l'assignation principale introduite par exploit d'huissier du 10 juin 2022, ensemble avec les rôles nos TAL-2022-07361, TAL-2023-03720 et TAL-2023-04206, l'assignation principale y étant jointe,

**statuer** conformément au dispositif de l'assignation en intervention forcée précitée du 26 juin 2025,

**ordonner** la jonction de l'assignation en intervention forcée dirigée contre ACM BIDCO, ELLIOTT ASSOCIATES et ELLIOTT INTERNATIONAL en déclaration de jugement commun du 30 juin 2025 avec l'assignation principale introduite par exploit d'huissier du 27 juin 2022, ensemble avec les rôles nos TAL-2022-07355, TAL-2023-03720 et TAL-2023-04206, l'assignation principale y étant jointe,

**statuer** conformément au dispositif de l'assignation en intervention forcée précitée du 30 juin 2025,

**prononcer** l'irrecevabilité de la requête en intervention volontaire de LEXINGTON du 9 février 2024 ;

sinon, **enjoindre à** LEXINGTON la communication d'une attestation de son commissaire aux comptes quant à sa détention des TPECS de classe E-1, sinon le rapport produit par son commissaire aux comptes relatif à la valorisation des TPECS de classe E-1 sur le fondement de l'article 60 du NCPC,

**constater** que BLUE SKYE LUX et LIC 159 se réservent expressément le droit de demander la production de tout autre document dans le respect des conditions de l'article 60 du NCPC ;

**TAL-2022-07355**

**déclarer** l'action de BLUE SKYE LUX et LIC 159 recevable,

**rejeter** tous les moyens et exceptions soulevés par les parties défenderesses,

**TAL-2022-07361**

**rejeter** les demandes formulées par les parties défenderesses sub 1) à sub 7), sub 9 ), sub 10) et sub 15) visant à obtenir la nullité de l'assignation du 27 juin 2022 pour cause de libellé obscur,

**constater** que les demandes formulées par les parties défenderesses sub 16 et sub 17) sont sans objet en raison du désistement d'instance notifié à MILAN ENTERTAINMENT et MILAN REAL ESTATE par acte d'avocat à avocat du 22 septembre 2025 dans l'instance pendante sous le numéro de rôle TAL-2022-07361,

**prendre acte** du désistement d'instance pure et simple de BLUE SKYE LUX et LIC 159 notifié à MILAN ENTERTAINMENT et MILAN REAL ESTATE par acte d'avocat à avocat du 22 septembre 2025 dans l'instance pendant sous le numéro de rôle TAL-2022-07361, précision faite que lesdits désistements d'instance portent limitativement sur les demandes introduites par BLUE SKYE LUX et LIC 159 à l'encontre de MILAN ENTERTAINMENT et MILAN REAL ESTATE au titre du prédit exploit de l'huissier Guy ENGEL du 27 juin 2022,

**TAL-2023-04206**

**prononcer** la nullité de l'assignation du 2 mars 2023 pour libellé obscur sur le fondement des articles 264 et 154 du NCPC,

sinon **prononcer** la nullité de l'assignation du 2 mars 2023 pour violation du principe du contradictoire garanti par l'article 63 du NCPC et l'article 6 paragraphe 1er de la Convention de sauvegarde des droits de l'homme et libertés fondamentales,

**sinon, alternativement,**

**PLAISE AU TRIBUNAL**

**constater** que Monsieur CERCHIONE et Monsieur D'AVANZO soulèvent *in limine litis*, la nullité pour libellé obscur de l'assignation du 2 mars 2023 dans la procédure portant le numéro de rôle TAL-2023-04206,

o**rdonner** la jonction de l'assignation en intervention forcée dirigée contre AC MILAN et ACM BIDCO en déclaration de jugement commun du 26 juin 2025 portant le numéro de rôle TAL-2025-07764 avec l'assignation principale introduite par exploit d'huissier du 10 juin 2022, ensemble avec les rôles nᵒˢ TAL-2022-07361, TAL-2023-03720 et TAL-2023-04206, l'assignation principale y étant jointe,

**statuer** conformément au dispositif de l'assignation en intervention forcée précitée du 26 juin 2025,

**ordonner** la jonction de l'assignation en intervention forcée dirigée contre ACM BIDCO, ELLIOTT ASSOCIATES et ELLIOTT INTERNATIONAL en déclaration de jugement commun du 30 juin 2025 avec l'assignation principale introduite par exploit d'huissier du 27 juin 2022, ensemble avec les rôles nos TAL-2022-07355, TAL-2023-03720 et TAL-2023-04206, l'assignation principale y étant jointe,

**statuer** conformément au dispositif de l'assignation en intervention forcée précitée du 30 juin 2025,

**constater** que les présentes conclusions de BLUE SKYE LUX, LIC 159, Monsieur CERCHIONE et Monsieur D'AVANZO se limitent à l'exception de libellé obscur, aux moyens d'irrecevabilité et à la loi applicable ;

**prononcer** l'irrecevabilité de la requête en intervention volontaire de LEXINGTON du 9 février 2024 ;

sinon, **enjoindre à** LEXINGTON la communication d'une attestation de son commissaire aux comptes quant à sa détention des TPECS de classe E-1, sinon le rapport produit par son commissaire aux comptes relatif à la valorisation des TPECS de classe E-1 sur le fondement de l'article 60 du NCPC,

**constater** que BLUE SKYE LUX et LIC 159 se réservent expressément le droit de demander la production de tout autre document dans le respect des conditions de l'article 60 du NCPC ;

**sur le fond, voir réserver** à BLUE SKYE LUX, LIC 159, Monsieur CERCHIONE et Monsieur D'AVANZO le droit de conclure à nouveau pour développer plus amplement tous autres moyens à formuler ;

### TAL-2022-07355

**constater** que les parties défenderesses à la procédure portant le numéro de rôle TAL-2022-07355 sont les parties défenderesses sub 1), 2), 8) à 12), 14) et 18),

**constater** que seules parties défenderesses sub 9) à 12) et sub 14) ont conclu pour l'instant conclu dans la procédure portant le numéro de rôle TAL-2022-07355,

partant **constater** que les présentes conclusions se limitent aux moyens d'irrecevabilité allégués de l'assignation du 10 juin 2022 soulevés par les parties défenderesses sub 9) à 12) et sub 14),

et réserver à BLUE SKYE et LIC 159 la possibilité de conclure plus amplement dans des conclusions subséquentes, notamment sur le fond de l'affaire,

**rejeter** les demandes formulées par les parties défenderesses sub 9) à 12) visant à obtenir l'irrecevabilité des demandes dirigées contre elles par BLUE SKYE LUX et LIC 159,

**rejeter** les demandes formulées par la partie défenderesse sub 14) visant à obtenir sa mise hors de cause et l'irrecevabilité des demandes dirigées contre lui par BLUE SKYE LUX et LIC 159,

**réserver** au jugement à intervenir sur le fond, l'ensemble des demandes des parties défenderesses sub 9) à 12) et 14) de voir condamner BLUE SKYE LUX et LIC 159 à payer une indemnité de procédure sur le fondement de l'article 240 du NCPC formulées par les parties défenderesses, **sinon les rejeter,**

**réserver** au jugement à intervenir sur le fond, la demande d'Alfredo CRACA de voir condamner BLUE SKYE LUX et LIC 159 au paiement de ses honoraires d'avocat sur le fondement de l'article 1382 du Code civil, **sinon la rejeter,**

**rejeter** l'ensemble des demandes des parties défenderesses sub 9) à 12), 14) et 19) de voir condamner BLUE SKYE LUX et LIC 159 à payer les frais et dépens de l'instance,

**réserver** au jugement à intervenir sur le fond les demandes formulées par BLUE SKYE LUX et LIC 19 contre Daniela ITALIA et Jean-Marc MCLEAN en paiement solidairement, sinon *in solidum*, sinon chacun pour le tout à payer à BLUE SKYE LUX et LIC 159, chacune prise individuellement, d'une indemnité de procédure fondée sur l'article 240 du Nouveau Code de procédure civile évaluée à 40.000 euros,

sinon **condamner** Daniela ITALIA et Jean-Marc MCLEAN en paiement solidairement, sinon *in solidum*, sinon chacun pour le tout à payer à BLUE SKYE LUX et LIC 159, chacune prise individuellement, d'une indemnité de procédure fondée sur l'article 240 du Nouveau Code de procédure civile évaluée à 40.000 euros,

**réserver** au jugement à intervenir sur le fond les demandes formulées par BLUE SKYE LUX et LIC 19 contre Daniela ITALIA et Jean-Marc MCLEAN, en paiement en paiement solidairement, sinon *in solidum*, sinon chacun pour le tout à payer à BLUE SKYE LUX et LIC 159, chacune prise individuellement, la somme de 50.000 euros au titre des frais et honoraires d'avocat par elles exposées sur le fondement des articles 1382 ou 1383 du Code civil,

**condamner** Daniela ITALIA et Jean-Marc MCLEAN, en paiement en paiement solidairement, sinon *in solidum*, sinon chacun pour le tout à payer à BLUE SKYE LUX et LIC 159, chacune prise individuellement, la somme de 50.000 euros au titre des frais et honoraires d'avocat par elles exposées sur le fondement des articles 1382 ou 1383 du Code civil,

**condamner** Daniela ITALIA et Jean-Marc MCLEAN aux frais et dépens de l'instance,

en tout état de cause, **prononcer** la recevabilité des demandes formulées BLUE SKYE LUX et LIC 159 et leur permettre de conclure sur le fond,

**réserver** à BLUE SKYE LUX et LIC 159 le droit de majorer leurs demandes en cours d'instance,

**réserver** à BLUE SKYE LUX et LIC 159 tous autres droits, moyens et actions à invoquer en temps et lieux utiles et suivant qu'il appartiendra,

## TAL-2022-07361

**prendre acte** du désistement d'instance pur et simple de BLUE SKYE LUX et LIC 159 notifié à MILAN ENTERTAINMENT et MILAN REAL ESTATE par acte d'avocat à avocat du 22 septembre 2025 dans l'instance pendant sous le numéro de rôle TAL-2022-07361, précision faite que lesdits désistements d'instance portent limitativement sur les demandes introduites par BLUE SKYE LUX et LIC 159 à

l'encontre de MILAN ENTERTAINMENT et MILAN REAL ESTATE au titre du prédit exploit de l'huissier Guy ENGEL du 27 juin 2022,

**rejeter** les demandes formulées par les parties défenderesses sub 1) à sub 7), sub 9), sub 10) et sub 15) visant à obtenir la nullité de l'assignation du 27 juin 2022 pour cause de libellé obscur,

**constater** que les demandes formulées par les parties défenderesses sub 16) et sub 17) sont sans objet en raison du désistement d'instance notifié à MILAN ENTERTAINMENT et MILAN REAL ESTATE par acte d'avocat à avocat du 22 septembre 2025 dans l'instance pendant sous le numéro de rôle TAL-2022-07361,

**rejeter** les demandes formulées par les parties défenderesses sub 11) à sub 13) visant à obtenir l'irrecevabilité des demandes dirigées contre elles par BLUE SKYE LUX et LIC 159,

**rejeter** les demandes formulées par Alfredo CRACA et FOOTBALLCO visant à obtenir leur mise hors de cause et l'irrecevabilité des demandes dirigées contre eux par BLUE SKYE LUX et LIC 159,

**rejeter** les demandes formulées par les parties défenderesses sub 11) à sub 13) visant à obtenir l'applicabilité de la loi de l'État de New-York au litige, et **déclarer** la loi luxembourgeoise applicable au SPA,

**rejeter** les demandes reconventionnelles formulées par PROJECT REDBLACK et ROSSONERI SPORT contre BLUE SKYE LUX et LIC 159,

**rejeter** la demande reconventionnelle formulée par GENIO, KING GEORGE et ELLIOTT UK en condamnation de BLUE SKYE LUX et LIC 159 au paiement d'une indemnité pour procédure abusive et vexatoire,

**réserver** l'ensemble des demandes des parties défenderesses de voir condamner BLUE SKYE LUX et LIC 159 à payer une indemnité de procédure sur le fondement de l'article 240 du NCPC formulées par les parties défenderesses au jugement à intervenir sur le fond, **sinon les rejeter**,

**réserver** la demande d'Alfredo CRACA et AC MILAN de voir condamner BLUE SKYE LUX et LIC 159 au paiement de leurs honoraires d'avocat sur le fondement de l'article 1382 du Code civil au jugement à intervenir sur le fond, **sinon la rejeter**,

**rejeter** l'ensemble des demandes des parties défenderesses de voir condamner BLUE SKYE LUX et LIC 159 à payer les frais et dépens de l'instance,

**réserver** au jugement à intervenir sur le fond les demandes formulées par BLUE SKYE LUX et LIC 159 contre les parties défenderesses sub 1 à 7) et sub 9) à 13) solidairement, sinon *in solidum*, sinon chacune pour le tout, au paiement d'une indemnité de procédure en vertu de l'article 240 du NCPC BLUE SKYE LUX et LIC 159, prise individuellement, évaluée à 100.000 euros en raison des sommes par elles exposées et non comprises dans les dépens alors qu'il serait inéquitable de leur laisser à leur unique charge,

sinon **condamner** les parties défenderesses sub 1 à 7) et sub 9) à 13) solidairement, sinon *in solidum*, sinon chacune pour le tout, au paiement d'une indemnité de procédure en vertu de l'article 240 du NCPC BLUE SKYE LUX et LIC 159, prise individuellement, évaluée à 100.000 euros en raison des sommes par elles exposées et non comprises dans les dépens alors qu'il serait inéquitable de leur laisser à leur unique charge,

**réserver** au jugement à intervenir sur le fond les demandes formulées par BLUE SKYE LUX et LIC 159 **contre** les parties défenderesses sub 1 à 7) et sub 9) à 13) solidairement, sinon *in solidum*, sinon chacun pour le tout à payer à BLUE SKYE LUX et LIC 159, chacune prise individuellement, la somme de 100.000 euros au titre des frais et honoraires d'avocat par elles exposées sur le fondement des articles 1382 ou 1383 du Code civil,

sinon **condamner** les parties défenderesses sub 1 à 7) et sub 9) à 13) solidairement, sinon *in solidum*, sinon chacun pour le tout à payer à BLUE SKYE LUX et LIC 159, chacune prise individuellement, la somme de 100.000 euros au titre des frais et honoraires d'avocat par elles exposées sur le fondement des articles 1382 ou 1383 du Code civil,

**condamner** les parties défenderesses sub 1 à 7) et sub 9) à 13) au frais et dépens de l'instance,

**réserver** à BLUE SKYE LUX et LIC 159 le droit de majorer leurs demandes en cours d'instance,

**réserver** à BLUE SKYE LUX et LIC 159 tous autres droits, moyens et actions à invoquer en temps et lieux utiles et suivant qu'il appartiendra,

**sur le fond, voir réserver** à BLUE SKYE LUX, LIC 159, Monsieur CERCHIONE et Monsieur D'AVANZO le droit de conclure à nouveau pour développer plus amplement tous autres moyens à formuler, et notamment le droit des deux premières de réévaluer le montant du préjudice qu'elles ont subi ;

**TAL-2023-04206**

**prononcer** *in limine litis* la nullité de l'assignation du 2 mars 2023 pour libellé obscur sur le fondement des articles 264 et 154 du NCPC,

sinon **prononcer** la nullité des demandes formulées Monsieur CERCHIONE et Monsieur D'AVANZO contre  pour violation du principe du contradictoire garanti par l'article 63 du NCPC et l'article 6 paragraphe 1er de la Convention de sauvegarde des droits de l'homme et libertés fondamentales,

sinon **rejeter** les demandes formulées par PROJECT REDBLACK et ROSSONERI SPORT contre Monsieur CERCHIONE et Monsieur D'AVANZO pour être irrecevables,

**réserver** au jugement à intervenir sur le fond, les demandes des parties défenderesses formulées par PROJECT REDBLACK et ROSSONERI SPORT de voir condamner Salvatore CERCHIONE et Gianluca D'AVANZO au paiement d'une indemnité de procédure sur le fondement de l'article 240 du NCPC formulées par les parties défenderesses, **sinon les rejeter,**

**rejeter** les demandes des parties défenderesses formulées par PROJECT REDBLACK et ROSSONERI SPORT de voir condamner Salvatore CERCHIONE et Gianluca D'AVANZO à payer les frais et dépens de l'instance,

**réserver** au jugement à intervenir sur le fond, les demandes formulées par Salvatore CERCHIONE et Gianluca D'AVANZO contre PROJECT REDBLACK et ROSSONERI SPORT solidairement, sinon *in solidum*, sinon chacune pour sa part, au paiement d'une indemnité pour procédure abusive et vexatoire évaluée *ex aequo et bono* à 80.000 euros, ou tout autre montant même supérieur arbitré par Votre Tribunal ou à dire d'expert, au titre de l'article 6-1 du Code civil,

sinon **condamner** PROJECT REDBLACK et ROSSONERI SPORT solidairement, sinon *in solidum*, sinon chacune pour sa part, au paiement d'une indemnité pour procédure abusive et vexatoire évaluée *ex aequo et bono* à 80.000 euros, ou tout autre montant même supérieur arbitré par Votre Tribunal ou à dire d'expert, au titre de l'article 6-1 du Code civil,

**réserver** au jugement à intervenir sur le fond, les demandes formulées par Salvatore CERCHIONE et Gianluca D'AVANZO contre PROJECT REDBLACK et ROSSONERI SPORT solidairement, sinon *in solidum*, sinon chacun pour le tout à payer à BLUE SKYE LUX et LIC 159, chacune prise individuellement, la somme de 100.000 euros au titre des frais et honoraires d'avocat par elles exposées sur le fondement des articles 1382 ou 1383 du Code civil,

sinon **condamner** PROJECT REDBLACK et ROSSONERI SPORT solidairement, sinon *in solidum*, sinon chacun pour le tout à payer à BLUE SKYE LUX et LIC 159, chacune prise individuellement, la somme de 100.000 euros au titre des frais et honoraires d'avocat par elles exposées sur le fondement des articles 1382 ou 1383 du Code civil,

**réserver** au jugement à intervenir sur le fond les demandes formulées par BLUE SKYE LUX et LIC 159 contre PROJECT REDBLACK et ROSSONERI SPORT solidairement, sinon *in solidum*, sinon chacune pour le tout, au paiement d'une indemnité de procédure en vertu de l'article 240 du NCPC BLUE SKYE LUX et LIC 159, prise individuellement, évaluée à 100.000 euros en raison des sommes par elles exposées et non comprises dans les dépens alors qu'il serait inéquitable de leur laisser à leur unique charge,

sinon **condamner** PROJECT REDBLACK et ROSSONERISPORT solidairement, sinon *in solidum*, sinon chacune pour le tout, au paiement d'une indemnité de procédure en vertu de l'article 240 du NCPC BLUE SKYE LUX et LIC 159, prise individuellement, évaluée à 100.000 euros en raison des sommes par elles exposées et non comprises dans les dépens alors qu'il serait inéquitable de leur laisser à leur unique charge,

**condamner** PROJECT REDBLACK et ROSSONERI SPORT aux frais et dépens de l'instance,

**réserver** à Salvatore CERCHIONE et Gianluca D'AVANZO le droit de majorer leurs demandes en cours d'instance,

**réserver** à Salvatore CERCHIONE et Gianluca D'AVANZO tous autres droits, moyens et actions à invoquer en temps et lieux utiles et suivant qu'il appartiendra,

**TAL-2023-03720**

acter que les parties représentées par la société MOLITOR ne sont pas parties à la présente procédure

Soient les conclusions qui précèdent, notifiées en copie et par courriel, sous toutes réserves à BONN & SCHMITT, Maître Cédric BELLWALD ; à C.A.S., Maître Emmanuelle PRISER ; à ELVINGER HOSS PRUSSEN, Maître Marc ELVINGER ; à CLIFFORD CHANCE, Maître Albert MORO ; à Christmann.legal SAS, Maître Bertrand CHRISTMANN ; Maître Nicolas THIELTGEN et à CMS DeBacker Luxembourg, Maître Antoine LANIEZ

Pour original

Pour MOLITOR Avocats à la Cour SARL
s. : Armel WAISSE


Donner acte aux parties représentées par la société MOLITOR qu'elles versent à l'appui des présentes, les pièces suivantes :

**TAL-2022-07355**

**Farde I :**

1. Extrait RCS de Project Redblack
2. Statuts de Project Redblack
3. Extrait RCS de Rossoneri Sport
4. Organigramme du groupe Redblack
5. Acquisition Facility Agreement entre Rossoneri Sport et Project Redblack du 13 avril 2017
6. Contrat de gage du 13 avril 2017
7. Supplemental pledge agreement du 31 juillet 2017
8. Master Agreement relatif au « Tracking Preferred Equity Certificates » conclu le 10 avril 2017
9. Tableau récapitulant les TPECset les prêts associés au niveau de Project Redblack
10. Tableau récapitulant le financement accordé par Project Redblack a Rossoneri Sport
11. Communiqué de presse de l'AC Milan en date du 1°juin 2022
12. Assignation en référé signifiée en date du 1°juin 2022
13. Courrier du 27 avril 2022 de Project Redblack (courrier non soumis au conseil de gérance)
14. Courrier du 2 juin 2022 de Rossoneri Sport
15. Courrier du 25 avril 2022 de DLA Piper
16. Courrier de CAS du 2 mai 2022 et courrier de DLA Piper du 2 mai 2022
17. Courrier de Befana Bagnès du 6 mai 2022


**Farde II :**

18. Assignation au fond signifiée par Monsieur CASLINI en date du 22 juin 2022
19. Article de presse paru dans l'Equipe le 10 mai 2022
20. Articles de presse mentionnant Elliott comme ayant négocié la cession des actions de l'AC Milan
21. Action au fond introduite par les Parties Demanderesses en date du 10 juin 2022
22. Article de presse paru dans l'Equipe en date du 17 juin 2022

23.  Article de presse paru dans l'Equipe le vendredi 15 avril 2022

24.  Communiqué de presse d'Elliott en date du 1er juin 2022 (« *Elliots letter of gratitude to AC Milan* »)

25.  Echange d'emails entre Gordon SINGER et Salvatore CERCHIONE en date du 19 avril 2022

26.  E-mail de Salvatore CERCHIONE à Gordon SINGER en date du 23 avril 2022

27.  E-mail de Salvatore CERCHIONE à Gordon SINGER en date du 5 mai 2022

28.  Courrier de Giovanni CASLINI en date du 10 juin 2022

29.  E-mail de Elliott Advisors adressé aux gérants de Blue Skye en date du 23 mars 2017

30.  *Amended and Restated Investment Agreement* en date du 31 octobre 2018

31.  Extrait du site internet d'Elliott Management en date du 22 juin 2022

32.  Avis déposé auprès du Registre de Commerce et des Sociétés de Luxembourg le 8 novembre 2024 relativement aux nouveaux associés de LIC 159.

33.  Courrier du 24 avril 2017 envoyé au notaire par PROJECT REDBLACK concernant la désignation de Monsieur CRACA

34.  Avis déposé auprès du Registre de Commerce et des Sociétés de Luxembourg le 12 juillet 2018 relativement à la réalisation du gage

35.  Extension du gage italien et traduction en français de ce document

36.  Conditions générales cadres modifiées et refondues au 31 octobre 2018

37.  Contrat d'investissement (*investors agreement*) du 10 avril 2017, tel que modifié et refondu au 31 octobre 2018

38.  Contrat de cession du 10 mai 2017 entre BLUE SKYE LUX et BLUE SKYE CAÏMANS

39.  Contrat de cession du 20 avril 2022 entre BLUE SKYE CAÏMANS et BLUE SKYE LUX

40.  Courrier du 10 juillet 2024 envoyé à BLUE SKYE LUX et BLUE SKYE CAÏMANS par PROJECT REDBLACK

41.  Courrier recommandé avec accusé de réception de BLUE SKYE LUX et LIC 159 à Project Redblack du 21 mai 2024 quant à la modification du registre des TPECs de classe A-2

42.  Contrat de contribution et de souscription de TPEC de classe E-1 (*class E-1 TPEC contribution and subscription agreement*) daté du 6 avril 2017 entre LEXINGTON en qualité de souscripteur et BLUE SKYE LUX en qualité d'émetteur

43.  Conditions générales des TPECs de classe E d'un montant maximal de 12.000.000 EUR

44.  E-mails de Monsieur D'AVANZO et de Monsieur Lawrence CUTLER, employé d'ARENA L.P. du 1er avril 2017

45.  Contrat de contribution (*contribution agreement*) daté du 8 mai 2017

46.  Preuve du paiement du prix de souscription des TPECs de classe B à partir du compte bancaire de LIC 159

47.  Comptes annuels de LIC 159 publiés pour les exercices 2017 à 2023

48.  Messages WhatsApp entre Monsieur Gordon SINGER et Monsieur CERCHIONE du 30 mars 2022

49.  Messages WhatsApp de Monsieur CERCHIONE à Monsieur Gordon SINGER du 15 avril 2022

50.  Extraits du *stock purchase agreement*

51.  Partie non-confidentielle des échanges WhatsApp entre Monsieur Gordon SINGER et Monsieur CERCHIONE entre le 11 et le 15 mai 2022

52.  Article du *Corriere della Sera* du 12 mars 2024 et traduction automatique en français de cet article

53.  Article du *Financial Times* du 12 mars 2024

54.  Article du *Corriere della Sera* du 14 mars 2024 et traduction automatique en français de cet article

55.  Transcription (*transcript*) du 17 mai 2023

56.  Ordonnance de protection (*protective order*) du 4 août 2023

57.   Assignation du 27 juin 2022

58.   Procès-verbal de la réunion du conseil de gérance de PROJECT REDBLACK du 9 septembre 2022

59.   Ordonnance de perquisition et de saisie du Tribunal de et à Luxembourg du 12 avril 2023

60.   Procès-verbal de perquisition du 21 avril 2023

61.   Biographie de Monsieur Giorgio FURLANI

62.   Requête aux fins d'ouverture d'une procédure de liquidation judiciaire du 6 mars 2023

63.   Décision du tribunal de Milan (Section civile) du 9 novembre 2023, n° 270-2023

64.   Courrier du 1er février 2023 adressé à BLUE SKYE CAÏMANS et BLUE SKYE LUX par PROJECT REDBLACK

65.   Procès-verbal de la réunion du conseil de gérance de PROJECT REDBLACK du 2 mars 2023

66.   Copie du communiqué publiée le 20 décembre 2024 sur le site internet de l'AC MILAN

67.   Article de *Sempre Milan* du 23 décembre 2024

68.   Comptes annuels de PROJECT REDBLACK publiés pour l'exercice se terminant au 30 juin 2023

69.   Copie de l'assignation en référé du 31 octobre 2023

70.   Copie de la requête en intervention du 4 avril 2024

71.   Courrier du 10 janvier 2025 par BLUE SKYE LUX et LIC 159 à LEXINGTON

72.   Décision de la Cour Suprême de l'Oregon du 29 Novembre 1996

73.   E-mail de Monsieur D'AVANZO envoyé le 24 mars 2017 à 14h34 à Misha RENDA

74.   États financiers de LEXINGTON se rapportant à l'année financière se terminant le 31 décembre 2021

75.   États financiers de LEXINGTON se rapportant à l'année financière se terminant le 31 décembre 2022

76.   Courrier du 15 novembre 2024 envoyé par PROJECT REDBLACK à BLUE SKYE LUX et LIC 159

77.   Courrier du 13 décembre 2024 envoyé par PROJECT REDBLACK à BLUE SKYE LUX et LIC 159

78.   Courrier du 15 décembre 2024 envoyé par BLUE SKYE LUX et LIC 159 à PROJECT REDBLACK

79.   Courrier du 14 janvier 2025 envoyé par PROJECT REDBLACK à BLUE SKYE LUX et LIC 159

80.   Courrier du 5 février 2025 envoyé par BLUE SKYE LUX et LIC 159 à PROJECT REDBLACK

81.   Courrier du 10 décembre 2024 envoyé par BLUE SKYE LUX et LIC 159 à PROJECT REDBLACK

82.   Exemple de contrat de contrat de transfert de TPECs de Classe B (TPECs B Assignment Agreement) accompagné de la lettre de souscription des TPECs de Classe B datée du même jour et de la preuve de paiement du prix de souscription par LIC 159 à PROJECT REDBLACK

83.   Procuration attestant du mandat donné à Blue Skye Lux par LIC 159 et traduction libre en français

84.   Extrait du mémoire en défense (*memoria difensiva*) de Project Redblack du 17 mai 2023

85.   Citation directe du 7 septembre 2023

86.   Jugement du 30 mai 2024 rendu par le tribunal d'arrondissement de et à Luxembourg, siégeant en matière correctionnelle

87.   Avis d'enregistrement en tant que partie offensée délivrés les 14 février 2023, le 19 avril 2024 et 20 mars 2025 par le ministère public italien et traductions assermentées en français de ces documents

88.   Déclaration du 12 juillet 2024 de Maître Roberto ZINGARI, avocat au barreau de Milan, concernant les avis d'enregistrement en tant que partie offensée délivrés par le ministère public italien

89.   Comptes annuels de ROSSONERI SPORT publiés pour l'exercice se terminant au 30 juin 2023

90.   Comptes annuels de ROSSONERI SPORT publiés pour l'exercice se terminant au 30 juin 2024

91.   Comptes annuels de PROJECT REDBLACK publiés pour l'exercice se terminant au 30 juin 2024

92.   Ordonnance de la Vice-Présidente du Tribunal d'arrondissement de et à Luxembourg du 26 mai 2025

**Farde III :**

93. Ordonnance rectifiée de la Vice-Présidente du Tribunal d'arrondissement de et à Luxembourg du 14 juillet 2025

94. Assignations en intervention forcée des 26 juin

95. Assignation en intervention forcée du 30 juin 2025

96. Copie de la facture du 15 juillet 2022 de Maître Raphaël COLLIN

97. Rapport de recherche délivré par le Cayman Islands General Registry concernant SHEVA INVESTMENTS LIMITED

98. Désistement d'instance du 22 septembre 2025

99. Communiqué de presse de FIVERS

100. Capture d'écran de la page web de FIVERS concernant Monsieur CRACA

101. Preuve du paiement de FIVELEX STUDIO E LEGALE TRIBUTARIO le 1er septembre 2022

## TAL-2022-07361

**Farde I :**

1. Extrait RCS de Project Redblack

2. Statuts de Project Redblack

3. Extrait RCS de Rossoneri Sport

4. Organigramme du groupe Redblack

5. Acquisition Facility Agreement entre Rossoneri Sport et Project Redblack du 13 avril 2017

6. Contrat de gage du 13 avril 2017

7. Supplemental pledge agreement du 31 juillet 2017

8. Master Agreement relatif au « Tracking Preferred Equity Certificates » conclu le 10 avril 2017

9. Tableau récapitulant les TPECset les prêts associés au niveau de Project Redblack

10. Tableau récapitulant le financement accordé par Project Redblack a Rossoneri Sport

11. Communiqué de presse de l'AC Milan en date du 1°juin 2022

12. Assignation en référé signifiée en date du 1°juin 2022

13. Assignation en référé signifiée par Monsieur Giovanni CASLINI en date du 22 juin 2022 ;

14. Article de presse paru dans l'Equipe le 10 mai 2022 ;

15. Article de presse mentionnant ELIOTT comme ayant négocié la cession des actions de l'AC MILAN ;

16. Courrier du 27 avril 2022 de Project Redblack (courrier non soumis au conseil de gérance) ;

17. Courrier du 2 juin 2022 de Rossoneri Sport ;

18. Courrier du 25 avril 2022 de DLA Piper ;

19. Courrier de CAS du 2 mai 2022 et courrier de DLA Piper du 2 mai 2022 ;

20. Courrier de Befana Bagnés du 6 mai 2022 ;

21. Action au fond introduite par les Parties Demanderesses en date du 10 juin 2022 ;

22. Article de presse paru dans l'Equipe en date du 17 juin 2022 ;

23. Article de presse paru dans l'Equipe le vendredi 15 avril 2022 ;

24. Communique de presse d'Elliott en date du 1er juin 2022 « (Elliotts letter of gratitude to AC Milan») ;

25. Echange d'e-mails entre Gordon SINGER et Salvatore CERCHIONE en date du 19 avril 2022 ;

26. E-mail de Salvatore CERCHIONE a Gordon SINGER en date du 23 avril 2022 ;

27. E-mail de Salvatore CERCHIONE a Gordon SINGER en date du 5 mai 2022 ;

28.    Courrier de Giovanni CASLINI en date du 10 juin 2022 ;

29.    E-mail de Elliott Advisors adressé aux gérants de Blue Skye en date du 23 mars 2017;

30.    Amended and Restated Investment Agreement en date du 31 octobre 2018;

31.    Extrait du site Internet d'Elliot Management en date du 22 juin 2022.


**Farde II :**

32.    Avis déposé auprès du Registre de Commerce et des Sociétés de Luxembourg le 8 novembre 2024 relativement aux nouveaux associés de LIC 159.

33.    Courrier du 24 avril 2017 envoyé au notaire par PROJECT REDBLACK concernant la désignation de Monsieur CRACA

34.    Avis déposé auprès du Registre de Commerce et des Sociétés de Luxembourg le 12 juillet 2018 relativement à la réalisation du gage

35.    Extension du gage italien et traduction en français de ce document

36.    Conditions générales cadres modifiées et refondues au 31 octobre 2018

37.    Contrat d'investissement (*investors agreement*) du 10 avril 2017, tel que modifié et refondu au 31 octobre 2018

38.    Contrat de cession du 10 mai 2017 entre BLUE SKYE LUX et BLUE SKYE CAÏMANS

39.    Contrat de cession du 20 avril 2022 entre BLUE SKYE CAÏMANS et BLUE SKYE LUX

40.    Courrier du 10 juillet 2024 envoyé à BLUE SKYE LUX et BLUE SKYE CAÏMANS par PROJECT REDBLACK

41.    Courrier recommandé avec accusé de réception de BLUE SKYE LUX et LIC 159 à Project Redblack du 21 mai 2024 quant à la modification du registre des TPECs de classe A-2

42.    Contrat de contribution et de souscription de TPEC de classe E-1 (*class E-1 TPEC contribution and subscription agreement*) daté du 6 avril 2017 entre LEXINGTON en qualité de souscripteur et BLUE SKYE LUX en qualité d'émetteur

43.    Conditions générales des TPECs de classe E d'un montant maximal de 12.000.000 EUR

44.    E-mails de Monsieur D'AVANZO et de Monsieur Lawrence CUTLER, employé d'ARENA L.P. du 1er avril 2017

45.    Contrat de contribution (*contribution agreement*) daté du 8 mai 2017

46.    Preuve du paiement du prix de souscription des TPECs de classe B à partir du compte bancaire de LIC 159

47.    Comptes annuels de LIC 159 publiés pour les exercices 2017 à 2023

48.    Messages WhatsApp entre Monsieur Gordon SINGER et Monsieur CERCHIONE du 30 mars 2022

49.    Messages WhatsApp de Monsieur CERCHIONE à Monsieur Gordon SINGER du 15 avril 2022

50.    Extraits du *stock purchase agreement*

51.    Partie non-confidentielle des échanges WhatsApp entre Monsieur Gordon SINGER et Monsieur CERCHIONE entre le 11 et le 15 mai 2022

52.    Article du *Corriere della Sera* du 12 mars 2024 et traduction automatique en français de cet article

53.    Article du *Financial Times* du 12 mars 2024

54.    Article du *Corriere della Sera* du 14 mars 2024 et traduction automatique en français de cet article

55.    Transcription (*transcript*) du 17 mai 2023

56.    Ordonnance de protection (*protective order*) du 4 août 2023

57.    Assignation du 27 juin 2022

58.    Procès-verbal de la réunion du conseil de gérance de PROJECT REBDBLACK du 9 septembre 2022

59.    Ordonnance de perquisition et de saisie du Tribunal de et à Luxembourg du 12 avril 2023

60. Procès-verbal de perquisition du 21 avril 2023

61. Biographie de Monsieur Giorgio FURLANI

62. Requête aux fins d'ouverture d'une procédure de liquidation judiciaire du 6 mars 2023

63. Décision du tribunal de Milan (Section civile) du 9 novembre 2023, n° 270-2023

64. Courrier du 1er février 2023 adressé à BLUE SKYE CAÏMANS et BLUE SKYE LUX par PROJECT REDBLACK

65. Procès-verbal de la réunion du conseil de gérance de PROJECT REDBLACK du 2 mars 2023

66. Copie du communiqué publiée le 20 décembre 2024 sur le site internet de l'AC MILAN

67. Article de *Sempre Milan* du 23 décembre 2024

68. Comptes annuels de PROJECT REDBLACK publiés pour l'exercice se terminant au 30 juin 2023

69. Copie de l'assignation en référé du 31 octobre 2023

70. Copie de la requête en intervention du 4 avril 2024

71. Courrier du 10 janvier 2025 par BLUE SKYE LUX et LIC 159 à LEXINGTON

72. Décision de la Cour Suprême de l'Oregon du 29 Novembre 1996

73. E-mail de Monsieur D'AVANZO envoyé le 24 mars 2017 à 14h34 à Misha RENDA

74. États financiers de LEXINGTON se rapportant à l'année financière se terminant le 31 décembre 2021

75. États financiers de LEXINGTON se rapportant à l'année financière se terminant le 31 décembre 2022

76. Courrier du 15 novembre 2024 envoyé par PROJECT REDBLACK à BLUE SKYE LUX et LIC 159

77. Courrier du 13 décembre 2024 envoyé par PROJECT REDBLACK à BLUE SKYE LUX et LIC 159

78. Courrier du 15 décembre 2024 envoyé par BLUE SKYE LUX et LIC 159 à PROJECT REDBLACK

79. Courrier du 14 janvier 2025 envoyé par PROJECT REDBLACK à BLUE SKYE LUX et LIC 159

80. Courrier du 5 février 2025 envoyé par BLUE SKYE LUX et LIC 159 à PROJECT REDBLACK

81. Courrier du 10 décembre 2024 envoyé par BLUE SKYE LUX et LIC 159 à PROJECT REDBLACK

82. Exemple de contrat de contrat de transfert de TPECs de Classe B (TPECs B Assignment Agreement) accompagné de la lettre de souscription des TPECs de Classe B datée du même jour et de la preuve de paiement du prix de souscription par LIC 159 à PROJECT REDBLACK

83. Procuration attestant du mandat donné à Blue Skye Lux par LIC 159 et traduction libre en français

84. Extrait du mémoire en défense (*memoria difensiva*) de Project Redblack du 17 mai 2023

85. Citation directe du 7 septembre 2023

86. Jugement du 30 mai 2024 rendu par le tribunal d'arrondissement de et à Luxembourg, siégeant en matière correctionnelle

87. Avis d'enregistrement en tant que partie offensée délivrés les 14 février 2023, le 19 avril 2024 et 20 mars 2025 par le ministère public italien et traductions assermentées en français de ces documents

88. Déclaration du 12 juillet 2024 de Maître Roberto ZINGARI, avocat au barreau de Milan, concernant les avis d'enregistrement en tant que partie offensée délivrés par le ministère public italien

89. Comptes annuels de ROSSONERI SPORT publiés pour l'exercice se terminant au 30 juin 2023

90. Comptes annuels de ROSSONERI SPORT publiés pour l'exercice se terminant au 30 juin 2024

91. Comptes annuels de PROJECT REDBLACK publiés pour l'exercice se terminant au 30 juin 2024

92. Ordonnance de la Vice-Présidente du Tribunal d'arrondissement de et à Luxembourg du 26 mai 2025

**Farde III :**

93. Ordonnance rectifiée de la Vice-Présidente du Tribunal d'arrondissement de et à Luxembourg du 14 juillet 2025

94. Assignations en intervention forcée des 26 juin
95. Assignation en intervention forcée du 30 juin 2025
96. Copie de la facture du 15 juillet 2022 de Maître Raphaël COLLIN
97. Rapport de recherche délivré par le Cayman Islands General Registry concernant SHEVA INVESTMENTS LIMITED
98. Désistement d'instance du 22 septembre 2025
99. Communiqué de presse de FIVERS
100. Capture d'écran de la page web de FIVERS concernant Monsieur CRACA
101. Preuve du paiement de FIVELEX STUDIO E LEGALE TRIBUTARIO le 1er septembre 2022


**TAL-2023-04206**


**Farde I :**
1. Extrait RCS de Project Redblack
2. Statuts de Project Redblack
3. Extrait RCS de Rossoneri Sport
4. Organigramme du groupe Redblack
5. Acquisition Facility Agreement entre Rossoneri Sport et Project Redblack du 13 avril 2017
6. Contrat de gage du 13 avril 2017
7. Supplemental pledge agreement du 31 juillet 2017
8. Master Agreement relatif au « Tracking Preferred Equity Certificates » conclu le 10 avril 2017
9. Tableau récapitulant les TPECset les prêts associés au niveau de Project Redblack
10. Tableau récapitulant le financement accordé par Project Redblack a Rossoneri Sport
11. Communiqué de presse de l'AC Milan en date du 1°juin 2022
12. Assignation en référé signifiée en date du 1°juin 2022
13. Courrier du 27 avril 2022 de Project Redblack (courrier non soumis au conseil de gérance)
14. Courrier du 2 juin 2022 de Rossoneri Sport
15. Courrier du 25 avril 2022 de DLA Piper
16. Courrier de CAS du 2 mai 2022 et courrier de DLA Piper du 2 mai 2022
17. Courrier de Befana Bagnès du 6 mai 2022


**Farde II :**
18. Assignation au fond signifiée par Monsieur CASLINI en date du 22 juin 2022
19. Article de presse paru dans l'Equipe le 10 mai 2022
20. Articles de presse mentionnant Elliott comme ayant négocié la cession des actions de l'AC Milan
21. Action au fond introduite par les Parties Demanderesses en date du 10 juin 2022
22. Article de presse paru dans l'Equipe en date du 17 juin 2022
23. Article de presse paru dans l'Equipe le vendredi 15 avril 2022
24. Communiqué de presse d'Elliott en date du 1er juin 2022 (« *Elliots letter of gratitude to AC Milan* »)
25. Echange d'emails entre Gordon SINGER et Salvatore CERCHIONE en date du 19 avril 2022
26. E-mail de Salvatore CERCHIONE à Gordon SINGER en date du 23 avril 2022
27. E-mail de Salvatore CERCHIONE à Gordon SINGER en date du 5 mai 2022

28.     Courrier de Giovanni CASLINI en date du 10 juin 2022

29.     E-mail de Elliott Advisors adressé aux gérants de Blue Skye en date du 23 mars 2017

30.     *Amended and Restated Investment Agreement* en date du 31 octobre 2018

31.     Extrait du site internet d'Elliott Management en date du 22 juin 2022

32.     Avis déposé auprès du Registre de Commerce et des Sociétés de Luxembourg le 8 novembre 2024 relativement aux nouveaux associés de LIC 159.

33.     Courrier du 24 avril 2017 envoyé au notaire par PROJECT REDBLACK concernant la désignation de Monsieur CRACA

34.     Avis déposé auprès du Registre de Commerce et des Sociétés de Luxembourg le 12 juillet 2018 relativement à la réalisation du gage

35.     Extension du gage italien et traduction en français de ce document

36.     Conditions générales cadres modifiées et refondues au 31 octobre 2018

37.     Contrat d'investissement (*investors agreement*) du 10 avril 2017, tel que modifié et refondu au 31 octobre 2018

38.     Contrat de cession du 10 mai 2017 entre BLUE SKYE LUX et BLUE SKYE CAÏMANS

39.     Contrat de cession du 20 avril 2022 entre BLUE SKYE CAÏMANS et BLUE SKYE LUX

40.     Courrier du 10 juillet 2024 envoyé à BLUE SKYE LUX et BLUE SKYE CAÏMANS par PROJECT REDBLACK

41.     Courrier recommandé avec accusé de réception de BLUE SKYE LUX et LIC 159 à Project Redblack du 21 mai 2024 quant à la modification du registre des TPECs de classe A-2

42.     Contrat de contribution et de souscription de TPEC de classe E-1 (*class E-1 TPEC contribution and subscription agreement*) daté du 6 avril 2017 entre LEXINGTON en qualité de souscripteur et BLUE SKYE LUX en qualité d'émetteur

43.     Conditions générales des TPECs de classe E d'un montant maximal de 12.000.000 EUR

44.     E-mails de Monsieur D'AVANZO et de Monsieur Lawrence CUTLER, employé d'ARENA L.P. du 1er avril 2017

45.     Contrat de contribution (*contribution agreement*) daté du 8 mai 2017

46.     Preuve du paiement du prix de souscription des TPECs de classe B à partir du compte bancaire de LIC 159

47.     Comptes annuels de LIC 159 publiés pour les exercices 2017 à 2023

48.     Messages WhatsApp entre Monsieur Gordon SINGER et Monsieur CERCHIONE du 30 mars 2022

49.     Messages WhatsApp de Monsieur CERCHIONE à Monsieur Gordon SINGER du 15 avril 2022

50.     Extraits du *stock purchase agreement*

51.     Partie non-confidentielle des échanges WhatsApp entre Monsieur Gordon SINGER et Monsieur CERCHIONE entre le 11 et le 15 mai 2022

52.     Article du *Corriere della Sera* du 12 mars 2024 et traduction automatique en français de cet article

53.     Article du *Financial Times* du 12 mars 2024

54.     Article du *Corriere della Sera* du 14 mars 2024 et traduction automatique en français de cet article

55.     Transcription (*transcript*) du 17 mai 2023

56.     Ordonnance de protection (*protective order*) du 4 août 2023

57.     Assignation du 27 juin 2022

58.     Procès-verbal de la réunion du conseil de gérance de PROJECT REDBLACK du 9 septembre 2022

59.     Ordonnance de perquisition et de saisie du Tribunal de et à Luxembourg du 12 avril 2023

60.     Procès-verbal de perquisition du 21 avril 2023

61.     Biographie de Monsieur Giorgio FURLANI

62.    Requête aux fins d'ouverture d'une procédure de liquidation judiciaire du 6 mars 2023

63.    Décision du tribunal de Milan (Section civile) du 9 novembre 2023, n° 270-2023

64.    Courrier du 1er février 2023 adressé à BLUE SKYE CAÏMANS et BLUE SKYE LUX par PROJECT REDBLACK

65.    Procès-verbal de la réunion du conseil de gérance de PROJECT REDBLACK du 2 mars 2023

66.    Copie du communiqué publiée le 20 décembre 2024 sur le site internet de l'AC MILAN

67.    Article de *Sempre Milan* du 23 décembre 2024

68.    Comptes annuels de PROJECT REDBLACK publiés pour l'exercice se terminant au 30 juin 2023

69.    Copie de l'assignation en référé du 31 octobre 2023

70.    Copie de la requête en intervention du 4 avril 2024

71.    Courrier du 10 janvier 2025 par BLUE SKYE LUX et LIC 159 à LEXINGTON

72.    Décision de la Cour Suprême de l'Oregon du 29 Novembre 1996

73.    E-mail de Monsieur D'AVANZO envoyé le 24 mars 2017 à 14h34 à Misha RENDA

74.    États financiers de LEXINGTON se rapportant à l'année financière se terminant le 31 décembre 2021

75.    États financiers de LEXINGTON se rapportant à l'année financière se terminant le 31 décembre 2022

76.    Courrier du 15 novembre 2024 envoyé par PROJECT REDBLACK à BLUE SKYE LUX et LIC 159

77.    Courrier du 13 décembre 2024 envoyé par PROJECT REDBLACK à BLUE SKYE LUX et LIC 159

78.    Courrier du 15 décembre 2024 envoyé par BLUE SKYE LUX et LIC 159 à PROJECT REDBLACK

79.    Courrier du 14 janvier 2025 envoyé par PROJECT REDBLACK à BLUE SKYE LUX et LIC 159

80.    Courrier du 5 février 2025 envoyé par BLUE SKYE LUX et LIC 159 à PROJECT REDBLACK

81.    Courrier du 10 décembre 2024 envoyé par BLUE SKYE LUX et LIC 159 à PROJECT REDBLACK

82.    Exemple de contrat de contrat de transfert de TPECs de Classe B (TPECs B Assignment Agreement) accompagné de la lettre de souscription des TPECs de Classe B datée du même jour et de la preuve de paiement du prix de souscription par LIC 159 à PROJECT REDBLACK

83.    Procuration attestant du mandat donné à Blue Skye Lux par LIC 159 et traduction libre en français

84.    Extrait du mémoire en défense (*memoria difensiva*) de Project Redblack du 17 mai 2023

85.    Citation directe du 7 septembre 2023

86.    Jugement du 30 mai 2024 rendu par le tribunal d'arrondissement de et à Luxembourg, siégeant en matière correctionnelle

87.    Avis d'enregistrement en tant que partie offensée délivrés les 14 février 2023, le 19 avril 2024 et 20 mars 2025 par le ministère public italien et traductions assermentées en français de ces documents

88.    Déclaration du 12 juillet 2024 de Maître Roberto ZINGARI, avocat au barreau de Milan, concernant les avis d'enregistrement en tant que partie offensée délivrés par le ministère public italien

89.    Comptes annuels de ROSSONERI SPORT publiés pour l'exercice se terminant au 30 juin 2023

90.    Comptes annuels de ROSSONERI SPORT publiés pour l'exercice se terminant au 30 juin 2023

91.    Comptes annuels de PROJECT REDBLACK publiés pour l'exercice se terminant au 30 juin 2024

92.    Ordonnance de la Vice-Présidente du Tribunal d'arrondissement de et à Luxembourg du 26 mai 2025

**Farde III :**

93.    Ordonnance rectifiée de la Vice-Présidente du Tribunal d'arrondissement de et à Luxembourg du 14 juillet 2025

94.    Assignations en intervention forcée des 26 juin

95.    Assignation en intervention forcée du 30 juin 2025

**96.**   Copie de la facture du 15 juillet 2022 de Maître Raphaël COLLIN

**97.**   Rapport de recherche délivré par le Cayman Islands General Registry concernant SHEVA INVESTMENTS LIMITED

**98.**   Désistement d'instance du 22 septembre 2025

**99.**   Communiqué de presse de FIVERS

**100.**   Capture d'écran de la page web de FIVERS concernant Monsieur CRACA

**101.**   Preuve du paiement de FIVELEX STUDIO E LEGALE TRIBUTARIO le 1er septembre 2022

Reçues le

s. : Me



Insight IP

Blackwell House,

Guildhall Yard

London

EC2V 5AE

### **Statement of Truth**

I, Robert Downs, am a qualified translator who is fluent and competent to translate from French into English. In my best judgment, the translated text truly reflects the content, meaning and style of the original text and constitutes in every respect a correct and true translation of the original document.

### **Certificate:**

I further certify that I am competent in the French and English language to render and certify such translations. I have the following qualifications of a certified translator:

- Master's degree in the teaching and learning of foreign languages
- 15 years of experience as quality assurance expert
- Certified court interpreter in the USA
- C1 DALF certification in the French language

I herewith certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from French of the attached document:

- 20250923_BLUE SKYE - Conclusions Synthèse 1 WAISSE_EN

Signature

Robert Louis Downs Rainey
Printed Name

24 November 2025
Dated

**MOLITOR**

|  |  |
|---|---|
| Court Register No.: | TAL-2022-07355; TAL-2022-07361 |
|  | TAL-2023-03720; TAL-2023-04206 |
| Chamber: | TAL, 2nd |
| Notified on: | 23 September 2025 |
| Scheduled for: | 24 September 2025 |

## SUMMARY SUBMISSIONS No. 1

### LIMITED TO THE PLEAS OF NULLITY AND INADMISSIBILITY RAISED
### BY THE RESPONDENTS

**FOR:**

1) **BLUE SKYE FINANCIAL PARTNERS S.À R.L.**, a limited liability company (société à responsabilité limitée), established and having its registered office at L-1450 Luxembourg, 5, Côte d'Eich, registered with the Luxembourg Trade and Companies Register under number B193016, represented by its acting management board,

hereinafter, "**BLUE SKYE LUX**",

2) **LUXEMBOURG INVESTMENT COMPANY 159 S.À R.L.**, a limited liability company, established and having its registered office at L-1450 Luxembourg, 5, Côte d'Eich, registered with the Luxembourg Trade and Companies Register under number B210208, represented by its acting manager,

hereinafter, "**LIC 159**",

claimants pursuant to a writ issued by the bailiff Guy ENGEL, registered with the District Court of Luxembourg, dated 10 June 2022,

claimants pursuant to a writ issued by the bailiff Guy ENGEL, registered with the District Court of Luxembourg, dated 27 June 2022,

claimants pursuant to a writ issued by the bailiff Martine LISÉ, registered with the District Court of Luxembourg, dated 26 June 2025,

claimants pursuant to a writ issued by the deputy bailiff Kelly FERREIRA SIMOES, acting in place of the bailiff Carlos CALVO, registered with the District Court of Luxembourg, dated 30 June 2025,

parties 1) and 2) are hereinafter referred to as the "**Claimants**",

3) Mr **Salvatore CERCHIONE**, company manager, with registered address at P.O. BOX 506736 CAP 0, Dubai, United Arab Emirates, and with professional address at L-1450 Luxembourg, 5, Côte d'Eich,

hereinafter, "**Mr CERCHIONE**",

4) Mr **Gianluca D'AVANZO**, company manager, with registered address at DIFC GATE VILLAGE 7 107 CAP 0, Dubai, United Arab Emirates, and with professional address at L-1450 Luxembourg, 5 Côte d'Eich,

hereinafter, "**Mr D'AVANZO**",

respondents pursuant to a writ issued by bailiff Josiane GLODEN, registered with the District Court of Luxembourg, dated 2 March 2023, appearing through the limited liability company **MOLITOR Avocats à la Cour SARL**, established and having its registered office at L-2763 LUXEMBOURG, 8, rue Sainte-Zithe, entered on list V of the Roll of the Luxembourg Bar Association, registered with the Luxembourg Trade and Companies Register under number B 211810, represented in these proceedings by **Maître Armel WAISSE**, avocat à la Cour (fully qualified lawyer), residing at the same address;

**AGAINST:**

1) **Ms Daniela ITALIA**, company manager, electing professional address at Intertrust Group, in L-2453 Luxembourg, 6, rue Eugène Ruppert,

hereinafter, "**Ms ITALIA**",

2) **Mr Jean-Marc MCLEAN**, company manager, electing professional address at IQ-EQ, in L-1882 Luxembourg, 12C, rue Guillaume Kroll,

hereinafter, "**Mr MCLEAN**",

respondents for the purposes of the ENGEL writ of 10 June 2022,
respondents for the purposes of the ENGEL writ of 27 June 2022,

3) Mr **Elliott GREENBERG**, company manager, with registered address at 600 Steamboat Road, 06830 Greenwich Connecticut, United States of America,

hereinafter, "**Mr GREENBERG**",

4) Mr **Viktor SCHUH**, company manager, electing professional address at Intertrust Group, in L-2453 Luxembourg, 6, rue Eugène Ruppert,

hereinafter, "**Mr SCHUH**",

5) Mr **Alfred Izak GOSLING**, company manager, electing professional address at Intertrust Group, L-2453 Luxembourg, 6, rue Eugène Ruppert,

hereinafter, "**Mr GOSLING**",

6) Mr **Christos STAVROU**, company manager, electing professional address at IQ-EQ, in L-1882 Luxembourg, 12C, rue Guillaume Kroll,

hereinafter, "**Mr STAVROU**",

7) Mr **Aiden ASPELDING**, company manager, electing professional address at Intertrust Group, L-2453 Luxembourg, 6, rue Eugène Ruppert,

hereinafter, "**Mr ASPELDING**",

respondents for the purposes of the aforementioned ENGEL writ of 27 June 2022,

all seven (parties 1) to 7)) appearing through the limited liability company **BONN & SCHMITT**, established and having its registered office at L-1511 Luxembourg, 148, avenue de la Faïencerie, entered on list V of the Roll of the Luxembourg Bar Association, registered with the Luxembourg Trade and Companies Register under number B246634, represented in these proceedings by **Maître Cédric BELLWALD**, avocat à la Cour, with the same registered address;

8) Mr **Giovanni CASLINI**, company manager, electing professional address at Blue Skye Financial Partners, L-1450 Luxembourg, 5, Côte d'Eich,

hereinafter, "**Mr CASLINI**",

respondent for the purposes of the aforementioned ENGEL writ of 10 June 2022,
respondent for the purposes of the aforementioned ENGEL writ of 27 June 2022,

respondent pursuant to a writ issued by the bailiff Josiane GLODEN, registered with the District Court of Luxembourg, dated 2 March 2023,

claimant pursuant to a writ issued by the deputy bailiff Luana COGONI, acting in place of bailiff Véronique REYTER, registered with the District Court of Luxembourg, dated 8 March 2023,

appearing through the limited liability company **C.A.S.**, established and having its registered office at L-2339 Luxembourg, 1A, rue Christophe Plantin, entered on list V of the Roll of the Luxembourg Bar Association, registered with the Luxembourg Trade and Companies Register under number B231602, represented by **Maître Emmanuelle PRISER**, avocat à la Cour, with the same registered address;

9) **PROJECT REDBLACK S.À R.L.**, a limited liability company established and having its registered office at L-1616 Luxembourg, 5 place de la Gare, registered with the Luxembourg Trade and Companies Register under number B 213015, represented by its acting management board,

Hereinafter, "**PROJECT REDBLACK**",

respondent for the purposes of the aforementioned ENGEL writ of 10 June 2022,
respondent for the purposes of the aforementioned ENGEL writ of 27 June 2022,
claimant for the purposes of the aforementioned GLODEN writ of 2 March 2023,
respondent for the purposes of the aforementioned REYTER writ of 8 March 2023,

10) **ROSSONERI SPORT INVESTMENT LUXEMBOURG S.À R.L.**, a limited liability company, established and having its registered office at L-1882 Luxembourg, 12C, rue Guillaume Kroll, registered with the Luxembourg Trade and Companies Register under number B 211625, represented by its acting management board,

hereinafter, "**ROSSONERI SPORT**",

respondent for the purposes of the aforementioned ENGEL writ of 10 June 2022,
respondent for the purposes of the aforementioned ENGEL writ of 27 June 2022,
claimant for the purposes of the aforementioned GLODEN writ of 2 March 2023,

both (parties 9) and 10)) appearing through the public limited company **ELVINGER HOSS PRUSSEN**, established and having its registered office é L-1340 Luxembourg, 2, place Winston Churchill, entered on list V of the Roll of the Luxembourg Bar Association, registered with the Luxembourg Trade and Companies Register under number B209469, represented for these purposes by **Maître Marc ELVINGER**, avocat à la Cour, with professional address in Luxembourg;

11) **GENIO INVESTMENT LLC**, a limited liability company organized under the laws of the United States of America, established and having its registered office at 1209 Orange Street, Corporation Trust Center, 19801 Wilmington, Delaware, United States of America, registered with the Division of Corporations of the Secretary of the State of Delaware under number 6368216, represented by its acting governing body,

hereinafter, "**GENIO**",

12) **KING GEORGE INVESTMENTS LLC**, a limited liability company organized under the laws of the United States of America, established and having its registered office at 1209 Orange Street, Corporation Trust Center, 19801 Wilmington, Delaware, United States of America, registered with the Division of Corporations of the Secretary of the State of Delaware under number 6368212, represented by its acting governing body,

hereinafter, "**KING GEORGE**",

respondents for the purposes of the aforementioned ENGEL writ of 10 June 2022,
respondents for the purposes of the aforementioned ENGEL writ of 27 June 2022,

13) **ELLIOTT ADVISORS (UK) LIMITED,** an English private limited company, established and having its registered office at Park House, 116 Park Street, London WIK 6AF, United Kingdom, registered with the Companies House under number 02989338, represented by its acting governing body,

hereinafter, "**ELLIOTT UK**",

respondent for the purposes of the aforementioned ENGEL writ of 27 June 2022,

all three (11), 12) and 13)) appearing through the limited partnership (société en commandite simple) **CLIFFORD CHANCE**, established and having its registered office at L-1330 Luxembourg, 10, Boulevard G.D. Charlotte, entered on list V of the Roll of the Luxembourg Bar Association, registered with the Luxembourg Trade and Companies Register under number B185112, represented by its acting manager, namely the limited liability company **CLIFFORD CHANCE GP**, itself represented for the purposes of these proceedings by its manager **Maître Albert MORO**, avocat à la Cour, with professional address in Luxembourg;

14) Mr **Alfredo CRACA**, in his capacity as sequestrator of the castre [sic], domiciled professionally at Via degli Omenoni, 2, 20121 Milan, Italy,

hereinafter, "**Mr CRACA**",

respondent for the purposes of the aforementioned ENGEL writ of 10 June 2022,
respondent for the purposes of the aforementioned ENGEL writ of 27 June 2022,

15) **ASSOCIAZIONE CALCIO MILAN S.p.A.**, a joint stock company (società per azioni) under Italian law, established and having its registered office at Via Aldo Rossi 8, 20149, Milan, Italy, registered with the Chamber of Commerce of Milan under number 569909 and tax number 01073200154, represented by its acting governing body,

hereinafter, "**AC MILAN**",

16) **MILAN ENTERTAINMENT S.r.l.**, a limited liability company (società a responsabilità limitata) under Italian law, established and having its registered office at Via Aldo Rossi, 8, 20149 Milan, Italy, registered with the Milan Chamber of Commerce under number 1355664 and tax number 10219030151, represented by its acting governing body,

hereinafter, "<b>MILAN ENTERTAINMENT</b>",

17) **MILAN REAL ESTATE S.p.A.**, a joint stock company under Italian law, established and having its registered office at Via Milanello 25, 21040 Carnago, Italy, registered with the Chamber of Commerce of Varese under number 285406 and tax number 13287110152, represented by its acting governing body,

hereinafter, "<b>MILAN REAL ESTATE</b>",

respondents for the purposes of the aforementioned ENGEL writ of 27 June 2022,

all four (parties 14), 15), 16) and 17)) appearing through the simplified joint stock company (société par actions simplifiée) **Christmann.legal S.A.S.**, established and having its registered office at L-1420 Luxembourg, 27 avenue Gaston Diderich, entered on list V of the Roll of the Luxembourg Bar Association, registered with the Luxembourg Trade and Companies Register under number B212183, represented for the purposes of these proceedings by **Maître Bertrand CHRISTMANN**, avocat à la Cour, with professional address in Luxembourg;

18) **FOOTBALLCO INTERMEDIATE COÖPERATIEF U.A.**, a cooperative with excluded liability (coöperatief met uitgesloten aansprakelijkheid) under Dutch law, established and having its registered office at Basiveg, 10, 1043AP, Amsterdam, the Netherlands, registered with the Dutch Commercial Register (Kamer van Koophandel, KVK) under number 78443962 (RSIN 861399663) represented by its acting management board,

hereinafter, "<b>FOOTBALLCO</b>",

respondent for the purposes of the aforementioned ENGEL writ of 10 June 2022,
respondent for the purposes of the aforementioned ENGEL writ of 27 June 2022,

appearing through **Maître Nicolas THIELTGEN**, avocat à la Cour, with professional address in Luxembourg,

the parties served, 1) to 18), are hereinafter referred to as the "<b>Respondents</b>";

In the presence of:

19) **Lexington Finance Designated Activity Company**, a company incorporated under the laws of Ireland, having its registered office and place of business at 32, Molesworth Street, DO2 Y512 Dublin, Ireland, registered with the Irish Companies Registration Office under number 594130, represented by its present legal representatives;

hereinafter, "<b>LEXINGTON</b>",

party intervening voluntarily pursuant to an application for voluntary intervention dated 9 February 2024 (incorrectly dated 9 February 2023),

appearing through the company **CMS DeBacker Luxembourg**, established and having its registered office at L-1433 Luxembourg, 5, rue Charles Darwin, entered on list V of the Roll of the Luxembourg Bar Association, registered with the Luxembourg Trade and Companies Register under number B 241190, represented in these proceedings by **Maître Antoine LANIEZ**, avocat à la Cour, residing at the same address.

TAL-2022-07355

Having reviewed the writ of summons of 10 June 2022

Having reviewed Submissions No. 1 from Maître Marc ELVINGER of 18 January 2023

Having reviewed Submissions No. 1 from Maître Albert MORO of 20 February 2023

Having reviewed Submissions No. 1 from Maître Bertrand CHRISTMANN of 11 April 2023

TAL-2022-07361

Having reviewed the writ of summons of 27 June 2022

Having reviewed Submissions No. 1 from Maître Marc ELVINGER of 31 October 2022

Having reviewed Submissions No. 1 from Maître Bertrand CHRISTMANN of 11 April 2023

Having reviewed Submissions No. 1 from Maître Albert MORO of 7 June 2023

Having reviewed Submissions No. 1 from Maître Cédric BELLWALD of 3 July 2023

Having reviewed Submissions No. 2 from Maître Marc ELVINGER of 5 July 2023

Having reviewed Submissions No. 1 from Maître Bertrand CHRISTMANN of 25 September 2024

Having reviewed Submissions No. 1 from Maître Nicolas THIELTGEN of 4 July 2024

Having reviewed Submissions No. 1 from Maître Emmanuelle PRISER of 5 July 2024

Having reviewed the withdrawal of proceedings notified to Maître Bertrand CHRISTMANN of 22 September 2025

TAL-2023-03720

Having reviewed the writ of summons of 8 March 2023

TAL-2023-04206

Having reviewed the writ of summons of 2 March 2023

TAL-2022-07355; TAL-2022-07361; TAL-2023-03720; TAL-2023-04206

Having reviewed the application for voluntary intervention of 9 February 2024 (incorrectly dated 9 February 2023)
by Maître Clara MARA-MARHUENDA

1.    As a preliminary matter, before raising any defence on the merits and as their principal argument, Mr Salvatore CERCHIONE and Mr Gianluca D'AVANZO petition the Court, *in limine litis*, to declare the nullity, if not the inadmissibility, of the writ initiating proceedings served to them on 2 March 2023, in the proceedings bearing Court Register No. TAL-2023-04206, at the request of PROJECT REDBLACK and ROSSONERI SPORT, on account of the obscure wording of the said writ initiating proceedings (*exceptio obscuri libelli*), contrary to Article 154 of the New Code of Civil Procedure.

2.    This argument will be developed in greater detail in paragraphs 304 et seq. of this document.


**INTRODUCTION**

3.    This dispute arises in the context of a financing transaction in April 2017, which became an acquisition transaction in 2018 (following the borrower's default), targeting the Italian company Associazione Calcio Milan S.p.A., owner of the AC MILAN football club ("**AC MILAN**") by Rossoneri Sport Luxembourg ("**ROSSONERI SPORT**"), which has since become the subsidiary of Project Redblack S.à r.l. ("**PROJECT REDBLACK**").

PROJECT REDBLACK is a vehicle under Luxembourg law, 95.73% co-owned by Genio Investment LLC ("**GENIO**") and KING GEORGE Investments LLC ("**KING GEORGE**"), two entities belonging to the US investment group Elliott Management ("**ELLIOTT**").

Blue Skye Financial Partners S.à r.l. ("**BLUE SKYE LUX**") and Luxembourg Investment Company 159 S.à r.l. ("**LIC 159**") are two entities in the European group Blue Skye ("**BLUE SKYE**"), which hold a 4.27% minority stake in PROJECT REDBLACK.

4.    More specifically, and as will be detailed below, the claims raised by BLUE SKYE LUX and LIC 159, the two entities from the BLUE SKYE group involved in the financing and acquisition of AC MILAN, claimants in the first two actions brought before Your Court, focus on a series of acts carried out at the instigation of ELLIOTT since 2022, without prejudice as to the exact date, whose central factor is ROSSONERI SPORT's sale AC MILAN shares, organised under highly dubious conditions, which is clearly fraudulent, infringing on BLUE SKYE's rights, and completely disregards the essential role BLUE SKYE has played since 2017.

5.    BLUE SKYE LUX and LIC 159 had no choice but to initiate several legal proceedings from 2022 onwards, based on the scarce information available to them at the time, in order to preserve their rights as shareholders and creditors and therefore, indirectly, those of their own shareholders and creditors. In particular, they made the following applications in Luxembourg:

(i)    a declaratory action initiated through a writ of summons of 10 June 2022 (Court Register No. TAL-2022-07355), concerning the release by PROJECT REDBLACK of the pledge under Italian law which had been granted to it by ROSSONERI SPORT over the shares issued by AC MILAN (which represented a legal obstacle to the sale of these shares by ROSSONERI SPORT), and the corresponding waiver of repayment of one part of ROSSONERI SPORT's debt to PROJECT REDBLACK, which should have been unanimously approved by the managers of PROJECT REDBLACK or, if not, by all its partners (and therefore by BLUE SKYE LUX); and

(ii)    an action brought by the writ of summons of 27 June 2022 (No. TAL-2022-07361), based on the existence of fraud perpetrated by several persons (including the managers of PROJECT REDBLACK, appointed based on the proposal of the ELLIOTT group) in connection with the sale of AC MILAN shares. These must, among other things, lead to the nullity of the deed of sale which was executed in disregard of the rights of BLUE SKYE LUX and to the nullity of the release of the pledge under Italian law granted in favour of PROJECT REDBLACK of the AC MILAN shares.

6.    Mr Giovanni CASLINI ("**Mr CASLINI**"), the only one of the three managing directors of PROJECT REDBLACK appointed based on the proposal of BLUE SKYE LUX, has, by means of a writ of summons from 8 March 2023 (Court Register No. TAL-2023-03720), brought an action for nullity against the resolutions passed on 9 September 2022 by the Management Board of PROJECT REDBLACK, particularly concerning the ratification of the decision to release the pledge under Italian law and the decision to sell the AC MILAN shares.

7.    In an attempt to intimidate and retaliate, PROJECT REDBLACK and its subsidiary, ROSSONERI SPORT, which held the AC MILAN shares before they were sold, issued a writ of summons on 2 March 2023 (Court Register No. TAL-2023-04206) against Mr Salvatore CERCHIONE ("**Mr CERCHIONE**") and Mr Gianluca D'AVANZO ("**Mr D'AVANZO**"), the partners of BLUE SKYE LUX, and Mr CASLINI, calling into question their civil liability based on alleged abusive conduct in relation to the legal steps referred to above, which the latter had undertaken.

8.    By an order made by the District Court of Luxembourg on 20 December 2023, the four proceedings referred to in the above-mentioned writs of summons were joined. An order made on the same day by the same court required the parties in Court Register No. TAL-2022-07361 to conclude initially only on:

-    "*the obscure wording,*

-     *the grounds for inadmissibility raised by Maître Albert MORO*

-    *applicable law*".

9.    Finally, it should be noted that Lexington Finance Designated Activity Company LLC ("**LEXINGTON**"), the subsidiary of the American investment fund Arena ("**ARENA**"), whose ownership stake in the transactions concerning AC MILAN had been permitted by BLUE SKYE since April 2017 due to the excellent relationship it then had with ARENA, suddenly decided to intervene voluntarily in the four cases with the above-mentioned court register numbers by means of the application of 9 February 2024 (and not 9 February 2023, as listed in the request) to side, rather suspiciously, with the ELLIOTT Group, in order to hinder the BLUE SKYE Group in its legal proceedings relating to the sale of AC MILAN.

10.    LEXINGTON also filed a writ of summary writ of summons on 31 October 2023 (Court Register No. TAL-2023-08710) seeking the appointment of an ad hoc administrator for BLUE SKYE LUX and LIC 159. In a sign of collusion or a secret agreement between the parties, PROJECT REDBLACK and ROSSONERI SPORT intervened in the case with an application for voluntary intervention, dated 4 April 2024, in support of LEXINGTON's claims. As could have been predicted. Ordinance no. 2025TALREFO/00286 of 26 May 2025 (rectified by Order

No. 2025TALREFO/00398 of 14 July 2025)[1], delivered by the Vice-President of Your Court, declared LEXINGTON's claim inadmissible for lack of legal capacity and standing in bringing proceedings on the part of LEXINGTON, as LEXINGTON was merely a creditor and had not been able to establish that BLUE SKYE LUX and LIC 159 were in a state of liquidation or no longer had management bodies capable of ensuring their normal and regular operation.

11.    As will be detailed below, BLUE SKYE LUX and LIC 159 became aware, following the service of the writs of summons of 10 and 27 June 2022, of a series of acts carried out before and after the sale of the AC MILAN shares which, taken together, undeniably demonstrate that PROJECT REDBLACK and ROSSONERI SPORT, led by ELLIOTT, acted fraudulently against their rights. Indeed, even if the sale of the AC MILAN shares played a central role in this dispute, it was only one of the stages in the unfair and fraudulent scheme put in place by the ELLIOTT group to (i) allow the latter to siphon off the funds resulting from the sale, for an amount provisionally evaluated at EUR 962,704,136; (ii) artificially and indefinitely suspend any distribution to which BLUE SKYE LUX and LIC 159 are entitled, by keeping the corresponding sums blocked at the level of ROSSONERI SPORT; and (iii) spend these sums in every possible way in order to reduce them to nothing in the event that a distribution should finally take place in favour of BLUE SKYE LUX and LIX 159.

12.    Finally, BLUE SKYE LUX and LIC 159 were also able to discover the identity of the entities that were party to the contract for the sale of the AC MILAN shares and of the company that acquired the AC MILAN shares on 31 August 2022. Similarly, BLUE SKYE LUX and LIC 159 were also able to conclude that there was insufficient evidence to implicate certain parties included in the writs of summons of 10 and 27 June 2022. As a result, BLUE SKYE LUX and LIC 159 are discontinuing certain proceedings against certain parties, as well as proceeding with the compulsory interventions, dated 26 and 30 June 2025[2], to join the parties involved in the agreement for the sale of the AC MILAN shares in the present litigation.

* *
*

---

[1]    **Court Register No. TAL-2022-07355, Exhibit No. 92 of Folder II from MOLITOR -** Order of the Vice-President of the District Court of Luxembourg of 26 May 2025; **Exhibit No. 93 of Folder III from MOLITOR -** Rectified Order of the Vice-President of the District Court of Luxembourg of 14 July 2025; **Court Register No. TAL-2022-07361, Exhibit No. 92 of Folder II from MOLITOR -** Order of the Vice-President of the District Court of Luxembourg of 26 May 2025; **Exhibit No. 93 in Folder III from MOLITOR -** Rectified Order of the Vice-President of the District Court of Luxembourg dated 14 July 2025; **Court Register No. TAL-2023-04206, Exhibit No. 92 of Folder I from MOLITOR -** Order of the Vice-President of the District Court of Luxembourg of 26 May 2025; **Exhibit No. 93 of Folder II from MOLITOR -** Rectified Order of the Vice-President of the District Court of Luxembourg of 14 July 2025.

[2]    **Court Register No. TAL-2022-07355, Exhibit No. 94 of Folder III from MOLITOR -** Summons for compulsory intervention of 26 June 2025; **Exhibit No. 95 of Folder III from MOLITOR -** Summons for compulsory intervention of 30 June 2025; **Court Register No. TAL-2022-07361, Exhibit No. 94 in Folder III from MOLITOR -** Summons for compulsory intervention of 26 June 2025; **Exhibit No. 95 of Folder III from MOLITOR -** Summons for compulsory intervention of 30 June 2025; **Court Register No. TAL-2023-04206, Exhibit No. 94 of Folder III from MOLITOR -** Summons for compulsory intervention of 26 June 2025, **Exhibit No. 95 of Folder II from MOLITOR -** Summons for compulsory intervention of 30 June 2025.

\* \*
\*

# Table of contents

I.      FACTS .................................................................................................................................. 11

1       THE PARTIES INVOLVED ..................................................................................................... 11

2       SUMMARY OF THE FACTS ................................................................................................... 13

2.1     The acquisition of AC MILAN .......................................................................................... 13

2.1.1   The situation before 10 July 2018: the financing of the acquisition of AC MILAN by a Chinese investor 13

2.1.2   The realisation of the Luxembourg Pledge by PROJECT REDBLACK ............................ 15

2.2     The financing of PROJECT REDBLACK by BLUE SKYE and ELLIOTT ............................... 16

2.2.1   Class A-1, A-2 and B TPECs issued by PROJECT REDBLACK ....................................... 16

2.2.2   Class E-1, E-2 and F TPECs initially issued by BLUE SKYE LUX .................................. 18

2.2.3   The transfer of the Class B TPECs by BLUE SKYE LUX to LIC 159 and the replacement of BLUE SKYE LUX by LIC 159 as issuer of the Class E-1, E-2 and F TPECs ...................................................... 19.

2.3     The disputes arising from the concealment from BLUE SKYE of the project to sell AC MILAN ........ 20

2.4     The proceedings initiated by BLUE SKYE LUX and LIC 159 in relation to the sale of AC MILAN shares ......... 28

2.5     Completion of the sale of AC MILAN shares ............................................................... 30

2.6     More recent evidence confirming the fraud of which BLUE SKYE LUX, LIC 159 and their creditors are victims 33

2.6.1   The unlawful distributions of 1 February 2023 by ROSSONERI SPORT and PROJECT REDBLACK .......... 34

2.6.2   The fraudulent undervaluation of vendor loan notes distributed by PROJECT REDBLACK to ELLIOTT entities ........................................................................................................... 37

2.6.3   The early repayment of vendor loan notes and their refinancing by ELLIOTT ............... 39

2.7     The surprising position taken by LEXINGTON ............................................................. 42

2.8     Early setbacks suffered by the ELLIOTT group ........................................................... 49

II.     LAW ..................................................................................................................................... 50

1       TAL-2022-07355:DECLARATORY ACTION .......................................................................... 50

2       TAL-2022-07361:ACTION FOR FRAUD ............................................................................... 63

3       TAL-2023-04206: Civil liability action against Mr CERCHIONE, Mr D'AVANZO and Mr CASLINI ........ 92

4       TAL-2023-03720: Action for annulment brought by Mr CASLINI ....................................... 106

\* \*
\*

## I.    FACTS

## 1    THE PARTIES INVOLVED

13.    BLUE SKYE LUX is a limited liability company under Luxembourg law co-founded by Mr CERCHIONE and Mr D'AVANZO, who each hold half of its share capital. This company heads a European investment group providing venture capital and investment in the field of credit.

14.    LIC 159 is a limited liability company under Luxembourg law and at the time of the events was a wholly owned subsidiary of BLUE SKYE LUX. All of its shares were transferred on 7 November 2024 to Mr CERCHIONE and Mr D'AVANZO, each of whom currently holds half[3].

15.    PROJECT REDBLACK is a limited liability company incorporated under Luxembourg law, currently 4.27% owned by BLUE SKYE LUX and 95.73% majority owned by two ELLIOTT Group companies, GENIO (28.72%) and KING GEORGE (67.01%). At the time of the events in question, PROJECT REDBLACK's management board included two class A managers appointed on the proposal of GENIO and KING GEORGE (namely, Mr Jean-Marc MCLEAN ("**Mr MCLEAN**") and Mrs Daniela ITALIA ("**Mrs ITALIA**")) and one class B manager appointed on the proposal of BLUE SKYE LUX (Mr CASLINI).



---

[3]    **Court Register No. TAL-2022-07355, Exhibit No. 32 of Folder II from MOLITOR** - Notice filed with the Luxembourg Trade and Companies Register on 8 November 2024 regarding the new shareholders of LIC 159; Court Register **No. TAL-2022-07361, Exhibit No. 32 of Folder II from MOLITOR** - Notice filed with the Luxembourg Trade and Companies Register on 8 November 2024 with respect to the new partners of LIC 159; Court Register **No. TAL-2023-04206, Exhibit No. 32 of Folder II from MOLITOR** - Notice filed with the Luxembourg Trade and Companies Register on 8 November 2024 with respect to the new partners of LIC 159.

16.   ROSSONERI SPORT is a limited liability company under Luxembourg law wholly owned by PROJECT REDBLACK since 10 July 2018 following, the realisation, by way of appropriation, of a pledge under Luxembourg law constituted on the shares of ROSSONERI SPORT, in favour of PROJECT REDBLACK. At the time of the events giving rise to these actions, the management board of this company comprised three class A managers (namely, Mr CASLINI, Mr Alfred Izak GOSLING ("**Mr GOSLING**") and Mr Viktor SCHUH ("**Mr SCHUH**")), and two class B managers (namely, Mr Elliott GREENBERG ("**Mr GREENBERG**") and Mr MCLEAN). Mr CASLINI was removed from his position as manager of Rossoneri Sport on 17 May 2022, while Mr GOSLING resigned from his position with effect from 13 May 2022, the company having taken note of this resignation on 17 May 2022. Mr Aiden ASPELDING and Mr Christos STAVROU were appointed Class A managers of ROSSONERI SPORT on 17 May 2022.

17.   AC MILAN is a company incorporated under Italian law and owns the football club AC MILAN. Until 31 August 2022, this company was 99.93% owned by ROSSONERI SPORT before the shares held by ROSSONERI SPORT were transferred by means of the fraudulent deed of sale to ACM BIDCO B.V. ("**ACM BIDCO**").

18.   Mr Alfredo CRACA ("**Mr CRACA**") was the custodian of certificates representing AC MILAN shares held by ROSSONERI SPORT, which were subject to a pledge under Italian law in favour of PROJECT REDBLACK in order to guarantee the debts of ROSSONERI SPORT to the latter. At the time of the sale of the AC MILAN shares, Mr CRACA was also a director of this company and has always denied the existence or imminence of such a transaction. Mr CRACA, who was secretly cooperating with ELLIOTT, also acted as Italian legal counsel for AC MILAN in relation to the sale of the shares for which he coordinated the due diligence. He was generously compensated for this role, in particular via FIVERS (formerly known as FIVELEX STUDIO E LEGALE TRIBUTARIO), the Italian law firm of which he is a partner, which received, among other things, a sum of EUR 602,830 from ROSSONERI SPORT on 1 September 2022[4].

19.   Elliot Advisors (UK) Limited ("**ELLIOTT UK**") is an English company belonging to the ELLIOTT group. It played a leading role in the sale of ROSSONERI SPORT's shares of AC MILAN.

---

4    **Court Register No. TAL-2022-07355, Exhibit No. 99 of Folder III from MOLITOR** - FIVERS Press Release; **Exhibit No. 100 of Folder I from MOLITORI** - Screenshot of FIVERS's webpage regarding Mr. CRACA; **Exhibit No. 101 of Folder III from MOLITOR** - Proof of payment to FIVELEX STUDIO E LEGALE TRIBUTARIO on 1 September 2022; **Court Register No. TAL-2022-07361, Exhibit No. 99 of Folder III from MOLITOR** - FIVERS Press Release; **Exhibit No. 100 of Folder I from MOLITORI** - Screenshot from FIVERS webpage regarding Mr. CRACA; **Exhibit No. 101 of MOLITOR's Shard III** - Proof of payment from FIVELEX STUDIO E LEGALE TRIBUTARIO on 1 September 2022; **Court Register No. TAL-2023-04206, Exhibit No. 99 of Folder III from MOLITOR** - FIVERS Press Release; **Exhibit No. 100 of Folder I from MOLITORI** - Screenshot from FIVERS's webpage regarding Mr CRACA; **Exhibit No. 101 of Folder I from MOLITORI** - Proof of payment from FIVELEX STUDIO E LEGALE TRIBUTARIO on 1 September 2022.

20.     Footballco Intermediate Coöperatief U.A. ("**FOOTBALLCO**"), a company belonging to the RedBird Capital Partner group ("**REDBIRD**"), is the company which entered into the agreement with ROSSONERI SPORT for the sale of AC MILAN shares on 26 May 2022. The other parties to this agreement are ELLIOTT ASSOCIATES L.P. ("**ELLIOTT ASSOCIATES**") and ELLIOTT INTERNATIONAL L.P. ("**ELLIOTT INTERNATIONAL**"), parties summoned for compulsory intervention on 26 and 30 June 2025[5].

21.     ACM BIDCO is the vehicle under Dutch law belonging to the REDBIRD Group and appointed by FOOTBALLCO to become the new owner of the shares of AC MILAN on 31 August 2022.

22.     LEXINGTON is an Irish company belonging to the ARENA group, which provided part of the funds injected by the BLUE SKYE group into PROJECT REDBLACK.


## 2     SUMMARY OF THE FACTS


### 2.1     The acquisition of AC MILAN


### 2.1.1     The situation before 10 July 2018: the financing of the acquisition of AC MILAN by a Chinese investor

23.     In April 2017, BLUE SKYE Group, known for its debt restructuring activity, was approached to provide necessary financing to ROSSONERI SPORT INVESTMENT CO. LIMITED ("**ROSSONERI HK**"), the Hong Kong holding company of a Chinese investor, Mr Yong Hong LI ("**Mr LI**"), to enable him to acquire 99.93% of the shares of AC MILAN.

24.     The BLUE SKYE group then contacted the ELLIOTT group, with whom it had already worked in the past (notably for the acquisition, debt restructuring and resale of the Hotel Bauer in Venice) to offer to participate in the project, which ELLIOTT accepted.

25.     Entities from these two groups then acquired the shares of PROJECT REDBLACK in order to use it as a dedicated vehicle for the needs of the project, for which they redesigned its governance. In particular, the articles of association of PROJECT REDBLACK provide for the appointment of two class A managers proposed by GENIO and KING GEORGE [6] and one class B manager proposed by BLUE SKYE (Mr CASLINI), none of whom may be dismissed without the approval of the shareholder(s) to whom they report.

---

[5]     **Court Register No. TAL-2022-07355, Exhibit No. 94 of Folder III from MOLITOR** - cited above, **Exhibit No. 95 of Folder III from MOLITOR** - cited above; **Court Register No. TAL-2022-07361, Exhibit No. 94 of Folder III from MOLITOR** - cited above; **Exhibit No. 95 of Folder III from MOLITOR** - cited above; **Court Register No. TAL-2023-04206, Exhibit No. 94 of Folder III from MOLITOR** - cited above, **Exhibit No. 95 of Folder II from MOLITOR** - cited above.

[6]     These were Mr MACLEAN and Ms ITALIA, replaced on 10 February 2023 by VENTO DELL'S EAST MANAGEMENT S.A.R.L. and ZORO MANAGEMENT S.A.R.L., two companies incorporated under Luxembourg law represented by Ms ITALIA and Mr MCLEAN.

26.    PROJECT REDBLACK granted a term loan facility to ROSSONERI SPORT, the indirect subsidiary of ROSSONERI HK, pursuant to the acquisition facility agreement under English law dated 17 April 2017[7] (the "AFA"), which was guaranteed by, inter alia:

(i)    a pledge under Luxembourg law on all class A shares issued by ROSSONERI SPORT (the "**Luxembourg Pledge**"); and

(ii)    a pledge under Italian law granted by ROSSONERI SPORT and relating to the shares of AC MILAN, originally set up by two pledge agreements dated 13 April 2017 and 31 July 2017[8] (the "**Italian Pledge**"). Pursuant to clause 3.3 of the Italian Pledge agreements, the certificates representing the AC MILAN shares were given to Mr CRACA, the custodian appointed by PROJECT REDBLACK, who was to hold them for the duration of the Italian Pledge[9].



---

[7]    **Court Register No. TAL-2022-07355, Exhibit No. 5 of Folder I from MOLITOR** - Acquisition Facility Agreement between ROSSONERI SPORT and PROJECT REDBLACK; **Court Register No. TAL-2022-07361, Exhibit No. 5 of Folder I from MOLITOR** - Acquisition Facility Agreement between ROSSONERI SPORT and PROJECT REDBLACK. **Court Register No. TAL-2023-04206, Exhibit No. 5 in Folder I from MOLITOR** - Acquisition Facility Agreement between ROSSONERI SPORT and PROJECT REDBLACK.

[8]    **Court Register No. TAL-2022-07355, Exhibit No. 6 to Folder I from MOLITOR** - Pledge Agreement of 13 April 2017 and **Exhibit No. 7 to Folder I from MOLITOR** - *Supplemental Pledge Agreement* of 31 July 2017; **Court Register No. TAL-2022-07361, Exhibit No. 6 to Folder I from MOLITOR** - Pledge Agreement dated 13 April 2017 and **Exhibit No. 7 to Folder I from MOLITOR** - *Supplemental Pledge Agreement* dated 31 July 2017; **Court Register No. TAL-2023-04206, Exhibit No. 6 to Folder I from MOLITOR** - Pledge Agreement dated 13 April 2017 and **Exhibit No. 7 to Folder I from MOLITOR** - *Supplemental Pledge Agreement* dated 31 July 2017.

[9]    **Court Register No. TAL-2022-07355, Exhibit No. 33 of Folder III from MOLITOR** - Letter dated 24 April 2017 sent to the notary by PROJECT REDBLACK regarding the appointment of Mr CRACA as custodian; **Court Register No. TAL-2022-07355, Exhibit No. 33 of Folder II from MOLITOR** - Letter dated 24 April 2017 sent to the notary by PROJECT REDBLACK regarding the appointment of Mr CRACA as custodian; **Court Register No. TAL-2023-04206, Exhibit No. 33 of Folder II from MOLITOR** - Letter dated 24 April 2017 sent to the notary by PROJECT REDBLACK regarding the appointment of Mr CRACA as custodian.

### 2.1.2    The realisation of the Luxembourg Pledge by PROJECT REDBLACK

27.    On 10 July 2018[10], following an event of default under the AFA, PROJECT REDBLACK realised the Luxembourg Pledge by appropriating all of the class A shares issued by ROSSONERI SPORT (the sole class B share of this company being already held by PROJECT REDBLACK).As a result, BLUE SKYE LUX and the ELLIOTT group (through GENIO and KING GEORGE) became indirect holders, via PROJECT REDBLACK and ROSSONERI SPORT, of 99.93% of the share capital of AC MILAN. In fact, there is still an ongoing dispute with Mr LI over the realisation of this security.

AC MILAN's ownership structure at the time was as follows:



28.    Following the realisation of the Luxembourg Pledge, the AFA and the Italian Pledge were maintained between PROJECT REDBLACK and ROSSONERI SPORT. This security has even been extended to cover several additional credit facilities under English law, which were granted to ROSSONERI SPORT by PROJECT REDBLACK to finance AC MILAN[11].

---

10    **Court Register No. TAL-2022-07355, Exhibit No. 34 of Folder III from MOLITOR** - Notice filed with the Luxembourg Trade and Companies Register on 12 July 2018 relating to the realisation of the pledge granted by ROSSONERI CHAMPION on the shares it holds in ROSSONERI SPORT; **Court Register No. TAL-2022-07355, Exhibit No. 34 of Folder II from MOLITOR** - Notice filed with the Luxembourg Trade and Companies Register on 12 July 2018 relating to the realisation of the pledge granted by ROSSONERI CHAMPION on the shares it holds in ROSSONERI SPORT; **Court Register No. TAL-2023-04206, Exhibit No. 34 of Folder II from MOLITOR**. Notice filed with the Luxembourg Trade and Companies Register on 12 July 2018 relating to the realisation of the pledge granted by ROSSONERI CHAMPION on the shares it holds in ROSSONERI.

11    **Court Register No. TAL-2022-07355, Exhibit No. 35 of Folder III from MOLITOR -** Extension of the Italian Pledge and machine translation into French; **Court Register No. TAL-2022-07355, Exhibit No. 35 of Folder I from MOLITOR -** Extension of the Italian Pledge and machine translation into French; **Court Register No. TAL-2023-04206, Exhibit No. 35 of Folder I from MOLITOR -** Extension of the Italian Pledge and machine translation into French.

29.    The Italian Pledge was therefore carefully maintained until its release on 31 August 2022, the day the AC MILAN shares were sold. It is therefore incorrect to claim, as certain opposing parties do, that the Italian Pledge had lost all relevance on the day when PROJECT REDBLACK (the pledgee) became the sole shareholder of ROSSONERI SPORT (the debtor)[12].On the contrary, this security remained essential to safeguard the financial interests of PROJECT REDBLACK and its investors[13].

## 2.2    The financing of PROJECT REDBLACK by BLUE SKYE and ELLIOTT

30.    As explained in the writs of summons of 10 June 2022 (Court Register No. TAL-2022-07355)[14] and 27 June 2020 (No. TAL-2022-07361)[15], the funds loaned to ROSSONERI SPORT by PROJECT REDBLACK were raised by the latter through (i) interest-free loans granted by BLUE SKYE LUX and entities of the ELLIOTT group and (ii) "Tracking Preferred Equity Certificates" ("**TPECs**"), i.e. instruments conferring on their holders several economic rights, namely a fixed yield which resembles an interest rate, and a variable yield linked to the value of an underlying asset.

### 2.2.1    The class A-1, A-2 and B TPECs issued by PROJECT REDBLACK

31.    PROJECT REDBLACK issued several categories of TPECs, all governed by Terms and Conditions initially dated 10 April 2017 and amended on 8 May 2017 and 31 October 2018 (the "**General Terms and Conditions of the class A and B TPECs**")[16].

32.    These categories of TPECs are as follows:

    (i)    **class A TPECs** which confer a right over 95.73% of the proceeds generated by the financing and then by any sale of the AC MILAN shares.

---

[12]    **Court Register No. TAL-2022-07355**, submissions by CLIFFORD CHANCE of 20 February 2023, para. 7, p. 6 and para. 21, p. 15; **Court Register No. TAL-2022-07355**, submissions by ELVINGER HOSS PRUSSEN of 31 October 2022, para. 14, p. 9; Court Register No. TAL-2023-04206, writ of summons of 2 March 2023 by ELVINGER HOSS PRUSSEN, para. 14, p. 7.

[13]    **Court Register No. TAL-2022-07355, Exhibit No.s 6 and 7 of Folder I from MOLITOR** – cited above; **Court Register No. TAL-2022-07361, Exhibit No.s 6 and 7 of Folder I from MOLITOR** – cited above; **Court Register No. TAL-2023-04206, Exhibit No.s 6 and 7 of Folder I from MOLITOR** – cited above.

[14]    **Court Register No. TAL-2022-07355**, writ of summons of 10 June 2022, pgs. 3 et seq.

[15]    **Court Register No. TAL-2022-07361**, writ of summons of 27 June 2022, pgs. 6 et seq.

[16]    **Court Register No. TAL-2022-07355, Exhibit No. 8 of Folder I from MOLITOR** – Master Agreement relating to the Tracking Preferred Equity Certificates entered into on 10 April 2017 and **Exhibit No. 36 of Folder I from MOLITOR** – amended and restated master terms and conditions of the class A-1, A-2 and B tracking preferred equity certificates of 10 April 2017, as amended and supplemented on 8 May 2017 and amended and restated on 31 October 2018; **Court Register No. TAL-2022-07361, Exhibit No. 8 of Folder I from MOLITOR** – Master Agreement relating to the Tracking Preferred Equity Certificates entered into on 10 April 2017 and **Exhibit No. 36 of Folder I from MOLITOR** – amended and restated master terms and conditions of the class A-1, A-2 and B tracking preferred equity certificates of 10 April 2017, as amended and supplemented on 8 May 2017 and amended and restated on 31 October 2018; **Court Register No. TAL-2023-04206, Exhibit No. 8 of Folder I from MOLITOR** – Master Agreement relating to the Tracking Preferred Equity Certificates entered into on 10 April 2017 and **Exhibit No. 36 of Folder I from MOLITOR** – amended and restated master terms and conditions of the class A-1, A-2 and B tracking preferred equity certificates of 10 April 2017, as amended and supplemented on 8 May 2017 and amended and restated on 31 October 2018.

The class A TPECs were themselves divided into two sub-categories, class A-1 and A-2 TPECs:

(a) **class A-1 TPECs**, whose current number is 702,403,906, are held by BUCKTHORN ASSOCIATES LIMITED and BUCKTHORN INTERNATIONAL LIMITED, belonging to the ELLIOTT group; and

(b) 10 **class A-2 TPECs** subscribed on 10 April 2017 by BLUE SKYE LUX[17].

These class A-2 TPECs, whose nominal amount (EUR 10) is low but whose yields are very high, were in fact allocated to BLUE SKYE LUX on account of its leading role in setting up, developing and managing the project.

Pursuant to the terms of the Investors Agreement signed on 10 April 2017 between Buckthorn International Limited and Buckthorn Associates Limited, Genio, King George, Blue Skye Lux and Project Redblack (the "**Investors Agreement**")[18], the class A-2 TPECs give entitlement to the following income:

---

[17]    On 10 May 2017, the class A-2 TPECs were first transferred to the Cayman company BLUE SKYE CAPITAL LIMITED, wholly owned by Mr CERCHIONE and Mr D'AVANZO ("BLUE SKYE **CAYMANS**"), in order to separate the entities holding the TPECs issued by PROJECT REDBLACK from the one holding shares in PROJECT REDBLACK **(Court Register No. TAL-2022-07355, Exhibit No. 38 of Folder I from MOLITOR** – Transfer Agreement of 10 May 2017 between BLUE SKYE LUX and BLUE SKYE CAYMANS; **Court Register No. TAL-2022-07361, Exhibit No. 38 of Folder I from MOLITOR** – Transfer Agreement of 10 May 2017 between BLUE SKYE LUX and BLUE SKYE CAYMANS; **Court Register No. TAL-2023-04206, Exhibit No. 38 of Folder I from MOLITOR** – Transfer Agreement of 10 May 2017 between BLUE SKYE LUX and BLUE SKYE CAYMANS).They were again transferred back to BLUE SKYE LUX on 20 April 2022 in order to ensure that the various proceedings on the merits, between BLUE SKYE LUX and LIC 159 on the one hand and the ELLIOTT group on the other, would not affect BLUE SKYE CAYMANS solely by reason of its holding the class A-2 TPECs (**Court Register No. TAL-2022-07355, Exhibit No. 39 of Folder I from MOLITOR** – Transfer Agreement of 20 April 2022 between BLUE SKYE CAYMANS and BLUE SKYE LUX; **Court Register No. TAL-2022-07361, Exhibit No. 39 of Folder I from MOLITOR** – Transfer Agreement of 20 April 2022 between BLUE SKYE CAYMANS and BLUE SKYE LUX; **Court Register No. TAL-2023-04206, Exhibit No. 39 of Folder I from MOLITOR** – Transfer Agreement of 20 April 2022 between BLUE SKYE CAYMANS and BLUE SKYE LUX). PROJECT REDBLACK ultimately agreed to update the register of class A TPECs in respect of the ownership of the class A-2 TPECs by BLUE SKYE LUX, only with effect from 21 May 2024, not without first attempting to rely on every possible and imaginable excuse in order to evade that obligation (**Court Register No. TAL-2022-07355, Exhibit No. 40 of Folder I from MOLITOR** – letter of 10 July 2024 sent to BLUE SKYE LUX and BLUE SKYE CAYMANS by PROJECT REDBLACK; **Exhibit No. 41 of Folder I from MOLITOR** – registered letter with acknowledgement of receipt from Blue Skye Lux and LIC 159 to Project Redblack of 21 May 2024 concerning the amendment of the register of class A-2 TPECs; **Court Register No. TAL-2022-07361, Exhibit No. 40 of Folder I from MOLITOR** – letter of 10 July 2024 sent to BLUE SKYE LUX and BLUE SKYE CAYMANS by PROJECT REDBLACK; **Exhibit No. 41 of Folder I from MOLITOR** – registered letter with acknowledgement of receipt from Blue Skye Lux and LIC 159 to Project Redblack of 21 May 2024 concerning the amendment of the register of class A-2 TPECs; **Court Register No. TAL-2023-04206, Exhibit No. 40 of Folder I from MOLITOR** – letter of 10 July 2024 sent to BLUE SKYE LUX and BLUE SKYE CAYMANS by PROJECT REDBLACK; **Exhibit No. 41 of Folder I from MOLITOR** – registered letter with acknowledgement of receipt from Blue Skye Lux and LIC 159 to Project Redblack of 21 May 2024 concerning the amendment of the register of class A-2 TPECs).BLUE SKYE LUX has naturally reserved the right to take such measures as are required to secure an entry in the register of the date from which its renewed ownership of the class A-2 TPECs was actually known to PROJECT REDBLACK, which in any event is earlier than 21 May 2024.

[18]    **Court Register No. TAL-2022-07355, Exhibit No. 37 of Folder I from MOLITOR** – Investors Agreement of 10 April 2017, as amended and restated on 31 October 2018; **Court Register No. TAL-2022-07361, Exhibit No. 37 of Folder I from MOLITOR** – Investors Agreement of 10 April 2017, as amended and restated on 31 October 2018; **Court Register No. TAL-2023-04206, Exhibit No. 37 of Folder I from MOLITOR** – Investors Agreement of 10 April 2017, as amended and restated on 31 October 2018.

- a carried interest (i.e., the right to a percentage of the profit which the entities of the ELLIOTT group derive from their investment in AC MILAN) to compensate the structuring work carried out by the BLUE SKYE group and its role as *originator* of the project, which allowed ELLIOTT to take part in the transaction, and

- management fees for the work performed by the BLUE SKYE group to increase the value and income of AC MILAN (Mr CERCHIONE and Mr D'AVANZO having been directors of AC MILAN and Mr D'AVANZO having also held the position of chief financial officer of that company until 2021)[19].These fees were regularly paid by PROJECT REDBLACK until 2022.

(ii)   class B TPECs (currently 31,325,065 in number for an amount of EUR 31,325,065) issued from 10 April 2017 onwards. As will be explained below, while **BLUE SKYE LUX** held the first 10,735,567 class B TPECs between 10 April 2017 and 8 May 2017, **LIC 159** became the holder of these instruments and of all other class B TPECs issued after 8 May 2017.

### 2.2.2   The class E-1, E-2 and F TPECs initially issued by BLUE SKYE LUX

33.   The funds used by BLUE SKYE LUX to pay the subscription price of the first 10,735,567 class B TPECs issued by PROJECT REDBLACK came from the financing it obtained through the issue of the following TPECs between 6 April 2017 and 8 May 2017:

(i)   **class E** TPECs denominated in euros, broken down as follows:

(a)  10,009,852 class **E-1 TPECs** subscribed by **LEXINGTON**[20], and

(b)  **class E-2** TPECs subscribed by BLUE SKYE CAYMANS, as well as

(ii)   **class F** TPECs subscribed by SKYE CAPITAL PARTNERS LIMITED and GIGIBA CAPITAL LIMITED, third parties to these proceedings.

---

19    Court Register No. TAL-2022-07361, writ of summons of 27 June 2022, p. 5.

20    **Court Register No. TAL-2022-07355, Exhibit No. 42 of Folder I from MOLITOR** – Class E-1 TPEC Contribution and Subscription Agreement of 6 April 2017 between LEXINGTON as subscriber and BLUE SKYE LUX as issuer, and **Exhibit No. 43 of Folder I from MOLITOR** – Terms and Conditions of class E tracking preferred equity certificates up to a maximum amount of EUR 12,000,000 of 6 April 2017; **Court Register No. TAL-2022-07361, Exhibit No. 42 of Folder I from MOLITOR** – Class E-1 TPEC Contribution and Subscription Agreement of 6 April 2017 between Lexington as subscriber and BLUE SKYE LUX as issuer, and Exhibit No. 43 of Folder I from MOLITOR – Terms and Conditions of class E tracking preferred equity certificates up to a maximum amount of EUR 12,000,000 of 6 April 2017; **Court Register No. TAL-2023-04206, Exhibit No. 42 of Folder I from MOLITOR** – Class E-1 TPEC Contribution and Subscription Agreement of 6 April 2017 between Lexington as subscriber and BLUE SKYE LUX as issuer, and **Exhibit No. 43 of Folder I from MOLITOR** – Terms and conditions of class E tracking preferred equity certificates up to a maximum amount of EUR 12,000,000 of 6 April 2017.

34.   As will be explained in more detail below[21], the underlying assets of the class E-1 and E-2 TPECs are made up of the class B TPECs, issued by PROJECT REDBLACK, and have never included the class A-2 TPECs.

**2.2.3   The transfer of the class B TPECs by BLUE SKYE LUX to LIC 159 and the replacement of BLUE SKYE LUX by LIC 159 as issuer of the class E-1, E-2 and F TPECs**

35.   On 8 May 2017, at the very request of LEXINGTON, which required that the class E-1 TPECs it had subscribed and the underlying assets corresponding to those instruments (namely the class B TPECs) all be isolated in a dedicated entity[22], LIC 159 replaced BLUE SKYE LUX:

-   in its capacity as holder of the then existing 10,009,852 class B TPECs[23]; and
-   in its capacity as issuer of the class E[24] and F TPECs,

pursuant to a Contribution Agreement under Luxembourg law[25] between BLUE SKYE LUX, LIC 159, LEXINGTON, BLUE SKYE CAYMANS, SKYE CAPITAL PARTNERS LIMITED and GIGIBA CAPITAL LIMITED (the "**Contribution Agreement**")[26].

---

[21]   See below, paragraph 92.

[22]   **Court Register No. TAL-2022-07355, Exhibit No. 44 of Folder I from MOLITOR –** emails from Mr D'Avanzo and Mr Lawrence Cutler, an employee of Arena L.P., of 1 April 2017; Court Register No. TAL-2022-07361, **Exhibit No. 44 of Folder I from MOLITOR** – emails from Mr D'Avanzo and Mr Lawrence Cutler, an employee of Arena L.P., of 1 April 2017; **Court Register No. TAL-2023-04206, Exhibit No. 44 of Folder I from MOLITOR** – emails from Mr D'Avanzo and Mr Lawrence Cutler, an employee of Arena L.P., of 1 April 2017: "*All of our previous conversation*[s] *[…] had this deal going into a separate clean entity, […]. I am sure that you can understand that if we are commingling our deal into an entity with deals we are not part of, we must understand the risk if such deals can* [a]*ffect the integrity of the vehicle and any of our investments*".

[23]   This transfer was moreover permitted by the Master Terms and Conditions applicable to the class B TPECs (**Court Register No. TAL-2022-07355, Exhibit No. 43 of Folder I from MOLITOR** – cited above, clause I, p. 2; **Court Register No. TAL-2022-07361, Exhibit No. 43 of Folder I from MOLITOR** – cited above, clause I, p. 2; **Court Register No. TAL-2023-04206, Exhibit No. 43 of Folder I from MOLITOR** – cited above, clause I, p. 2).

[24]   Further subscription agreements were also signed between LEXINGTON and LIC 159 in respect of new class E-1 TPECs from 10 July 2021.These agreements show that LEXINGTON did indeed recognise LIC 159 (and not BLUE SKYE LUX) as the current issuer of the class E-1 TPECs.

[25]   It should be noted that LEXINGTON appears to consider that the Contribution Agreement effected a double novation in respect of the class E-1 TPECs held by LEXINGTON and the class B TPECs formerly held by BLUE SKYE LUX (Application for voluntary intervention of 9 February 2024, para. 27, p. 15), whereas none of the terms of that agreement contains any reference whatsoever to a "novation" (and whereas any novation must be express under Luxembourg law), but instead refers to a "contribution" and a "transfer".

[26]   **Court Register No. TAL-2022-07355, Exhibit No. 45 of Folder I from MOLITOR** – Contribution Agreement of 8 May 2017 between BLUE SKYE LUX as contributor and LIC 159 as contributee; **Court Register No. TAL-2022-07361, Exhibit No. 45 of Folder I from MOLITOR** – Contribution Agreement of 8 May 2017 between BLUE SKYE LUX as contributor and LIC 159 as contributee; **Court Register No. TAL-2023-04206, Exhibit No. 45 of Folder I from MOLITOR** – Contribution Agreement of 8 May 2017 between BLUE SKYE LUX as contributor and LIC 159 as contributee.

36.   In addition to the first 10,735,567 class B TPECs received under the Contribution Agreement, LIC 159 became the holder of all the other class B TPECs issued after 8 May 2017 by PROJECT REDBLACK (currently 20,589,498 in number) and paid the entire subscription prices of these new financial instruments to PROJECT REDBLACK[27].This holding of all the class B TPECs has been reflected in the annual accounts of LIC 159 since 2017[28].

37.   To summarise the above, the development of the ownership structure (i) of the class A-2 and class B TPECs issued by PROJECT REDBLACK and (ii) of the class E-1 TPECs issued by BLUE SKYE may be illustrated as follows:



### 2.3   The disputes arising from the concealment from BLUE SKYE of the project to sell AC MILAN

38.   From March 2022, Mr CERCHIONE asked Mr Gordon SINGER ("**Mr SINGER**"), equity and managing partner of ELLIOTT MANAGEMENT CORPORATION (the American investment fund heading the ELLIOTT group, founded by his father, Mr Paul SINGER), on several occasions[29] about the accuracy of rumours reported in the press that AC MILAN was going to be sold to a Bahraini fund.

---

27   **Court Register No. TAL-2022-07355, Exhibit No. 46 of Folder I from MOLITOR** – proof of payment of the subscription price of the class B TPECs from the bank account of LIC 159; **Court Register No. TAL-2022-07361, Exhibit No. 46 of Folder I from MOLITOR** – proof of payment of the subscription price of the class B TPECs from the bank account of LIC 159; **Court Register No. TAL-2023-04206, Exhibit No. 46 of Folder I from MOLITOR** – proof of payment of the subscription price of the class B TPECs from the bank account of LIC 159.

28   **Court Register No. TAL-2022-07355, Exhibit No. 47 of Folder I from MOLITOR** – annual accounts of LIC 159 published for the financial years 2017 to 2023; **Court Register No. TAL-2022-07361, Exhibit No. 47 of Folder I from MOLITOR** – annual accounts of LIC 159 published for the financial years 2017 to 2023; **Court Register No. TAL-2023-04206, Exhibit No. 47 of Folder I from MOLITOR** – annual accounts of LIC 159 published for the financial years 2017 to 2023.

29   **Court Register No. TAL-2022-07355, Exhibit No. 48 of Folder I from MOLITOR** – WhatsApp messages between Mr Gordon SINGER and Mr CERCHIONE of 30 March 2022; **Court Register No. TAL-2022-07361, Exhibit No. 48 of Folder I from MOLITOR** – WhatsApp messages between Mr Gordon SINGER and Mr CERCHIONE of 30 March 2022; **Court Register No. TAL-2023-04206, Exhibit No. 48 of Folder II from MOLITOR** – WhatsApp messages between Mr Gordon SINGER and Mr CERCHIONE of 30 March 2022.

39.   Mr SINGER, on several occasions, deliberately denied the existence of any ongoing operation for the sale of AC MILAN, but undertook to keep the BLUE SKYE Group informed of any "concrete"

developments on this topic[30], which he did not do. He also led BLUE SKYE to believe that his interests and those of the ELLIOTT group were aligned and that everything would be done to maximise the value of AC MILAN (without mentioning anything about the possible sale of the shares)[31].

40.    In this respect, it should be noted that GENIO and KING GEORGE are trying to have people believe that in an email of 19 April 2022, addressed to Mr SINGER[32], Mr CERCHIONE gave full backing to the sale of AC MILAN shares. In reality, in doing so, they distorted everything Mr CERCHIONE said by selecting the bits from sentences that suited them[33]. The extract in question must be reproduced in full to reveal its exact content: "*If you have made the decision to dispose of [AC Milan]  we can only follow your decisions **but** as you know our incentives are more than aligned (blue sky* [sic] *real economics are linked to the profit). We believe that **the price mentioned in the press undervalues the company and all the value that we have brought** since we have inherited from Mr L[i]* [the Chinese investor and former beneficial owner of AC MILAN before PROJECT REDBLACK took over the shares of ROSSONERI SPORT]. *The process of selecting a buyer must, in our view, be structured with the aim of maximising value and fully reflecting what has been achieved over the years. Similar to what was done for the Bauer Hotel, this has produced positive results compared to our initially conservative expectations*." [34] (emphasis added). These comments are therefore far from a full backing given to a sale that was to have the full and unreserved approval of the company he was managing, but this only in the event that such sale was to be negotiated and the details not concealed from them.

---

[30]    **Court Register No. TAL-2022-07355, Exhibit No. 48 of Folder II from MOLITOR,** cited above; **Court Register No. TAL-2022-07361, Exhibit No. 48 of Folder II from MOLITOR,** cited above; **Exhibit No. 48 of Folder I from MOLITOR,** cited above; **Court Register No. TAL-2022-07355, Exhibit No. 49 of Folder II from MOLITOR -** WhatsApp messages from Mr. CERCHIONE to Mr. Gordon SINGER of 15 April 2022; **Court Register No. TAL-2022-07361, Exhibit No. 49 of Folder II from MOLITOR -** WhatsApp messages from Mr CERCHIONE to Mr Gordon SINGER of 15 April 2022; **Court Register No. TAL-2023-04206, Exhibit No. 49 of Folder II from MOLITOR -** WhatsApp messages from Mr CERCHIONE to Mr Gordon SINGER of 15 April 2022.

[31]    **Court Register No. TAL-2022-07355, Exhibit No. 25 from Folder II from MOLITOR** - Email exchange between Gordon SINGER and Salvatore CERCHIONE of 19 April 2022; **Court Register No. TAL-2022-07361**, writ of summons of summons of 27 June 2022, p. 9; **Exhibit No. 25 of Folder I from MOLITOR** - Email exchange between Gordon SINGER and Salvatore CERCHIONE of 19 April 2022; **Court Register No. TAL-2023-04206, Exhibit No. 25 of Folder II from MOLITOR.** Email exchange between Gordon SINGER and Salvatore CERCHIONE of 19 April 2022.

[32]    **Court Register No. TAL-2022-07355, Exhibit No. 25 from Folder II from MOLITOR** - Email exchange between Gordon SINGER and Salvatore CERCHIONE of 19 April 2022; **Court Register No. TAL-2022-07361**, writ of summons of summons of 27 June 2022, p. 9; **Exhibit No. 25 of Folder I from MOLITOR** - Email exchange between Gordon SINGER and Salvatore CERCHIONE of 19 April 2022; **Court Register No. TAL-2023-04206, Exhibit No. 25 of Folder II from MOLITOR.** Email exchange between Gordon SINGER and Salvatore CERCHIONE of 19 April 2022.

[33]    Court Register No. TAL-2022-07361, conclusions of CLIFFORD CHANCE of 7 June 2023, No. 20, p. 13.

[34]     Original text: "*If you have made the decision to dispose of ACM we can only follow your decisions but as you know our incentives are more than aligned (blue skey real economics are linked to the profit). We believe that the price mentioned in the press undervalues the company and all the value that we have brought since we have inherited from Mr L*[i]. "**(Court Register No. TAL-2022-07355, Exhibit No. 25 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2022-07361, Exhibit No. 25 of Folder I from MOLITOR**, cited above; **Court Register No. TAL-2023-04206, Exhibit No. 25 of Folder II from MOLITOR**, cited above).

41.     During a conference call held on 20 April 2022, Mr SINGER, who could no longer credibly deny the existence of serious discussions with a potential purchaser, finally admitted to Mr CERCHIONE that an exclusivity undertaking had been signed with INVESTCORP HOLDINGS B.S.C., an investment fund based in Bahrain ("**INVESTCORP**"), in relation to the sale of AC MILAN for a price of €1.1 billion[35].

42.     These negotiations between INVESTCORP and ELLIOTT UK, the English subsidiary of the ELLIOTT group, which had no direct or indirect capital ties with AC MILAN, were deliberately concealed from the BLUE SKYE group and Mr CASLINI. BLUE SKYE LUX was, however, one of the three shareholders of PROJECT REDBLACK and, in this capacity and in accordance with the company's articles of association, was entitled to receive the information necessary to give its consent to the transaction. Mr CASLINI was the manager of PROJECT REDBLACK and ROSSONERI SPORT, the latter holding 99.93% of the share capital of AC MILAN, so that in his capacity as manager he should have received all the information relevant to the transaction.

43.     However, the manoeuvres of the ELLIOTT group did not stop at concealing the transaction, but also included not wanting to maximise the sale price of AC MILAN. In two emails dated 23 April and 5 May 2022[36], which remained unanswered, Mr CERCHIONE questioned Mr SINGER about the reasons for such a surprising and illogical decision. It noted:

        (i)     that no tender procedure had been put in place, contrary to the usual procedure for this type of transaction and to what would have been consistent with the way in which ELLIOTT and BLUE SKYE had proceeded in the past for another project (the sale of the Bauer Hotel in Venice); and

        (ii)    that the sale would go ahead without waiting for (a) the effects of the COVID-19 pandemic to be completely behind them; (b) AC MILAN to finally reach a financial balance; and (c) the acquisition to be finalised of the AC MILAN stadium, which was in progress at the time*.*

44.     Faced with ELLIOTT's fraudulent concealment and other dishonest behaviour, BLUE SKYE LUX had no choice but to instruct its legal advisers to defend its interests and ensure that its rights were respected, namely the right (i) to benefit from the same level of information and transparency as ELLIOTT or ROSSONERI SPORT; (ii) to have the transaction performed under normal conditions of competition; and (iii) to respect the prerogatives conferred on it by the articles of association of PROJECT REDBLACK (in particular, the requirement for unanimous agreement for any Restricted Matter, pursuant to Articles 13 and 16 of the Articles of Association[37]) and the documentation relating to the TPECs.

---

[35]    Court Register No. TAL-2022-07361, writ of summons of summons of 27 June 2022, p. 9.

[36]    **Court Register No. TAL-2022-07361**, writ of summons of 27 June 2022, p. 9; **Court Register No. TAL-2022-07355, Exhibit No. 26 of Folder II from MOLITOR -** Email sent on 23 April 2022 at 7:36 p.m. by Mr CERCHIONE to Mr. Gordon SINGER and **Exhibit No. 27 of Folder II from MOLITOR -** Email sent on 5 May 2022 at 12:17 p.m. by Mr. CERCHIONE to Mr. Gordon SINGER; **Court Register No. TAL-2022-07361, Exhibit No. 26 of Folder I from MOLITOR -** Email from Salvatore CERCHIONE to Gordon SINGER of 23 April 2022; **Exhibit No. 27 of Folder I from MOLITOR -** Email from Salvatore CERCHIONE to Gordon SINGER of 5 May 2022; **Court Register No. TAL-2023-04206, Exhibit No. 26 of Folder II from MOLITOR -** Email from Salvatore CERCHIONE to Gordon SINGER of 23 April 2022; **Exhibit No. 27 of Folder II from MOLITOR -** Email from Salvatore CERCHIONE to Gordon SINGER of 5 May 2022.

[37]    **Court Register No. TAL-2022-07355, Exhibit No. 2 of Folder I from MOLITOR** - Articles of Association of Project Redblack; **Court Register No. TAL-2022-07361, Exhibit No. 2 of Folder I from MOLITOR** - Articles of Association of Project Redblack; **Court Register No. TAL-2023-04206, Exhibit No. 2 of Folder I from MOLITOR**, - Articles of Association of Project Redblack.

This was followed by numerous exchanges of letters and emails between the parties and their respective lawyers, highlighting the wrongs alleged by BLUE SKYE LUX and Mr CASLINI against the ELLIOTT Group. However, these efforts failed to change the behaviour of the ELLIOTT group and its lackeys.

45.    The following points should particularly be noted from this correspondence:

(i)    On 25 April 2022[38], BLUE SKYE LUX reminded Mr CRACA (who, as we have seen, was working behind the scenes for ELLIOTT, in particular through his role as director of AC MILAN) that, in his capacity as custodian of the certificates representing the AC MILAN shares subject to the Italian pledge, the release of this security was a prerequisite for any sale of the AC MILAN shares and was subject to the unanimous approval of the managers of PROJECT REDBLACK and, if not, of its shareholders.

(ii)    27 April 2022[39], Mr MCLEAN and Ms ITALIA, the class A managers of PROJECT REDBLACK, became involved in the matter, taking care not to provide the slightest information about the transaction in progress in relation to the AC MILAN shares (the very fact that they do not deny the existence of this transaction and the promise to organise a meeting of the management board of PROJECT REDBLACK to discuss this transaction is significant[40]).

(iii)    On 2 May 2022[41], BLUE SKYE's Luxembourg and Italian counsel and Mr CASLINI took note of the implicit confirmation of the ELLIOTT group's role in the secret operation to sell AC MILAN shares and reiterated the need to comply with the unanimity requirements set out in PROJECT REDBLACK's articles of association in the context of such an operation.

(iv)    On 6 May 2022[42], BEFANA BAGNES, the Luxembourg counsel for the class A managers of PROJECT REDBLACK (Mr MCLEAN and Ms ITALIA), stated that a transaction purportedly to be carried out "*at arm's length*" was underway, and that full details would be revealed at meetings of the management boards of PROJECT REDBLACK and ROSSONERI SPORT to be held on 13 May 2022.

---

[38]    **Court Register No. TAL-2022-07355, Exhibit No. 15 of Folder I from MOLITOR** - Letter of 25 April 2022 from DLA PIPER; **Court Register No. TAL-2022-07361, Exhibit No. 18 of Folder I from MOLITOR**- Letter of 25 April 2022 from DLA PIPER; **Court Register No. TAL-2023-04206, Exhibit No. 18 of Folder II from MOLITOR** - Letter of 25 April 2022 from DLA PIPER.

[39]    **Court Register No. TAL-2022-07355, Exhibit No. 13 of Folder I from MOLITOR** - Letter of 27 April 2022 from Project Redblack (letter not submitted to the management board); **Court Register No. TAL-2022-07361, Exhibit No. 16 of Folder I from MOLITOR** - Letter of 27 April 2022 from Project Redblack (letter not submitted to the management board); **Court Register No. TAL-2023-04206, Exhibit No. 16 of Folder I from MOLITOR** - Letter of 27 April 2022 from Project Redblack (letter not submitted to the management board).

[40]    **Court Register No. TAL-2022-07355**, writ of summons of 10 June 2022, p. 7; **Court Register No. TAL-2022-07361**, writ of summons of 27 June 2022, p. 10; C.A.S. conclusions of 5 July 2023, No. 17, pgs. 6 and 7.

[41]    **Court Register No. TAL-2022-07355, Exhibit No. 16 of Folder I from MOLITOR** - Letter from CAS of 2 May 2022 and letter from DLA PIPER of 2 May 2022; **Court Register No. TAL-2022-07361, Exhibit No. 19 of Folder I from MOLITOR** - letter from CAS of 2 May 2022 and letter from DLA PIPER of 2 May 2022; **Court Register No. TAL-2023-04206, Exhibit No. 19 of Folder II from MOLITOR**- letter from CAS of 2 May 2022 and letter from DLA PIPER of 2 May 2022.

[42]    **Court Register No. TAL-2022-07355, Exhibit No. 17 of Folder I from MOLITOR** - Letter from BEFANA BAGNÈS of 6 May 2022; **Court Register No. TAL-2022-07361, Exhibit No. 20 of Folder I from MOLITOR**- Letter from BEFANA BAGNÈS of 6 May 2022; **Court Register No. TAL-2023-04206, Exhibit No. 20 of Folder II from MOLITOR**- Letter from BEFANA BAGNÈS of 6 May 2022.

46.  The PROJECT REDBLACK management board meeting postponed to 17 May 2022[43], which should have shed light on the proposed transaction[44], was actually about "*changing the composition of the management board of ROSSONERI SPORT*". This formulation was in truth a gentle euphemism used to designate the dismissal of Mr CASLINI from his duties as manager of ROSSONERI SPORT, after the Class A managers of PROJECT REDBLACK (and therefore ELLIOTT) had done everything possible to keep him in the dark about the negotiations concerning the sale of the AC MILAN shares[45]. This dismissal was contrary to the common intention of the ELLIOTT and BLUE SKYE groups to have a BLUE SKYE representative as manager of ROSSONERI SPORT.

47.  The dismissal of Mr CASLINI and the subsequent accusations made against him by PROJECT REDBLACK and ROSSONERI SPORT[46] are disconcerting, to say the least. These two companies have shown rare ingratitude and incomprehensible animosity towards their (former) manager[47], who did his utmost to ensure that the provisions of the articles of association were respected and to act in their corporate interest in order to avoid (i) the sale of the AC MILAN shares being carried out at a reduced price; (ii) ROSSONERI SPORT consequently finding itself in a situation where it could not pay its debts to PROJECT REDBLACK in full; and (iii) the latter consequently having to give up part of its debt to its subsidiary, thereby incurring a loss of several hundred million euros.

48.  It should also be noted that as at 17 May 2022, no decision had been taken by the management board of ROSSONERI SPORT regarding possible negotiations for the sale of its shares in AC MILAN or the appointment of special representatives for this purpose[48], which shows that the negotiations had been carried out directly and in secret by the ELLIOTT group and the A managers of PROJECT REDBLACK in order to keep BLUE SKYE and Mr CASLINI completely in the dark.

---

43   **Court Register No. TAL-2022-07361, Exhibit No. 15 of File I of C.A.S. -** Minutes of the PROJECT REDBLACK management board meeting of 17 May 2022. On 22 June 2022, Mr CASLINI initiated proceedings before the Luxembourg District Court against PROJECT REDBLACK and ROSSONERI SPORT, seeking the annulment of the decision that removed him from his position as manager of ROSSONERI SPORT. These proceedings are currently pending and registered under No. TAL-2022-05135 **(Court Register No. TAL-2022-07355, Exhibit No. 18 from Folder II from MOLITOR -** Summons of 22 June 2022; **Court Register No. TAL-2022-07361, Exhibit No. 13 of Folder I from MOLITOR -** Writ of summons on the merits served by Mr Giovanni CASLINI on 22 June 2022; **Court Register No. TAL-2023-04206, Exhibit No. 13 of Folder I from MOLITOR –** Writ of summons on the merits served by Mr Giovanni CASLINI on 22 June 2022). Previously, he had applied to the judge for interim relief for a suspension of the effects of that removal, by writ of summons of 1 June 2022. (**Court Register No. TAL-2022-07355, Exhibit No. 12 of Folder I from MOLITOR –** Writ of summons for interim relief served on 1 June 2022; **Court Register No. TAL-2022-07361, Exhibit No. 12 of Folder I from MOLITOR –** Writ of summons for interim relief served on 1 June 2022; **Court Register No. TAL-2023-04206, Exhibit No. 12 of Folder I from MOLITOR –** Writ of summons for interim relief served on 1 June 2022) This application was declared inadmissible in interim proceedings by order of 30 November 2022. Mr CASLINI did not apply in interim proceedings for the suspension of the effects of the resolutions approving the sale of AC MILAN, contrary to what Lexington claims (application for voluntary intervention of 9 February 2024, no. 25, p. 15).

44   **Court Register No. TAL-2022-07355, Exhibit No. 17 of Folder I from MOLITOR -** cited above; **Court Register No. TAL-2022-07361, Exhibit No. 20 from Folder I from MOLITOR -** cited above; **Court Register No. TAL-2023-04206, Exhibit No. 20 of Folder II from MOLITOR -** cited above.

45   Court Register No. TAL-2022-07355, writ of summons of 10 June 2022, pgs. 6 and 7; Court Register No. TAL-2022-07361, writ of summons of 27 June 2022, pgs. 9 and 10.

46   Contained, in particular, in the aforementioned writ of summons of 2 March 2023.

47   **Court Register No. TAL-2022-07355,** submissions by ELVINGER HOSS PRUSSEN of 31 October 2022, No. 24 and No. 25, pgs. 15 and 16; Court Register No. TAL-2023-04206, writ of summons of 2 March 2023, Nos. 24 and 25, p. 13.

48   Court Register No. TAL-2022-07361, writ of summons of 27 June 2022, p. 10.

49.   On 26 May 2022, around nine days after the dismissal of Mr CASLINI, ROSSONERI SPORT signed a stock purchase agreement (hereinafter "**SPA**") with FOOTBALLCO, a special purpose vehicle under Dutch law 100% owned by the American investment fund REDBIRD[49], concerning all the shares held by ROSSONERI SPORT in AC MILAN, after due diligence coordinated by Mr CRACA[50] was carried out for the purposes of the transaction[51] (such a process, which generally takes several months, was deliberately concealed from Mr CASLINI and BLUE SKYE).

50.   On 1 June 2022, a press release was issued by REDBIRD and ELLIOTT announcing that a definitive agreement had been reached in relation to the sale of the AC MILAN shares with a closing scheduled for September 2022 and an indication that the ELLIOTT Group would retain a minority financial interest in AC MILAN and seats on the AC MILAN board of directors[52]. On the other hand, and as a matter of importance, there is no mention whatsoever in this article of BLUE SKYE LUX, as if this company had disappeared, thereby concealing the role that the BLUE SKYE group has played for years in the development of AC MILAN. Even if PROJECT REDBLACK and ROSSONERI SPORT (and behind them, the ELLIOTT group) like to point out that the financial investment made by the BLUE SKYE group in the structure is less than that of ELLIOTT[53], they cannot hide the considerable role played by the BLUE SKYE group in structuring the transaction and the efforts the latter made.

51.   However, it was not until the following day, 2 June 2022, that a letter was finally sent by ROSSONERI SPORT to PROJECT REDBLACK (with a copy sent to BLUE SKYE LUX)[54], in which BLUE SKYE LUX and Mr CASLINI were finally[55] officially informed of the signing of the SPA and the sale of AC MILAN, not to INVESTCORP, as the statements made by Mr SINGER on 20 April 2022 had suggested, but to REDBIRD. The assertions from GENIO and KING GEORGE that the offer from

---

[49]   **Court Register No. TAL-2022-07355, Exhibit No. 50 in File II -** Extracts from the SPA; **Court Register No. TAL-2022-07361, Exhibit No. 50 of Folder II from MOLITOR** - Extracts from the SPA; **Court Register No. TAL-2023-04206, Exhibit No. 50 of Folder II from MOLITOR** - Extracts from the SPA.

[50]   **Court Register No. TAL-2022-07355, Exhibit No. 99 of Folder II from MOLITOR** - cited above; **Exhibit No. 100 of Folder II from MOLITOR** - cited above; **Exhibit No. 101 of Folder II from MOLITOR** - cited above; **Court Register No. TAL-2022-07361, Exhibit No. 99 of Folder II from MOLITOR**- cited above; **Exhibit No. 100 from Folder II from MOLITOR** - cited above; **Exhibit No. 101 from Folder III from MOLITOR** - cited above; **Court Register No. TAL-2023-04206, Exhibit No. 99 from Folder III from MOLITOR** - cited above; **Exhibit No. 100 from Folder II from MOLITOR** - cited above; **Exhibit No. 101 from Folder II from MOLITOR** - cited above.

[51]   Court Register No. TAL-2022-07355, writ of summons of 10 June 2022, p. 7; Court Register No. TAL-2022-07361, writ of summons of 27 June 2022, p. 10.

[52]   Court Register No. TAL-2022-07355, writ of summons of 10 June 2022, p. 6; Court Register No. TAL-2022-07361, writ of summons of 27 June 2022, p. 8; **Court Register No. TAL-2022-07355, Exhibit No. 11 of Folder I from MOLITOR** - AC MILAN Press Release of 1 June 2022; **Court Register No. TAL-2022-07361, Exhibit No. 11 of Folder I from MOLITOR** - AC Milan Press Release of 1 June 2022; **Court Register No. TAL-2023-04206, Exhibit No. 11 of Folder I from MOLITOR** - AC Milan Press Release of 1 June 2022.

[53]   **Court Register No. TAL-2022-07361, Court Register No. TAL-2022-07355,** submissions of ELVINGER HOSS PRUSSEN of 31 October 2022, No. 20, p. 14; **Court Register No. TAL-2023-04206,** writ of summons of 2 March 2023, No. 20, p. 12.

[54]   **Court Register No. TAL-2022-07355, Exhibit No. 14 of Folder I from MOLITOR** - Letter of 2 June 2022 from ROSSONERI SPORT; **Court Register No. TAL-2022-07361, Exhibit No. 17 of Folder I from MOLITOR** - Letter of 2 June 2022 from ROSSONERI SPORT; **Court Register No. TAL-2023-04206, Exhibit No. 17 of Folder I from MOLITOR** - Letter of 2 June 2022 from ROSSONERI SPORT.

[55]   **Court Register No. TAL-2022-07355, Exhibit No. 51 of Folder II from MOLITOR -** Non-confidential part of the WhatsApp exchanges between Mr Gordon SINGER and Mr CERCHIONE between 11 and 15 May 2022; **Court Register No. TAL-2022-07361, Exhibit No. 51 of Folder II from MOLITOR -** Non-confidential part of the WhatsApp exchanges between Mr Gordon SINGER and Mr CERCHIONE between 11 and 15 May 2022; **Court Register No. TAL-2023-04206, Exhibit No. 51 of Folder II from MOLITOR -** Non-confidential part of the WhatsApp exchanges between Mr Gordon SINGER and Mr CERCHIONE between 11 and 15 May 2022.

REDBIRD was better than that of INVESTCORP[56] cannot be verified, due to the improper withholding of information by the ELLIOTT group and its executors in this respect.

ROSSONERI SPORT attached the "main" elements of the transaction to this letter.

As such, BLUE SKYE LUX learned that:

(i)     the sale price of AC MILAN would be based on a company value of EUR 1,228,418,010.20;

(ii)    part of the sale price (between EUR 200 million and EUR 550 million) would be financed by one or more vendor loan notes issued by the buyer and taken up by ROSSONERI SPORT at a rate of 7% per annum, which would mature on the third anniversary of the date of completion of the transaction;

(iii)   the release of the Italian pledge (which, it should be remembered, related to the AC MILAN shares and was a guarantee for PROJECT REDBLACK of the proper repayment of its debt to ROSSONERI SPORT) was a condition precedent to the completion of the sale transaction, which would allow the sale of the AC MILAN shares;

(iv)   ROSSONERI SPORT would have a pledge on AC MILAN shares[57] (which PROJECT REDBLACK and ROSSONERI SPORT seem to accept[58]) as a guarantee for the repayment of the vendor loan notes issued for the payment of part of the sale price. However, the sale price thus guaranteed in part by the new pledge is in any event less than the amount of PROJECT REDBLACK's claim against ROSSONERI SPORT, which was previously guaranteed by the Italian pledge. However, this new pledge could only allow for the repayment of the vendor credit notes, the amount of which is less than PROJECT REDBLACK's claim against ROSSONERI SPORT; and

(v)    until the full repayment of the vendor credit notes, ROSSONERI SPORT (and therefore, in reality, the ELLIOTT group, which controls this company) could appoint two members to the board of directors of AC Milan.

52.    In the letter of 2 June 2022, ROSSONERI SPORT also asked PROJECT REDBLACK to grant an additional loan of EUR 5,000,000 to meet a request for funds from AC MILAN. Such a loan would have increased ROSSONERI SPORT's debt to PROJECT REDBLACK even further, even though ROSSONERI SPORT no longer had sufficient assets to repay it once the AC MILAN shares had been sold. What is more, as this request for an additional loan came after the SPA had been signed, it would have been logical for the purchaser of the AC MILAN shares to be responsible for the financing.

---

[56]    Court Register No. TAL-2022-07361, opinion of CLIFFORD CHANCE of 7 June 2023, No. 20, p. 14.

[57]    **Court Register No. TAL-2022-07355, Exhibit No. 14 of Folder I from MOLITOR**, cited above, Appendix C; **Court Register No. TAL-2022-07361, Exhibit No. 17 of Folder I from MOLITOR**, cited above, Appendix C; **Court Register No. TAL-2023-04206, Exhibit No. 17 of Folder I from MOLITOR**, cited above, Appendix C.

[58]    Court Register No. TAL-2022-07361, ELVINGER HOSS PRUSSEN's counterclaim and incidental submissions of 31 October 2022, No. 15, p. 10; TAL-2023-04206, writ of summons of 2 March 2023, No. 15, p. 8.

The incongruity of this request is indicative of the fact that the SPA was concluded in total haste to present the BLUE SKYE group with a fait accompli[59].

53.    The sale of AC MILAN, as permitted by PROJECT REDBLACK, breached Article 13 of the company's articles of association in several respects. At this stage, it is worth noting that:

(i)    The release of the Italian pledge, which required an agreement between PROJECT REDBLACK and ROSSONERI SPORT, is a transaction between PROJECT REDBLACK and a subsidiary or affiliate of its partners or TPEC holders (ROSSONERI SPORT being the indirect subsidiary of KING GEORGE, one of PROJECT REDBLACK's partners with 67.01% of its share capital).

(ii)    Article 19.12.(a) of the AFA prohibited the transfer of AC MILAN shares by ROSSONERI SPORT (such a transaction not falling within the definition of "Permitted Disposal" or "Permitted Transaction"). Similarly, Article 20.16 stated that any "*Change of Control*"[60] would constitute an Event of Default under this agreement. Finally, the implementation of vendor loan notes for part of the sale price of the AC MILAN shares violated clause 19.14 of the AFA, which prohibited ROSSONERI SPORT from being a creditor in respect of "*Financial Indebtedness*" other than a "*Permitted Loan*" or a "*Permitted Transaction*", which was not applicable in this case. The only solution would have been to transfer the AC MILAN shares to PROJECT REDBLACK following the implementation of the Italian pledge and the settlement of PROJECT REDBLACK's debt to ROSSONERI SPORT for an amount equivalent to the realisable value of the shares.

In order for the transaction to be completed, it was necessary for ROSSONERI SPORT and PROJECT REDBLACK to amend the terms of the AFA, which again constituted a transaction between PROJECT REDBLACK and a subsidiary or affiliate of one of its associates (in this case, KING GEORGE).

54.    Articles 13 and 16 of the articles of association of PROJECT REDBLACK consider such transactions as "Restricted Matters" and "Reserved Matters"[61] which must be approved by all of PROJECT REDBLACK's directors or, if not, by its associates. It was therefore impossible for PROJECT REDBLACK to satisfy this requirement and not to be in breach of its own articles of association in the circumstances described above, where the transaction took place without the knowledge of Mr CASLINI and BLUE SKYE LUX.

---

[59]    Court Register No. TAL-2022-07361, writ of summons of 27 June 2022, pgs. 23 and 24; **Court Register No. TAL-2022-07355, Exhibit No. 14 of Folder I from MOLITOR**, cited above, point 11; **Court Register No. TAL-2022-07361, Exhibit No. 17 of Folder I from MOLITOR**, cited above, point 11; **Court Register No. TAL-2023-04206, Exhibit No. 17 of Folder I from MOLITOR**, cited above, point 11.

[60]    Point (c) of the definition of "Change of Control" in clause 1.1 of the AFA includes the case where ROSSONERI SPORT no longer directly holds 99.92973% of the issued share capital of the Target, in other words AC MILAN - **Court Register No. TAL-2022-07355, Exhibit No. 5 of Folder I from MOLITOR,** cited above; **Court Register No. TAL-2022-07361, Exhibit No. 5 of Folder I from MOLITOR**, cited above; **Court Register No. TAL-2023-04206, Exhibit No. 5 of Folder I from MOLITOR**, cited above.

[61]    Article 13, paragraph 7 of PROJECT REDBLACK's articles of association: "any transaction to be entered into by and between the Company and any of its Shareholders, TPECs holders or any other subsidiary or affiliate of that Shareholder or TPECs holder" **(Court Register No. TAL-2022-07355, Exhibit No. 2 of Folder I from MOLITOR**, cited above; **Court Register No. TAL-2022-07361, Exhibit No. 2 of Folder I from MOLITOR**, cited above; **Court Register No. TAL-2023-04206, Exhibit No. 2 of Folder I from MOLITOR**, cited above); writ of summons of 10 June 2022, p. 11.

It is irrelevant that the opposing parties refer to BLUE SKYE LUX's "veto right" [62] to describe the unanimity requirement for these decisions to be taken by the managers and partners for "Restricted Matters" and "Reserved Matters". Insofar as BLUE SKYE LUX and Mr CASLINI have the right, under the articles of association, to not consent to certain transactions which they consider to be contrary to the corporate interests of PROJECT REDBLACK, they could legitimately exercise this right, even if by doing so they were thwarting the schemes of the ELLIOTT group.

55.    Far from being an unfortunate oversight, the violation of these statutory provisions was fully deliberate and part of a plan skilfully orchestrated over an extended period by ELLIOTT and its executors. This is evidenced in particular by an invoice sent to PROJECT REDBLACK by its former Luxembourg counsel for services from May to June 2022[63]. These include (i) the preparation, with an ELLIOTT employee, of the meeting at which Mr CASLINI was ousted from the management board of ROSSONERI SPORT; (ii) correspondence with
ELLIOT regarding this; and (iii) numerous services rendered in relation to the Italian pledge and the contract for the sale of AC MILAN shares. It is therefore clear that the covert sale of the AC MILAN shares was part of a long thought-out plan by ELLIOTT and is, in reality, as will be explained below, only the first stage of an operation intended to swindle BLUE SKYE and monopolise the income derived from this operation without having to share it with BLUE SYKE, in disregard of the contractual and statutory commitments undertaken by ELLIOTT and its entities and subordinates.

## 2.4    The proceedings initiated by BLUE SKYE LUX and LIC 159 in relation to the sale of AC MILAN shares

56.    On 10 June 2022, BLUE SKYE LUX and LIC 159 applied to the District Court of Luxembourg for a declaration that (i) the release of the Italian pledge by PROJECT REDBLACK, an essential condition for the completion of the sale of AC MILAN; and (ii) the waiver by PROJECT REDBLACK of part of its claim against ROSSONERI SPORT (which would no longer be guaranteed by the Italian Pledge, and could not be reimbursed due to the insufficiency of the sale price of the AC MILAN shares) had to be authorised unanimously by the directors, and if not, by the shareholders of PROJECT REDBLACK (i.e. BLUE SKYE LUX, GENIO and KING GEORGE), in accordance with articles 13 and 16 of the articles of association of PROJECT REDBLACK (procedure registered under number TAL 2022-07355 referred to above)[64].

57.    The objective of the writ of summons of 10 June 2022 is to establish the manner in which the process of selling AC MILAN, which was then underway - the opacity of which demonstrated that it was not in the best interests of PROJECT REDBLACK and ROSSONERI SPORT, their shareholders and creditors - should have continued in accordance with articles 13 and 16 of the PROJECT REDBLACK articles of association, in particular with regard to "Restricted Matters" and "Reserved Matters".

---

[62]    Court Register No. TAL-2022-07361, opinion of CLIFFORD CHANCE of 7 June 2023, No. 80, p. 39.

[63]    **Court Register No. TAL-2022-07355, Exhibit No. 96 of Folder III from MOLITOR** - Copy of the invoice of 15 July 2022 from Maître Raphaël COLLIN; **Court Register No. TAL-2022-07361, Exhibit No. 96 of Folder III from MOLITOR** - Copy of the invoice of 15 July 2022 from Maître Raphaël COLLIN; **Court Register No. TAL-2023-04206, Exhibit No. 96 of Folder III from MOLITOR** - Copy of the invoice of 15 July 2022 from Maître Raphaël COLLIN.

[64]    **Court Register No. TAL-2022-07361, Exhibit No. 21 of Folder II from MOLITOR -** Action on the merits brought by Blue Skye Lux and LIC 159 of 10 June 2022; **Court Register No. TAL-2023-04206, Exhibit No. 21 of Folder II from MOLITOR -** Action on the merits brought by Blue Skye Lux and LIC 159 of 10 June 2022.

58.    BLUE SKYE's suspicions regarding ELLIOTT's fraudulent intentions were confirmed by the newspaper *L'Équipe* which, in an article of 17 June 2022, revealed that "*ELLIOTT intends to retain between 30 and 49% of the capital of AC MILAN*". The text of the article goes on to ask whether the sale of AC MILAN shares would signal the end of any ELLIOTT presence in AC MILAN[65].

59.    It was, in particular on reading this press article, that BLUE SKYE LUX was able to glimpse the extent of the fraud of which it was the victim and realised that the real objectives of ELLIOTT's manoeuvres were (i) to get rid of BLUE SKYE LUX in one way or another as an indirect shareholder of AC MILAN, in violation of the rights conferred on it by the articles of association of PROJECT REDBLACK; (ii) to subsequently realise a capital gain, from which BLUE SKYE LUX would be excluded, by financing the purchaser for the payment of the sale price of the AC MILAN shares; and (iii) to retain, in one form or another, control, or at the very least a definite influence, over AC MILAN and the profits that could derive therefrom, as the Italian authorities now suspect[66].

60.    In order to shed full light on this fraud, on 27 June 2022, BLUE SKYE LUX launched a discovery procedure in the United States against REDBIRD and ELLIOTT MANAGEMENT CORPORATION, whose registered offices are in the United States, with the aim of obtaining the forced disclosure of numerous documents relating to the sale of AC MILAN.

---

[65]    **Court Register No. TAL-2022-07355, Exhibit No. 22 of Folder II from MOLITOR** - Press article published in *L'Equipe* on 17 June 2022; **Court Register No. TAL-2022-07361, Exhibit No. 22 of Folder I from MOLITOR -** Press article published in *L'Equipe* on 17 June 2022; **Court Register No. TAL-2023-04206, Exhibit No. 22 of Folder II from MOLITOR -** Press article published in *L'Equipe* on 17 June 2022.

[66]    **Court Register No. TAL-2022-07355, Exhibit No. 52 of Folder II from MOLITOR -** Article in the *Corriere della Sera* of 12 March 2024 and machine translation into French of this article; **Exhibit No. 53 of Folder II from MOLITOR** - Article in the *Financial Times* of 12 March 2024; **Exhibit No. 54 of Folder II from MOLITOR -** Article in the *Corriere della Sera* of 14 March 2024 and machine translation into French of this article; **Exhibit No. 87 of Folder II from MOLITOR -** Notices of registration as an aggrieved party issued on 14 February 2023, 19 April 2024 and 20 March 2025 by the Italian Public Prosecutor's Office and sworn French translations of these documents; **Exhibit No. 87 of Folder II from MOLITOR -** Declaration of 12 July 2024 by Roberto ZINGARI, lawyer at the Milan Bar, concerning the notices of registration as an aggrieved party issued by the Italian Public Prosecutor's Office; **Court Register No. TAL-2022-07361, Exhibit No. 52 of Folder II from MOLITOR** - Article in the *Corriere della Sera* of 12 March 2024 and machine translation into French of this article; **Exhibit No. 53 of Folder II from MOLITOR** - Article in the *Financial Times* of 12 March 2024; **Exhibit No. 54 of Folder II from MOLITOR -** Article in the *Corriere della Sera* of 14 March 2024 and automatic translation into French of this article; **Exhibit No. 87 of Folder II from MOLITOR -** Notices of registration as an aggrieved party issued on 14 February 2023, 19 April 2024 and 20 March 2025 by the Italian Public Prosecutor's Office and sworn translations into French of these documents; **Exhibit No. 87 of Folder II from MOLITOR -** Declaration of 12 July 2024 by Maître Roberto ZINGARI, lawyer at the Milan Bar, regarding the notices of registration as an aggrieved party issued by the Italian Public Prosecutor's Office; **Court Register No. TAL-2023-04206, Exhibit No. 52 of Folder II from MOLITOR** - Article in the *Corriere della Sera* of 12 March 2024 and machine translation into French of this article; **Exhibit No. 53 of Folder I from MOLITOR -** Article in the *Financial Times* of 12 March 2024; **Exhibit No. 54 of Folder I from MOLITOR -** Article in the *Corriere della Sera* of 14 March 2024 and machine translation into French of this article; **Exhibit No. 87 of Folder I from MOLITOR -** Notices of registration as an aggrieved party issued on 14 February 2023, 19 April 2024 and 20 March 2025 by the Italian Public Prosecutor's Office and sworn translations into French of these documents; **Exhibit No. 87 of Folder I from MOLITOR -** Declaration of 12 July 2024 by Roberto ZINGARI, lawyer at the Milan Bar, concerning the notices of registration as an offended party issued by the Italian Public Prosecutor's Office.

On 17 May 2023, Ms Katherine POLK FAILLA, judge at the United States District Court for the Southern District of New York, ordered the disclosure of all documents in the possession of two employees of ELLIOTT MANAGEMENT CORPORATION who had worked on the sale of AC MILAN[67]. However, it is not possible, for the purposes of these proceedings, to refer to the information thus obtained, given the restrictive conditions attached by the US judge to the disclosure of the documents[68].

61.    In parallel, BLUE SKYE LUX and LIC 159 brought, on 27 June 2022, another action before the District Court of Luxembourg (Court Register No. TAL-2022-07361)[69] in order to seek:

(i)    primarily, the annulment of a number of contracts and agreements (including the SPA) and, *a fortiori*, the transfer of the AC MILAN shares; and

(ii)    in the alternative, compensation for the loss they have suffered as a result of ELLIOTT's fraudulent conduct, which was estimated at EUR 102,667,407 at the time the action was brought, without prejudice to any more advantageous assessment for BLUE SKYE.

**2.5    The completion of the sale of the AC MILAN shares**

62.    Despite the warnings from BLUE SKYE LUX and Mr CASLINI, ROSSONERI SPORT (all of whose managers were controlled by ELLIOTT) deliberately transferred the AC MILAN shares to ACM BIDCO on 31 August 2022, in the knowledge that no decision had been taken at the level of the management board of PROJECT REDBLACK on this subject, in accordance with Articles 13 and 16 of that company's articles of association.



---

67    **Court Register No. TAL-2022-07355, Exhibit No. 55 of Folder II from MOLITOR** – Transcript of 17 May 2023; **Court Register No. TAL-2022-07361, Exhibit No. 55 of Folder II from MOLITOR** – Transcript of 17 May 2023; **Court Register No. TAL-2023-04206, Exhibit No. 55 of Folder II from MOLITOR** – Transcript of 17 May 2023.

68    **Court Register No. TAL-2022-07355, Exhibit No. 56 of Folder II from MOLITOR** – Protective order of 4 August 2023; **Court Register No. TAL-2022-07361, Exhibit No. 56 of Folder II from MOLITOR** – Protective order of 4 August 2023; **Court Register No. TAL-2023-04206, Exhibit No. 56 of Folder II from MOLITOR** – Protective order of 4 August 2023.

69    **Court Register No. TAL-2022-07355, Exhibit No. 57 of Folder II from MOLITOR** – Writ of summons of 27 June 2022; **Court Register No. TAL-2022-07361, Exhibit No. 57 of Folder II from MOLITOR** – Writ of summons of 27 June 2022; **Court Register No. TAL-2023-04206, Exhibit No. 57 of Folder II from MOLITOR** – Writ of summons of 27 June 2022.

63.  At the meeting of the management board of PROJECT REDBLACK held on 9 September 2022[70], Mr CASLINI had a number of resolutions imposed on him by the class A managers of PROJECT REDBLACK, ratifying *ex post* the following acts, of which he had previously been completely unaware:

   (i)  the release on 31 August 2022[71] of the Italian Pledge, which was the only security effectively guaranteeing full repayment of PROJECT REDBLACK's claim against ROSSONERI SPORT;

   (ii)  the transfer of the AC MILAN shares for a price of EUR 1,123,036,449.06, of which almost half, namely EUR 560,000,100, was financed by the issue of vendor loan notes issued by the purchaser and subscribed by ROSSONERI SPORT – which was therefore financing the purchaser – with the remainder (i.e. EUR 563,036,349.06) paid in cash; and

   (iii)  the creation (a) of a pledge under Dutch law over receivables of ROSSONERI SPORT, including those arising under the vendor loan notes, whose repayment depended entirely on the financial health of their debtor; and (b) of a pledge under Luxembourg law over a bank account opened in the name of ROSSONERI SPORT, into which the cash funds resulting from payment of the sale price of the AC MILAN shares were paid[72].Contrary to what PROJECT REDBLACK, ROSSONERI SPORT, GENIO and KING GEORGE[73] suggest, the combined value of the collateral for these new pledges is lower than that of the AC MILAN shares (the collateral for the Italian Pledge).

64.  In this respect, it is immaterial that the sale price of AC MILAN may have been described, as PROJECT REDBLACK, ROSSONERI SPORT and LEXINGTON do, as "*the highest sale price ever paid for a continental European football club*"[74], since both its amount and its payment terms remain extremely problematic in several respects.

65.  Indeed, the sums received by ROSSONERI SPORT in respect of the sale price of AC MILAN (namely **EUR 1,123,036,449.06**) do not allow it to repay the outstanding balance of its debt to PROJECT REDBLACK, which as June 2022 amounted to **EUR 1,231,048,383** (principal and interest). This finding is all the more striking because ROSSONERI SPORT has divested itself of its only asset truly generating income (namely the AC MILAN shares), which could have enabled it to receive further funds to repay its debt. In other words, the class A managers of PROJECT REDBLACK (and behind them, the ELLIOTT group) decided, without any apparent reason, that PROJECT REDBLACK would waive a claim of **EUR 108,011,933.94**, with ROSSONERI SPORT not having, and not being able to generate, the funds needed to pay back that amount. Such a waiver of debt therefore has a direct and negative impact on the income generated by the TPECs issued by PROJECT REDBLACK.

---

[70]  **Court Register No. TAL-2022-07355, Exhibit No. 58 of Folder II from MOLITOR** – Project Redblack management board meeting minutes of 9 September 2022; **Court Register No. TAL-2022-07361, Exhibit No. 58 of Folder II from MOLITOR** – Project Redblack management board meeting minutes of 9 September 2022; **Court Register No. TAL-2023-04206, Exhibit No. 58 of Folder II from MOLITOR** – Project Redblack management board meeting minutes of 9 September 2022.

[71]  TAL-2022-07355, submissions by ELVINGER HOSS PRUSSEN of 18 January 2023, para. 1, p. 4.

[72]  TAL-2022-07355, submissions by CLIFFORD CHANCE of 20 February 2023, para. 11, p. 7; Court Register No. TAL-2022-07355, submissions by ELVINGER HOSS PRUSSEN of 31 October 2022, para. 14, p. 9; TAL-2023-04206, writ of summons of 2 March 2023, para. 14, p. 7.

[73]  TAL-2022-07355, submissions by CLIFFORD CHANCE of 07 June 2023, para. 21, p. 15; Court Register No. TAL-2022-07355, submissions by ELVINGER HOSS PRUSSEN of 31 October 2022, para. 14, p. 10; TAL-2023-04206, writ of summons of 2 March 2023, para. 15, p. 8.

[74]  Court Register No. TAL-2022-07361, submissions by CLIFFORD CHANCE of 7 June 2023, para. 21, p. 14; Court Register No. TAL-2023-04206, writ of summons by ELVINGER HOSS PRUSSEN of 2 March 2023, para. 7, p. 4; application for voluntary intervention of 9 February 2024, para. 25, p. 14.

The assertions by PROJECT REDBLACK and ROSSONERI SPORT, which focus on the sale price of the AC MILAN shares exceeding the total amount (assessed at EUR 733,728,971) invested in PROJECT REDBLACK by the ELLIOTT and BLUE SKYE groups[75] give a distorted picture of reality, since they do not take into account the substantial income that the sums injected into PROJECT REDBLACK were supposed to generate, in particular under the class A-2 and B TPECs[76].

66.   For these reasons, Mr CERCHIONE lodged, on behalf of BLUE SKYE LUX, a criminal complaint in Italy against ELLIOTT and its representatives and affiliates. The Italian public prosecutor then decided in 2023 to open a criminal investigation against several parties affiliated with ELLIOTT, particularly against Ms ITALIA, Mr MCLEAN and Mr SCHUH, for various offences. The investigation is still ongoing at the time of writing and, according to information provided by the Italian public prosecutor, new offences have recently been added ex officio by the public prosecutor's office to the list of those already under investigation, highlighting the fact that the ELLIOTT group is under investigation for matters going beyond those complained of by BLUE SKYE LUX and LIC 159.In particular, offences are being investigated relating to (i) obstruction of prudential supervisory authorities; (ii) fraudulent bankruptcy; and (iii) misappropriation and misuse of company assets[77].

In the context of this investigation, various searches have been carried out at the premises of PROJECT REDBLACK, AC MILAN and of other natural persons, some of whom are connected with ELLIOTT UK. The search of PROJECT REDBLACK's offices was ordered on 12 April 2023 and carried out on 21 April 2023[78]. More recently, and as a continuation of these steps, it was reported in the press[79] that the financial brigade of the Italian police carried out an additional search at AC MILAN's head office on 12 March 2024, and that an investigation for obstruction of the supervisory authority is ongoing against Mr Ivan GAZIDIS, the former chief executive officer of AC MILAN, and Mr Giorgio FURLANI, the current chief executive officer of AC MILAN (in that role since 2022), who was previously a portfolio

---

[75]   **Court Register No. TAL-2022-07361**, submissions by CLIFFORD CHANCE of 7 June 2023, para. 79, p. 38; Court Register No. TAL-2022-07355, submissions by ELVINGER HOSS PRUSSEN of 31 October 2022, para. 13, p. 9; TAL-2023-04206, writ of summons of 2 March 2023, para. 13, p. 6.

[76]   **Court Register No. TAL-2022-07355, Exhibit No. 37 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2022-07361, Exhibit No. 37 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2023-04206, Exhibit No. 37 of Folder II from MOLITOR**, cited above.

[77]   **Court Register No. TAL-2022-07355, Exhibit No. 87 of Folder II from MOLITOR** – cited above; **Court Register No. TAL-2022-07361, Exhibit No. 87 of Folder II from MOLITOR** – cited above; **Court Register No. TAL-2023-04206, Exhibit No. 87 of Folder II from MOLITOR** – cited above; **Court Register No. TAL-2022-07355, Exhibit No. 88 of Folder II from MOLITOR** – cited above; **Court Register No. TAL-2022-07361, Exhibit No. 88 of Folder II from MOLITOR** – cited above; **Court Register No. TAL-2023-04206, Exhibit No. 88 of Folder II from MOLITOR** – cited above.

[78]   **Court Register No. TAL-2022-07355, Exhibit No. 59 of Folder II from MOLITOR** – Search and seizure order of the District Court of Luxembourg of 12 April 2023; **Exhibit No. 60 of Folder II from MOLITOR** – Search report of 21 April 2023; **Court Register No. TAL-2022-07361, Exhibit No. 59 of Folder II from MOLITOR** – Search and seizure order of the District Court of Luxembourg of 12 April 2023; **Exhibit No. 60 of Folder II from MOLITOR** – Search report of 21 April 2023; **Court Register No. TAL-2023-04206, Exhibit No. 59 of Folder II from MOLITOR** – Search and seizure order of the District Court of Luxembourg of 12 April 2023; **Exhibit No. 60 of Folder I from MOLITOR** – Search report of 21 April 2023.

[79]   **Court Register No. TAL-2022-07355, Exhibit No. 52 and No. 53 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2022-07361, Exhibit No. 52 and No. 53 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2023-04206, Exhibit No. 52 and No. 53 of Folder II from MOLITOR**, cited above.

manager with ELLIOTT UK for twelve years[80]. The homes of these two individuals were searched.

These measures, the scale of the resources deployed and the growing number of offences under investigation demonstrate the seriousness of the suspicions regarding the real links between AC MILAN and the ELLIOTT group, the Italian authorities suspecting that the ELLIOTT group still exercises effective control over AC MILAN[81].

67.    On 6 March 2023, BLUE SKYE LUX also brought proceedings in Italy seeking the winding-up of the "super società di fatto" formed in Italy by PROJECT REDBLACK and ROSSONERI SPORT, this structure no longer having sufficient assets to meet its debts, in particular to repay all the amounts due in respect of the various TPECs issued by PROJECT REDBLACK[82].By decision of 9 November 2023, the Italian judge declared that he lacked jurisdiction to rule on these claims, taking the view that the centre of main interests of the "super società di fatto" was presumed to be in Luxembourg[83].The substance of the case was nevertheless not examined.

## 2.6    More recent evidence confirming the fraud of which BLUE SKYE LUX, LIC 159 and their creditors are victims

68.    As central as the release of the Italian Pledge and the sale of the AC MILAN shares may be, they are only the tip of the iceberg or, to use an equally vivid image, the first act of an opera which could have been entitled "The (Almost) Perfect Fraud". Indeed, all of the decisions subsequently taken, in particular by PROJECT REDBLACK and ROSSONERI SPORT, follow the same line which, as BLUE SKYE LUX and LIC 159 quickly realised, can be summed up as follows:

(i)    the transfer of the AC MILAN shares in order to place this asset beyond the reach of BLUE SKYE, in return for a purchase price that was deliberately not maximised;

(ii)    the systematic siphoning-off, by entities of the ELLIOTT group located in the United States and the Cayman Islands, of the sums and assets resulting from this reduced price (consisting, as we have seen, of EUR 563,036,349.06 in cash and EUR 500,000,100[84] in the form of vendor loan notes);

---

[80]    **Court Register No. TAL-2022-07355, Exhibit No. 61 of Folder II from MOLITOR** – Biography of Mr Giorgio FURLANI; **Court Register No. TAL-2022-07361, Exhibit No. 61 of Folder II from MOLITOR** – Biography of Mr Giorgio FURLANI; **Court Register No. TAL-2023-04206, Exhibit No. 61 of Folder II from MOLITOR** – Biography of Mr Giorgio FURLANI.

[81]    **Court Register No. TAL-2022-07355, Exhibit No. 52 and No. 53 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2022-07361, Exhibit No. 52 and No. 53 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2023-04206, Exhibit No. 52 and No. 53 of Folder II from MOLITOR**, cited above.

[82]    **Court Register No. TAL-2022-07355, Exhibit No. 62 of Folder II from MOLITOR** – Application for the opening of judicial liquidation proceedings of 6 March 2023; **Court Register No. TAL-2022-07361, Exhibit No. 62 of Folder II from MOLITOR** – Application for the opening of judicial liquidation proceedings of 6 March 2023; **Court Register No. TAL-2023-04206**, **Exhibit No. 62 of Folder II from MOLITOR** – Application for the opening of judicial liquidation proceedings of 6 March 2023.

[83]    **Court Register No. TAL-2022-07355, Exhibit No. 63 of Folder II from MOLITOR** – Decision of the Milan District Court (Civil Section) of 9 November 2023, No. 270-2023; **Court Register No. TAL-2022-07361, Exhibit No. 63 of Folder II from MOLITOR** – Decision of the Milan District Court (Civil Section) of 9 November 2023, No. 270-2023; **Court Register No. TAL-2023-04206, Exhibit No. 63 of Folder II from MOLITOR** – Decision of the Milan District Court (Civil Section) of 9 November 2023, No. 270-2023.

[84]    One payment of EUR 10,000,000 had been made in October 2022 against the total nominal value of the notes of EUR 560,000,000.

(iii)  the dissipation of any sums not diverted by ELLIOTT in order to minimise, as far as possible, what might ultimately have to be paid to BLUE SKYE LUX and LIC 159; and

(iv)  the granting of new financing by the ELLIOTT group to the purchaser of the AC MILAN shares in anticipation of a forthcoming default, enabling it to regain control of AC MILAN, this time after having ousted BLUE SKYE LUX and LIC 159.

69.  The facts summarised in the following paragraphs are admittedly complex and technical, but confirm point by point ELLIOTT's scheme.

70.  One must immediately note the usual *modus operandi* of the class A managers of PROJECT REDBLACK who, acting as obedient puppets of ELLIOTT, are in the habit of secretly carrying out a series of transactions and then formally submitting them to the management board of PROJECT REDBLACK for ratification, thereby presenting Mr CASLINI with a fait accompli[85] and preventing him from bringing any legal action that might hinder ELLIOTT's plan.

### 2.6.1  The unlawful distributions of 1 February 2023 by ROSSONERI SPORT and PROJECT REDBLACK

71.  On the basis of information contained in a letter from the class A managers of PROJECT REDBLACK of 1 February 2023[86], BLUE SKYE LUX was able to reconstruct the timeline of the first transactions, which appear to have taken place on 27 January 2023:

(i)  the repayment of part of PROJECT REDBLACK's claim against ROSSONERI SPORT by way of a distribution to PROJECT REDBLACK of EUR 515,117,074.73 in cash and 95.73% of the vendor loan notes issued by ACM BIDCO[87], this being contrary to the AFA, as it does not permit repayment in kind (since under clause 20.1 of that agreement, failure to pay the agreed sums within the contractual deadlines and in the currency permitted by the agreement is an "Event of Default"), and therefore required an amendment of that agreement in accordance with Articles 13 and 16 of PROJECT REDBLACK's articles of association;

(ii)  the cash distribution by PROJECT REDBLACK of (a) EUR 14,289,989.73 to GENIO and KING GEORGE in repayment of interest-free loans; and (b) EUR 454,201,707 to BUCKTHORN INTERNATIONAL LIMITED and BUCKTHORN

---

85   **Court Register No. TAL-2022-07361**, submissions by C.A.S. of 5 July 2023, para. 31, pgs. 9 and 10; **Exhibit No. 35 in Folder I of C.A.S.'–** Minutes of the PROJECT REDBLACK management board meeting of 2 March 2023; **Court Register No. TAL-2022-07355, Exhibit No. 65 of Folder II from MOLITOR –** Minutes of the PROJECT REDBLACK management board meeting of 2 March 2023; **Court Register No. TAL-2022-07361, Exhibit No. 65 of Folder II from MOLITOR –** Minutes of the PROJECT REDBLACK management board meeting of 2 March 2023; **Court Register No. TAL-2023-04206, Exhibit No. 65 of Folder II from MOLITOR –** Minutes of the PROJECT REDBLACK management board meeting of 2 March 2023.

86   **Court Register No. TAL-2022-07355, Exhibit No. 64 of Folder II from MOLITOR –** Letter of 1 February 2023 sent to BLUE SKYE CAÏMANS and BLUE SKYE LUX by PROJECT REDBLACK; **Court Register No. TAL-2022-07361, Exhibit No. 64 of Folder II from MOLITOR –** Letter of 1 February 2023 sent to BLUE SKYE CAYMANS and BLUE SKYE LUX by PROJECT REDBLACK; **Court Register No. TAL-2023-04206, Exhibit No. 64 of Folder II from MOLITOR –** Letter of 1 February 2023 sent to BLUE SKYE CAYMANS and BLUE SKYE LUX by PROJECT REDBLACK.

87   See above, paragraph 51 (iv).

ASSOCIATES LIMITED in respect of payment of the fixed yield and part of the variable yield on the class A-1 TPECs[88]; and

(iii)    the transfer of 95.73% of the vendor loan notes on 27 January 2023 to BUCKTHORN INTERNATIONAL LIMITED and BUCKTHORN ASSOCIATES LIMITED
for a total value of EUR 541,412,981, taking into account interest accrued between 31 August 2022 and 27 January 2023 (with a nominal value of EUR 526,515,000) with respect to the class A-1 TPECs, with the result that these two entities were then to become the beneficiaries of the new pledge over the AC MILAN shares accessory to these vendor loan notes, thereby enabling them to seize those shares in the event of a default on the notes.

Such a distribution violates not only Articles 3.1.5 and 5.1.1 of the General Terms and Conditions of the class A and B TPECs (which provide that the amounts due under these TPECs may be paid only if the company has sufficient cash available[89]), but also Article 3.3 (which allows only payments in cash and denominated in euros for the TPECs[90].)

Moreover, it is contrary to the General Terms and Conditions of the class A and B TPECs, under which BLUE SKYE LUX should have received EUR 16.16 million [91].



---

88    This amount was subject to a clawback in the sum of EUR 47,200,000.00 resulting from a clawback which took place on 16 and 17 May 2023 (**Court Register No. TAL-2022-07355, Exhibit No. 68 of Folder II from MOLITOR**, cited above, p. 12; **Court Register No. TAL-2022-07361, Exhibit No. 68 of Folder II from MOLITOR**, cited above, p. 12; **Court Register No. TAL-2023-04206, Exhibit No. 68 of Folder II from MOLITOR**, cited above, p. 12).

89    *"only to the extent the Company has enough cash* available" (**Court Register No. TAL-2022-07355, Exhibit No. 8 of Folder I from MOLITOR and Exhibit No. 43 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2022-07361, Exhibit No. 8 of Folder I from MOLITOR and Exhibit No. 43 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2023-04206, Exhibit No. 8 of Folder I from MOLITOR and Exhibit No. 43 of Folder I from MOLITOR**, cited above).

90    **Court Register No. TAL-2022-07355, Exhibit No. 43 of Folder II from MOLITOR** – cited above, Article 3.3, p. 14; **Court Register No. TAL-2022-07361, Exhibit No. 43 of Folder II from MOLITOR** – cited above, Article 3.3, p. 14; **Court Register No. TAL-2023-04206, Exhibit No. 43 of Folder II from MOLITOR** – cited above, Article 3.3, p. 1.

91    Taking into account the transfer of the vendor loan notes for an amount of EUR 541,412,981 on 27 January 2023 and the fact that these notes were to mature on 31 August 2025, the fixed yield on the class A-2 TPECs would be around **EUR 6,900,000** (i.e. 0.5% x 947 days/360 x 526,515,000) and the variable yield would be around **EUR 9,700,000** (i.e. 8% of around 121,000,000, representing the interest payable on the notes between 27 January 2023 and 31 August 2025).

72.    As a result of these transfers, only EUR 47,620,390 remained at the level of PROJECT REDBLACK and 4.27% of the vendor loan notes, with a value of EUR 23,485,000, at the level of ROSSONERI SPORT which, had they not been deliberately and artificially kept in that company, should have gone to BLUE SKYE LUX and LIC 159 under the class A-2 and B TPECs.

73.    Worse still: ROSSONERI SPORT, which is wholly controlled by ELLIOTT, has sought to spend as much of the assets as possible that it holds, particularly on consultancy and legal fees in connection with these proceedings, in order to minimise, as far as possible, the share that will ultimately have to be returned to BLUE SKYE LUX and LIC 159[92].By ensuring that it was ROSSONERI SPORT and not PROJECT REDBLACK which paid these costs, ELLIOTT again arranged matters so as not to have to comply with Articles 13 and 16 of PROJECT REDBLACK's articles of association, which made the conclusion that consultancy, management or other service agreements for amounts exceeding EUR 20,000 per year must be subject to the approval of all the managers of PROJECT REDBLACK and, if not, of its shareholders.

74.    In the aforementioned letter of 1 February 2023[93], the class A managers of PROJECT REDBLACK attempted to justify the difference in treatment between, on the one hand, the ELLIOTT entities holding the class A-1 TPECs and, on the other hand, BLUE SKYE LUX and LIC 159.The convenient explanation was that the vendor loan notes issued by ACM BIDCO (the terms of which were negotiated with the ELLIOTT group in the context of the sale of the AC MILAN shares) could only benefit entities described as "Affiliates" of ROSSONERI SPORT, which (no doubt deliberately from the outset) excluded entities of the BLUE SKYE group because of the absence of any direct or indirect stake of more than 50% in the latter[94].This shows that, contrary to what PROJECT REDBLACK and ROSSONERI SPORT claim, the vendor loan notes do not benefit all investors in PROJECT REDBLACK and were drafted solely in the interests of the ELLIOTT group[95].

75.    Furthermore, although in the same letter of 1 February 2023, the class A managers of PROJECT REDBLACK held out the prospect of a distribution of the proceeds of the sale of AC MILAN in respect of the class B TPECs (but not the class A-2 TPECs), the conditions they imposed were in fact a new trap set for the BLUE SKYE group. Indeed, the proposed distribution could only be temporary and would have had to be repaid without delay to PROJECT REDBLACK by virtue of a clawback mechanism, if the latter were ordered to pay damages in any of the court proceedings involving it (including the enforcement of the pledge over the shares in ROSSONERI, which has been challenged by the former Chinese investor).

---

92    For example: **Court Register No. TAL-2022-07355, Exhibit No. 88 of Folder II from MOLITOR** – Annual accounts of ROSSONERI SPORT for the financial year ending 30 June 2023, p. 13 ("*other professional fees*"); **Court Register No. TAL-2022-07361, Exhibit No. 88 of Folder II from MOLITOR** – Annual accounts of ROSSONERI SPORT for the financial year ending 30 June 2023, p. 13 ("*other professional fees*"); **Court Register No. TAL-2023-04206, Exhibit No. 88 of Folder I from MOLITOR** – Annual accounts of ROSSONERI SPORT for the financial year ending 30 June 2023, p. 13 ("*other professional fees*").

93    **Court Register No. TAL-2022-07355, Exhibit No. 64 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2022-07361, Exhibit No. 64 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2023-04206, Exhibit No. 64 of Folder II from MOLITOR**, cited above.

94    BLUE SKYE LUX could not be regarded as an "Affiliate" of ROSSONERI SPORT because it did not hold a majority direct or indirect stake in that company, BLUE SKYE LUX holding indirectly only 4.26% of the share capital of ROSSONERI SPORT via PROJECT REDBLACK.

95    Court Register No. TAL-2022-07355, submissions by ELVINGER HOSS PRUSSEN of 31 October 2022, para. 15, p. 10; TAL-2023-04206, writ of summons of 2 March 2023, para. 15, p. 9.

Now, as soon as LIC 159 had received a distribution under the Class B TPECs, it would have been obliged to transfer almost all of it to the holders of the Class E and F TPECs (including LEXINGTON), who were not, for their part, bound by any clawback commitment. Therefore, in the event of repayment to PROJECT REDBLACK under the clawback, the BLUE SKYE group would have had to bear all the negative financial consequences, as it could not demand any repayment from the holders of the Class E and F TPECs. Paradoxically, the BLUE SKYE group therefore had more to lose by accepting distribution on the terms demanded by PROJECT REDBLACK than by refusing it.

Contrary to what the ELLIOTT entities assert[96], the prospect of such a situation obviously being detrimental to the BLUE SKYE group made the proposed distribution unacceptable. It is a safe bet that PROJECT REDBLACK only hinted at the prospect of such a distribution because it knew that such a proposal would go unheeded, ensuring that the vendor loan notes would continue to be held by ROSSONERI SPORT, and therefore be under the control of the ELLIOTT group.

76.  Finally, the Class A managers specified in the said letter of 1 February 2023 that, in view of the counter-claims[97] made by PROJECT REDBLACK and ROSSONERI SPORT against BLUE SKYE and LIC 159 in the context, in particular, of the action for fraud brought by the latter, no repayment of the class A-2 TPECs could be made to BLUE SKYE LUX since any amounts that might be owed for these TPECs would be offset with the sums claimed by way of counter-claim. Once again, this ready excuse must be linked to the counter-claim made by PROJECT REDBLACK and ROSSONERI SPORT in their submissions in response[98] to the writ of summons of 27 June 2022, which sought to deprive BLUE SKYE LUX and LIC 159 of the income relating to the TPECs they held, or even to cancel those securities, which is indicative of the ELLIOTT group's desire to appropriate all the income deriving from the sale of AC MILAN shares.

### 2.6.2  The fraudulent undervaluation of vendor loan notes distributed by PROJECT REDBLACK to ELLIOTT entities.

77.  On 26 July 2023, PROJECT REDBLACK and BUCKTHORN INTERNATIONAL LIMITED and BUCKTHORN ASSOCIATES LIMITED decided to reduce the valuation of the vendor loan notes they had received. The value of these notes has therefore fallen from EUR **541,412,981** to **EUR 463,333.200**, corresponding to a **discount of EUR 78,079,781**[99].

---

[96]  **Court Register No. TAL-2022-07361**, CLIFFORD CHANCE conclusions of 7 June 2023, No. 79, pgs. 38 and 39.

[97]  **Court Register No. TAL-2022-07355**, pleadings of ELVINGER HOSS PRUSSEN of 31 October 2022, No. 12, p. 8; TAL-2023-04206, writ of summons of 2 March 2023, No. 12, p. 6.

[98]  **Court Register No. TAL-2023-04206**, writ of summons of 2 March 2023, No. 29, p. 14.

[99]  **Court Register No. TAL-2022-07355, Exhibit No. 68 of Folder II from MOLITOR -** Annual Accounts of PROJECT REDBLACK as at 30 June 2023, pgs. 12 and 17; **Court Register No. TAL-2022-07361, Exhibit No. 68 of Folder II from MOLITOR -** Annual accounts of PROJECT REDBLACK as at 30 June 2023, pgs. 12 and 17; **Court Register No. TAL-2023-04206, Exhibit No. 68 of Folder II from MOLITOR -** Annual accounts of PROJECT REDBLACK as at 30 June 2023, pgs. 12 and 17; **Court Register No. TAL-2022-07355, Exhibit No. 89 of Folder II from MOLITOR -** Annual accounts of ROSSONERI SPORT as at 30 June 2023, p. 15; **Court Register No. TAL-2022-07361, Exhibit No. 89 of Folder II from MOLITOR -** Annual accounts of ROSSONERI SPORT as at 30 June 2023, pgs. 15; **Court Register No. TAL-2023-04206, Exhibit No. 89 of Folder II from MOLITOR -** Annual accounts of ROSSONERI SPORT as at 30 June 2023, p. 15.

78. As a result of the downward revaluation of the vendor loan notes that it distributed, in respect of the repayment of the Class A-1 TPECs, PROJECT REDBLACK revalued its debt upwards, in respect of these Class A-1 TPECs, since it had in fact repaid a smaller sum than initially estimated.

79. PROJECT REDBLACK has pulled off a double coup: (i) transferring deliberately undervalued vendor loan notes to BUCKTHORN INTERNATIONAL LIMITED and BUCKTHORN ASSOCIATES LIMITED; and (ii) making it appear that its debt to its companies was higher than it actually was (due to the reduction in repayment value via the undervaluation of the notes). By this subterfuge, it therefore succeeded in diverting to ELLIOTT entities assets that would otherwise have had to be shared with BLUE SKYE LUX and LIC 159 in their capacity as holders of Class A-2 and Class B TPECs.

80. However, as we will explain below, the vendor loan notes were fully and prematurely repaid in December 2024, which calls into question the undervaluation of the notes distributed by PROJECT REDBLACK. Indeed, while these instruments were valued at a nominal value **EUR 463,333,200**, BUCKTHORN INTERNATIONAL LIMITED and BUCKTHORN ASSOCIATES LIMITED actually received **EUR 630.860,700** (covering the nominal value of the notes (**EUR 526,515,000**) and their fixed and variable yield. The result is therefore unjust enrichment of these entities and misappropriation of sums for their benefit (in the amount of **EUR 167,527,500**), to the detriment of BLUE SKYE LUX and LIC 159.

| | Amounts before revaluation | Amounts after revaluation | Difference |
|---|---|---|---|
| Value of notes reimbursed | EUR 541,412,981 | EUR 463,333,200 | EUR 78,079,781 |
| Amount repaid to the A-1 TPECs through the notes | EUR 541,412,981 | EUR 463,333,200 | EUR 78,079,781 |
| Amount actually received on redemption of notes in December 2024 (taking into account fixed and variable yields) | EUR 630,860,700 | EUR 630,860,700 | Gain for ELLIOTT entities of EUR 89,447,719 (compared with amounts before revaluation)<br><br>Gain for ELLIOTT entities of EUR 167,527,500 (compared to amounts after revaluation) |

### 2.6.3    The early repayment of vendor loan notes and their refinancing by ELLIOTT

81.    On 20 December 2024, AC MILAN issued a press release[100], the content of which was commented on in various press articles[101], which announced that the entirety of the vendor loan notes had been repaid by ACM BIDCO in December 2024 (without prejudice as to the exact date), eight months ahead of the contractual date.

82.    The Claimants then learned that this early repayment had been financed in part by an equity contribution of EUR 170,000,000 and also, and more curiously, by a refinancing of EUR 489,000.000 granted until 2028 by SHEVA INVESTMENTS LIMITED[102], **a Cayman Islands company belonging to the ELLIOTT group** and advised by ELLIOTT UK.

On the one hand, since the originating vendor loan notes produced interest at 7%, they enabled the ELLIOTT group, via BUCKTHORN INTERNATIONAL LIMITED and BUCKTHORN ASSOCIATES LIMITED, to amass between 27 January 2023 (the date of the disputed distribution of the vendor loan notes to these two entities) and 20 December 2024 (the date of the unexpected early repayment of the vendor loan notes) an amount of EUR 89,447,719. This sum is obviously not taken into account in the calculation of the sums distributed, in respect of the repayment of the Class A-1 TPECs, and represents a new **diversion** of the sums that should normally have formed part of the common pot to be distributed between the ELLIOTT Group and the BLUE SKYE Group under the General Terms and Conditions of the Class A and Class B TPECs. The Claimants will therefore reassess the damage they suffered as a result of the fraudulent conduct of which they were victims when they submit their arguments on the merits.

The profit unduly enjoyed by the ELLIOTT Group in respect of this misappropriation is even greater in view of the new interest rate of approximately 13%, which it imposed when refinancing the vendor loan notes granted on 20 December 2024, which would represent an amount of approximately EUR 273,000,000[103]. In doing so, the ELLIOTT Group once again contrived to divert the flow of income generated by the sale of AC MILAN (particularly the interest produced by the vendor loan notes still held by ROSSONERI SPORT) when it was intended to be used to repay PROJECT REDBLACK's debt and then distributed to BLUE SKYE LUX and LIC 159 in their capacity as holders of Class A-2 and Class B TPECs.

---

[100].    **Court Register No. TAL-2022-07355, Exhibit No. 66 of Folder II from MOLITOR -** Copy of press release published on 10 December 2024 on the AC MILAN website; **Court Register No. TAL-2022-07361, Exhibit No. 66 of Folder II from MOLITOR -** Copy of press release published on 10 December 2024 on the AC MILAN website; **Court Register No. TAL-2023-04206, Exhibit No. 66 of Folder II from MOLITOR -** Copy of press release published on 10 December 2024 on the AC MILAN website.

[101]    **Court Register No. TAL-2022-07355, Exhibit No. 67 of Folder II from MOLITOR -** Article from *Sempre Milan* of 23 December 2024; **Court Register No. TAL-2022-07361, Exhibit No. 67 of Folder II from MOLITOR -** Article from *Sempre Milan* of 23 December 2024; **Court Register No. TAL-2023-04206, Exhibit No. 67 of Folder II from MOLITOR -** Article from *Sempre Milan* of 23 December 2024.

[102]    **Court Register No. TAL-2022-07355, Exhibit No. 97 of Folder III from MOLITOR -** Search Report issued by the Cayman Islands General Registry regarding SHEVA INVESTMENTS LIMITED; **Court Register No. TAL-2022-07361, Exhibit No. 97 of Folder III of MOLITOR -** Search Report issued by the Cayman Islands General Registry in respect of SHEVA INVESTMENTS LIMITED; **Court Register No. TAL-2023-04206, Court Register No. 97 of Folder II from MOLITOR -** Search Report issued by Cayman Islands General Registry regarding SHEVA INVESTMENTS LIMITED.

[103]    This amount is calculated as follows over a period from 20 December 2024 to July 2028: (i) total amount with interest 489,000,000 x (1+13%) x (1308/360) = EUR 762,000,000; (ii) amount of interest: 762,000,000 - 489,000,000 = EUR 273,000,000.

Moreover, this refinancing, which was very timely for ELLIOTT, was in all likelihood guaranteed by a new pledge on AC MILAN shares. In the event of a default by ACM BIDCO, ELLIOTT will be able to realise this security and thus get its hands on AC MILAN directly, without having to share it with BLUE SKYE if the fraud had not been committed. BLUE SKYE LUX and LIC 159 naturally reserve the right to request the compulsory disclosure of documents attesting to the existence of this new security and even, once again, that they will reassess the amount of their damages when they conclude on the merits.

Finally, it should be noted that the refinancing by SHEVA INVESTMENTS LIMITED is a global transaction entered into between ROSSONERI SPORT, BUCKTHORN INTERNATIONAL LIMITED and BUCKTHORN ASSOCIATES LIMITED (as holders of vendor loan notes), ACM BIDCO (as the issuer of such notes), SHEVA INVESTMENTS LIMITED (as the company providing the refinancing) and REDBLACK (as the creditor of ROSSONERI SPORT, in particular under the AFA). This involved converting the originating vendor loan notes into a refinancing facility provided by SHEVA INVESTMENTS LIMITED. This agreement, which directly affects the underlying assets of the Class A and Class B TPECs, once again constitutes a transaction between companies affiliated to PROJECT REDBLACK's associates or to the holders of the Class A-1 TPECs, without any decision having been unanimously validated by PROJECT REDBLACK's managers or associates, pursuant to Article 13 and PROJECT REDBLACK's articles of association. This is another factor to be linked to the fraud suffered by the Claimants. We will, of course, come back to these points in greater detail when we conclude on the substance of the case.

83.  Lastly, the repayment of the vendor loan notes on 20 December 2024 crystallises the financial position of ROSSONERI SPORT and PROJECT REDBLACK.

It should first be noted that the annual accounts of PROJECT REDBLACK at 30 June 2023 mention the existence of a receivable from the latter towards ROSSONERI SPORT for an amount of EUR 340,821,221.84[104]. This amount should have been higher, if the provisions of the AFA had been complied with and if PROJECT REDBLACK had not decided on 28 August 2023 to waive the interest for which ROSSONERI SPORT was liable with effect from 6 March 2023[105]. Once again, this was in breach of Articles 13 and 16 of its articles of association, since the amendment of the terms to an agreement concluded with a subsidiary or affiliate of one of PROJECT REDBLACK's associates constitutes a "Restricted Matter".

Following the repayment of the vendor loan notes and other receivables from ROSSONERI SPORT for a sum valued at EUR 27,348,615.41 at 30 June 2024[106] ,and even taking into consideration the cash assets held by ROSSONERI SPORT

---

[104]  **Court Register No. TAL-2022-07355, Exhibit No. 68 of Folder II from MOLITOR**, cited above, p. 10; **Court Register No. TAL-2022-07361, Exhibit No. 68 of Folder II from MOLITOR**, cited above, at 10; **Court Register No. TAL-2023-04206, Exhibit No. 68 of Folder II from MOLITOR**, cited above, at 10.

[105]  **Court Register No. TAL-2022-07355, Exhibit No. 68 of Folder II from MOLITOR**, cited above, p. 14; **Court Register No. TAL-2022-07361, Exhibit No. 68 of Folder II from MOLITOR**, cited above, at 14; **Court Register No. TAL-2023-04206, Exhibit No. 68 of Folder II from MOLITOR**, cited above, at 14.

[106]  **Court Register No. TAL-2022-07355, Exhibit No. 90 of Folder II of MOLITOR -** Annual accounts of ROSSONERI SPORT for the financial year ending 30 June 2024, first page; **Court Register No. TAL-2022-07361, Exhibit No. 90 of Folder II of MOLITOR -** Annual accounts of ROSSONERI SPORT for the financial year ending 30 June 2024, first page; **Court Register No. TAL-2023-04206, Exhibit No. 90 of Folder II of MOLITOR -** Annual accounts of ROSSONERI SPORT for the financial year ending 30 June 2024, first page.

(EUR 6,151,370.59 according to the annual accounts at 30 June 2023 of this company[107] and EUR 3,498,615.09 according to the annual accounts at 30 June 2024 of this company[108]), it is certain that only a tiny part of the debt of ROSSONERI SPORT to PROJECT REDBLACK, which appears to amount to EUR 340.949.811.96 as at 30 June 2024[109], will be able to be repaid in full, representing a shortfall of EUR 310,102,581 for PROJECT REDBLACK.

Financial situation of ROSSONERI SPORT

| Total assets: | EUR 33,500,986.00 <br><br> including <br> - EUR 27,348,615.41 (repayment of vendor loan notes) <br> - EUR 6,151,370.59 (cash in account) |
|---|---|
| Debt to PROJECT REDBLACK | EUR 340,949,811.96 |
| **Results** | **EUR -307,448,825.96** |

As a result, PROJECT REDBLACK's receivable from ROSSONERI SPORT (included in PROJECT REDBLACK's total assets, which are valued at EUR 435,599,872.78 as at 30 June 2023 and EUR 434,903,692.69 as at 30 June 2024[110]) had to be revalued downwards on 30 December 2024.

On this basis, it is possible to value PROJECT REDBLACK's assets as amounting today to more or less EUR 124,801,112, which is obviously insufficient to enable PROJECT REDBLACK to pay its debts (particularly those to BLUE SKYE LUX and PROJECT REDBLACK), which amounted to EUR 409,529,574.25 on 30 June 2024[111]. In fact, the General Terms and Conditions of the Class A and Class B TPECs indicate that the write-downs suffered by the Company on the underlying assets of the Class A and Class B TPECs are not taken into account as a "loss" in the calculation of the returns linked to the Class A and Class B TPECs and therefore do not reduce the amounts due[112].

---

[107] **Court Register No. TAL-2022-07355, Exhibit No. 88 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2022-07361, Exhibit No. 88 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2023-04206, Exhibit No. 88 of Folder II from MOLITOR**, cited above.

[108] **Court Register No. TAL-2022-07355, Exhibit No. 90 of Folder II from MOLITOR -** cited above, first page; **Court Register No. TAL-2022-07361, Exhibit No. 90 of Folder II from MOLITOR -** cited above, first page; **Court Register No. TAL-2023-04206, Exhibit No. 90 of Folder II from MOLITOR -** cited above, first page.

[109] **Court Register No. TAL-2022-07355, Exhibit No. 90 of Folder II from MOLITOR -** cited above, second page; **Court Register No. TAL-2022-07361, Exhibit No. 90 of Folder II from MOLITOR -** cited above, second page; **Court Register No. TAL-2023-04206, Exhibit No. 90 of Folder II from MOLITOR-** cited above, second page.

[110] **Court Register No. TAL-2022-07355, Exhibit No. 91 of Folder II from MOLITOR -** Annual accounts of PROJECT REDBLACK for the year ended 30 June 2024, first page; **Court Register No. TAL-2022-07361, Exhibit No. 91 of Folder II from MOLITOR -** Annual accounts of PROJECT REDBLACK for the year ending 30 June 2024, first page; **Court Register No. TAL-2023-04206, Exhibit No. 91 of Folder II from MOLITOR -** Annual accounts of PROJECT REDBLACK for the year ended 30 June 2024, page one.

[111] **Court Register No. TAL-2022-07355, Exhibit No. 91 of Folder II from MOLITOR -** cited above, second page; **Court Register No. TAL-2022-07361, Exhibit No. 91 of Folder II from MOLITOR -** cited above, second page; **Court Register No. TAL-2023-04206, Exhibit No. 91 of Folder II from MOLITOR -** cited above, second page.

[112] **Court Register No. TAL-2022-07355, Exhibit No. 36 of Folder II from MOLITOR**, cited above, definitions of "*Class A Eligible TPEC Income*" and " *Class B Eligible TPEC Income* "; **Court Register No. TAL-2022-07361, Exhibit No. 36 of Folder II from MOLITOR**, cited above, definitions of "*Class A Eligible TPEC Income*" and " *Class B Eligible TPEC Income* "; **Court Register No. TAL-2023-04206, Exhibit No. 36 of Folder II from MOLITOR**, cited above, definitions of "*Class A Eligible TPEC Income*" and of "*Class B Eligible TPEC Income*".

**2.7    The surprising position taken by LEXINGTON**

84.    It is apparent from the events amply described above that ELLIOTT is continuing to act fraudulently against the rights of BLUE SKYE LUX, LIC 159 and their respective creditors and shareholders. In order to remedy this situation, BLUE SKYE LUX and LIC 159 have been redoubling their efforts for over three years to ensure that their rights are finally respected and that the rights and interests of their respective shareholders and creditors are protected. It would therefore be natural to expect LEXINGTON, as the creditor holding the Class E-1 TPECs, to welcome such an undertaking and to work with BLUE SKYE LUX and LIC 159 to ensure the success of the legal actions they have brought.

85.    However, since May 2022, LEXINGTON has taken a position that is disconcerting, to say the least, with regards to BLUE SKYE LUX and LIC 159.

86.    The errors in LEXINGTON's presentation of the facts must therefore be corrected.

87.    In May 2022, when BLUE SKYE LUX itself had no (and still has very little) information about the sale of AC MILAN shares, LEXINGTON suddenly wrote to BLUE SKYE LUX (putting GENIO, KING GEORGE, ROSSONERI SPORT and
PROJECT REDBLACK in copy of this correspondence) to urge it to do all it could to clear this transaction, which it said was in the interests of all BLUE SKYE LUX creditors[113]. By taking this position (or rather this about-face, since LEXINGTON had previously sided with BLUE SKYE LUX), LEXINGTON was opposing the legal initiatives taken by BLUE SKYE.

88.    BLUE SKYE LUX did not fail to express its astonishment in May, and then in June 2022[114], in relation to the strange nature of LEXINGTON's attitude and the fact that it was far better informed than the entities of the BLUE SKYE group about the disposal of AC MILAN shares, to the point of fearing that behind LEXINGTON's inconsistent behaviour lay the existence of a secret agreement between it and ELLIOTT. LEXINGTON is therefore displaying unrestrained hypocrisy when it claims that BLUE SKYE LUX did not provide it with information in relation to the sale of AC MILAN[115]. At the time, the BLUE SKYE group was faced with the ELLIOTT group withholding information and was therefore unable to provide information that it did not have.

89.    LEXINGTON then did not come forward again for more than a year, until 31 October 2023, when it summoned BLUE SKYE LUX and LIC 159 in interim proceedings[116] in order to obtain the appointment of an "ad hoc administrator" for each of these two companies, whose mission would be, inter alia, to " *oversee all financial flows of BLUE SKYE and Company 159; give its consent to any transfer of funds by BLUE SKYE and Company 159, which may only authorise transactions in the corporate interest of BLUE SKYE and Company 159 and must refuse any transaction allowing a dissipation of assets to the detriment of LEXINGTON;* [...] *monitor any legal proceedings already initiated (and yet to be initiated) by BLUE SKYE and/or*

---

[113]    Exhibit No. 6, No. 8 and No. 11 of Folder I from Arendt & Medernach.
[114]    Exhibit No. 7 and No. 9 of Folder I from Arendt & Medernach.
[115]    Application for voluntary intervention of 9 February 2024, No. 25, p. 14.
[116]    **Court Register No. TAL-2022-07355, Exhibit No. 69 of Folder II from MOLITOR -** Copy of the writ of summons for interim relief of 31 October 2023; **Court Register No. TAL-2022-07361, Exhibit No. 69 of Folder II from MOLITOR -** Copy of the writ of summons for interim relief of 31 October 2023; **Court Register No. TAL-2023-04206, Exhibit No. 69 of Folder II from MOLITOR -** Copy of the writ of summons for interim relief of 31 October 2023.

*Company 159 which could cause financial harm to LEXINGTON as a result, until LEXINGTON's claim under the "LEXINGTON TPECs" is satisfied in full".*

In addition, on 4 April 2024[117], PROJECT REDBLACK and ROSSONERI SPORT chose to intervene voluntarily in support of LEXINGTON's claims, which confirms the existence of dealings between the directors/owners of LEXINGTON and the ELLIOTT group to maximise their power to frustrate the BLUE SKYE group.

90.   LEXINGTON continued its illogical and suspicious behaviour by bringing an application for voluntary intervention in various cases brought by BLUE SKYE LUX and LIC 159 against ELLIOTT on 9 February 2024, primarily aimed at attempting to portray the legal steps taken by the BLUE SKYE group as erroneous and seeking an "*unlawful advantage in* [its] *purely personal interest* " [118], thereby
"*gravely jeopardising LEXINGTON's legitimate rights and financial interests resulting* [...] *from the sale of AC MILAN*"[119]. Such an application for intervention (which PROJECT REDBLACK and ROSSONERI SPORT, both controlled by the ELLIOTT group, curiously already seemed to have envisaged as early as 2 March 2023 in the civil action against Mr CERCHIONE, Mr D'AVANZO and Mr CASLINI (indicating that they reserved the right to be supported by LEXINGTON)[120], and which LEXINGTON appeared to announce in its writ of summons for interim relief of 31 October 2023) has no other purpose than to enable LEXINGTON to join the ELLIOTT group, due probably to a secret agreement between these entities.

91.   More recently, BLUE SKYE LUX and LIC 159 attempted to alert[121] LEXINGTON by letter to the events of December 2024 (including the refinancing of the vendor loan notes by the ELLIOTT Group), which have a negative impact on the value of the Class B TPECs and, in turn, on the value of the Class E-1 TPECS held by LEXINGTON. However, LEXINGTON has remained silent, confirming that it has sided with the ELLIOTT group, while the terms of the financial arrangements that may have been made between them remains unknown.

92.   Through its actions, LEXINGTON is trying to extract more money from the BLUE SKYE group than the Class E-1 TPECs will allow, by falsely claiming that the underlying assets of these instruments are not only Class B TPECs, but also Class A-2 TPECs. To do so, it relies on a deliberate misinterpretation of the *Terms and Conditions of Class E Tracking Preferred Equity Certificates,* dated 6 April 2017, subject to Luxembourg law and unamended to date, which govern Class E TPECs[122].

---

[117]   **Court Register No. TAL-2022-07355, Exhibit No. 70 of Folder II from MOLITOR -** Copy of the application for intervention of 4 April 2024; **Court Register No. TAL-2022-07361, Exhibit No. 70 of Folder II from MOLITOR -** Copy of the application for intervention of 4 April 2024; **Court Register No. TAL-2023-04206, Exhibit No. 70 of Folder II from MOLITOR -** Copy of the application for intervention of 4 April 2024.

[118]   Application for voluntary intervention of 9 February 2024, No. 2, p. 6.

[119]   Application for voluntary intervention of 9 February 2024, No. 7, p. 7.

[120]   Court Register No. TAL-2023-04206, Writ of summons of 2 March 2023 of ELVINGER HOSS PRUSSEN, p. 3.

[121]   **Court Register No. TAL-2022-07355, Exhibit No. 71 of Folder II from MOLITOR -** Letter of 10 January 2025 from BLUE SKYE LUX and LIC 159 to LEXINGTON; **Court Register No. TAL-2022-07361, Exhibit No. 71 of Folder II from MOLITOR -** Letter of 10 January 2025 by BLUE SKYE LUX and LIC 159 to LEXINGTON; **Court Register No. TAL-2023-04206, Exhibit No. 71 of Folder II from MOLITOR -** Letter of 10 January 2025 by BLUE SKYE LUX and LIC 159 to LEXINGTON.

[122]   **Court Register No. TAL-2022-07355, Exhibit No. 43 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2022-07361, Exhibit No. 43 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2023-04206, Exhibit No. 43 of Folder II from MOLITOR**, cited above.

93.    However, this position is contradicted by the text of these General Terms and Conditions and by the factual elements set out below, which are more than sufficient to explain why, for almost seven years, LEXINGTON has never made the slightest claim in relation to class A-2 TPECs:

(i)    Reading the General Terms and Conditions for Class E TPECs[123], they particularly tell us that:

"*The Class E TPECs shall track 92.308% of all investments by the Company in the Class B TPECs and other instruments issued by Project RedBlack S.à r.l. to* [Blue Skye Lux] *(the Class E Initial Underlying Investment) and any other underlying investments, which may be agreed by* [Blue Skye Lux] *and the* [class E TPECs] *Holders"[124]* (Section II of the General Terms and Conditions of Class E TPECs).

Class E TPECs thus follow the sums collected by BLUE SKYE LUX in respect of Class B TPECs alone and no mention is made of Class A-2 TPECs.

It should be noted that the very text of Section II of the General Terms and Conditions of the Class E TPECs certainly includes (i) other instruments issued by PROJECT REDBLACK to BLUE SKYE LUX; and (ii) other underlying instruments, in addition to the Class B TPECs, subject to the express condition, in both cases, that such instruments have been agreed between the holders and the issuer of the Class E TPECs. The syntax of this clause (i.e. the inclusion of a comma in the text, just before the relative pronoun "*which*" introducing the condition) moreover confirms the fact that the condition is not linked exclusively to the words immediately preceding it (namely "*other underlying instruments*"). To cite a reference work on the subject, the Supreme Court of Oregon decided that the proof that a reservation is supposed to apply to all the terms that precede, instead of the immediately preceding term, can be found in the fact that this reservation is separated from all these terms by a comma. The Supreme Court noted that other courts and tribunals had used this rule regularly. It also added that this rule relating to the observance of the use of commas was consistent with general grammatical rules applied outside a legal context[125].

By application of these grammatical rules, Class A-2 TPECs must necessarily be excluded from the underlying assets of Class E TPECs, in the absence of an agreement reached between BLUE SKYE LUX (and *a fortiori* LIC 159), LEXINGTON and any other holder of Class E TPECs on this subject.

---

[123]    **Court Register No. TAL-2022-07355, Exhibit No. 43 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2022-07361, Exhibit No. 43 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2023-04206, Exhibit No. 43 of Folder II from MOLITOR**, cited above.

[124]    Original text: "*The Class E TPECs shall track 92.308% of all investments by the Company in the Class B TPECs and other instruments issued by Project RedBlack S.à r.l. to* [Blue Skye Lux] *(the Class E Initial Underlying Investment) and any other underlying investments, which may be agreed by* [Blue Skye Lux] *and the* [class E TPECs] *Holders* " - (**Court Register No. TAL-2022-07355, Exhibit No. 43 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2022-07361, Exhibit No. 43 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2023-04206, Exhibit No. 43 of Folder II from MOLITOR**, cited above).

[125]    **Court Register No. TAL-2022-07355, Exhibit No. 72 of Folder II from MOLITOR -** Oregon Supreme Court Decision of 29 November 1996; **Court Register No. TAL-2022-07361, Exhibit No. 72 of Folder II from MOLITOR -** Oregon Supreme Court Decision of 29 November 1996; **Court Register No. TAL-2023-04206, Exhibit No. 72 of Folder II from MOLITOR -** Oregon Supreme Court Decision of 29 November 1996.

(ii)     The subscription price of the Class A-2 TPECs is EUR 10, due to the fact that the income generated by these financial instruments does not depend on the funds invested. Rather, as we have seen, it depends on the role played by BLUE SKYE LUX in arranging the financing granted to ROSSONERI SPORT and in increasing the value of the AC MILAN shares, as stipulated in the Investors Agreement[126]. There can be no doubt, therefore, that BLUE SKYE LUX needed no external funds to pay such a limited subscription price.

(iii)    Mr D'AVANZO's email of 24 March 2017 to Arena L.P., LEXINGTON's parent company, prior to the issue of the Class E TPECs stated that: *"[...] TPECS F and TPECS E will share some underlying investment which is TPECS B"* [127]. This is proof that, when the creation of both Class A-2 TPECs and Class B TPECs was envisaged for the purposes of financing PROJECT REDBLACK, there was no question of counting Class A-2 TPECs among the underlying assets of the Class E TPECs.

(iv)    The link between Class B TPECs and Class E TPECs and, by contrast, the lack of link between Class A-2 TPECs and Class E TPECs, are *further* illustrated by the provisions of the Contribution Agreement[128], pursuant to which LIC 159 assumes the dual position of issuer of the Class E TPECs and holder of the Class B TPECs, in place of BLUE SKYE LUX, in order to isolate these instruments, in accordance with the express request of ARENA L.P., the parent company of LEXINGTON[129]. However, ownership of the Class A-2 TPECs held by BLUE SKYE LUX has not been transferred to LIC 159.

(v)     It appears from LEXINGTON's financial statements for 2021[130] that the only investment made in euros by this company in financial assets is estimated at a value corresponding to USD 29,955,965 in 2020 and USD 30,976.374 for 2021, this amount being abruptly revalued to USD 44,255,513 in LEXINGTON's 2022 financial statements as a result of the change in the valuation method from a market approach to the "discounted cash flow" or "DCF" method (we will return to this troubling but very important detail below)[131].

---

126    See above, paragraph 32 (i)(b).

127    Original text: "[...] *TPECS F and TPECS E will share some underlying investment which is TPECS B* "(**Court Register No. TAL-2022-07355, Exhibit No. 73 of Folder II from MOLITOR -** Email from Mr D'AVANZO sent on 24 March 2017 at 2:34 p.m. to Misha RENDA, Director, Structured Finance at Arena LP; **Court Register No. TAL-2022-07361, Exhibit No. 73 of Folder II from MOLITOR -** Email from Mr D'AVANZO sent on 24 March 2017 at 2:34 p.m. to Misha RENDA, Director, Structured Finance at Arena LP; **Court Register No. TAL-2023-04206, Exhibit No. 73 of Folder II from MOLITOR -** Email from Mr D'AVANZO sent on 24 March 2017 at 2:34 p.m. to Misha RENDA, Director, Structured Finance at Arena LP).

128    **Court Register No. TAL-2022-07355, Exhibit No. 42 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2022-07361, Exhibit No. 42 of Folder II from MOLITOR,** cited above; **Court Register No. TAL-2023-04206, Exhibit No. 42 of Folder II from MOLITOR,** cited above.

129    **Court Register No. TAL-2022-07355, Exhibit No. 44 of Folder II from MOLITOR,** cited above; **Court Register No. TAL-2022-07361, Exhibit No. 44 of Folder II from MOLITOR,** cited above; **Court Register No. TAL-2023-04206, Exhibit No. 44 of Folder II from MOLITOR,** cited above.

130    **Court Register No. TAL-2022-07355, Exhibit No. 74 of Folder II from MOLITOR -** Lexington financial statements relating to financial year ending 31 December 2021, pgs. 30 and 36; **Court Register No. TAL-2022-07361, Exhibit No. 74 of Folder II from MOLITOR -** Lexington financial statements relating to financial year ending 31 December 2021, pgs. 30 and 36; **Court Register No. TAL-2023-04206, Exhibit No. 74 of Folder II from MOLITOR -** Lexington financial statements relating to financial year ending 31 December 2021, pgs. 30 and 36.

131    **Court Register No. TAL-2022-07355, Exhibit No. 75 of Folder II from MOLITOR -** Lexington financial statements relating to financial year ending 31 December 2022, pgs. 31 and 37; **Court Register No. TAL-2022-07361, Exhibit No. 75 of Folder II from MOLITOR -** Lexington financial statements relating to financial year ending 31 December 2022, pgs. 31 and 37; **Court Register No. TAL-2023-04206, Exhibit No. 75 of Folder II from**

As the Class E TPECs are denominated in euros, it is reasonable to deduce that these amounts should correspond to LEXINGTON's assessment of the value of the Class E-1 TPECs. However, according to the valuations provided by PROJECT REDBLACK and ROSSONERI SPORT[132], the cumulative value of the Class A-2 and Class B TPECs is approximately EUR 75 million (or more or less USD 80 million, according to the applicable conversion rate). The value of Class E TPECs recorded by LEXINGTON can thus only be explained by taking into account the value of Class B TPECs, to the exclusion of Class A-2 TPECs.

94.  LEXINGTON therefore has no interest in the transfers of Class A-2 TPECs between BLUE SKYE LUX and a group company located in the Cayman Islands, or even in the fate of these instruments. In addition, it should be noted that LEXINGTON's allegations concerning the price of EUR 10 applied to these transfers are purely fanciful[133]. In fact, as indicated above and as PROJECT REDBLACK and ROSSONERI SPORT moreover acknowledge[134], this amount corresponds to the subscription price of the Class A-2 TPECs, which remunerated the efforts of the BLUE SKYE Group in developing the value of AC MILAN[135]. The directors of the BLUE SKYE group were therefore perfectly free to place the class A-2 TPECs in the entity of their choice, with the income from these securities ultimately accruing to Mr CERCHIONE and Mr D'AVANZO.

95.  LEXINGTON is also attempting to make it appear that LIC 159 is not the holder of all the Class B TPECs issued by PROJECT REDBLACK, in that it does not appear as such in the register of Class B TPECs, despite the objective elements set out above showing that such a claim is not tenable[136] and despite the existence of the Contribution Agreement[137] to which LEXINGTON is nonetheless a party.

It should be remembered that in view of the good understanding between all the parties at that time and the fact that LEXINGTON had explicitly asked for LIC 159 to be its sole contact, and given that any new issue of Class B TPECs was paid directly by LIC 159 to PROJECT REDBLACK in full transparency, BLUE SKYE LUX and LIC 159 did not consider it necessary to immediately carry out the formalities of notifying PROJECT REDBLACK of this transfer, which was then fully aware of the parties' situation.

96.  BLUE SKYE LUX and LIC 159 have finally obtained the registration of 12 November 2024 of LIC 159 as registrant in the relevant register maintained by PROJECT REDBLACK[138] of the

---

MOLITOR - Lexington financial statements relating to the financial year ending 31 December 2022, pgs. 31 and 37.

[132]  **Court Register No. TAL-2022-07355**, conclusions of ELVINGER HOSS PRUSSEN of 31 October 2022, No. 13, p. 9 and No. 19, p. 13; Court Register No. TAL-2023-04206, Writ of summons of 2 March 2023 of ELVINGER HOSS PRUSSEN, No. 13, p. 7 and No. 19, p. 12.

[133]  Application for intervention of 9 February 2024, No. 31, p. 18.

[134]  **Court Register No. TAL-2022-07355**, pleadings of ELVINGER HOSS PRUSSEN of 31 October 2022, No. 19, p. 13; TAL-2023-04206, writ of summons of 2 March 2023, No. 19, p. 11.

[135]  See above, paragraph 32 (i).

[136]  See above, paragraph 36.

[137]  **Court Register No. TAL-2022-07355, Exhibit No. 42 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2022-07361, Exhibit No. 42 of Folder II from MOLITOR**, cited above; **Court Register No. TAL-2023-04206, Exhibit No. 42 of Folder II from MOLITOR**, cited above.

[138]  **Court Register No. TAL-2022-07355, Exhibit No. 76 of Folder II from MOLITOR** - Letter of 15 November 2024 sent by PROJECT REDBLACK to BLUE SKYE LUX and LIC 159; **Court Register No. TAL-2022-07361, Exhibit No. 76 of Folder II from MOLITOR** - Letter of 15 November 2024 sent by PROJECT REDBLACK to BLUE SKYE.

10,735,567 first Class B TPECs acquired on 10 May 2017 pursuant to the Contribution Agreement, without prejudice to BLUE SKYE LUX's and LIC 159's right to obtain a registration at any earlier date on which PROJECT REDBLACK had knowledge of the change of ownership of the Class B TPECs. This registration was not obtained without difficulty and led LIC 159 to have to fulfil (without any recognition which could be prejudicial to it) conditions which did not exist but which PROJECT REDBLACK unilaterally claimed to derive from the General Terms and Conditions applicable to Class B TPECs by misreading these rules.

97.    Even if LIC 159 has, for the time being, been unable to obtain a retroactive entry of the Class B TPECs in the corresponding register, LEXINGTON cannot derive any grievance from this since, to date, no distributions have ever been made under the Class B TPECs, so distributions due under the Class E-1 TPECs held by LEXINGTON have not been triggered[139].

98.    LIC 159's application to be registered as the holder of the remaining 20,589,498 Class B TPECs is currently being refused in bad faith by PROJECT REDBLACK on flimsy grounds. In particular:

(i)    The contractual documentation put in place by BLUE SKYE LUX and LIC 159 concomitantly with the issue of the newly issued Class B TPECs, the authenticity of which PROJECT REDBLACK questions without providing the slightest proof[140], further shows that each of these TPECs was immediately incorporated into LIC 159's assets as soon as it was issued by PROJECT REDBLACK[141] and that LIC 159 has

---

LUX and LIC 159; **Court Register No. TAL-2023-04206, Exhibit No. 76 of Folder II from MOLITOR** - Letter of 15 November 2024 sent by PROJECT REDBLACK to BLUE SKYE LUX and LIC 159.

[139]    **Court Register No. TAL-2022-07355, Exhibit No. 43 of Folder II from MOLITOR**, cited above, Article 4.1; **Court Register No. TAL-2022-07361, Exhibit No. 43 of Folder II from MOLITOR**, cited above, section 4.1; **Court Register No. TAL-2023-04206, Exhibit No. 43 of Folder II from MOLITOR**, cited above, section 4.1.

[140]    **Court Register No. TAL-2022-07355, Exhibit No. 77 of Folder II from MOLITOR** - Letter of 13 December 2024 sent by PROJECT REDBLACK to BLUE SKYE LUX and LIC 159; **Exhibit No. 78 of Folder II from MOLITOR** - Letter of 15 December 2024 sent by BLUE SKYE LUX and LIC 159 to PROJECT REDBLACK; **Exhibit No. 79 of Folder II from MOLITOR** - Letter of 14 January 2025 sent by PROJECT REDBLACK to BLUE SKYE LUX and LIC 159; **Exhibit No. 80 of Folder II from MOLITOR** - Letter of 5 February 2025 sent by BLUE SKYE LUX and LIC 159 to PROJECT REDBLACK; **Court Register No. TAL-2022-07361, Exhibit No. 77 of Folder II from MOLITOR** - Letter of 13 December 2024 sent by PROJECT REDBLACK to BLUE SKYE LUX and LIC 159; **Exhibit No. 78 of Folder II from MOLITOR** - Letter of 15 December 2024 sent by BLUE SKYE LUX and LIC 159 to PROJECT REDBLACK; **Exhibit No. 79 of Folder II from MOLITOR** - Letter of 14 January 2025 sent by PROJECT REDBLACK to BLUE SKYE LUX and LIC 159; **Exhibit No. 80 of Folder II from MOLITOR** - Letter of 5 February 2025 sent by BLUE SKYE LUX and LIC 159 to PROJECT REDBLACK; **Court Register No. TAL-2023-04206, Exhibit No. 77 of Folder II from MOLITOR** - Letter of 13 December 2024 sent by PROJECT REDBLACK to BLUE SKYE LUX and LIC 159; **Exhibit No. 78 of Folder I from MOLITOR** - Letter of 15 December 2024 sent by BLUE SKYE LUX and LIC 159 to PROJECT REDBLACK; **Exhibit No. 79 of Folder I from MOLITOR** - Letter of 14 January 2025 sent by PROJECT REDBLACK to BLUE SKYE LUX and LIC 159; **Exhibit No. 80 of Folder I from MOLITOR** - Letter of 5 February 2025 sent by BLUE SKYE LUX and LIC 159 to PROJECT REDBLACK.

[141]    **Court Register No. TAL-2022-07355, Exhibit No. 78 and No. 80 of Folder II from MOLITOR**, cited above; **Exhibit No. 81 of Folder II from MOLITOR** - Letter of 10 December 2024 sent by BLUE SKYE LUX and LIC 159 to PROJECT REDBLACK; **Exhibit No. 82 of Folder II from MOLITOR** - Sample TPECs Class B Assignment Agreement accompanied by the subscription letter for the Class B TPECs dated the same day and proof of payment of the subscription price by LIC 159 to PROJECT REDBLACK; **Court Register No. TAL-2022-07361, Exhibit No. 78 and No. 80 of Folder II from MOLITOR**, cited above; **Exhibit No. 81 of Folder II from MOLITOR** - Letter of 10 December 2024 sent by BLUE SKYE LUX and LIC 159 to PROJECT REDBLACK; **Exhibit No. 82 of Folder II from MOLITOR** - Sample TPECs Class B Assignment Agreement accompanied by the subscription letter

paid the subscription fees directly to PROJECT REDBLACK. It should also be noted that as the General Terms and Conditions of the Class A and Class B TPECs[142] do not impose any form of notification of transfers, the transmission of the relevant information to PROJECT REDBLACK was more than sufficient to enable it to update the register.

(ii)    PROJECT REDBLACK is attempting to use the fact that LIC 159 has only been directly owned by Mr CERCHIONE and Mr D'AVANZO since 7 November 2024 as a pretext to try to call into question the possibility of transferring Class B TPECs to LIC 159[143]. Not only, as we have seen, did the General Terms and Conditions of the Class B TPECs[144] not require the holder of the Class B TPECs to be "directly" owned by these two individuals, but following PROJECT REDBLACK's reasoning, this restriction should have applied to all Class B TPECs, and therefore also to the 10.735,567 Class B TPECs originally issued. Equal treatment for equal conditions. PROJECT REDBLACK is therefore inconsistent, and even acting in bad faith, in agreeing to register the transfer of these first Class B TPECs and refusing to register the transfer of the subsequent 20,589,498 Class B TPECs, even though at the time the first TPECs were acquired, LIC 159 was in all cases indirectly owned by Mr CERCHIONE and Mr D'AVANZO via BLUE SKYE LUX.

(iii)   Despite the information and additional documents it has been provided with, PROJECT REDBLACK continues to sow controversy over secondary points. In particular, it refers in bad faith to the fact that BLUE SKYE LUX was allegedly informed as the holder of the Class B TPECs[145] in a foreign proceeding[146], even though it had received a copy of the notarised power of attorney that LIC 159, as holder of the Class B TPECs, had given before a notary to BLUE SKYE LUX for the latter to represent it in that case[147].

---

Class B TPECs dated the same day and proof payment of the subscription price by LIC 159 to Project Redblack; **Court Register No. TAL-2023-04206, Exhibit No. 78 and No. 80 of Folder II from MOLITOR,** cited above; **Exhibit No. 81 of Folder I from MOLITOR** - Letter of 10 December 2024 sent by BLUE SKYE LUX and LIC 159 to PROJECT REDBLACK; **Exhibit No. 82 of Folder II from MOLITOR**- Sample TPECs Class B Assignment Agreement accompanied by the subscription letter for the Class B TPECs dated the same day and proof of payment of the subscription price by LIC 159 to PROJECT REDBLACK.

[142]  **Court Register No. TAL-2022-07355, Exhibit No. 8 of Folder I from MOLITOR and Exhibit No. 36 of Folder II from MOLITOR,** cited above; **Court Register No. TAL-2022-07361, Exhibit No. 8 of Folder I from MOLITOR and Exhibit No. 36 of Folder II from MOLITOR,** cited above; **Court Register No. TAL-2023-04206, Exhibit No. 8 of Folder I from MOLITOR and Exhibit No. 36 of Folder II from MOLITOR,** cited above.

[143]  **Court Register No. TAL-2022-07355, Exhibit No. 79 of Folder II from MOLITOR,** cited above; **Court Register No. TAL-2022-07361, Exhibit No. 79 of Folder II from MOLITOR,** cited above; **Court Register No. TAL-2023-04206, Exhibit No. 79 of Folder II from MOLITOR,** cited above.

[144]  **Court Register No. TAL-2022-07355, Exhibit No. 8 of Folder I from MOLITOR and Exhibit No. 36 of Folder II from MOLITOR,** cited above; **Court Register No. TAL-2022-07361, Exhibit No. 8 of Folder I from MOLITOR and Exhibit No. 36 of Folder II from MOLITOR,** cited above; **Court Register No. TAL-2023-04206, Exhibit No. of Folder I from MOLITOR and Exhibit No. 36 of Folder II from MOLITOR,** cited above.

[145]  **Court Register No. TAL-2022-07355, Exhibit No. 79 of Folder II from MOLITOR,** cited above; **Court Register No. TAL-2022-07361, Exhibit No. 79 of Folder II from MOLITOR,** cited above; **Court Register No. TAL-2023-04206, Exhibit No. 79 of Folder II from MOLITOR,** cited above.

[146]  **Court Register No. TAL-2022-07355, Exhibit No. 84 of Folder II from MOLITOR -** Extract from Project Redblack's Statement of Defence (*Memoria Difensiva*) of 17 May 2023; **Court Register No. TAL-2022-07361, Exhibit No. 84 of Folder II from MOLITOR -** Extract from Project Redblack's Statement of Defence (*Memoria Difensiva*) of 17 May 2023; **Court Register No. TAL-2023-04206, Exhibit No. 84 of Folder II from MOLITOR** - Extract from Project Redblack's Statement of Defence (*Memoria Difensiva*) of 17 May 2023.

[147]  **Court Register No. TAL-2022-07355, Exhibit No. 83 of Folder II from MOLITOR -** Proxy evidencing mandate given to Blue Skye Lux by LIC 159; **Court Register No. TAL-2022-07361, Exhibit No. 83 of Folder II from MOLITOR -**

99.   BLUE SKYE's and LIC 159's suspicions that LEXINGTON's actions were in fact being driven by ELLIOTT were further strengthened by examination of LEXINGTON's financial statements, already referred to below[148]. The change in LEXINGTON's valuation method, which led to a sharp increase in the valuation of class E-1 TPECs, is highly revealing.

The "discounted cash flow" or "DCF" method now used by LEXINGTON to value this asset applies a fixed discount rate of 3.5% to the currently determined value of this asset[149]. The lower the rate, the greater the certainty that the owner of the asset will receive repayment from the issuer.

However, as we have seen, PROJECT REDBLACK and ROSSONERI SPORT arranged for LIC 159 not to be able to obtain, in the near future, repayment of the Class B TPECs, the underlying assets of the Class E TPECs. It would therefore have been normal for LEXINGTON to apply a much higher discount rate to take account of this non-negligible risk of non-repayment of the class E TPECs. The use of the abnormally low rate of 3.5% could only be explained by the fact that LEXINGTON has received assurances that it will obtain repayment of its class E-1 TPECs, which could be the case if it has entered into a financial agreement with ELLIOTT in this respect.

100.  BLUE SKYE LUX and LIC 159 can therefore reasonably conclude from this analysis that LEXINGTON is probably no longer the owner of the E-1 class TPECs, which may even have become the property of a third party (perhaps the ELLIOTT group?). If this is indeed the case, LEXINGTON's presence here is not justified.


## 2.8   Early setbacks of the Elliott Group

101.  On 7 September 2023, almost six months after the writ of summons was issued against Mr CERCHIONE, Mr D'AVANZO and Mr CASLINI, PROJECT REDBLACK and ROSSONERI SPORT have filed a writ of summons of against BLUE SKYE LUX, LIC 159, Mr CERCHIONE, Mr D'AVANZO and Mr CASLINI in yet another attempt to hinder the actions taken by the BLUE SKYE group against ELLIOT[150]. This application was declared inadmissible on 30 May 2024 by the District Court of Luxembourg ruling on criminal matters, which put an end to one of the ELLIOTT group's schemes against the BLUE SKYE group. No new criminal proceedings having been brought against BLUE SKYE LUX, LIC 159, Mr CERCHIONE, Mr D'AVANZO and Mr CASLINI[151].

---

Power of attorney evidencing the mandate given to Blue Skye Lux by LIC 159; **Court Register No. TAL-2023-04206, Exhibit No. 83 of Folder II from MOLITOR** - Power of Attorney evidencing the mandate given to Blue Skye Lux by LIC 159.

[148]   See above, paragraph 93 (v); **Court Register No. TAL-2022-07355, Exhibit No. 74 of Folder II from MOLITOR**, cited above, pgs. 31 and 37; **Court Register No. TAL-2022-07361, Exhibit No. 74 of Folder II from MOLITOR**, cited above, pgs. 31 and 37; **Court Register No. TAL-2023-04206, Exhibit No. 74 of Folder II from MOLITOR**, cited above, pgs. 31 and 37.

[149]   **Court Register No. TAL-2022-07355, Exhibit No. 75 of Folder II from MOLITOR**, cited above, p. 37; **Court Register No. TAL-2022-07361, Exhibit No. 75 of Folder II from MOLITOR**, cited above, at 37; **Court Register No. TAL-2023-04206, Exhibit No. 75 of Folder II from MOLITOR**, cited above, at 37.

[150]   **Court Register No. TAL-2022-07355, Exhibit No. 85 of Folder II from MOLITOR** - Direct summons of 7 September, 2023; **Court Register No. TAL-2022-07361, Exhibit No. 85 of Folder II from MOLITOR** - Direct Summons of 7 September 2023; **Court Register No. TAL-2023-04206, Exhibit No. 85 of Folder II from MOLITOR** -Direct Summons of 7 September 2023.

[151]   **Court Register No. TAL-2022-07355, Exhibit No. 86 of Folder II from MOLITOR** - Judgement of 30 May 2024 rendered by the District Court of Luxembourg, ruling on correctional matters; **Court Register No. TAL-2022-07361, Exhibit No. 86 of Folder II from MOLITOR** - Judgement of 30 May 2024 rendered by the District

102. More recently, the attempts by LEXINGTON and the ELLIOTT group to have BLUE SKYE LUX and LIC 159 placed under guardianship via the appointment of an ad hoc administrator have failed miserably: On 26 May 2025, the Vice-President of the District Court of Luxembourg declared inadmissible LEXINGTON's application for interim measures as well as the applications for voluntary intervention by PROJECT REDBLACK and ROSSONERI SPORT[152], finally bringing this case to a close.

103. On the other hand, as explained above[153], the criminal complaint launched by BLUE SKYE LUX against ELLIOTT and its representatives and affiliates continues to run its course, clearly demonstrating that the accusations made by the BLUE SKYE group in relation to the sale of AC MILAN are far from unfounded.

## II.    IN LAW

104. By notice of 20 December 2023, for Court Register No. TAL-2022-07361, your Court invited the parties to make limited submissions regarding:
    -    obscure wording;
    -    pleas of inadmissibility raised by Maître Albert MORO; and
    -    applicable law.

105. These conclusions are therefore limited to the procedural arguments presented by the opposing parties. The parties therefore reserve the right to address the substantive aspects of the cases in subsequent submissions.

## 1    TAL-2022-07355: DECLARATORY ACTION

106. The respondents in the proceedings bearing Court Register No. TAL-2022-07355 are Respondents 1), 2), 8) to 12), 14) and 18).

107. Respondents 1), 2), 8) and 18) have not yet entered a plea in this court register.

108. Respondents 9) to 12) have raised, in submissions No. 1, the inadmissibility of the writ of summons of 10 June 2022 and accordingly request that a prior decision be taken on this plea of inadmissibility before any defence on the merits[154].

109. Mr CRACA, respondent 14), merely refers "to prudence of justice as regards the admissibility of the writ of summons in pure form"[155]. As regards the merits, Mr CRACA limits himself to raising the inadmissibility, if not the unfounded nature, of the writ of summons of 10 June 2022 against him on the grounds that he is no longer, rendered by the

---

Court of Luxembourg, ruling on correctional matters; **Court Register No. TAL-2023-04206, Exhibit No. 86 of Folder II from MOLITOR** - Judgement of 30 May 2024 rendered by the District Court of Luxembourg, ruling on correctional matters.

[152]  **Court Register No. TAL-2022-07355, Exhibit No. 92 of Folder II from MOLITOR -** cited above; **Exhibit No. 93 of Folder II from MOLITOR -** cited above; **Court Register No. TAL-2022-07361, Exhibit No. 92 of Folder II from MOLITOR -** cited above; **Exhibit No. 93 of Folder II from MOLITOR -** cited above; **Court Register No. TAL-2023-04206, Exhibit No. 92 of Folder II from MOLITOR** - cited above; **Exhibit No. 93 of Folder II from MOLITOR -** cited above.

[153]  See above, paragraph 60.

[154]  **Court Register No. TAL-2022-07355**, submissions of ELVINGER HOSS PRUSSEN of 18 January 2023, p. 4; **Court Register No. TAL-2022-07355**, submissions of CLIFFORD CHANCE of 20 February 2023, No. 2, p. 2.

[155]  **Court Register No. TAL-2022-07355**, conclusions of CHRISTMANN.LEGAL S.A.S. of 11 April 2023, p. 3.

31 August 2022, the holder of the certificates representing the AC MILAN shares which were the subject of the Italian pledge.

110. These submissions will therefore be limited to the alleged inadmissibility pleas in the writ of summons of 10 June 2022 raised by Respondents 9) to 12) and by respondent 14).

111. For the rest, the claimants reserve the right to make further submissions in subsequent pleadings, in particular on the merits of the case.

### A. ON THE ALLEGED INADMISSIBILITY OF A DECLARATORY ACTION

112. Respondents 9) to 12) go out of their way to try to convince the court that the conditions applicable to declaratory actions would not be met in this case[156], thereby rendering inadmissible the claims of BLUE SKEY LUX and LIC 159.

113. It should be remembered that "[a] declaratory action is one whose purpose is to obtain a judicial declaration of the existence or non-existence of a legal situation, or the regularity or irregularity of an act that is not the subject of any dispute. A purely declaratory action, i.e. one whose purpose would be simply to ask the judges for a consultation and which would be totally detached from the notion of interest, is not permitted. [...] Such an action is admissible without reference to an existing dispute if there is on the part of the plaintiff a certain, born and actual interest[157]".

114. The plaintiff has an interest in acting in a declaratory action "if the judicial declaration they seek is of such a nature as to offer them not a purely theoretical satisfaction, but a concrete and definite utility[158]".

115. The limited admissibility of declaratory actions is firmly established in Luxembourg case law, subject to the two cumulative conditions, in which (i) the plaintiff must be exposed to serious uncertainty or a serious threat paralysing the normal exercise of a right; and (ii) the judicial declaration sought must be such as to offer the plaintiff not a purely theoretical satisfaction, but a concrete and definite utility[159].

> (i)    The condition relating to the existence of serious uncertainty or a serious threat paralysing the normal exercise of a right is split into two elements:
>
>> a)  firstly, the existence of serious uncertainty or a serious threat; and
>> b)  secondly, the risk of paralysis in the normal exercise of a right.
>
> (ii)   The requirement that the declaratory action be of concrete and definite utility to the plaintiff must be examined in the light of the content of the legal action. The conditions governing the admissibility of a declaratory application must be examined in the light of the object of the application, i.e. the economic or social result that constitutes the objective of the claim.

---

[156]   **Court Register No. TAL-2022-07355**, submissions of ELVINGER HOSS PRUSSEN of 18 January 2023, No. 7 et seq., p. 7 et seq.; submissions of CLIFFORD CHANCE of 20 February 2023, No. 12 et seq., p. 7 et seq.

[157]   Court of Appeal (9th ch.), 3 April 2014, *J.T.L.*, 2014/6, No. 36, pgs. 169-172.

[158]   TAL, 11 July 2018, Court Register No. 184072.

[159]   TAL, 11 July 2018, *op. cit.*

116. Despite what the opposing parties say[160], the declaratory action initiated on 10 June 2022 fulfils the two cumulative conditions imposed by Luxembourg case law.

117. Firstly, this claim is based on serious and grave uncertainty and the paralysis of a right likely to cause a specific disturbance. The following points should be noted:

  (i)  *Existence of serious uncertainty or serious threat and paralysis of a right likely to cause a specific disturbance*

  The opposing parties vainly try to make it appear that the obligation to obtain a unanimous decision existed only concerning the management board for the release of the Italian pledge[161], which is incorrect, since Article 13 of the articles of association of PROJECT REDBLACK[162] states that if the unanimous consent of the directors is not possible, the proposed resolution must then be transferred to the partners for their decision. In this case, Article 16 of the articles of association[163] also states that the shareholders must unanimously approve such a resolution. Since Mr CASLINI refused to vote in favour of ratifying the release of the Italian pledge, the decision should have been submitted to the shareholders of PROJECT REDBLACK (and therefore to BLUE SKYE LUX itself). Moreover, the fact that the decision was not submitted for approval until after the Italian pledge had been released is problematic in itself, since it reverses the order of affairs by putting the execution of the resolutions ahead of their adoption.

  Given the loss that PROJECT REDBLACK would face as a result of the release of the Italian pledge (consisting in the fact that by authorising the release of the Italian pledge, PROJECT REDBLACK ensured that ROSSONERI SPORT would not be able to fully repay its debts to PROJECT REDBLACK), it would have been in PROJECT REDBLACK's corporate interest to oppose such a transaction. The fact that PROJECT REDBLACK and its class A directors had a different reading of the articles of association of PROJECT REDBLACK, thus forcing through a with damaging consequences for the company, its partners and its creditors, clearly demonstrates the need for the Luxembourg judge to resolve the serious uncertainty and the serious threat created by the decision taken by PROJECT REDBLACK regarding the release of the Italian pledge and the paralysis of the rights of Mr CASLINI (class B director of PROJECT REDBLACK and BLUE SKYE LUX, a partner of this entity) to oppose such an act.

---

[160]  **Court Register No. TAL-2022-07355**, submissions by ELVINGER HOSS PRUSSEN of 18 January 2023, No. 9, p. 7; **Court Register No. TAL-2022-07355**, submissions by CLIFFORD CHANCE of 20 February 2023, No. 18 et seq, pgs. 9 et seq.

[161]  **Court Register No. TAL-2022-07355**, submissions of CLIFFORD CHANCE of 20 February 2023, No. 20, p. 9.

[162]  **Court Register No. TAL-2022-07355, Exhibit No. 2 of Folder I from MOLITOR**, cited above, "If the Directors are unable to reach unanimous consent in relation to the Restricted Matters set out above, the relevant decision will be referred to the Partners for deliberation."

[163]  **Court Register No. TAL-2022-07355, Exhibit No. 2 of Folder I from MOLITOR**, cited above, "All decisions relating to:

  (i)  any change in the Company's capital and/or redemption of any Company Shares;
  (ii)  any amendment to the Articles of Association;
  (iii) the appointment of any person as statutory auditor;
  (iv) the decision to dissolve the Company and put it into liquidation and the appointment of the Company's liquidator; and
  (v)  any Restricted Matter submitted by the Directors to the Shareholders; constitute "Reserved Matters" and require the unanimous consent of the Partners".

(ii)    *Nature and interests of LIC 159*

As we have seen above, and contrary to the assertions of the opposing parties[164], LIC 159, which is a creditor of PROJECT REDBLACK in respect of Class B TPECs, and therefore an interested party, may well rely on the fraudulent breach of articles 16 et seq. of PROJECT REDBLACK's articles of association and the financial damage which resulted for it. It is directly affected by the breach of PROJECT REDBLACK's articles of association, which led to the release of the Italian pledge, the sale of AC MILAN's shares and the misappropriation of funds that should otherwise have been returned to it. The direct consequence of this chain of breaches, the starting point of which is the release of the Italian pledge, is that PROJECT REDBLACK has voluntarily prevented itself from paying LIC 159 what the latter should normally have received under the Class B TPECs. Since a third party can sue a party to a contract in tort for a breach of contract committed by the latter and having caused damage to the third party[165], LIC 159 therefore has a personal interest in obtaining a declaratory judgement allowing it to have a court recognise that the release of the Italian pledge was indeed subject to the unanimous agreement of the managers of PROJECT REDBLACK or, if not, to that of its partners.

For the rest, a declaratory action is not a designated action and can therefore be brought by any party. It is therefore not necessary, contrary to PROJECT REDBLACK's and ROSSONERI SPORT's view[166], for LIC 159 to have to show any particular standing in order to be a co-claimant in this case[167].

(iii)    *Personal interests of BLUE SKYE LUX*

The damage suffered by BLUE SKYE LUX, in its dual capacity as a partner of PROJECT REDBLACK and as a creditor of PROJECT REDBLACK (as is also LIC 159, as explained in point (ii) above), indeed, notwithstanding KING GEORGE and GENIO[168], affects it personally. It should be noted that BLUE SKYE's right to vote under Article 16 of PROJECT REDBLACK's articles of association, which is one of its own prerogatives[169], has been prejudiced, since its vote against the release of the Italian pledge would have prevented that act from being carried out. In addition, the release of the Italian pledge and the transactions that followed at the instigation of the ELLIOTT group made it impossible for ROSSONERI SPORT to repay its debts to PROJECT REDBLACK, while allowing the ELLIOTT group (to which GENIO, KING GEORGE, BUCKTHORN ASSOCIATES LIMITED and BUCKTHORN INTERNATIONAL LIMITED belong) to receive far more money than should have accrued to it, to the detriment of BLUE SKYE LUX, which has suffered all of the negative consequences resulting from the release of the Italian pledge, as described in the "*Facts*" section above.

---

[164]    **Court Register No. TAL-2022-07355**, submissions of ELVINGER HOSS PRUSSEN of 18 January 2023, No. 8, p. 7; **Court Register No. TAL-2022-07355**, submissions of CLIFFORD CHANCE of 20 February 2023, No. 20, p. 9.

[165]    Court of Appeals, 17 May 2017, No. 87/17 IV-COM, Court Register No. 42252; French Court of Cassation, Full Court, 13 January 2020, No. 17-19.963; Court of Appeals, 31 May 2022, No. 105/22 IV-COM, Court Register No. CAL-2021-00407; Court of Appeals, 29 October 2024, No. 157/24 IV-COM, Court Register No. CAL-2020-00484.

[166]    **Court Register No. TAL-2022-07355**, submissions of ELVINGER HOSS PRUSSEN of 18 January 2023, No. 8, p. 7.

[167]    S. MÉNÉTREY, *Procédure civile luxembourgeoise* [Luxembourg Civil Procedure], *Larcier,* 2nd edition, 2023, No. 203 et 204, p. 139.

[168]    **Court Register No. TAL-2022-07355**, submissions of CLIFFORD CHANCE of 20 February 2023, No. 21, p. 9.

[169]    A. STEICHEN, *Précis de droit des sociétés* [Manual of business law], 6th edition, Ed. Saint-Paul, 2018, p. 310, No. 391.

(iv)   The other arguments raised by the respondents, in an attempt to refute the existence of serious uncertainty or a serious threat and the paralysis of a right of such a nature as to cause a specific disturbance, can also be dismissed for the following reasons:

(a)   The fact that the release of the Italian pledge on 31 August 2022 would have given rise to a substitution of this security by a pledge under Luxembourg law on assets on account, concerning the part of the price paid in cash, and by a pledge under Dutch law on the vendor loan notes[170], is of no consequence as to the existence of a serious and specific disturbance relating to the failure to comply with the unanimous decision requirement under articles 13 and 16 of the articles of association of PROJECT REDBLACK for the purposes of the release of the Italian pledge.

As we have seen, the base assets of the new securities, which relate to cash and receivables, are of a completely different nature to that of the Italian pledge, which related to the shares of AC MILAN. More importantly, the value of these new base assets is considerably lower than the Italian pledge[171]. As a result, PROJECT REDBLACK no longer has a security covering the full value of its claim against ROSSONERI SPORT and, as the latter does not have sufficient assets following the sale of the AC MILAN shares, it will never be able to repay its debt. PROJECT REDBLACK must therefore suffer a loss equal to the amount that will never be recovered, for which it can never demand full reimbursement, at the risk of being guilty of abusive credit support against ROSSONERI SPORT. As we have seen, most of this loss will have to be absorbed by the BLUE SKYE group rather than by the ELLIOTT group. It is therefore impossible to share the analysis of the opposing parties, who dare to describe this situation, which is nevertheless obvious and constitutes a serious and grave threat, as a "pipe dream"[172].

Finally, it should be noted that the opposing parties are attempting to refute the idea of the release of the Italian pledge by describing it as a simple change of base asset. However, such a transaction requires several successive and separate steps, consisting of the release of an existing pledge (in this case the Italian pledge), the release of the pledged assets (the AC MILAN shares) and the creation of new securities over other assets.

(b)   It is also incorrect to state that the issue of the waiver of part of PROJECT REDBLACK's claim against ROSSONERI SPORT has no connection with the sale of AC MILAN[173]. This waiver, which is intimately linked to the decision to release the Italian pledge (a condition *sine qua non* for the transfer of AC Milan's shares to ACM BIDCO) to replace it with securities of a different quality and with considerably lower base assets, are indeed matters falling within the scope of Article 13 of the articles of association of PROJECT REDBLACK, since, among other things, these transactions constitute transactions with an associated company to a partner of PROJECT REDBLACK (ROSSONERI SPORT being the subsidiary of PROJECT REDBLACK, which in turn is the subsidiary of KING GEORGE).

---

[170]   **Court Register No. TAL-2022-07355**, submissions of ELVINGER HOSS PRUSSEN of 18 January 2023, No. 10, p. 7; **Court Register No. TAL-2022-07355**, submissions of CLIFFORD CHANCE of 20 February 2023, No. 21, p. 9.

[171]   See above, paragraph 63 (i).

[172]   **Court Register No. TAL-2022-07355**, submissions of CLIFFORD CHANCE of 20 February 2023, No. 21, p. 9.

[173]   **Court Register No. TAL-2022-07355**, submissions of CLIFFORD CHANCE of 20 February 2023, No. 21, pgs. 9 and 10.

(c) The assertion that PROJECT REDBLACK's possible waiver of a claim would be neutral from an economic point of view[174] is false, since the directors of that company would have to explain such a liberality (consisting of a waiver of debt or of never claiming payment of a claim), which is contrary to the corporate interest of a commercial company.

118. Second, the opposing parties further err when they assert that the declaratory action of 10 June 2022 is devoid of any practical utility to BLUE SKYE LUX and LIC 159[175]. Indeed:

(i)   Contrary to the insinuations of the opposing parties[176], the sale of the AC MILAN shares had not been finalised at the time the application of 10 June 2022 was made. Even if the SPA had indeed been concluded on 26 May 2022, the sale of these shares required the lifting of a series of conditions precedent, including the release of the Italian pledge. These conditions were not lifted until 31 August 2022, more than two months after 10 June 2022. These parties are therefore falsely claiming that the sale had already been completed.

(ii)  Contrary to the assertions of GENIO and KING GEORGE[177], the existence of the action brought by way of the writ of summons of 27 June 2022 does not call into question the existence of the declaratory action. Insofar as your court has not yet ruled on the admissibility of these actions, they must both continue to exist.

In any event, "[t]he disappearance in the course of the proceedings of the circumstances on which the interest in bringing the action is based does not affect the admissibility of the action, since the conditions of admissibility are assessed on the date of the writ initiating proceedings. Their disappearance in the course of proceedings means that the claim becomes unfounded or devoid of purpose[178]". As the present pleadings are limited to the inadmissibility pleas at this stage, the introduction of the action for fraud after the declaratory action is therefore without consequence as to the interest of BLUE SKYE LUX and LIC 159 in bringing the declaratory action, the conditions for admissibility of the said action being met on the date of the writ of summons of 10 June 2022, and their alleged disappearance in the course of the proceedings not being proven.

Moreover, even if the declaratory action and the fraud action arise (in part) from the same facts, they are each based on different elements, which prevents one from excluding the other. While the declaratory action focuses on compliance with articles 13 and 16 of PROJECT REDBLACK's articles of association in relation to the release of the Italian pledge, the action for fraud concerns all the fraudulent manoeuvres that led to the transfer of AC MILAN's shares to ACM BIDCO.

---

[174]   **Court Register No. TAL-2022-07355**, submissions of CLIFFORD CHANCE of 20 February 2023, No. 21, p. 9.

[175]   **Court Register No. TAL-2022-07355**, submissions by ELVINGER HOSS PRUSSEN of 18 January 2023, No. 9, p. 7; **Court Register No. TAL-2022-07355**, submissions by CLIFFORD CHANCE of 20 February 2023, No. 22, p. 10.

[176]   **Court Register No. TAL-2022-07355**, submissions of CLIFFORD CHANCE of 20 February 2023, No. 21, p. 10 and No. 25, pgs. 10 and 11 and No. 26, p. 11.

[177]   **Court Register No. TAL-2022-07355**, submissions of CLIFFORD CHANCE of 20 February 2023, No. 21, p. 10 and No. 25, pgs. 10 and 11.

[178]   T. HOSCHEIT, *Le droit judiciaire privé au Grand-Duché de Luxembourg*, [Private judicial law in the Grandy Duchy of Luxeumbourg] ed. Paul Bauler, 2nd ed., 2019, No. 999, p. 569.

(iii)    The practical utility of the declaratory action is not, as GENIO and KING GEORGE assert, to use it as a misuse of process to block the sale of AC MILAN's shares[179], but to have it recognised that the provisions of the articles of association of PROJECT REDBLACK prevented the release of the Italian pledge without a unanimous decision of the directors, or if not, the partners, of that company. Once this recognition has been obtained, and even if the sale of the AC MILAN shares has nevertheless taken place in defiance of numerous rules, it will in no way be too late for BLUE SKYE and LIC 159 to take legal action against the parties liable for compensating the harm and prejudice they caused through the breach of PROJECT REDBLACK's statutory provisions.

### B. ON THE FORCED INTERVENTION OF MR CRACA

119.  Mr CRACA denies having acted as sequestrator of the Italian pledge and states that he was merely a precarious holder of the AC MILAN share certificates, the sole reason why he was served with a joint declaration of judgement[180].

120.  According to him, since following the transfer by ROSSONERI SPORT to ACM BIDCO of the shares of AC MILAN, he would no longer be the holder of the certificates representing the shares of AC MILAN, there would no longer be any reason for him to appear as a party to the present proceedings. Thus, it would be appropriate to declare his compulsory intervention in the present proceedings inadmissible, if not unfounded.

121.  In fact, Mr CRACA was indeed exercising his function as depositary of the certificates representing shares under the Italian pledge, as confirmed by clause 3.1.2 of this agreement[181], pursuant to which these certificates must be delivered to PROJECT REDBLACK and the letter sent by the Italian notary who officiated for the purposes of creating this security, who confirms that Mr CRACA is the custodian appointed by PROJECT REDBLACK to hold the certificates[182].

122.  Moreover, Mr CRACA had been alerted by letter[183] to the fact that the release of the Italian pledge was subject to obtaining a unanimous decision within PROJECT REDBLACK by virtue of Article 13 of that company's articles of association. He could not therefore have been unaware that by agreeing to surrender the certificates representing AC MILAN shares at the request of PROJECT REDBLACK (and therefore of its two Class A directors), he was deliberately placing himself in breach of this statutory provision. The letters he had received informed him that neither Mr CASLINI nor BLUE SKYE LUX would vote in favour of resolutions to release the security, which would be taken in contravention of PROJECT REDBLACK's articles of association, and that Mr CASLINI and BLUE SKYE LUX were opposed to the ploy orchestrated by the ELLIOTT group and its puppets to sell AC MILAN without their knowledge and under more than dubious conditions.

---

[179]  **Court Register No. TAL-2022-07355**, submissions of CLIFFORD CHANCE of 20 February 2023, No. 21, p. 10 and No. 24, p. 11.

[180]  **Court Register No. TAL-2022-07355**, submissions of Maître Bertrand CHRISTMANN of 11 April 2023, p. 3.

[181]  **Court Register No. TAL-2022-07355, Exhibit No. 6 of Folder I from MOLITOR**, cited above; **Court Register No. TAL-2022-07361, Exhibit No. 6 of Folder I from MOLITOR**, cited above.

[182]  **Court Register No. TAL-2022-07355, Exhibit No. 33 of Folder III from MOLITOR**, cited above.

[183]  See above, paragraph 45 (i) and (iii); **Court Register No. TAL-2022-07355, Exhibit No. No. 15 and No. 16 of Folder I from MOLITOR**, cited above.

123.  Consequently, Mr CRACA was indeed a party to the Italian pledge at the time of the writ of summons of 10 June 2022, at which date this security had not yet been released, and the AC Milan shares were still held by ROSSONERI SPORT. By disposing of the certificates representing AC MILAN shares, but also, as referred to above, by lending essential assistance to the implementation of ELLIOTT's schemes[184], he was agreeing to collaborate in a breach of PROJECT REDBLACK's articles of association, even though he had been informed of this fact beforehand. Mr CRACA must therefore remain a party to this dispute and be declared to be a party to the judgement.

### C. ON LEXINGTON'S APPLICATION FOR VOLUNTARY INTERVENTION

124.  By application of 9 February 2024, LEXINGTON intends to intervene voluntarily in the proceedings under Court Register No. TAL-2022-07355 to take up the defence of PROJECT REDBLACK and ROSSONERI SPORT[185]. However, this request is inadmissible in several respects.

125.  First, LEXINGTON would not have the necessary legal capacity or standing to be able to support its claims:

(i)  LEXINGTON is no longer a creditor of BLUE SKYE and has therefore had no claim against it since 8 May 2017 (i.e. more than six years), when it approved the replacement of BLUE SKYE LUX by LIC 159 as issuer of the Class E-1 TPECs, by its countersignature of the Contribution Agreement[186]. As explained above, LEXINGTON has no claim to the Class A-2 TPECs currently held by BLUE SKYE LUX. In addition, ownership of all Class B TPECs and the income derived from these instruments has been contractually transferred to LIC 159.

(ii)  It is unclear whether LEXINGTON is a creditor of LIC 159. It is true that LEXINGTON relies on its status as the owner of the Class E-1 TPECs to support its claim. However, in light of the tangible evidence uncovered by BLUE SKYE LUX and LIC 159 in LEXINGTON's financial statements for 2021 and 2022, in relation to the transfer of the Class E-1 TPECs to a third party[187], it is strongly suspected, and it is quite reasonable to think, that LEXINGTON was already, at the time it lodged its claim, no longer a creditor of LIC 159, as it did not yet hold the Class E-1 TPECs. In view of the incredible jump in the value of the TPECs shown in its financial statements and the abnormally low discount rate applied to these securities (3.5%), the only logical explanation would be that LEXINGTON had been totally bought out by a third party (probably an entity of the ELLIOTT group) which had acquired the class E-1 TPECs. Indeed, it is hard to see how a financial company like LEXINGTON could apply a discount rate of 3.5% to value class E-1 TPECs when their repayment, at least in the near future, is more than unlikely (which would have required the application of a much higher discount rate).

---

[184]  See above, particularly paragraph 18.
[185]  Application for voluntary intervention of 9 February 2024, No. 41 et seq., pgs. 21 et seq.
[186]  **Court Register No. TAL-2022-07355, Exhibit No. 344 of Folder III from MOLITOR**, cited above.
[187]  **Court Register No. TAL-2022-07355, Exhibit No. 74 and No. 75 of Folder II from MOLITOR**, cited above. See above, paragraph 71.

If LEXINGTON is not a creditor of LIC 159, it therefore has *a fortiori* no interest in supporting its claims in the present case. In view of the legitimate doubts as to LEXINGTON's status as a creditor, LEXINGTON will have to provide tangible evidence showing that it was in possession of the Class E-1 TPECs at the date of notification of the application for voluntary intervention, and disclose, for example, a certificate from its auditor or the report that the auditor produced on the valuation of the Class E-1 TPECs. If not, its standing to sue and its interest in suing will be deemed non-existent.

126. According to article 60 of the New Code of Civil Procedure (Nouveau Code de Procédure Civile, **NCPC**), "the parties are obliged to assist with the investigative measures, unless the judge draws any consequences from an abstention or refusal. If a party is in possession of evidence, the judge may, at the request of the other party, order it to be disclosed, if necessary under penalty of a fine. It may, at the request of one of the parties, request or order, if necessary under the same penalty, the disclosure of any documents held by third parties if there is no legitimate impediment."

"Pursuant to Article 288 of the same Code, "requests for the disclosure of evidence held by the parties shall be made, and such evidence shall be disclosed, in accordance with the provisions of articles 284 and 285 of the same Code."

Article 284 of the aforementioned Code provides that "if, in the course of proceedings, a party wishes to refer to a deed or private document to which he has not been a party or a document held by a third party, he may ask the court hearing the case to order the issue of a copy or the disclosure of the deed or document."

In accordance with Article 285 of the NCPC, the court orders disclosure if it considers the application to be well-founded, which means that disclosure must be of interest in resolving the dispute: disclosure must be useful, if not indispensable (see *JurisClasseur Procédure civile, Production forcée de pièces* [JurisClasseur Civil Procedure, Compulsory Production of Documents], Fasc. 623, No.32).

In order for a request for the submission or disclosure of documents to be granted, four conditions must be met: the document requested must be precisely identified, the existence of the document must be plausible, the possession of the document by the respondent/third party must be plausible and the document requested must be relevant to the resolution of the dispute"[188].

The disclosure of a document justifying LEXINGTON's possession of class E-1 TPECS is relevant and essential to the present proceedings in order to justify its legal capacity and its standing in bringing proceedings.

LEXINGTON's possession of the E-1 TPECS is likely, as LEXINGTON relies on its possession of Class E-1 TPECS to intervene in these proceedings. If its assertion is correct, it must have documents attesting to its possession.

127. Consequently, and in order to enable your court to decide whether LEXINGTON has legal capacity and standing in bringing proceedings, BLUE SKYE LUX and LIC 159 request that LEXINGTON be ordered to provide a certificate from its statutory auditor

---

[188] Court of Appeal (9th ch.), 13 March 2025, No. 27/25, Court Register No. CAL-2018-00718.

as to its holding of class E-1 TPECS, other than the report produced by its statutory auditor relating to the valuation of class E-1 TPECS, on the basis of article 60 of the NCPC. In the event that these documents are not conclusive as to LEXINGTON's ownership or non-ownership of the class E-1 TPECs, BLUE SKYE LUX and LIC 159 expressly reserve the right to request the production of any other document in compliance with the conditions of article 60 of the NCPC.

128. It should next be noted that LEXINGTON submits that "*it does not appear either explicitly or implicitly from Article 13 of PROJECT REDBLACK's articles of association, that the change of the base asset of a security, and even the release of any security, would require the unanimous agreement of the company directors*[189]" and that "*as management board is competent in all matters, unless the articles of association or the law confer them on the general meeting of shareholders, the management board could take such a decision* [the termination of the pledge] *without the prior approval of the general meeting of partners, or even of the sole partner*[190]".

129. Yet, in its factual developments, LEXINGTON refers to its letter of 6 May 2022 to BLUE SKYE LUX[191] in which it states that the agreement of BLUE SKYE LUX and Mr CASLINI will be required to proceed with the sale of the AC MILAN shares:

"In view of the actions that the Company [BLUE SKYE LUX] will soon be called to take in connection with the Envisaged Transaction and the resolutions to be adopted also by Mr Giovanni Caslini, Company's manager (acting in his capacity as manager of Rossoneri Sport and Project Redblack) […]

*We therefore urge the Company [BLUE SKYE] and, to the extent required, Mr Giovanni Caslini, to approve the Envisaged Transaction* [the sale of ROSSONERI SPORT's shareholdings in AC MILAN] [...][192]".

130. The claims put forward by LEXINGTION in its application for voluntary intervention are therefore completely contradictory.

131. Indeed, the principle of consistency (or *estoppel)* opposes a party being able to rely on an argument contrary to what it has previously put forward[193].

Everyone must be consistent with themselves; no one can contradict themselves. Whoever adopts a behaviour contrary to his previous attitude or statements, violates the legitimate trust placed in him[194].

---

189  Application for voluntary intervention of 9 February 2024, No. 42, p. 22.
190  Application for voluntary intervention of 9 February 2024, No. 43, p. 23.
191  **Court Register No. TAL-2022-07355**, Exhibit No. 6 of Folder I from CMS.
192  Original text: "*In view of the actions that the Company [BLUE SKYE LUX] will soon be called to take in connection with the Envisaged Transaction and the resolutions to be adopted also by Mr Giovanni Caslini, Company's manager (acting in his capacity as manager of Rossoneri Sport and Project Redblack) […] We therefore urge the Company [BLUE SKYE] and, to the extent required, Mr Giovanni Caslini, to approve the Envisaged Transaction […]".*
193  Jurisclasseur Procédure civile, Moyens de défense – Règles générales [Jurisclasseur Civil Procedure, Defences – General Rules], fasc. 128, No. 75.
194  Jurisclasseur civil, Apgs. Art. 1131 to 1133, Nos. 80 - 82; French Court of Cassation, com. ch., 20 September 2011, No. 10-22888, RTDC 2011, p. 760, note B. FAGES.

The principle of estoppel regards a change of position in law, of such a nature as to mislead as to its intentions. The prohibition on contradicting oneself to the detriment of others is an extension of good faith and the objective expression of a certain procedural fairness. And other rules, including those of civil procedure, have the intrinsic function of ensuring the fairness of the proceedings. This principle, according to which no one may contradict themselves to the detriment of another, has been affirmed by the French Court of Cassation which, by upholding the plea of inadmissibility based on the rule of estoppel[195], declared the legal action inadmissible.

Luxembourg case law has also recognised the principle of estoppel by stating that it is a plea of inadmissibility that must meet the following two cumulative conditions: (i) the same dispute opposing the same parties; and (ii) "inconsistent conduct on the part of the party who creates a misleading appearance and goes back on its position which it had put forward to the other party, thereby deceiving the latter's legitimate expectations and, on the other hand, a change of position for the other party, who is itself led to modify its initial position as a result of the contradictory conduct of its adversary which is prejudicial to it."[196]

132.  LEXINGTON, by first asserting that the agreement of BLUE SKYE and Mr CASLINI was required to release the Italian pledge, and then by maintaining in a diametrically opposed manner that their agreement was not required in order to take this step, contradicts itself to the detriment of the Claimants.

133.  This contradiction is all the more incoherent given that LEXINGTON's interests should logically be aligned with those of BLUE SKYE and LIC 159, since, as we have seen, the latter two are attempting, through their actions, to obtain compensation for the wrongs caused by the sale of the AC MILAN shares. If their actions are successful, this will result in an increase in the value of the Class B TPECs and, in turn, an increase in the value of the Class E-1 TPECs, which are their underlying assets, which have been subscribed by LEXINGTON. It is therefore more than a little puzzling that LEXINGTON is so intent on putting obstacles in the way of BLUE SKYE LUX and LIC 159, unless, as already suspected, it has made a secret deal with the ELLIOTT group to do so.

134.  BLUE SKYE and LIC 159 suffered from the contradictions in LEXINGTON's position, even though at first they could legitimately have thought that LEXINGTION shared their position, since the latter also considered that Article 13 of PROJECT REDBLACK's articles of association should have been applied and respected, only to learn at their expense, through LEXINGTON's voluntary intervention, that the latter had finally taken the position of the respondents to the proceedings.

### D. ON THE CLAIMS FOR PROCEDURAL DAMAGES

135.  In their various submissions, the respondents' request that BLUE SKYE LUX and LIC 159 be ordered to pay damages and costs.

136.  As explained above, all the pleas of inadmissibility put forward by the respondents must be rejected, as that the parties must first conclude on the merits.

---

[195]    TAL, 27 October 2022, Court Register No. TAL-2020-09397, JUDOC File No. 100111304.
[196]    Court of Appeal, 13 July 2022, No. 166/22-I-CIV, Court Register No. CAL-2019-00507.

137. In these circumstances, the respondents' claims for procedural damages, which are opposed by BLUE SKYE LUX and LIC 159, should be reserved for when judgement is made on the merits of this case.

138. The same applies to the applications by BLUE SKYE LUX and LIC 159 for judgement against parties sub. 1) and sub. 2), i.e. the Class A directors, namely Ms ITALIA and Mr MCLEAN, in payment jointly and severally, if not *in solidum*, if not each for the whole to pay BLUE SKYE LUX and LIC 159, each taken individually, a procedural indemnity based on Article 240 of the New Code of Civil Procedure assessed at EUR 20,000, whereas it would be unfair to leave part of the sums incurred by the Claimants in these proceedings, which were initiated solely as a result of the fraudulent conduct of Respondents. 1) and sub. 2).

139. In the event that your court were unable to accept the pleas of inadmissibility raised by the respondents, BLUE SKYE LUX and LIC 159 object to these requests, even though it is clear from the foregoing that they are not justified in any way by equity, and that the present proceedings had to be initiated by the Claimants solely because of the fraudulent conduct of the respondents.

140. For this reason, there are grounds for the application by BLUE SKYE LUX and LIC 159 for an order that parties 1) and 2), i.e. the class A directors, namely Ms ITALIA and Mr MCLEAN, pay jointly and severally, if not *in solidum*, if not each for the whole to BLUE SKYE LUX and LIC 159, each taken individually, procedural damages based on Article 240 of the New Code of Civil Procedure assessed at EUR 40,000.

141. BLUE SKYE LUX and LIC 159 expressly reserve the right to increase this claim during the course of the proceedings.

### E. ON THE LEGAL FEES

142. Mr CRACA requests that BLUE SKYE LUX and LIC 159 be ordered to pay the sum of EUR 8,230, subject to increase during the proceedings, in respect of his costs and lawyers' fees, based on the provisions of Article 1382 of the Civil Code[197].

143. As explained above, all the pleas of inadmissibility put forward by the respondents must be rejected, as that the parties must first conclude on the merits.

144. If your court were to admit Mr CRACA's plea of inadmissibility, BLUE SKYE LUX and LIC 159 would object to Mr CRACA's request for an order to pay his legal fees, as no fault can be attributed to the Claimants.

145. Indeed, the right to take legal action in order to be heard by a judge on the merits of a dispute is a fundamental right, the exercise of which can only engage the liability of the person exercising it in the event of abuse resulting from malicious intent, gross negligence equivalent to fraud, or culpable negligence[198].

---

[197] **Court Register No. TAL-2022-07355 -** submissions of Maître Bertrand CHRISTMANN of 11 April 2023, p. 4.
[198] Court of Appeals, 19 January 2023, Court Register No. CAL-2021-00599.

146. As Mr CRACA has failed to establish any such fault on the part of the Claimants, the latter having had to bring the present action solely because of the fraudulent conduct of the Respondents, Mr CRACA's request that the Claimants be ordered to pay its legal fees on the basis of Article 1382 of the Civil Code should be rejected.

147. On the other hand, it follows from the considerations of fact and law developed above that the Claimants are entitled to seek an order that Respondents 1) and 2) reimburse the costs and legal fees incurred by them in the context of the present proceedings, whereas, ever since the judgement of the Court of Cassation of 9 February 2012, it is now accepted that lawyers' fees may constitute reparable damage[199].

148. This claim may be combined with a claim for damages based on Article 240 of the NCPC, provided that the requirements for such compensation are met, i.e. fault, loss and a causal relationship between the fault and the loss:

"The fact that Article 240 of the New Code of Civil Procedure allows the judge, on the basis of equity, to award a party a certain amount in respect of sums not included in the costs, including lawyers' fees, does not prevent a party from claiming these fees as compensation for its loss on the basis of contractual or criminal liability, provided that it can establish the elements on which such compensation depends, namely fault, loss and a causal relationship between the fault and the loss (see Jurisclasseur Proc. civ. fasc. 524, Nos. 6 et seq)[200]".

149. The doctrine establishes that:

"It is an ineradicable principle of law that the damage resulting from a fault, whatever it may be, must be repaired by the perpetrator of the fault and that this repair must be total. However, defence costs clearly constitute compensable damage and the victim will not receive full compensation if these defence costs are deducted or if it has cost the litigant to have its rights recognised. The right to full compensation for damages justifies the repeatability of defence costs, including lawyers' fees (*Devoirs et Prérogatives de l'Avocat* [Duties and Prerogatives of the Lawyer], Cléo Leclerq, ed. 1999, No. 76) (see Trib. arr. XI, 25 March 2004, SES/Whitehead, Court Register No. 64095)"[201].

150. The essential role played by parties 1) and 2) as the armed wing of ELLIOTT, who wordlessly endorsed the fraudulent mechanism put in place in contravention of PROJECT REDBLACK's articles of association, even though they knew full well that their actions were limited by the articles of association, must lead to them being ordered to reimburse the legal costs incurred by the Claimants to have their rights recognised, as implied by the principle of full reparation.

151. The Claimants are therefore entitled to request that Respondents 1) and 2) be ordered, jointly and severally, if not *in solidum*, if not each for its share, to individually pay to each of them, the sum provisionally assessed at EUR 50,000 in respect of legal costs and fees incurred by them on the basis of Articles 1382 or 1383 of the Civil Code.

---

[199]   Court of Appeal, 9 February 2012, *J.T.L.*, No. 20, 2012, p. 190.
[200]   Court of Appeal, 5 December 2018, *Pas.*, 39, p. 287.
[201]   Court of Appeal, 4 January 2012, *Pas,* 35, p. 848.

152. The Claimants expressly reserve the right to increase this claim in the course of the proceedings.

## 2    TAL-2022-07361: ACTION FOR FRAUD

### A. ON THE ALLEGED NULLITY OF THE WRIT INITIATING PROCEEDINGS ON THE GROUNDS OF OBSCURE WORDING

153. It should be noted at the outset that the Summoned Parties 8) and 11) to 14) did not raise the nullity of the writ of summons of 27 June 2022 on the grounds of obscure wording, so that the validity of the writ of summons of 27 June 2022 against them should be noted.

### 1.   On the jurisdiction of the pre-trial judge

154. The plea of obscure wording raised by the respondents constitutes a plea of nullity[202].

155. As a plea of nullity, the objection of obscure wording falls within the sole jurisdiction of the pre-trial judge, in accordance with Article 212 of the NCPC:

> "Where the application is lodged after his appointment, the pre-trial judge shall, until he relinquishes jurisdiction, <u>have exclusive jurisdiction</u>, to the exclusion of any other formation of the court, to:
> (a) rule on pleas of lack of jurisdiction, <u>nullity</u> and dilatory pleas; with the exception of pleas based on public-order grounds, the parties shall raise such pleas in their first submissions or as soon as they come to light if they were to come to light after their first submissions. After such a plea has been submitted, each of the parties to the proceedings shall take a position on that plea at least twice at most, the submission of the plea being equivalent to a pleading, before the pre-trial judge rules, [...]" (emphasis added).

156. The plea of obscure wording raised by the respondent therefore falls within the sole jurisdiction of the pre-trial judge and will in fact have to be decided by a separate order of the pre-trial judge limited to this plea of nullity.

### 2.   As to the plea of obscure wording raised by Respondents 1) to 7)

157. As a preliminary point, the Claimants recall that, at the time of the facts in issue, Respondents 1) and 2) were the Class A directors of PROJECT REDBLACK, Respondents 2) to 3) were class B directors of ROSSONERI SPORT and Respondents 4), 5) and 8) were class A directors of ROSSONERI SPORT[203]. It follows that all the decisions taken by PROJECT REDBLACK and ROSSONERI SPORT in relation to the sale of AC MILAN in breach of the statutory provisions of these two entities, and in order to conceal the various stages of the transaction from BLUE SKYE LUX, LIC 159 and Mr CASLINI, must have been taken by these respondents, the only ones qualified to act

---

[202]   T. HOSCHEIT, *op. cit.*, No. 348, p. 233.
[203]   **Court Register No. TAL-2022-07361, Exhibit No. 4 of Folder I from MOLITOR** - Organisational chart of the REDBLACK Group.

for these companies. Furthermore, it was Respondents 1) and 2) who took the decision in the name and on behalf of PROJECT REDBLACK to remove Mr CASLINI from the management board of ROSSONERI SPORT in order to prevent him from exercising the information and voting rights inherent in his capacity as director of this company. It follows that all these natural persons necessarily participated actively in the commission of the fraud by carrying out the instructions they had received from the ELLIOTT group, through the decisions they approved and by the positive acts they carried out in the name and on behalf of these companies.

158.   However, in their submissions No. 1, summoned parties 1) to 7) play ignorant by claiming *in limine litis* the nullity of the writ of summons of 27 June 2022 for obscure wording on the grounds that BLUE SKYE LUX and LIC 159 did not include in the writ initiating proceedings *"what precise grievances they have against the managers, and in what 'fraud' they allegedly participated"*[204]. The fact that they describe the pages of the writ of summons of 27 June 2022 as "*long and tedious*" must surely have to do with the discomfort suffered by respondents 1) to 7) at the reminder of the wrongdoing to which they have lent themselves. These include:

   (i)     the voluntary and deliberate sidelining of Mr CASLINI, still class B director of PROJECT REDBLACK and class A director of ROSSONERI SPORT (until his dismissal on 17 May 2022), to ensure either that he was never aware of the envisaged transaction and the preparatory operations for it, or that he was made aware of it at the wrong time in order to prevent him from taking any legal action to suspend the decisions taken by PROJECT REDBLACK and ROSSONERI SPORT[205];

   (ii)    the concealment of the imminence of the transaction from BLUE SKYE LUX and Mr CASLINI[206];

   (iii)   the fact that the resolutions that had been taken by the directors of PROJECT REDBLACK (and therefore also submitted to Mr CASLINI for approval) were always ratification resolutions, in that they systematically concerned acts which had previously been taken in the greatest secrecy by the managers controlled by the ELLIOTT group, without informing Mr CASLINI, since no item was ever put on the agenda of the meetings of the management boards of PROJECT REDBLACK and ROSSONERI SPORT before the agreements and deeds relating to the transaction were taken[207];

   (iv)    the fact that Mr MCLEAN and Ms ITALIA, parties 1) and 2), acting as class A directors of PROJECT REDBLACK, to remove Mr CASLINI from his post as acting director of ROSSONERI SPORT on 17 May 2022 to prevent him from invoking the information rights that this capacity conferred on him[208];

---

[204]   **Court Register No. TAL-2022-07361**, Submissions No. 1 from BONN & SCHMITT of 3 July 2023, p. 6.

[205]   **Court Register No. TAL-2022-07361**, writ of summons of 27 June 2022, pgs. 9 and 10.

[206]   **Court Register No. TAL-2022-07361, Exhibit No. 16 of Folder I from MOLITOR**, cited above.

[206]   **Court Register No. TAL-2022-07361**, writ of summons of 10 June 2022, p. 7; **Court Register No. TAL-2022-07361**, writ of summons of 27 June 2022, p. 10

[207]   **Court Register No. TAL-2022-07361**, writ of summons of 27 June 2022, pgs. 9, 10 and 19.

[208]   **Court Register No. TAL-2022-07361**, writ of summons of 27 June 2022, pgs. 9 and 10; **Court Register No. TAL-2022-07361, Exhibit No. 15 of Folder I from C.A.S.**, cited above.

(v)    the fact that the managers of ROSSONERI SPORT apparently allowed ELLIOTT UK, an entity of the ELLIOTT group, to secretly conduct the negotiations for the sale of AC MILAN by following a deliberately opaque process, and subsequently approved the terms only for form's sake, thereby endorsing what had already been decided by ELLIOTT[209];

(vi)    the deliberate violation of Article 13 of the PROJECT REDBLACK articles of association by Mr MCLEAN and Mrs ITALIA, in releasing the Italian Pledge and accepting that PROJECT REDBLACK, would never be able to recover its claim against ROSSONERI SPORT, since the latter would be left with no assets following the transfer of the AC MILAN shares, which the two managers attempted to justify by any means necessary[210];

159.    The facts following the writ of summons of 27 June 2022, as summarised in these submissions, such as the distribution to ELLIOTT group entities of the majority of the cash and vendor loan notes obtained from the sale of AC MILAN, further reinforce the fact that the managers of PROJECT REDBLACK and ROSSONERI SPORT appointed by the ELLIOTT group were indeed involved in the fraud.

160.    It follows from the few points mentioned above that the role of Respondents 1) to 7) was clearly described in the writ of summons of 27 June 2022, so that these individuals are fully aware, from reading the writ of summons, why they are currently being investigated by the courts. The arguments of respondents 1) to 7) regarding the alleged obscure wording are therefore clearly made in bad faith.

161.    It should nevertheless be noted that to support their argument, respondents 1) to 7) attempt to distort the facts by referring back to the dismissal of Mr CASLINI from his position as manager of ROSSONERI SPORT. In an attempt to exonerate themselves, respondents 1) to 7) argue that the decision to dismiss a company manager belongs to its partner or partners. They of course omit to mention that the decision to dismiss Mr CASLINI was taken by Mr MCLEAN and Mrs ITALIA, the managers of PROJECT REDBLACK (certainly acting as faithful executors of ELLIOTT group orders), in the name and on behalf of this company, which was the sole partner of ROSSONERI SPORT. Respondents 1) to 7) also attempt to normalise this abrupt and unexpected dismissal by quoting out of context a sentence from the writ of summons of 27 June 2022, from which they seek to deduce that BLUE SKYE LUX and LIC 159 allegedly acknowledged that "*no statutory provision required* [keeping Mr CASLINI], *contrary to the articles of association of Project Redblack*"[211]. In reality, the sentence in the writ of summons to which respondents 1) to 7) refer merely states that only Mr CASLINI's position as manager of PROJECT REDBLACK was protected by the articles of association, meaning he could not be dismissed from that role. As we have seen, however, this does not justify his abrupt dismissal from ROSSONERI SPORT on 17 May 2022, given that the structure established by the BLUE SKYE and ELLIOTT groups required BLUE SKYE to have managers at all levels of the holding structure to enable it to influence the management of AC MILAN, whose good performance determined the compensation

---

[209]    **Court Register No. TAL-2022-07361**, writ of summons of 27 June 2022, p. 10.
[210]    **Court Register No. TAL-2022-07361**, writ of summons of 27 June 2022, pgs. 12 and 13.
[211]    **Court Register No. TAL-2022-07361**, writ of summons of 27 June 2022, p. 18; submissions No. 1 of 3 July 2023 by BONN & SCHMITT, p. 6.

to which BLUE SKYE LUX was entitled under the Class A TPECs and that due to LIC 159 under the Class B TPECs[212].

162. The fraudulent actions attributed to them by the Claimants are explicitly and repeatedly described in clear terms in the writ of summons, notably on pages 9, 10, 17 to 23 and 28, for having "*violated the rules relating to the collegiate body that is the management board, by effectively excluding one manager from all information regarding the sale of AC MILAN, […] violated the articles of association of ROSSONERI SPORT by not including any item relating to the sale on the agenda of the management board of ROSSONERI SPORT, all with the aim of preventing Giovanni CASLINI [Mr CASLINI] from intervening and possibly halting a sales process that was fraudulent and aimed both at financially harming the Claimants and at circumventing UEFA Champions League rules*" [213], and that the way in which the sale of the AC MILAN shares was structured allowed ELLIOTT to direct AC MILAN[214].

### 3.    On the claim of obscure wording raised by FOOTBALLCO

163. In its submissions No. 1, FOOTBALLCO raises, *in limine litis,* the plea of obscure wording on the grounds that it is "*not in a position to organise its defence as it does not understand in what capacity and for what reason it finds itself in the present proceedings*"[215].

164. In support of its claim, it states that it was mentioned only once in the writ of summons of 27 June 2022 on page 20, where the Claimants state "*for example, in the body of the letter [of 2 June 2022]*[216] *the buyer is Footballco Intermediate Cooperatief U.A. or one of its subsidiaries, whereas in Annex A, the buyer can only be FootballCo Intermediate Cooperatief U.A.*".

165. FOOTBALLCO's assertion that it was only mentioned once in the writ of summons of 27 June 2022 is incorrect since, in the said writ of summons, the party summoned under item 18) is also mentioned:

   (i)    on pages 25 and 26 to explain that the decision to be taken is to be declared common to FOOTBALLCO, notably because the latter "*is the buyer of the AC MILAN shares according to the letter of 2 June 2022 and is therefore directly concerned by the decision to be taken*"[217].

   (ii)   on page 28, under the operative part, where the Claimants request the annulment "*of the Stock Purchase Agreement concluded on 26 May 2022 between ROSSONERI SPORT Luxembourg and Footballco Intermediate Coöperatif*"[218];

   (iii)  on page 29, again under the operative part, to "*declare the forthcoming judgment common to […] Footballco Intermediate Coöperatif […]*[219]".

---

[212]  See above, paragraph 30.
[213]  **Court Register No. TAL-2022-07361,** writ of summons of 27 June 2022, p. 19.
[214]  **Court Register No. TAL-2022-07361,** writ of summons of 27 June 2022, p. 18.
[215]  **Court Register No. TAL-2022-07361**, submissions No. 1 of 4 July 2024 by Maître Nicolas THIELTGEN, p. 6.
[216]  **Court Register No. TAL-2022-07361, Exhibit No. 17 of Folder I from BSP**, cited above.
[217]  **Court Register No. TAL-2022-07361,** writ of summons of 27 June 2022, p. 26.
[218]  **Court Register No. TAL-2022-07361,** writ of summons of 27 June 2022, p. 28.
[219]  **Court Register No. TAL-2022-07361,** writ of summons of 27 June 2022, p. 29.

166. In their writ of summons of 27 June 2022, the Claimants thus clearly and precisely indicated on page 20 that they were able to identify FOOTBALLCO as the buyer of the AC MILAN shares through the letter of 2 June 2022. This is why, in the context of the present proceedings, which, as a reminder, aim to annul the sale in question due to fraud, they subsequently state on pages 25 and 26 of their pleadings that they are summoning FOOTBALLCO for a declaration of common judgment in its capacity as buyer of the AC MILAN shares, since it is directly concerned by the decision to be taken.

167. It is therefore entirely consistent that, under their operative part, the Claimants request, in particular: (i) the annulment of the SPA, in which FOOTBALLCO is designated as the buyer of the AC MILAN shares, which was concluded in fraud of the Claimants' rights; and (ii) that the forthcoming judgment be declared common to FOOTBALLCO so that it may be informed of the annulment of the agreement to which it is a party.

168. If, in preparing its defence, FOOTBALLCO, as it seems to suggest, only read the writ of summons of 27 June 2022 up to page 20 of the 30-page writ initiating proceedings, it cannot now rely on this fact to claim the unjustified nullity of the allegedly obscure writ of summons of 27 June 2022, since the above developments show this is not the case.

169. The plea of obscure wording raised by FOOTBALLCO must therefore be dismissed as it is neither substantiated nor justified.

**4.    On the claim of obscure wording raised by PROJECT REDBLACK and ROSSONERI SPORT**

170. Respondents 9) and 10) initially submitted submissions No. 1 of
31 October 2022, in which they made counterclaims and incidental claims, notably against BLUE SKYE LUX and LIC 159, seeking an order for damages based on rules governing contractual, or failing that, tortious liability.

171. In their submissions No. 2 of 5 July 2023, respondents 9) and 10) state that they adopt the submissions No. 1 of Maître Cédric BELLWALD of 3 July 2023, seeking the annulment of the writ of summons of 27 June 2022, without further elaboration.

172. Should Your Court conclude that PROJECT REDBLACK and ROSSONERI SPORT adopt, by an unusual reference-based reasoning, the plea of obscure wording raised by respondents 1) to 7), the Claimants intend to respond as follows.

173. The plea of obscure wording falls under the legal regime of purely formal nullities subject to the requirements of Article 264 of the NCPC[220].

174. The requirements under Article 264 of the NCPC are twofold:
    (i)    the exception must be raised at the outset of the proceedings;
    (ii)    the formal irregularity must have caused harm to the party seeking nullity.

---

[220]    Th.HOSCHEIT, op. *cit, No.* 348, p. 233.

175. Neither of these conditions are met in this case, since:

    (i)    the exception was raised by respondents 9) and 10) in their submissions No. 2 after they had already submitted arguments on the merits in their submissions No. 1 of 31 October 2022. It was therefore not raised at the outset of the proceedings. Case law rules on "*inadmissibility, based on obscure wording of the writ of summons raised in the respondent's second submissions*"[221];

    (ii)    PROJECT REDBLACK and ROSSONERI SPORT merely refer to submissions No. 1 of respondents 1) to 7) of 3 July 2023. However, in their submissions, parties 1) to 7) merely set out the exception of alleged obscure wording concerning the sections of the writ of summons of 27 June 2022 that relate to them. Said submissions of 3 July 2023 therefore contain no developments regarding any exception for obscure wording in relation to the writ of summons as it concerns PROJECT REDBLACK and ROSSONERI SPORT. As a result, submissions No. 1 of 3 July 2023 by Maître Cédric BELLWALD also do not contain any arguments explaining how the alleged formal irregularity would prejudice PROJECT REDBLACK and ROSSONERI SPORT.

176. The plea of obscure wording raised by PROJECT REDBLACK and ROSSONERI SPORT must therefore be dismissed, as it was not raised at the outset of the proceedings, and respondents 9) and 10) have failed both to justify it and to explain how it would cause them harm.

177. Furthermore, PROJECT REDBLACK and ROSSONERI SPORT cannot dispute that the writ of summons sets out in great detail the facts attributed to them and adopted in their name and on their behalf by the agents placed by the ELLIOTT group on their management boards. Non-exhaustive examples include:

    (i)    the voluntary and deliberate sidelining of Mr CASLINI, still class B director of PROJECT REDBLACK and class A director of ROSSONERI SPORT (until his dismissal on 17 May 2022), to ensure either that he was never aware of the envisaged transaction and the preparatory operations for it, or that he was made aware of it at the wrong time in order to prevent him from taking any legal action to suspend the decisions taken by PROJECT REDBLACK and ROSSONERI SPORT[222];

    (ii)    the concealment of the imminence of the transaction from BLUE SKYE LUX and Mr CASLINI[223];

    (iii)    the fact that the resolutions that had be taken by the directors of PROJECT REDBLACK (and therefore also submitted to Mr CASLINI for approval) were always ratification resolutions, in that they systematically concerned acts which had previously been taken in the greatest secrecy by the managers controlled by the ELLIOTT group, without informing Mr CASLINI, since no item was ever put on the agenda of the meetings of the management boards of PROJECT REDBLACK and ROSSONERI SPORT before the agreements and deeds relating to the transaction were taken[224];

---

221    TAL, 17th chamber, 29 March 2017, Case Nos. 165899 and 167151.

222    **Court Register No. TAL-2022-07361,** writ of summons of 27 June 2022, pgs. 9 and 10.

223    **Court Register No. TAL-2022-07361, Exhibit No. 17 of Folder I from MOLITOR,** cited above.

223    **Court Register No. TAL-2022-07361,** writ of summons of 10 June 2022, p. 7; writ of summons of 27 June 2022, p. 10.

224    **Court Register No. TAL-2022-07361,** writ of summons of 27 June 2022, pgs. 9, 10 and 19.

(iv)    the fact that PROJECT REDBLACK, through its Class A managers (Mr MCLEAN and Mrs ITALIA), dismissed Mr CASLINI from his role as manager of ROSSONERI SPORT on 17 May 2022 to prevent him from invoking the information rights associated with that position[225];

(v)    the fact that ROSSONERI SPORT apparently allowed ELLIOTT UK, an entity of the ELLIOTT group, to secretly conduct the negotiations for the sale of AC MILAN by following a deliberately opaque process, and subsequently approved the terms only for form's sake, thereby endorsing what had already been decided by ELLIOTT[226]; and

(vi)    the deliberate violation of Article 13 of the PROJECT REDBLACK articles of association in releasing the Italian Pledge and accepting that PROJECT REDBLACK, would never be able to recover its claim against ROSSONERI SPORT, since the latter would be left with no assets following the transfer of the AC MILAN shares, which the two managers attempted to justify by any means necessary[227];

**5.    On the claim of obscure wording raised by respondents 15) to 17)**

178.    Respondents 15) to 17) raise the nullity of the writ of summons of 27 June 2022 due to obscure wording, arguing that said writ of summons contains "*no developments on the consequences of a possible annulment of the share transfer agreement of AC Milan on the distribution of the shares between the shareholders of AC Milan[228]*", so that, in this context,
"*the parties submitting pleading*s [Respondents 15) and 17)] *do not understand how they could 'know who owns the* [AC Milan] shares' if the claimant parties [the Claimants] *do not make a request in that regard[229]*".

179.    As will be further explained in Section I of this document, BLUE SKYE LUX and LIC 159 have simply and unconditionally withdrawn their claims brought against respondents 16) and 17) in the present proceedings before Your Court under Court Register No. TAL-2022-07361, by way of a lawyer-to-lawyer deed of 19 September 2025[230].

180.    The claims raised by respondents 16) and 17) have therefore become moot due to the withdrawal of proceedings, so there is no need to take a position on these claims.

181.    Regarding the claims raised by the respondent 15), the present proceedings seek to "*declare null the transaction concerning the sale of AC MILAN shares, i.e., to declare null any contract or agreement concluded to effect the sale of AC MILAN[231]*", which is clearly apparent from the Claimants' pleadings and is not disputed by

---

[225]    **Court Register No. TAL-2022-07361,** writ of summons of 27 June 2022, pgs. 9 and 10; **Exhibit No. 15 of Folder I from C.A.S.,** cited above.

[226]    **Court Register No. TAL-2022-07361,** writ of summons of 27 June 2022, p. 10.

[227]    **Court Register No. TAL-2022-07361,** writ of summons of 27 June 2022, pgs. 12 and 13.

[228]    **Court Register No. TAL-2022-07361,** submissions by Maître Bertrand CHRISTMANN of 25 September 2024, p. 7.

[229]    **Court Register No. TAL-2022-07361,** submissions by Maître Bertrand CHRISTMANN of 25 September 2024, p. 7.

[230]    **Court Register No. TAL-2022-07361, Exhibit No. 98 of Folder III from MOLITOR** - Withdrawal of proceedings of 22 September 2025; **Court Register No. TAL-2022-07355, Exhibit No. 98 of Folder III from MOLITOR** - Withdrawal of proceedings of 22 September 2025; **Court Register No. TAL-2023-04206, Exhibit No. 98 of Folder III from MOLITOR** - Withdrawal of proceedings of 22 September 2025.

[231]    **Court Register No. TAL-2022-07361,** writ of summons of 27 June 2022, p. 28.

respondent 15), who does not raise the plea of obscure wording on this basis and who was able to easily recall the Claimants' requests in its own submissions[232].

182.    The annulment of the contract results in the retroactive disappearance of the agreement, restoring the parties to their original state:

> "The annulment of the agreement causes its dissolution not only for the future but also retroactively.  Each party to the contract must therefore return to the other what it received under the annulled contract.  In principle, this restitution will be in kind.  If restitution in kind proves impossible, it will be made by equivalent. The annulment aims to erase the unlawful situation created by the formation of the contract, and the parties are thus restored, by virtue of the annulment, to the 'original state[233, 234]".

183.    This principle is a corollary to the principle of full compensation for the damage suffered.

184.    Accordingly, the annulment of an agreement - and therefore the restoration of the parties to their original state - is the direct legal consequence of the declaration of its nullity.

185.    Since the nullity of the agreements regarding the sale of AC MILAN shares is clearly stated under the operative part - something the respondent 15) does not dispute - further specification of their effects, namely retroactive nullity and restoration to the original state, is not necessary as it is inherent in the very request for annulment.

186.    Furthermore, the Claimants do not understand how the alleged ignorance by the respondent 15) of the consequences of the nullity of the contracts could prevent it from choosing the appropriate means of defence[235], since the inability to defend oneself is a requirement for admissibility of the plea of obscure wording. In any event, respondent 15)'s ignorance of the effects of the nullity in the context of a request for a declaration of common judgment poses no problem, since this party understood that no claim for damages was being brought against it.


**B.    ON THE ALLEGED INADMISSIBILITY OF THE CLAIMS BY BLUE SKYE LUX AND LIC 159**

187.    Respondents 11) to 13) raise the inadmissibility of the writ of summons of 27 June 2022 on the grounds of (1) the alleged existence of a contractual bar to proceedings; (2) the alleged failure to involve a legitimate opposing party; (3) the alleged lack of interest on the part of the Claimants to bring the action; and (4) the alleged subsequent waiver of the claim for nullity.

---

[232]    **Court Register No. TAL-2022-07361,** submissions by Maître Bertrand CHRISTMANN of 25 September 2024, p. 5.
[233]    Court of Appeal, 9 November 2011, No. 35055 to be published in Pas., 35 (2012/3) and commentary by P. ANCEL; Court of Appeal, 12 March 2008, *Pas.*, 34, p. 189.
[234]    O. POELMANS, *Law of Obligations in Luxembourg, Larcier*, 2013, No. 234, p. 298.
[235]    TAL, 6 May 2008, BIJ 6/2008, p. 117.

1. **Regarding the alleged contractual bar to proceedings under the general terms and conditions of the TPECs**

188. In order to prevent BLUE SKYE LUX and LIC 159 from pursuing the actions initiated in the writ of summons of 27 June 2022, GENIO, KING GEORGE, and ELLIOTT UK attempt to rely on clause 4 of the general terms and conditions of Class A and Class B TPECs[236].According to these three respondents, clause 4.3 states that:

> "*4.3 […]. The Holders will look solely to such sums and such amounts* [(a) payable under Class A or Class B TPECs, or (b) amounts received, realised or recovered by or on behalf of PROJECT REDBLACK in relation to the Class A or Class B TPECs] *for payments to be made by the Company under these Terms and Conditions and will not otherwise take any judicial or other proceedings or exercise any other right or remedy it might otherwise have against the Company or any of its assets*"[237].

189. GENIO, KING GEORGE, and ELLIOTT UK also refer to clause 7.3 of the general terms and conditions of Class A and Class B TPECs, under which PROJECT REDBLACK is allegedly granted full discretion with respect to: "*(ii) sell (particularly with regard to price and timing) all or part of the Class A Underlying Assets and/or the Class B Underlying Asset,* […]*, (iv) exercise any voting and other rights in relation to the Class A Underlying Assets and/or the Class B Underlying Assets*"[238], which, according to these parties, "*explicitly allows Project Redblack to decide to sell any TPEC underlying asset, at the time and price of its choosing, and to agree to waivers, recalling that this decision could perfectly well be taken by two Class A managers*[239].

190. The following points must be noted, which contradict the sweeping assertions of GENIO, KING GEORGE and ELLIOTT UK, and should lead to the dismissal of their argument based on the existence of a waiver clause:

   (i)   The AC MILAN shares would only constitute Class A and Class B Underlying Assets under the general terms and conditions of the Class A and Class B TPECs to the extent that they are held by PROJECT REDBLACK, as clearly indicated by point (d) of the definition of Class A[240] Underlying Assets and point (d) of the definition of Class B Underlying Assets.

---

[236] **Court Register No. TAL-2022-07361,** submissions by Clifford Chance of 7 June 2022, No. 28 et seq., pgs. 18 et seq.; **Exhibit No. 8 of Folder I from MOLITOR** - cited above, and **Exhibit No. 36 of Folder II from MOLITOR** - cited above.

[237] Original text: "*The Holders will look solely to such sums and such amounts for payments to be made by the Company under these Terms and Conditions and will not otherwise take any judicial or other proceedings or exercise any other right or remedy it might otherwise have against the Company or any of its assets*" (**Court Register No. TAL-2022-07361, Exhibit No. 36 of Folder II from MOLITOR**, cited above).

[238] Original text:"*(ii) sell (particularly with regard to price and timing) all or part of the Class A Underlying Assets and/or the Class B Underlying Asset,* […]*, (iv) exercise any voting and other rights in relation to the Class A Underlying Assets and/or the Class B Underlying Assets*" (**Court Register No. TAL-2022-07361, Exhibit No. 36 of Folder II from MOLITOR**, cited above).

[239] **Court Register No. TAL-2022-07361,** submissions by CLIFFORD CHANCE of 7 June 2022, No. 30, p. 18.

[240] "*95.73 percent of all the rights, assets, claims, receivables, income, gains, payments and proceeds in relation to any present and future shares, notes, bonds, and other debt financial instruments, which may be issued by Associazione Calcio Milan S.p.A. (the Italian Issuer) and the Borrower and acquired by the Company (including any warrants, call options and derivative arrangements between the Company and the Borrower in relation to shares in the Italian Issuer)*" (**Court Register No. TAL-2022-07361, Exhibit No. 36 of Folder II from MOLITOR**, cited above, p. 4).

of Class B[241]. Since these shares were held by ROSSONERI SPORT and not by PROJECT REDBLACK, the discretion granted to PROJECT REDBLACK under clause 7.3 (ii) of the general terms and conditions of the Class A and Class B TPECs concerning the sale of underlying assets of these TPECs does not apply to the sale of AC MILAN shares, as they were not eligible to qualify as Class A or Class B Underlying Assets. Consequently, clause 7.3 (ii) does not authorise PROJECT REDBLACK and its Class A managers to circumvent the requirements set out in Articles 13 and 16 of the company's articles of association.

(ii)    The discretionary power that might be conferred on PROJECT REDBLACK under clause 7.3 does not, however, permit it to violate Article 13 of its own articles of association, which provides for the obligation to obtain unanimous approval from its managers or, if not, from its partners for a range of actions - notably, any transaction between PROJECT REDBLACK and a company affiliated with one of its partners, which is the case for ROSSONERI SPORT, an indirect subsidiary of KING GEORGE, one of the three partners of PROJECT REDBLACK. Moreover, as the French Court of Cassation ruled in a similar case, the sale of AC MILAN shares - the sole asset of ROSSONERI SPORT - **necessarily entailed the liquidation of this company and of PROJECT REDBLACK**, following the distribution of the sale proceeds to investors, as the company's corporate purpose would have become impossible to achieve[242].Consequently, the decision to liquidate PROJECT REDBLACK is subject to the unanimous agreement of its partners (and therefore requires the approval of BLUE SKYE LUX) under Article 16 of the articles of association. It is therefore incorrect to claim that PROJECT REDBLACK could act as it saw fit under the general terms and conditions of the Class A and Class B TPECs;

(iii)    a waiver of a future right must concern a defined or definable object[243] and is only valid if the waiving party acted with full knowledge. Established doctrine confirms that "*the waiver must be clearly established through evidence of concrete acts demonstrating the waiving party's intention to relinquish their right and their awareness of the consequences of their act, implying both awareness of the possible existence of the right and understanding of the implications of the waiver*"[244].It is therefore up to the party invoking a waiver to prove that the author of the waiver knew or could not have been unaware of the existence of the right being relinquished[245].

It is inconceivable that BLUE SKYE LUX and LIC 159, as holders of Class A-2 and Class B TPECs respectively, could have agreed in advance that PROJECT REDBLACK - now a puppet of the ELLIOTT group - could act in breach of the articles of association and the rights granted to BLUE SKYE LUX, solely to serve the interests of those pulling the strings. In any case, respondents 11) to 13) have failed to produce any evidence establishing that BLUE SKYE LUX and LIC 159 waived their right to take action against PROJECT REDBLACK in the event that the latter committed fraud to enable the sale of AC MILAN shares by ROSSONERI SPORT.

---

[241]    "*95.73 percent of all the rights, assets, claims, receivables, income, gains, payments and proceeds in relation to any present and future shares, notes, bonds, and other debt financial instruments, which may be issued by the Italian Issuer and the Borrower and acquired by the Company (including any warrants, call options and derivative arrangements between the Company and the Borrower in relation to shares in the Italian Issuer)*" (**Court Register No. TAL-2022-07361, Exhibit No. 36 of Folder II from MOLITOR**, cited above, p. 5).

[242]    French Court of Cassation, commercial chamber, 13 March 2024, judgment No. 122 FS-B, appeal No. R 22-13.764.

[243]    D. HOUTCIEFF, "Waiver", in: *Répertoire de droit civil*, Paris, Dalloz, 2017, No. 28.

[244]    T. HOSCHEIT, *op. cit.*, No. 1056.

[245]    D. HOUTCIEFF, *op. cit.*, No. 20.

(iv)    Even more telling is the ineffectiveness of a waiver clause concerning legal action in cases of gross or wilful misconduct committed by the beneficiary of the waiver. In such cases, the waiver clause must be treated as equivalent to an "exemption clause", in that it deprives the waiving party of the right to take action, thereby obliging them to bear their own loss[246]. "One can easily imagine," for example, "that a party cannot waive certain entitlements because of the conduct of the counterparty"[247].

Under Luxembourg law, gross or inexcusable misconduct is defined as "gross negligence that even the least careful individual would not commit in managing their own affairs" and is more readily identifiable in the case of a professional. It does not require evidence of an intention to cause harm, nor awareness of the damage that may result, nor the desire to inflict such damage[248]. The concept of wilful misconduct or intentional fault refers instead to misconduct stemming from the author's deliberate intention to carry out the harmful act. This presumes that the harm was foreseen and unreservedly accepted by the author with the aim of achieving a specific result, regardless of whether they wished to harm others[249].

Lastly, under the general principles of contract law, bad faith on the part of the person invoking a waiver clause for their own benefit renders that clause ineffective[250].

Even if respondents 11) to 13) were able to demonstrate that the general terms and conditions of the Class A and Class B TPECs included a waiver knowingly granted by BLUE SKYE LUX and LIC 159 against submitting claims such as those in the writ of summons of 27 June 2022 - *which is denied* - such a clause could not apply. Since fraud - including the commission of intentional or wilful misconduct by respondents 11) to 13) - lies at the heart of this case, it is clear that any waiver clause behind which PROJECT REDBLACK may attempt to hide must be disregarded.

**2.    On the alleged inadmissibility for failure to designate a legitimate opposing party**

191.    It must once again be emphasised that, at the time of the writ of summons of 27 June 2022, BLUE SKYE LUX and LIC 159 had not been able to obtain a copy of the SPA, due to the machinations of the ELLIOTT group, PROJECT REDBLACK, ROSSONERI SPORT and their loyal managers. ACM BIDCO, ELLIOTT ASSOCIATES and ELLIOTT INTERNATIONAL have since been forced to join the proceedings

---

[246]    P. DELEBECQUE, "Waivers of Legal Recourse", in X., *Essays in Honour of Dean Philippe Simler*, Dalloz, 2006, No. 4, p. 564.

[247]    P. DELEBECQUE, *op. cit.*, No. 4, pgs. 564-565.

[248]    G. RAVARANI, *Civil Liability of Private and Public Persons*, 3rd ed., *Pasicrisie luxembourgeoise*, 2014, No. 77, p. 79.

[249]    G. RAVARANI, *op. cit.*, No. 76, pgs. 77 and 78.

[250]    C.-E. BUCHER, "The Clause of Anticipated Waiver of Judicial Termination", *Contrats Concurrence Consommation,* No. 6, June 2020, form 6.

by virtue of the writs of summons issued on 26 and 30 June 2025[251]. Thus, the objection raised by respondents 11) to 13) concerning the absence of ACM BIDCO, ELLIOTT ASSOCIATES and ELLIOTT INTERNATIONAL in the proceedings is now moot.

192. On the contracts expressly referred to in the writ of summons of 27 June 2022, namely:

*"any subsequent agreement entered into between those same parties [ROSSONERI SPORT and FOOTBALLCO] concerning the transfer of AC MILAN shares;*

- *the nullity of any waiver by PROJECT REDBLACK and/or Daniela ITALIA and/or Jean-Marc MCLEAN of the pledge granted to it by ROSSONERI SPORT as security for the AFA;*

- *the nullity of any waiver by PROJECT REDBLACK and/or Daniela ITALIA and/or Jean-Marc MCLEAN of part of its claim;*

- *the nullity of any delegation of power granted by ROSSONERI SPORT and/or Victor SHUH and/or Jean-Marc MCLEAN and/or Elliot GREENBERG and/or Alfred Izak GOSLING to any entity of the ELLIOTT group, including ELLIOTT MANAGEMENT CORPORATION, in connection with the transfer of the AC MILAN shares[252];"*

for which the Claimants are requesting nullity, all parties to said contracts are already party to the present proceedings. Therefore, the plea for inadmissibility raised by respondents 11) to 13) is either moot or, otherwise, unfounded.

193. In their writ of summons of 27 June 2022, the Claimants further request the nullity of
"*any ancillary, accessory or related agreement to the agreements for the transfer of AC MILAN shares[253]*".

194. As is clear from the facts, as described both in the writ of summons and in the current submissions, the Claimants were unable to obtain any information from ROSSONERI SPORT, PROJECT REDBLACK or their managers regarding the transaction for the sale of AC MILAN shares, in clear violation of their rights. The Claimants therefore still do not know the full extent of the side agreements to the Stock Purchase Agreement concluded with third parties, which would inevitably be affected by a declaration of nullity of the Stock Purchase Agreement. This is why the Claimants have included in their requests a demand for the nullity of all agreements related to the sale of the AC MILAN shares, given that any such agreements would necessarily be impacted by the nullity of the Stock Purchase Agreement.

195. Thus, contrary to the assertions of respondents 11) to 13)[254], such a position cannot lead to the inadmissibility of the writ of summons of 27 June 2022, especially

---

[251] **Court Register No. TAL-2022-07355, Exhibit No. 94 of Folder III from MOLITOR** - Summons for compulsory intervention of 26 June 2025; **Exhibit No. 95 of Folder III from MOLITOR** - cited above; **Court Register No. TAL-2022-07361, Exhibit No. 94 of Folder III from MOLITOR** - Summons for compulsory intervention of 30 June 2025; **Exhibit No. 95 of Folder III from MOLITOR** - cited above; **Court Register No. TAL-2023-04206, Exhibit No. 94 of Folder III from MOLITOR** - Summons for compulsory intervention of 26 June 2025; **Exhibit No. 95 of Folder II from MOLITOR** - Summons for compulsory intervention of 30 June 2025.

[252] **Court Register No. TAL-2022-07361,** writ of summons of 27 June 2022, p. 28.

[253] **Court Register No. TAL-2022-07361,** writ of summons of 27 June 2022, p. 28.

[254] **Court Register No. TAL-2022-07361,** submissions by CLIFFORD CHANCE of 7 June 2022, No. 41 et seq., pgs. 24 et seq.

since all parties to the agreements concluded for the sale of the AC MILAN shares and known to the Claimants are already party to the present proceedings.

196. Moreover, neither respondents 11) to 13), nor any other respondent, have claimed in their submissions that other agreements were concluded in connection with the sale of the AC MILAN shares.

197. If such agreements were to come to light, the Claimants would not hesitate to bring all interested third parties into the present proceedings, as they have already done with ACM BIDCO, ELLIOTT ASSOCIATES, and ELLIOTT INTERNATIONAL.

**3.      On the alleged lack of standing in bringing proceedings**

198. Respondents 11) to 13) argue that:(3.1) BLUE SKYE LUX and LIC 159 allegedly lack standing, as BLUE SKYE LUX is no longer the holder of Class A-2[255] TPECs and LIC 159 is no longer the holder of Class B[256], TPECs; and (3.2.)BLUE SKYE LUX and LIC 159 lack a current and vested standing in bringing proceedings.

199. Meanwhile, respondents 9) and 10) argue that (3.2):BLUE SKYE LUX lacks legal capacity or standing to bring this action, since it is not a party to the SPA "or to any subsequent agreement concerning the sale of the AC MILAN shares[257]".they also challenge BLUE SKYE LUX's interest in acting due to its status as a minority shareholder in PROJECT REDBLACK (3.3).

**3.1.   The standing of BLUE SKYE LUX and LIC 159, based on their holding of TPECs**

200. As has been fully described in the facts above[258], BLUE SKYE LUX initially transferred its Class A-2 TPECs to BLUE SKYE Caymans, a company registered in the Cayman Islands and wholly owned by Mr CERCHIONE and Mr D'AVANZO, in order to separate the entities holding the TPECs issued by PROJECT REDBLACK from those holding shares in PROJECT REDBLACK[259].However, the assertion by respondents 11) to 13)[260], that BLUE SKYE LUX is therefore no longer the holder of the Class A-2 TPECs is incorrect, since the Class A-2 TPECs were retroceded to BLUE SKYE LUX on 20 April 2022[261], as PROJECT REDBLACK has acknowledged in the Class A TPEC register[262].

201. The purpose of this retrocession was to ensure that the various main proceedings opposing the BLUE SKYE group to the ELLIOTT group involved only BLUE SKYE LUX and LIC 159, in order to avoid BLUE SKYE Cayman having to participate as either a claimant or a respondent. After exhausting every possible excuse, PROJECT REDBLACK ultimately had to record BLUE SKYE LUX

---

[255]    **Court Register No. TAL-2022-07361,** submissions by CLIFFORD CHANCE of 7 June 2022, No. 46, p. 25.
[256]    **Court Register No. TAL-2022-07361,** submissions by CLIFFORD CHANCE of 7 June 2022, No. 49, p. 26.
[257]    **Court Register No. TAL-2022-07361,** submissions by ELVINGER HOSS PRUSSEN of 5 July 2023, No. 5, p. 6.
[258]    See above, paragraph 35 et seq.
[259]    **Court Register No. TAL-2022-07361, Exhibit No. 38 of Folder II from MOLITOR**, cited above.
[260]    **Court Register No. TAL-2022-07361,** submissions by CLIFFORD CHANCE of 7 June 2022, No. 47 et seq., p. 26.
[261]    **Court Register No. TAL-2022-07361, Exhibit No. 39 of Folder II from MOLITOR**, cited above.
[262]    See above, paragraph 36.

as the holder of the Class A-2 TPECs as of 21 May 2024, albeit much later than the date on which PROJECT REDBLACK became aware of the transfer.

202. Therefore, the inadmissibility plea raised by respondents 11) to 13), asserting that BLUE SKYE LUX lacks standing in the current proceedings due to not holding the Class A-2 TPECs, must be rejected as moot.

203. Having initially claimed that BLUE SKYE LUX lacked standing because it was no longer a TPEC holder, respondents 11) to 13) next argue that LIC 159 lacks standing because it is not the holder of the Class B TPECs on which it relies. In support of this claim, they point to the fact that in the context of the Italian bankruptcy proceedings, it is BLUE SKYE which allegedly claimed ownership of the Class B TPECs.

204. This assertion by the defendant parties under items 11) to 13) is a misinterpretation of the facts, since, as already explained[263], the fact that BLUE SKYE LUX was listed as the holder of the Class B TPECs in the Italian insolvency proceedings results from a notarial mandate granted by LIC 159, in its capacity as the holder of the Class B TPECs, authorising BLUE SKYE LUX to represent it in those proceedings[264].

205. Moreover, the evidence proving LIC 159's ownership of all Class B TPECs has already been presented above[265] and PROJECT REDBLACK has already had to register LIC 159 as the holder of the first 10,735,567 Class B TPECs[266].

206. It should also be noted that the general terms and conditions applicable to the Class A and Class B TPECs only establish a rebuttable presumption of ownership based on the entries in the relevant registers, as they state that:
"*Except as expressly required by law, the Person in whose name the Class TPECs are registered in the TPEC Register shall be deemed to be the owner and record holder thereof for all purposes*" (emphasis added)[267].It follows that the entries in the TPEC registers only create a rebuttable presumption of ownership for those listed therein.

207. This contractual provision aligns with settled case law concerning the register of registered shares of a public limited company, which holds that an entry in such a register does not create an irrefutable presumption of ownership, and that contrary proof may always be submitted through any legal means. Legal doctrine has also adopted this jurisprudential stance and recognises this limited evidentiary effect of the register[268].Consequently, a company issuing registered securities cannot shield itself behind the entries in its register, lest it fabricate, for its

---

[263]    See above, paragraph 203.

**[264]    Court Register No. TAL-2022-07361, Exhibit No. 83 of Folder II from MOLITOR** - Copy of the power of attorney confirming the mandate given to Blue Skye Lux by LIC 159, accompanied by an automatic French translation.

[265]    See above, particularly paragraphs 95 et seq.

[266]    See above, paragraph 36.

[267]    Original text: "*Except as expressly required by law, the Person in whose name the Class TPECs are registered in the TPEC Register shall be deemed to be the owner and record holder thereof for all purposes*" (**Court Register No. TAL-2022-07361, Exhibit No. 36 of Folder II from MOLITOR**, cited above).

[256]    Court of Appeal, 30 October 2002, Court Register No. 25762; Court of Appeal (4th ch.), 23 January 2019, Court Register No. CAL-2018-00072; A. STEICHEN, *Précis de droit des sociétés*, 6th edition, Saint-Paul Publishing, 2018, footnote No. 4, p. 711.

own benefit, the basis for its assertions[269]. As has been shown, LIC 159 has submitted all necessary evidence to demonstrate its ownership of all Class B TPECs, which may be used to challenge any conflicting entry in the Class B [270],TPEC register in relation to the remaining 20,589,498 Class B TPECs.

208.  These elements indisputably show that the inadmissibility plea raised by respondents 11) to 13), claiming that LIC 159 lacks standing to participate in the current proceedings due to not holding the Class B TPECs, must be rejected as unfounded.

### 3.2.  The existence of a current and vested standing

209.  Respondents 11) to 13) argue that the nullity claims submitted by the Claimants in their writ of summons of 27 June 2022 are inadmissible, on the basis that the Claimants allegedly "*did not, at the time of bringing the action, have a current and vested standing in seeking the annulment of contracts that had not yet been concluded and thus did not exist at the time of the writ of summons[271]*".

210.  It should first be noted that respondents 11) to 13) do not challenge the admissibility of the Claimants' request to annul "*the Stock Purchase Agreement concluded on 26 May 2022 between Rossoneri Sport Luxembourg and Footballco Intermediate Coöperatief[272]*", which had already been executed prior to the commencement of these legal proceedings.

211.  Luxembourg case law considers that standing exists "*when the outcome of the claim is likely to alter or improve the claimant's legal situation, or when the claim is likely to present them with a benefit or advantage[273]*". Thus, standing depends on the usefulness of pursuing the action for the claimant[274].

212.  On this point, "standing exists independently of the outcome actually produced by the action, and is not contingent upon prior demonstration of the claim's merits, the actual existence of the right invoked, or the reality of the harm alleged. *Verification of the real existence of the asserted right or harm is relevant only to the substance of the claim. Standing is a concept attached to the right of action itself, not to the substantive right that the action seeks to protect, which is why it must be assessed in terms of the admissibility of the claim, not its merits[275]*." As such, "*verification of standing (and, by extension, legal capacity - the two concepts often overlap) is independent of whether the claimant actually holds the right they invoke to support their claim[276]*".

---

[269]  Tribunal d'arrondissement of Luxembourg (17th chamber), 19 January 2011, Court Register No. 122354.
[270]  **Court Register No. TAL-2023-04206, Exhibits No. 32, No. 46, No. 47 and No. 82 of Folder II from MOLITOR**, cited above.
[271]  **Court Register No. TAL-2023-04206,** submissions by CLIFFORD CHANCE of 7 June 2022, No. 50 et seq., pgs. 26 et seq.
[272]  **Court Register No. TAL-2022-07361,** writ of summons of 27 June 2022, p. 28.
[273]  T. HOSCHEIT, *op. cit.*, No. 997 and 998, pgs. 567 and 568.
[274]  District Court of Luxembourg, 25 October 2002, Court Register No. 77445.
[275]  T. HOSCHEIT, *op. cit.*, No. 997 and 998, pgs. 567 and 568.
[276]  *Ibid.*

213.   The question of whether BLUE SKYE LUX actually holds a right to request the annulment of a series of contracts and agreements, and the arguments made by respondents 11) to 13) regarding an alleged impermissible action *ad futurum* [277],- which the Claimants contest as unfounded - are therefore matters of substance and not matters of admissibility[278], and as such, they are not to be assessed at this stage of the proceedings.

214.   As previously stated, the Claimants are acting in their capacity as a shareholder of PROJECT REDBLACK and an indirect shareholder of ROSSONERI SPORT and AC MILAN (in the case of BLUE SKYE LUX), and as creditors of PROJECT REDBLACK (in the case of BLUE SKYE LUX and LIC 159), to seek a judgment from the Luxembourg courts annulling the sale of the AC MILAN shares that was carried out in violation of their rights. They therefore clearly have standing to act.

215.   As mentioned earlier, when the Claimants served the writ of summons of 27 June 2022, they were still unaware of the specific contracts and legal instruments that had in fact already been executed in relation to the sale of the AC MILAN shares. For that reason, the operative part of the writ of summons of 27 June 2022 seeks, among other things, to: "D*ECLARE null and void the transaction aimed at selling the shares in AC Milan, i.e., to declare null and void any contract or agreement concluded with a view to proceeding with the sale of AC Milan shares, and in particular, though not exhaustively: [...]*" (emphasis added). It is thus clear that the list of contracts and agreements mentioned in the operative part is illustrative rather than exhaustive, which avoids the need to focus on the specific date of each item listed.

216.   In any case, the annulment of the sale of the AC MILAN shares will necessarily lead, as a consequence, to the annulment of the SPA as well as of any other related legal agreements and instruments, including those mentioned in the writ of summons of 27 June 2022, such as the release of the Italian Pledge. If respondents 11) to 13) persist in treating this as a cause of inadmissibility, the Claimants will have no difficulty characterising these requests as incidental claims within the meaning of Article 53 of the NCPC, since it is evident that they are sufficiently connected to the original claims and were at least implicitly included therein[279].

### 3.3.    The legal capacity and standing of BLUE SKYE LUX

217.   As a preliminary remark, the Claimants note that by order of 20 December 2024, this Court instructed the parties, in relation to Court Register No. TAL-2022-07361, to submit arguments only on the pleas of inadmissibility raised by Maître Albert MORO, meaning that the plea of inadmissibility raised by Maître Marc ELVINGER does not, in principle, fall within the scope of these submissions.

218.   However, in view of the fact that this is a plea of inadmissibility, and in the interest of the proper administration of justice, the Claimants wish to take a position on it as outlined in the following paragraphs.

219.   The Claimants acknowledge that the plea of inadmissibility for lack of "*legal capacity or standing to act*" is raised by respondents 9) and 10) solely against BLUE SKYE LUX, meaning that they do not contest the legal capacity or standing of LIC 159 on this ground.

---

[277]   **Court Register No. TAL-2022-07361**, submissions by CLIFFORD CHANCE of 7 June 2023, No. 51 et seq., p. 27.

[278]   Court of Appeal, 21 November 1995, Court Register No. 15696.

[279]   Court of Appeal, 12 March 2014, Court Register No. 37801; T. HOSCHEIT, *op. cit.*, No. 117, pgs. 628-629.

220.    Respondents 9) and 10) take the view that BLUE SKYE LUX would have neither standing nor capacity to bring an action to annul the SPA because the latter was not a party to said contract, and, by virtue of its status as a shareholder of PROJECT REDBLACK, it cannot substitute itself for that company in bringing an action that primarily concerns the latter, particularly given the harm caused to its assets[280].

221.    As explained in detail above, the acts surrounding the sale of the AC MILAN shares took place in breach of PROJECT REDBLACK's articles of association and in particular Article 13 thereof and the shareholder rights of BLUE SKYE LUX. In its dual capacity as a shareholder and a creditor of PROJECT REDBLACK, BLUE SKYE LUX therefore has, just as LIC 159 does in its capacity as a creditor of PROJECT REDBLACK, the ability to invoke the breach of that company's articles of association. Since Mr CASLINI logically refused to support the release of the Italian pledge and the sale of the AC MILAN shares, the decision should have been submitted to the shareholders of PROJECT REDBLACK (and therefore to BLUE SKYE LUX itself). As the condition of unanimity required to approve these transactions would not have been met, the sale of the AC MILAN shares could not have taken place and would not have had the consequences that it did, which are detrimental only to BLUE SYKE and LIC 159 and spare the entities of the ELLIOTT group, i.e. GENIO and KING GEORGE.

222.    The harm thus suffered by BLUE SKYE LUX as a result of the breach of PROJECT REDBLACK's articles of association is indeed personal, in that, unlike the company's two other shareholders, it also holds Class A-2 TPECs, and it experiences, just as LIC 159 does in its capacity as holder of the Class B TPECs, a personal loss linked to the fraud orchestrated by the ELLIOTT group from the sale of the AC MILAN shares and the release of the Italian Pledge up to the recent repayment of the vendor-loan notes in December 2024.

### 4.    Regarding the alleged waiver by BLUE SKYE LUX of the request for annulment of the AC MILAN sale

223.    Respondents 11) to 13) argue that BLUE SKYE LUX tacitly waived its claim for annulment of the sale of AC MILAN shares due to the bankruptcy proceedings initiated against PROJECT REDBLACK and ROSSONERI SPORT before the Courts of Milan[281].

224.    The Claimants note that LIC 159 is not the subject of the plea of inadmissibility raised by respondents 11) to 13).

225.    Waiver is defined as the unilateral legal act by which the holder relinquishes a prerogative or a set of prerogatives[282]. In this regard, the waiver of a right cannot be presumed and can only be established by facts that necessarily imply it, that is to say, it can only result from acts that clearly manifest the intention of a certain and unequivocal waiver, together with awareness of the scope of that act, involving both the awareness of the possible existence of the right and the awareness of the consequences of its relinquishment[283]. It is a general principle that waivers cannot be presumed[284] and it is up to the party invoking the waiver to demonstrate that the person who waived the right was aware of the prerogative being relinquished

---

[280]    ELVINGER HOSS PRUSSEN submissions of 5 July 2023, no. 5, p. 6.
[281]    CLIFFORD CHANCE submissions of 7 June 2022, no. 54 et seq., p. 27.
[282]    D. HOUTCIEFF, Renonciation, Répertoire de droit civil, Dalloz, 2017, no. 1, p. 3.
[283]    Court of Appeal, 14 December 2023, Court Register No. CAL-2023-00103; T. HOSCHEIT, op. cit., No. 1056, p. 603.
[284]    Court of Appeal Luxembourg, 3 June 2009, Court Register No. 34203.

or could not have been unaware of its existence[285], so that the conditions for the existence of a waiver must be interpreted strictly.

226.  Respondents 11) to 13) infer the Claimants' waiver of their main claim for annulment of the AC MILAN sale solely from the bankruptcy proceedings initiated by the claimants before the Italian courts against PROJECT REDBLACK and ROSSONERI SPORT. The allegations made by respondents 11) to 13) do not at any time demonstrate that the Claimants' intention to waive their main claim for annulment of the AC MILAN sale, despite the fact that:

  (i)    the said bankruptcy writ of summons was filed on 27 March 2023, that is, after the writ of summons of 27 June 2022 which initiated the present proceedings, and was aimed at the impossibility for PROJECT REDBLACK to pay all of its debts given the assets it held [286];

  (ii)   if the Claimants had intended to withdraw their primary claim for annulment following the bankruptcy proceedings initiated before the Italian courts, they would have simply withdrawn from the proceedings before the Court seeking to annul the sale of AC MILAN shares, which they did not do; and, in any event,

  (iii)  on 9 November 2023, the Italian court dismissed BLUE SKYE's claims on the grounds that it had not accepted territorial jurisdiction.

227.  It is clear from the facts set out above that the bankruptcy proceedings initiated before the Italian courts cannot be construed as a tacit waiver by the Claimants of their rights to bring an action for annulment of the sale of the AC MILAN shares.

228.  In these circumstances, the objection of inadmissibility raised by respondents 11 to 13 must be dismissed as unfounded.

### C.  FORCED INTERVENTION OF MR CRACA

229.  Mr CRACA denies having acted as sequestrator of the Italian pledge and states that he was merely a precarious holder of the AC MILAN share certificates, the sole reason why he was served with a joint declaration of judgement[287].

230.  According to him, since following the transfer by ROSSONERI SPORT to ACM BIDCO of the shares of AC MILAN, he would no longer be the holder of the certificates representing the shares of AC MILAN, there would no longer be any reason for him to appear as a party to the present proceedings. Thus, it would be appropriate to declare his compulsory intervention in the present proceedings inadmissible, if not unfounded.

231.  It should nevertheless be emphasised that Mr CRACA did indeed perform his function as depositary of the share certificates within the framework of the Italian Pledge, as confirmed by (i) clause 3.1.2 of that agreement[288], under which these certificates must be delivered to PROJECT REDBLACK; and (ii) the letter sent by the Italian notary who officiated for the purposes of creating this security, which confirms that Mr CRACA is the custodian appointed

---

285   French Court of Cassation, 1st Civil Chamber, 5 December 1972, Civil Bulletin I, No. 269; Luxembourg District Court, 13 July 2022, Court Register No. TAL-2022-03762.
286   See below, paragraph 75.
287   **Court Register No. TAL-2022-07361,** submissions of Maître Bertrand CHRISTMANN of 11 April 2023, p. 4.
288   **Court Register No. TAL-2022-07361, Exhibit 6 of Folder I from MOLITOR,** cited above,

by PROJECT REDBLACK to hold the certificates[289]. As already stated above[290], at the time of the sale of the AC MILAN shares, Mr CRACA was also a director of that company and has always denied the existence or imminence of such a transaction. Mr CRACA, who was secretly cooperating with ELLIOTT, also acted as Italian legal counsel for AC MILAN in relation to the sale of the shares for which he coordinated the due diligence. He was generously compensated for this role, in particular via FIVERS (formerly known as FIVELEX STUDIO E LEGALE TRIBUTARIO), the Italian law firm of which he is a partner, which received, among other things, a sum of EUR 602,830 from ROSSONERI SPORT on 1 September 2022[291].

232.   Furthermore, as we have seen in the context of the declaratory action[292], Mr CRACA had been alerted by letter[293] to the fact that the release of the Italian Pledge was subject to obtaining a unanimous decision within PROJECT REDBLACK by virtue of Article 13 of that company's articles of association. He could not therefore have been unaware that by agreeing to surrender the certificates representing AC MILAN shares at the request of PROJECT REDBLACK (and therefore of its two Class A directors), he was deliberately placing himself in breach of this statutory provision and thereby contributing to the scheme orchestrated by the ELLIOTT group for the sale of the AC MILAN shares. The letters he had received informed him that (i) neither Mr CASLINI nor BLUE SKYE LUX would vote in favour of resolutions to release the security, which would therefore necessarily be adopted in breach of PROJECT REDBLACK's articles of association; and that (ii) Mr CASLINI and BLUE SKYE LUX opposed the scheme orchestrated by the ELLIOTT group and its agents to sell AC MILAN without their knowledge and under highly questionable conditions.

233.   Consequently, by disposing of the share certificates of AC MILAN, Mr CRACA signalled his agreement to collaborate in the fraudulent activities as described in the writ of summons of 27 June 2022. Mr CRACA must therefore remain a party to this dispute and be declared to be a party to the judgement.

### D.   ON THE FORCED INTERVENTION OF FOOTBALLCO

234.   FOOTBALLCO considers that the writ of summons of 27 June 2022 does not mention any reason why it should be included in the fraud proceedings. It therefore feigns ignorance by claiming not to know in what capacity it received this writ of summons and thereby seeks to have the writ of summons declared inadmissible, or at least unfounded, against it[294].

---

289   **Court Register No. TAL-2022-07361, Exhibit 33 of Folder II from MOLITOR**, cited above.

290   See above, paragraph 18.

291   **Court Register No. TAL-2022-07355, Exhibit 99 of Folder III from MOLITOR** - FIVERS Press Release; **Exhibit 100 of Folder I from MOLITORI** - Screenshot of FIVERS's webpage regarding Mr. CRACA; **Exhibit 101 of Folder III from MOLITOR** - Proof of payment to FIVELEX STUDIO E LEGALE TRIBUTARIO on 1 September 2022; **Court Register No. TAL-2022-07361, Exhibit 99 of Folder III from MOLITOR** - FIVERS Press Release; **Exhibit 100 of Folder I from MOLITORI** - Screenshot from FIVERS webpage regarding Mr. CRACA; **Exhibit 101 of MOLITOR's Shard III** - Proof of payment from FIVELEX STUDIO E LEGALE TRIBUTARIO on 1 September 2022; **Court Register No. TAL-2023-04206, Exhibit 99 of Folder III from MOLITOR** - FIVERS Press Release; **Exhibit 100 of Folder I from MOLITORI** - Screenshot from FIVERS's webpage regarding Mr CRACA; **Exhibit 101 of Folder I from MOLITORI** - Proof of payment from FIVELEX STUDIO E LEGALE TRIBUTARIO on 1 September 2022.

292   See above, paragraph 122.

293   See above, paragraphs 45 (i) and (iii); **Court Register No. TAL-2022-07355, Exhibits 18 and 19 of Folder I from MOLITOR**, cited above.

294   **Court Register No. TAL-2022-07361**, Submissions No. 1 of 4 July 2024 of Maître Nicolas THIELTGEN, p. 7.

235.　However, as has already been extensively explained, whether in the writ of summons of 27 June 2022[295] or in the present submissions[296], FOOTBALLCO is a party to the SPA concerning the sale of AC MILAN's shares and has appointed ACM BIDCO to become AC MILAN's new shareholder.

236.　As the writ of summons of 27 June 2022 seeks, among other things, the annulment of any transaction involved in the sale of AC MILAN shares, it is only natural that FOOTBALLCO should be one of the respondents. Consequently, FOOTBALLCO's plea that the writ of summons be declared inadmissible, if not unfounded, must be rejected.

## E.　APPLICABLE LAW

237.　The Claimants take note that respondents 11) to 13) do not dispute the jurisdiction of the Court.

238.　Respondents 11) to 13) alternatively request that the Court rule as to the law applicable to the claim for annulment of the contracts and agreements entered into for the purposes of the sale of the AC MILAN shares and contend that the law of the State of New York should apply by virtue of the SPA's choice-of-law (*electio juris*) clause[297].

239.　Respondents 11) to 13) contend, in reaching this conclusion, that (i) the Claimants are alleging fraud on their rights (*fraus alterius*) in an international context; and (ii) that the sanction applicable to fraud on the rights of others in an international context would be determined according to the national law established by the applicable conflict-of-law rule. In this context, respondents 11) to 13) attempt to bring the law governing the SPA into the debate, curiously relying on Article 3 of Regulation (EC) No. 593/2008 (and not No. 893/2008, as incorrectly indicated by respondents 11) to 13)[298]) of the European Parliament and Council of 17 June 2008, "**Rome I Regulation**").

240.　The reasoning put forward by respondents 11) to 13) and the conclusions they draw from it are incorrect on several levels for the reasons set out below.

241.　Firstly, respondents 11) to 13) appear to confuse the concepts of fraud on the law in domestic law and fraud on the law in private international law[299]. Whereas the latter aims "*to penalise the artificial creation, through simulation, of the conditions for the application of a particular law, in order to take advantage of that law, deemed more favourable than the law that would normally apply under the conflict-of-law rules*", thereby allowing fraud based on "*the artificial manipulation of conflict-of-law rules*"[300], the former, which is a vague concept, "*involves the use of a legal mechanism which is lawful in itself, but in an artificial, dishonest, or immoral manner, with a view to achieving a result prohibited by a rule of public order*

---

[295]　**Court Register No. TAL-2022-07361**, writ of summons of 27 June 2022, pgs. 25, 26, 28 and 29.

[296]　See above, paragraphs 20, 49 and 164 et seq.

[297]　**Court Register No. TAL-2022-07361,** CLIFFORD CHANCE submissions of 7 June 2022, No. 57 et seq, pgs. 29 et seq.

[298]　**Court Register No. TAL-2022-07361,** CLIFFORD CHANCE submissions of 7 June 2022, No. 65, p. 32.

[299]　**Court Register No. TAL-2022-07361,** CLIFFORD CHANCE submissions of 7 June 2022, No. 60, p. 30.

[300]　P. VAN OMMESLAGHE, *De Page. Traité de droit civil belge, Volume II, Les obligations*, Bruylant, 2013, no. 302, p. 463.

*or by a mandatory provision*[301]"[302]. In the present case, it is clear that by their writ of summons of 27 June 2022, the Claimants are not invoking the existence of a fraud on the law of private international law, since they do not base their claim on any artificial use of conflict-of-law rules. The considerations put forward by respondents 11) to 13) are therefore irrelevant, as fraud on law under domestic law will necessarily be assessed in accordance with Luxembourg law.

242.    Secondly, it should be noted that the distinction between fraud on law and fraud on the rights of third parties is generally regarded as not easy to draw, since the boundary between these two concepts may appear artificial and imprecise[303]. Its reality and usefulness are, moreover, very frequently called into question[304]. Be that as it may, it is nevertheless necessary to examine these concepts in order to address the arguments of respondents 11) to 13).

243.    Contrary to the assertion made by respondents 11) to 13)[305], the action on the merits brought by the Claimants is based, at least in part, on a fraud upon Luxembourg law which led to the sale of the AC MILAN shares and ultimately resulted in a fraud against the Claimants' proprietary interests.

It is clear from the above that, under the guise of legal mechanisms that appeared lawful but were in fact contrived, PROJECT REDBLACK and its Class A managers, through fraudulent conduct, succeeded in creating a situation that infringed a series of mandatory, even public-order, provisions of Luxembourg company law which would otherwise have applied to PROJECT REDBLACK, a company incorporated and having its registered office in Luxembourg.

244.    It may indeed be noted as follows:

(i)    By attempting to create the impression that the decisions taken within PROJECT REDBLACK, leading to various acts such as the release of the Italian Pledge and the sale of the AC MILAN shares, were in accordance with the company's constitutional provisions and complied with Article 710-15 of the Law of 10 August 1915 on commercial companies, as amended (the "**1915 Law**"), PROJECT REDBLACK and its Class A managers thereby breached Articles 13 and 16 of the company's articles of association and, consequently, Article 1134, paragraph 3 of the Civil Code, under which agreements, including the articles of association, must be performed in good faith.

(ii)    More striking still, since the sale of AC MILAN must inevitably lead to the voluntary liquidation of ROSSONERI SPORT and, consequently, that of PROJECT REDBLACK, since the purpose for which these companies were created no longer exists following the sale of the AC MILAN shares, it was imperative that, <u>prior</u> to any transactions connected directly or indirectly with that sale (such as the release of the Italian Pledge), and irrespective of the requirements laid down in Articles 13 and 16 of the articles of association of PROJECT REDBLACK, the consent of all the shareholders of ROSSONERI SPORT and PROJECT REDBLACK should have been obtained[306], in accordance with the well-established principle in company law

---

[301]    P. VAN OMMESLAGHE, *op. cit.*, no. 300, p. 460.
[302]    Belgian Court of Cassation, 16 November 2015, *Pas. be.*, 2015, no. 679.
[303]    P. DE VAREILLES-SOMMIÈRES, *Répertoire de droit international*, entry "Fraude à la loi", Dalloz, December 1998, no. 2; C. PEDAMON, "Theory of fraud in French law: fraus omnia corrumpit – old law, new opportunities? ", in X. *Research Handbook on International Financial Crimes*, Edward Elgar Publishing Ltd, 2015, p. 349; P. VAN OMMESLAGHE, *op. cit.*, no. 300, p. 460.
[304]    J. GHESTIN and H. BARBIER, *Traité de droit civil*, 5e ed., vol. II, no. 701, L.G.D.J., 2020, pgs. 550 and 551.
[305]    **Court Register No. TAL-2022-07361,** CLIFFORD CHANCE submissions of 7 June 2022, No. 63, p. 32.
[306]    French Court of Cassation, Commercial Chamber, 13 March 2024, judgment no. 122 FS-B, appeal no. R 22-13.764.

according to which the decision to dissolve a company must obtain the unanimous agreement of its members under Article 1134, paragraph 2 of the Civil Code, which states that agreements "may only be revoked by their mutual consent, or for the reasons authorised by law"[307]. It is indeed indisputable that both PROJECT REDBLACK and ROSSONERI SPORT (whose very names are telling and closely linked to the football club "AC MILAN") were special purpose vehicles established solely for the purposes of financing, acquiring, developing and selling AC MILAN. Once the shares in this company had been sold and the price paid, all that remained for ROSSONERI SPORT to do was to repay its debts to PROJECT REDBLACK and for PROJECT REDBLACK to make the distributions due under the TPECs. Once these transactions were completed, there was no longer any justification for maintaining these vehicles, which had lost their purpose and raison d'être, and, according to the normal course of things in the investment field, should then be dissolved.

245. Alternatively, if the court were to find that the fraud as described in the writ of summons of 27 June 2022, does not include fraud on the law under domestic law, *quod non*, it would constitute fraud on the rights of third parties based on the maxim "*fraus omnia corrumpit*" and encompassing cases of fraud involving contractual provisions[308]. Such fraud generally involves the fraudulent breach of a rule (for example, a contractual provision or a general standard of proper conduct, by reference to the conduct of a reasonable person), which may prejudice the rights of others[309].

246. In the case of fraud on the rights of third parties, the judge hearing the case must consider the application of the maxim "*fraus omnia corrumpit*" to various types of conduct. In such circumstances, it is irrelevant whether the fraudulent conduct took place in Luxembourg or abroad. Indeed, since the rights protected by the maxim are governed by Luxembourg law, the Luxembourg judge may only address the fraud by applying Luxembourg law in order to determine whether the party seeking redress is entitled to bring a claim on that basis[310].

247. It must be recalled that the fraud at issue in this case infringes contractual rights, in that it resulted in:

(i) infringement of PROJECT REDBLACK's statutory provisions, including Articles 13 and 16, which are subject to Luxembourg law as *lex societatis*, as specified in Article 1(2)(f) of the Rome I Regulation; and

(ii) breach of the rules contained in the general terms and conditions of the Class A-2 and Class B TPECs, which expressly designate Luxembourg law as the law applicable to these contractual obligations[311], this clause being valid under Article 3(1) of the Rome I Regulation.

Since all the protected interests are governed by Luxembourg law, the court is required to apply Luxembourg law alone to establish the existence of fraud. This position is also confirmed by the case law of the Court of Justice of the European Union, which, in

---

[307]   A. STEICHEN, *op. cit.*, no. 626, p. 473.

[308]   C. PEDAMON, *op. cit.*, p. 345.

[309]   P. DE VAREILLES-SOMMIÈRES, *Répertoire de droit international, op. cit.*, pgs. 349 et seq.; P. VAN OMMESLAGHE, *op. cit.*, no. 309, p. 484.

[310]   M.-A. ANCEL, P. DEUMIER and M. LAAZOUZI, *Droit des contrats internationaux*, 2nd ed., *Lefebvre Dalloz*, 2020, no. 308, pgs. 260 and 261.

[311]   **Court Register No. TAL-2022-07361, Exhibit 36 of Folder II from MOLITOR**, cited above, Article 11.1.

when examining a question of jurisdiction, the Court expressly confirmed that a Paulian action (one of the applications of the fraud theory) brought by a creditor based on rights deriving from a contract falls within the field of contract law[312]. The application of Luxembourg law under the Rome I Regulation, applicable to contractual obligations, is therefore correct.

248.    It follows from these rules that the application of the law of the State of New York, which respondents 11) to 13) propose as the law applicable to the SPA, must be rejected: It is indeed difficult to understand how the question of the existence and consequences of the breach of Luxembourg rights due to fraud could be assessed under foreign law. The application of New York law is all the more incongruous given that Luxembourg law undoubtedly has a number of mechanisms modulating the effects of fraud, such as the protection of third parties acting in good faith and the remedies for restoration to pristine status in the event of annulment. The parties to the SPA therefore have robust safeguards under Luxembourg law designed to preserve what must be preserved in the case of an action based on fraud, without needing to resort to New York State law for this purpose. Furthermore, in attempting to follow the argument put forward by respondents 11) to 13), they do not justify why only the law of the State of New York should be retained, when the conduct alleged by the Claimants in the writ of summons of 27 June 2022, and resulting from fraud against Luxembourg law, are multiple and can be linked to various jurisdictions, including Luxembourg.

### F.  COUNTERCLAIM AND INCIDENTAL CLAIM BY PROJECT REDBLACK AND ROSSONERI SPORT

249.    In their submissions of 31 October 2022, respondents 9) and 10) present, before any defence on admissibility or the merits, (i) a counterclaim for damages against PROJECT REDBLACK and ROSSONERI SPORT for abusive and vexatious procedure and for "*systematically and deliberately wrongful, abusive and prejudicial conduct*"; and (ii) an incidental claim against Mr CASLINI for "(serious) mismanagement, manifest breach of his duty of loyalty and his "fiduciary obligations" towards PROJECT REDBLACK and breach of his obligations regarding conflicts of interest"[313].

250.    In particular, PROJECT REDBLACK and ROSSONERI SPORT seek (i) payment of damages for transaction costs incurred as a result of what they describe as "*obstructive and harassing actions*" carried out by BLUE SKYE LUX and LIC 159, (ii) the reimbursement of all management fees paid to BLUE SKYE LUX under the Class A-2 TPECs and the forfeiture of BLUE SKYE LUX's right to receive the carried interest related to these financial instruments, due to its alleged attempt to sabotage the sale of the AC MILAN shares, which they characterise as an abuse of power; and (iii) subsidiarily, the annulment of the Class A-2 TPECs and the restoration of the parties to their original position, on account of an alleged material non-performance by BLUE SKYE LUX of its obligations under these instruments[314].

---

[312]    CJEU, 4 October 2018, *Feniks Sp. z o.o. v Azteca Products & Services SL.*, Case no. C-337/17, paragraphs 43, 44 and 50.

[313]    **Court Register No. TAL-2022-07361**, submissions of ELVINGER HOSS PRUSSEN of 31 October 2022, no. 1, p. 5.

[314]    **Court Register No. TAL-2022-07361**, submissions of ELVINGER HOSS PRUSSEN of 31 October 2022, No. 25 et seq, pp. 16 et seq.

251. As explained above, all the pleas of inadmissibility put forward by the Respondents must be rejected, as that the parties must first conclude on the merits.

252. In these circumstances, the counterclaims made by PROJECT REDBLACK and ROSSONERI SPORT, which are opposed by BLUE SKYE LUX and LIC 159, should be reserved for the judgement to be given on the merits of this case.

253. In the event that Your Court were to uphold the pleas of inadmissibility raised by the Respondents, BLUE SKYE LUX and LIC 159 would oppose the claims made by PROJECT REDBLACK and ROSSONERI SPORT, whereas no fault could be found on the part of the Claimants.

254. Indeed, the right to take legal action in order to be heard by a judge on the merits of a dispute is a fundamental right, the exercise of which can only engage the liability of the person exercising it in the event of abuse resulting from malicious intent, gross negligence equivalent to fraud, or culpable negligence[315].

255. It should also be emphasised that, as amply described in the facts set out above, which are corroborated by a considerable number of objective factual elements, BLUE SKYE LUX and LIC 159 acted in good faith in order to preserve the legitimate rights that had been breached by the ELLIOTT group and its executors, including PROJECT REDBLACK and ROSSONERI SPORT, so that the legal proceedings initiated by BLUE SKYE LUX and LIC 159 cannot result in them being ordered to pay damages to PROJECT REDBLACK and ROSSONERI SPORT. Moreover, the allegations made by PROJECT REDBLACK and ROSSONERI SPORT to justify the cancellation of the payments made to BLUE SKYE LUX and the forfeiture of their right to receive further sums under the Class A-2 TPECs and, in the alternative, the cancellation of these financial instruments, are as far-fetched as they are made in bad faith. As already documented, the BLUE SKYE Group has, through its work, greatly contributed to the growth of AC MILAN's business and has done its utmost to increase its value, which has benefited all holders of Class A and Class B TPECs, including GENIO and KING GEORGE, in respect of their Class A-1 TPECs. The actions brought by BLUE SKYE and LIC 159 in the present case are aimed in particular at preventing the sale of AC MILAN's shares in breach of PROJECT REDBLACK's articles of association from having resulted in the payment of a price which was much lower than it should have been. It is therefore very difficult for PROJECT REDBLACK and ROSSONERI SPORT to argue that the purpose of these actions was to undermine the value of AC MILAN's shares, when the facts show that quite the opposite is true.

256. The counterclaims made by PROJECT REDBLACK and ROSSONERI SPORT against BLUE SKYE LUX and LIC 159, as set out in the submissions served by ELVINGER HOSS PRUSSEN on 31 October 2022, should therefore be rejected in their entirety.

---

315    Court of Appeal, 19 January 2023, *op. cit.*

### G.    COUNTERCLAIM BY GENIO, KING GEORGE AND ELLIOTT UK FOR ABUSIVE AND VEXATIOUS PROCEDURE

257.    GENIO, KING GEORGE and ELLIOTT UK are seeking an order that BLUE SKYE LUX and LIC 159 pay damages provisionally assessed at EUR 1,000,000 for abusive and vexatious procedure based on the provisions of Articles 6-1, 1382 and 1383 of the Civil Code316.

258.    GENIO, KING GEORGE and ELLIOTT UK specify that their present counterclaim is to be reserved to be joined with the judgement on the merits in the event that the present action should not be declared inadmissible317.

259.    As explained above, all the pleas of inadmissibility put forward by the Respondents must be rejected, as that the parties must first conclude on the merits.

260.    In these circumstances, the claims for damages for abusive and vexatious procedure brought by GENIO, KING GEORGE and ELLIOTT UK, which are opposed by BLUE SKYE LUX and LIC 159, should be reserved for the judgement to be given on the merits of this case.

261.    In the event that Your Court were to uphold the pleas of inadmissibility raised by the Respondents, BLUE SKYE LUX and LIC 159 would oppose the claim for damages made by GENIO, KING GEORGE and ELLIOTT UK for abusive and vexatious proceedings, whereas no fault can be found on the part of Claimants.

262.    Indeed, the right to take legal action in order to be heard by a judge on the merits of a dispute is a fundamental right, the exercise of which can only engage the liability of the person exercising it in the event of abuse resulting from malicious intent, gross negligence equivalent to fraud, or culpable negligence318.

263.    GENIO, KING GEORGE and ELLIOTT UK justify their claim on the grounds that BLUE SKYE LUX and LIC 159 would have acted with malicious intent both at the factual level, even though the facts put forward in their writ of summons of 27 June 2022 would be pure allegations[319], than at a legal level, even though the present action would be inadmissible and would be aimed at forcibly imposing the will of minority investors[320].

264.    The developments in the writ of summons of 27 June 2022 have been confirmed point by point by the facts described herein, which further strengthens the version of the facts as presented by BLUE SKYE LUX and LIC 159. BLUE SKYE LUX's and LIC 159's claims are therefore perfectly well founded and justified, as they had to bring the present action solely because of the Respondents' fraudulent conduct.

265.    The application by GENIO, KING GERGE and ELLIOTT UK for an order that BLUE SKYE LUX and LIC 159 pay damages for abusive and vexatious proceedings on the basis of articles 6-1, 1382 and 1383 of the Civil Code should therefore be dismissed.

---

316    **Court Register No. TAL-2022-07361,** submissions of CLIFFORD CHANCE of 7 June 2022, No. 77 et seq, pgs. 37 et seq.

317    **Court Register No. TAL-2022-07361,** submissions of CLIFFORD CHANCE of 7 June 2022, No. 81, p.40

318    Court of Appeal, 19 January 2023, *op. cit.*

319    **Court Register No. TAL-2022-07361,** submissions of CLIFFORD CHANCE of 7 June 2022, No. 78 et seq., pgs. 37 et seq.

320    **Court Register No. TAL-2022-07361,** CLIFFORD CHANCE submissions of 7 June 2022, No. 80 et seq. pgs. 39 et seq.

### H. LEXINGTON'S APPLICATION FOR VOLUNTARY INTERVENTION

266.    By application of 9 February 2023, LEXINGTON intended to intervene voluntarily in the proceedings "*on a purely conservatory basis*[321]" in the action for fraud.

267.    The arguments developed in the declaratory action in relation to the lack of legal capacity and standing on the part of LEXINGTON are repeated here, in that LEXINGTON is not a creditor of BLUE SKYE LUX and that it clearly no longer appears to hold the Class B TPECs and to be in that capacity a creditor of LIC 159[322]. As a result, LEXINGTON's claims should be declared inadmissible, as it was unable to establish its legal capacity and standing in bringing the action.

268.    Moreover, it should be noted that by means of protective intervention, the third party "*intervenes on a protective basis, to preserve* its *interests, by joining the party to which its interests are linked. It takes up the cause of that party and supports it in its arguments, but without anyone soliciting an advantage*[323]" (emphasis added).


Indeed, if in the first part of its developments LEXINGTON takes up the cause of PROJECT REDBLACK and ROSSONERI SPORT[324], in the second part of its developments, it concludes that the counterclaims made by PROJECT REDBLACK and ROSSONERI for an order that BLUE SKYE reimburse PROJECT REDBLACK for management fees, assessed at EUR 16.5 million on the grounds that "*any pecuniary condemnation of BLUE SKYE and/or LIC 159 would cause prejudice to LEXINGTON, insofar as it would become impossible for it to collect the total sum due to it under the LEXINGTON TPECs* [the Class E-1 TPECs] *if the financial position of BLUE SKYE and/or LIC 159 were to deteriorate, in particular as a result of the reduction in assets*[325]".

269.    It must therefore be noted that LEXINGTON claims to act in support of the interests of PROJECT REDBLACK and ROSSONERI SPORT when this also suits its interests, and, conversely, opposes the requests of these two entities when they run counter to its interests and place it at a disadvantage. Consequently, the present voluntary intervention by LEXINGTON in Court Register No. TAL-2022-07361 must be declared inadmissible, since LEXINGTON remains in default of taking up the cause of the parties to whom it is linking its interests, namely PROJECT REBLACK and ROSSONERI, and, by the same token, is seeking and pursuing, without even concealing it, a personal advantage.

270.    In the event that Your Court were to reclassify the present protective intervention as an active intervention - *quod non* -, LEXINGTON's voluntary intervention in the proceedings would in any event have to be declared inadmissible by way of an active intervention. Even if the intervening third party can assert its own rights, it remains obliged to take up the defence of the principal respondent[326], which LEXINGTON remains in default of doing in its application for voluntary intervention of 9 February 2023, since it serves its interests alone.

---

[321]    Application for voluntary intervention of 9 February 2023, No. 50, p. 24
[322]    See above, paragraph 125.
[323]    Court of Appeals, 7 May 2008, Court Register No. 31679; T. HOSCHEIT, *op. cit*, no. 1139, p. 641.
[324]    Application for voluntary intervention of 9 February 2023, No. 45 et seq., pgs. 23 et seq.
[325]    Application for voluntary intervention of 9 February 2023, No. 51 et seq., p. 25
[326]    T. HOSCHEIT, *op. cit.*, no. 1139, p. 641

### I.     WITHDRAWAL OF PROCEEDINGS

271.   By lawyer-to-lawyer deed of 22 September 2025[327], the Claimants have notified MILAN ENTERTAINMENT and MILAN REAL ESTATE to purely and simply discontinue the proceedings pending before Your Court under Court Register number TAL-2022-07361.

272.   The Claimants therefore ask Your Court to take note of their withdrawal of proceedings pending before Your Court under Court Register No. TAL-2022-07361, it being specified that the said withdrawals relate solely to the claims brought by BLUE SKYE LUX and LIC 159 against MILAN ENTERTAINMENT and MILAN REAL ESTATE under the aforementioned writ of summons issued by bailiff Guy ENGEL on 27 June 2022.

### J.     ON THE CLAIMS FOR PROCEDURAL DAMAGES

273.   In their various pleadings, the Respondents request that BLUE SKYE and LIC 159 be ordered to pay damages, costs and expenses.

274.   As explained above, all the pleas of inadmissibility put forward by the Respondents must be rejected, as that the parties must first conclude on the merits.

275.   In these circumstances, the defendants' claims for procedural damages, which are opposed by BLUE SKYE and LIC 159, should be reserved for when judgement is made on the merits of this case.

276.   The same applies to BLUE SKYE LUX and LIC 159's claims for an order against Respondents 1) to 7) and 9) to 13) to jointly and severally, otherwise *in solidum*, otherwise each for the whole, pay a procedural indemnity under Article 240 of the NCPC to each of the Claimants individually, assessed at EUR 50,000 for the sums they have incurred and not included in the costs, whereas it would be unfair to leave them to bear their own costs, the present proceedings having been initiated solely as a result of the fraud perpetrated by Respondents 1) to 7) and 9) to 13).

277.   In the event that your court were to uphold the pleas of inadmissibility raised by the Respondents, BLUE SKYE LUX and LIC 159 object to these requests, even though it is clear from the foregoing that they are not justified in any way by equity, and that the present proceedings had to be initiated by the Claimants solely because of the fraudulent conduct of the Respondents.

278.   For this reason, the application by BLUE SKYE LUX and LIC 159 for an order that Respondents 1 to 7) and 9) to 13) jointly and severally, otherwise *in solidum*, otherwise each for the whole, pay procedural damages under Article 240 of the NCPC to each of the Claimants individually, assessed at EUR 100,000 for the sums incurred by them and not included in the costs, whereas it would be unfair to leave them to bear their own costs, the present proceedings having been initiated solely as a result of the fraud perpetrated by Respondents 1) to 7) and 9) to 13).

---

[327]   **Court Register No. TAL-2022-07361, Exhibits 98 and 7 of MOLITOR's File III** – cited above; **Court Register No. TAL-2022-07355, Exhibits 98 and 7 of MOLITOR's File III** – cited above; **Court Register No. TAL-2023-04206, Exhibits 98 and 7 of MOLITOR's File III** – cited above.

279.    BLUE SKYE LUX and LIC 159 expressly reserve the right to increase this claim during the course of the proceedings.

280.    On the claims against MILAN ENTERTAINMENT and MILAN REAL ESTATE, they must be dismissed as moot because the proceedings have been discontinued.

281.    As regards the application for MILAN ENTERTAINMENT and MILAN REAL ESTATE to be ordered to pay a procedural indemnity on the basis of Article 240 of the NCPC, it is, in any event, to be dismissed insofar as it expressly states that it covers "the lawyers' costs that the concluding parties have had to incur in relation to proceedings in which the assistance of an avocat à la Cour (fully qualified lawyer) is mandatory" [328], which are lawyers' fees already covered by its claim for an award of damages resulting from their lawyers' fees and costs on the basis of Article 1382 of the Civil Code[329].

282.    An order that the Claimants pay the costs and legal fees of MILAN ENTERAINMENT and MILAN REAL ESTATE under both Article 240 of the NCPC and Article 1382 of the Civil Code would in fact amount to "covering the same expense twice and thus giving rise to an undue gain[330]".


### K. LEGAL FEES

283.    Mr. CRACA[331], AC MILAN, MILAN ENTERTAINMENT and MILAN REAL ESTATE[332] request that BLUE SKYE and LIC 159 be ordered to pay damages resulting from their legal costs and fees on the basis of the provisions of Article 1382 of the Civil Code.

284.    The claims of MILAN ENTERTAINMENT and MILAN REAL ESTATE are to be dismissed as moot due to the withdrawal of proceedings.

285.    In any event, as set out above, all the pleas of inadmissibility raised by the Respondents must be rejected and the parties must now conclude on the merits.

286.    In the event that Your Court were to uphold the pleas of inadmissibility raised by Mr CRACA, AC MILAN, MILAN ENTERAINMENT and MILAN REAL ESTATE, BLUE SKYE LUX and LIC 159 object to the request that they be ordered to pay their legal fees, as no fault can be attributed to the Claimants.

287.    Indeed, the right to take legal action in order to be heard by a judge on the merits of a dispute is a fundamental right, the exercise of which can only engage the liability of the person exercising it in the event of abuse resulting from malicious intent, gross negligence equivalent to fraud, or culpable negligence[333].

---

[328]    **Court Register No. TAL-2022-07361,** submissions of Maître Bertrand CHRISTMANN of 11 April 2023, p. 8
[329]    **Court Register No. TAL-2022-07361**, submissions of Maître Bertrand CHRISTMANN of 11 April 2023, pgs. 8 et seq.
[330]    T. HOSCHEIT, *op. cit.*, no. 1215, p. 674
[331]    **Court Register No. TAL-2022-07361**, submissions of Maître Bertrand CHRISTMANN of 11 April 2023, p. 4.
[332]    **Court Register No. TAL-2022-07361**, submissions of Maître Bertrand CHRISTMANN of 25 September 2023, pgs. 8 et seq.
[333]    Court of Appeal, 19 January 2023, *op. cit.*

288. Mr CRACA, AC MILAN, MILAN ENTERAINMENT and MILAN REAL ESTATE have
failed to establish such fault on the part of the Claimants, who had to bring the present action
solely because of the fraudulent conduct of the Respondents. The claims of Mr CRACA, AC
MILAN, MILAN ENTERAINMENT and MILAN REAL ESTATE for an order that the Claimants pay
their legal fees on the basis of Article 1382 of the Civil Code should therefore be dismissed.

289. BLUE SKYE and LIC 159 object to this request, pointing out in particular that it is not within the
jurisdiction of the pre-trial judge to rule on claims for damages based on Article 1382 of the Civil
Code, as this jurisdiction relates to the merits of the case and is therefore not covered by Article
212 of the NCPC.

290. On the other hand, it follows from the considerations of fact and law set out above that BLUE
SKYE LUX and LIC 159 are entitled to seek an order that Respondents 1) to 7) and 9) to 13)
reimburse the lawyers' fees and expenses incurred by them in the context of the present
proceedings, whereas, ever since the judgement of the Court of Cassation of 9 February 2012, it
is now accepted that lawyers' fees may constitute compensable loss[334].

291. This claim may be combined with a claim for damages based on Article 240 of the NCPC, provided that
that the requirements for such compensation are met, i.e. fault, loss and a causal relationship
between the fault and the loss:

"The fact that Article 240 of the New Code of Civil Procedure allows the judge, on the basis of
equity, to award a party a certain amount in respect of sums not included in the costs, including
lawyers' fees, does not prevent a party from claiming these fees as compensation for its loss on
the basis of contractual or criminal liability, provided that it can establish the elements on which
such compensation depends, namely fault, loss and a causal relationship between the fault and
the loss (see Jurisclasseur Proc. civ. fasc. 524, Nos. 6 et seq)[335]".

292. The doctrine establishes that:

"It is an ineradicable principle of law that the damage resulting from a fault, whatever it may be,
must be repaired by the perpetrator of the fault and that this repair must be total. However,
defence costs clearly constitute compensable damage and the victim will not receive full
compensation if these defence costs are deducted or if it has cost the litigant to have its rights
recognised. The right to full compensation for damages justifies the repeatability of defence costs,
including lawyers' fees (*Devoirs et Prérogatives de l'Avocat* [Duties and Prerogatives of the
Lawyer], Cléo Leclerq, ed. 1999, No. 76) (see Trib. arr. XI, 25 March 2004, SES/Whitehead, Court
Register No. 64095)"[336].

293. It is clear from the facts set out above that Respondents 1) to 7) and 9) to 13) all participated in
the fraud perpetrated on the Claimants, forcing the latter to apply to the Court to have their rights
recognised.

294. By virtue of the principle of full reparation, the Claimants are entitled to reimbursement of the legal
costs incurred in obtaining recognition of their rights.

---

[334]   Court of Appeal, 9 February 2012, JTL, No. 20, 2012, p. 190.
[335]   Court of Appeal, 5 December 2018, *Pas,* 39, p. 287.
[336]   Court of Appeal, 4 January 2012, *Pas,* 35, p. 848.

295.    The Claimants are therefore entitled to request that Respondents 1) to 7) and 9) be ordered, jointly and severally, otherwise *in solidum*, otherwise each for its share, to individually pay to each of them, the sum provisionally assessed at EUR 100,000 in respect of legal costs and fees incurred by them on the basis of Articles 1382 or 1383 of the Civil Code.

296.    The Claimants expressly reserve the right to increase this claim in the course of the proceedings.

### III.    TAL-2023-04206: Civil liability action against Mr CERCHIONE, Mr D'AVANZO and Mr CASLINI

297.    Mr CERCHIONE and Mr D'AVANZO raise, *in limine litis*, before any plea in defence on the merits, and as their principal claim, the nullity, otherwise the inadmissibility, of the writ initiating proceedings served on them on 2 March 2023 at the request of PROJECT REDBLACK and ROSSONERI SPORT, because of the obscure wording of the said initiating writ (*exceptio obscuri libelli*), in contravention of Article 154 of the New Code of Civil Procedure (**A**).

Mr CERCHIONE and Mr D'AVANZO will take a subsidiary position, in the event that the writ initiating proceedings is not affected by nullity for obscure wording, on the admissibility of the claims of PROJECT REDBLACK and ROSSONERI SPORT (**B**).

298.    Mr CERCHIONE and Mr D'AVANZO will only take a position on the merits of the present dispute at a later date, and only if, in such a case, the writ of summons issued by PROJECT REDBLACK and ROSSONERI SPORT is declared admissible and the Court agrees to consider the merits of the case.

299.    Mr CERCHIONE and Mr D'AVANZO will make a counterclaim for damages for abusive and vexatious proceedings (**C**).

300.    Mr CERCHIONE's and Mr D'AVANZO's claims for procedural damages will then be explained.

### A.    IN LIMINE LITIS, PRINCIPALLY, NULLITY, IF NOT INADMISSIBILITY, OF THE WRIT OF SUMMONS FOR OBSCURE WORDING

301.    Among the formal requirements that Article 154 of the NCPC imposes on the validity of a writ of summons, this provision provides in particular that "*the writ of summons must contain: 1) the subject-matter and a summary statement of the pleas, [...] if not, it will be null*".

302.    The case law on the plea of obscure wording can be summarised as follows (emphasis added):

"*While the statement of pleas may be summary, it must nevertheless be sufficiently **precise** to put the judge in a position to determine the legal basis of the claim, not to allow the respondent to misunderstand the object of the claim and to enable him to choose the appropriate pleas in defence.*

*To the same extent, **the subject-matter of the claim must be specified** in such a way as to enable the defendant to appreciate its scope and to know precisely what is being asked of him and on what capacity, what title, what grounds the plaintiff relies.*

*Indeed, the **wording of the claim** brought against the opposing party must be stated **explicitly** so as to **determine** and **delimit** the initial subject matter of the dispute. This not only enables the respondent to prepare its defence knowingly, but also allows the court to precisely know the dispute before it so that it may rule on the merits.*

*The requirement of clarity includes the obligation for the claimant to **set out the facts** underlying the dispute in an **intelligible** manner, i.e., in a way that is **structured** so as not to give rise to **ambiguity**.*

*It is not necessary, in order to satisfy the requirements of the aforementioned Article 154 of the New Code of Civil Procedure, to indicate the legal text on which the action is based, i.e. to legally qualify the claim.*

*It is nevertheless essential that the writ be drafted in such a way that the texts referred to are at least implicitly clear from it"* [337].

303.    A writ initiating proceedings must be clear, precise, intelligible, unequivocal, explicit and unambiguous.

The rationale behind such requirements is to allow the defendant to choose the appropriate pleas to defend the claim made by the opposing party.

304.    The rule of immutability of the dispute prevents the claimant from curing the irregularity by means of subsequent pleadings or by referring to earlier acts[338].

305.    It must be acknowledged that the writ of summons served on Mr CERCHIONE and Mr D'AVANZO does not satisfy the requirements of Article 154 of the NCPC for the reasons set out below.

## 1.    Failure of the writ of summons to comply with the requirements of Article 154 of the New Code of Civil Procedure

306.    The form of the writ of summons, the "subject matter" of the claim and the "summary statement of grounds" are confusing and show a clear lack of coherence and clarity.

### 1.1    On the obscurities and inconsistencies in the actual form of the writ initiating proceedings

307.    The writ of summons of 2 March 2023 states that it is first and foremost a writ of summons. However, PROJECT REDBLACK and ROSSONERI SPORT, in their submissions, constantly refer to the writ of 27 June 2022 bearing Court Register No. TAL-2022-07361 and initiated by BLUE SKYE LUX and LIC159, a writ which they do not submit to the present proceedings.

---

[337]    TAL, 17 November 2022, No. TAL-2020-04008 and TAL-2021-02330 of the Court Register
[338]    Court Register, 29 March 2022, No. CAL-2020-00305 of the Court Register

308. The developments of PROJECT REDBLACK and ROSSONERI SPORT are limited to contesting the assertions made by BLUE SKYE LUX and LIC 159 in their writ of summons of 27 June 2022 and to requesting the joint, otherwise *in solidum,* sentencing of Mr CERCHIONE and Mr D'AVANZO.

309. In their operative part, PROJECT REDBLACK and ROSSONERI SPORT even include claims for judgement against BLUE SKYE LUX and LIC 159, even though the latter are not parties to the proceedings[339].

310. Mr CERCHIONE and Mr D'AVANZO are therefore unable to identify whether the writ of summons of 2 March 2023 actually constitutes a writ of summons, or if it is a summons for compulsory intervention in Court Register No. TAL-2022-07361, or even submissions in response to the writ of summons of 27 June 2022, or, consequently, to determine the subject matter of the present proceedings.

## 1.2    On the obscurities and inconsistencies in the statement of facts

311. In accordance with Article 154 of the NCPC, the statement of facts must be intelligible, structured and unequivocal[340]. It is therefore regularly recalled by the courts and tribunals that *"the requirement of clarity in the presentation of the grounds includes the obligation for the claimant to set out the facts underlying the dispute in a clear and intelligible manner, and that they must be structured in such a way as not to give rise to ambiguity"*[341].

312. In their writ of summons of 2 March 2023, PROJECT REDBLACK and ROSSONERI SPORT merely refer to the facts alleged against BLUE SKYE LUX and LIC 159 and to the writ of summons of 27 June 2022 in the proceedings bearing Court Register No. TAL-2022-07361.

313. However, Mr CERCHIONE and Mr D'AVANZO do not appear as parties to the writ of summons of 27 June 2022 and PROJECT REDBLACK and ROSSONERI SPORT have still not submitted that writ of summons to the present proceedings. Mr CERCHIONE and Mr D'AVANZO are therefore not in a position to know the facts alleged against BLUE SKYE LUX and LIC 159 to which PROJECT REDBLACK and ROSSONERI SPORT refer.

314. No reproach is made against Mr CERCHIONE and Mr D'AVANZO, other than being "limited partners" of BLUE SKYE LUX and LIC 159[342], or associates of BLUE SKYE LUX[343]. It is not clear from the wording of the facts whether PROJECT REDBLACK and ROSSONERI SPORT are criticising Mr CERCHIONE and Mr D'AVANZO in their capacity as partners or directors. In any event, neither of these qualities constitutes a fault in itself.

315. Mr CERCHIONE and Mr D'AVANZO are therefore not in a position to understand the facts of which they are accused and consequently to organise their defence.

---

[339]   **Court Register No. TAL-2023-04206**, writ of summons of 2 March 2023, pgs. 15 et seq.

[340]   TAL, 17 November 2022, *op. cit.*

[341]   TAL, 9 May 2018, Nos. 171820, 171961, 171962, 175433, 176025 and 176026; Court of Appeal, 8 April 1998, No. 20062 of the Court Register; Court of Appeal, 19 December 2000, No. 24212 of the Court Register; see also T. HOSCHEIT, *op. cit.*, No. 358, p. 238

[342]   Court Register No. TAL-2023-04206, writ of summons of 02 March 2023, p. 3.

[343]   Court Register No. TAL-2023-04206, writ of summons of 02 March 2023, p. 4.

### 1.3    On the absence of legal grounds

316.    The writ of summons of 2 March 2023 only contains factual developments and not legal developments. Thus, Mr CERCHIONE and Mr D'AVANZO, in addition to not knowing the facts of which they are accused, do not know what offence they are alleged to have committed.

317.    PROJECT REDBLACK and ROSSONERI SPORT do not specify whether they intend to hold Mr CERCHIONE and Mr D'AVANZO liable in contract or tort.

318.    The lack of legal grounds also makes it impossible to understand whether Mr CERCHIONE and Mr D'AVANZO are being held liable in their capacity as partners or directors.

319.    While it is not required that they state the statute on which the action is founded in the title of the writ of summons[344], "[i]t is nonetheless essential that the writ be drafted in such a way that the texts referred to emerge from it, at least implicitly"[345].

320.    As explained above, the writ is not drafted in such a way that the texts referred to can be implicitly inferred from it, nor are the texts referred to explicitly. As a result, Mr CERCHIONE and Mr D'AVANZO, and Your Tribunal, are unable to identify them.

### 1.4    On the completely vague nature of the purpose of the request

321.    The purpose of the request must be "stated clearly and completely[346]". It must be "precise" to enable the defendant "to appreciate its scope and to know precisely what is being asked of him and on what capacity, what title, what grounds the plaintiff relies[347]". Such must be the case, as "[i]t is the writ initiating proceedings which circumscribes the relationship of proceedings in its constituent elements (the parties, the subject-matter and the cause of the claim)"[348].

322.    It must be said that the operative part is neither clear nor complete. Another confusing aspect is the liability sought by PROJECT REDBLACK and ROSSONERI SPORT against Mr CERCHIONE and Mr D'AVANZO. It confines itself to requesting that Your Tribunal *give notice to Project Redblack of its claim against Blue Skye based on the rules governing contractual liability, otherwise, in the alternative, in tort in its submissions of 31 October 2022 in the proceedings registered under Court Register No. TAL-2022-07361"*[349], without any mention being made of Mr CERCHIONE or Mr D'AVANZO and even though BLUE SKYE is not a party to these proceedings.

---

[344]    Court Register, 16 June 2004, No. 28385.

[345]    T. HOSCHEIT, *op. cit,* No. 358, p. 239.

[346]    TAL, 17 November 2022, *op. cit.*

[347]    *Ibidem*

[348]    TAL, 28 February 2018, Court Register No. 179095

[349]    Court Register No. TAL-2023-04206, writ of summons of 02 March 2023, p. 15.

323. Still in their operative part, and without specifying whether the claim is based on contractual or tort liability, PROJECT REDBLACK and ROSSONERI SPORT request that Your Court "*recognise, against assignees 1)* [Mr CERCHIONE] *and 2)* [Mr D'AVANZO], *conduct constituting manifest abuse*"[350] (emphasis added). However, the vague notion of 'manifest abuse' constitutes neither a legal concept nor an offence provided for in the Civil Code. Nor is it supported by factual considerations in relation to the developments in the writ of summons of 2 March 2023. The liability of Mr CERCHIONE and Mr D'AVANZO cannot be incurred without fault, which is a *"fundamental principle of civil liability, its generating factor and the basis for the right to compensation. If there is no fault, the liability of Articles 1382 and 1383 of the Civil Code cannot be brought into play* "[351].

324. A special tort liability regime applies to the liability of directors towards third parties, and PROJECT REDBLACK and ROSSONERI SPORT are necessarily third parties, although no contractual commitment exists between them and Mr CERCHIONE and Mr D'AVANZO. This special regime, which PROJECT REDBLACK and ROSSONERI SPORT fail to invoke since their summons of 2 March 2023 contains no legal argument whatsoever, requires not only fault of some kind, but that of a "*reasonable person, but also a personal fault that is separable or distinguishable from the performance of the functions*"[352]. As stated above, PROJECT REDBLACK and ROSSONERI SPORT do not refer to any misconduct on the part of Mr CERCHIONE and Mr D'AVANZO, and even less to any misconduct originating from their duties.

325. Finally, if the writ of summons of 2 March 2023 did indeed constitute a writ of summons and not summons to intervene, Mr CERCHIONE and Mr D'AVANZO do not see how they could be ordered jointly and severally, otherwise *in solidum*, along with persons who are not parties to the proceedings, in this case BLUE SKYE LUX and LIC159, all without any other fault being attributed to them, except for being directors of these companies, a function which does not constitute fault.

326. The request for a joint and several judgement with LIC 159 is moreover devoid of any logic, given that LIC 159 is not a party to the present proceedings, that no request for judgement is made against LIC 159 in the writ of summons of 2 March 2023 and that Mr CERCHIONE and Mr D'AVANZO are not directors of that company.

327. On the request for an order for the joint and several liability, otherwise *in solidum,* of Mr CERCHIONE and Mr D'AVANZO, along with BLUE SKYE and LIC 159, to pay damages to ROSSONERI SPORT for an amount provisionally assessed at EUR 100,000, this also makes no sense, as unlike PROJECT REDBLACK, ROSSONERI SPORT does not mention in the operative part any request for an order against BLUE SKYE LUX and LIC 159.

2. **Meeting the conditions set out in Article 264 of the NCPC and nullity of the writ of summons**

328. The plea of obscure wording is a nullity of pure form subject to the cumulative conditions of Article 264 of the NCPC[353].

---

[350] *Ibidem*, p. 15
[351] G. RAVARANI, *op. cit.*, p. 57, No. 51
[352] G. RAVARANI, *op. cit.*, p. 650, No. 632; Lux., 12 July 2013, II No. 1417/2013
[353] T. HOSCHEIT, *op. cit.*, No. 348, p. 233.

329.   In accordance with Article 264 of the NCPC, a plea of nullity, in order to be admissible, must be raised *in limine litis*, and, in order to be well founded, requires the respondent to demonstrate that the lack of clarity in the act has caused them harm[354].

330.   The *exceptio obscuri libelli* was indeed raised by Mr CERCHIONE and Mr D'AVANZO at the beginning of the proceedings, meaning that it is admissible, in accordance with paragraph 1 of Article 264 of the NCPC.

331.   The second condition is set out in paragraph 2 of Article 264 of the NCPC, which reads as follows: *[a]ny nullity for formal defects in writs or procedural documents may be declared unless it is shown that failure to observe the formality, even if substantial, has **harmed the interests of the opposing party**"* (emphasis added).

332.   Case law has explicitly enshrined the fact that "*[t]he terms ″harming the interests″ are considered synonymous with ″causing prejudice ″*"[355], and that the concept of grievance "referred to in Article 264 paragraph 2 of the New Code of Civil Procedure does not include any restriction"[356]. The Court of Cassation has inferred from this that the appellate judges may, in the exercise of their sovereign discretion, find that the nullity of an appeal—arising from the absence of a statement of grounds—causes prejudice to the opposing party in that it creates an obstacle or even a mere hindrance, provided that it is real, to the organisation of the opponent's defence, **thus making it impossible for them to properly prepare their defence, even if this impossibility is not absolute**" (emphasis added).

333.   In particular, it has been held that "*[t]he claim of which the defendant must provide concrete proof, without being able merely to invoke its existence in the abstract, may be of various kinds. It generally lies in the obstruction or hindrance of the organisation of the defence by making it impossible for the defendant to organise their defence or choose appropriate pleas"*[357].

334.   It follows from the above that Mr CERCHIONE and Mr D'AVANZO are not in a position to usefully prepare their defence - which is therefore disorganised - as the terms of the writ of summons of 2 March 2023 do not enable them to know the exact matter of the claims against them, nor the pleas in law that could lead to them being held liable, with the result that Mr CERCHIONE and Mr D'AVANZO suffer prejudice within the meaning of Article 264 of the NCPC.

335.   The writ of summons of 2 March 2023 does not contain any precise description of Mr CERCHIONE's and Mr D'AVANZO's breaches. It confines itself to contesting the pleas in the writ of 27 June 2022 and to invoking the liability of BLUE SKYE LUX and LIC159, which are not even parties to the proceedings. This deficiency is such as to render the writ of summons of 2 March 2023 void, since it is impossible to establish a legal connection between the subject matter of the claim and any act or omission allegedly committed by Mr CERCHIONE or Mr D'AVANZO[358].

336.   The writ of summons contains no further reference to alleged conduct consisting in "manifest abuse" on the part of Mr CERCHIONE and Mr D'AVANZO.

---

[354]   TAL, 9 May 2018, *op. cit.*
[355]   TAL, 2 May 2012, No. 136532
[356]   Cour de cassation, 20 March 2003, *Pas.* 32, p. 365
[357]   TAL, 9 May 2018, *op. cit.*
[358]   TAL, 9 May 2018, *op. cit.*

337.  The writ of summons of 2 March 2023 also fails to establish the respective liability of each of the respondent parties and fails to provide the slightest explanation of the joint and several liability of BLUE SKYE LUX, LIC 159, who are not parties to the proceedings, and Mr CERCHIONE and Mr D'AVANZO.

338.  Lastly, the writ of summons of 2 March 2023 fails to break down its claims against BLUE SKYE LUX, LIC 159, Mr CERCHIONE and Mr D'AVANZO, for the payment of global sums, while the joint and several liability between the aforementioned parties still fails to be justified by PROJECT REDBLACK and ROSSONERI SPORT and cannot, in any event, be met.

339.  In the light of all the foregoing considerations, the formal nullity of the writ initiating proceedings on the grounds of obscure wording should be declared based on Articles 154 and 264 of the NCPC.

### 5.  As to the jurisdiction of the pre-trial judge

340.  The plea of obscure wording constitutes grounds for nullity[359].

341.  As grounds for nullity, the plea of obscure wording falls within the sole jurisdiction of the pre-trial judge, in accordance with Article 212 of the NCPC:

> *"Where the application is lodged after his appointment, the pre-trial judge shall, until he relinquishes jurisdiction, <u>have exclusive jurisdiction</u>, to the exclusion of any other formation of the court, to:*
> *(a) rule on pleas of lack of jurisdiction, <u>nullity</u> and dilatory pleas; with the exception of pleas based on public-order grounds, the parties shall raise such pleas in their first submissions or as soon as they come to light if they were to come to light after their first submissions. After such a plea has been submitted, each of the parties to the proceedings shall take a position on that plea at least twice at most, the submission of the plea being equivalent to a pleading, before the pre-trial judge rules, [...]"* (emphasis added).

342.  The plea of obscure wording raised by Mr CERCHIONE and Mr D'AVANZO therefore falls within the sole jurisdiction of the pre-trial judge and will in fact have to be decided by a separate order of the pre-trial judge limited to this plea of nullity.

### B.  IN THE ALTERNATIVE, NULLITY OR INADMISSIBILITY OF THE CLAIMS OF PROJECT REDBLACK AND ROSSONERI SPORT FOR BREACH OF THE ADVERSARIAL PRINCIPLE

343.  In the alternative, in the event that Your Court were to rule that the plea of obscure wording could not be upheld, quod non, the claims of PROJECT REDBLACK and ROSSONERI SPORT should be declared null, otherwise inadmissible, for breach of the adversarial principle.

---

[359]    T. HOSCHEIT, *op. cit.*, No. 348, p. 233.

**1. Nullity, otherwise inadmissibility, of the claims against BLUE SKYE LUX and LIC 159**

344. Throughout their writ of summons of 2 March 2023, PROJECT REDBLACK and ROSSONERI SPORT refer to the facts alleged against BLUE SKYE LUX.

345. For its operative part, PROJECT REDBLACK and ROSSONERI SPORT make the following claims against BLUE SYKE LUX and LIC 159:

> "give notice to Project Redblack of its claim against Blue Skye based on the rules governing contractual liability, otherwise, in the alternative, tort liability, in its submissions of 31 October 2022 in the proceedings registered under Court Register No. TAL-2022-07361,
>
> [...]
>
> In this regard, order Giovanni Caslini and Blue Skye to disclose all agreements binding them and that relate, in one way or another, with the exercise of Giovanni Caslini's mandate as manager of Project Redblack and, previously, of Rossoneri Sport, irrespective of whether these agreements were concluded specifically in relation to the mandates of Giovanni Caslini within the two companies referred to or not"[360].

346. PROJECT REDBLACK and ROSSONERI SPORT are also claiming joint and several liability, otherwise *in solidum*, against BLUE SKYE LUX, LIC 159 and the respondents to the proceedings.

347. In their writ of summons of 2 March 2023, PROJECT REDBLACK and ROSSONERI SPORT submitted claims for judgment against companies that were not parties to their writ of summons.

348. Neither BLUE SKYE LUX nor LIC 159 are in a position to defend themselves in these proceedings. The claims brought by PROJECT REDBLACK and ROSSONERI SPORT against them are therefore made in breach of the principle of adversarial proceedings as guaranteed by Article 63 of the NCPC and Article 6(1) of the Convention for the Protection of Human Rights and Fundamental Freedoms.

349. However, the adversarial principle is inherent in judicial proceedings, as it constitutes one of the pillars of a fair trial and of respect for the rights of the defence. Without adversarial exchange— meaning that each party must at all times be informed of the procedural steps taken by the other actors involved, whether by its opponents, the judges or other participants in the proceedings— the action cannot enjoy the credibility and acceptance necessary to ensure its own legitimacy and that of the final decision"[361], "breach of these principles entails the nullity of the decision"[362].

350. Case law accepts "that a claim is inadmissible if it contravenes the principle of adversarial proceedings enshrined in Article 63 of the New Code of Civil Procedure"[363].

---

[360]    Writ of summons of 02 March 2023, p. 15.
[361]    T. HOSCHEIT, *op. cit.*, No. 47, pgs. 82 and 83.
[362]    Cour de cassation, 30 May 2024, No. CAS-2023-00139 of the register.
[363]    TAL, 2 May 2015, No. TAL-2024-01042 and No.TAL-2024-06480 of the Court Register; Court of Appeal, 10 July 2002, No. 23054, No. 24097 and No.26382 of the Court Register, *BIJ* 02/2004, p. 27.

351.    As the claims of PROJECT REDBLACK and ROSSONERI SPORT against BLUE SKYE LUX and LIC 159 were made in breach of the adversarial principle, they should be declared null and void or inadmissible.

**2. Nullity or inadmissibility of the joint and several claims against Mr CERCHIONE and Mr D'AVANZO**

352.    The claims made by PROJECT REDBLACK and ROSSONERI SPORT against Mr CERCHIONE and Mr D'AVANZO under their writ of summons of 2 March 2023 relate to claims for joint and several condemnations for the faults allegedly committed by BLUE SKYE LUX and LIC 159.

353.    As indicated above, it is appropriate to conclude that the claims against BLUE SKYE LUX and LIC 159 relating to the writ of summons of 2 March 2023 are null and void, otherwise inadmissible, for breach of the adversarial principle, BLUE SKYE LUX and LIC 159 not being parties to the present proceedings.

354.    As a result, Mr CERCHIONE and Mr D'AVANZO cannot be held jointly and severally liable for claims against BLUE SKYE LUX and LIC 159 that are invalid or inadmissible.

355.    There are therefore grounds for concluding that the claims of PROJECT REDBLACK and ROSSONERI SPORT against Mr CERCHIONE and Mr D'AVANZO in their writ of summons of 2 March 2023 are null and void, otherwise inadmissible.

**C. *IN A DIFFERENT ORDER OF SUBSIDIARITY, INADMISSIBILITY OF THE CLAIMS OF PROJECT REDBLACK AND ROSSONERI SPORT FOR LACK OF LEGAL CAPACITY TO BRING PROCEEDINGS***

356.    In the event that Your Court were to hold that the plea of obscure wording does not apply and that the writ of summons of 2 March 2023 is not null, otherwise inadmissible, for breach of the adversarial principle, *quod non*, PROJECT REDBLACK's and ROSSONERI SPORT's liability claims against Mr CERCHIONE and Mr D'AVANZO should, in any event, be deemed null and void for lack of legal capacity to sue on behalf of PROJECT REDBLACK and ROSSONERI SPORT.

357.    PROJECT REDBLACK and ROSSONERI SPORT limit themselves to asking Your Court to take note of their claim against BLUE SKYE LUX and LIC 159 "based on the rules governing contractual liability, in the alternative tort liability, in its submissions of 31 October 2022" and therefore "declare that Blue Skye acted at the instigation of its sponsors [Mr CERCHIONE and Mr D'AVANZO][364] ".

358.    This wording does not allow Mr CERCHIONE and Mr D'AVANZO to rule out the possibility that PROJECT REDBLACK and ROSSONERI SPORT intend to pursue their contractual liability.

---

[364]    Writ of summons of 02 March 2023, p. 15.

359. The reference made by PROJECT REDBLACK and ROSSONERI SPORT to the notion of "limited partners" seem to imply that they intended to hold Mr CERCHIONE and Mr D'AVANZO liable in their capacity as directors of BLUE SKYE and LIC 159.

360. Contractual liability presupposes the existence of a contract between the claimant and the respondent to the action.

361. In terms of directors' liability, "contractual liability is based on the non-performance or improper performance of a mandate agreement. Tort liability requires the existence of damage arising from a juridical act between two persons who are not contracting parties. Vis-à-vis the company, as well as the partners, the liability of the directors is therefore contractual; as no mandate binds the directors to third parties, the liability of the directors to third parties is exclusively tortious in nature"[365].

362. As PROJECT REDBLACK and ROSSONERI SPORT are neither creditors of BLUE SKYE LUX or LIC 159 (on the contrary, they are their debtors), nor shareholders in these companies, they are therefore third parties and cannot claim non-performance or poor performance of a mandate agreement against Mr CERCHIONE and Mr D'AVANZO.

363. PROJECT REDBLACK and ROSSONERI SPORT therefore do not have the capacity to bring an action for contractual liability against Mr CERCHIONE and Mr D'AVANZO, contractual liability being a personalised form of liability[366] available only to the contracting parties themselves.

364. Lack of legal capacity on the part of the claimants in the action constitutes a defect affecting the conditions of existence of the action and results in its inadmissibility, in that it constitutes a plea of inadmissibility.

365. Pleas of inadmissibility may be raised at any stage of the proceedings, there is no obligation to raise it before any debate, nor is there any obligation to show that the rights of the opposing party have been infringed in order for it to be upheld[367].

366. Under these circumstances, it is therefore necessary to conclude that PROJECT REDBLACK and ROSSONERI SPORT's claim for contractual liability against Mr CERCHIONE and Mr D'AVANZO is inadmissible.

### D. APPLICATION FOR AN ORDER THAT PROJECT REDBLACK AND ROSSONERI SPORT PAY COMPENSATION FOR THE PROCEDURAL COSTS

367. It would be inequitable, in light of the circumstances and of the conduct of PROJECT REDBLACK and ROSSONERI SPORT, to leave Mr CERCHIONE and Mr D'AVANZO solely responsible for the unrecoverable costs they have incurred, and must still incur, to safeguard their rights and legitimate interests, which are not included in court costs and judicial expenses proper, such as lawyers' fees and expenses.

---

[365] A. STEICHEN, Précis de droit des sociétés, Éditions Saint-Paul, 6e edition, 2018, No. 381, pgs. 299 and 300.
[366] T. HOSCHEIT, *op. cit.*, No. 1006, p. 574.
[367] T. HOSCHEIT, *op. cit.*, No. 995, p. 566.

368.    This situation is particularly unfair, as it has been demonstrated that these proceedings were brought by PROJECT REDBLACK and ROSSONERI SPORT with the sole aim of exerting pressure on Mr CERCHIONE and Mr D'AVANZO and indirectly on BLUE SKYE LUX and LIC 159, without any real fault being attributed to them.

369.    Mr CERCHIONE and Mr D'AVANZO are therefore entitled to claim that PROJECT REDBLACK and ROSSONERI SPORT be ordered to jointly and severally, otherwise *in solidum*, otherwise each for its share, pay them each individually the sum of EUR 100,000 based on Article 240 of the NCPC.

370.    Mr CERCHIONE and Mr D'AVANZO are also entitled to request that PROJECT REDBLACK and ROSSONERI SPORT be ordered to jointly and severally, otherwise *in solidum*, otherwise each for its share, pay all costs and expenses.

371.    Mr CERCHIONE and Mr D'AVANZO expressly reserve the right to increase this claim during the course of the proceedings.


### E.    APPLICATION FOR AN ORDER THAT PROJECT REDBLACK AND ROSSONERI SPORT PAY DAMAGES FOR ABUSIVE AND VEXATIOUS PROCEEDINGS

372.    In view of the facts of the case, PROJECT REDBLACK and ROSSONERI SPORT should be ordered to jointly and severally, otherwise *in solidum*, otherwise each for its share, pay compensation for abusive and vexatious proceedings in an amount assessed *ex aequo et bony* at EUR 80,000 under Article 6-1 of the Civil Code.

373.    Article 6-1 of the Civil Code provides that "Any act or fact which manifestly exceeds, by the intention of its perpetrator, by its object or by the circumstances in which it occurred, the normal exercise of a right, is not protected by law, engages the liability of its perpetrator and may give rise to an action for cessation to prevent the persistence of the abuse"[368].

374.    Both doctrine and case law recognise that:

"It is accepted that in matters of abuse of procedural rights, an abuse may be committed in the exercise of a legal remedy. The essential question is obviously what constitutes abuse in such cases. It is a delicate matter, as two contradictory imperatives must be taken into account: on the one hand, the freedom to have recourse to justice, so that failure cannot in itself constitute a fault (it would be excessive to punish the slightest error of law).

On the other hand, the need to limit procedural excesses (justice is a public service - free in principle - and must not be abused).

As regards abuse in legal proceedings, it is the rule that a plaintiff who fails in his action and a defendant who is convicted are not considered *ipso facto* to have committed an abuse (Cass. fr., Civ. 1st, 18.5.1949, Bull. Civ, I, No. 175; Soc. 7.1.1955, Gaz. Pal. 1955.1.182; Civ. 2nd, 19.4.1958, Bull. Civ. II, No. 260; Civ. 1st, 8.11.1976, JCP 1976.IV.395; Civ. 2e, 24.6.1987, Bull. Civ. II, No. 137).

---

[368]    TAL, ref, 6 September 2024, Court Register No. TAL-2024-06622.

After previously requiring a malicious attitude, otherwise a gross error equating to fraud, case law has come to require only a simple fault, often referred to as culpable carelessness.

However, it is not enough for the claim to be reckless; it must be procedural behaviour that exceeds the legitimate exercise of the right to take legal action. Penalties should not be imposed for wrongfully taking legal action or unjustly resisting it, since legal action may be freely taken, but only for abusing one's right by committing a fault that is independent of the mere exercise of legal remedies (Court of Appeal, 20 March 1991, Pas. 28, p. 150; Court of Appeal, 17 March 1993, Court Register No. 14446; Court of Appeal, 22 March 1993, Court Register No. 14971, TAL, 9 February 2001, Court Register No. 25/2001). This intentional fault gives rise to civil liability on the part of the claimant towards the respondent, if the latter proves that it has suffered damage (see Court of Appeal, 16 February 1998, Court Register Nos. 21687 and 22631).

It should also be remembered that persistence in defending one's case before the courts and tenacity in seeking to have one's rights respected do not constitute judicial obstinacy - or at least what is regarded as such - being recognised as such (Court of Appeal, 21 March 2002, Court Register No. 25297)"[369].

375. It is clear from the foregoing that these proceedings were initiated by PROJECT REDBLACK and ROSSONERI SPORT with the sole aim of exerting pressure on Mr CERCHIONE and Mr D'AVANZO and indirectly on BLUE SKYE LUX and LIC 159 without any real fault being attributed to them. As previously stated, it is clear that the writ of summons of 2 March 2023 disregards all elementary requirements for drafting a legal document, both in form and substance. PROJECT REDBLACK and ROSSONERI SPORT have not, for example, even bothered to file the pleadings to which they refer, nor to specify the legal grounds violated, nor the faults reproached of Mr CERCHIONE and Mr D'AVANZO, for the simple and good reason that PROJECT REBLACK and ROSSONERI SPORT have, in reality, no reproach they are able to formulate against the latter, and the only goal of this procedure is to exert pressure on Mr CERCHIONE and Mr D'AVANZO.

376. In these circumstances, the attitude of PROJECT REBLACK and ROSSONERI SPORT in these proceedings constitutes an act of malice, otherwise gross error equalling fraud, otherwise culpable carelessness.

377. It is therefore appropriate to order PROJECT REDBLACK and ROSSONERI SPORT to jointly and severally, otherwise *in solidum*, otherwise each for its share, pay compensation for abusive and vexatious proceedings assessed *ex aequo et bono* at EUR 80,000, or any other even higher amount arbitrated by Your Court or according to expert opinion, under article 6-1 of the Civil Code.

---

[369] *Ibidem.*

### F.    APPLICATION TO ORDER PROJECT REDBLACK AND ROSSONERI SPORT TO PAY LEGAL COSTS

378.    It follows from the considerations of fact and law developed above that Mr CERCHIONE and Mr D'AVANZO are entitled to request that PROJECT REDBLACK and ROSSONERI SPORT be ordered to reimburse the legal fees and expenses incurred by them in the context of the present proceedings, whereas since a judgement of the Court of Cassation of 9 February 2012, it is now accepted that lawyers' fees may constitute a compensable loss[370].

379.    This claim may be combined with a claim for damages based on Article 240 of the NCPC, provided that the requirements for such compensation are met, i.e. fault, loss and a causal relationship between the fault and the loss:

"The fact that Article 240 of the New Code of Civil Procedure allows the judge, on the basis of equity, to award a party a certain amount in respect of sums not included in the costs, including lawyers' fees, does not prevent a party from claiming these fees as compensation for its loss on the basis of contractual or criminal liability, provided that it can establish the elements on which such compensation depends, namely fault, loss and a causal relationship between the fault and the loss (see Jurisclasseur Proc. civ. fasc. 524, Nos. 6 et seq)[371]".

380.    The doctrine establishes that:

"It is an ineradicable principle of law that the damage resulting from a fault, whatever it may be, must be repaired by the perpetrator of the fault and that this repair must be total. However, defence costs clearly constitute compensable damage and the victim will not receive full compensation if these defence costs are deducted or if it has cost the litigant to have its rights recognised. The right to full compensation for damages justifies the repeatability of defence costs, including lawyers' fees (*Devoirs et Prérogatives de l'Avocat* [Duties and Prerogatives of the Lawyer], Cléo Leclerq, ed. 1999, No. 76) (see Trib. arr. XI, 25 March 2004, SES/Whitehead, Court Register No. 64095)"[372].

381.    It is sufficiently clear from the developments in point F. above that the attitude of PROJECT REDBLACK and ROSSONERI SPORT at the present time constitutes a fault.

382.    By virtue of the principle of full compensation, Mr CERCHIONE and Mr D'AVANZO are entitled to reimbursement of legal costs incurred as a result of the sole fault of PROJECT REDBLACK and ROSSONERI SPORT.

383.    The Claimants are therefore entitled to request that Respondents 1) to 7) and 9) be ordered, jointly and severally, otherwise *in solidum*, otherwise each for its share, to individually pay to each of them, the sum provisionally assessed at EUR 100,000 in respect of legal costs and fees incurred by them on the basis of Articles 1382 or 1383 of the Civil Code.

384.    Mr CERCHIONE and Mr D'AVANZO expressly reserve the right to increase this claim during the proceedings.

---

[370]    Court of Appeal, 9 February 2012, JTL, No. 20, 2012, p. 190.
[371]    Court of Appeal, 5 December 2018, *Pas,* 39, p. 287.
[372]    Court of Appeal, 4 January 2012, *Pas,* 35, p. 848.

### G.  ON LEXINGTON'S APPLICATION FOR VOLUNTARY INTERVENTION

385.    By application of 9 February 2023, LEXINGTON intends to intervene voluntarily in the proceedings bearing Court Register No. TAL-2023-04206 and appears to be doing so on an exclusively conservatory basis in the context of this case[373].

386.    The arguments developed in the declaratory action in relation to the lack of legal capacity and standing on the part of LEXINGTON are repeated here, in that LEXINGTON is not a creditor of BLUE SKYE LUX and that it clearly no longer appears to hold the Class B TPECs and to be in that capacity a creditor of LIC 159[374]. As a result, LEXINGTON's claims should be declared inadmissible, as it was unable to establish its legal capacity and standing in bringing the action.

387.    In the alternative, to the extent that the claims made by PROJECT REDBLACK and ROSSONERI SPORT are not declared inadmissible[375], it should be remembered that through conservatory intervention, the third party *"intervenes on a conservatory basis, to preserve* its *interests, by joining the party to which its interests are linked. It takes up the cause of that party and supports it in its arguments, but without anyone soliciting an advantage*[376]*"* (emphasis added).

388.    However, while LEXINGTON initially takes up the cause of PROJECT REDBLACK and ROSSONERI SPORT by seeking the condemnation of Mr CERCHIONE, Mr D'AVANZO and Mr CASLINI[377], it states in the very same sentence that it does so only insofar as this does not affect the personal assets of BLUE SKYE LUX and LIC 159.[378].

389.    It should nonetheless be remembered that the purpose of the operative part of the writ of summons of 2 March 2023 is to seek orders against Mr CERCHIONE, Mr D'AVANZO and Mr CASLINI jointly and severally, or *in solidum*, with BLUE SKYE LUX and LIC 159. It must therefore be noted that LEXINGTON's conduct here is identical to that which it adopted in the action for fraud[379], in that it purports to act in support of the interests of PROJECT REDBLACK and ROSSONERI SPORT when this also suits its interests, and opposes the claims of these two entities when they run counter to its interests and place it at a disadvantage. Consequently, the present voluntary intervention by LEXINGTON in Court Register No. TAL-2023-04206 must be declared inadmissible, since LEXINGTON remains in default of taking up the cause of the parties to whom it is linking its interests, namely PROJECT REBLACK and ROSSONERI, and, by the same token, is seeking and pursuing, without even concealing it, a personal advantage.

390.    In the event that Your Court were to reclassify the present protective intervention as an active intervention - *quod non* - LEXINGTON's voluntary intervention in the proceedings would in any event have to be declared inadmissible by way of an active intervention. Even if the intervening third party can assert its own rights, it remains obliged to take up the defence of the principal respondent, which LEXINGTON remains in default of doing in its application for voluntary intervention of 9 February 2023, since it serves its interests alone.

---

[373]    Application for voluntary intervention of 9 February 2023, No. 54, p. 25.
[374]    See above, paragraph 125.
[375]    See above, paragraph No. 268.
[376]    Court Register, 7 May 2008, No. 31679; T. HOSCHEIT, *op. cit.*, No. 1139, p. 641.
[377]    Application for voluntary intervention of 9 February 2023, No. 56, pgs. 26.
[378]    Application for voluntary intervention of 9 February 2023, No. 56, p. 26.
[379]    See above, paragraph No. 131 et seq.

391. LEXINGTION's application for voluntary intervention should therefore be declared as inadmissible.

### IV.    TAL-2023-03720: Action for annulment brought by Mr CASLINI

392. By order of the District Court of Luxembourg of 20 December 2023, proceedings number TAL-2023-03720 were joined to proceedings numbered TAL-2022-07355, TAL-2022-07361 and TAL-2023-04206.

393. As the parties 1) to 4), for whom MOLITOR Avocats à la Cour SARL is constituted, are not parties in this Court Register, they are not required to make submissions.

### FOR THESE REASONS

and all others to be substituted in the course of the proceedings, and subject to the express and formal reservation of the right to increase, amend or remove these pleadings in the course of the proceedings, MOLITOR, on behalf of its parties, requests,

### MAY IT PLEASE THE COURT TO

### more specifically, the pre-trial judge in charge of the case, pursuant to Articles 206 and 212 of the NCPC,

**find** that Mr CERCHIONE and Mr D'AVANZO have raised, *in limine litis*, the nullity for obscure wording of the writ of summons of 2 March 2023 in the proceedings bearing Court Register No. TAL-2023-04206,

**order** the joinder of the summons for compulsory intervention directed against AC MILAN and ACM BIDCO in declaration of joint judgement of 26 June 2025 bearing Court Register No. TAL-2025-07764 with the main writ introduced by bailiff's writ of 10 June 2022, along with Court Registers No. TAL-2022-07361, TAL-2023-03720 and TAL-2023-04206, the main writ of summons being attached thereto,

**rule** in accordance with the operative part of the aforementioned summons for compulsory intervention of 26 June 2025,

**order** the joinder of the summons for compulsory intervention directed against ACM BIDCO, ELLIOTT ASSOCIATES and ELLIOTT INTERNATIONAL by declaration of joint judgement of 30 June 2025 with the main writ brought by bailiff's writ of 27 June 2022, along with Court Registers No. TAL-2022-07355, TAL-2023-03720 and TAL-2023-04206, the main writ being attached thereto,

**rule** in accordance with the operative part of the aforementioned summons for compulsory intervention of 30 June 2025,

**pronounce** the inadmissibility of LEXINGTON's application for voluntary intervention of 9 February 2024;

otherwise, **join** LEXINGTON to disclose a certificate from its statutory auditor as to its holding of the Class E-1 TPECS, or else the report produced by its statutory auditor relating to the valuation of the Class E-1 TPECS, based on Article 60 of the NCPC,

**find** that BLUE SKYE LUX and LIC 159 expressly reserve the right to request the production of any other document in compliance with the conditions of Article 60 of the NCPC;

**TAL-2022-07355**

**declare** the action of BLUE SKYE LUX and LIC 159 admissible,

**dismiss** all the pleas and objections raised by the Respondents,

**TAL-2022-07361**

**reject** the claims made by Respondents 1) to 7), 9 ), 10) and 15) seeking the nullity of the writ of 27 June 2022 on the grounds of obscure wording,

**find** that the claims made by Respondents 16) and 17) are moot by reason of the withdrawal of proceedings notified to MILAN ENTERTAINMENT and MILAN REAL ESTATE by lawyer-to-lawyer deed of 22 September 2025 in the proceedings pending under Court Register No. TAL-2022-07361,

**take note** of the pure and simple withdrawal of proceedings by BLUE SKYE LUX and LIC 159 notified to MILAN ENTERTAINMENT and MILAN REAL ESTATE by lawyer-to-lawyer deed of 22 September 2025 in the proceedings pending under Court Register No. TAL-2022-07361, it being specified that said withdrawals of proceedings relate strictly to the claims brought by BLUE SKYE LUX and LIC 159 against MILAN ENTERTAINMENT and MILAN REAL ESTATE under the aforementioned writ of the bailiff Guy ENGEL of 27 June 2022,

**TAL-2023-04206**

**pronounce** the nullity of the writ of 2 March 2023 for obscure wording based on Articles 264 and 154 of the NCPC,

otherwise **order** the nullity of the writ of summons of 2 March 2023 for breach of the adversarial principle guaranteed by article 63 of the NCPC and Article 6 paragraph 1 of the Convention for the Protection of Human Rights and Fundamental Freedoms,

**or, alternatively, MAY IT**

**PLEASE THE COURT TO**

**find** that Mr CERCHIONE and Mr D'AVANZO have raised, *in limine litis*, the nullity for obscure wording of the writ of summons of 2 March 2023 in the proceedings bearing Court Register No. TAL-2023-04206,

**order** the joinder of the summons for compulsory intervention directed against AC MILAN and ACM BIDCO in declaration of joint judgement of 26 June 2025 bearing Court Register No. TAL-2025-07764 with the main writ introduced by bailiff's writ of 10 June 2022, along with Court Registers No. TAL-2022-07361, TAL-2023-03720 and TAL-2023-04206, the main writ of summons being attached thereto,

**rule** in accordance with the operative part of the aforementioned summons for compulsory intervention of 26 June 2025,

**order** the joinder of the summons for compulsory intervention directed against ACM BIDCO, ELLIOTT ASSOCIATES and ELLIOTT INTERNATIONAL by declaration of joint judgement of 30 June 2025 with the main writ brought by bailiff's writ of 27 June 2022, along with Court Registers No. TAL-2022-07355, TAL-2023-03720 and TAL-2023-04206, the main writ being attached thereto,

**rule** in accordance with the operative part of the aforementioned summons for compulsory intervention of 30 June 2025,

**find** that these submissions of BLUE SKYE LUX, LIC 159, Mr CERCHIONE and Mr D'AVANZO are limited to the plea of obscure wording, the pleas of inadmissibility and the applicable law;

**pronounce** the inadmissibility of LEXINGTON's application for voluntary intervention of 9 February 2024;

otherwise, **join** LEXINGTON to disclose a certificate from its statutory auditor as to its holding of the Class E-1 TPECS, or else the report produced by its statutory auditor relating to the valuation of the Class E-1 TPECS, based on Article 60 of the NCPC,

**find** that BLUE SKYE LUX and LIC 159 expressly reserve the right to request the production of any other document in compliance with the conditions of Article 60 of the NCPC;

**on the merits, reserve** to BLUE SKYE LUX, LIC 159, Mr CERCHIONE and Mr D'AVANZO the right to make further submissions to develop more fully any other pleas to be made;

**TAL-2022-07355**

**find** that the Respondents in the proceedings bearing Court Register No. TAL-2022-07355 are Respondents 1), 2), 8) to 12), 14) and 18).

**find** that only Respondents 9) to 12) and 14) have so far issued submissions in the proceedings bearing Court Register No. TAL-2022-07355,

accordingly **find** that these present submissions are limited to the alleged pleas of inadmissibility of the writ of 10 June 2022 raised by Respondents 9) to 12) and 14),

and reserve the opportunity for BLUE SKYE and LIC 159 to make further submissions in subsequent submissions, in particular on the merits of the case,

**reject** the requests made by Respondents 9) to 12) seeking inadmissibility of the claims directed against them by BLUE SKYE LUX and LIC 159,

**reject** the requests made by Respondent 14) seeking his exoneration and the inadmissibility of the claims directed against him by BLUE SKYE LUX and LIC 159,

**reserve,** for the judgment to be made on the merits, all claims of respondents 9) to 12) and 14), requesting that BLUE SKYE LUX and LIC 159 be ordered to pay procedural damages on the basis of Article 240 of the NCPC, formulated by the respondents, **in the alternative, dismiss them,**

**reserve,** for the judgment to be made on the merits, Alfredo CRACA's request that BLUE SKYE LUX and LIC 159 be ordered to pay his legal fees on the basis of Article 1382 of the Civil Code, **in the alternative, dismiss them,**

**dismiss** all of the claims of Respondents 9) to 12), 14) and 19), requesting that BLUE SKYE LUX and LIC 159 be ordered to pay the costs and expenses of the proceedings,

**reserve,** for the judgment to be made on the merits, all claims made by BLUE SKYE LUX and LIC 19 against Daniela ITALIA and Jean-Marc MCLEAN to jointly and severally, otherwise *in solidum*, otherwise each for the whole, pay BLUE SKYE LUX and LIC 159, each taken individually, a procedural indemnity based on Article 240 of the New Code of Civil Procedure valued at EUR 40,000,

otherwise **condemn** Daniela ITALIA and Jean-Marc MCLEAN to jointly and severally, otherwise *in solidum*, otherwise each for the whole, pay BLUE SKYE LUX and LIC 159, each taken individually, a procedural indemnity based on Article 240 of the New Code of Civil Procedure valued at EUR 40,000,

**reserve**, for the judgment to be made on the merits, all claims made by BLUE SKYE LUX and LIC 19 against Daniela ITALIA and Jean-Marc MCLEAN, to jointly and severally, otherwise *in solidum*, otherwise each for the whole, pay BLUE SKYE LUX and LIC 159, each taken individually, the sum of EUR 50,000 for legal costs and fees incurred by them on the basis of Articles 1382 or 1383 of the Civil Code,

**condemn** Daniela ITALIA and Jean-Marc MCLEAN to jointly and severally, otherwise *in solidum*, otherwise each for the whole, pay BLUE SKYE LUX and LIC 159, each taken individually, the sum of EUR 50,000 for legal costs and fees incurred by them on the basis of Articles 1382 or 1383 of the Civil Code,

**order** Daniela ITALIA and Jean-Marc MCLEAN to pay the costs and expenses of the proceedings,

in any event, **pronounce** the admissibility of the claims made by BLUE SKYE LUX and LIC 159 and allow them to conclude on the merits,

**reserve** to BLUE SKYE LUX and LIC 159 the right to increase their claims during the course of the proceedings,

**reserve** to BLUE SKYE LUX and LIC 159 all other rights, pleas and actions to be asserted at the appropriate times and places and as may be appropriate,

<u>**TAL-2022-07361**</u>

**take note** of the pure and simple withdrawal of proceedings by BLUE SKYE LUX and LIC 159, notified to MILAN ENTERTAINMENT and MILAN REAL ESTATE by lawyer-to-lawyer deed of 22 September 2025 in the proceedings pending under Court Register No. TAL-2022-07361, it being specified that said withdrawals of proceedings relate strictly to the claims brought by BLUE SKYE LUX and LIC 159 against

MILAN ENTERTAINMENT and MILAN REAL ESTATE under the writ of summons issued by bailiff Guy ENGEL on 27 June 2022,

**reject** the claims made by Respondents 1) to 7), 9), 10) and 15) seeking the nullity of the writ of summons of 27 June 2022 on the grounds of obscure wording,

**find** that the claims made by Respondents 16) and 17) are moot by reason of the withdrawal of proceedings notified to MILAN ENTERTAINMENT and MILAN REAL ESTATE by lawyer-to-lawyer deed of 22 September 2025 in the proceedings pending under Court Register No. TAL-2022-07361,

**reject** the requests made by Respondents 11) to 13) seeking inadmissibility of the claims directed against them by BLUE SKYE LUX and LIC 159,

r**eject** the requests made by Alfredo CRACA and FOOTBALLCO seeking their exoneration and the inadmissibility of the claims directed against them by BLUE SKYE LUX and LIC 159,

**reject** the requests made by Respondents 11) to 13) seeking the applicability of New York law to the dispute, and **declare** Luxembourg law applicable to the SPA,

**reject** the counterclaims made by PROJECT REDBLACK and ROSSONERI SPORT against BLUE SKYE LUX and LIC 159,

**reject** the counterclaim made by GENIO, KING GEORGE and ELLIOTT UK, seeking an order for BLUE SKYE LUX and LIC 159 to pay compensation for abusive and vexatious proceedings,

**reserve** all of the respondents' requests that BLUE SKYE LUX and LIC 159 be ordered to pay procedural damages on the basis of Article 240 of the NCPC, formulated by the respondents, for the judgment to be made on the merits, **in the alternative, dismiss them**,

**reserve** the request by Alfredo CRACA and AC MILAN that BLUE SKYE LUX and LIC 159 be ordered to pay their legal fees on the basis of Article 1382 of the Civil Code, for the judgment to be made on the merits, **in the alternative, dismiss it**,

d**ismiss** all of the Respondents' requests that BLUE SKYE LUX and LIC 159 be ordered to pay the costs and expenses of the proceedings,

r**eserve,** for the judgment to be made on the merits, the claims made by BLUE SKYE LUX and LIC 159 against Respondents 1 to 7) and 9) to 13) to jointly and severally, otherwise *in solidum*, otherwise for the whole, pay procedural damages pursuant to Article 240 of the NCPC, for both BLUE SKYE LUX and LIC 159, taken individually, assessed at EUR 100,000, for the sums incurred by them and not included in the costs, whereas it would be unfair to leave them to bear their own costs,

otherwise **condemn** Respondents 1 to 7) and 9 ) to 13) to jointly and severally, otherwise *in solidum*, otherwise each for the whole, pay a procedural indemnity pursuant to Article 240 of the NCPC, for both BLUE SKYE LUX and LIC 159, taken individually, assessed at EUR 100,000, for the sums they have incurred and not included in the costs, whereas it would be unfair to leave them to bear their own costs,

**reserve,** for the judgment to be made on the merits, the claims made by BLUE SKYE LUX and LIC 159 **against** Respondents 1 to 7) and 9 ) to 13) to jointly and severally, otherwise *in solidum*, otherwise for the whole, to pay BLUE SKYE LUX and LIC 159, each taken individually, the sum of EUR 100,000 euros for legal costs and fees incurred by them on the basis of Articles 1382 or 1383 of the Civil Code,

otherwise **condemn** Respondents 1 to 7) and 9 ) to 13) to jointly and severally, otherwise *in solidum*, otherwise each for the whole, pay to BLUE SKYE LUX and LIC 159, each taken individually, the sum of EUR 100,000 for legal costs and fees incurred by them on the basis of Articles 1382 or 1383 of the Civil Code,

**condemn** Respondents 1 to 7) and 9 ) to 13) to costs and expenses of the proceedings,

**reserve** to BLUE SKYE LUX and LIC 159 the right to increase their claims during the course of the proceedings,

**reserve** to BLUE SKYE LUX and LIC 159 all other rights, pleas and actions to be asserted at the appropriate times and places and as may be appropriate,

**on the merits, reserve** to BLUE SKYE LUX, LIC 159, Mr CERCHIONE and Mr D'AVANZO the right to make further submissions to develop more fully any other pleas to be made, and in particular the right of the first two to reassess the amount of the loss they have suffered ;

**TAL-2023-04206**

**pronounce** *in limine litis* the nullity of the writ of summons of 2 March 2023 for obscure wording on the basis of articles 264 and 154 of the NCPC,

otherwise **order** the nullity of the claims made Mr CERCHIONE and Mr D'AVANZO for breach of the adversarial principle guaranteed by article 63 of the NCPC and article 6 paragraph 1 of the Convention for the Protection of Human Rights and Fundamental Freedoms,

otherwise **reject** the claims made by PROJECT REDBLACK and ROSSONERI SPORT against Mr CERCHIONE and Mr D'AVANZO as inadmissible,

**reserve,** for the judgment to be made on the merits, the requests of the respondents, formulated by PROJECT REDBLACK and ROSSONERI SPORT that Salvatore CERCHIONE and Gianluca D'AVANZO be ordered to pay a procedural indemnity on the basis of Article 240 of the NCPC formulated by the respondents, **in the alternative, dismiss them,**

**reject** the respondents' requests, made by PROJECT REDBLACK and ROSSONERI SPORT, that Salvatore CERCHIONE and Gianluca D'AVANZO be ordered to pay the costs and expenses of the proceedings,

reserve, for the judgment to be given on the merits, the claims made by Salvatore CERCHIONE and Gianluca D'AVANZO against PROJECT REDBLACK and ROSSONERI SPORT, to jointly and severally, otherwise *in solidum*, otherwise each for its share, pay compensation for abusive and vexatious proceedings assessed *ex aequo et bono* at EUR 80.000, or any other even higher amount arbitrated by Your Court or by expert opinion, under Article 6-1 of the Civil Code,

otherwise **condemn** PROJECT REDBLACK and ROSSONERI SPORT to jointly and severally, otherwise *in solidum*, otherwise each for its share, pay compensation for abusive and vexatious proceedings assessed *ex aequo et bono* at EUR 80,000 euros, or any other even higher amount arbitrated by Your Court or by expert opinion, under Article 6-1 of the Civil Code,

reserve, for the judgment to be made on the merits, the claims made by Salvatore CERCHIONE and Gianluca D'AVANZO against PROJECT REDBLACK and ROSSONERI SPORT, to jointly and severally, otherwise *in solidum*, otherwise each for the whole, pay to BLUE SKYE LUX and LIC 159, each taken individually, the sum of EUR 100.000 for legal costs and fees incurred by them on the basis of Articles 1382 or 1383 of the Civil Code,

otherwise **condemn** PROJECT REDBLACK and ROSSONERI SPORT to jointly and severally, otherwise *in solidum*, otherwise each for the whole, pay BLUE SKYE LUX and LIC 159, each taken individually, the sum of EUR 100,000 for legal costs and fees incurred by them on the basis of Articles 1382 or 1383 of the Civil Code,

reserve, for the judgment to be made on the merits the claims formulated by BLUE SKYE LUX and LIC 159 against PROJECT REDBLACK and ROSSONERI SPORT jointly and severally, otherwise *in solidum*, otherwise each for the whole, to pay a procedural indemnity pursuant to Article 240 of the NCPC BLUE SKYE LUX and LIC 159, taken individually, valued at 100.000 in respect of the sums incurred by them and not included in the costs, whereas it would be unfair to leave them to bear their own costs,

otherwise **condemn** PROJECT REDBLACK and ROSSONERISPORT jointly and severally, otherwise *in solidum*, otherwise each for the whole, to pay a procedural indemnity pursuant to Article 240 of the NCPC BLUE SKYE LUX and LIC 159, taken individually, assessed at 100,000 euros in respect of the sums incurred by them and not included in the costs whereas it would be unfair to leave them to bear their own costs,

**order** PROJECT REDBLACK and ROSSONERI SPORT to pay the costs and expenses of the proceedings,

**reserve** to Salvatore CERCHIONE and Gianluca D'AVANZO the right to increase their claims during the course of the proceedings,

**reserve** to Salvatore CERCHIONE and Gianluca D'AVANZO all other rights, pleas and actions to be asserted at the appropriate times and places and as may be appropriate,

**TAL-2023-03720**

record that the parties represented by MOLITOR are not parties to these proceedings

**112 / 122**

The foregoing submissions, served in copy and by email, without prejudice a BONN & SCHMITT, Maître Cedric BELLWALD; to C.A.S., Maître Emmanuelle PRISER; to ELVINGER HOSS PRUSSEN, Maître Marc ELVINGER; to CLIFFORD CHANCE, Maître Albert MORO; to Christmann. legal SAS, Maître Bertrand CHRISTMANN; Maître Nicolas THIELTGEN et to CMS DeBacker Luxembourg, Maître Antoine LANIEZ

For the original copy
[signature]

For MOLITOR Avocats à la Cour SARL
Signed: Armel WAISSE

Give notice to the parties represented by the company MOLITOR that they are providing the following documents in support herein:

**TAL-2022-07355**

**Folder** I:

1. Extract from the RCS (Luxembourg Trade and Companies Register, Registre de Commerce et des Sociétés) for Project Redblack

2. Project REDBLACK Articles of Association

3. Extract from the RCS for Rossoneri Sport

4. Redblack Group Organisational Chart

5. Acquisition Facility Agreement between Rossoneri Sport and Project Redblack of 13 April 2017

6. Pledge Agreement of 13 April 2017

7. Supplemental Pledge Agreement of 31 July 2017

8. Master Agreement on Tracking Preferred Equity Certificates signed on 10 April 2017

9. Table summarising the TPECs and associated loans for Project Redblack

10. Summary of Project Redblack's financing to Rossoneri Sport

11. AC Milan press release of 1 June 2022

12. Writ of summons for interim relief served on 1 June 2022

13. Letter of 27 April 2022 from Project Redblack (not submitted to the Management Board)

14. Letter of 2 June 2022 from Rossoneri Sport

15. Letter of 25 April 2022 from DLA Piper

16. Letter from CAS of 2 May 2022 and letter from DLA Piper of 2 May 2022

17. Letter from Befana Bagnes of 6 May 2022

**Folder** II:

18. Writ of summons on the merits served by Mr CASLINI on 22 June 2022

19. Press article published in L'Equipe on 10 May 2022

20. Press articles mentioning Elliott as having negotiated the sale of AC Milan shares

21. Action on the merits, brought by the Claimants, of 10 June 2022.

22. Press article published in L'Equipe on 17 June 2022

23.   Press article published in L'Equipe on Friday 15 April 2022

24.   Elliot press release of 1 June 2022 ("*Elliot's letter of gratitude to AC Milan*")

25.   Exchange of emails between Gordon Singer and Salvatore CERCHIONE of 19 April 2022

26.   Email from Salvatore CERCHIONE to Gordon SINGER of 23 April 2022

27.   Email from Salvatore CERCHIONE to Gordon SINGER of 05 May 2022

28.   Letter from Giovanni CASLINI of 10 June 2022

29.   Email from Elliott Advisors to the managers of Blue Skye of 23 March 2017

30.   *Amended and Restated Investment Agreement* of 31 October 2018.

31.   Extract from Elliott Management's website of 22 June 2022

32.   Notice filed with the Luxembourg Trade and Companies Register on 8 November 2024 concerning the new members of LIC 159.

33.   Letter of 24 April 2017 sent to the notary by PROJECT REDBLACK concerning the appointment of Mr CRACA

34.   Notice filed with the Luxembourg Trade and Companies Register on 12 July 2018 relating to the realisation of the pledge

35.   Extension of the Italian pledge and translation of this document into French

36.   Amended and restated Master Terms and Conditions as at 31 October 2018

37.   Investors Agreement of 10 April 2017, as amended and recast on 31 October 2018

38.   Transfer Agreement of 10 May 2017 between BLUE SKYE LUX and BLUE SKYE CAYMANS

39.   Transfer Agreement of 20 April 2022 between BLUE SKYE CAYMANS and BLUE SKYE LUX

40.   Letter of 10 July 2024 from PROJECT REDBLACK to BLUE SKYE LUX and BLUE SKYE CAYMANS

41.   Registered letter with acknowledgement of receipt from BLUE SKYE LUX and LIC 159 to Project Redblack of 21 May 2024 concerning the amendment to the register of class A-2 TPECs

42.   Class E-1 TPEC Contribution and Subscription Agreement dated 6 April 2017 between LEXINGTON as subscriber and BLUE SKYE LUX as issuer.

43.   General Terms and Conditions for class E TPECs up to EUR 12,000,000

44.   Emails from Mr D'AVANZO and Mr Lawrence CUTLER, ARENA L.P. employees, of 1 April 2017

45.   Contribution Agreement dated 8 May 2017.

46.   Proof of payment of the Class B TPECs subscription price from LIC 159's bank account

47.   LIC 159 financial statements for the years 2017 to 2023

48.   WhatsApp messages between Mr Gordon SINGER and Mr CERCHIONE from 30 March 2022

49.   WhatsApp messages from Mr CERCHIONE to Mr Gordon SINGER from 15 April 2022

50.   Extracts from the stock purchase agreement

51.   Non-confidential part of WhatsApp exchanges between Mr Gordon SINGER and Mr CERCHIONE between 11 and 15 May 2022

52.   Article from *Corriere della Sera* on 12 March 2024 and machine translation into French of this article

53.   Article from the *Financial Times* of 12 March 2024

54.   Article from *Corriere della Sera* on 14 March 2024 and machine translation into French of this article

55.   Transcript of 17 May 2023

56.   Protective Order of 4 August 2023

57. Writ of summons of 27 June 2022

58. Minutes of the PROJECT REDBLACK management board meeting of 9 September 2022

59. Search and seizure order from the District Court of Luxembourg from 12 April 2023

60. Search report of 21 April 2023

61. Biography of Mr Giorgio FURLANI

62. Application to open judicial liquidation proceedings of 6 March 2023

63. Decision of the Court of Milan (Civil Section) of 9 November 2023, No. 270-2023

64. Letter of 1 February 2023 from PROJECT REDBLACK to BLUE SKYE CAYMANS and BLUE SKYE LUX

65. Minutes of the PROJECT REDBLACK management board meeting of 2 March 2023

66. Copy of press release published on 20 December 2024 on the AC MILAN website

67. Article from *Sempre Milan* of 23 December 2024

68. Published annual accounts of PROJECT REDBLACK for the year ending 30 June 2023

69. Copy of the writ of summons for interim relief of 31 October 2023

70. Copy of the application to intervene of 4 April 2024

71. Letter of 10 January 2025 from BLUE SKYE LUX and LIC 159 to LEXINGTON

72. Oregon Supreme Court decision of 29 November 1996

73. Email from Mr D'AVANZO sent on 24 March 2017 at 2:34 p.m. to Misha RENDA.

74. Financial statements of LEXINGTON for the financial year ending 31 December 2021

75. Financial statements of LEXINGTON for the financial year ending 31 December 2022

76. Letter of 15 November 2024 from PROJECT REDBLACK to BLUE SKYE LUX and LIC 159

77. Letter of 13 December 2024 from PROJECT REDBLACK to BLUE SKYE LUX and LIC 159

78. Letter of 15 December 2024 from BLUE SKYE LUX and LIC 159 to PROJECT REDBLACK

79. Letter of 14 January 2025 from PROJECT REDBLACK to BLUE SKYE LUX and LIC 159

80. Letter of 5 February 2025 from BLUE SKYE LUX and LIC 159 to PROJECT REDBLACK

81. Letter of 10 December 2024 from BLUE SKYE LUX and LIC 159 to PROJECT REDBLACK

82. Example of a TPECs Class B Assignment Agreement, accompanied by the subscription letter for the Class B TPECs dated that same day and proof of payment of the subscription price by LIC 159 to PROJECT REDBLACK.

83. Power of attorney attesting to the mandate given to Blue Skye Lux by LIC 159 and informal translation into French

84. Extract from Project Redblack's Statement of Defence (*Memoria Difensiva*) of 17 May 2023.

85. Direct quote from 7 September 2023

86. Judgment of 30 May 2024 rendered by the District Court of Luxembourg, ruling on criminal matters

87. Notices of registration as an aggrieved party issued on 14 February 2023, 19 April 2024 and 20 March 2025 by the Italian Public Prosecutor's Office and sworn translations into French of these documents

88. Declaration of 12 July 2024 by Maître Roberto ZINGARI, member of the Milan Bar, concerning the notices of registration as an aggrieved party issued by the Italian Public Prosecutor's Office

89. Published financial statements of ROSSONERI SPORT for the year ending 30 June 2023

90. Published financial statements of ROSSONERI SPORT for the year ending 30 June 2024

91. Published annual accounts of PROJECT REDBLACK for the year ending 30 June 2024

92. Order of the Vice-President of the District Court of Luxembourg of 26 May 2025

**Folder III:**

**93.**   Rectified order of the Vice-President of the District Court of Luxembourg of 14 July 2025

**94.**   Summons for compulsory intervention of 26 June

**95.**   Summons for compulsory intervention of 30 June 2025

**96.**   Copy of the invoice of 15 July 2022 from Maître Raphaël COLLIN

**97.**   Search report issued by the Cayman Islands General Registry concerning SHEVA INVESTMENTS LIMITED

**98.**   Withdrawal of proceedings of 22 September 2025

**99.**   Press release from FIVERS

**100.**  Screenshot of the FIVERS web page concerning Mr CRACA

**101.**  Proof of payment to FIVELEX STUDIO E LEGALE TRIBUTARIO on 1 September 2022


## TAL-2022-07361

**Folder I:**

**1.**    Extract from the RCS for Project Redblack

**2.**    Project REDBLACK Articles of Association

**3.**    Extract from the RCS for Rossoneri Sport

**4.**    Redblack Group Organisational Chart

**5.**    Acquisition Facility Agreement between Rossoneri Sport and Project Redblack of 13 April 2017

**6.**    Pledge Agreement of 13 April 2017

**7.**    Supplemental Pledge Agreement of 31 July 2017

**8.**    Master Agreement on Tracking Preferred Equity Certificates signed on 10 April 2017

**9.**    Table summarising the TPECs and associated loans for Project Redblack

**10.**   Summary of Project Redblack's financing to Rossoneri Sport

**11.**   AC Milan press release of 1 June 2022

**12.**   Writ of summons for interim relief served on 1 June 2022

**13.**   Writ of summons for interim relief served by Mr Giovanni CASLINI on 22 June 2022;

**14.**   Press article published in L'Equipe on Tuesday 10 May 2022;

**15.**   Press articles mentioning ELLIOTT as having negotiated the sale of AC MILAN shares;

**16.**   Letter of 27 April 2022 from Project Redblack (not submitted to the management board);

**17.**   Letter of 2 June 2022 from Rossoneri Sport;

**18.**   Letter of 25 April 2022 from DLA Piper;

**19.**   Letter from CAS of 2 May 2022 and letter from DLA Piper of 2 May 2022;

**20.**   Letter from Befana Bagnes of 6 May 2022;

**21.**   Action on the merits brought by the Claimants on 10 June 2022;

**22.**   Press article published in L'Equipe on 17 June 2022

**23.**   Press article published in L'Equipe on Friday, 15 April 2022;

**24.**   Elliot press release of 1 June 2022 ("Elliot's letter of gratitude to AC Milan")

**25.**   Email exchange between Gordon SINGER and Salvatore CERCHIONE of 19 April 2022;

**26.**   Email from Salvatore CERCHIONE to Gordon SINGER of 23 April 2022;

**27.**   Email from Salvatore CERCHIONE to Gordon SINGER of 05 May 2022;

**28.**   Letter from Giovanni CASLINI of 10 June 2022;

**29.**   Email from Elliott Advisors to the managers of Blue Skye of 23 March 2017;

**30.**   Amended and Restated Investment Agreement of 31 October 2018;

**31.**   Extract from Elliott Management's website of 22 June 2022;


**Folder II:**

**32.**   Notice filed with the Luxembourg Trade and Companies Register on 8 November 2024 concerning the new members of LIC 159.

**33.**   Letter of 24 April 2017 sent to the notary by PROJECT REDBLACK concerning the appointment of Mr CRACA

**34.**   Notice filed with the Luxembourg Trade and Companies Register on 12 July 2018 relating to the realisation of the pledge

**35.**   Extension of the Italian pledge and translation of this document into French

**36.**   Amended and restated Master Terms and Conditions as at 31 October 2018

**37.**   Investors Agreement of 10 April 2017, as amended and recast on 31 October 2018

**38.**   Transfer Agreement of 10 May 2017 between BLUE SKYE LUX and BLUE SKYE CAYMANS

**39.**   Transfer Agreement of 20 April 2022 between BLUE SKYE CAYMANS and BLUE SKYE LUX

**40.**   Letter of 10 July 2024 from PROJECT REDBLACK to BLUE SKYE LUX and BLUE SKYE CAYMANS

**41.**   Registered letter with acknowledgement of receipt from BLUE SKYE LUX and LIC 159 to Project Redblack of 21 May 2024 concerning the amendment to the register of class A-2 TPECs

**42.**   Class E-1 TPEC Contribution and Subscription Agreement dated 6 April 2017 between LEXINGTON as subscriber and BLUE SKYE LUX as issuer.

**43.**   General Terms and Conditions for class E TPECs up to EUR 12,000,000

**44.**   Emails from Mr D'AVANZO and Mr Lawrence CUTLER, ARENA L.P. employees, of 1 April 2017

**45.**   Contribution Agreement dated 8 May 2017.

**46.**   Proof of payment of the Class B TPECs subscription price from LIC 159's bank account

**47.**   LIC 159 financial statements for the years 2017 to 2023

**48.**   WhatsApp messages between Mr Gordon SINGER and Mr CERCHIONE from 30 March 2022

**49.**   WhatsApp messages from Mr CERCHIONE to Mr Gordon SINGER from 15 April 2022

**50.**   Extracts from the stock purchase agreement

**51.**   Non-confidential part of WhatsApp exchanges between Mr Gordon SINGER and Mr CERCHIONE between 11 and 15 May 2022

**52.**   Article from *Corriere della Sera* on 12 March 2024 and machine translation into French of this article

**53.**   Article from the *Financial Times* of 12 March 2024

**54.**   Article from *Corriere della Sera* on 14 March 2024 and machine translation into French of this article

**55.**   Transcript of 17 May 2023

**56.**   Protective Order of 4 August 2023

**57.**   Writ of summons of 27 June 2022

**58.**   Minutes of the PROJECT REDBLACK management board meeting of 9 September 2022

**59.**   Search and seizure order from the District Court of Luxembourg from 12 April 2023

**60.**    Search report of 21 April 2023

**61.**    Biography of Mr Giorgio FURLANI

**62.**    Application to open judicial liquidation proceedings of 6 March 2023

**63.**    Decision of the Court of Milan (Civil Section) of 9 November 2023, No. 270-2023

**64.**    Letter of 1 February 2023 from PROJECT REDBLACK to BLUE SKYE CAYMANS and BLUE SKYE LUX

**65.**    Minutes of the PROJECT REDBLACK management board meeting of 2 March 2023

**66.**    Copy of press release published on 20 December 2024 on the AC MILAN website

**67.**    Article from *Sempre Milan* of 23 December 2024

**68.**    Published annual accounts of PROJECT REDBLACK for the year ending 30 June 2023

**69.**    Copy of the writ of summons for interim relief of 31 October 2023

**70.**    Copy of the application to intervene of 4 April 2024

**71.**    Letter of 10 January 2025 from BLUE SKYE LUX and LIC 159 to LEXINGTON

**72.**    Oregon Supreme Court decision of 29 November 1996

**73.**    Email from Mr D'AVANZO sent on 24 March 2017 at 2:34 p.m. to Misha RENDA.

**74.**    Financial statements of LEXINGTON for the financial year ending 31 December 2021

**75.**    Financial statements of LEXINGTON for the financial year ending 31 December 2022

**76.**    Letter of 15 November 2024 from PROJECT REDBLACK to BLUE SKYE LUX and LIC 159

**77.**    Letter of 13 December 2024 from PROJECT REDBLACK to BLUE SKYE LUX and LIC 159

**78.**    Letter of 15 December 2024 from BLUE SKYE LUX and LIC 159 to PROJECT REDBLACK

**79.**    Letter of 14 January 2025 from PROJECT REDBLACK to BLUE SKYE LUX and LIC 159

**80.**    Letter of 05 February 2025 from BLUE SKYE LUX and LIC 159 to PROJECT REDBLACK

**81.**    Letter of 10 December 2024 from BLUE SKYE LUX and LIC 159 to PROJECT REDBLACK

**82.**    Example of a TPECs Class B Assignment Agreement, accompanied by the subscription letter for the Class B TPECs dated that same day and proof of payment of the subscription price by LIC 159 to PROJECT REDBLACK.

**83.**    Power of attorney attesting to the mandate given to Blue Skye Lux by LIC 159 and informal translation into French

**84.**    Extract from Project Redblack's Statement of Defence (*Memoria Difensiva*) of 17 May 2023.

**85.**    Direct quote from 7 September 2023

**86.**    Judgment of 30 May 2024 rendered by the District Court of Luxembourg, ruling on criminal matters

**87.**    Notices of registration as an aggrieved party issued on 14 February 2023, 19 April 2024 and 20 March 2025 by the Italian Public Prosecutor's Office and sworn translations into French of these documents

**88.**    Declaration of 12 July 2024 by Maître Roberto ZINGARI, member of the Milan Bar, concerning the notices of registration as an aggrieved party issued by the Italian Public Prosecutor's Office

**89.**    Published financial statements of ROSSONERI SPORT for the year ending 30 June 2023

**90.**    Published financial statements of ROSSONERI SPORT for the year ending 30 June 2024

**91.**    Published annual accounts of PROJECT REDBLACK for the year ending 30 June 2024

**92.**    Order of the Vice-President of the District Court of Luxembourg of 26 May 2025

**Folder III:**

**93.**    Rectified order of the Vice-President of the District Court of Luxembourg of 14 July 2025

94.    Summons for compulsory intervention of 26 June

95.    Summons for compulsory intervention of 30 June 2025

96.    Copy of the invoice of 15 July 2022 from Maître Raphaël COLLIN

97.    Search report issued by the Cayman Islands General Registry concerning SHEVA INVESTMENTS LIMITED

98.    Withdrawal of proceedings of 22 September 2025

99.    Press release of FIVERS

100.   Screenshot of the FIVERS web page concerning Mr CRACA

101.   Proof of payment to FIVELEX STUDIO E LEGALE TRIBUTARIO on 1 September 2022


## TAL-2023-04206


**Folder I:**

1.    Extract from the RCS for Project Redblack

2.    Project REDBLACK Articles of Association

3.    Extract from the RCS for Rossoneri Sport

4.    Redblack Group Organisational Chart

5.    Acquisition Facility Agreement between Rossoneri Sport and Project Redblack of 13 April 2017

6.    Pledge Agreement of 13 April 2017

7.    Supplemental Pledge Agreement of 31 July 2017

8.    Master Agreement on Tracking Preferred Equity Certificates signed on 10 April 2017

9.    Table summarising the TPECs and associated loans for Project Redblack

10.   Summary of Project Redblack's financing to Rossoneri Sport

11.   AC Milan press release of 1 June 2022

12.   Writ of summons for interim relief served on 1 June 2022

13.   Letter of 27 April 2022 from Project Redblack (not submitted to the management board)

14.   Letter of 2 June 2022 from Rossoneri Sport

15.   Letter of 25 April 2022 from DLA Piper

16.   Letter from CAS of 2 May 2022 and letter from DLA Piper of 2 May 2022

17.   Letter from Befana Bagnès of 6 May 2022


**Folder II:**

18.   Writ of summons on the merits served by Mr CASLINI on 22 June 2022

19.   Press article published in L'Equipe on Tuesday 10 May 2022

20.   Press articles mentioning Elliott as having negotiated the sale of AC Milan shares

21.   Action on the merits brought by the Claimants on 10 June 2022

22.   Press article published in L'Equipe on 17 June 2022

23.   Press article published in L'Equipe on Friday 15 April 2022

24.   Elliot press release of 1 June 2022 ("*Elliot's letter of gratitude to AC Milan*")

25.   Exchange of emails between Gordon Singer and Salvatore CERCHIONE of 19 April 2022

26.   Email from Salvatore CERCHIONE to Gordon SINGER of 23 April 2022

27.   Email from Salvatore CERCHIONE to Gordon SINGER of 05 May 2022

28. Letter from Giovanni CASLINI of 10 June 2022

29. Email from Elliott Advisors to the managers of Blue Skye of 23 March 2017

30. *Amended and Restated Investment Agreement* of 31 October 2018.

31. Extract from Elliott Management's website of 22 June 2022

32. Notice filed with the Luxembourg Trade and Companies Register on 8 November 2024 concerning the new members of LIC 159.

33. Letter of 24 April 2017 sent to the notary by PROJECT REDBLACK concerning the appointment of Mr CRACA

34. Notice filed with the Luxembourg Trade and Companies Register on 12 July 2018 relating to the realisation of the pledge

35. Extension of the Italian pledge and translation of this document into French

36. Amended and restated Master Terms and Conditions as at 31 October 2018

37. Investors Agreement of 10 April 2017, as amended and recast on 31 October 2018

38. Transfer Agreement of 10 May 2017 between BLUE SKYE LUX and BLUE SKYE CAYMANS

39. Transfer Agreement of 20 April 2022 between BLUE SKYE CAYMANS and BLUE SKYE LUX

40. Letter of 10 July 2024 from PROJECT REDBLACK to BLUE SKYE LUX and BLUE SKYE CAYMANS

41. Registered letter with acknowledgement of receipt from BLUE SKYE LUX and LIC 159 to Project Redblack of 21 May 2024 concerning the amendment to the register of class A-2 TPECs

42. Class E-1 TPEC Contribution and Subscription Agreement dated 6 April 2017 between LEXINGTON as subscriber and BLUE SKYE LUX as issuer.

43. General Terms and Conditions for class E TPECs up to EUR 12,000,000

44. Emails from Mr D'AVANZO and Mr Lawrence CUTLER, ARENA L.P. employees, of 1 April 2017

45. Contribution Agreement dated 8 May 2017.

46. Proof of payment of the Class B TPECs subscription price from LIC 159's bank account

47. LIC 159 financial statements for the years 2017 to 2023

48. WhatsApp messages between Mr Gordon SINGER and Mr CERCHIONE from 30 March 2022

49. WhatsApp messages from Mr CERCHIONE to Mr Gordon SINGER from 15 April 2022

50. Extracts from the stock purchase agreement

51. Non-confidential part of WhatsApp exchanges between Mr Gordon SINGER and Mr CERCHIONE between 11 and 15 May 2022

52. Article from *Corriere della Sera* on 12 March 2024 and machine translation into French of this article

53. Article from the *Financial Times* of 12 March 2024

54. Article from *Corriere della Sera* on 14 March 2024 and machine translation into French of this article

55. Transcript of 17 May 2023

56. Protective Order of 4 August 2023

57. Writ of summons of 27 June 2022

58. Minutes of the PROJECT REDBLACK management board meeting of 9 September 2022

59. Search and seizure order from the District Court of Luxembourg from 12 April 2023

60. Search report of 21 April 2023

61. Biography of Mr Giorgio FURLANI

62. Application to open judicial liquidation proceedings of 6 March 2023

63. Decision of the Court of Milan (Civil Section) of 9 November 2023, No. 270-2023

64. Letter of 1 February 2023 from PROJECT REDBLACK to BLUE SKYE CAYMANS and BLUE SKYE LUX

65. Minutes of the PROJECT REDBLACK management board meeting of 2 March 2023

66. Copy of press release published on 20 December 2024 on the AC MILAN website

67. Article from *Sempre Milan* of 23 December 2024

68. Published annual accounts of PROJECT REDBLACK for the year ending 30 June 2023

69. Copy of the writ of summons for interim relief of 31 October 2023

70. Copy of the application to intervene of 4 April 2024

71. Letter of 10 January 2025 from BLUE SKYE LUX and LIC 159 to LEXINGTON

72. Oregon Supreme Court decision of 29 November 1996

73. Email from Mr D'AVANZO sent on 24 March 2017 at 2:34 p.m. to Misha RENDA.

74. Financial statements of LEXINGTON for the financial year ending 31 December 2021

75. Financial statements of LEXINGTON for the financial year ending 31 December 2022

76. Letter of 15 November 2024 from PROJECT REDBLACK to BLUE SKYE LUX and LIC 159

77. Letter of 13 December 2024 from PROJECT REDBLACK to BLUE SKYE LUX and LIC 159

78. Letter of 15 December 2024 from BLUE SKYE LUX and LIC 159 to PROJECT REDBLACK

79. Letter of 14 January 2025 from PROJECT REDBLACK to BLUE SKYE LUX and LIC 159

80. Letter of 05 February 2025 from BLUE SKYE LUX and LIC 159 to PROJECT REDBLACK

81. Letter of 10 December 2024 from BLUE SKYE LUX and LIC 159 to PROJECT REDBLACK

82. Example of a TPECs Class B Assignment Agreement, accompanied by the subscription letter for the Class B TPECs dated that same day and proof of payment of the subscription price by LIC 159 to PROJECT REDBLACK.

83. Power of attorney attesting to the mandate given to Blue Skye Lux by LIC 159 and informal translation into French

84. Extract from Project Redblack's Statement of Defence (*Memoria Difensiva*) of 17 May 2023.

85. Direct quote from 7 September 2023

86. Judgment of 30 May 2024 rendered by the District Court of Luxembourg, ruling on criminal matters

87. Notices of registration as an aggrieved party issued on 14 February 2023, 19 April 2024 and 20 March 2025 by the Italian Public Prosecutor's Office and sworn translations into French of these documents

88. Declaration of 12 July 2024 by Maître Roberto ZINGARI, member of the Milan Bar, concerning the notices of registration as an aggrieved party issued by the Italian Public Prosecutor's Office

89. Published financial statements of ROSSONERI SPORT for the year ending 30 June 2023

90. Published financial statements of ROSSONERI SPORT for the year ending 30 June 2024

91. Published annual accounts of PROJECT REDBLACK for the year ending 30 June 2024

92. Order of the Vice-President of the District Court of Luxembourg of 26 May 2025


**Folder III:**

93. Rectified order of the Vice-President of the District Court of Luxembourg of 14 July 2025

94. Summons for compulsory intervention of 26 June

95. Summons for compulsory intervention of 30 June 2025

**96.**   Copy of the invoice of 15 July 2022 from Maître Raphaël COLLIN

**97.**   Search report issued by the Cayman Islands General Registry concerning SHEVA INVESTMENTS LIMITED

**98.**   Withdrawal of proceedings of 22 September 2025

**99.**   Press release of FIVERS

**100.**  Screenshot of the FIVERS web page concerning Mr CRACA

**101.**  Proof of payment to FIVELEX STUDIO E LEGALE TRIBUTARIO on 1 September 2022

Received on

Signed: Maître